**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| IN RE: | Case No: |
| **ACRON 2 PORSCHE DRIVE MEZZCO LLC,** | **25-61529-LRC** |
| Debtor. | **Chapter 7** |
| **CAI OVERLAND LENDER, LLC,** | |
| Movant, | |
| v. | **CONTESTED MATTER** |
| **ACRON 2 PORSCHE DRIVE MEZZCO LLC and S. GREGORY HAYS as Chapter 7 Trustee,** | |
| Respondents. | |

**NOTICE OF MOTION FOR RELIEF FROM**
**STAY, DEADLINE TO OBJECT, AND HEARING**

CAI Overland Lender, LLC ("**Movant**") has filed its *Motion for Relief from the Automatic Stay* (the "**Motion**") on November 13, 2025. Pursuant to Fifth Amended and Restated General Order No. 24-2018, the Court may consider this matter without further notice or hearing if no party in interest files a response or objection within **fourteen (14) days** from the date of service of this notice. **If you object to the relief requested in this pleading, you must timely file your objection with the Bankruptcy Clerk** at Clerk, U.S. Bankruptcy Court, Suite 1340, 75 Ted Turner Drive, SW, Atlanta Georgia 30303, and serve a copy the movant's attorney, **Ashley Champion, Polsinelli PC, 1201 W. Peachtree St. NW, Suite 1100, Atlanta, GA 30309** and any other appropriate persons by the objection deadline. The response or objection must explain your position and be actually received by the Bankruptcy Clerk within the required time.

A hearing on the Motion has been scheduled for **9:30 a.m. (EST)** on **December 4, 2025** in **Courtroom 1204, United States Courthouse, 75 Ted Turner Drive, SW, Atlanta, Georgia 30303**, which must be attended in person, unless the court orders otherwise.

If an objection or response is timely filed and served, the hearing will proceed as scheduled. **If you do not file a response or objection within the time permitted, the Court may grant the relief requested without further notice and without holding the scheduled hearing** provided that an order approving the relief requested is entered at least one business day prior to the scheduled hearing. If no objection is timely filed, but no order is entered granting the relief requested at least one business day prior to the scheduled hearing, the hearing will be held as scheduled.

107172842.1

**<u>Your rights may be affected</u>**. **You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case. If you do not have an attorney, you may wish to consult one.**

If a hearing on the Motion cannot be held within thirty (30) days, Movant waives the requirement for holding a preliminary hearing within thirty (30) days of filing the Motion and agrees to a hearing on the earliest possible date. Movant consents to the automatic stay remaining in effect until the Court orders otherwise.

Dated: November 13, 2025                    **POLSINELLI PC**

                                            */s/ Ashley D. Champion*
                                            Ashley D. Champion
                                            Georgia Bar No. 423962
                                            1201 W. Peachtree St. NW, Suite #1100
                                            Atlanta, GA 30309
                                            achampion@polsinelli.com

                                            *Counsel for CAI Overland Lender, LLC*

107172842.1

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| IN RE:<br><br>**ACRON 2 PORSCHE DRIVE MEZZCO LLC,**<br><br>Debtor. | Case No:<br><br>**25-61529-LRC**<br><br>Chapter 7 |
| **CAI OVERLAND LENDER, LLC,**<br><br>Movant,<br><br>v.<br><br>**ACRON 2 PORSCHE DRIVE MEZZCO LLC and S. GREGORY HAYS as Chapter 7 Trustee,**<br><br>Respondents. | **CONTESTED MATTER** |

## MOTION FOR RELIEF FROM THE AUTOMATIC STAY

COMES NOW Movant CAI Overland Lender, LLC ("**Lender**"), by and through its undersigned counsel, and hereby files its Motion for Relief from the Automatic Stay (the "**Motion**"). In support of the Motion, Debtor relies upon the *Declaration of Marisa Lizak in Support of Motion for Relief from the Automatic Stay* (the "**Lizak Declaration**"), the *Declaration of Patrick Aramgio in Support of Motion for Relief from the Automatic Stay* (the "**Arangio Declaration**"), and the *Declaration of Michael I. Gottfried in Support of Motion for Relief from the Automatic Stay* (the "**Gottfried Declaration**"), each filed contemporaneously herewith. In further support of the Motion, Lender states the following:

107172842.1

## Preliminary Statement

Acron 2 Porsche Drive Mezzco LLC ("**Debtor**") filed this case approximately three hours prior to Lender's rescheduled UCC foreclosure auction with the singular purpose of further delaying Lender's efforts to foreclose upon its Collateral (defined below) following the decision of the 160th District Court in Dallas County, Texas (the "**Texas Court**") to deny injunctive relief to Debtor, which filed a temporary restraining order prior to the previously scheduled UCC foreclosure auction. Debtor's sole asset is its ownership interest in non-debtor ACRON 2 Porsche Drive, Atlanta LLC ("**ACRON Atlanta**"), which serves as the collateral (the "**Collateral**" or Equity Collateral as hereinafter defined) for Lender's claim. Debtor has no other business operations apart from ownership of ACRON Atlanta. Lender is the sole secured creditor and the sole non-insider creditor in this case.[1] Debtor seeks relief under chapter 7 of title 11 of the United States Code (the "**Bankruptcy Code**"), indicating an intent to cease operations and liquidate its sole asset. However, an extensive and comprehensive marketing process executed in connection with Lender's UCC foreclosure proceedings garnered no bids for the Equity Collateral.

Further, ACRON Atlanta owns certain real property known as the Kimpton Overland Hotel Atlanta Airport located at 2 Porche Drive, Atlanta, GA 30354 (the "**Property**"). The Property is not property of the Debtor's bankruptcy estate (the "**Estate**") and is encumbered by a Senior Mortgage (defined below), which matures in January of 2026. In addition, as discussed below, under the Loan Agreement and Senior Loan Agreement (each defined below), Debtor's ability to cause ACRON Atlanta to sell the Property requires the consent of both the Lender and the Senior Lender (defined below). Even if the Debtor could somehow direct the sale of the Property and recover proceeds of that sale on account of the Equity Collateral, a recent Valuation Analysis from

---

[1] *See* Docket No. 1. Debtor lists only three unsecured creditors, each an insider, with claims totaling $1,136.960.37. *See* Docket No. 1, at 12-13.

Hodges Ward Elliott (the "**Valuation Analysis**") establishes that there is insufficient equity in the Property to satisfy both the Senior Mortgage and the Lender's claim, let alone provide any benefit to the Estate. Finally, even assuming Lender consented to the sale of the Property, which it will not, and the Property sold for substantially more than the Valuation Analysis indicates that it is worth, there are no non-insider unsecured creditors that would benefit from such sale.

In sum, a comprehensive pre-petition marketing process executed in connection with Debtor's UCC foreclosure auction failed to garner any bids for the Equity Collateral. Moreover, even under a best-case sale scenario, there is insufficient value in the Property to even come close to satisfying Lender's claim, let alone provide an equity cushion to protect its interests, and Debtor is not seeking to reorganize. Last, this case was filed in bad faith mere hours before the Auction for the improper purpose of bringing a two-party dispute between Debtor and Lender to the Bankruptcy Court to frustrate Lender's ability to enforce its right to foreclose on the Equity Collateral for the second time. As a result, stay relief is appropriate in this case because it was filed in bad faith, Lender's interests are not protected, there is no value in the Equity Collateral sufficient to satisfy Lender's claim, and the Equity Collateral cannot be necessary to an effective reorganization because Debtor is not undertaking a reorganization.

## <u>Jurisdiction and Venue</u>

1.      This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A) and (G).

2.      Venue is proper in this District and before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested herein are sections 105 and 362 of the Bankruptcy Code as well as Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure

(the "**Federal Rules**").

**Background**

### A.  Procedural Background

4.      On October 6, 2025 (the "**Petition Date**"), ACRON 2 Porsche Drive Mezzco LLC ("**Debtor**"), filed a voluntary petition for relief under chapter 7 Bankruptcy Code.

5.      S. Gregory Hays has been appointed chapter 7 trustee (the "**Trustee**") of the Estate.

6.      The initial meeting of creditors required under section 341 of the Bankruptcy Code was scheduled for November 5, 2025 and reset to December 2, 2025 on account of Debtor's failure to appear. *See* Docket No. 6.

### B.  The Senior Loan

7.      Non-debtor entity ACRON Atlanta as borrower and KHRE SMA Funding, LLC ("**Senior Lender**") as lender entered into that certain Loan Agreement dated December 21, 2018 (as amended, the "**Senior Loan Agreement**"), pursuant to which ACRON Atlanta obtained a loan in the original principal amount of $36,000,000.00 from Senior Lender (the "**Senior Loan**"). *See* Lizak Declaration, at ¶ 4. The Senior Loan is coterminous with the Mezzanine Loan (defined below) and matures on January 18, 2026. *See* Lizak Declaration, at ¶ 5. The Senior Loan is evidenced by that certain Amended and Restated Promissory Note, dated as of December 21, 2018, which is secured by that certain Amended and Restated Deed to Secure Debt, Assignment, Security Agreement, and Fixture Filing, dated as of December 21, 2018, and initially recorded on Deed Book 59576, Page 220 on January 2, 2019, and re-recorded on Deed Book 59788 Page 14 on March 12, 2019, by the Clerk of Superior Court of Fulton County, Georgia (as further amended, the "**Senior Mortgage**"). *See* Lizak Declaration, at ¶ 6. The Senior Mortgage encumbers the Property, which is the 214-room Kimpton Overland Hotel Atlanta Airport. *See* Lizak Declaration,

at ¶ 7. ACRON Atlanta is the owner of the Property, through a leased fee interest from the Development Authority of the City of Hapeville, a public body corporate and politic created and existing under the laws of the State of Georgia (the fee owner), pursuant to the Rental Agreement dated May 5, 2017. Debtor is the sole member of ACRON Atlanta. *See* Lizak Declaration, at ¶ 8. The current balance of the Senior Loan is approximately $25,000,000.00. *See* Lizak Declaration, at ¶ 14.

### C.  The Mezzanine Loan

8.      Debtor and Lender entered into that certain Loan Agreement dated as of January 18, 2024 (the "**Loan Agreement**"), pursuant to which Debtor obtained a mezzanine loan from Lender in the original principal amount of $11,600,000.00 (the "**Mezzanine Loan**"). A true and correct copy of the Loan Agreement is attached to the Lizak Declaration as <u>Exhibit A</u>. Approximately $8,000,000.00 of the Mezzanine Loan was used to pay down the Senior Loan, reducing the then-existing balance from $33,000,000.00 to $25,000,000.00, $2,000,000 funded the debt service reserve account, and the remaining proceeds funded initial deposits to escrow accounts and closing costs. *See* Lizak Declaration, at ¶ 14. The Mezzanine Loan is evidenced by that certain Promissory Note dated as of January 18, 2024 in the amount of $11,600,000.00 (the "**Note**"). A true and correct copy of the Note is attached to the Lizak Declaration as <u>Exhibit B</u>.

9.      The Note is secured by that certain Pledge and Security Agreement dated as of January 18, 2024 (the "**Pledge Agreement**"),[2] pursuant to which Debtor granted Lender a first priority security interest in one hundred percent of the limited liability company interest in

---

[2] Pursuant to the Pledge Agreement, Debtor also granted an irrevocable proxy to Lender "[s]olely with respect to Article 8 Matters . . . ." *See* Pledge Agreement, § 4(c). Under the Loan Agreement, Article 8 governs transfers and Section 8.1 specifies that, "without Senior Lender's and Lenders' prior written consent, [Debtor] shall not, and shall not permit [ACRON Atlanta] to," *inter alia*, directly or indirectly sell or otherwise assign, transfer or convey the Property.

ACRON Atlanta (the "**Equity Collateral**"). A true and correct copy of the Pledge Agreement is attached to the Lizak Declaration as <u>Exhibit C</u>.

10.     Pursuant to the terms of the following guaranty agreements (collectively, the "**Guaranty Agreements**"): (i) that certain Guaranty Agreement (the "**TH Investment Guaranty**") by TH Investment Holdings II, LLC (the **"TH Investment Guarantor"**) and (ii) that certain Guaranty Agreement (the "**ACRON Guaranty**") by ACRON (USA), L.P., and ACRON AG (**"ACRON (USA)"** and **"ACRON AG,"** respectively, and collectively, the **"ACRON Guarantor"**), each dated as of January 18, 2024, TH Investment Holdings II, LLC, ACRON (USA), L.P., and ACRON AG (collectively, the "**Guarantors**") agreed to indemnify and hold harmless Lender against and permit Lender to collect or recover certain amounts attributable to losses sustained by Lender under certain circumstances, as more fully set forth in the Guaranty Agreements. True and correct copies of the Guaranty Agreements are attached to the Lizak Declaration as <u>Exhibit D</u>. The Loan Agreement, Note, Guaranty Agreements, Pledge Agreement and other related documents are collectively referred to herein as the "**Loan Documents**."

11.     Lender properly perfected its security interest by filing the following financing statements (together, the "**UCC Statements**"): (i) an initial UCC Financing Statement filed on January 18, 2024 bearing the U.C.C. Initial Filing No. 2024 0422525 and (ii) UCC Financing Statement Amendment bearing the U.C.C. Amendment No. 2024 0824324, which was filed on February 7, 2024. True and correct copies of the UCC Statements are attached to the Lizak Declaration as <u>Exhibit E</u>.

12.     Additionally, Lender, Debtor, and Texas Capital Bank (the "**Bank**") entered into that certain Deposit Account Control Agreements dated as of January 18, 2024 (the "**DACA**"), pursuant to which: (i) Debtor granted Lender control over its account with the Bank ending in 2364

(the "**Account**") and (ii) funds from the Account were to be swept into Lender's account on each business day. A true and correct copy of the DACA is attached to the Lizak Declaration as <u>Exhibit F</u>.

13.      In connection with the Mezzanine Loan, Lender and Senior Lender entered into that certain Intercreditor Agreement dated as of January 18, 2024 (the "**Intercreditor Agreement**"), pursuant to which, *inter alia,* (i) Lender agreed to subordinate the Mezzanine Loan to the Senior Loan and (ii) Senior Lender acknowledged that it did not have and would not acquire a lien or other interest in the Separate Collateral (as defined therein and including the Equity Collateral) securing the Mezzanine Loan. A true and correct copy of the Intercreditor Agreement is attached to the Lizak Declaration as <u>Exhibit G</u>.

14.      As of the Petition Date, Lender's undisputed claim totaled $16,775,492.00, as reflected in Debtor's schedules.[3] Since the filing, the outstanding amount due and owing to Lender has grown to $17,611,806 and will be over $18.4 million as of December 1, 2025. *See* Lizak Declaration, at ¶ 19. The rapid increase in Lender's claim is due, in part, to the protective advances it has been making to the Senior Lender in accordance with Section 10.2.1 of the Loan Agreement since Debtor defaulted under its payment obligations under the Senior Loan Agreement, which total $1,312,030.89 as of the Petition Date, with monthly payments due under the Senior Loan Agreement totaling either $115,208.33 or $119,048.61 alone. *See* Lizak Declaration, at ¶ 20.

**D.  Debtor's Defaults Under the Loan Documents**

15.      Less than one year following the execution of the Loan Documents in January of 2024, Debtor began defaulting on its obligations under the same. *See* Lizak Declaration, at ¶ 21. Prior to commencing foreclosure proceedings regarding the Equity Collateral, Lender sent Debtor

---

[3] *See* Docket No. 1, at 10. Lender's claim is not scheduled as contingent, unliquidated, or disputed in Debtor's schedules and statements.

four notices of default between January of 2025 and May of 2025 (collectively, the "**Notices of Default**"), outlining both monetary and non-monetary defaults under the Loan Documents. *See* Lizak Declaration, at ¶ 22. Following its commencement of foreclosure proceedings, Debtor's defaults persisted, and Lender sent Debtor two additional notices of default in August of 2025 and September of 2025. *See* Lizak Declaration, at ¶ 23.

16. Such defaults went uncured and included, *inter alia*: (A) failure to pay (i) Servicing Fees (as defined in the Loan Agreement), (ii) monthly Reserves (with respect to the required deposits pursuant to Section 4 of the Loan Agreement), (iii) monthly Debt Service, (iv) Late Fees (as defined in the Loan Agreement), (iv) Legal Fees (as defined in the Loan Agreement), (B) failure to replenish the Debt Service Reserve Account in violation of Section 4.5.1 of the Loan Agreement, (C) violation of Section 8.5.2 of the Loan Agreement regarding Permitted Indebtedness Conditions (as defined therein); (D) triggering a Senior Event of Default (as defined in the Loan Agreement), which is an Event of Default under the Loan Agreement and under each of the other Loan Documents; (E) triggering Events of Default regarding Financial Reporting (Section 7.1.6 of the Loan Agreement), the Minimum Guarantor Financial Requirement (Section 7.1.16 of the Loan Agreement), and the Compliance Certificate (Section 7.3 of the Loan Agreement); (F) violation of Cash Management obligations (Article 3 of the Loan Agreement); (G) committing of at least ten (10) other defaults which were listed as examples in Schedule 1 (Other Defaults) of the April 2, 2025 Notice of Default; and (H) entering into a listing agreement to sell the Property without prior approval from Lender in violation of Section 7.1.10 of the Loan Agreement. *See* Lizak Declaration, at ¶ 24. Accordingly, following Debtor's persistent failure to cure the Events of Default, Lender commenced foreclosure proceedings regarding the Equity Collateral.

> **i.    The Notices of Default Issued Prior to the Sale Notice**

17.    More particularly, Lender sent the following notices of Default prior to commencing foreclosure proceedings:

a. The January 13, 2025 letter (the "**First Notice of Default**"), pursuant to which Lender notified Debtor of its failure to perform multiple monetary obligations required under the Loan Agreement totaling $268,558.32, including its: (i) failure to pay the monthly servicing fee required under the Loan Agreement; (ii) failure to fund the Tax Reserve; (iii) failure to fund the Insurance Reserve; and (iv) failure to fund the FF&E Reserve;

b. The February 6, 2025 letter (the "**Second Notice of Default**"), pursuant to which Lender notified Debtor of the following Events of Default under the Loan Agreement: (i) incurrence of trade payables (in violation of Section 8.5.2 of the Loan Agreement) exceeding the threshold of 2% of the Combined Loan Amount (as defined in the Loan Agreement) and (ii) defaulting in Debtor's payment obligations to the Senior Lender beyond the applicable cure period and continuing Events of Default due to Debtor's failure to cure the defaults outlined in the First Notice of Default.  At this time, Lender also made a demand for Debtor to replenish the Debt Service Reserve Account in accordance with Section 4.5.1 of the Loan Agreement;

c. The April 2, 2025 letter (the "**Third Notice of Default**"), pursuant to which Lender (A) notified Debtor of the following Events of Default: (i) failure to comply with the financial reporting requirements contained in Section 7.1.6 of the Loan Agreement; (ii) failure to establish that the Guarantors' aggregate net worth requirements under the Loan Agreement were met by failing to provide sufficient financial reporting for the same; (iii) misrepresentation per Section 10.1.12 based on the discrepancy between affirmative certifications made by the ACRON Guarantors in their quarterly Compliance Certificates and their inability to actually substantiate to Lender their satisfaction of the Minimum Guarantor Financial Requirement; (iv) failure to comply with its cash management obligations under Article 3 of the Loan Agreement; (v) violation of Section 7.2.7 (Distributions) of the Loan Agreement regarding Debtor's failure to deposit available Distributable Cash into the Operating Account (as each term is defined therein), which represents a continuing Event of Default under Section 10.1.3 (Violation of Certain Covenants) of the Loan Agreement; (B) provided a second notice regarding Debtor's failure to replenish the Debt Service Reserve Account which is a Loss Recourse Obligation (as defined in the ACRON Guaranty) under the ACRON Guaranty; (C) notified Debtor of continued events of default due to Debtor's failure to cure the Events of Default outlined in the First and Second Notices of Default; (D) notified Debtor of further defaults not previously addressed while Lender worked to accommodate Debtor; (E) notified Debtor of its election to commence foreclosure proceedings; and (F) provided notice of Lender's commencement of

foreclosure proceedings regarding the Equity Collateral; and

    d.    The May 12, 2025 letter (the "**Fourth Notice of Default**"), pursuant to which Lender (A) notified Debtor that by ACRON Atlanta entering into the Listing Agreement with Berkadia Real Estate Advisors LLC, it triggered a Default under Section 7.1.10 under the Loan Agreement; (B) provided written notice regarding potential new Events of Default under Sections 10.1 and 10.1.4 of the Loan Agreement stating that the aforementioned violation of Section 7.1.10(c) of the Loan Agreement must be cured by June 11, 2025 in order to avoid triggering an Event of Default (which, for avoidance of doubt, was not cured); (C) emphasized that ACRON Atlanta is prohibited from selling the Property without prior approval from both Lender and Senior Lender pursuant to Section 8.1 of the Loan Agreement, that Section 2(a) of the ACRON Guaranty covers breaches and/or violations of Article 8 (Transfers) of the Loan Agreement as Springing Recourse Events (as defined in the ACRON Guaranty), and that a similar provision is set forth in Section 2(a) of the TH Investment Guaranty; (D) raised the potential violation of Section 13.9 of the Loan Agreement regarding Debtor's interference with Lender's UCC foreclosure process which also represents Springing Recourse Events under the ACRON Guaranty and TH Investment Guaranty; and (E) provided a status update on Lender's UCC foreclosure process.

    **ii.**    **The Sale Notices and Further Notices of Default**

    18.    Following the issuance of the initial four (4) Notices of Default, Lender delivered its Notice of Disposition of Collateral, with a copy of the Notice of Public Sale of Collateral (the "**Sale Notice**") attached on May 16, 2025. A true and correct copy of the Notice of Disposition of Collateral is attached to the Lizak Declaration as <u>Exhibit I</u>.

    19.    On May 28, 2025, Lender sent a letter containing the terms of sale (the "**Terms of Sale Notice**"), which, among other things, (i) set forth the date of the public auction (the "**Auction**") as July 30, 2025 at 10 am (CT); (ii) established the logistics of the Auction and bidding process; (iii) reserved certain of Lender's rights, including the right to credit bid, set a minimum reserve price, reject any bid, terminate or adjourn the sale, and revise the Terms of Sale (as defined therein); (iv) set forth the requirements for a prospective bidder to be considered a Qualified Bidder (as defined therein); (v) established a deadline to submit qualified bids  (the "**Qualified Bidder Deadline**") of July 23, 2025 at 5:00 pm (CT) and included other Auction logistics, including the

zoom log in information for the same. A true and correct copy of the Terms of Sale Notice is attached to the Lizak Declaration as Exhibit J.

20.     On July 22, 2025, Lender sent notice of the adjournment of the Auction (the "**First Adjournment Notice**"), which notified Debtor that it was adjourning the Auction to August 19, 2025 at 9:00 am (CT) and adjourning the Qualified Bidder Deadline to August 12, 2024 at 5:00 pm (CT). A true and correct copy of the First Adjournment Notice is attached to the Lizak Declaration as Exhibit K.

21.     On July 24, 2025, Lender sent a second notice of the adjournment of the Auction (the "**Second Adjournment Notice**"), which notified Debtor that it was adjourning the Auction to August 27, 2025 at 12:30 pm (CT) and adjourning the Qualified Bidder Deadline to August 20, 2024 at 5:00 pm (CT). A true and correct copy of the Second Adjournment Notice is attached to the Lizak Declaration as Exhibit L.

22.     On August 1, 2025, Lender sent a letter (the "**Fifth Notice of Default**"), which (i) notified Debtor of continued events of default due to Debtor's failure to cure the Events of Default outlined in the First, Second, Third, and Fourth Notices of Default; (ii) notified Debtor of its additional default under Section 7.1.19(a) of the Loan Agreement resulting from its default under its licensing agreement with IHG Franchising, LLC (the "**IHG Licensing Agreement**") caused by its failure to pay the fees due thereunder in the amount of $170,795.26 and failure to maintain the requisite Guest Love Score (as defined in the IHG Licensing Agreement). *See* Lizak Declaration, at ¶ 30.

**E.  The Foreclosure and Marketing Process**

**i.    The Foreclosure Process**

23.     As set forth above with respect to the Second Adjournment Notice, the Lender's

foreclosure sale of the Equity Collateral had been scheduled for August 27, 2025. *See* Lizak Declaration, at ¶ 29. Just two days prior to the scheduled foreclosure sale, the Debtor filed a Motion for Temporary Restraining Order (the "**TRO Motion**") in the Texas Court on August 25, 2025. *See* Lizak Declaration, at ¶ 31.

24.    On August 26, 2025, a hearing was held with respect to the TRO Motion, and the Texas Court granted the TRO Motion such that the Auction temporarily was postponed, subject to further hearing that was held on September 9 and 10, 2025. *See* Lizak Declaration, at ¶ 32. At the hearing, the Texas Court denied the TRO Motion in its entirety.  A true and correct copy of the Texas Court's denying the TRO Motion is attached to the Lizak Declaration as Exhibit M.

25.    Following entry of the Texas Court's order, Lender sent Debtor the September 15, 2025 Letter (the "**September Notice**"), pursuant to which Lender notified Debtor (i) that the foreclosure sale was adjourned to October 6, 2025 at 2:30 p.m. (CT) and the Qualified Bidder Deadline was adjourned to September 29, 2025 at 5:00 p.m. (CT) and (ii) of its continuing defaults under the Loan Documents. Lender attached to the September Notice that certain Third Amended and Restated Notice of Disposition of Collateral, that certain Third Amended and Restated Terms of Sale, and that further updated Notice of Public Sale of Collateral, and CBRE (defined below) resumed its marketing efforts with respect to the Equity Collateral. A true and correct copy of the September Notice is attached to the Lizak Declaration as Exhibit N. The Debtor then filed its chapter 7 bankruptcy petition on October 6, 2025 at 12:26 p.m. (ET), approximately three hours before the Auction was to take place.

   **ii.    Lender's Marketing Efforts**

26.    On April 7, 2025, Lender engaged CBRE Capital Markets, Inc. ("**CBRE**") as its exclusive brokerage advisor in connection with the pending foreclosure sale. *See* Arangio

Declaration, at ¶ 4. Lender also engaged Mannion Auctions, LLC ("**Mannion**") and Moecker Auctions, Inc. ("**Moecker**") to conduct the Auction. *See* Lizak Declaration, at ¶ 37. Lender selected Mannion because of its vast experience in auctions related to U.C.C. foreclosure sales generally and the sale of LLC membership interests specifically. *See Id.* Moecker is a Texas-licensed auctioneer that was selected at the recommendation of Mannion because the Auction was to be conducted under Texas law. *See Id*. On May 19, 2025, CBRE distributed the Sale Notice via national email campaign to its proprietary database. *See* Arangio Declaration, at ¶ 5. On May 21, 2025, the first print ad of the Sale Notice was published in the Wall Street Journal, commencing marketing to the public markets, and on May 28, 2025, CBRE's secure online data room containing the due diligence for the UCC foreclosure sale was opened to prospective bidders that had executed an acceptable confidentiality and non-disclosure agreement (the "**NDA**"). *See* Arangio Declaration, at ¶ 6. Over the course of the marketing period—which began in mid-May 2025, lasted approximately 100 days to the hearing on the TRO Motion, and resumed following the Texas Court's entry of its order denying the TRO Motion—the foreclosure sale was publicly noticed and advertised with 17 print publications,[4] running in a myriad of periodicals including The Wall Street Journal, The Atlanta Journal-Constitution, Commercial Mortgage Alert, Real Estate Alert, the monthly hospitality newsletter referred to as "Hotel Business," and The New York Times. *See* Arangio Declaration, at ¶ 9. Additionally, CBRE disseminated multiple email sale announcements and reminders of this auction opportunity to its proprietary investor list that includes over 7,500 individuals or entities that operate in a space relative to the collateral being sold, with sale notices

---

[4] More specifically, (i) seven advertisements were run in the Wall Street Journal on May 21, 2025; June 11, 2025; June 14, 2025; July 2, 2025; July 16, 2025; and September 17, 2025; (ii) an advertisement was run in the Real Estate Alert on June 17, 2025; (iii) an advertisement was run in the New York Times on June 22, 2025; (iv) an advertisement was run in the June edition of Hotel Business; (v) two advertisements were run in the Commercial Mortgage alert on June 6, 2025 and July 11, 2025; and (vi) five advertisements were run in the Atlanta Journal-Constitution on May 29, 2025; June 12, 2025; July 21, 2025; August 11, 2025; and September 25, 2025.

being distributed to this list 8 times. *See* Arangio Declaration, at ¶ 10.

27.     According to CBRE's Marketing Status Report (Updated September 30, 2025) (the "**Status Report**"), as of September 30, 2025: (i) 73 acceptable NDAs had been received, (ii) 46 investor groups had accessed the secure data room, and (iii) 40 investor groups downloaded materials from the data room; however, "[n]o investor group has submitted eligible Bidder Qualification Materials for CBRE or Secured Party's review as of the date of this status report." A copy of the CBRE Marketing Status Report is attached to the Arangio Declaration as <u>Exhibit A</u>.

## **Relief Requested**

28.     Generally, the filing of a bankruptcy petition stays litigation involving prepetition claims against the debtor and any act to obtain possession of estate property. 11 U.S.C. § 362(a)(1), (3); *see also In re Robertson,* 244 B.R. 880, 882 (N.D. Ga. 2000). Bankruptcy courts may, however, grant relief from the automatic stay: (i) where cause exists, including where the Movant's interests are not adequately protected, (ii) where the debtor has no equity in the property, and (iii) where the property is not necessary for an effective reorganization. 11 U.S.C. § 362(d)(1)-(2).

29.     When seeking relief from the automatic stay, the moving party bears the initial burden of proof on the issue of the debtor's equity in the property and the party opposing such relief bears the burden of proof as to all other issues. *See* 11 U.S.C. § 362(g)(1), (2); *see also In re Gaime,* 17 F.4th 1349, 1355 (11th Cir. 2021) (holding that although ultimately the error was harmless, the bankruptcy court erred by placing the burden on the party seeking relief to show cause rather than placing the burden on the trustee to show the absence of cause). Thus, if the Movant establishes that the debtor lacks equity in the Property, the burden then shifts to the Debtor to prove the absence of cause in order to defeat the motion to modify the stay. *Gaime,* 17 F.4th at 1355 ("[Movant] is correct that the bankruptcy court placed the burden on it to show cause, rather

than on the trustee to show the absence of cause. [Movant] is also correct that the bankruptcy court

erred in doing so.") (citing *In re Allstar Bldg. Prods., Inc.,* 834 F.2d 898, 899 (11th Cir. 1987) (en

banc) (per curiam).

### F. Cause Exists Under Bankruptcy Code Section 362(d)(1) because Movant is Not Adequately Protected and This Case Was Filed in Bad Faith

30.     First, the automatic stay should be modified for "cause" pursuant to 11 U.S.C.

§ 362(d)(1). Congress has granted broad discretion to the bankruptcy courts to modify the

automatic stay for cause. *In re Feingold,* 730 F.3d 1268, 1272, fn. 2 (11th Cir. 2013) ("[A] decision

to lift the stay is discretionary with the bankruptcy judge, and may be reversed only upon a showing

of abuse of discretion.") (quoting *In re Dixie Broadcasting, Inc.,* 871 F.2d 1023, 1026 (11th Cir.

1989)); *In re Ferrouillat,* 558 B.R. 938, 942 (S.D. Ala. Bankr. 2016) ("The lack of enumerated

types of causes leaves a bankruptcy court broad discretion in determining what constitutes cause

for the stay to lift."). Because "cause" is not defined by the Bankruptcy Code, "[c]ourts generally

decide whether cause exists based on the totality of the circumstances in each case." *In re*

*Ferrouillat,* 558 B.R. 938, 941 (Bankr. S.D. Ala. 2016); *see also Feingold,* 730 F.3d at 1277. But

the Bankruptcy Code specifically provides that "the lack of adequate protection of an interest in

property" of a party in interest constitutes cause to modify the stay. 11 U.S.C. § 362(d)(1).  Cause

exists in this case both because Lender is not adequately protected and because this case was

commenced in bad faith.

#### i.    Movant is Not Adequately Protected

31.     A secured creditor lacks adequate protection where the value of the indebtedness

owed to it exceeds the value of the collateral, and where there is not a sufficient "equity cushion"

to protect its interest in the collateral. *See generally, In re Senior Care Props., Inc.,* 137 B.R. 527,

528–30 (Bankr. N.D. Fla. 1992) (discussing case law where bankruptcy courts held that a creditor

was entitled to adequate protection where the "determining factor" was the percentage level of the equity cushion); *see also In re Big Dog II, LLC,* 602 B.R. 64, 69 (Bankr. N.D. Fla. 2019) (referring to *In re Senior Care Props., Inc.* for a review of relevant case law, and noting that courts typically find an equity cushion of less than 11% to be insufficient, and are split on whether 12% to 20% constitutes adequate protection).

32. There is no equity cushion protecting Lender's interest in the Equity Collateral. The Debtor values the Equity Collateral as "unknown" in its Schedules.[5] Further, the Equity Collateral has already been marketed by CBRE, a globally-recognized leader in commercial real estate advisory, which conducted an extensive marketing campaign lasting more than 100 days that reached thousands of investors and encouraged numerous parties to execute NDAs and access the data room. Despite these extensive efforts, no bidders confirmed attendance at the Auction. Running the same process, which cost Lender more than $350,000,[6] within the bankruptcy less than a month later would not imply a different outcome, and the Trustee would have to incur similar costs to administer such. As a result, the only source of value in the Equity Collateral appears to be the sale of the Property, which the Debtor cannot unilaterally accomplish.

### 1. Debtor Cannot Sell or Cause the Sale of the Property Absent Lender Consent

33. Section 7.1.10(c) of the Loan Agreement specifies that Debtor "shall not (and shall not cause [ACRON Atlanta] to) enter into, amend or modify any listing agreement or brokerage agreement for the Property (a 'Listing Agreement) without Lender's prior written consent," with the only exception to the consent requirement being that the listing agreement in question automatically terminates (at no cost to ACRON Atlanta or Debtor) if the membership interests in

---

[5] *See* Docket No. 1, at 7,10.
[6] *See* Lizak Declaration, at ¶ 38.

ACRON Atlanta is transferred to Lender or another party in connection with an enforcement action against Debtor (which exception was not satisfied in the Listing Agreement with Berkadia).

34.     Additionally, Pursuant to Section 8.1 of the Loan Agreement, except as provided in Article 8 (with respect to certain permitted transfers not applicable in this case), "without Senior Lender's and Lender's prior written consent, Borrower shall not, and shall not permit [ACRON Atlanta] to, (i) directly or indirectly sell, assign, convey, transfer or otherwise dispose of the Property or other Collateral or any portion thereof or any direct or indirect legal, beneficial or equitable interest in all or any part of the Property or Senior Collateral…" (emphasis added)

35.     Moreover, Section 5.2.10(a) of the Senior Loan Agreement precludes ACRON Atlanta from selling the Property without the prior written consent of [Senior] Lender (emphasis added) and under Section 8.1(a)(v) of the Senior Loan Agreement, it is an "Event of Default" thereunder if "Borrower transfers or encumbers any portion of any of the Property in violation of the provisions of Section 5.2.10 hereof or Section 8 of the Security Instrument."[7]

36.     Finally, Section 6(d) of the Pledge Agreement provides that Debtor (as the "**Pledgor**" party) "shall not assign, transfer, release, subordinate, terminate, encumber, or cancel the Pledged Interests in whole or in part, or give any consent under, any of the instruments, documents, or agreements constituting the Collateral or exercise any of the rights, options or interests of Pledgor except as permitted under the Loan Documents." And in Section 6(g)(ii), of the Pledge Agreement, the Pledgor party shall "Comply, and cause [ACRON Atlanta] to comply, with all terms, covenants, and agreements contained in the Senior Loan Documents…"

37.     As a result, Debtor cannot pursue a sale absent the consent of both the Senior Lender and the Lender. Additionally, Section 9(b) of the Pledge Agreement provides that,

---

[7] In connection with the foregoing, it is an immediate Event of Default under Section 10.1.24 of the Loan Agreement if a *"Senior Event of Default has occurred that is not waived by Senior Lender…"*

"[Debtor] grants Lender the following: (i) <u>All voting rights, consent rights, and other powers of ownership pertaining to the Pledged Interests and other Collateral as if Lender were the sole and absolute owner thereof</u>…" (emphasis added) and Section 7(g) of the Pledge Agreement clearly states that "[d]uring such time an Event of Default exists, the revocable license granted under this Section 7(g) shall automatically be revoked, and thereafter, [Debtor] shall take no action nor exercise any rights under the Owner Charter Documents <u>without the prior written consent of Lender</u> in each instance." (emphasis added). The aforementioned provisions in the Pledge Agreement clearly set forth the Lender's voting and consent rights during an Event of Default, which is the case now considering that Debtor is guilty of a litany of continuing Events of Default that have been extensively documented in the Notices of Default.

38.     Thus, even if the Debtor could vote the membership interest of ACRON Atlanta, it could not sell the Property absent the consent of Lender, which has not and will not be given. Moreover, even if such consent was given, the Senior Loan matures on January 18, 2026, leaving insufficient time to run a sale process. Finally, Lender is not willing to continue making protective advances through another futile sale process and, upon a payment default or a maturity default of the Senior Loan, the Senior Lender will be able to pursue a foreclosure of the Property and thereby extinguish the Equity Collateral, countering all efforts to preserve and recuperate value for the benefit of the Estate.

### 2. The Value of the Property is Insufficient to Satisfy Lender's Claim

39.     Additionally, even if the Debtor could sell or cause the sale of the Property, the proceeds from such sale would be far from sufficient to satisfy Lender's claim, even under a best-case sale scenario.

40.     First, Lender commissioned a Valuation Analysis in March of 2025, which includes a valuation of the Property—the underlying asset. *See* Lizak Declaration, at ¶ A true and correct

107172842.1

copy of the Valuation Analysis is attached to the Lizak Declaration as <u>Exhibit H</u>. The Valuation Analysis concludes that the value of the Property is between $24,000,000 and $28,000,000. As discussed above, the Senior Lender has a first priority lien on the Property with a remaining balance of $25,000,000. Thus, under a best-case sale scenario and unrealistically assuming no closing costs, legal costs, or exit fees,[8] Debtor could at most realize $3,000,000.00 in the event of a sale of the Property on account of its equity interest. According to Debtor's schedules, Lender's undisputed claim as of the Petition Date is $16,775,492. *See* Docket No. 1, 10. Moreover, since the Petition Date, the outstanding amount due and owing to Lender has grown to $17,611,806 and will be over $18.4 million as of December 1, 2025.

41.     Second, in support of its TRO Motion, Debtor attached a letter of intent with the identity of the proposed purchaser redacted and a proposed purchase price of $38,000,000 (the "**LOI**"). A true and correct copy of the LOI is attached to the Lizak Declaration as <u>Exhibit N</u>. Even at this proposed purchase price, the LOI, which is dated August 6, 2025 and expired on August 13, 2025, supports Lender's position that there is insufficient equity in the Property to provide a recovery to the Estate for several reasons. First, the LOI is subject to multiple contingencies, including a "Due Diligence Period", "Closing Period", "Financing Contingency", and "Franchise Approval Contingency." Second, the $38,000,000 proposed purchase price is inclusive of a $500,000 credit to be applied at closing for capital expenditures, and "if the estimated costs exceed the $500,000 credit, the Purchaser may negotiate an adjustment to the Purchase Price or terminate in its sole discretion." Third, even if the undisclosed purchaser went forward with the sale for the full purchase price of $37,500,000 (which is highly suspect given the Valuation Analysis), the

---

[8] There is an exit fee of 0.5% multiplied by the maximum principal amount of the Senior Loan that is applicable under the Senior Loan Agreement, which would be $125,000 assuming the maximum principal amount of the Senior Loan is $25 million.

proceeds would not be sufficient to pay the Senior Lender and Lender, even again assuming no closing costs, legal costs, or exit fees. Fourth, the proposed purchase price was offered several months ago when the performance of the Property was superior to what it is now, and the cash flow of the Property continues to decline under current ownership. Fifth, the combined Due Diligence Period and Closing Period would extend beyond the maturity date of both the Senior Loan and the Mezzanine Loan if such LOI were to be reissued in the coming weeks.

42.    Finally, the Trustee appears to acknowledge the lack of equity in the Property in his email correspondence with counsel for the Lender in response to Lender's request that the Trustee stipulate to stay relief, wherein he requested consent to a carve out to pay administrative expenses in a sale scenario. *See Gottfried Declaration,* at ¶ 7. Such request suggests that the Trustee is aware that sale proceeds would be insufficient to cover administrative costs.

43.    Accordingly, there is no equity cushion in this case and Lender, as an undersecured creditor, is not adequately protected, resulting in cause for stay relief under section 362(d)(1) of the Bankruptcy Code.

### ii.    This Case Was Filed in Bad Faith

44.    Next, "cause" exists for granting Lender relief from the automatic stay pursuant to § 362(d)(1) of the Bankruptcy Code because Debtor's petition was filed in bad faith, and for the improper purpose of bringing a two-party dispute between Debtor and Lender to the Bankruptcy Court with the sole purpose of frustrating Lender's ability to foreclose on the Equity Collateral—for the *second* time. "[B]ad faith commencement of [a bankruptcy] case justifies lifting [the] stay." *Raleigh v. Ill. Dept. of Revenue*, 530 U.S. 15, 25 (2000); *see also*, *Matter of Little Creek Development Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986) ("Requirement of good faith prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes").

45.     The Eleventh Circuit has held that "there is no particular test for determining whether a debtor has filed a petition in bad faith. Instead, the courts may consider any factors which evidence 'an intent to abuse the judicial process and the purpose of the reorganization provisions.'" *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1394 (11th Cir. 1988) (*citing In re Albany Partners, Ltd.*, 749 F.2d 670, 674 (11th Cir. 1984)). "[I]n particular [courts should focus on] factors which evidence that the petition was filed 'to delay or frustrate the legitimate efforts of secured creditors to enforce their rights.'" *Phoenix Piccadilly*, 849 F.2d 1394 (*citing Albany Partners*, 749 F.2d at 674).

46.     Courts have identified a number of factors as indicia of a petition filed in bad faith. Such factors to consider include, *inter alia*, the following:

   a. Whether the debtor is a single-asset debtor;
   b. Whether the debtor has relatively few unsecured claims whose claims are small in relation to those of secured creditors;
   c. Whether the debtor has a limited number of employees;
   d. Whether the asset of the debtor is subject to a pending foreclosure action or proceeding as a result of arrearages on the indebtedness;
   e. Whether the debtor's financial problems involve largely a dispute between the debtor and secured creditors which can be resolved in another action;
   f. Whether the timing of the debtor's filing evidences an attempt to delay or frustrate the legitimate efforts of the secured creditors to enforce their rights under state law.

*In re Global Ship Systems, LLC*, 2007 WL 5171045 (Bankr. S.D. Ga. 2007) (*citing Albany Partners*, 749 F.2d at 674); *Phoenix Piccadilly*, 849 F.2d at 1344. Cause is found to exist where the filing of a bankruptcy petition amounts to an abuse of process. *Matter of Bell*, 215 B.R. 266, 275 (Bankr. N.D. Ga. 1997) (citing *I.R.S. v. Bacha*, 166 B.R. 611, 612 (Bankr. D. Md. 1993) (finding that cause for lifting the automatic stay included "Debtor's repetitive filing on the eve of two successive scheduled [foreclosure] sales by the Internal Revenue Service")).

47.     Here, the factors above clearly weigh in favor of lifting the automatic stay for a bad faith filing. As reflected in its schedules, the Debtor's sole asset is the Equity Collateral, and this

107172842.1

is the second time Debtor has stopped a foreclosure sale of the Equity Collateral. Debtor's financial problems solely involve a dispute between Debtor and Lender, its sole secured creditor. Finally, the timing of the filing approximately three hours before the rescheduled Auction was set to occur, combined with the TRO Motion being filed just two days before the prior Auction date, establishes abuse of process and bad faith. These factors overwhelmingly indicate a bad faith filing; Lender should be granted relief from the automatic stay.

### G. Cause Exists Under Section 362(d)(2) Because the Debtor Lacks Equity in the Equity Collateral, which is Not Necessary to an Effective Reorganization

48.    Grounds also exist to grant Movant relief from the automatic stay pursuant to section 362(d)(2) of the Bankruptcy Code because the Debtor does not have equity in the Equity Collateral and the Equity Collateral is not necessary to an effective reorganization.

#### i.    The Debtor Lacks Equity in the Equity Collateral

49.    First, a debtor lacks equity in the property if the property's value is less than the debt owed. 11 U.S.C. § 362(d)(2); *see also In re Albany Partners, Ltd.,* 749 F.2d 670, 672 (11th Cir. 1984) (finding that debtor lacked equity in the subject property where the property value was less than the amount owed). The moving party has the burden of proof as to the issue of debtor's equity, and the opposing party has the burden on all other issues. *See* Code § 362(g); *In re Hotel Sierra Vista Ltd. Partnership*, 112 F.3d 429, 433 fn. 4 (9th Cir. 1997); *In re Jordan*, 329 B.R. 428, 450 (Bankr. D. Idaho 2008). The debtor's equity in the property is determined by accounting for all liens on the Property, not just the moving creditor. *In re Egea*, 167 B.R. 226 (Bankr. Kan. 1994); *In re Indian Palms Associates Ltd.*, 61 F.3d 197 (3d Cir. 1995). As set forth above, Movant is an undersecured creditor because the amount owed to it by Debtor under the Loan Documents is greater than the value of the Equity Collateral.

### ii.  The Equity Collateral is Not Necessary to an Effective Reorganization

50.     As the Supreme Court has explained, to show that the Equity Collateral is necessary to an effective reorganization, the Debtor must show that there is "a reasonable possibility of a successful reorganization within a reasonable time." *United Sav. Ass'n v. Timbers of Inwood Forest Assoc. Ltd.*, 484 U.S. 365, 366 (1988) (citations omitted); *see also In re Sun Valley Ranches, Inc.*, 823 F.2d at 1376. "[T]he mere fact that the property is indispensable to the debtor's survival is insufficient." *In re Albany Partners, Ltd.*, 749 F.2d 670, 673 (11th Cir. 1984).

51.     The Debtor filed a chapter 7 case, "which results in liquidation and not reorganization." *In re Willis*, 411 B.R. 455, 458 (Bankr. S.D. Ga. 2007). Further, "in Chapter 7 cases, the court abandons the requirements of 11 U.S.C. § 362(d)(2)(B) as the debtor's reorganization is not an issue." *In re Lyons*, 19 B.R. 66, 67 (Bankr. N.D. Ga. 1982). *See also In re Williamson*, No. 07-60416, 2009 WL 8590640, at *2 (Bankr. S.D. Ga. Mar. 15, 2009) (concluding that "[b]ecause Debtor is currently under Chapter 7," the collateral at issue was not necessary to an effective reorganization). As a result, section 362(d)(2)(B) has been met and stay relief is appropriate.

52.     Accordingly, by this Motion, Movant seeks relief from the automatic stay to pursue its rights and remedies under the Loan Documents, including the right to proceed with a foreclosure of the Equity Collateral.

## CONCLUSION

This chapter 7 case was filed in bad faith approximately three hours prior to Lender's scheduled Auction for the sole purpose of delaying Lender's exercise of its foreclosure rights for the second time. The Equity Collateral is the sole asset of the estate and has already been extensively marketed pre-petition without any bidders confirming attendance at the Auction.

Moreover, Debtor cannot sell or cause the sale of the underlying Property absent the consent of the Lender and Senior Lender. Even if the Debtor were able to sell the Property, there is insufficient value in the same to satisfy the Senior Mortgage and Lender's claim, let alone provide any recovery for the Estate and the Senior Loan matures in January of 2026, leaving no time to run a sale process. Finally, even if Debtor were able to overcome these significant hurdles and somehow obtain a recovery for the Estate, Debtor's own schedules reveal no other secured creditors and no non-insider unsecured creditors who would benefit from such recovery. As a result, Lender is not adequately protected, there is no equity in the Equity Collateral, and the Equity Collateral is not necessary to an effective reorganization because Debtor is not seeking to reorganize. Thus, cause exists to modify the stay to permit Lender to pursue its remedies under the Loan Documents and applicable non-bankruptcy law.

WHEREFORE, Movant respectfully requests that the Motion for Relief from Stay be granted, and for such other and further relief as the Court deems just and proper.

Dated: November 13, 2025

**POLSINELLI PC**

*/s/ Ashley D. Champion*

Ashley D. Champion
Georgia Bar No. 423962
1201 W. Peachtree St. NW
Suite #1100
Atlanta, GA 30309
achampion@polsinelli.com

*Counsel for CAI Overland Lender, LLC*

107172842.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 13, 2025, I electronically filed the foregoing *Motion for Relief from the Automatic Stay* (the "**Motion**") using the Bankruptcy Court's Electronic Case Filing program, which sends a notice of this document and an accompanying link to this document to the following parties who have appeared in this case under the Bankruptcy Court's Electronic Case Filing program:

J. Robert Williamson
rwilliamson@swlawfirm.com
***Counsel for the Debtor***

I further certify that on this day I caused a copy of this document to be served via overnight mail on the following parties at the address shown for each:

ACRON 2 Porsche Drive Mezzco LLC
2424 E. 21st Street
Suite 150
Tulsa, OK 74114

*U.S. Trustee*
Office of the United States Trustee
362 Richard Russell Building
75 Ted Turner Drive, SW
Atlanta, GA 30303

S. Gregory Hays
Hays Financial Consulting, LLC
Suite 555
2964 Peachtree Road
Atlanta, GA 30305

/s/ Ashley D. Champion
Ashley D. Champion
Georgia Bar No. 423962

*Counsel for CAI Overland Lender, LLC*

107172842.1