# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| IN RE:<br><br>**ACRON 2 PORSCHE DRIVE MEZZCO LLC,**<br><br>   **Debtor.** | Case No:<br><br>**25-61529-LRC**<br><br>**Chapter 7** |
| **CAI OVERLAND LENDER, LLC,**<br><br>   **Movant,**<br><br>v.<br><br>**ACRON 2 PORSCHE DRIVE MEZZCO LLC and S. GREGORY HAYS as Chapter 7 Trustee,**<br><br>   **Respondents**. | **CONTESTED MATTER** |

## DECLARATION OF MARISA LIZAK
### IN SUPPORT OF MOTION FOR RELIEF FROM STAY

  I, Marisa Lizak, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

  1.  I am the Managing Director, Investments at Civitas Capital Management, LLC, which is the ultimate parent of CAI Overland Lender, LLC ("**Lender**").[1] I am authorized to make and execute this declaration on behalf of Lender.

  2.  I make this declaration based on my personal knowledge and review of certain records kept by Lender in the ordinary course of business. I am familiar with Lender's business and recordkeeping processes and procedures. Except as otherwise indicated herein, I have personal

---

[1] Capitalized terms not otherwise defined herein shall have the definitions assigned to them in the Motion.

knowledge of the matters set forth herein and, if called as a witness, would testify competently thereto.

3.      I submit this declaration in support of the *Motion for Relief from Stay* (the "**Motion**") filed contemporaneously herewith by the Lender.

**A.      The Senior Loan**

4.      ACRON 2 Porsche Drive, Atlanta LLC ("**ACRON Atlanta**") as borrower and KHRE SMA Funding, LLC ("**Senior Lender**") as lender entered into that certain loan agreement dated December 21, 2018 (as amended, the "**Senior Loan Agreement**"), pursuant to which ACRON Atlanta obtained a loan in the original principal amount of $36,000,000.00 from Senior Lender (the "**Senior Loan**").

5.      The maturity date of the Senior Loan was originally December 21, 2021 (the "**Original Maturity Date**"). Over the course of three amendments to the Senior Loan Agreement and two letter agreements, the Original Maturity Date was extended to January 2, 2023; May 2, 2023; August 2, 2023; October 2, 2023; and finally to be coterminous with the Mezzanine Loan (defined below), which matures on January 18, 2026.

6.      The Senior Loan is evidenced by that certain Amended and Restated Promissory Note, dated as of December 21, 2018, which is secured by that certain Amended and Restated Deed to Secure Debt, Assignment, Security Agreement, and Fixture Filing, dated as of December 21, 2018, and initially recorded on Deed Book 59576, Page 220 on January 2, 2019, and re-recorded on Deed Book 59788 Page 14 on March 12, 2019, by the Clerk of Superior Court of Fulton County, Georgia (as further amended, the "**Senior Mortgage**").

7.      The Senior Mortgage encumbers the property, which is each parcel of real property located at 2 Porsche Drive, Hapeville, Georgia 30354 and the Improvements thereon and Personal

2

Property (as defined in the Security Instrument) known as and associated with the 214-room Kimpton Overland Hotel Atlanta Airport (the "**Property**").

8.　　ACRON Atlanta is the owner of the Property, through a leased fee interest from the Development Authority of the City of Hapeville, a public body corporate and politic created and existing under the laws of the State of Georgia (the fee owner), pursuant to the Rental Agreement dated May 5, 2017.

9.　　Debtor is the sole member of ACRON Atlanta.

**B.　　The Mezzanine Loan**

10.　　Debtor and Lender entered into that certain Loan Agreement dated as of January 18, 2024 (the "**Loan Agreement**"), pursuant to which Debtor obtained a mezzanine loan from Lender in the original principal amount of $11,600,000.00 (the "**Mezzanine Loan**"). A true and correct copy of the Loan Agreement is attached hereto as <u>Exhibit A</u>.

11.　　The Mezzanine Loan is evidenced by that certain Promissory Note dated as of January 18, 2024 in the amount of $11,600,000.00 (the "**Note**"). A true and correct copy of the Note is attached hereto as <u>Exhibit B</u>.

12.　　The Note is secured by that certain Pledge and Security Agreement dated as of January 18, 2024 (the "**Pledge Agreement**"), pursuant to which Debtor granted Lender a first priority security interest in one hundred percent of the limited liability company interest in ACRON Atlanta (the "**Equity Collateral**"). A true and correct copy of the Pledge Agreement is attached hereto as <u>Exhibit C</u>.

13.　　Pursuant to the terms of the following guaranty agreements (collectively, the "**Guaranty Agreements**"): (i) that certain Guaranty Agreement (the "**TH Investment Guaranty**") by TH Investment Holdings II, LLC (the **"TH Investment Guarantor"**) and (ii) that

certain Guaranty Agreement (the "**ACRON Guaranty**") by ACRON (USA), L.P., and ACRON AG (**"ACRON (USA)"** and **"ACRON AG,"** respectively, and collectively, the **"ACRON Guarantor"**), each dated as of January 18, 2024, TH Investment Holdings II, LLC, ACRON (USA), L.P., and ACRON AG (collectively, the "**Guarantors**") agreed to indemnify and hold harmless Lender against and permit Lender to collect or recover certain amounts attributable to losses sustained by Lender under certain circumstances, as more fully set forth in the Guaranty Agreements. True and correct copies of the Guaranty Agreements are attached hereto as <u>Exhibit D</u>.

14.     Approximately $8,000,000.00 of the Mezzanine Loan was used to pay down the Senior Loan, reducing the then-existing balance from $33,000,000 to $25,000,000.00, $2,000,000.00 funded the debt service reserve account, and the remaining proceeds funded initial deposits to escrow accounts and closing costs.

15.     Lender properly perfected its security interest by filing the following financing statements (together, the "**UCC Statements**"): (i) an initial UCC Financing Statement filed on January 18, 2024 bearing the U.C.C. Initial Filing No. 2024 0422525 and (ii) UCC Financing Statement Amendment bearing the U.C.C. Amendment No. 2024 0824324, which was filed on February 7, 2024. True and correct copies of the UCC Statements are attached hereto as <u>Exhibit E</u>.

16.     Lender, Debtor, and Texas Capital Bank (the "**Bank**") entered into that certain Deposit Account Control Agreements dated as of January 18, 2024 (the "**DACA**"), pursuant to which: (i) Debtor granted Lender control over its account with the Bank ending in 2364 (the "**Account**") and (ii) funds from the Account were to be swept into Lender's account on each business day. A true and correct copy of the DACA is attached hereto as <u>Exhibit F</u>.

4

17.     In connection with the Mezzanine Loan, Lender and Senior Lender entered into that certain Intercreditor Agreement dated as of January 18, 2024 (the "**Intercreditor Agreement**"), pursuant to which, *inter alia,* (i) Lender agreed to subordinate the Mezzanine Loan to the Senior Loan and (ii) Senior Lender acknowledged that it did not have and would not acquire a lien or other interest in the Separate Collateral (as defined therein and including the Equity Collateral) securing the Mezzanine Loan. A true and correct copy of the Intercreditor Agreement is attached hereto as Exhibit G.

18.     As of the Petition Date, Debtor's schedules reflect that Lender holds an undisputed claim totaling $16,775,492.00.

19.     Since the Petition Date, the outstanding amount due and owing to Lender has grown to $17,611,806 and will be over $18.4 million as of December 1, 2025.

20.      The rapid increase in Lender's claim is due, in part, to the protective advances it has been making to the Senior Lender in accordance with Section 10.2.1 of the Loan Agreement since Debtor defaulted under its payment obligations under the Senior Loan Agreement. Such protective advances total $1,312,030.89 as of the Petition Date and $1,431,079.50 as of the date of this Declaration, with monthly payments due under the Senior Loan Agreement totaling $115,208.33 or $119,048.61 alone.

21.     Lender commissioned a Valuation Analysis from Hodges Ward Elliott (the "**Valuation Analysis**"), which concludes that the Value of the property is between $24,000,000 and $28,000,000. A true and correct copy of the Valuation Analysis is attached hereto as Exhibit H.

C.     **Debtor's Defaults Under the Loan Document**

22.     Less than one year following the execution of the Loan Documents in January of

2024, Debtor began defaulting on its obligations under the same.

23.     Prior to commencing foreclosure proceedings regarding the Equity Collateral, Lender sent Debtor four notices of default between January of 2025 and May of 2025 (collectively, the "**Notices of Default**"), outlining both monetary and non-monetary defaults under the Loan Documents.

24.     Following its commencement of foreclosure proceedings, Debtor's defaults persisted, and Lender sent Debtor two additional notices of default in August of 2025 and September of 2025.

25.     Such defaults went uncured and included, *inter alia*: (A) failure to pay (i) Servicing Fees (as defined in the Loan Agreement), (ii) monthly Reserves (with respect to the required deposits pursuant to Section 4 of the Loan Agreement), (iii) monthly Debt Service, (iv) Late Fees (as defined in the Loan Agreement), (iv) Legal Fees (as defined in the Loan Agreement), (B) failure to replenish the Debt Service Reserve Account in violation of Section 4.5.1 of the Loan Agreement, (C) violation of Section 8.5.2 of the Loan Agreement regarding Permitted Indebtedness Conditions (as defined therein); (D) triggering a Senior Event of Default (as defined in the Loan Agreement), which is an Event of Default under the Loan Agreement and under each of the other Loan Documents; (E) triggering Events of Default regarding Financial Reporting (Section 7.1.6 of the Loan Agreement), the Minimum Guarantor Financial Requirement (Section 7.1.16 of the Loan Agreement), and the Compliance Certificate (Section 7.3 of the Loan Agreement); (F) violation of Cash Management obligations (Article 3 of the Loan Agreement); (G) committing of at least ten (10) other defaults which were listed as examples in Schedule 1 (Other Defaults) of the April 2, 2025 Notice of Default; and (H) entering into a listing agreement to sell the Property without prior approval from Lender in violation of Section 7.1.10 of the Loan Agreement.

26.     Accordingly, following Debtor's persistent failure to cure the Events of Default, Lender commenced foreclosure proceedings regarding the Equity Collateral.

27.     Following the issuance of the initial four (4) Notices of Default, Lender delivered its Notice of Disposition of Collateral, with a copy of the Notice of Public Sale of Collateral attached on May 16, 2025. A true and correct copy of the Notice of Disposition of Collateral is attached hereto as <u>Exhibit I</u>.

28.     On May 28, 2025, Lender sent a letter containing the terms of sale (the "**Terms of Sale Notice**"), which, among other things, (i) set forth the date of the public auction (the "**Auction**") as July 30, 2025 at 10 am (CT); (ii) established the logistics of the Auction and bidding process; (iii) reserved certain of Lender's rights, including the right to credit bid, set a minimum reserve price, reject any bid, terminate or adjourn the sale, and revise the Terms of Sale (as defined therein); (iv) set forth the requirements for a prospective bidder to be considered a Qualified Bidder (as defined therein); (v) established a deadline to submit qualified bids  (the "**Qualified Bidder Deadline**") of July 23, 2025 at 5:00 pm (CT) and included other Auction logistics, including the zoom log in information for the same. A true and correct copy of the Terms of Sale Notice is attached to hereto as <u>Exhibit J</u>.

29.     On July 22, 2025, Lender sent notice of the adjournment of the Auction (the "**First Adjournment Notice**"), which notified Debtor that it was adjourning the Auction to August 19, 2025 at 9:00 am (CT) and adjourning the Qualified Bidder Deadline to August 12, 2024 at 5:00 pm (CT). A true and correct copy of the First Adjournment Notice is attached hereto as <u>Exhibit K</u>.

30.     On July 24, 2025, Lender sent a second notice of the adjournment of the Auction (the "**Second Adjournment Notice**"), which notified Debtor that it was adjourning the Auction to August 27, 2025 at 12:30 pm (CT) and adjourning the Qualified Bidder Deadline to August 20,

2024 at 5:00 pm (CT). A true and correct copy of the Second Adjournment Notice is attached to the hereto as <u>Exhibit L</u>.

31.　　On August 1, 2025, Lender sent a letter (the "**Fifth Notice of Default**"), which (i) notified Debtor of continued events of default due to Debtor's failure to cure the Events of Default outlined in the First, Second, Third, and Fourth Notices of Default; (ii) notified Debtor of its additional default under Section 7.1.19(a) of the Loan Agreement resulting from its default under its licensing agreement with IHG Franchising, LLC (the "**IHG Licensing Agreement**") caused by its failure to pay the fees due thereunder in the amount of $170,795.26 and failure to maintain the requisite Guest Love Score (as defined in the IHG Licensing Agreement).

**D.　　The TRO Motion and Foreclosure Process**

32.　　Two days prior to the scheduled foreclosure sale, the Debtor filed a Motion for Temporary Restraining Order (the "**TRO Motion**") in the Texas Court on August 25, 2025.

33.　　On August 26, 2025, a hearing was held with respect to the TRO Motion, and the Texas Court granted the TRO Motion such that the Auction temporarily was postponed, subject to further hearing that was held on September 9 and 10, 2025. I was called as a witness representing the Lender at the hearing.

34.　　At the hearing, the Texas Court denied the TRO Motion in its entirety. A true and correct copy of the Texas Court's denying the TRO Motion is attached to the hereto as <u>Exhibit M</u>.

35.　　Following entry of the Texas Court's order, Lender sent Debtor the September 15, 2025 Letter (the "**September Notice**"), pursuant to which Lender notified Debtor (i) that the foreclosure sale was adjourned to October 6, 2025 at 2:30 p.m. (CT) and the Qualified Bidder Deadline was adjourned to September 29, 2025 at 5:00 p.m. (CT) and (ii) of its continuing defaults under the Loan Documents. Lender attached to the September Notice that certain Third Amended

107074163.3

and Restated Notice of Disposition of Collateral, that certain Third Amended and Restated Terms of Sale, and that further updated Notice of Public Sale of Collateral, and CBRE (defined below) resumed its marketing efforts with respect to the Equity Collateral. A true and correct copy of the September Notice is attached to the hereto as <u>Exhibit N</u>.

36.     Debtor then filed its chapter 7 bankruptcy petition on October 6, 2025 at 12:26 p.m. (ET), halting the Auction.

**E.     Lender's Marketing Efforts**

37.     On April 7, 2025, Lender engaged CBRE Capital Markets, Inc. ("**CBRE**") as its exclusive brokerage advisor in connection with the pending foreclosure sale.

38.     Lender also engaged Mannion Auctions, LLC ("**Mannion**") and Moecker Auctions, Inc. ("**Moecker**") to conduct the Auction. Lender selected Mannion because of its vast experience in auctions related to U.C.C. foreclosure sales generally and the sale of LLC membership interests specifically. Moecker is a Texas-licensed auctioneer that was selected at the recommendation of Mannion because the Auction was to be conducted under Texas law.

39.     As set forth more fully in the Motion, CBRE launched a comprehensive marketing campaign that included dissemination of the sale notices across multiple national and regional publications and via email to CBRE's proprietary investor database, reaching thousands of investors. The cost of the marketing campaign totaled approximately $350,000.

40.     Despite these efforts, the campaign yielded no Qualified Bidders for the Equity Collateral.

Executed this 12th day of November, 2025.

/s/ *Marisa Lizak*
Marisa Lizak

# **<u>EXHIBIT A</u>**

(Loan Agreement)

# LOAN AGREEMENT

by and between

**ACRON 2 PORSCHE DRIVE MEZZCO LLC,**
as Borrower

and

**CAI OVERLAND LENDER, LLC,**
as Lender

Mezzanine Loan Amount: $11,600,000

January 18, 2024

5129199.27

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

ARTICLE 1 CERTAIN DEFINITIONS ...................................................................5
   1.1.   Definitions.....................................................................................................5

ARTICLE 2 GENERAL MEZZANINE LOAN TERMS ........................................30
   2.1.   Mezzanine Loan; Closing Conditions...........................................................30
       2.1.1  Closing Fees, Costs and Charges ....................................................30

   2.2.   Interest Rate and Loan Debt Service Payments .............................................33
       2.2.1  Interest Rate .....................................................................................33
       2.2.2  Initial Interest Payment for Stub Period in January 2024 ...............34
       2.2.3  Monthly Loan Debt Service Payments ...........................................34
       2.2.4  Amounts Due on Maturity Date.......................................................34
       2.2.5  Advances.........................................................................................34
       2.2.6  Servicing Fee ..................................................................................35

   2.3.   Prepayment ....................................................................................................35
       2.3.1  Prepayment in Whole; Exceptions...................................................35
       2.3.2  Prepayment Conditions....................................................................35
       2.3.3  Partial Prepayments. ........................................................................36
       2.3.4  Minimum Interest during Event of Default. ....................................36
       2.3.5  No Reinvestment Obligations. .........................................................36
       2.3.6  Waiver of Prepayment Right Without Premium...............................36

   2.4.   Late Fee..........................................................................................................36

   2.5.   Default Rate Accrual on Amounts Owed .......................................................37

   2.6.   Application of Payments.................................................................................37
       2.6.1  Application of Payments If No Event of Default Exists...................37
       2.6.2  Application of Payments During Event of Default...........................37

   2.7.   Payments; Business Day.................................................................................38

   2.8.   Release of Collateral ......................................................................................38

   2.9.   Increased Costs ..............................................................................................38
       2.9.1  Increased Costs Generally................................................................38
       2.9.2  Capital Requirements.......................................................................39
       2.9.3  Certificates for Reimbursement .......................................................39
       2.9.4  Delay in Requests ............................................................................39

   2.10.  Illegality ........................................................................................................39

   2.11.  Special Circumstances and Suspension or Modification of Interest Rate ...........40
       2.11.1 Substitute Index. .............................................................................40
       2.11.2 Spread Adjustment; Adjusted Substitute Index. .............................40

   2.12.  Borrower Extension Options...........................................................................41

2.12.1   Extension Request Notice. .................................................41
2.12.2   Certification from Borrower and Guarantor. .........................41
2.12.3   Amendments/Reaffirmations. ..............................................41
2.12.4   Extension Fee. ....................................................................41
2.12.5   Extension Debt Yield Test. ..................................................41
2.12.6   Extension DSCR Test. .........................................................42
2.12.7   Extension LTV Test. ............................................................42
2.12.8   Intentionally Omitted. .........................................................43
2.12.9   Intentionally Omitted. .........................................................43
2.12.10  Continuing Lien on Collateral; UCC Policy .........................43
2.12.11  Senior Loan Term ...............................................................43
2.12.12  Borrower Cooperation; Payment of Lender's Costs and Expenses ........43
2.12.13  Extension Prepayment ........................................................43
2.12.14  Satisfaction of Extension Conditions for Borrower's First
            Extension Option. ...............................................................44

ARTICLE 3   CASH MANAGEMENT ..............................................................44

3.1.    Gross Revenue Collections into Hotel Operating Account ...................44

3.2.    Establishment of Accounts ...............................................................44
        3.2.1   Borrower's Operating Account ...............................................44
        3.2.2   Lender Account ....................................................................45
        3.2.3   Reserves ..............................................................................45

3.3.    Distributable Cash Flow Sweep .........................................................45
        3.3.1   Distributable Cash Flow Sweep during Distributable Cash Flow
                Sweep Period ......................................................................45
        3.3.2   Distributable Cash Flow Sweep Period - Prior to Initial Maturity
                Date ....................................................................................45
        3.3.3   Distributable Cash Flow Sweep Period - During Extension Periods ........45
        3.3.4   Distributable Cash Flow Sweep Period – Mandated Renovation
                Program under IHG License ..................................................46
        3.3.5   Administration of Distributable Cash Flow from Lender Account
                and Excess Cash Flow ..........................................................46
        3.3.6   Return of Excess Cash Flow ..................................................46
        3.3.7   Principal Paydown/Letter of Credit .......................................47

ARTICLE 4   RESERVE ACCOUNTS ..............................................................47

4.1.    Tax Reserve .....................................................................................47

4.2.    Insurance Reserve ............................................................................48

4.3.    FF&E Reserve ...................................................................................48
        4.3.1   Deposits ..............................................................................48
        4.3.2   FF&E Expenditures ...............................................................48
        4.3.3   Conditions to Disbursements ................................................49
        4.3.4   Return and Direct Disbursement of FF&E Funds.....................50
        4.3.5   Conditions to Reduced FF&E Collection .................................50

4.4.    Intentionally Omitted .......................................................................50

4.5.    Debt Service Reserve ................................................................................50
  4.5.1    Deposits.............................................................................................51
  4.5.2    Release of Debt Service Funds .........................................................51

ARTICLE 5 MAINTENANCE AND PLEDGE OF ACCOUNTS...........................................51

5.1.    Maintenance of Accounts .........................................................................51
  5.1.1    Name of Accounts.............................................................................51
  5.1.2    Disbursement Authority ....................................................................52
  5.1.3    Investment of Funds..........................................................................52
  5.1.4    Application During Event of Default.................................................52

5.2.    Pledge of Accounts; Security Interests .....................................................53
  5.2.1    Pledge of Account Collateral ............................................................53
  5.2.2    Control ..............................................................................................53
  5.2.3    No Waiver..........................................................................................53
  5.2.4    Treatment of Account Collateral in Bankruptcy...............................54

5.3.    Return of Funds........................................................................................54

ARTICLE 6 REPRESENTATIONS AND WARRANTIES.....................................................54

6.1.    Representations and Warranties as to Entities ..........................................54
  6.1.1    Due Authorization; Approvals...........................................................54
  6.1.2    Organizational Structure; Borrower's Legal Name; No Conflict.............54
  6.1.3    Taxes .................................................................................................55
  6.1.4    Enforceability....................................................................................55
  6.1.5    Litigation ...........................................................................................55
  6.1.6    Defaults of Borrower Control Person ...............................................55
  6.1.7    No Bankruptcy Filing .......................................................................56
  6.1.8    Solvency............................................................................................56
  6.1.9    Other Indebtedness............................................................................56
  6.1.10  Full and Accurate Disclosure; Financial Information.......................56
  6.1.11  Investment Company Act; Public Utility Holding Company Act .............56
  6.1.12  Compliance with Legal Requirements...............................................57
  6.1.13  No Foreign Person or Prohibited Person; Source of Funds ...............57
  6.1.14  Labor Matters; ERISA ......................................................................57
  6.1.15  No Offsets..........................................................................................57

6.2.    Representations and Warranties as to the Property....................................57
  6.2.1    Title to the Property ..........................................................................57
  6.2.2    Utilities and Public Access; Property Record Agreements.......................58
  6.2.3    Compliance with Legal Requirements...............................................58
  6.2.4    Compliance with Insurance Requirements ........................................58
  6.2.5    Deed of Trust ....................................................................................58
  6.2.6    Assessments; Abatements; Separate Tax Lots...................................58
  6.2.7    No Encroachments.............................................................................59
  6.2.8    Leases ................................................................................................59
  6.2.9    Contracts ...........................................................................................59
  6.2.10  No Other Real Property .....................................................................59

6.2.11 Fees, Commissions and Compensation....................................................59
6.2.12 Zoning...............................................................................................59
6.2.13 Flood Zone.........................................................................................60
6.2.14 Permits..............................................................................................60
6.2.15 Repairs and Alterations; No Condemnation or Casualty...........................60
6.2.16 Brokers and Financial Advisors.............................................................60
6.2.17 Intellectual Property............................................................................60
6.2.18 Borrower Rental Agreement..................................................................60
6.2.19 Property Management Agreement...........................................................60
6.2.20 IHG License........................................................................................60
6.2.21 Merchant Schedule..............................................................................60
6.2.22 Maximum Closing LTV.........................................................................61
6.2.23 Combined Loan Amount.......................................................................61

6.3.    Representations and Warranties as to the Collateral..............................................61
6.3.1 Title to the Collateral............................................................................61
6.3.2 Security Instrument...............................................................................61

6.4.    Reliance on Representations..............................................................................61

ARTICLE 7 COVENANTS .................................................................................................61

7.1.    Affirmative Covenants......................................................................................61
7.1.1 Performance of Loan Documents............................................................62
7.1.2 Performance Under Other Encumbrances.................................................62
7.1.3 Taxes and Assessments.........................................................................62
7.1.4 Maintenance and Repair of Property and Chattels; Contracts; Use...........63
7.1.5 Condemnation; Casualty; Capital Proceeds.............................................65
7.1.6 Financial Reporting..............................................................................67
7.1.7 Books and Records; Inspection Rights; Access to Property.......................70
7.1.8 Cooperate in Legal Proceedings; Notices of Litigation.............................70
7.1.9 Further Assurances................................................................................71
7.1.10 Management and Leasing of the Property.................................................71
7.1.11 Compliance with Legal Requirements......................................................73
7.1.12 Single Purpose Entity; Preservation of Existence; Non-Foreign
        Status..................................................................................................74
7.1.13 Leases.................................................................................................74
7.1.14 Prohibited Persons; Economic Sanctions; Anti-Money Laundering;
        Corporate Transparency Act...................................................................76
7.1.15 Replacement Guarantor.........................................................................78
7.1.16 Minimum Guarantor Financial Requirement.............................................78
7.1.17 General Indemnity................................................................................78
7.1.18 Title to Collateral.................................................................................80
7.1.19 IHG License and Property Manager's Hotel Operations.............................80
7.1.20 Senior Loan Covenants.........................................................................81
7.1.21 Meetings in Texas................................................................................81

7.2.    Negative Covenants.........................................................................................81
7.2.1 Waste and Alterations...........................................................................81

7.2.2   Zoning and Private Covenants ...................................................82
7.2.3   Liens on the Property or other Collateral .................................82
7.2.4   Indebtedness ...........................................................................82
7.2.5   Property Record Agreements ...................................................82
7.2.6   ERISA; Labor Matters .............................................................83
7.2.7   Distributions ...........................................................................83
7.2.8   Improper Use of Property, Chattels, or other Collateral .........83
7.2.9   Name and Business of Borrower; Jurisdiction of Organization ...............83
7.2.10  Use of Proceeds ......................................................................84
7.2.11  Assessments against Property ................................................84
7.2.12  Property Management Agreement ...........................................84
7.2.13  IHG License .............................................................................84
7.2.14  Bond Documents ....................................................................85
7.2.15  Combined Loan Amount .........................................................85
7.2.16  Senior Loan Amount ...............................................................85

7.3.    Compliance Certificate ......................................................................85

7.4.    Post-Closing Obligations ...................................................................85

ARTICLE 8 TRANSFERS .........................................................................................85

8.1.    Transfer, Encumbrance and Change of Control Prohibition Regarding
        Owner and Property .........................................................................85

8.2.    Chattel Transfers ..............................................................................86

8.3.    Transfer, Encumbrance and Change of Control Prohibition Regarding
        Collateral and Borrower ...................................................................86

8.4.    Permitted Transfers ..........................................................................86
        8.4.1   Transfers of Direct or Indirect Ownership Interests in Borrower
                and Owner .....................................................................86
        8.4.2   Permitted Transfer Conditions ...............................................87
        8.4.3   Lender's Costs .......................................................................89

8.5.    Permitted Indebtedness ....................................................................89
        8.5.1   Trade Payables; Permitted Equipment Financing .....................89
        8.5.2   Permitted Indebtedness Conditions ........................................89
        8.5.3   Permitted Subordinated Member Loans ..................................90

8.6.    Immediate Event of Default ..............................................................90

ARTICLE 9 INSURANCE .........................................................................................90

9.1.    Property and Related Insurance ........................................................91
        9.1.1   Property Insurance .................................................................91
        9.1.2   Rental Loss/Business Interruption .........................................91
        9.1.3   Boiler and Machinery .............................................................91
        9.1.4   Builder's Risk .........................................................................91
        9.1.5   Flood ......................................................................................92
        9.1.6   Earthquake .............................................................................92
        9.1.7   Pollution/Environmental .........................................................92

9.1.8    Terrorism (Property) ....................................................................92

9.2.    Liability Insurance ...............................................................................92
9.2.1    General Liability Insurance...............................................................92
9.2.2    Commercial General Liability Insurance for Construction .....................93
9.2.3    Insurance for Independent Vendors ...................................................93
9.2.4    Workers' Compensation and Employer's Liability Insurance..................93
9.2.5    Excess/Umbrella Liability Insurance .................................................93

9.3.    Other Insurance Coverage ....................................................................93

9.4.    Other Requirements With Respect to Insurance .......................................94
9.4.1    Insurance Companies.....................................................................94
9.4.2    Deductibles .................................................................................94
9.4.3    Automatic Reinstatement; Blanket Policies; Joint Loss Agreement .........94
9.4.4    Evidence of Insurance ...................................................................94
9.4.5    Other Contents of Required Insurance Policies ...................................95
9.4.6    Cancellation; Replacement .............................................................95
9.4.7    Separate Insurance .......................................................................95
9.4.8    Contravention of Insurance ............................................................96
9.4.9    Payment of Premium; Failure of the Borrower to Effect Insurance .........96
9.4.10   Successor's Rights ........................................................................96
9.4.11   Notice of Changes ........................................................................96
9.4.12   Leases........................................................................................97

ARTICLE 10 EVENTS OF DEFAULT; REMEDIES ..............................................97

10.1.    Event of Default .................................................................................97
10.1.1   Failure to Pay Scheduled Amounts...................................................97
10.1.2   Failure to Pay Other Amounts ........................................................97
10.1.3   Violation of Certain Covenants .......................................................97
10.1.4   Other Obligations ........................................................................97
10.1.5   Levy Against Property ...................................................................98
10.1.6   Liquidation; Division ....................................................................98
10.1.7   Appointment of Receiver ...............................................................98
10.1.8   Assignments ...............................................................................98
10.1.9   Order for Relief ...........................................................................98
10.1.10  Bankruptcy .................................................................................98
10.1.11  Admission Regarding Debt..............................................................98
10.1.12  Misrepresentation.........................................................................98
10.1.13  Judgments ..................................................................................98
10.1.14  Assertion of Priority .....................................................................98
10.1.15  Other Loan Documents ..................................................................99
10.1.16  Other Liens.................................................................................99
10.1.17  Other Indebtedness .......................................................................99
10.1.18  Injunction ..................................................................................99
10.1.19  Validity of Loan Documents............................................................99
10.1.20  Cash Management; Accounts ...........................................................99
10.1.21  Financial Statements ....................................................................99

10.1.22 Property Management Agreement ........................................99
10.1.23 IHG License ...........................................................99
10.1.24 Senior Event of Default ...........................................100

10.2. Remedies.................................................................100
10.2.1 Performance of Defaulted Obligations and Protective Advances...........100
10.2.2 Specific Performance and Injunctive Relief .............................100
10.2.3 Acceleration of Secured Obligations....................................100
10.2.4 Suit for Monetary Relief ..............................................100

ARTICLE 11 GENERAL PROVISIONS ................................................101

11.1. Expiration of Borrower Claims............................................101

11.2. Time of the Essence .....................................................101

11.3. Joint and Several Obligation ............................................101

11.4. Waivers by Borrower .....................................................101
11.4.1 Homestead, Marshaling of Assets and other Rights .....................101
11.4.2 Claims for Monetary Damages ..........................................101
11.4.3 Required Notices......................................................102
11.4.4 Offsets; Counterclaims................................................102

11.5. Entire Agreement; Modification in Writing; No Implied Waivers by Lender
.............................................................................102

11.6. Lender's Discretion; Binding Action ....................................103

11.7. Headings; Exhibits and Schedules Incorporated...........................103

11.8. Governing Law; Forum....................................................103

11.9. WAIVER OF TRIAL BY JURY .................................................103

11.10. Notices ...............................................................104

11.11. Severability ..........................................................105

11.12. Preferences; Reinstatement ............................................105

11.13. No Joint Venture or Partnership .......................................105

11.14. Conflict; Construction; Counterparts...................................106

11.15. Estoppel Certificates; Appraisals......................................106
11.15.1 Estoppel Certificates ...............................................106
11.15.2 Appraisals ..........................................................106

11.16. No Third Party Beneficiaries; Successors and Assigns ..................106

11.17. Sale of Mezzanine Loan and Securitization; Future Loan Modification ...107
11.17.1 Loan Modifications ..................................................107
11.17.2 Securitization ......................................................107
11.17.3 Disclosure of Lease Information......................................108

11.18. Subrogation of Lender .................................................108

11.19.  Appointment of Servicer and Delegation of Lender Responsibilities ...............108
    11.19.1  Appointment and Replacement of Servicer ..........................................108
    11.19.2  Servicer Fees; Designation of Lender Responsibilities ......................108

11.20.  Payment of Expenses ...............................................................................109
    11.20.1  Payment of Lender's Costs and Expenses ...........................................109
    11.20.2  Attorneys' Fees References ................................................................110
    11.20.3  Fee Deposit .......................................................................................110

11.21.  Disclaimer Regarding Third Party Reports..........................................110

11.22.  Acceptance of Cures for Events of Default ...........................................111

ARTICLE 12  LIMITATION ON LIABILITY...........................................................111

12.1.  General Limitation on Liability .................................................................111

12.2.  Loss Recourse Events ..............................................................................111

12.3.  Springing Recourse Events ......................................................................111

ARTICLE 13  SENIOR LOAN ...............................................................................112

**List of Exhibits and Schedules**

<u>**EXHIBITS**</u>

Exhibit A  Property Description

Exhibit B  Organizational Chart

Exhibit C  FF&E Budget

Exhibit D  Borrower Rental Agreement

Exhibit E  Property Management Agreement

Exhibit F  IHG License (including First Amendment)

Exhibit G  Form of PCNA Estoppel

<u>**SCHEDULES**</u>

Schedule 1     Contracts, Brokerage Agreements and Commissions
Schedule 2     Merchant Schedule
Schedule 3     Post-Closing Obligations

# LOAN AGREEMENT

This **LOAN AGREEMENT**, is made as of January 18, 2024 ("**Effective Date**"), by and between **CAI OVERLAND LENDER, LLC**, a Delaware limited liability company, having its principal place of business at c/o Civitas Capital Group, 1722 Routh Street, Suite 800, Dallas, Texas 75201, as lender ("**Lender**"), and **ACRON 2 PORSCHE DRIVE MEZZCO LLC**, a Delaware limited liability company, having its principal place of business at c/o Acron (USA), L.P., 2424 East 21st Street, Suite 150, Tulsa, Oklahoma 74114, as borrower ("**Borrower**").

## RECITALS

A.      Borrower has requested that Lender make a mezzanine loan (the "**Mezzanine Loan**") to Borrower in the maximum principal amount of up to $11,600,000 ("**Mezzanine Loan Amount**") to be secured by, among other things, the pledge of 100% of Borrower's limited liability company interests in ACRON 2 Porsche Drive, Atlanta LLC, a Delaware limited liability company, having its principal place of business at c/o Acron (USA), L.P., 2424 East 21st Street, Suite 150, Tulsa, Oklahoma 74114 ("**Owner**").

B.      Borrower was formed as a Delaware limited liability company on August 7, 2023 and is currently the owner of 100% of the limited liability company interests of Owner.  Prior to such time, Owner was owned by the following three members: (i) ACRON 2 Porsche Drive Holding LLC, a Delaware limited liability company with a 99% limited liability company interest in Owner, (ii) Partnership Guarantor (as defined below in Recital H) with a 0.9% limited liability company interest in Owner, and (iii) Castleton Holdings LLC, a District of Columbia limited liability company with a 0.1% limited liability company interest in Owner.

C.      Owner, as the prior fee simple owner of the Land (as defined in the Deed of Trust) commonly known by the street address of 2 Porsche Drive, Hapeville, Georgia 30354, entered into that certain Deed to Secure Debt, Security Agreement and Fixture Financing Statement in favor of Bank of Ozarks ("**Original Lender**"), dated December 30, 2015 and recorded on December 31, 2015 in Book 55721, Page 564 of the deed records of the Clerk of the Superior Court of Fulton County, Georgia (the "**Original Security Deed**"), encumbering the Land and certain other real and personal property described in the Original Security Deed, more particularly described and defined as the "Property" in the Deed of Trust (as defined below in these Recitals) in connection with Owner's loan from Original Lender in the original principal amount of $30,000,000 (the "**Original Loan**"), as evidenced by a promissory note in favor of Original Lender in the original principal amount of $30,000,000 (the "**Original Note**").

D.      Subsequent to the recordation of the Original Security Deed, Owner conveyed certain interests in the mortgaged Property to the Development Authority of the City of Hapeville, a public body corporate and politic of the State of Georgia (the "**Authority**") pursuant to the terms of that certain Purchase, Sale, Financing and Option Agreement dated May 5, 2017 (the "**Purchase Agreement**") by the recordation of that certain Limited Warranty Deed dated December 20, 2017 and recorded on December 20, 2018 in Book 58279, Page 573 of the deed records of the Clerk of the Superior Court of Fulton County, Georgia, such conveyance to the Authority being subject to the continued encumbrance of the Original Security Deed.

E.      As contemplated by the Purchase Agreement and in connection with the transfer of certain interests in the mortgaged Property by Owner to the Authority, the Authority issued its Economic Development Revenue Bond (Solis Hotel 2 Porsche Drive Project), Series 2017, in the aggregate principal amount of up to $424,097,500 (the "**Bond**") for the benefit of Owner (the "**Bond Transaction**").

F.      As contemplated by the Purchase Agreement, Bond and other documentation executed in connection with the Bond Transaction, Owner entered into that certain Rental Agreement dated May 5, 2017 (together with all amendments, restatements, replacements and supplements thereof, the "**Borrower Rental Agreement**") as evidenced by that certain Short Form Rental Agreement between the same parties, dated May 5, 2017, and recorded in Deed Book 57489, page 218, Fulton County, Georgia records, as corrected by that certain Corrective Short Form Rental Agreement dated May 5, 2017, filed January 2, 2019, and recorded in Deed Book 59576, Page 216, Fulton County, Georgia records, for Owner's continued use and occupancy of the portion of the mortgaged Property owned by the Authority as more particularly described in the Borrower Rental Agreement.

G.      Immediately prior to the effectiveness of the A&R Security Deed (as defined below), Original Lender assigned all its rights, title and interest in the Original Note and Original Security Deed to Senior Lender, as evidenced by that certain Assignment of Note and Deed to Secure Debt from Original Lender to Senior Lender, dated December 21, 2018 and recorded on January 2, 2019 as Deed Book 59576, Page 213, in the deed records of the Clerk of the Superior Court of Fulton County, Georgia (the "**Original Loan Assignment**").

H.      Owner subsequently executed and delivered to Senior Lender that certain Amended and Restated Deed to Secure Debt, Assignment, Security Agreement and Fixture Filing, dated as of December 21, 2018 ("**A&R Security Deed**"), as consented to by the Authority, to amend and restate the Original Security Deed in its entirety in connection with the refinancing of the Original Loan with a term loan (the "**Senior Loan**") in the principal sum of $36,000,000 ("**Senior Loan Amount**") or so much thereof as may be advanced pursuant to that certain Loan Agreement, dated as of December 21, 2018, between Owner and Senior Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Senior Loan Agreement**") and evidenced by the amendment and restatement of the Original Note pursuant to that certain Amended and Restated Promissory Note, dated as of December 21, 2018 made by Owner to Senior Lender (such promissory note, together with all extensions, renewals, replacements, restatements or modifications thereof being hereinafter collectively referred to as the "**Senior Note**"). Pursuant to the Senior Loan Agreement and other Senior Loan Documents, the original guarantors consisted of jointly and severally, individually and collectively, (i) Bruce Bradley, an individual resident in the state of Maryland, and the Bruce F. Bradley Revocable Trust (collectively, "**Bradley Guarantors**") and (ii) ACRON (USA), L.P., a Texas limited partnership ("**Partnership Guarantor**") and ACRON AG, a Swiss stock corporation ("**ACRON AG Guarantor**", together with Partnership Guarantor, the "**ACRON Guarantors**").

I.      Senior Lender and Owner subsequently amended the original Senior Loan Agreement pursuant to the First Amendment to Loan Agreement and Other Loan Documents and Reaffirmation of Loan Documents, dated as of December 31, 2021 ("**First Amendment to Senior Loan Agreement**"), among Senior Lender, Owner, the ACRON Guarantors, TH Investment

Holdings II, LLC, a Delaware limited liability company ("**TH Investment Guarantor**", together with the ACRON Guarantors, the "**Senior Loan Guarantors**") and the Bradley Guarantors, to make certain modifications to the original Senior Loan Agreement and Senior Loan Documents, including but not limited to the following: (i) to amend the definition of "Maturity Date" so as to extend the Maturity Date of the Senior Loan from December 21, 2021 to January 2, 2023, (ii) to replace the Bradley Guarantors with the TH Investment Guarantor, and (iii) for Owner to make a principal paydown of the Senior Loan in the amount of $3,000,000, in order to reduce the outstanding principal balance of the Senior Loan from $36,000,000 to $33,000,000.

J.      Concurrently with the execution of the First Amendment to Senior Loan Agreement, Senior Lender reflected the Senior Loan's Maturity Date extension from December 21, 2021 to January 2, 2023 in the First Amendment to Amended and Restated Deed to Secure Debt, Assignment, Security Agreement and Fixture Filing, dated as of December 31, 2021 ("**First Amendment to A&R Security Deed**"), which was recorded on January 7, 2022 in Book 65100, Page 148 of the deed records of the Clerk of the Superior Court of Fulton County, Georgia.

K.      Senior Lender and Owner subsequently further amended the original Senior Loan Agreement pursuant to the Second Amendment to Loan Agreement and Other Loan Documents and Reaffirmation of Loan Documents, dated as of January 2, 2023 ("**Second Amendment to Senior Loan Agreement**"), among Senior Lender, Owner, and the Senior Loan Guarantors, to make certain further modifications to the original Senior Loan Agreement and other Senior Loan Documents (which had been previously amended by the First Amendment to Senior Loan Agreement and First Amendment to A&R Security Deed), including but not limited to the following: to amend the definition of "Maturity Date" so as to extend the Maturity Date of the Senior Loan from January 2, 2023 to May 2, 2023.

L.      Concurrently with the execution of the Second Amendment to Senior Loan Agreement, Senior Lender reflected the Senior Loan's Maturity Date extension from January 2, 2023 to May 2, 2023 in the Second Amendment to Amended and Restated Deed to Secure Debt, Assignment, Security Agreement and Fixture Filing, dated as of January 2, 2023 ("**Second Amendment to A&R Security Deed**"), which was recorded on January 25, 2023 in Book 66495, Page 686 of the deed records of the Clerk of the Superior Court of Fulton County, Georgia.

M.      Pursuant to that certain Letter Agreement, dated May 5, 2023 ("**May 2023 Letter Agreement**"), from Senior Lender, on the one hand, and acknowledged and agreed to by Owner and the Senior Loan Guarantors, on the other hand, Senior Lender agreed to extend the Maturity Date of the Senior Loan on a one-time basis from May 2, 2023 to August 2, 2023 subject to Borrower's satisfaction of the terms and conditions set forth in the May 2023 Letter Agreement.

N.      Pursuant to that certain Letter Agreement, dated August 31, 2023 ("**August 2023 Letter Agreement**"), from Senior Lender, on the one hand, and acknowledged and agreed to by Owner and the Senior Loan Guarantors, on the other hand, Senior Lender agreed to extend the Maturity Date of the Senior Loan on a one-time basis from August 2, 2023 to October 2, 2023 subject to Borrower's satisfaction of the terms and conditions set forth in the August 2023 Letter Agreement.

O.    Senior Lender and Owner further amended the Senior Loan Agreement pursuant to the Third Amendment to Loan Agreement and Other Loan Documents and Reaffirmation of Loan Documents, dated as of the Effective Date ("**Third Amendment to Senior Loan Agreement**"), among Senior Lender, Owner, and the Senior Loan Guarantors, to make certain further modifications to the original Senior Loan Agreement and other Senior Loan Documents (which had been previously amended by the First Amendment to Senior Loan Agreement, Second Amendment to Senior Loan Agreement, May 2023 Letter Agreement, and August 2023 Letter Agreement), including but not limited to the following: (i) to amend the definition of "Maturity Date" so as to extend the Maturity Date of the Senior Loan from October 2, 2023 to the Initial Maturity Date (as defined herein); (ii) for Owner to make a principal paydown of the Senior Loan in the amount of $8,000,000, in order to reduce the outstanding principal balance of the Senior Loan from $33,000,000 to $25,000,000; (iii) to permit the Mezzanine Loan hereunder and account for the release of the original Pledge Agreement (which was part of the Senior Loan Documents, prior to the Effective Date, the "**Original Pledge**") so that 100% of the limited liability company interests in Owner may be pledged to Lender pursuant to the Security Instrument (as defined herein), and (iv) to effect other modifications required by Lender to evidence, preserve and/or protect the Collateral and the Liens of the Loan Documents or to better and more effectively carry out the intents and purposes of this Agreement and the other Loan Documents.

P.    Concurrently with the execution of the Third Amendment to Senior Loan Agreement, Senior Lender reflected the Senior Loan's Maturity Date extension from October 2, 2023 to the Initial Maturity Date in the Third Amendment to Amended and Restated Deed to Secure Debt, Assignment, Security Agreement and Fixture Filing, dated as of the Effective Date ("**Third Amendment to A&R Security Deed**"), which Senior Lender shall record (or cause to have recorded) at Closing in the deed records of the Clerk of the Superior Court of Fulton County, Georgia.

Q.    Concurrently with the execution of the Third Amendment to Senior Loan Agreement and Third Amendment to A&R Security Deed, Senior Lender executed certain other related transaction documents with respect to the Senior Loan, including, but not limited to, the release of the Original Pledge (as defined above) and escrow letter, in order to effect amendments to the Senior Loan and to permit the Mezzanine Loan.

R.    Lender is unwilling to make the Mezzanine Loan unless Borrower executes and delivers this Agreement, and Borrower and Guarantor (as defined below) execute and deliver the other Loan Documents (as defined below) to which Borrower and/or Guarantor are a party, which Loan Documents shall establish the terms and conditions of, and provide security for, the Secured Obligations (as defined below).

**NOW, THEREFORE**, in consideration of the making of the Mezzanine Loan by Lender and for other good and valuable consideration, the mutual receipt and legal sufficiency of which are hereby acknowledged, Borrower and Lender hereby covenant, agree, represent and warrant as follows:

## ARTICLE 1

## CERTAIN DEFINITIONS

1.1.    <u>Definitions</u>.  For all purposes of this Agreement and each other Loan Document, (i) unless otherwise specified, all accounting terms have the meanings assigned to them in accordance with GAAP, (ii) the words "Dollars" or "dollars" and the symbols "$" shall mean and refer to the currency of the United States of America, (iii) the words "include", "included," "including", "includes" and words of similar import shall be deemed to be followed by the words "without limitation", and (iv) any requirement that a Person perform any covenant, obligation, promise, representation, warranty or other understanding shall be deemed to include a requirement that such Person pay all amounts necessary or required to perform such covenant, obligation, promise, representation, warranty or other understanding.  For all purposes of this Agreement:  (a) the capitalized terms defined in this <u>Section 1.1</u> include the plural as well as the singular; (b) unless otherwise expressly set forth in this Agreement, "herein", "hereof", "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section, clause or other subdivision; (c) unless otherwise specified herein, all references to Sections, subsections, Articles, Exhibits or Schedules shall refer to the Sections, subsections, Articles, Exhibits and Schedules hereof; and (d) the following terms have the following meanings:

"<u>Account Collateral</u>" means, collectively, (i) all funds, money or cash from time to time on deposit in the Accounts, (ii) all of Borrower's right, title and interest in and to the Accounts and such funds, (iii) all proceeds and all rights to payment from the Accounts and such funds and all interest accruing thereon, (iv) any dividends, certificates, instruments and securities or other "investment property" (as defined in the UCC), if any, representing such funds, (v) all claims, demands, general intangibles, choses in action and other rights or interests of Borrower in respect of the Accounts and such funds, (vi) any increases, renewals, extensions, substitutions and replacements thereof, and (vii) all proceeds of the foregoing.

"<u>Accounts</u>" means the Debt Service Reserve Account, the FF&E Reserve Account, the Insurance Reserve Account, the Tax Reserve Account, the Operating Account, any Capital Proceeds account, and any other reserve, account or subaccount maintained by Servicer or Lender in accordance with the terms of this Agreement, and all other "accounts" (whether now owned or hereafter acquired) as defined in the UCC relating to the Property and/or the Secured Obligations.

"<u>ACRON AG Guarantor</u>" has the meaning set forth in Recital H above.

"<u>ACRON Guarantors</u>" has the meaning set forth in Recital H above.

"<u>ACRON Guaranty</u>" means that certain Guaranty Agreement, dated as of the Effective Date, made by ACRON AG Guarantor and Partnership Guarantor to Lender, as the same may be amended, restated, supplemented, reaffirmed, replaced or otherwise modified from time to time.

"Adjusted NOI" means all Gross Revenue, less Operating Expenses, as determined on a cash basis of accounting, in each case, for the 12 calendar months immediately preceding the date of calculation; provided, however, for the purposes of calculating Adjusted NOI: (i) Operating Expenses shall be adjusted: (A) to include (I) a management fee equal to the greater of 3.0% of Gross Revenue and the actual management fees payable under the Property Management Agreement or IHG License (or any replacement license or franchise agreement) in place at the time of calculation, and (II) an FF&E reserve equal to the greater of 4.0% of Gross Revenue and the amount required by the Property Management or IHG License (or any replacement license or franchise agreement) in place at the time of calculation; (B) such that payments of Operating Expenses, including Property Impositions and insurance premiums, shall be spread out over the period during which such Operating Expenses accrued and shall be adjusted for any known future changes to any such Operating Expenses; (C) to exclude extraordinary or one-time items; and (D) such that any refunds or rebates to Operating Expenses shall be applied and credited against the applicable Operating Expenses for the period during which such Operating Expenses were incurred; and (ii) Gross Revenue shall be adjusted: (A) such that any prepaid Gross Revenue and other prepayments received by or on behalf of Owner shall be spread out over the periods during which such Gross Revenue is earned or applied by or on behalf of Owner, as applicable; (B) such that security deposits shall not be included as Gross Revenue until duly earned or applied by or on behalf of Owner, as applicable; (C) to exclude loans, Capital Proceeds, contributions to capital and extraordinary or one-time items; and (D) to be calculated based on a lease-in-place analysis that reflects the then-current Leases (excluding Hotel Transactions) in place as of the date of determination, in each case, as determined by Lender in accordance with Lender's then-current standard underwriting criteria, consistently applied (but expressly excluding from such analysis any Lease in which (I) the Tenant thereunder is in default in the payment of base rent for 30 days or more or there exists a material nonmonetary default under such Lease, (II) the Tenant thereunder is in bankruptcy or other similar insolvency proceeding, (III) there is a materially significant probability, as determined by Lender, that the Tenant thereunder will file bankruptcy or seek protection from creditors in another similar insolvency proceeding, (IV) the Tenant thereunder has 6 months or more free or abated rent under its Lease and the amount of such free or abated rent is not in a reserve held by Senior Lender or Lender, (V) the term remaining thereunder, not including any unexercised extension options, is equal to or less than 6 months, or (VI) with respect to a retail Lease, the Tenant thereunder is no longer in occupancy or has otherwise "gone dark").

"Adjusted Substitute Index" has the meaning set forth in Section 2.11.2.

"Affiliate" means, with respect to a specified Person, (i) a Person that Controls, is Controlled by or is under common Control with, the specified Person, (ii) any Person who is an officer, director, general partner, joint-venturer, manager, managing member or trustee of, or serves in a similar capacity with respect to, the specified Person, (iii) the spouse, issue, sibling, parent or grandparent of the specified Person, (iv) Guarantor, if the specified Person is Borrower or any Borrower Owner Person, (v) Borrower, if the specified Person is Guarantor or any Borrower Owner Person, (vi) each Borrower Owner Person, if the specified Person is Borrower, Guarantor or any other Borrower Owner Person, and (vii) any Person that would constitute an Affiliate of any such Person described in clauses (i) through (vi) above.

"Agreement" means this Loan Agreement, together with any Schedules and Exhibits hereto, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Anti-Money Laundering Laws" has the meaning set forth in the definition of the term "Prohibited Person".

"Applicable Interest Rate" means the Interest Rate, or if applicable pursuant to the terms of this Agreement or the other Loan Documents, the Default Rate.

"Appraisal" means a FIRREA-compliant appraisal of the Property obtained by Lender at the sole cost and expense of Borrower (subject to the terms of Section 11.15.2) that is (i) prepared by a Member of Appraisal Institute appraiser that is selected and engaged by Lender and is certified in the state where the Property is located and (ii) otherwise reasonably satisfactory in form and substance to Lender. A FIRREA-compliant appraisal means an appraisal of a financed property that is commissioned by Lender and satisfies the requirements of the Federal Institutions Reform Recovery and Enforcement Act or is otherwise acceptable to Lender in its sole discretion.

"Approved Accounting Principles" means GAAP (with respect to entities) or such other accounting method approved by Lender in writing (with respect to individuals), consistently applied.

"Approved Budget" has the meaning set forth in Section 7.1.6(e).

"Approved Insurer" has the meaning set forth in Section 9.4.1.

"Authority" means the Development Authority of the City of Hapeville, a public body corporate and politic of the State of Georgia, as set forth in the Recitals of this Agreement.

"Bank" has the meaning set forth in Section 3.2.1.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy", as amended from time to time, and any successor statute or statutes, and all rules and regulations from time to time promulgated thereunder.

"Bankruptcy Law" means (i) the Bankruptcy Code and (ii) any similar federal, state or other law, rule or regulation relating to bankruptcy, insolvency, reorganization, debtors' relief or creditors' rights, whether now or hereinafter in effect.

"Benchmark" means, initially, the SOFR or the Adjusted Substitute Index, if applicable, pursuant to the terms of Section 2.11 of this Agreement.

"Bond" has the meaning set forth in the Recitals of this Agreement.

"Bond Documents" has the collective meaning set forth in the Senior Loan Agreement and the Bond Pledge Agreement, dated as of December 21, 2018, by and between Owner and Senior Lender.

"Bond Transaction" has the meaning set forth in the Recitals of this Agreement.

"Borrower" has the meaning set forth in the preamble of this Agreement.

"Borrower Control Persons" means (i) Borrower, (ii) Guarantor, (iii) Owner, (iv) Partnership Guarantor, (v) ACRON US Management Inc., a Nevada corporation, and (vi) any other Person that Controls any of the Persons set forth in the preceding clauses (i), (ii), (iii), (iv) or (v).

"Borrower Owner Persons" means (i) any Person that is a Borrower Control Person, and (ii) any Person that owns, directly or indirectly, through one or more intermediaries, an interest of 10% or more in Borrower.

"Borrower Rental Agreement" has the meaning set forth in the Recitals of this Agreement.

"Borrower's First Extension Option" has the meaning set forth in Section 2.12.

"Borrower's Second Extension Option" has the meaning set forth in Section 2.12.

"Business Day" means every day on which national banking associations located in Georgia, Texas and New York are allowed to be open for general lending business, but specifically excluding Saturdays, Sundays and federal holidays; provided, however, for purposes of determining the SOFR, a Business Day shall also exclude a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities in accordance with the term "U.S. Government Securities Business Day" defined below.

"Capital Expenditures" means expenditures with respect to the Property that are, or would be if incurred, capitalized under GAAP.  For the avoidance of doubt, Capital Expenditures include Tenant Improvement Costs and Leasing Commissions.

"Capital Proceeds" means all casualty insurance proceeds (excluding business or rental loss insurance proceeds), condemnation awards and similar compensation (including proceeds from settlements of actual, potential or threatened insurance and condemnation claims) relating to or in respect of all or any part of the Property.

"Change in Law" means the occurrence, after the Effective Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Chattels" means the "Personal Property" as such term is defined in the Deed of Trust.

"Charges" means all fees, charges and/or any other things of value, if any, contracted for, charged, received, taken or reserved by Lender in connection with the transactions relating to this Agreement, the Note and the other Loan Documents, which are treated as interest under applicable law.

"Closing" means the closing of the Mezzanine Loan upon satisfaction of the conditions set forth in Section 2.1.

"Closing Date" means the date of Closing.

"Code" means the Internal Revenue Code of 1986, as amended, and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"Collateral" has the meaning set forth in the Security Instrument.

"Combined Loan Amount" means the sum of the Principal Indebtedness under the Mezzanine Loan and the Senior Indebtedness under the Senior Loan.

"Contracts" has the meaning set forth in Section 1.1(n) (Agreements) of the Deed of Trust.

"Control" means, with respect to any Person, either (i) ownership, directly or indirectly, of greater than fifty percent (50%) of the ownership interests in such Person or (ii) the possession, directly or indirectly through one or more intermediaries, of the power to direct (or cause the direction of) the management, activities and policies of such Person, whether through the ownership of voting securities, by contract or otherwise, subject only to customary major decision rights. Notwithstanding the foregoing, for purposes of Section 7.1.14 (Prohibited Persons; Economic Sanctions; Anti-Money Laundering; Corporate Transparency Act), Article 8 (Transfers) and the definition of "Prohibited Person" and the definition of "Family Entity", and for purposes of the Organizational Certificates, the term "Control" shall mean, with respect to any Person, the possession, directly or indirectly through one or more intermediaries, of the power to direct (or cause the direction of) the management, activities and policies of such Person, whether through the ownership of voting securities, by contract or otherwise, subject only to customary major decision rights. This definition is to be construed to apply equally to variations of the word "Control" including "Controlled", "Controlling" or "Controlled by".

"Corporate Transparency Act" means the Corporate Transparency Act adopted as Title LXIV of the 2021 National Defense Authorization Act (codified at 31 U.S.C. § 5336) and the regulations promulgated thereunder or any substitute or similar legislative or statutory requirement, each as amended from time to time.

"DACA" has the meaning set forth in Section 3.2.1.

"Debt Service Coverage Ratio" or "DSCR" means the ratio, as determined by Lender, of (i) Adjusted NOI for the Property for the 12 calendar months immediately preceding the date of determination (unless such period in question is specifically defined otherwise), to (ii) the Loan

9

Debt Service Payments due under the Loan Documents plus the Debt Service (as defined in the Senior Loan Agreement) due on the Senior Loan pursuant to the Senior Loan Documents for the corresponding 12 calendar months immediately preceding the date of determination (unless such period in question is specifically defined otherwise).

"Debt Service Funds" has the meaning set forth in Section 4.5.1.

"Debt Service Reserve Account" has the meaning set forth in Section 4.5.1.

"Debt Yield" means the percentage, as determined by Lender, obtained by dividing (i) Adjusted NOI for the 12 calendar months immediately preceding the date of determination, by (ii) the Combined Loan Amount at the date of determination.

"Deed of Trust" means collectively the Amended and Restated Deed to Secure Debt, Assignment, Security Agreement and Fixture Filing, dated as of December 21, 2018, by Owner to Senior Lender, as amended by the First Amendment to Amended and Restated Deed to Secure Debt, Assignment, Security Agreement and Fixture Filing, dated as of December 31, 2021, as further amended by the Second Amendment to Amended and Restated Deed to Secure Debt, Assignment, Security Agreement and Fixture Filing, dated as of January 2, 2023, as further amended by the Third Amendment to Amended and Restated Deed to Secure Debt, Assignment, Security Agreement and Fixture Filing, dated as of the Effective Date, and as the same may be further amended, restated, supplemented or otherwise modified from time to time.

"Default" means any matter, event or circumstance that, but for the giving of notice or the passage of time, or both, would constitute an Event of Default.

"Default Rate" means the lesser of (i) 18% per annum and (ii) the Maximum Lawful Rate; provided, however, that if no Maximum Lawful Rate exists, then such rate applicable to past due principal of and accrued interest on the Note shall be equal to the rate specified in clause (i) preceding.

"Deposit Amount" means the $100,000 deposit amount that Borrower previously paid to Lender's Affiliate at the time of the execution of the Term Sheet for this Mezzanine Loan as a deposit of payment against the Expenses (as defined in the Term Sheet).

"Disbursement Request" means a written request for the disbursement of funds from the applicable Account delivered by Borrower to Lender and including all of the applicable items required by the terms of this Agreement.

"Distributable Cash" has the meaning set forth in Section 3.1.

"Distributable Cash Flow Sweep" has the meaning set forth in Section 3.3.1.

"Distributable Cash Flow Sweep Period" has the meaning set forth in Section 3.3.1.

"DSCR" means the Debt Service Coverage Ratio as defined herein.

"Effective Date" has the meaning set forth in the preamble of this Agreement.

"Embargoed Person" has the meaning set forth in Section 7.1.14(b).

"Emergency" shall mean an event or circumstance that threatens imminent death, injury, harm or damage to individuals or the Property.

"Emergency Expenses" shall mean expenditures which Borrower determines, in its good faith reasonable judgment, are required to be made by reason of the occurrence of an Emergency or compliance with any law, rule or regulation applicable to Borrower or to the Property and with respect to which it would be impracticable, under the circumstances, to give Lender prior written notice of the same within the applicable time periods for notice otherwise set forth herein or to obtain Lender's prior approval of the same within the applicable time periods for approval otherwise set forth herein; provided that Borrower shall give Lender notice of such Emergency Expenses as soon as practicable.

"Environmental Indemnity Agreement" means that certain Environmental Indemnity Agreement, dated as of the Effective Date, made by Borrower and Guarantor to Lender, as the same may be amended, restated, supplemented, reaffirmed, replaced or otherwise modified from time to time.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

"Event of Default" has the meaning set forth in Section 10.1.

"Excess Cash Flow" has the meaning set forth in Section 3.3.5.

"Executive Order" has the meaning set forth in the definition of the term "Prohibited Person".

"Extension Condition Satisfaction Amount" means the amount of funds that, when subtracted from the Principal Indebtedness in the calculation of the Debt Yield, DSCR and/or Loan-to-Value Ratio, as applicable, results in achievement of a Debt Yield, DSCR and/or Loan-to-Value Ratio, as applicable, satisfying the applicable requirements of Section 2.12, at the commencement of the applicable Extension Period.

"Extension Conditions" has the meaning set forth in Section 2.12.

"Extension Debt Yield Test" has the meaning set forth in Section 2.12.5.

"Extension DSCR Test" shall have the meaning set forth in Section 2.12.6.

"Extension Fee" means an amount equal to $58,000, which is 0.5% of the original principal balance of the Mezzanine Loan Amount.

"Extension LTV Test" shall have the meaning set forth in Section 2.12.7.

"Extension Option" has the meaning set forth in Section 2.12.

"Extension Period" has the meaning set forth in Section 2.12.

"Extension Request Notice" shall have the meaning set forth in Section 2.12.1.

"Family Entity" means (i) any Family Trust, or (ii) any corporation, partnership, limited liability company or other entity directly or indirectly Controlled by a Family Member or Family Trust in which all of the issued and outstanding equity interests are owned through one or more intermediaries by one or more Family Members or Family Trusts.

"Family Member" means any individual that owns a direct or indirect ownership interest in Borrower, and any of his or her spouses, descendants and spouses of such descendants.

"Family Trust" means any trust in which the beneficiary(ies) consist only of one or more Family Members.

"Fee Deposit" has the meaning set forth in Section 11.20.3.

"FF&E" means fixtures, furnishings, equipment, furniture, and other items of tangible personal property now or hereafter located in or on the Land or the Improvements or used in connection with the use, occupancy, operation and maintenance of all or any part of the hotel located on the Land, other than stocks of food and other supplies held for consumption in normal operation but including appliances, machinery, equipment, signs, artwork, office furnishings and equipment, guest room furnishings, and specialized equipment for kitchens, laundries, bars, restaurant, public rooms, health and recreational facilities, linens, dishware, all partitions, screens, awnings, shades, blinds, floor coverings, hall and lobby equipment, heating, lighting, plumbing, ventilating, refrigerating, incinerating, elevators, escalators, air conditioning and communication plants or systems with appurtenant fixtures, vacuum cleaning systems, call or beeper systems, security systems and fire prevention and extinguishing apparatus and materials (other than the sprinkler system); reservation system computer and related equipment; all equipment, manual, mechanical or motorized, for the construction, maintenance, repair and cleaning of, parking areas, walks, underground ways, truck ways, driveways, common areas, roadways, highways and streets; and any "Property", "Equipment", "Inventories" or "Vehicles" (each as defined in the Uniform System of Accounts).

"FF&E Budget" has the meaning set forth in Section 4.3.2.

"FF&E Expenditures" has the meaning set forth in Section 4.3.2.

"FF&E Funds" has the meaning set forth in Section 4.3.1.

"FF&E Reserve Account" has the meaning set forth in Section 4.3.1.

"Financial Statements" means the balance sheets, income statements, reconciliations of capital and surplus or statement of retained earnings, changes in financial condition, statement of cash flows, statement of shareholders' equity, schedules of sources and applications of funds, and other financial information and related schedules for the foregoing (including, but not limited to, bank account reconciliation(s), accounts receivable aging, accounts payable aging, and general ledgers) of Owner, Borrower, each Borrower Owner Person, each Borrower Control Person, each

Guarantor, and any other Person required by Lender in its reasonable discretion, as applicable, heretofore furnished to Lender or required to be furnished to Lender under the terms of this Agreement or any other of the Loan Documents from time to time, which statements shall be prepared in such scope, detail and form as shall be reasonably acceptable to Lender, and shall be certified by such parties and, if reasonably required by Lender pursuant to this Agreement, certified by an independent certified public accountant selected by Borrower which is reasonably satisfactory to Lender. All financial statements shall be prepared in accordance with GAAP or another consistently applied accounting method, provided, however, that all financial statements of ACRON AG Guarantor or any other Guarantor, Borrower Owner Person or Borrower Control Person that is a Swiss entity, shall be prepared in accordance with the Swiss Code of Obligations if they are not otherwise prepared in accordance with GAAP. In those cases where a Borrower Owner Person is an individual or a trust, financial statements shall also include statements of assets and liabilities, statements of trust property (if the Borrower Owner Person is a trust), tax returns, and such other information as Lender may reasonably request.

"FinCEN" means the U.S. Department of Treasury Financial Crimes Enforcement Network.

"First Extended Maturity Date" shall mean January 18, 2027 (which is 12 months following the Initial Maturity Date) if Borrower properly and timely exercises Borrower's First Extension Option.

"First Extension Minimum DSCR" shall have the meaning set forth in Section 2.12.6(a).

"First Extension Option Minimum Debt Yield" shall have the meaning set forth in Section 2.12.5(a).

"Floor Rate" is 4.50% per annum.

"Full Replacement Cost" means the cost of replacing the Improvements (together with all appurtenances and betterments) in compliance with all Legal Requirements, without deduction for physical depreciation thereof, following any casualty or other damage to the Property, as determined by an Appraisal.

"GAAP" means generally accepted accounting principles in the United States of America, consistently applied.

"Governmental Authority" means (i) the government of (a) the United States of America or any state, commonwealth, county, city or other political subdivision of any of the foregoing, or (b) any other jurisdiction in which Owner, Borrower, Guarantor, any Borrower Control Person, Lender or any Affiliate of Lender conducts all or any portion of its business, (ii) any government that asserts jurisdiction over any properties of any of the foregoing Persons, or (iii) any entity exercising executive, legislative, judicial, regulatory or administrative functions of, or pertaining to, any such government.

"Gross Revenue" means payments and other revenues (exclusive, however, of any payments attributable to sales taxes) received by or on behalf of (or paid at the direction of) Owner from all sources related to the ownership or operation of the Property, including, but not limited

to, all fees, charges, accounts or other charges for the use and occupancy of rooms and other public facilities in or on the Property, and all rents, income, security deposits, tax, insurance, charges, receipts, advances, royalties, profits, issues, service reimbursements, fees, accounts receivables, revenues and prepayments of any of the same (including termination, cancellation, option and similar payments), from or related to the Property including, without limitation, all revenues and receipts collected from guest rooms and suites, restaurants, bars, cocktail lounges, meeting rooms, banquet rooms, parking fees and recreational facilities, and any other operations of the Property, all receivables from credit card companies, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of property or rendering of services by Owner or any operator or manager of the Property or the commercial space located in the Property or acquired from others (including from the rental of any office space, retail space, parking, guest rooms or other space, halls, stores, and offices, and deposits securing reservations of such space), license, lease, sublease and concession fees and rentals, health club facilities, health club membership fees, food and beverage wholesale and retail sales, other department revenues, service charges (including late charges, termination, cancellation, option and similar payments), vending machine sales, other payments, profits, proceeds, and in particular, proceeds if any, from business interruption or other loss of income insurance proceeds, operating expense pass-through revenues, direct expense reimbursements, common area maintenance charges, payments received by or on behalf of Owner as compensation or as settlement of claims or litigation, and payments under an indemnity or other similar matters with respect to Owner or the Property, in each case, for the relevant period for which the calculation of Gross Revenue is being made.

"Guarantor" means, individually or collectively as the context requires, ACRON AG Guarantor, Partnership Guarantor and TH Investment Guarantor, or any replacement guarantor that replaces such Person in accordance with Section 7.1.15.

"Hotel Operating Account" shall have the meaning set forth in Section 3.1.

"Hotel Transactions" means temporary occupancy arrangements for customary hotel transactions in the ordinary course of Owner's business, including nightly rentals or the licensing of hotel rooms or suites and the use of hangout rooms, function rooms and event space.

"IHG Comfort Letter (Mezz Loan)" means that certain letter agreement from IHG Licensor, and agreed to and accepted by Owner (as licensee) and Lender, with respect to the IHG License Agreement in connection with the Mezzanine Loan.

"IHG Comfort Letter (Senior Loan)" means that certain letter agreement (or similar agreement) from IHG Licensor, and agreed to and accepted by Owner (as licensee) and Senior Lender, with the Effective Date of February 1, 2022, with respect to the IHG License Agreement in connection with the Senior Loan.

"IHG Consent" has the meaning set forth in Section 7.1.10(b).

"IHG License" means that certain License Agreement, dated February 1, 2022, by and between IHG Licensor, as licensor, and Owner, as licensee, as amended by the First Amendment

to License Agreement, dated as of the Effective Date, as the same may be further amended, restated, supplemented or otherwise modified from time to time.

"<u>IHG Licensor</u>" means IHG Franchising, LLC, a Delaware limited liability company.

"<u>IHG Reno Approval</u>" has the meaning set forth in <u>Section 3.3.4</u>.

"<u>Improvements</u>" has the meaning set forth in the Deed of Trust.

"<u>Indebtedness</u>" means, as of the date of any determination thereof, (i) all indebtedness for borrowed money or purchase money financing, (ii) all indebtedness evidenced by a note, bond, debenture or similar instrument, (iii) the face amount of all letters of credit and, without duplication, all unreimbursed amounts drawn thereunder, (iv) all payment obligations under any interest rate protection agreements, currency swaps or similar agreements (if any), and (v) all other indebtedness.

"<u>Indemnified Parties</u>" means, collectively, Lender, any holder of any Note, any existing or prior servicer of the Mezzanine Loan, any trustee under the Security Instrument, each Affiliate of the foregoing Persons and the legal representatives, successors and assigns of each of the foregoing Persons.

"<u>Independent Manager</u>" means an individual who has prior experience as an independent manager, independent director or independent member with at least 3 years of employment experience and who is provided by CT Corporation, Corporation Service Company, National Registered Agents, Inc., Wilmington Trust Company, Stewart Management Company, Lord Securities Corporation or, if none of those companies is then providing professional Independent Managers, another nationally-recognized company reasonably approved by Lender, in each case that is not an Affiliate of Borrower and that provides professional Independent Managers and other corporate services in the ordinary course of its business, and which individual is duly appointed as an Independent Manager of the Borrower and is not, and has never been, and will not while serving as Independent Manager be, any of the following:

(i)     a member, partner, equityholder, manager, director, officer or employee of Borrower or any of its equity holders or Affiliates (other than as an Independent Manager of Borrower or an Affiliate of Borrower that does not own a direct or indirect ownership interest in Borrower and that is required by a creditor to be a single-purpose entity, provided that such Independent Manager is employed by a company that routinely provides professional Independent Managers or managers in the ordinary course of its business);

(ii)    a creditor, supplier or service provider (including provider of professional services) to Borrower or any of its respective equity holders or Affiliates (other than a nationally-recognized company that routinely provides professional Independent Managers and other corporate services to Borrower or any of its Affiliates in the ordinary course of its business);

(iii)   a family member of any such member, partner, equityholder, manager, director, officer, employee, creditor, supplier or service provider; or

(iv)    a Person that controls (whether directly, indirectly or otherwise) any of (i), (ii) or (iii) above.

"Initial Maturity Date" means January 18, 2026, which is the date that is 24 months following the Closing Date.

"Installment Payment Date" means March 1, 2024, and the first day of each month thereafter to and including (i) January 1, 2026 for the Initial Maturity Date, (ii) January 1, 2027 for the First Extended Maturity Date, and (iii) January 1, 2028 for the Second Extended Maturity Date.

"Insurance Reserve Account" means any reserve account or subaccount (including any subaccount established on a ledger or book-entry basis within another account, and not as a separate account) in which Lender holds the deposits for insurance premiums made pursuant to Section 4.2.

"Intellectual Property" has the meaning set forth in Section 1.1(o) of the Deed of Trust pertaining to Trademarks, which includes: "All tradenames, trademarks, service marks, logos, copyrights, goodwill, books and records and all other general intangibles relating to or used in connection with the operation of the Property".

"Intercreditor Agreement" means that certain Intercreditor Agreement, dated as of the Effective Date, by and between Senior Lender and Lender, as the same may be amended, restated, supplemented or otherwise modified from time to time, in form and substance acceptable to Lender in Lender's sole and absolute discretion.

"Interest Change Date" means February 1, 2024, and the first day of each calendar month thereafter to and including (i) January 1, 2026 for the Initial Maturity Date, (ii) January 1, 2027 for the First Extended Maturity Date, and (iii) January 1, 2028 for the Second Extended Maturity Date, provided that if an Interest Change Date would otherwise occur on a day that is not a Business Day, such Interest Change Date shall be the following Business Day.

"Interest Rate" means a per annum variable rate of interest equal to the greater of (x) SOFR plus the Spread or (y) the Floor Rate plus the Spread.

"Land" has the meaning set forth in the Deed of Trust.

"Leases" has the meaning set forth in the Deed of Trust.

"Leasing Commissions" means any leasing commissions incurred under any leasing, brokerage or agency agreement in connection with any Lease.

"Legal Requirements" means all present and future federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions imposed by any Governmental Authority (including all building, zoning and other land use laws and regulations, Environmental Laws (as defined in the Environmental Indemnity Agreement), ecological laws, the Americans with Disability Act of 1990 (as amended from time to time, and any successor statute or statutes, and all rules and regulations from time to time

promulgated thereunder) and all other laws or requirements regarding access for persons with disabilities), and all Permits relating thereto, and all public or private covenants, agreements, restrictions and encumbrances contained in any Property Record Agreements or other instruments at any time in force affecting the Property or any part thereof (entered into with any Governmental Authority or any other third party) and/or otherwise applicable to Owner, Borrower and the Transactions.

"<u>Lender</u>" has the meaning set forth in the preamble of this Agreement.

"<u>Lender Account</u>" has the meaning set forth in <u>Section 3.2.2</u>.

"<u>Letter of Credit</u>" means a clean, "evergreen", irrevocable, unconditional letter of credit with Lender as the beneficiary that shall (i) be negotiable and freely transferable or assignable in connection with a transfer or assignment by Lender of the Mezzanine Loan (or any portion thereof) or the Loan Documents (or any portion thereof), with any fees or charges in connection with any such transfer paid by Borrower, and not by Lender, (ii) be issued by a bank or national banking association acceptable to Lender in Lender's sole discretion (taking into account, among other things, the concentration of exposure of Lender and Lender's Affiliates to such bank), (iii) provide for payment of all or any portion of the face amount of such letter of credit to Lender upon the receipt by the issuing bank of (1) a statement signed by a representative of Lender that Lender is entitled to such amount pursuant to the terms of this Agreement and the other Loan Documents and (2) a "sight draft" signed by Lender in the form of a sight draft attached to such letter of credit, (iv) provide for an initial term of one year (or until the Maturity Date, if less than one year is remaining in the term of the Mezzanine Loan) and, without further act or instrument required by Lender or Borrower, is automatically renewed for successive one year periods during the term of the Mezzanine Loan, (v) provide that draws upon such letter of credit may be made at a branch or office of the issuing bank located in New York County, New York or by facsimile transmission to an office of such issuing bank (without the additional requirement to send any original documents to any office of such issuing bank), and (vi) be otherwise in form and substance reasonably acceptable to Lender.

"<u>Lien</u>" means any mortgage, deed of trust, lien (statutory or other), pledge, hypothecation, assignment, security interest, or any other encumbrance or charge, including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, any financing statement or similar instrument under the UCC or comparable law of any other jurisdiction, domestic or foreign, and any Mechanic's Liens and other similar liens and encumbrances, in each case regardless of whether the same is subordinate to the lien(s) created by the Security Instrument, this Agreement or any other Loan Document.

"<u>Liquidation Event</u>" means any Senior Loan Foreclosure Transfer or any refinancing of the Senior Loan.

"<u>Liquidation Proceeds</u>" means, with respect to any Liquidation Event, all amounts paid to or received by or on behalf of Owner in connection with such Liquidation Event, including, without limitation, proceeds of any sale, refinancing or other disposition or liquidation, less (i) in the case of a Senior Loan Foreclosure Transfer, amounts required or permitted to be deducted therefrom and amounts paid pursuant to the Senior Loan Documents to Senior Lender, (ii) in the

case of a Senior Loan Foreclosure Transfer, such reasonable and customary costs and expenses of sale or other disposition (including attorneys' fees and brokerage commissions), (iii) in the case of a Senior Loan Foreclosure Transfer, such costs and expenses incurred by Senior Lender under the Senior Loan Documents as Senior Lender shall be entitled to receive reimbursement for under the terms of the Senior Loan Documents, (iv) in the case of a refinancing of the Senior Loan, such costs and expenses (including attorneys' fees) of such refinancing, and (v) the amount of any prepayments required pursuant to the Senior Loan Documents in connection with any such Liquidation Event.

"Listing Agreement" has the meaning set forth in Section 7.1.10(c).

"Loan Debt Service Payments" means the regularly scheduled payments of principal and/or interest, as applicable, required to be paid on the Mezzanine Loan hereunder and under the Note during each month or during any other specified period, as applicable.

"Loan Documents" means this Agreement, the Note, the Security Instrument, the Environmental Indemnity Agreement, the ACRON Guaranty, the TH Investment Guaranty, the Organizational Certificates, the UCC-1 Financing Statements, the Intercreditor Agreement, opinions of counsel in connection with Borrower's authority and capacity to accept the Mezzanine Loan and execute the Loan transaction documents, and all other agreements, instruments, certificates and documents (other than the organizational documents of Borrower or any Borrower Owner Person) executed or delivered by Borrower, Guarantor and/or any of their respective Affiliates in connection with the Secured Obligations or otherwise in connection with the Transactions.  The term "Loan Documents" also includes all amendments, restatements, modifications, supplements, extensions, renewals, reaffirmations and replacements of each document referred to above.

"Loan Modification" has the meaning set forth in Section 11.17.

"Loan Origination Fee" has the meaning set forth in Section 2.1.1(a).

"Loan-to-Value Ratio" means the ratio, as determined by Lender as of the date of determination, of (i) the Combined Loan Amount, to (ii) the as-is fair market value of the Property, as such fair market value is determined by an Appraisal.

"Losses" means, collectively, all claims, suits, liabilities, administrative and judicial actions, proceedings, obligations, debts, damages, losses, costs, expenses, fines, penalties, charges, fees, judgments, awards, amounts paid in settlement, and litigation costs of whatever kind or nature (including out-of-pocket attorneys' fees and all other out-of-pocket costs of defense).

"Material Action" means to file any insolvency, or reorganization case or proceeding, to institute proceedings to have such Person be adjudicated bankrupt or insolvent, to institute proceedings under any applicable insolvency law, to seek any relief under any law relating to relief from debts or the protection of debtors, to consent to the filing or institution of bankruptcy or insolvency proceedings against such Person, to file a petition seeking, or consent to, reorganization or relief with respect to such Person under any applicable federal or state law relating to bankruptcy or insolvency, to seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian, or any similar official of or for such Person or a substantial part of its

property, to make any assignment for the benefit of creditors of such Person, to admit in writing such Person's inability to pay its debts generally as they become due, or to take action in furtherance of any of the foregoing.

"Material Adverse Effect" means any fact, event, circumstance or other effect (including changes in market conditions), whether foreseeable or unforeseeable, that alone or in combination with other facts, events, circumstances, or effects occurring or existing concurrently with such fact, event, circumstance, or effect results in or causes, or could reasonably be expected to result in or cause, a material adverse change in any of (i) the Property, (ii) the business operations, properties, assets or financial condition, or legal authority or status, of Borrower, Owner, or any Guarantor or the Property that would impair the ability of Borrower or any Guarantor to satisfy any of their respective obligations under any Loan Document to which it is a party, (iii) the enforceability or validity of any of the Loan Documents, the perfection or priority of any Lien created under any of the Loan Documents or the rights, interests or remedies of Lender under any of the Loan Documents, or the ability of Lender to enforce Lender's rights under the Loan Documents, or (iv) the ability of Borrower to repay the Mezzanine Loan.

"Maturity Date" means the Initial Maturity Date (as defined above) or, if Borrower timely and properly exercises Borrower's First Extension Option, the First Extended Maturity Date (as defined above), or if Borrower timely and properly exercises Borrower's Second Extension Option, the Second Extended Maturity Date (as defined below), as applicable.

"Maximum First Extension LTV" has the meaning in Section 2.12.7(a).

"Maximum Lawful Rate" means the maximum lawful rate of interest which may be contracted for, charged, taken, received or reserved by Lender in accordance with the applicable laws of the State of Texas (or applicable United States federal law to the extent that it permits Lender to contract for, charge, take, receive or reserve a greater amount of interest than under Texas law), taking into account all Charges made in connection with the transaction evidenced by this Agreement, the Note and the other Loan Documents.

"Maximum Second Extension LTV" has the meaning in Section 2.12.7(b).

"Mechanic's Lien" means any Lien filed by (or on behalf of) any contractor, materialman or other Person in connection with any work performed, or services or materials provided, with respect to the Property or any portion thereof, in each case regardless of whether the same is subordinate to the Lien(s) created by the Deed of Trust or any other Senior Loan Document.

"Merchant Schedule" means a schedule of all third party merchants and others who, from time to time, make or are obligated to make payments directly to Owner (excluding tenants and Hotel Transactions), including, but not limited to, credit card companies, managers, operating companies and agents.

"Mezzanine Loan" has the meaning set forth in the Recitals of this Agreement.

"Mezzanine Loan Amount" has the meaning set forth in the Recitals of this Agreement.

"Minimum Guarantor Financial Requirement" means (i) ACRON Guarantors have an aggregate Net Worth of not less than $36,600,000 and (ii) TH Investment Guarantor has an aggregate Net Worth of not less than $36,600,000.

"Minimum Interest" has the meaning set forth in Section 2.3.2(b).

"Net Worth" means, as of a given date with respect to any Person, the excess, if any, of (i) total assets of such Person held in the domestic United States of America (excluding (i) the Property or any direct or indirect interest in the Property or Owner, (ii) receivables from Affiliates, and (iii) Intellectual Property) over (ii) total liabilities (including, without limitation, liabilities for taxes and a fair valuation of contingent or indirect liabilities) of such Person, in each case, as determined in accordance with Approved Accounting Principles.

"New Borrower Party" has the meaning set forth in Section 8.4.2(d).

"Non-Discretionary Costs" means those expenses, the payment and amount of which are not within the discretion of Borrower, including sales/occupancy taxes incurred in accordance with applicable law and other costs and expenses that are based on Property revenue and incurred pursuant to and in accordance with any lease, contract or agreement that (x) was entered into in accordance with this Agreement and (y) is binding on Borrower or Owner.

"Note" means that certain Promissory Note, dated as of the Effective Date, executed by Borrower payable to the order of Lender, as the same may be amended, restated, supplemented, extended, consolidated, split, severed, replaced (whether by one or more replacement notes) or otherwise modified from time to time (including in connection with a Loan Modification effectuated pursuant to this Agreement).

"O&M Program" has the meaning set forth in Section 7.1.4(e).

"OFAC" has the meaning set forth in the definition of the term "Prohibited Person".

"OFAC Listed Person" has the meaning set forth in the definition of the term "Prohibited Person".

"Operating Account" has the meaning set forth in Section 3.2.1.

"Operating Expenses" means, in the aggregate with respect to the Property during any period, all operating costs and expenses relating to the ownership, operation, repair, maintenance and management of the Property that are actually incurred by Owner and due and payable during such period in respect of the Property, including, but not limited to, all departmental expenses and undistributed operating expenses as set forth on the Property's operating statements, Property Impositions, insurance premiums, property management fees and expenses payable pursuant to any Property Management Agreement approved by Senior Lender, costs attributable to the ordinary operation, repair and maintenance of the systems for heating, ventilation, air conditioning, mechanical, electrical, and plumbing, advertising expenses, license fees (including, but not limited to, fees owed to IHG Licensor pursuant to the IHG License), utilities, payroll and related taxes, employee benefits, training costs, subscription fees, computer processing charges, operating equipment or other lease payments and other similar costs, and any other amounts included in the

definition of "Operating Expenses" under the Senior Loan Documents, in each instance, actually paid for by or for Owner; provided that Operating Expenses shall not include the following: (i) Capital Expenditures; (ii) depreciation and other income tax related bookkeeping entries that do not result in the payment of monies; (iii) Loan Debt Service Payments, other amounts (including the amount of any and all monthly reserve deposits) due under the Loan Documents, Senior Loan Debt Service Payments and any other amounts excluded from the definition of "Operating Expenses" under the Senior Loan Documents; (iv) refunds or credits actually paid by Owner to Tenants for overpayment of Property Impositions, insurance premiums, or other expenses pursuant to the Leases; or (v) any expenses related to operations of Owner and not the Property, including asset management and similar fees.

"Organizational Certificates" means collectively, (i) the Officer's Certificate of ACRON AG (Mezzanine Loan), dated January 18, 2024, (ii) the Officer's Certificate of ACRON U.S. Management Inc., dated January 18, 2024, and (iii) the Manager's Certificate of TH Investment Guarantor, dated January 18, 2024, each of which is to and for the benefit of Lender.

"Organizational Chart" means an organizational chart that sets forth each of the Persons that directly or indirectly own, manage or Control Borrower and Guarantor, the percentage interests held by each such Person and the type of entity of each such Person that is an entity.

"Original Lender" has the meaning set forth in the Recitals of this Agreement.

"Original Loan" has the meaning set forth in the Recitals of this Agreement.

"Original Note" has the meaning set forth in the Recitals of this Agreement.

"Original Pledge" has the meaning set forth in the Recitals of this Agreement.

"Original Security Deed" has the meaning set forth in the Recitals of this Agreement.

"Owner" has the meaning set forth in the Recitals of this Agreement.

"Partnership Guarantor" has the meaning set forth in Recital H above.

"PATRIOT Act" has the meaning set forth in the definition of the term "Prohibited Person".

"PCNA Estoppel" shall mean that certain Estoppel Certificate from Porsche Cars North America, Inc., a Delaware corporation, to be certified to Owner and Lender and to be delivered to Lender in accordance with Section 7.4, **Exhibit G** and **Schedule 3** of this Agreement.

"Permits" means, collectively, all permits, approvals, licenses, certificates (including certificates of occupancy), franchises, consents, entitlements and authorizations necessary or desirable for the development, ownership, use, occupancy, operation, leasing and maintenance of the Property and/or the conduct of the business of Owner.

"Permitted Encumbrances" has the meaning set forth in the Senior Loan Agreement.

"Permitted Equipment Financing" has the meaning set forth in Section 8.5.1.

"Permitted Indebtedness" means (i) the Senior Indebtedness subject to Section 2.1.19 and Section 7.2.16 of this Agreement, (ii) the Permitted Subordinated Member Loans subject to Section 8.5.3 of this Agreement, and (iii) any Permitted Trade Payables and/or Permitted Equipment Financing that satisfies each of the applicable conditions set forth in Section 8.5.2 of this Agreement.

"Permitted Labor Agreement" means an industry-wide collective bargaining agreement or other similar labor agreement with a union to which the majority of hotels comparable to the Property in the Cities of Hapeville and Atlanta are subject.

"Permitted Subordinated Member Loans" has the meaning set forth in Section 8.5.3.

"Permitted Trade Payables" has the meaning set forth in Section 8.5.1.

"Permitted Transfer Conditions" has the meaning set forth in Section 8.4.2.

"Permitted Transfer Deposit" has the meaning set forth in Section 8.4.2(d).

"Permitted Transfer Notice" has the meaning set forth in Section 8.4.2(d).

"Person" means any individual, corporation, association, joint stock company, trust, business trust, partnership, joint venture, limited liability company, real estate investment trust, unincorporated organization, or government or any agency or political subdivision thereof or any other entity (whether incorporated or unincorporated).

"PIP" means a property improvement plan designed to bring a hotel property into compliance with the latest brand standards.

"Principal Indebtedness" means the aggregate principal amount of the Mezzanine Loan outstanding as of the date of determination.

"Prohibited Person" means:

(i)    any Person that is identified on the list of Specially Designated Nationals and Blocked Persons, the list of Foreign Sanctions Evaders or the Sectorial Sanctions Identifications list (collectively, an "OFAC Listed Person") published by the Office of Foreign Assets Control, United States Department of the Treasury ("OFAC"), or is restricted from doing business under any statute (including the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56) (the "PATRIOT Act"), executive order (including the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism and the Annex thereto, collectively, the "Executive Order"), or other governmental action relating to terrorism financing, terrorism support and/or otherwise relating to terrorism;

(ii)    any agent, department, or instrumentality of, or any Person otherwise beneficially owned by, Controlled by or acting on behalf of, directly or indirectly, (a) any OFAC Listed Person or (b) any Person that, to Borrower's actual knowledge after making due inquiry, is the target of any sanctions programs administered and/or enforced by OFAC;

(iii)    any Person that is otherwise blocked by or, to Borrower's actual knowledge after making due inquiry, a target of United States economic sanctions;

(iv)    any Person that (a) has been found in violation of, charged with, or convicted of, money laundering, drug trafficking, terrorist-related activities or other money laundering predicate crimes under the Currency and Foreign Transactions Reporting Act of 1970 (otherwise known as the Bank Secrecy Act), 18 U.S.C. §§ 1956 and 1957, the PATRIOT Act or any other United States law or regulation governing such activities (collectively, "Anti-Money Laundering Laws") or any United States economic sanctions violations, (b) to Borrower's actual knowledge after making due inquiry, is under investigation by any Governmental Authority for possible violation of Anti-Money Laundering Laws or any United States economic sanctions violations, (c) has been assessed civil penalties under any Anti-Money Laundering Laws or any United States economic sanctions, or (d) to Borrower's actual knowledge after making due inquiry, has had any of its funds seized or forfeited in an action under any Anti-Money Laundering Laws;

(v)    any Person that (a) is owned or Controlled by the government of any country or territory that is subject to United States sanctions (the "Sanctioned Countries") (unless and until any such country or region ceases to be subject to United States sanctions, as evidenced by reference to OFAC's online resource center (at https://www.treasury.gov/resource-center/sanctions/Programs/Pages/Programs.aspx) or similar source), (b) is located in any Sanctioned Countries, or (c) to Borrower's actual knowledge after making due inquiry, does business in or with any Sanctioned Countries; or

(vi)    any Person that (a) is in violation of the Foreign Corrupt Practices Act of 1977 (15 U.S.C. §§ 78dd-1, et seq.), (b) is in violation of the Comprehensive Iran Sanctions, Accountability and Divestment Act of 2010, or (c) to Borrower's actual knowledge after making due inquiry, has engaged or will engage in or has conspired or will conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in the Executive Order or any statutes, laws or regulations referred to in this definition of "Prohibited Person".

"Property" has the meaning set forth in the Deed of Trust and it is described in **Exhibit A** attached hereto.

"Property Impositions" means all taxes (or payments in lieu thereof, including any amounts owed to the Authority with respect to the Bond Documents), assessments (general or special) and similar governmental charges that may be levied or imposed at any time against the Property or other Senior Collateral.

"Property Management Agreement" has the meaning set forth in Section 7.1.10(a).

"Property Manager" has the meaning set forth in Section 7.1.10(a).

"Property Record Agreement" means any reciprocal easement agreement, unilateral easement agreement, access agreement, right of way agreement or similar agreement affecting the Land or the Improvements, including any agreement of record that may (i) require construction, repairs, modifications, alterations or maintenance of the Improvements or any other portion of the Property or (ii) in any way limit the use and enjoyment of the Property.

"Protective Advance(s)" means any advance by Lender with respect to (i) the payment of any delinquent Property Impositions or insurance premiums owed with respect to the Property, (ii) except for any Permitted Encumbrances, the removal of any Lien on the Property or the defense of Owner's or Senior Lender's title or interest thereto or the defense of the validity, enforceability, perfection or priority of the Liens granted pursuant to the Loan Documents or the Senior Loan Documents, (iii) the preservation of the value of the Property, including payments of water, heating, gas, electric and other utility bills, (iv) the payment of amounts necessary to satisfy Owner's obligations under the Senior Loan Documents or any Leases or Contracts (including the payment of any Tenant Improvement Costs and Leasing Commissions), and/or (v) the payment of any Capital Expenditures or any maintenance or repair costs and expenses that may be necessary or reasonably advisable to be incurred in connection with maintaining the value of the Property.

"Purchase Agreement" has the meaning set forth in the Recitals of this Agreement.

"Rate Conforming Changes" means, with respect to the SOFR, any technical, administrative or operational changes (including, without limitation and as applicable, changes to the timing and frequency of determining rates and making payments of interest, the applicability and terms of breakage provisions and other technical, administrative or operational matters) that Lender decides may be appropriate to reflect the adoption and implementation of the SOFR and to permit the administration thereof by Lender in a manner substantially consistent with market practice (or, if Lender decides that adoption of any portion of such market practice is not administratively feasible or if Lender determines that no market practice for the administration of the SOFR exists, in such other manner of administration as Lender decides is reasonably necessary in connection with the administration of this Agreement, the Note and the other Loan Documents).

"Rent Roll" means a rent roll in such form as approved by Lender in writing prior to delivery thereof to Lender, that includes all Leases (excluding Hotel Transactions), if any.

"Reporting Company" means each of Borrower, Guarantor, any other Borrower Owner Person, and any such Person's direct or indirect managers, members, partners, shareholders, affiliates or controlling persons that are entities and are considered "Reporting Companies" as such term is defined in the Corporate Transparency Act.

"Required Insurance Policies" means the insurance policies that Borrower is required to obtain and maintain pursuant to the terms of Article 9.

"Reserves" shall have the meaning set forth in Section 3.2.3.

"RevPAR" means the revenue per available room for the hotel calculated in accordance with Approved Accounting Principles and the Uniform System of Accounts and certified and approved by Lender.

"Sanctioned Countries" has the meaning set forth in the definition of "Prohibited Person".

"Second Extended Maturity Date" shall mean January 18, 2028 (which is 12 months following the First Extended Maturity Date and 48 months following the Closing Date) if Borrower properly and timely exercises Borrower's Second Extension Option.

"Second Extension Minimum DSCR" shall have the meaning set forth in Section 2.12.6(b).

"Second Extension Option Minimum Debt Yield" shall have the meaning set forth in Section 2.12.5(b).

"Secured Obligations" means the Principal Indebtedness and all interest accruing thereon, together with all other present and future obligations of Borrower to Lender evidenced by or contained in the Note, this Agreement and all other Loan Documents, whether stated in the form of promises, covenants, representations, warranties, conditions, or prohibitions or in any other form, whether absolute or contingent, direct or indirect, joint, several or independent, now outstanding or owing, or that may hereafter be existing or incurred, arising by operation of law or otherwise, due or to become due under the Loan Documents, and/or are in any way secured by the Collateral now or hereafter provided to Lender as collateral for the Mezzanine Loan, including (i) any Protective Advance, and (ii) any exit fee, late charge, late fee and/or other fee, default interest at the Default Rate, Minimum Interest or other prepayment premium that may become payable to Lender pursuant to the terms of this Agreement or any other Loan Document.

"Securitization" has the meaning set forth in Section 11.17.2.

"Security Instrument" means that certain Pledge and Security Agreement dated as of the Effective Date, from Borrower to Lender, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Senior Collateral" means the "Collateral" as such term is defined in the Deed of Trust.

"Senior Event of Default" means, prior to the indefeasible payment and performance of all of the Senior Secured Obligations (other than any Senior Secured Obligations that survive repayment of the Senior Loan), an "Event of Default" as such terms is defined under the Senior Loan Documents and, thereafter, an Event of Default.

"Senior Indebtedness" means the aggregate principal amount of the Senior Loan outstanding as of the date of determination.

"Senior Lender" means, prior to the indefeasible payment and performance of all of the Senior Secured Obligations (other than any Senior Secured Obligations that survive repayment of the Senior Loan), KHRE SMA Funding, LLC, a Delaware limited liability company, having offices at c/o Knighthead Funding, LLC, 777 West Putnam Avenue, 3rd Floor, Suite B-2, Greenwich, CT 06830, and, thereafter, Lender.

"Senior Loan" means that certain loan in the Senior Loan Amount made by Senior Lender to Owner pursuant to the terms of the Senior Loan Agreement as set forth in the Recitals.

"Senior Loan Agreement" has the meaning set forth in the Recitals of this Agreement.

"Senior Loan Amount" has the meaning set forth in the Recitals of this Agreement.

"Senior Loan Debt Service Payment" means the "Monthly Debt Service Payment Amount" as such term is defined in the Senior Loan Agreement.

"Senior Loan Default" means, prior to the indefeasible payment and performance of all of the Senior Secured Obligations (other than any Senior Secured Obligations that survive repayment of the Senior Loan), a "Default" as such term is defined in the Senior Loan Agreement and, thereafter, a Default.

"Senior Loan Documents" means the "Loan Documents" as such term is defined in the Senior Loan Agreement, and as such Loan Documents may be amended, restated, supplemented or otherwise modified from time to time.

"Senior Loan Foreclosure Transfer" means any foreclosure or deed-in-lieu of foreclosure of the Property under the Senior Loan Documents.

"Senior Note" means the promissory note executed by Owner payable to the order of Senior Lender, as the same may be amended, restated, supplemented, extended, consolidated, split, severed, replaced (whether by one or more replacement notes) or otherwise modified from time to time.

"Senior Secured Obligations" means the "Obligations" as such term is defined in the Senior Loan Agreement.

"Servicer" has the meaning set forth in Section 5.1.1.

"Servicing Fee" has the meaning set forth in Section 2.2.6.

"Single Purpose Entity" means a Person, other than an individual, that (i) is formed or organized solely for the purpose of holding, directly, an ownership interest in the Owner, (ii) does not engage in any business other than the ownership, management and operation of the Owner, (iii) does not have any (a) assets other than those related to its interest in the Owner or (b) Indebtedness other than the Secured Obligations and any Permitted Indebtedness, (iv) does not guarantee or otherwise become liable on, or in connection with, any obligation of any other Person (or acquire obligations or securities of its Affiliates), (v) does not enter into any contract or agreement with any Affiliate, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arm's length basis with third parties other than an Affiliate, (vi) does not incur, create or assume any Indebtedness (except for the Secured Obligations and any Permitted Indebtedness), (vii) does not make any loans or advances to any other Person (including any Affiliate), (viii) does not become insolvent or fail to pay its debts as the same become due (provided that nothing in this clause (viii) shall require any owner or principal of Borrower or any other Person to make any capital contribution or other contribution of cash or assets to Borrower), (ix) does not fail to conduct and operate its business in all material respects as presently conducted and operated, (x) does not fail to maintain its books, records, bank accounts and Financial Statements separately from those of such Person's Affiliates, including its

general partners or members, as may be applicable, (xi) does not fail at all times to hold itself out to the public as a legal entity separate and apart from any other Person (including any Affiliate (including any stockholder, partner, member, trustee, beneficiary, or other owner of Borrower or any Affiliate of any such stockholder, partner, member, trustee, beneficiary, or other owner)), (xii) does not fail to file its own tax returns (except to the extent such Person is a disregarded entity and such Person consolidates its tax returns with the tax returns of the applicable regarded entity); (xiii) does not fail to maintain adequate capital for its normal obligations, reasonably foreseeable in a business of its size and character and in light of its contemplated business operations (provided that nothing in this clause (xiii) shall require any owner or principal of Borrower or any other Person to make any capital contribution or other contribution of cash or assets to Borrower), (xiv) does not commingle its assets with any Affiliate or any other Person, and does not otherwise fail to maintain its assets in such a manner that it is not costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or any other Person, (xv) does not hold itself out to be responsible for the Indebtedness of any other Person, (xvi) is subject to and complies with all of the limitations on powers set forth in the organizational documents of such Person (and the organizational documents of each general partner or managing member, as applicable, of such Person) as in effect on the Closing Date, and observes all applicable organizational formalities in all material respects, (xvii) holds all of its assets and conducts business in its own name, (xiii) utilizes its own letterhead, invoices and checks, (xix) holds title to its interest in the Owner in its own name, (xx) allocates fairly and reasonably any overhead expenses that are shared with any Affiliate, including paying for office space and services performed by any employee of any Affiliate, (xxi) does not pledge its assets for the benefit of any other Person (other than Lender) (xxii) corrects any known misunderstandings regarding its separate identity, (xxiii) has an operating or partnership agreement that provides that, until all of the Secured Obligations have been paid in full, such Person shall not take or consent to any of the following actions:  the dissolution, liquidation, consolidation, merger or sale of all or substantially all of such Person's assets, or any division of such Person into multiple entities or series pursuant to Section 18-217 of the Delaware Limited Liability Company Act (or similar provision under the law of the applicable Person's state of formation) or otherwise, and (xxiv) is a Delaware limited liability company that has (a) at least two Independent Managers whose unanimous written consent is required for Borrower to take any Material Action, and (b) organizational documents that contain a provision for a "Special Member" whereby one of the Independent Managers shall be admitted as a Special Member of Borrower upon the occurrence of any event that causes the last remaining member of Borrower to cease to be a member of Borrower.

"SOFR" means a rate per annum which is identified and normally published by Bloomberg Professional Service page SR1M Index as the offered rate for loans in United States dollars for a 1 month period, rounded upwards, if necessary, to the nearest 0.01%.  Such rate shall be determined monthly and shall be the rate set by the CME Group Benchmark Administration Limited as of 5:00 a.m. (Chicago time) three Business Days prior to commencement of each SOFR Interest Period (defined herein) and effective for such SOFR Interest Period. Notwithstanding the foregoing, the SOFR will be determined as of one Business Day prior to the Closing Date to determine the initial interest payment for the January 2024 stub period.

"SOFR Interest Period" shall have the same meaning as set forth in Section 2.2.1(d).

"Spread" means 1085 basis points (10.85%) per annum.

"<u>Spread Adjustment</u>" has the meaning set forth in <u>Section 2.11.2</u>.

"<u>State</u>" means the state or commonwealth in which the Land is located.

"<u>Stub Interest Period</u>" means the period from and including the Closing Date through and including January 31, 2024.

"<u>Subordination of Listing Agreement</u>" means any Subordination of Listing Agreement entered into in accordance with <u>Section 7.1.10</u>, in each case, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"<u>Subordination of Property Management Agreement</u>" means any Subordination of Property Management Agreement entered into in accordance with <u>Section 7.1.10</u>, in each case, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"<u>Substitute Index</u>" shall have the meaning set forth in <u>Section 2.11.1</u>.

"<u>Survey</u>" means (i) the ALTA/ACSM survey of the Property certified to Senior Lender and Lender, and approved by Senior Lender and Lender, on or prior to the Closing Date and referred to in the Title Policy and (ii) any other ALTA/ACSM survey of the Property certified to Senior Lender and Lender and prepared by a registered independent surveyor, containing the form of survey certification provided to Borrower by Lender and in form and content satisfactory to Senior Lender and Lender.

"<u>Tax Reserve Account</u>" means any reserve account or subaccount (including any subaccount established on a ledger or book-entry basis within another account, and not as a separate account) in which Lender or Servicer holds the deposits for Property Impositions made pursuant to <u>Section 4.1</u>.

"<u>Tax Returns</u>" has the meaning set forth in <u>Section 6.1.3</u>.

"<u>Tenant</u>" means any party that is a "tenant", "lessee", "subtenant", "licensee" or similar party under any Lease.

"<u>Tenant Improvement Costs</u>" means all non-recurring hard costs and typical and reasonable soft costs (such as space design costs, architect's fees and legal fees) incurred with respect to any Tenant Improvements.

"<u>Tenant Improvements</u>" means the fixtures, equipment and improvements as part of the fit-out of and finishing of the applicable space demised (or to be demised) to a Tenant.

"<u>Term Sheet</u>" means the Term Sheet, with an Effective Date of July 13, 2023 ("**Term Sheet Effective Date**"), between Civitas Alternative Investment II, LLC, a Texas limited liability company (an Affiliate of Lender) ("**Civitas**") and Partnership Guarantor (an Affiliate of Borrower) concerning the Mezzanine Loan transaction, as amended by the First Amendment to Term Sheet, made effective as of October 11, 2023, between Civitas and Partnership Guarantor, as such Term Sheet may be further amended.

"<u>Term Sheet Effective Date</u>" has the meaning set forth in the definition of "**Term Sheet**".

"<u>Termination Fees</u>" has the meaning set forth in <u>Section 7.1.13(d)</u>.

"<u>TH Investment Guarantor</u>" has the meaning set forth in Recital I above.

"<u>TH Investment Guaranty</u>" means that certain Guaranty Agreement, dated as of the Effective Date, made by TH Investment Guarantor to Lender, as the same may be amended, restated, supplemented, reaffirmed, replaced or otherwise modified from time to time.

"<u>Third Party Reports</u>" has the meaning set forth in <u>Section 11.21</u>.

"<u>Title Company</u>" means Fidelity National Title Company, or such other title company approved by Lender.

"<u>Title Policy</u>" means the title insurance policy insuring Owner's interest in the Property as of the Closing Date (subject only to the Permitted Encumbrances) in the amount of $55,600,000 based on the "As Is" market value of the Property as set forth in the most recent Appraisal, dated August 18, 2023, prepared by HVS Consulting & Valuation.

"<u>TPG Manager</u>" has the meaning set forth in <u>Section 7.1.10(a)</u>.

"<u>TPG Recognition Agreement</u>" has the meaning set forth in <u>Section 7.1.10(a)</u>.

"<u>Transactions</u>" means the transactions contemplated by this Agreement and the other Loan Documents.

"<u>UCC</u>" means, with respect to any Collateral, the Uniform Commercial Code as in effect from time to time in the jurisdiction in which such Collateral is located.

"<u>UCC Policy</u>" means the insurance policy insuring Lender's first priority Lien under the Security Instrument as of the Closing Date in the full amount of the Mezzanine Loan.

"<u>UCC-1 Financing Statement</u>" means each UCC-1 Financing Statement naming Lender as secured party and Borrower as debtor that is filed or recorded (or required by Lender to be filed or recorded) as security for the Secured Obligations.

"<u>Uniform System of Accounts</u>" means the Uniform System of Accounts for the Lodging Industry, Eleventh Revised Edition, as adopted by the American Hotel and Motel Association, as amended or supplemented from time to time.

"<u>U.S. Government Securities Business Day</u>" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

# ARTICLE 2

## GENERAL MEZZANINE LOAN TERMS

2.1.    <u>Mezzanine Loan; Closing Conditions</u>.  Lender shall advance the Mezzanine Loan to Borrower, and Borrower shall borrow the Mezzanine Loan from Lender, in accordance with this <u>Article 2</u> and in accordance with the other terms and conditions of this Agreement and the other Loan Documents.  The Secured Obligations shall be due and payable in accordance with the terms, covenants and conditions of this Agreement and the Note, which are hereby incorporated herein by reference as if set forth in full herein.  Amounts borrowed under the Loan Documents and repaid or prepaid may not be reborrowed.  The Secured Obligations shall be secured by the Security Instrument and the other Loan Documents.  The obligation of Borrower to pay the Principal Indebtedness, interest thereon and other amounts due under the Loan Documents shall be evidenced by the Note, this Agreement and the other Loan Documents.  As a condition precedent to the Closing of the Mezzanine Loan on the Closing Date, Borrower must satisfy all of the conditions required hereby and set forth elsewhere in this Agreement and deliver to Lender, the documents, certificates, and other items that are set forth below, together with such other documents, instruments, and certificates as Lender, or its legal counsel, may require from time to time:

2.1.1    <u>Closing Fees, Costs and Charges</u>.

(a)    <u>Origination Fee</u>.  Borrower's payment at Closing of the loan origination fee in the amount of $116,000 (the "**Loan Origination Fee**"), which is one percent (1%) of the Mezzanine Loan Amount.

(b)    <u>Lender's Fees, Costs and Charges</u>.  Lender's receipt of payment of all fees, costs, charges, expenses and other amounts incurred by Lender or Civitas Capital Management, LLC, d/b/a Civitas Capital Group in connection with this Mezzanine Loan transaction, including without limitation, due diligence investigations of the Property, Owner, Borrower and each Guarantor; studies; any environmental site assessments; valuations; documentation; negotiation of the Term Sheet (as defined herein) and Loan Documents; and closing of the Mezzanine Loan (including, without limitation, Lender's legal fees).

(c)    <u>Title, Escrow and Third-Party Costs</u>.  Borrower's payment of all third-party fees, costs, charges, expenses and other amounts required to be paid in order to satisfy the conditions of Closing and to close the Mezzanine Loan, including all title and escrow fees, costs and charges, the cost of the Survey and Title Policy (inclusive of all endorsements), the cost of the UCC Policy, and any and all recording and filing fees and costs.

(d)    <u>Application of Deposit; Loan Proceeds</u>.  Up to $1,600,000 in closing costs, which may include customary transaction costs, may be funded from the Mezzanine Loan Amount at closing to fund (i) the Loan Origination Fee (defined above) and (ii) up to $1,484,000 of other closing costs. The balance of the closing costs will be paid by Borrower from the Deposit Amount and other funds of

Borrower, all in accordance with Lender's closing instructions and the settlement statement approved by Lender and Borrower as of the Closing Date. Notwithstanding the foregoing, Borrower agrees that the foregoing expenses in (b) and (c) will be due to Lender whether or not Lender closes the Mezzanine Loan.

2.1.2    The Loan Documents duly executed (and notarized as applicable) and in recordable form by Borrower and, other parties thereto, if applicable, and Title Company shall have accepted and approved the Security Instrument, UCC-1 Financing Statements and all other recordable Loan Documents for recordation in the applicable counties and states.

2.1.3    A new Owner's extended coverage title insurance policy in form and content reasonably satisfactory to Lender, to be obtained at Borrower's expense insuring that the Property is free and clear of all defects and encumbrances except such as Lender shall approve, and naming Owner as the insured party, issued by the Title Company, in the coverage amount that is the As-Is appraisal value of the Property set forth in the recent Appraisal, with no exceptions or exclusions other than as may be approved by Lender and containing any mezzanine and other endorsements required by Lender (the "**Title Policy**").

2.1.4    The UCC Policy in form and content reasonably satisfactory to Lender, to be obtained at Borrower's expense, insuring Lender's perfected, first priority security interest in the equity interests of Owner in connection with the Security Instrument, with no exceptions or exclusions other than as may be approved by Lender.

2.1.5    The Survey (as defined herein) prepared in compliance with standards established by Lender and certified to the benefit of Lender, Senior Lender and the Title Company by a duly registered land surveyor or engineer in the State of Georgia, acceptable to Lender which survey shall show all courses and distances, dimensions, the area in square feet, street and setback lines, existing improvements and other details reasonably required by Lender.

2.1.6    The completion of any Loan Modification deemed necessary or desirable by Lender as specified in Section 11.17 herein.

2.1.7    Original or certified copies of all Required Insurance Policies, which are in full force and effect with all premiums paid thereunder as specified in Section 6.2.4; provided, however, Borrower shall cause Owner to deliver to Lender the complete Commercial Property Insurance Policy #7011547663 as a post-closing item in accordance with Section 7.4 below and **Schedule 3** attached hereto.

2.1.8    The Financial Statements required to be furnished to Lender prior to Closing under the terms of this Agreement.

2.1.9    Evidence that all Legal Requirements of the Authority related to the Borrower Rental Agreement have been satisfied with regard to the Mezzanine Loan, including, but not limited to, but only to the extent required by the Authority, delivery to Lender of a consent from the Authority permitting the Mezzanine Loan and the Security Instrument, and all other required consents and approvals, beyond any appeal period, on

terms reasonably satisfactory to Lender.  Borrower shall further provide Lender with an estoppel certificate reasonably satisfactory to Lender, in which the Authority certifies to Lender (and its successors and assigns), to the best of its knowledge, as to the items set forth in Section 8.04(b) of the Borrower Rental Agreement.

2.1.10    An estoppel certificate from Owner, reasonably satisfactory to Lender, in which Owner certifies to Lender (and its successors and assigns), to the best of its knowledge, as to the items set forth in Section 8.04(b) of the Borrower Rental Agreement.

2.1.11  Satisfactory completion of Lender's due diligence investigations of Owner, Borrower, each Guarantor, and the Property (including, without limitation, review of the capital structure and Financial Statements, material agreements, architectural and engineering plans, drawings, and specifications, all entitlements, third-party reports and other Property documents; and any inspections of the Property).

2.1.12  Any required approvals from the Property Manager (including the TPG Recognition Agreement, as defined in Section 7.1.10(a) below) are obtained by Lender in form and substance reasonably acceptable to Lender.

2.1.13  Any required approvals from IHG Licensor are obtained by Lender in form and substance reasonably acceptable to Lender.

2.1.14  There have been no events, circumstances or conditions occurring after the Term Sheet Effective Date that have had or could reasonably be expected to have a Material Adverse Effect on the Property, Borrower, Guarantor, or Mezzanine Loan.  Without limiting the generality of the foregoing, no material investigation, litigation, bankruptcy, or other proceeding is pending or threatened against the Property, Owner, Borrower, Guarantor, or any other Person as of the Closing Date, which can reasonably be expected to have any material adverse effect whatsoever upon the validity or enforceability of this Agreement or any other Loan Document.

2.1.15  There have been no events, circumstances or conditions occurring since the date of the Financial Statements most recently received by Lender that have had or could reasonably be expected to have a Material Adverse Effect.

2.1.16  Reasonably satisfactory evidence that all applicable zoning ordinances or restrictive covenants affecting the Property permit the use for which the Property is intended and have been or will be complied with and evidence of approval of the plans for the Property by any necessary Governmental Authority.

2.1.17  A Phase I environmental site assessment report, soils report, property condition report and any other third-party reports of the Property prepared by consultants acceptable to Lender, certified to Lender and with results reasonably acceptable to Lender, and if requested by Lender, a Phase II environmental site assessment report reasonably acceptable to Lender.

2.1.18  Evidence reasonably satisfactory to Lender's legal counsel that all necessary action on the part of Borrower and each Guarantor (as applicable) has been taken

with respect to the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, so that this Agreement and all Loan Documents to be executed and delivered by or on behalf of Borrower and each Guarantor (as applicable) will be valid and binding upon Borrower and each Guarantor (as applicable) or the person or entity executing and delivering such document in accordance with its terms.  Such evidence shall include the legal opinion or opinions of legal counsel for Borrower, as reasonably approved by Lender, confirming such authority, validity, and binding effect of the documents in accordance with their terms, confirming the perfection of the Lender's security interest in the Mezzanine Loan collateral, confirming that neither the Mezzanine Loan nor any of the financing arrangements contemplated by this Agreement violate the usury laws of the State of Texas, or any other applicable jurisdiction, and covering such other matters as Lender may require in form and content reasonably acceptable to Lender's legal counsel and containing no exceptions other than such as may be reasonably acceptable to Lender and its legal counsel.

2.1.19  The Third Amendment to Senior Loan Agreement (as defined above in the Recitals) is reasonably acceptable to Lender and Lender's legal counsel and includes the following terms: (i) the Senior Loan Amount has been reduced to and shall remain at an amount not to exceed $25,000,000, and (ii) the Senior Loan bears interest on an interest-only basis with a fixed "Note Rate" as defined in the Senior Loan Documents of no greater than 5.53%.

2.1.20  The Loan-To-Value Ratio does not exceed 65%.

2.1.21  The Combined Loan Amount does not exceed $36,600,000.

2.2.    Interest Rate and Loan Debt Service Payments.

2.2.1    Interest Rate. The Applicable Interest Rate shall accrue and be computed as follows:

(a)    The Principal Indebtedness shall bear interest at the Applicable Interest Rate. Loan Debt Service Payments for any and all periods (including the Stub Interest Period) shall be calculated by multiplying the Principal Indebtedness by the Applicable Interest Rate, dividing the product by three hundred sixty (360), and multiplying that result by the actual number of days elapsed during such period in question. The Applicable Interest Rate shall be determined by Lender, and such determination shall be conclusive absent manifest error.

(b)    From the Closing Date to, but not including, the first Interest Change Date following the Closing Date, the Applicable Interest Rate shall, subject to Sections 2.2.1(a) and 2.3 below, be equal to the SOFR plus the Spread and shall be adjusted on the first day of the SOFR Interest Period in accordance with Section 2.2.1(c) below.  In no event shall the SOFR be less than the Floor Rate (as defined in Article 1).

(c)    Lender shall increase or decrease the Applicable Interest Rate in accordance with this Section 2.2.1(c) effective on each Interest Change Date. The

new Applicable Interest Rate effective on each Interest Change Date shall be equal to the SOFR on such Interest Change Date plus the Spread, but in no event shall the SOFR be less than the Floor Rate.

(d)      The SOFR Interest Period shall be for a period of one month commencing on February 1, 2024, and continuing on each Installment Payment Date thereafter.  If any SOFR Interest Period would otherwise expire on a day which is not a Business Day, such SOFR Interest Period shall expire on the next succeeding Business Day. The SOFR Interest Period shall not extend beyond the Maturity Date.

(e)      Notwithstanding anything to the contrary herein or in any other Loan Documents, Lender shall have the right to make Rate Conforming Changes from time to time and, any amendments or modifications to this Agreement, the Note or to any other Loan Documents implementing or evidencing such Rate Conforming Changes will become effective without any further action or consent of Borrower.

2.2.2   <u>Initial Interest Payment for Stub Period in January 2024</u>.   A single installment payment of interest only for the period beginning on the Closing Date and ending on the day immediately preceding the first day of the month following the Closing Date shall be due and payable on the Closing Date.  As set forth in the definition of "SOFR" above, the one month term SOFR will be determined as of one Business Day prior to the Closing Date as part of the determination of the interest payment for the January 2024 stub period.

2.2.3   <u>Monthly Loan Debt Service Payments</u>.   Installment payments of interest only on the then-outstanding Principal Indebtedness shall be due and payable monthly in arrears commencing on the first Installment Payment Date and continuing on the first day of each month thereafter to and including the month of the Initial Maturity Date. In the event Borrower timely and properly exercises Borrower's First Extension Option, then such payments shall continue through and including the month of the First Extended Maturity Date. In the event Borrower timely and properly exercises Borrower's Second Extension Option, then such payments shall continue through and including the month of the Second Extended Maturity Date.

2.2.4   <u>Amounts Due on Maturity Date</u>.  The entire Principal Indebtedness and all other amounts due under this Agreement and the other Loan Documents, together with all accrued and unpaid interest thereon, shall be due and payable in full on the Maturity Date (being the Initial Maturity Date, or if Borrower's First Extension Option is exercised, the First Extended Maturity Date, or if Borrower's Second Extension Option is exercised, the Second Extended Maturity Date).

2.2.5   <u>Advances</u>.  The Mezzanine Loan is being advanced in full on the Closing Date.

2.2.6    Servicing Fee.  In addition to the monthly Loan Debt Service Payments, Borrower shall pay to Lender a monthly servicing fee in the amount equal to 12 basis points per annum ("**Servicing Fee**"), payable monthly from the Closing Date and through the Maturity Date (which shall include any applicable Extension Period).  The Servicing Fee shall be calculated on the outstanding principal balance of the Mezzanine Loan as of the first day of each month.  After the Closing Date, the Servicing Fee shall be due at the time the interest and principal (as applicable) on the Mezzanine Loan are due each month. The Servicing Fee shall be prorated as necessary (for the first month's payment at Closing and last month's payment covering the period up until and including the Maturity Date).

2.3.    Prepayment.

2.3.1    Prepayment in Whole; Exceptions.  Except for the purposes of satisfying the Extension Debt Yield Test, the Extension DSCR Test, the Extension LTV Test, suspending the Distributable Cash Flow Sweep Period, or resulting from Capital Proceeds or Liquidation Proceeds required to be applied to Principal Indebtedness pursuant to Section 7.1.5, the Mezzanine Loan may only be prepaid in whole.

2.3.2    Prepayment Conditions.  To prepay the Mezzanine Loan, Borrower shall satisfy each of the following conditions (collectively, the "**Prepayment Conditions**"):

(a)    Notice.  Borrower has provided a minimum of 10 Business Days' prior written notice to Lender, which Lender has received.

(b)    Minimum Interest.  Borrower shall pay on a Business Day (i) minimum interest to Lender equal to 12 months of Loan Debt Service Payments based on a funded Mezzanine Loan balance of not less than $11,600,000, inclusive of Loan Debt Service Payments paid prior to the prepayment (but excluding the following from such amount of Loan Debt Service Payments paid pursuant to the foregoing clause (i): any late charges, late fees and/or other fees, and default interest at the Default Rate) based on an interest rate equal to the Interest Rate in effect on the Closing Date without regard to subsequent adjustments in the Interest Rate, and (ii) all other additional amounts and other sums unpaid under the Note with respect to the amount prepaid (collectively, the "**Minimum Interest**").  If such prepayment is not made on an Installment Payment Date, Borrower has paid to Lender all interest that would be due and payable through the end of the Loan Debt Service Payment period in which such prepayment occurs.  Notwithstanding the foregoing or anything herein to the contrary, no Minimum Interest shall be payable in connection with (i) a prepayment for the purposes of satisfying the Extension Debt Yield Test, Extension DSCR Test, or Extension LTV Test  or (ii) a prepayment in full of the Mezzanine Loan resulting from Capital Proceeds required to be applied to Principal Indebtedness pursuant to Section 7.1.5.

(c)    Repayments in Full Prior to Initial Maturity Date.

(i)     <u>Refinancing</u>: For a refinancing transaction and prepayment in full prior to the Initial Maturity Date, Borrower shall pay the Minimum Interest.

(ii)     <u>Sale</u>: For sale of the Property and prepayment in full prior to the Initial Maturity Date, Borrower shall pay the Minimum Interest.

2.3.3   <u>Partial Prepayments.</u> In no event shall Borrower be permitted to make any partial prepayments of the Principal Indebtedness, except as expressly set forth in <u>Section 2.3.1</u>.

2.3.4   <u>Minimum Interest during Event of Default</u>.  If Lender accelerates the Secured Obligations during the existence of an Event of Default, then in addition to Borrower's obligation to pay the Principal Indebtedness, all accrued but unpaid interest thereon and any other amounts due under this Agreement and the other Loan Documents, Borrower shall pay to Lender an additional amount equal to the Minimum Interest.

2.3.5   <u>No Reinvestment Obligations.</u>  Lender shall not be obligated to actually reinvest any amount prepaid in any United States Treasury obligations (or otherwise) as a condition precedent to receiving any Minimum Interest or prepayment premium or for any other reason.

2.3.6   <u>Waiver of Prepayment Right Without Premium</u>.  Except as otherwise expressly permitted hereunder, Borrower hereby expressly waives, to the extent not expressly prohibited by applicable Legal Requirements, any right that Borrower may have under Legal Requirements to prepay the Mezzanine Loan, in whole or in part, without prepayment charge, upon acceleration of the Maturity Date, and agrees that, except as otherwise expressly permitted hereunder, if for any reason a prepayment of all or any part of the Secured Obligations is made, whether voluntarily or following any acceleration of the Maturity Date by Lender on account of the existence of any Event of Default arising for any reason, including as a result of any prohibited or restricted transfer, further encumbrance or disposition of the Property or any part thereof, then Borrower shall be obligated to pay, concurrently with such prepayment, the Minimum Interest or prepayment premium provided for herein (including, in the event of acceleration at any time that prepayment is not permitted pursuant to the Loan Documents, the prepayment premium as set forth in <u>Section 2.3.2</u>).  Borrower hereby declares that Lender's agreement to make the Mezzanine Loan at the interest rate and for the term set forth herein constitutes adequate consideration, given individual weight by Borrower, for this waiver and agreement.

2.4.   <u>Late Fee</u>.  If Borrower fails to make any payment pursuant to this Agreement or any other Loan Document on or before the 10th day after the due date for such payment (other than the balloon payment due on the Maturity Date), then Borrower shall pay Lender a late fee equal to the greater of (a) 5% of such past-due payment or (b) $10.00. Such late fee will be immediately due and payable and is in addition to any other charges, costs, fees, and expenses that Borrower may owe as a result of the late payment, including the accrual of interest at the Default Rate pursuant to this Agreement or any other Loan Document. Borrower agrees that the actual damages suffered by Lender because of any late installment payment are extremely difficult and

impracticable to ascertain, and the late charge described in this section represents a reasonable attempt to fix such damages under the circumstances existing at the time this Agreement is executed. Lender's acceptance of any late charge shall not constitute a waiver of any of the terms of this Agreement and the Note and shall not affect Lender's right to enforce any of its rights and remedies against any party liable for payment of the Note.

2.5.    <u>Default Rate Accrual on Amounts Owed</u>.  If any Event of Default shall occur, then during the continuance of such Event of Default, interest shall accrue on the Principal Indebtedness (and on all accrued but unpaid interest thereon and on any other amounts due under this Agreement and the other Loan Documents) at the Default Rate. Without limiting the foregoing terms of this <u>Section 2.5</u>, (i) if Borrower fails to pay any Loan Debt Service Payments or other amounts payable under this Agreement or any other Loan Document on the due date therefor (including the payment of the Principal Indebtedness on the Maturity Date, by acceleration or otherwise), then, interest shall accrue on the entire Principal Indebtedness (and all accrued but unpaid interest thereon and any other amounts due under this Agreement and the other Loan Documents) at the Default Rate from the due date of such payment until the date that such amount is actually paid to Lender by Borrower, and (ii) any Protective Advance or any other out-of-pocket payments made or expenses (including actual attorneys' fees) incurred by Lender in connection with Lender's (or Lender's agent's) performance of Borrower's obligations or the exercise of Lender's rights and remedies under this Agreement or any other Loan Document shall accrue interest thereon at the Default Rate from the date that any such Protective Advance or payment is made by Lender, or the date that such expense is incurred by Lender, as applicable, until the date that such amounts (together with the applicable interest thereon at the Default Rate) are actually paid to Lender by Borrower, and shall be part of the Secured Obligations. In no event shall the foregoing be construed to nullify any grace and/or cure periods applicable to a determination of the existence of an Event of Default.

2.6.    <u>Application of Payments</u>.

2.6.1    <u>Application of Payments If No Event of Default Exists</u>.  So long as no Event of Default exists, except as otherwise expressly set forth herein, Lender shall apply all payments made to Lender by or on behalf of Borrower in the following order:  (i) first, to the payment of late fees and late charges, if any; (ii) second, to the payment of any Minimum Interest or prepayment premiums, if applicable; (iii) third, to the repayment of any Protective Advances and any other costs and expenses incurred by Lender in accordance with the Loan Documents (together with interest thereon at the Default Rate from the date of advance until repaid), if any; (iv) fourth, to the payment of accrued and unpaid Loan Debt Service Payments on the Principal Indebtedness (at the Applicable Interest Rate) and to other amounts due and payable under this Agreement and the other Loan Documents (other than the Principal Indebtedness), if any; and (v) fifth, to the reduction of the Principal Indebtedness.

2.6.2    <u>Application of Payments During Event of Default</u>.  Notwithstanding the foregoing terms of <u>Section 2.6.1</u> or anything to the contrary in this Agreement or the other Loan Documents, for so long as any Event of Default is continuing, Lender shall have the continuing exclusive right to apply any payments received by Lender from or on behalf of Borrower, and any funds held by Lender pursuant to the terms of <u>Article 3</u> or the other terms of this Agreement or the other Loan Documents (including any funds held in any

Account and the proceeds of any Letter of Credit held by Lender as security for the Secured Obligations) as Lender may elect against the Secured Obligations of Borrower in such order of priority or in such allocations as Lender may determine.

2.7.    Payments; Business Day.  Each payment or prepayment under this Agreement and the Note shall be paid at the office of Lender (c/o Civitas Capital Group, 1722 Routh Street, Suite 800, Dallas, Texas 75201) in lawful money of the United States of America and in funds which are or will be available for immediate use by Lender at such office on or before 12:00 p.m., Dallas, Texas time, on the day such payment or prepayment is due.  Any funds received by Lender after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day.  In any case where a payment of principal or interest hereof is due on a day which is not a Business Day, Borrower shall be entitled to delay such payment until the next succeeding Business Day, but interest shall continue to accrue until the payment is, in fact, made.  For the purposes of this Section, no payment or prepayment under this Agreement and the Note shall be deemed to be received by Lender unless and until such payment or prepayment is available to Lender in the account designated by Lender for such payment or prepayment. All payments made by Borrower under this Agreement, the Note or the other Loan Documents shall be made without setoff, counterclaim or deduction of any kind and shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority. If requested by Lender, Borrower shall verbally verify all payment instructions to Lender before transmitting any payment or prepayment of funds by wire transfer or other means of payment.

2.8.    Release of Collateral.  Upon indefeasible payment and performance (in full) of all of the Secured Obligations (other than any Secured Obligations that survive repayment of the Mezzanine Loan), Lender shall, at the request of Borrower and at the sole cost and expense of Borrower, release or cause to be released all Liens with respect to all Collateral (or, at Borrower's request, assign such Liens with respect to all or certain Collateral as Borrower may request), in each case, pursuant to documentation in form and substance satisfactory to Lender.

2.9.    Increased Costs.

2.9.1    Increased Costs Generally.  If any Change in Law or compliance by Lender with any request or directive (whether or not having the force of law) from any central bank or other governmental authority shall:

(a)    subject Lender to any taxes (other than taxes that are indemnified by Borrower pursuant to this Agreement) on its loans, loan principal, letters of credit, commitments or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(b)    impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances or loans by, or any other acquisition of funds by any office of Lender;

and the result of any of the foregoing shall be to increase the cost to Lender or such other recipient of making, converting to, continuing or maintaining the Mezzanine Loan or of maintaining Lender's obligation to make the Mezzanine Loan, or to increase the cost to Lender, or to reduce the amount of any sum received or receivable by Lender (whether of principal, interest or any other amount) then, upon request of Lender (but, in each case, without duplication of (x) any obligations of Borrower pursuant to Section 7.1.3(c) of this Agreement, or (y) any amounts paid or payable by Borrower to Lender pursuant to Section 7.1.3(c) of this Agreement), Borrower will pay to such Lender such additional amount or amounts as will compensate Lender for such additional costs incurred or reduction suffered.  In making any determination with regard to costs incurred by Lender and/or reductions in amounts received by Lender attributable to Changes in Law (including the amount of such costs or reduction in amounts), any determination made by Lender shall (absent manifest error) be conclusive and binding upon Borrower.  Notwithstanding the foregoing, Borrower shall not be required to compensate Lender pursuant to this Section 2.9 for any such costs incurred more than 365 days prior to the date that Lender notifies Borrower of the Change in Law giving rise to such costs and of Lender's intention to claim compensation therefor; provided, further that, if the Change in Law giving rise to such costs is retroactive, then the 365 day prior period referred to above shall be extended to include the period of retroactive effect.

2.9.2   Capital Requirements.  Without limiting Section 2.9.1, if Lender determines that any Change in Law affecting Lender or any lending office of Lender, if any, regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on Lender's capital as a consequence of this Agreement or the Mezzanine Loan to a level below that which Lender could have achieved but for such Change in Law (taking into consideration Lender's policies with respect to capital adequacy), then from time to time Borrower will pay to Lender such additional amount or amounts as will compensate Lender for any such reduction suffered.

2.9.3   Certificates for Reimbursement.  A certificate of Lender setting forth the amount or amounts necessary to compensate Lender as specified in Section 2.9.1 or Section 2.9.2, and delivered to Borrower, shall be conclusive absent manifest error.  Borrower shall pay Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

2.9.4   Delay in Requests.  Failure or delay on the part of Lender to demand compensation pursuant to this Section 2.9 shall not constitute a waiver of Lender's right to demand such compensation.

2.10.   Illegality. If Lender determines in good faith that any Change in Law shall make it unlawful for Lender (i) to make interest rate options based upon the then-current Benchmark available hereunder, or (ii) to maintain interest rates based on the then-current Benchmark, then in the event described in clause (i), any obligation of Lender to make available such unlawful interest rate based upon the then-current Benchmark shall immediately be suspended or cancelled (at the election of Lender), and in the event described in clause (ii), any such unlawful interest rates based on the then-current Benchmark then outstanding shall be converted to the Floor Rate as of the effective date of such Change in Law; provided, however, that if any such Change in Law shall

permit any interest rates based on SOFR or any other Substitute Index (as defined herein), as applicable, to remain in effect until the expiration of the interest period applicable thereto, then such permitted SOFR or Substitute Index-based interest rates shall continue in effect until the expiration of such interest period. Thereafter, for so long as the Change in Law that gave rise to the conversion to the Floor Rate remains in effect, the outstanding principal of the Mezzanine Loan shall bear interest at the Floor Rate, provided that if such Change in Law no longer remains in effect, the outstanding principal of the Mezzanine Loan shall bear interest at the Applicable Interest Rate, as determined by reference to SOFR or another Substitute Index that is available, in which event the outstanding principal of the Mezzanine Loan shall bear interest in accordance with Section 2.11.2 of this Agreement. Upon the occurrence of any of the foregoing events, Borrower shall pay to Lender within 10 Business Days following written demand such amounts as may be necessary to compensate Lender for any actual out-of-pocket fines, fees, charges, penalties or other out-of-pocket costs incurred or payable by Lender as a result thereof and that are attributable to any SOFR- or Substitute Index-based interest rate, as applicable, made available to Borrower hereunder.

2.11.    Special Circumstances and Suspension or Modification of Interest Rate.

2.11.1    Substitute Index. If Lender, taking into consideration any then prevailing market convention, determines in its good faith but sole and absolute discretion (which determination shall be conclusive and binding so long as it is not inconsistently applied across loans of similar nature and not inconsistent with applicable federal laws), that the SOFR has become unavailable or unreliable, either temporarily, indefinitely or permanently, during the term of the Loan, then Lender may amend the Loan Documents by designating a substantially similar substitute index to replace the SOFR (the "**Substitute Index**").

2.11.2    Spread Adjustment; Adjusted Substitute Index. Lender may also adjust the Substitute Index by applying a spread adjustment, which may be a positive or negative number, or zero (the "**Spread Adjustment**") as well as adding a margin to the Spread Adjustment. In making these amendments, Lender may take into consideration any then prevailing market convention for selecting the Substitute Index and Spread Adjustment (collectively, the "**Adjusted Substitute Index**"). If the Adjusted Substitute Index as determined pursuant to this section would be less than the Floor Rate, the Adjusted Substitute Index will be deemed to be the Floor Rate for the purposes of this Agreement and the other Loan Documents. An amendment to this Agreement pursuant to this Section will become effective and enforceable 10 Business Days after Lender gives written notice of the amendment to Borrower in which case the Adjusted Substitute Index shall replace the SOFR for all purposes under this Agreement without any further action or consent of Lender or other party. Any determination under this Section 2.11.2 shall be conclusive and binding on Borrower in the absence of manifest error. Lender shall not be liable to Borrower in any manner for its determination that an amendment to this Agreement is required pursuant to this Section, for its selection of the Substitute Index or for its determination and application of the Spread Adjustment and margin, provided that Lender makes its determination or selection in good faith. If selected by Lender, the Adjusted Substitute Index shall remain in effect until the Maturity Date, unless Lender later determines in its sole discretion that the Substitute Index has become unavailable or

unreliable, either temporarily, indefinitely or permanently, in which case the provisions of this Section will again apply for purposes of replacing the Substitute Index.

2.12.    <u>Borrower Extension Options</u>. Borrower shall have the option to extend the Initial Maturity Date through and including the First Extended Maturity Date (such option referred to herein as "**Borrower's First Extension Option**"), and Borrower shall have the option to extend the First Extended Maturity Date through and including the Second Extended Maturity Date (such option referred to herein as "**Borrower's Second Extension Option**") (each option is referred to herein as an "**Extension Option**" and the period of time during each such extension period is referred to herein as an "**Extension Period**"), provided, in each case, that Borrower shall satisfy each of the following conditions (collectively, the "**Extension Conditions**") as determined by Lender in its reasonable discretion:

2.12.1 <u>Extension Request Notice</u>. Borrower shall deliver to Lender a written request that Lender extend the applicable Maturity Date (each such request, an "**Extension Request Notice**") not less than 60 days prior to the applicable Maturity Date.

2.12.2 <u>Certification from Borrower and Guarantor</u>. Borrower and each Guarantor shall have delivered to Lender, together with the Extension Request Notice and also as of the commencement of the Extension Period, a certification of Borrower (signed by an officer of Borrower) and each Guarantor (signed by an officer of each guarantor that is an entity) certifying that, (i) each of the representations and warranties of Borrower and each Guarantor contained in the Loan Documents is true, complete and correct in all material respects as of the date of such certificate to the extent such representations and warranties are not matters which by their nature can no longer be true and correct as a result of the passage of time, (ii) Borrower and each  Guarantor are in compliance in all material respects with all applicable covenants and requirements contained in the Loan Documents as of the date of such certificate, (iii) there has been no material adverse change in the financial condition of the Property, Borrower or any Guarantor, and (iv) no Default or Event of Default (after any applicable notice and cure period) shall have occurred and be continuing under the Loan Documents.

2.12.3 <u>Amendments/Reaffirmations</u>. Borrower and each Guarantor, at Lender's request and in Lender's reasonable discretion, shall enter into any amendments to, and reaffirmations of, the Loan Documents in order (i) to reflect the extension of the term of the Mezzanine Loan pursuant to Borrower's First Extension Option and/or Borrower's Second Extension Option as of the date of commencement of each such extension and (ii) to reaffirm all of the obligations of Borrower and each Guarantor under the Loan Documents.

2.12.4 <u>Extension Fee</u>. Borrower shall pay to Lender or its designee on the date of delivery of the Extension Request Notice a non-refundable Extension Fee in immediately available funds in an amount equal to the Extension Fee.

2.12.5 <u>Extension Debt Yield Test</u>. To exercise each Extension Option, Borrower shall have provided to Lender a signed Debt Yield Compliance Certificate in the form to be provided by Lender to Borrower in the future, evidencing that (and Lender has

confirmed in its sole and absolute discretion, which determination shall be conclusive absent manifest error that) the information and data provided in such certification is correct and that the following test has been satisfied (the "**Extension Debt Yield Test**"):

(a)  To exercise Borrower's First Extension Option, the Debt Yield shall not be less than ten and one-half percent (10.5%) ("**First Extension Option Minimum Debt Yield**") (i) as of the date of the applicable Extension Request Notice and (ii) as of the Initial Maturity Date.

(b)  To exercise Borrower's Second Extension Option, the Debt Yield shall not be less than eleven percent (11.0%) ("**Second Extension Option Minimum Debt Yield**") (i) as of the date of the applicable Extension Request Notice and (ii) as of the First Extended Maturity Date.

2.12.6  <u>Extension DSCR Test</u>. To exercise each Extension Option, Borrower shall have provided to Lender a signed DSCR Compliance Certificate in the form to be provided by Lender to Borrower in the future, evidencing that (and Lender has confirmed in its sole and absolute discretion, which determination shall be conclusive absent manifest error that) the information and data provided in such certification is correct and that the following test has been satisfied (the "**Extension DSCR Test**"):

(a)  To exercise Borrower's First Extension Option, the DSCR shall not be less than 1.25x ("**First Extension Minimum DSCR**") (i) as of the date of the applicable Extension Request Notice and (ii) as of the Initial Maturity Date.

(b)  To exercise Borrower's Second Extension Option, the DSCR shall not be less than 1.35x ("**Second Extension Minimum DSCR**") (i) as of the date of the applicable Extension Request Notice and (ii) as of the First Extended Maturity Date.

2.12.7  <u>Extension LTV Test</u>. To exercise each Extension Option, Borrower shall have provided to Lender a signed LTV Compliance Certificate in the form to be provided by Lender to Borrower in the future, evidencing that (and Lender has confirmed in its sole and absolute discretion, which determination shall be conclusive absent manifest error that) the information and data provided in such certification is correct and that the following test has been satisfied (the "**Extension LTV Test**") with respect to each Extension Option:

(a)  To exercise Borrower's First Extension Option, the Loan-to-Value Ratio shall be no greater than sixty-two and one-half percent (62.5%) (the "**Maximum First Extension LTV**") as determined by Lender based on the then-applicable Combined Loan Amount and a then-current Appraisal dated not more than 60 days prior to the Initial Maturity Date and received and approved by Lender (i) as of the date of the applicable Extension Request Notice and (ii) as of the Initial Maturity Date.

(b)  To exercise Borrower's Second Extension Option, the Loan-to-Value Ratio, shall be no greater than sixty percent (60.0%) (the "**Maximum Second Extension LTV**") as determined by Lender based on the then-applicable

Combined Loan Amount and a then-current Appraisal dated not more than 60 days prior to the First Extended Maturity Date and received and approved by Lender (i) as of the date of the applicable Extension Request Notice and (ii) as of the First Extended Maturity Date.

2.12.8  Intentionally Omitted.

2.12.9  Intentionally Omitted.

2.12.10 Continuing Lien on Collateral; UCC Policy.  Borrower shall obtain and provide to Lender such evidence as Lender may reasonably require evidencing that (i) Lender continues to have a first priority lien on the Collateral, and (ii) the UCC Policy remains in full force and effect and will remain in full force and effect during the applicable Extension Period.

2.12.11 Senior Loan Term. Owner simultaneously extends the Senior Loan pursuant to the Senior Loan Documents, such that the maturity date of the Senior Loan remains co-terminus with the Maturity Date as set forth herein, and Borrower provides written evidence reasonably satisfactory to Lender that the Senior Loan has been extended in an amount not to exceed $25,000,000 and at a note rate not to exceed 5.53%.

2.12.12 Borrower Cooperation; Payment of Lender's Costs and Expenses. Borrower shall diligently and in good faith cooperate with Lender in the completion of Lender's due diligence with respect to Lender's determination of whether all of the applicable Extension Conditions have been satisfied, and Borrower shall deliver to Lender any and all calculations, documents and information reasonably requested by Lender in connection therewith promptly under the circumstances.  Borrower shall pay all of Lender's costs and expenses (including actual, out-of-pocket attorneys' fees and charges) actually incurred in connection with the Extension Option and Lender's determination of whether or not the Extension Conditions have been satisfied, including, without limitation, any title, legal, processing, accounting, appraisal, and other fees, whether or not such Extension Option is actually consummated and whether or not Borrower satisfies the Extension Conditions.  Within 10 Business Days following receipt by Lender of any such Extension Request Notice and all of the other items, calculations, documents and information required or requested under this Section 2.12, Lender shall endeavor to confirm in writing to Borrower whether or not each of the Extension Conditions have been satisfied (and if not, specifying which Extension Condition(s) have not been satisfied). Subject to Section 2.12.13 below, if Borrower has not satisfied each of the Extension Conditions in respect of any such Extension Request Notice, then Borrower shall not be entitled to the applicable Extension Option and Lender shall not have any obligation to confirm or grant such applicable extension.

2.12.13 Extension Prepayment.  Notwithstanding the foregoing, in the event that Borrower wishes to exercise Borrower's First Extension Option or Borrower's Second Extension Option, as applicable, and each of the Extension Conditions to such Extension Option have been satisfied other than the Extension Debt Yield Test, Extension DSCR Test, and/or Extension LTV Test in this Section 2.12, then, Borrower shall have the right

to cause such test(s) to be satisfied by prepaying the Principal Indebtedness in an amount equal to the (i) Extension Condition Satisfaction Amount or (ii) a greater portion of the principal balance of the Note, without any prepayment premium or other penalty.

2.12.14 Satisfaction of Extension Conditions for Borrower's First Extension Option. With respect to Borrower's Second Extension Option, Borrower shall have exercised Borrower's First Extension Option in accordance with the provisions of this Section 2.12, and Borrower shall have satisfied all of the applicable Extension Conditions for Borrower's First Extension Option.

## ARTICLE 3

## CASH MANAGEMENT

3.1.    Gross Revenue Collections into Hotel Operating Account. Borrower shall cause all Gross Revenue arising from or related to the Property to be collected by Owner and/or the Property Manager (on behalf of Owner) and deposited into the one or more accounts previously established in accordance with the Property Management Agreement and the Senior Loan Agreement (collectively, such accounts shall be known as the "**Hotel Operating Account**").  From the Hotel Operating Account, Borrower shall cause Owner and/or the Property Manager (on behalf of Owner) to pay (i) the regular monthly Operating Expenses with respect to the Property in accordance with the Approved Budget (excluding any expenses, such as Property Impositions, that are to be paid separately from the Reserves as expressly set forth in this Agreement), (ii) Senior Loan Debt Service Payments, (iii) Senior Loan reserve payments, (iv) Emergency Expenses, and (v) Non-Discretionary Costs.  The remaining amount after the foregoing five items have been paid shall be known herein as "**Distributable Cash**."  Without limitation to the foregoing, to the extent there is any available Distributable Cash each month, then prior to such Distributable Cash being distributed to Borrower and deposited into the Operating Account (in accordance with Section 3.2.1 below, subject to the terms and conditions of any applicable Distributable Cash Flow Sweep Period), Borrower shall be permitted to cause Owner and/or the Property Manager (on behalf of Owner) to pay IHG Licensor any then overdue regular monthly payments under the IHG License (collectively, the "**IHG Paydown Amount**") so that no monetary obligation of Owner thereunder is more than 30 days overdue at any time.  For the avoidance of doubt, the IHG Paydown Amount shall not include any overdue payments that are one-time, non-recurring extraordinary expenses owing to IHG Licensor, such as any capital expenditures, legal fee reimbursements, default payments, penalties, liquidated damages, or any other non-recurring, extraordinary expense items. Any Distributable Cash remaining after subtracting any applicable IHG Paydown Amount shall then be deposited by Borrower into the Operating Account in accordance with Section 3.2.1 below, subject to the terms and conditions of any applicable Distributable Cash Flow Sweep Period.

3.2.    Establishment of Accounts.

3.2.1    Borrower's Operating Account. On or prior to the Closing Date, Borrower shall establish and thereafter maintain an operating account (the "**Operating Account**") in the name of Borrower for the sole and exclusive benefit of Lender.  The Operating Account shall be established at Texas Capital Bank or any other bank acceptable to Lender ("**Bank**"), and shall be subject to a control agreement ("**DACA**") satisfactory in form and

substance to both Bank and Lender. To the extent that Borrower has not provided Texas Capital Bank with all requested KYC (Know Your Customer) documentation on or prior to the Closing Date, then Borrower shall deliver to Texas Capital Bank all outstanding KYC documentation requests, to Texas Capital Bank's satisfaction, as a post-closing item in accordance with <u>Section 7.4</u> and **<u>Schedule 3</u>** below. The funds in the Operating Account shall be additional collateral for the Mezzanine Loan. Until such time as all Secured Obligations are fully and indefeasibly satisfied (other than any Secured Obligations that survive repayment of the Mezzanine Loan), Borrower shall cause Owner and/or the Property Manager (on behalf of Owner) to distribute to Borrower all Distributable Cash, which shall be deposited into the Operating Account on at least a monthly basis. Borrower shall furnish Lender with monthly bank statements, as they are received by Borrower showing all deposits to and withdrawals from the Operating Account for Lender's verification of Borrower's compliance with this Agreement and the DACA pertaining to the Operating Account.

3.2.2    <u>Lender Account</u>. During a Distributable Cash Flow Sweep Period (as defined below), all Distributable Cash in the Operating Account shall be transferred (i.e., swept) on a daily basis from the Operating Account into a Lender-controlled bank account administered by Lender (the "**Lender Account**").

3.2.3    <u>Reserves</u>. Lender shall establish, on a ledger or book-entry basis within one or more accounts held by Lender, and not as a separate account, certain reserves for the payment of Property Impositions, insurance premiums (monthly if paid annually), FF&E Expenditures, any debt service shortfalls under the Senior Loan or this Mezzanine Loan, and other contingencies and costs as required by Lender, in accordance with <u>Article 4</u> (the "**Reserves**").

3.3.    <u>Distributable Cash Flow Sweep</u>.

3.3.1    <u>Distributable Cash Flow Sweep during Distributable Cash Flow Sweep Period</u>. The term "**Distributable Cash Flow Sweep Period**" means the period of time when all Distributable Cash currently in the Operating Account must be transferred on a daily basis to the Lender Account (the "**Distributable Cash Flow Sweep**"). For the avoidance of doubt and notwithstanding anything herein to the contrary, Borrower and the Property will be deemed to be in a Distributable Cash Flow Sweep Period at the Closing of the Mezzanine Loan and remain in such state unless and until Borrower and the Property satisfy all of the conditions set forth in <u>Section 3.3.6</u> to Lender's satisfaction in order to suspend the Distributable Cash Flow Sweep Period in accordance therewith.

3.3.2    <u>Distributable Cash Flow Sweep Period - Prior to Initial Maturity Date</u>. If at any time from Closing through the Initial Maturity Date, either (a) the Debt Yield falls below 10.0%, or (b) the Debt Service Coverage Ratio falls below 1.15x, then Borrower and the Property shall be subject to a Distributable Cash Flow Sweep Period.

3.3.3    <u>Distributable Cash Flow Sweep Period - During Extension Periods</u>. If at any time during any Extension Period, either (a) the Debt Yield falls below 10.5% (during the first Extension Period through the First Extended Maturity Date) or 11.0% (during the

second Extension Period through the Second Extended Maturity Date), or (b) the Debt Service Coverage Ratio falls below 1.25x (during the first Extension Period through the First Extended Maturity Date) or 1.35x (during the second Extension Period through the Second Extended Maturity Date), then Borrower and the Property shall be subject to a Distributable Cash Flow Sweep Period.

3.3.4   <u>Distributable Cash Flow Sweep Period – Mandated Renovation Program under IHG License</u>. Borrower and Lender acknowledge that pursuant to Paragraph 4.3 (Periodic Renovations) of the IHG License that throughout the term of such license, "Licensee must complete significant renovations of the Guestrooms and Public Facilities of the Hotel in order to maintain the Hotel as a first class facility" and that any such renovation plans shall be subject to IHG Licensor's review and approval for compliance with the "then-current Brand Standards and the Licensed Brand's design criteria." In accordance with the foregoing, if at any time from Closing through the Initial Maturity Date, and during any Extension Period, if applicable, IHG Franchisor mandates Owner (which is the "Licensee" party under the IHG License) to undertake any such renovation program in accordance with Paragraph 4.3 (Periodic Renovations) or any other related provision of the IHG License, then Borrower and the Property shall be subject to a Distributable Cash Flow Sweep Period from the date of IHG Licensor's notice of such required renovation program and until Lender's receipt of written notice from IHG Licensor that IHG Licensor has formally approved the successful, lien-free completion of such required renovation program ("**IHG Reno Approval**"). Provided that Borrower and the Property are not already deemed to be in a Distributable Cash Flow Sweep Period for a reason unrelated to the required renovation program, Lender will make disbursements from the Lender Account, in accordance with the applicable disbursement terms and conditions in Section 4.3 below, in order to fund such IHG Franchisor-mandated renovations.

3.3.5   <u>Administration of Distributable Cash Flow from Lender Account and Excess Cash Flow</u>. During the continuance of a Distributable Cash Flow Sweep Period (other than an Event of Default), provided no Event of Default is then continuing, Lender shall disburse the Distributable Cash (to the extent of such funds) in the following order of priority (on a ledger or book-entry basis within another Lender account, to be performed by Lender's accounting team): (i) pay itself the then monthly Loan Debt Service Payment (including late charges and any interest accruing at the Default Rate, if applicable); (ii) make the monthly required payment of Borrower to the Insurance Reserve Account; (iii) make the monthly required payment of Borrower to the Tax Reserve Account to pay all applicable Property Impositions (such as the annual PILOT payment under the Bond Documents); (iv) make the monthly required payment to the FF&E Reserve Account; (v) cover any other payment <u>set forth in Section 3.1 above or otherwise</u> required to be paid by Borrower under this Agreement, if any; and (vi) hold all amounts remaining from the Distributable Cash as "**Excess Cash Flow**." During the Distributable Cash Flow Sweep Period, Lender shall hold the Excess Cash Flow unless and until the Distributable Cash Flow Sweep Period expires in accordance with <u>Section 3.3.6</u> below.

3.3.6   <u>Return of Excess Cash Flow</u>. Notwithstanding anything to the contrary contained in this <u>Section 3.3</u>, provided that (i) there is no existing or continuing Default or

Event of Default as of the date of the Disbursement Request or the date on which the disbursement is to be funded, (ii) the Debt Yield for the two previous consecutive calendar quarters as of the date of determination is greater than 10.5% if the date of the Disbursement Request or the date on which the disbursement is to be funded is prior to the Initial Maturity Date or greater than 11.5% during any Extension Period, (iii) the Debt Service Coverage Ratio for the two previous consecutive calendar quarters as of the date of determination is greater than 1.15x if the date of the Disbursement Request or the date on which the disbursement is to be funded is prior to the Initial Maturity Date or greater than 1.35x during any Extension Period, and (iv) the IHG Reno Approval has been received by Lender, if applicable under Section 3.3.4 above, then the Distributable Cash Flow Sweep Period shall expire, and Lender shall disburse to the Operating Account any Excess Cash Flow remaining in the Lender Account within 30 days following receipt of a Disbursement Request for such funds from Borrower (excluding any funds in the Reserve Accounts which shall continue to be internally maintained and administered by Lender).

3.3.7   Principal Paydown/Letter of Credit. Notwithstanding the foregoing, Borrower shall have the right to either (i) pay down the Mezzanine Loan Amount, or (ii) deposit a Letter of Credit (as defined in Section 1.1 above) from a bank or national banking association acceptable to Lender in Lender's sole discretion (taking into account, among other things, the concentration of exposure of Lender and Lender's Affiliates to such bank), in the amount necessary to offset the Mezzanine Loan Amount balance and suspend the Distributable Cash Flow Sweep, provided that (i) no Default or Event of Default shall exist as of the date of the Disbursement Request or the date on which the disbursement is to be funded (or as of the date in which Borrower's requests that the Distributable Cash Flow Sweep Period be suspended) and (ii) any prepayment of the Mezzanine Loan made for purposes of suspending the Distributable Cash Flow Sweep shall be subject to the prepayment and Minimum Interest provision of Section 2.3.

## ARTICLE 4

## RESERVE ACCOUNTS

4.1.   Tax Reserve.  Lender shall establish the Tax Reserve Account in accordance with Article 3.  Borrower shall furnish to Lender bills for Property Impositions at least 30 days before the date on which the Property Impositions (such as the PILOT payments) become due for payment.  On the Closing Date, Borrower shall deposit with Lender, for credit to the Tax Reserve Account, an amount equal to $191,750.45.  On each Installment Payment Date, Borrower shall deposit with Lender, for credit to the Tax Reserve Account, an amount equal to $1/12^{th}$ of the amount that Lender estimates will be required to pay the next annual payment of Property Impositions, which as of the Effective Date is $38,350.09.  The purpose of these provisions is to provide Lender with sufficient funds on hand for Lender or Servicer to pay all Property Impositions 30 days prior to the date that any such Property Impositions become past due.  If Lender determines that the funds deposited with Lender hereunder are, or will be, insufficient to pay such Property Impositions, then Borrower shall, upon demand, pay (i) such additional sums as Lender shall determine necessary to pay such Property Impositions and (ii) any increased monthly charges requested by Lender.  Provided no Event of Default exists, Lender will apply the amounts so deposited with Lender to the payment of such Property Impositions when due, but in no event will

Lender be liable for any interest on any amount so deposited, and any amount so deposited may be held and commingled with Lender's or Servicer's own funds.

4.2.    <u>Insurance Reserve</u>.    Lender shall establish the Insurance Reserve Account in accordance with <u>Article 3</u>.  Borrower shall furnish to Lender bills for insurance premiums at least 30 days before the date on which insurance premiums become due for payment.  On the Closing Date, Borrower shall deposit with Lender, for credit to the Insurance Reserve Account, an amount equal to $215,516.11.  On each Installment Payment Date, Borrower shall deposit with Lender, for credit to the Insurance Reserve Account, an amount equal to $1/12^{th}$ of the amount that Lender estimates will be required to pay the next required annual premium for each Required Insurance Policy, which as of the first Installment Payment Date is $30,560.23.  The purpose of these provisions is to provide Lender with sufficient funds on hand for Lender or Servicer to pay all such premiums 30 days prior to the date that such premiums become past due.  If Lender determines that the funds deposited with Lender hereunder are, or will be, insufficient to pay such premiums, then Borrower shall, upon demand, pay (i) such additional sums as Lender shall reasonably determine as necessary to pay such premiums and (ii) any increased monthly charges requested by Lender.  Provided that no Event of Default exists and Borrower has furnished to Lender bills for insurance premiums at least 30 days before the date on which insurance premiums become due for payment, Lender shall apply the amounts so deposited to the payment of such insurance premiums when due, but in no event will Lender be liable for any interest on any amounts so deposited, and the money so deposited may be held and commingled with Lender's own funds.

4.3.    <u>FF&E Reserve</u>.

4.3.1    <u>Deposits</u>.  Lender shall establish a reserve account for FF&E reserves in accordance with <u>Article 3</u> (the "**FF&E Reserve Account**").  On each Installment Payment Date, Borrower shall deposit with Lender, for credit to the FF&E Reserve Account, an amount equal to the greater of (i) 4% of the monthly Gross Revenue in accordance with the then-current Approved Budget for the immediately preceding calendar month or (ii) the maximum amount of FF&E Reserve required under the IHG License or the Property Management Agreement (the "**Standard FF&E Collection**") (collectively with any interest actually earned thereon, the "**FF&E Funds**").

4.3.2    <u>FF&E Expenditures</u>.  Subject to the terms of this <u>Section 4.3</u>, Borrower shall have the right to obtain disbursements from time to time under this <u>Section 4.3</u> in order to reimburse Borrower for FF&E Expenditures previously paid by Borrower.  As used herein "**FF&E Expenditures**" shall mean the costs of the replacement and renewal of FF&E located on the Property (the "**FF&E Budget**") in accordance with an annual budget submission and approval process as further described in <u>Section 7.1.6(e)</u>.  The initial FF&E Budget shall cover the period of time from January 1, 2024 through and including December 31, 2024 and is attached hereto as **<u>Exhibit C</u>**. Thereafter, Borrower shall submit the annual FF&E Budget for Lender's approval, not to be unreasonably withheld, conditioned or delayed, in conjunction with the annual operating budget submission and approval process as further described in <u>Section 7.1.6(e)</u>, on or before December 1st of each calendar year, which shall include the FF&E Budget for the immediately succeeding calendar year (or the remaining portion thereof) through and including the Maturity Date.  All such FF&E Expenditures shall be undertaken in an industry standard manner (as to

nature of repair or replacement, cost and vendors or providers used) for hospitality properties comparable in size, nature, market and location to the Property.

4.3.3    <u>Conditions to Disbursements</u>.  Lender's obligation to authorize or make any disbursements of any FF&E Funds hereunder shall be subject to the following terms, restrictions, requirements and conditions.  All items required to be delivered to Lender shall be delivered by Borrower at Borrower's sole cost and expense and shall be, in each case, in form and substance reasonably acceptable to Lender.

(a)    Borrower has submitted a Disbursement Request to Lender not less than 30 days prior to the date of the requested disbursement, together with (i) any and all other reasonable documentation evidencing Borrower's satisfaction of the disbursement conditions set forth in this <u>Section 4.3.3</u>, as may be reasonably requested by Lender, and (ii) a certification from Borrower that Borrower has delivered to Lender all of the documents and information required in this <u>Section 4.3.3</u>.

(b)    Lender shall not be obligated to disburse any FF&E Funds:

(i)    on any day that is not a Business Day;

(ii)    more frequently than once per calendar month;

(iii)    in increments of less than the lesser of (a) $5,000 per disbursement and (b) the amount of FF&E Funds then on deposit in the FF&E Reserve Account; or

(iv)    for any FF&E Expenditures incurred or paid more than one year prior to the date of the Disbursement Request.

(c)    No Default or Event of Default shall exist as of the date of the Disbursement Request or the date on which the disbursement is to be funded.

(d)    In connection with any Disbursement Request for FF&E Funds in excess of $200,000, Lender shall have received evidence that Lender continues to have a first priority Lien on all of Borrower's rights, title and interest in and to the Collateral under the Security Instrument, including, upon Lender's request, receipt of a title report showing no Liens other than Lender's first priority Lien under the Security Instrument as of the date of such disbursement, and showing such Liens to be subject only to the Liens of the Borrower Rental Agreement, Senior Loan Documents and the Permitted Encumbrances.

(e)    Lender shall have received evidence reasonably satisfactory to Lender that all amounts owed to third parties in connection with the applicable FF&E Expenditures are due and have been paid (including a certification signed by Borrower confirming the same, billing statements, "paid" invoices and, at Lender's option for FF&E Funds in excess of $5,000, final, unconditional lien waivers or

conditional upon payment from the proceeds of the applicable Disbursement Request from any potential lienor under applicable Legal Requirements).

(f)     Lender has approved the FF&E Budget, and Lender has received a reasonably detailed description of the FF&E Expenditures to which the requested funds are to be applied, cross referenced against such approved budget, together with evidence that such costs have been incurred in accordance with such approved budget. For FF&E Expenditures included in Disbursement Requests that are not identified in the FF&E Budget and are in the amount of $5,000 or more, Borrower shall submit such request for reimbursement in writing and with Lender-required supporting documentation to Lender for approval, not to be unreasonably withheld, conditioned or delayed.

(g)     Lender has received copies of billing statements and invoices relating to or prepared in connection with the applicable FF&E Expenditures, all in form and substance reasonably satisfactory to Lender.

4.3.4   <u>Return and Direct Disbursement of FF&E Funds</u>.   If any FF&E Expenditures in respect of which Lender has disbursed FF&E Funds out of the FF&E Reserve Account are subsequently rebated, returned or reimbursed to Borrower, then Borrower shall promptly remit such rebated, returned or reimbursed amounts to Lender, and Lender shall deposit the same back into the FF&E Reserve Account. Upon Lender's approval of any Disbursement Request, unless the requested FF&E Funds will be used to reimburse Borrower for costs previously paid by Borrower, Lender may in Lender's sole discretion fund the requested FF&E Funds directly to the materialman or other third party entitled thereto.

4.3.5   <u>Conditions to Reduced FF&E Collection</u>.   Notwithstanding Section 4.3.1 above, the monthly FF&E Reserve collection shall be in an amount equal to the greater of (i) 2% of the monthly Gross Revenue generated by the Property from the immediately preceding calendar month or (ii) the maximum amount of FF&E Reserve required under the IHG License or Property Management Agreement (the "**Reduced FF&E Collection**") under the following conditions: (i) upon such time that the Debt Yield exceeds and remains above 10.0% based on the most recent trailing 12-month Adjusted NOI (for avoidance of doubt, if upon future testing, the Debt Yield falls below 10%, the Standard FF&E Collection will be reinstated), (ii) so long as no PIP (as defined in Article 1) has been issued by IHG Licensor (or any replacement brand) (i.e., upon a PIP being issued prior to the Maturity Date, the Standard FF&E Collection will be required except in the case of any change-of-ownership PIP that Borrower may order), (iii) so long as the Property is brand-compliant with the IHG License and achieves passing scores in its quality evaluation reports (i.e., at any time the Property fails such evaluation, the Standard FF&E Collection will be required), and (iv) so long as no Default or Event of Default has occurred and is continuing.

4.4.   <u>Intentionally Omitted</u>.

4.5.   <u>Debt Service Reserve</u>.

4.5.1  <u>Deposits</u>.    Lender shall establish a debt service reserve account in accordance with <u>Article 3</u> (the "**Debt Service Reserve Account**").  On the Closing Date, $2,000,000 of the Mezzanine Loan proceeds will fund the Debt Service Reserve Account ("**Debt Service Funds**"). The Debt Service Funds will be held by Lender and used to satisfy any debt service shortfalls under the Senior Loan or the Mezzanine Loan. If and when there are any debt service shortfalls, Borrower shall notify Lender in writing at least 10 Business Days in advance as to the amount to be disbursed from the Debt Service Reserve, subject to verification by Lender.  Borrower hereby authorizes and directs Lender, and Lender shall have the right to disburse and charge the Debt Service Reserve for any debt service then due and payable under the Senior Loan on the applicable Payment Date (as defined in the Senior Loan Agreement) pursuant to the terms of the Senior Loan Documents and any Loan Debt Service Payment due under the Mezzanine Loan on the applicable Installment Payment Date pursuant to the terms of the Loan Documents.  In the event the amounts due pursuant to the preceding sentence under the Loan Documents and Senior Loan Documents exceed the funds available in the Debt Service Reserve, Borrower will pay accrued unpaid interest when due according to the terms of the Loan Documents and Senior Loan Documents. Without limitation to the foregoing, if at any time Lender determines that the outstanding Debt Service Funds in the Debt Service Reserve Account are, or will be, insufficient to pay at least two months of Loan Debt Service Payments, then Borrower shall, upon demand, deposit with Lender an amount equal to $450,000 in immediately available funds, to fund the Debt Service Reserve Account; provided, however, Borrower's foregoing obligation shall not apply if at the time of Lender's determination there are less than three months of term remaining before the Maturity Date.

4.5.2  <u>Release of Debt Service Funds</u>.  Notwithstanding anything to the contrary contained in this Section 4.5, provided that (i) no Default or Event of Default shall exist as of the date of the Disbursement Request or the date on which the disbursement is to be funded and (ii) the Debt Yield is greater than 12.5% for each of the two previous consecutive calendar quarters, Lender shall disburse to Borrower any remaining Debt Service Funds within 30 days following receipt of a Disbursement Request for such Debt Service Funds.

## ARTICLE 5

## MAINTENANCE AND PLEDGE OF ACCOUNTS

5.1.  <u>Maintenance of Accounts</u>.

5.1.1  <u>Name of Accounts</u>.  Lender may in Lender's sole discretion and at its sole option, direct the funds in the Accounts to be held on Lender's behalf by a servicer appointed pursuant to <u>Section 11.19</u> (the "**Servicer**"), in which case such Servicer shall hold such funds as Lender's agent and for the benefit of Lender.  Each of such Accounts shall be, at Lender's option, held by Lender or such Servicer (i) in the name of Lender as secured party of Borrower, (ii) in the name of Borrower for the sole and exclusive benefit of Lender, with respect to the Operating Account, Lender Account, and as otherwise applicable herein, (iii) in the name of such Servicer, for the benefit of, and in trust for, Lender and its successors and assigns (or as agent of Lender), or (iv) in such other name

as Lender shall designate that indicates such account is held by Lender or Lender's agent or trustee.

5.1.2    <u>Disbursement Authority</u>.  Only Lender, or Persons designated by Lender, in each case in Lender's sole discretion, shall have the authority to make withdrawals or disbursements from the Accounts, and Borrower shall have no right to withdraw or otherwise transfer funds from any Account, to close any Account, or to otherwise modify or exercise any authority over any Account or any funds on deposit therein.  Borrower hereby irrevocably and unconditionally authorizes Lender, and grants to Lender, a continuing, irrevocable, and unconditional power of attorney (which power of attorney is coupled with an interest) in the name of Borrower, without notice to or further consent or authorization from Borrower:  (i) to make withdrawals and disbursements from the Accounts in accordance with the terms and conditions of this Agreement and the Senior Loan Agreement; (ii) to open mail and other documents delivered to Lender hereunder, whether such mail is addressed to Borrower, Lender or any other Person; (iii) to disburse amounts on deposit in the Accounts to the applicable Persons in the order and priority set forth in this Agreement or the Senior Loan Agreement; and (iv) to otherwise carry out the duties and obligations imposed upon Lender pursuant to the terms of this Agreement.

5.1.3    <u>Investment of Funds</u>.  Each of the Accounts will be established and held by Lender, in Borrower's name, but shall not constitute trust funds and may be commingled with other monies held by Lender. Disbursements by Lender from an Account shall be subject to all conditions to making disbursements from each such Account as set forth in this Agreement. Lender's rights with respect to Protective Advances or other advances permitted under any of the Loan Documents shall include the right to disburse funds from any Accounts for the purpose of making any payments for which such Account was created.  Lender shall have no obligation whatsoever to make any advances or disbursements under this paragraph or pursuant to any other applicable provision hereunder if a Default or an Event of Default shall have occurred and is continuing. Borrower shall not be entitled to any earnings or interest on funds deposited in any of the Accounts.

5.1.4    <u>Application During Event of Default</u>.  Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, in addition to exercising any or all of its other rights and remedies under the Loan Documents or applicable law, upon an Event of Default, Lender may, at Lender's option (i) setoff, recoup or otherwise apply all or any part of the funds in any Account against all or any part of the Secured Obligations (whether matured, unmatured, due or not yet due), in such order, priority and manner as Lender shall determine, (ii) apply all or any part of the funds in any Account to satisfy any of the other obligations of Borrower under the Loan Documents, and/or (iii) hold all or any part of the funds in any Account as additional cash collateral for the Secured Obligations without applying the same pursuant to <u>clauses (i)</u> through <u>(ii)</u> above and without any obligation to disburse any or all of such funds pursuant to this Agreement or the other Loan Documents.  If Lender applies any of the funds in any Account to repay any portion of the Principal Indebtedness during the existence of an Event of Default, then Borrower shall be liable for the payment of any yield maintenance or prepayment premium in connection with such application in accordance with <u>Section 2.3</u>. Borrower hereby irrevocably constitutes and appoints Lender as Borrower's true and lawful attorney-in-fact,

with full power of substitution, during the continuation of an Event of Default, to execute, acknowledge and deliver any instruments and to exercise and enforce every right, power, remedy, option and privilege of Borrower with respect to the Account Collateral, and do in the name, place and stead of Borrower, all such acts, things and deeds for and on behalf of and in the name of Borrower with respect to the Account Collateral, that Borrower could or might do or that Lender may deem necessary or desirable to more fully vest in Lender the rights and remedies provided for herein with respect to the Account Collateral and to accomplish the purposes of this Agreement.    The foregoing powers of attorney are irrevocable and coupled with an interest and shall terminate upon indefeasible repayment of the Secured Obligations in full (other than any Secured Obligations that survive repayment of the Mezzanine Loan).

5.2.    Pledge of Accounts; Security Interests.

5.2.1    Pledge of Account Collateral.  To secure the full and punctual payment and performance of all of the Secured Obligations, Borrower hereby assigns, conveys, pledges and transfers to Lender, as secured party, and grants Lender a first and continuing security interest in and to, the Account Collateral.  To the extent Lender's security interest in any portion of the Account Collateral may be perfected by possession or control thereof, Lender shall be deemed to be in possession and control of the same by virtue of it being a customer of the bank at which Lender holds the Account Collateral.  At Lender's option, Lender may notify the financial institution that holds the applicable Accounts of Lender's security interest in the Account Collateral.  Borrower hereby authorizes Lender to file such financing statements in such locations as Lender deems reasonably necessary to perfect Lender's security interest in the Account Collateral, and Borrower hereby agrees to execute such other documents as Lender may request to perfect the rights assigned and the security interest granted by this Agreement, and shall pay the cost of filing such financing statements in such offices in such jurisdictions as Lender may reasonably require.

5.2.2    Control.  The Accounts shall be under the sole dominion and control of Lender, and the "control" of Lender within the meaning of Section 9-104 and Section 9-106 of the UCC.  The Account Collateral shall be subject to such Legal Requirements, and such applicable regulations of the Board of Governors of the Federal Reserve System and of any other banking authority or Governmental Authority, as may now or hereafter be in effect, and to the rules, regulations and procedures of Lender relating to demand deposit accounts generally from time to time in effect.

5.2.3    No Waiver.  Until such time as all Secured Obligations are fully and indefeasibly satisfied (other than any Secured Obligations that survive repayment of the Mezzanine Loan), any and all of Lender's rights with respect to the pledge of and security interest in the Account Collateral granted hereunder shall continue unimpaired, and to the extent permitted by applicable Legal Requirements, Borrower shall be and remain obligated in accordance with the terms hereof, notwithstanding (i) any proceeding of Borrower under any Bankruptcy Law, (ii) the release or substitution of Account Collateral at any time, or of any rights or interests therein or (iii) any delay, extension of time, renewal, compromise or other indulgence granted by Lender in the event of any Default or Event of Default with respect to the Account Collateral or otherwise hereunder.

5.2.4   <u>Treatment of Account Collateral in Bankruptcy</u>.  Lender and Borrower hereby acknowledge that upon the filing of a bankruptcy petition by or against Borrower under any Bankruptcy Laws, the Account Collateral (whether collected or uncollected, or then due or becoming due thereafter) shall not be deemed to be property of the Borrower's bankruptcy estate within the meaning of Section 541 of the Bankruptcy Code.  In the event, however, that a court of competent jurisdiction determines that, notwithstanding the foregoing characterization of the Account Collateral by Borrower and Lender, the Account Collateral does constitute property of the Borrower's bankruptcy estate, then Lender and Borrower hereby further acknowledge that all such Account Collateral, whether due and payable before or after the filing of the petition, is, and shall be, cash collateral of Lender pursuant to Section 363 of the Bankruptcy Code.  Borrower acknowledges that Lender does not consent to Borrower's use of such Account Collateral (except to the extent expressly provided for in this Agreement or ordered by a United States bankruptcy court) and that, in the event Lender elects to give consent to such use, such consent shall only be effective if given in writing.  Except as provided in the immediately preceding sentence, Borrower shall have no right to use or apply or to require the use or application of such Account Collateral unless (i) Borrower has received a court order authorizing the same and (ii) Borrower has provided such adequate protection to Lender as required by the bankruptcy court.

5.3.   <u>Return of Funds</u>.  Upon indefeasible payment in full of the Secured Obligations (other than any Secured Obligations that survive repayment of the Mezzanine Loan), Borrower shall be entitled to the prompt return, at Borrower's expense, of any funds then on deposit in the Accounts that have not otherwise been applied pursuant to the terms of this Agreement or any other Loan Document.

## ARTICLE 6

## REPRESENTATIONS AND WARRANTIES

6.1.   <u>Representations and Warranties as to Entities</u>.  Borrower and each Guarantor hereby represents and warrants that as of the Closing Date (or as of the date that such representations and warranties are being remade, as applicable):

6.1.1   <u>Due Authorization; Approvals</u>.  Each individual who executes each of the Loan Documents on behalf of each Borrower Control Person, as applicable, has been duly authorized by all necessary corporate, partnership, limited liability company or other action on the part of such Borrower Control Person.  Each Borrower Control Person, as applicable, has obtained all consents and approvals required in connection with the execution, delivery and performance by each Borrower Control Person of the Loan Documents to which such Borrower Control Person is a party.  No authorization, approval, consent or other action by, and no notice to or filing with, any Governmental Authority is required for the due execution, delivery and performance by the Borrower Control Person of any of the Loan Documents or the effectiveness of any assignment of any of the Borrower Control Persons' rights and interests of any kind to Lender.

6.1.2   <u>Organizational Structure; Borrower's Legal Name; No Conflict</u>.

(a)      Borrower is (i) a limited liability company, duly formed, validly existing and in good standing under the laws of the State of Delaware, (ii) the sole owner of Owner, (iii) owned by the Borrower Owner Persons, as set forth in the Organizational Certificates, and (iv) solely managed and Controlled by ACRON US Management Inc..   The full legal name of Borrower is as set forth on the signature page hereof.  Borrower does not conduct any business under any other name (including any trade name or fictitious business name).  Borrower is as of the Closing Date, and has always been since its formation through the Closing Date, a Single Purpose Entity.  Attached hereto as **Exhibit B** is a true, correct and complete copy of Borrower's Organizational Chart.

(b)      The execution, delivery and performance by each Borrower Control Person of the Loan Documents to which such Borrower Control Person is a party (i) will not violate any provision of the certificate of incorporation, by-laws, certificate of partnership, partnership agreement, certificate of formation, articles of organization, operating agreement, trust agreement or other organizational documents of such Borrower Control Person, (ii) will not contravene any Legal Requirements or any contractual or other restriction binding on or affecting such Borrower Control Person, and (iii) will not result in or require the creation of any Lien (other than pursuant to the Loan Documents) upon or with respect to any of the properties of such Borrower Control Person.

6.1.3   <u>Taxes</u>.  Each Borrower Control Person has (i) filed or has obtained extensions to file all tax returns that are required to be filed by such Borrower Control Person pursuant to applicable Legal Requirements (with respect to the Property or otherwise) (the "**Tax Returns**") and (ii) paid all Property Impositions and all other taxes and assessments that are due and payable by such Borrower Control Person (with respect to the Property or otherwise).

6.1.4   <u>Enforceability</u>.  This Agreement and each other Loan Document to which any Borrower Control Person is a party will, when delivered hereunder, be legal, valid and binding obligations of such Borrower Control Person enforceable against each such Borrower Control Person in accordance with its respective terms, except as limited by equitable principles and bankruptcy, insolvency and similar laws affecting creditors' rights.

6.1.5   <u>Litigation</u>.  There is no pending or, to the best of Borrower's knowledge, threatened (in writing) litigation, action, proceeding, arbitration or investigation, against or involving any of the Borrower Control Persons or the Property before or by any Governmental Authority, except those, if any, disclosed by Borrower to Lender in writing.

6.1.6   <u>Defaults of Borrower Control Person</u>.   None of Borrower, Owner, or Guarantor is in default, in any manner that would adversely affect such Person's properties, assets, operations or financial condition, in the performance, observance or fulfillment of any of the obligations, covenants or conditions set forth in any agreement or instrument to which such Person is a party or by which such Person or such Person's properties, assets or revenues are bound.  None of the Borrower Control Persons (other than Borrower,

Owner, and Guarantor) is in default in any manner that would create a Material Adverse Effect. No Default or Event of Default exists.

6.1.7    No Bankruptcy Filing.    None of the Borrower Control Persons has made any assignment for the benefit of creditors, nor has any of the Borrower Control Persons filed, or had filed against such Borrower Control Person, any petition in bankruptcy.    No part of the Collateral is in the hands of a receiver, no application for a receiver is pending with respect to any portion of the Collateral, and no part of the Collateral is subject to any foreclosure or similar proceeding.

6.1.8    Solvency.    Giving effect to the transactions contemplated hereby, the fair saleable value of Borrower's assets, taken as a whole, exceeds and (immediately following the making of the Mezzanine Loan) will exceed Borrower's total liabilities (including subordinated, unliquidated, disputed and contingent obligations of Borrower).    Borrower's assets, do not and (immediately following the making of the Mezzanine Loan) will not constitute unreasonably small capital to carry out the business of Borrower as conducted or as proposed to be conducted.

6.1.9    Other Indebtedness.    Borrower has no Indebtedness other than the Secured Obligations, any Permitted Indebtedness, and such other indebtedness expressly approved by Lender in Lender's sole discretion. Owner has no Indebtedness other than the Senior Indebtedness and such other indebtedness expressly approved by Senior Lender pursuant to the Senior Loan Documents.

6.1.10    Full and Accurate Disclosure; Financial Information.    No statement of fact made by or on behalf of any Borrower Control Person in this Agreement or in any of the other Loan Documents is untrue or omits to state any material fact necessary to make statements contained herein or therein not misleading.    All financial data concerning the Borrower Control Persons, the Property and the Collateral that has been delivered by or on behalf of any Borrower Control Person to Lender is true, complete and correct in all material respects and has been prepared in accordance with Approved Accounting Principles.    Since the delivery of such data (including the Financial Statements for Borrower dated as of November 30, 2023), there has been no material adverse change in the financial position of any Borrower Control Person, the Property, or in the results of operations of any Borrower Control Person.    None of the Borrower Control Persons have incurred (or will incur as a result of converting certain member loans to equity on or before the Effective Date) any material obligation or liability, contingent or otherwise, not reflected in such financial data.

6.1.11    Investment Company Act; Public Utility Holding Company Act.    No Borrower Control Person is (i) an "investment company", an "affiliated person" of, "promoter" or "principal" underwriters for or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended, (ii) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended, or (iii) subject to any other Legal

Requirements that purports to restrict or regulate its ability to borrow money in accordance with this Agreement.

6.1.12  <u>Compliance with Legal Requirements</u>.  Each Borrower Control Person is in compliance with all applicable Legal Requirements in all material respects, and no Borrower Control Person has received any written notice that any Borrower Control Person is in violation of any Legal Requirement.

6.1.13  <u>No Foreign Person or Prohibited Person; Source of Funds</u>.  Except for ACRON AG Guarantor and ACRON 2 Porsche Drive Atlanta AG, a Swiss stock corporation, no Borrower Control Person is a "foreign person" within the meaning of Sections 1445 and 7701 of the Code.  No Borrower Control Person is a Prohibited Person or receives any of its revenue or capital from business conducted in or with Sanctioned Countries.

6.1.14  <u>Labor Matters; ERISA</u>.  Borrower is not a party to any collective bargaining agreements or similar labor agreements.  No portion of the Property is subject to any collective bargaining agreements or similar labor agreements, except for any Permitted Labor Agreements.  Borrower complies with, or is not subject to, ERISA.  Neither the making of the Mezzanine Loan nor the exercise by Lender of any of Lender's rights under the Loan Documents constitutes or will constitute a non-exempt, prohibited transaction under ERISA.

6.1.15  <u>No Offsets</u>.  None of the Borrower Control Persons has any offsets, claims, counterclaims or defenses against Lender or any of the Secured Obligations, and any such offsets, claims, counterclaims or defenses are hereby waived by Borrower.

6.2.  <u>Representations and Warranties as to the Property</u>.  Borrower and each Guarantor hereby represents and warrants to Lender that as of the Closing Date (or as of the date that such representations and warranties are being remade, as applicable):

6.2.1  <u>Title to the Property</u>.  Owner entered into a Usafruct (bond driven real estate tax abatement) with the Authority (as defined herein), subsequent to the recordation of the Original Security Deed (as defined in the Recitals), such that (i) Owner granted its fee simple interest in the mortgaged Property to the Authority (as defined herein) pursuant to the terms of the Purchase Agreement (as defined herein), such conveyance to the Authority being subject to the continued encumbrance of the Original Security Deed and (ii) Owner retained a leasehold interest in the Property pursuant to the Borrower Rental Agreement (as defined herein). Owner's leasehold interest in the Property is free and clear of all Liens, subject only to the Liens of the Borrower Rental Agreement, Senior Loan Documents and the Permitted Encumbrances.  Owner is the sole and absolute owner of the Chattels and the other Senior Collateral, free and clear of all Liens, subject only to the Liens of the Borrower Rental Agreement, Senior Loan Documents and the Permitted Encumbrances. To Borrower's knowledge, there are no defaults under any applicable Permitted Encumbrances by Owner or any other party, and no conditions that with the passage of time and/or notice would constitute defaults thereunder.  All amounts due and payable by Owner under any applicable Permitted Encumbrances have been paid. There are no

purchase options, purchase contracts or agreements, rights of first refusal, rights of first offer, or other similar agreements of any type in favor of any party other than Owner (with respect to the Bond Transaction and Bond Documents) or IHG Licensor (with respect to Paragraph 16.11 of the IHG License), in each case, with respect to the purchase of the Property (or any portion thereof), whether written or oral, and there are no other restrictions on transferability presently affecting the Property, except as expressly set forth (if any) in the Borrower Rental Agreement, the Property Management Agreement or IHG License.

6.2.2    <u>Utilities and Public Access; Property Record Agreements</u>.  Access to and egress from the Property are available and provided by public streets or recorded easement instruments, and Borrower has no knowledge of any plans by any Governmental Authority or third party to restrict or change access from any public street, highway or road to the Property.  All public utility services necessary for the operation of the Property and the Improvements for their intended purposes are available at the boundaries of the Land, including water supply, storm and sanitary sewer facilities, natural gas, electric and telephone facilities, cable television facilities and broadband internet access facilities.  The Property Record Agreements, if any, are in full force and effect and there are no defaults thereunder by Borrower or any other party and no conditions exist that with the passage of time and/or notice would constitute defaults thereunder.  All amounts due and payable by Borrower under any Property Record Agreement have been paid.

6.2.3    <u>Compliance with Legal Requirements</u>.  To Borrower's knowledge, (i) the Property is in compliance in all material respects with applicable Legal Requirements, and (ii) neither Borrower nor Owner has received any written notice from any Governmental Authority as to any violation of any Legal Requirements.

6.2.4    <u>Compliance with Insurance Requirements</u>.  Borrower has obtained and has delivered to Lender original or certified copies of all Required Insurance Policies which are in full force and effect with all premiums paid thereunder.  Neither Borrower nor Owner have received any notice from any insurance company or inspection or rating bureau (i) terminating or threatening in writing to terminate any Required Insurance Policies insuring Borrower, Owner or the Property, or (ii) setting forth any requirements as a condition to the continuation of any insurance coverage on or with respect to Borrower, Owner or the Property or the continuation thereof at premium rates existing at present that, in either case, has not been remedied or satisfied.

6.2.5    <u>Deed of Trust</u>.  The Deed of Trust creates a valid and enforceable first priority Lien on all of Owner's rights, title and interest in and to the Property, Chattels, and the other collateral described therein, in each case, subject only to Permitted Encumbrances and the Borrower Rental Agreement.  Senior Lender is the collateral assignee of Owner's interest under the Contracts and the Leases.  There are no prior assignments by Owner of the Contracts or of the Leases or any portion of the Gross Revenue.

6.2.6    <u>Assessments; Abatements; Separate Tax Lots</u>.  Except related to the Bond, there are no special or other assessments for public improvements or otherwise now affecting the Property. To Borrower's knowledge, there are no contemplated improvements affecting the Property that would reasonably be expected to result in such special or other

assessments.  Except as set forth in the Bond Documents in connection with the Bond Transaction, there are no tax abatements or exemptions affecting the Property. There are no license fees or similar charges required in respect of any filled land, tideland, wetland or other bodies of water.  The Property is not jointly assessed (i) with any other real property constituting a separate tax lot or that is otherwise not a part of the Property, or (ii) with any portion of the Property that may be deemed to constitute personal property.  The Property is comprised of one or more parcels, each of which constitutes a separate tax lot and none of which constitutes a portion of any other tax lot that is not a part of the Property.

6.2.7   <u>No Encroachments</u>.  Except as set forth on the Survey, (i) all of the Improvements lie wholly within the boundaries and building restriction lines of the Land, (ii) no improvements on adjoining properties encroach upon the Land, and (iii) no recorded easements or other known encumbrances upon the Land encroach upon any of the Improvements, so as to create a Material Adverse Effect in connection with the Property, except for the Permitted Encumbrances.

6.2.8   <u>Leases</u>.  Except for the Borrower Rental Agreement, Hotel Transactions and as otherwise set forth on **<u>Schedule 1</u>**, the Property is not currently subject to any Leases.

6.2.9   <u>Contracts</u>.  Except as set forth on **<u>Schedule 1</u>**, (i) other than the Property Management Agreement and IHG License, there are no Contracts having a term in excess of 180 days or not terminable by Owner (without penalty) on 30 days' notice, (ii) Owner has delivered to Lender a true, correct and complete copy of each Contract that is not terminable by Owner (without penalty) on 30 days' notice, (iii) to Borrower's knowledge, no uncured event of default exists under any of the Contracts, and (iv) the Contracts represent the complete agreement between Owner and such other parties as to the services to be performed or materials to be provided thereunder.

6.2.10   <u>No Other Real Property</u>.  Except for the Land, public streets, recorded easements and sidewalks, Owner does not use or occupy any other real property in connection with the operation, use, occupancy and management of the Property or any amenities (including parking) made available to Tenants, guests and other users of the Property.

6.2.11   <u>Fees, Commissions and Compensation</u>.  Except as set forth on **<u>Schedule 1</u>**, there exists no brokerage or listing agreement with respect to any part of the Property and no Person has any right or claim to any fees, commissions, compensation or other remuneration in connection with or arising out of the financing, sale, lease, use, occupancy, management or operation of all or any portion of the Property.

6.2.12   <u>Zoning</u>.  The Property is located in zoning districts designated by the zoning report obtained by Lender in anticipation of Closing. Such designation permits the use, operation and maintenance of the Property as the Property is currently operated as a permitted (and not as a non-conforming) use.

6.2.13  <u>Flood Zone</u>.  No portion of the Property is located in a flood hazard area as defined by the Federal Insurance Administration, except as expressly identified in the Survey.

6.2.14  <u>Permits</u>.  Owner has obtained (or caused to be obtained) all Permits.  None of the Permits has been suspended or revoked, all of the Permits are in full force and effect and all amounts due and payable by or on behalf of Owner in respect of such Permits have been paid.  Neither Borrower nor Owner has received any written notice of default or notice terminating or threatening to terminate any such Permit.

6.2.15  <u>Repairs and Alterations; No Condemnation or Casualty</u>.  There is no ongoing material alteration, construction or other improvement work at the Property.  No portion of the Property, Chattels or other Senior Collateral (i) is the subject of a pending or, to Borrower's knowledge, threatened condemnation proceeding of which Owner has received written notice, or (ii) has been damaged by any casualty.

6.2.16  <u>Brokers and Financial Advisors</u>.  Neither Borrower nor Owner has dealt with any financial advisors, brokers, underwriters, placement agents or finders in connection with the Mezzanine Loan.

6.2.17  <u>Intellectual Property</u>.  All of the Intellectual Property is in good standing and is uncontested.  To Borrower's knowledge, neither Borrower nor Owner has infringed, nor has either received written notice of infringement with respect to, asserted trademarks of others.  To Borrower's knowledge, there is no infringement by other Persons on any Intellectual Property.

6.2.18  <u>Borrower Rental Agreement</u>.  Attached hereto as **<u>Exhibit D</u>** is a true, complete and correct copy of the Borrower Rental Agreement.  The Borrower Rental Agreement is in full force and effect and there is no uncured event of default thereunder by any party thereto and, to Borrower's knowledge, no event has occurred that, with the passage of time and/or giving of notice, would constitute a default thereunder.

6.2.19  <u>Property Management Agreement</u>.  Attached hereto as **<u>Exhibit E</u>** is a true, complete and correct copy of the Property Management Agreement.  The Property Management Agreement is in full force and effect and there is no uncured event of default thereunder by any party thereto and, to Borrower's knowledge, no event has occurred that, with the passage of time and/or giving of notice, would constitute a default thereunder.

6.2.20  <u>IHG License</u>.  Attached hereto as **<u>Exhibit F</u>** is a true, complete and correct copy of the IHG License.  The IHG License is in full force and effect and there is no uncured event of default thereunder by any party thereto and, to Borrower's knowledge, no event has occurred that, with the passage of time and/or giving of notice, would constitute a default thereunder.  As of the Effective Date, the remaining term under the IHG License is at least 16 years from the Closing Date.

6.2.21  <u>Merchant Schedule</u>.  The Merchant Schedule attached hereto as **<u>Schedule 2</u>** is true, complete and correct.

6.2.22 <u>Maximum Closing LTV</u>.  The Loan-To-Value Ratio (as defined in Article 1) does not exceed 65%.

6.2.23 <u>Combined Loan Amount</u>. The Combined Loan Amount does not exceed $36,100,000.

6.3.   <u>Representations and Warranties as to the Collateral</u>.  Borrower and each Guarantor hereby represents and warrants that as of the Closing Date (or as of the date that such representation and warranties are being remade, as applicable):

6.3.1   <u>Title to the Collateral</u>.  Borrower is the sole and absolute owner of the Collateral, subject only to the Liens of the Loan Documents. There are no purchase options, purchase contracts or agreements, rights of first refusal, rights of first offer, or other similar agreements of any type, in each case, with respect to the purchase of the Collateral (or any portion thereof), whether written or oral, and there are no other restrictions on transferability presently affecting the Collateral.

6.3.2  <u>Security Instrument</u>.   The Security Instrument creates a valid and enforceable first priority Lien on all of Borrower's rights, title and interest in and to the Collateral.  The Loan Agreement creates a valid and enforceable first priority Lien on all Account Collateral.  To the extent governed by the UCC, upon proper recording and/or filing, as applicable, of each of the UCC-1 Financing Statements in the appropriate recording and/or filing office, as applicable, the UCC-1 Financing Statements will perfect the security interest created in favor of Lender in all property described therein in which a security interest may be perfected by the filing of a financing statement, and such security interest shall be a valid and first priority Lien.

6.4.   <u>Reliance on Representations</u>.   All representations, warranties, covenants and agreements made in this Agreement or in the other Loan Documents shall (i) be deemed to have been relied upon by Lender, notwithstanding any investigation heretofore or hereafter made by Lender or on Lender's behalf or any documents or other materials delivered to or reviewed by Lender and (ii) survive termination of this Agreement, the Security Instrument and any other Loan Document (whether by foreclosure, assignment-in-lieu of foreclosure or otherwise) for so long as any amount remains payable to Lender under this Agreement or any of the other Loan Documents.

# ARTICLE 7

# COVENANTS

7.1.   <u>Affirmative Covenants</u>.

From the Effective Date hereof and until payment and performance in full of all obligations of Borrower under the Loan Documents or the earlier release of the Lien of the Security Instrument (and all related obligations) in accordance with the terms of this Agreement and the other Loan Documents, Borrower and each Guarantor hereby covenants and agrees with Lender that:

7.1.1   Performance of Loan Documents.  Borrower shall perform and comply in all material respects with all covenants, conditions and prohibitions required to be observed, performed or satisfied by Borrower pursuant to and in accordance with the terms and provisions set forth in the Loan Documents, and shall pay when due all Loan Debt Service Payments and all other sums payable under the Loan Documents, without any additional notice or demand, other than as expressly set forth in the Loan Documents. Borrower shall promptly advise Lender in writing of (i) any change in the condition, financial or otherwise of Borrower, Owner, or Guarantor that is reasonably likely to have a Material Adverse Effect upon the business operations, properties, assets or financial condition, or legal authority or status, of such Person or the Property that would impair the ability of such Person to satisfy or perform any of such Person's obligations under any Loan Document or Senior Loan Document to which it is a party, (ii) any change in the condition, financial or otherwise, of any Borrower Control Person (other than Borrower, Owner, and Guarantor) that is reasonably likely to have a Material Adverse Effect, or (iii) the occurrence of any Event of Default.

7.1.2   Performance Under Other Encumbrances.  Borrower shall cause Owner to perform and comply with all covenants, conditions and prohibitions required of Owner in connection with any Property Record Agreement and any other encumbrance affecting the Property, the Chattels, or other Senior Collateral, or any part thereof, or any interest therein, regardless of whether such other encumbrance is superior or subordinate to the Lien hereof.

7.1.3   Taxes and Assessments.

(a)   Payment of Taxes.  Borrower shall, on behalf of Owner, be obligated to pay, before delinquency and before the imposition of any penalty or interest, all Property Impositions in accordance with the administration of the Tax Reserve Account. Borrower shall deliver to Lender, without notice or demand, an official receipt for the payment of such Property Impositions (or, if an official receipt is not provided to Borrower, other written evidence of the payment of such Property Impositions reasonably acceptable to Lender) within 10 days after each such payment.  At Lender's option, Lender may retain the services of a firm to monitor the payment of all Property Impositions, the actual, out-of-pocket cost of which shall be borne by Borrower.

(b)   Intangible Taxes.  If by reason of any Legal Requirement, any change or amendment thereto or in the interpretation or application thereof, any judicial decision adopted or rendered following the Closing Date, or any request or directive by any Governmental Authority, (i) any tax, assessment or similar charge is imposed against any of the Secured Obligations, any of the Loan Documents, Lender, or any interest of Lender in any Collateral, (ii) any reserve, special deposit, compulsory loan or similar requirement is imposed on Lender or any of Lender's Affiliates, (iii) the rate of return on Lender's capital as a consequence of Lender's obligations hereunder is reduced by any amount reasonably deemed by Lender to be material, or (iv) any other condition is imposed on Lender that increases the cost to Lender of making, renewing or maintaining the Mezzanine Loan or reduces any amount receivable by Lender hereunder, then, in any such case, Borrower shall

promptly pay Lender upon demand any additional amounts necessary to compensate Lender for such additional costs of Lender or reduced amount receivable in respect of the Mezzanine Loan, and Borrower shall indemnify Lender against all Losses in connection with any such tax, assessment or other charge. If Borrower is unable to pay such amounts before delinquency, then the Secured Obligations shall, at Lender's option, become due and payable in full upon 120 days' notice to Borrower (and, within such 120 day period, Borrower shall repay the Principal Indebtedness plus all accrued and unpaid interest thereon, together with any applicable yield maintenance or prepayment premium and all other amounts outstanding under the Loan Documents, in accordance with the prepayment provisions set forth in Section 2.3).

(c)      Right to Contest.  Notwithstanding any other provision of this Section 7.1.3 to the contrary, Borrower shall not be deemed to be in Default solely by reason of Borrower's or Owner's failure to pay any Property Impositions so long as, in Lender's reasonable judgment, each of the following conditions is satisfied: (i) no Default or Event of Default has occurred and remains uncured under the Senior Loan Documents or Loan Documents; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower or Owner is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all Legal Requirements; (iii) neither the Property nor any part thereof or interest therein will be in any reasonably foreseeable danger of being sold, forfeited, terminated, cancelled or lost; (iv) Borrower shall, or Borrower shall cause Owner to, promptly upon final determination thereof pay the amount of any such Property Impositions, together with all costs, interest and penalties which may be payable in connection therewith; (v) such proceeding shall suspend the collection of such contested Property Impositions from the Property; and (vi) Borrower shall, or Borrower shall cause Owner to, furnish such security as may be required in the proceeding, or as may be reasonably requested by Senior Lender, to insure the payment of any such Property Impositions, together with all interest and penalties thereon. Senior Lender may apply such security or part thereof held by Senior Lender at any time when, in the reasonable judgment of Senior Lender, the validity or applicability of such Property Impositions are established or the Property (or part thereof or interest therein) shall be in any reasonably foreseeable danger of being sold, forfeited, terminated, cancelled or lost or there shall be any reasonably foreseeable danger of the Lien of the Deed of Trust being primed by any related Lien.

(d)      Failure to Comply with Contest Requirements.  If Senior Lender determines that any one or more of the conditions set forth in Section 5.1.2 of the Senior Loan Agreement is not satisfied or is no longer satisfied, then Borrower shall, or shall cause Owner to, pay the applicable Property Impositions in question not later than the date that is 5 Business Days following the date that Senior Lender provides written notice to Owner of such determination.

7.1.4   Maintenance and Repair of Property and Chattels; Contracts; Use.

(a)    Borrower shall cause Owner to at all times maintain (or cause to be maintained) the Property and the Chattels in good condition and repair and at a standard not lower than the standard maintained by prudent managers of similar properties in the geographic region of the Property.  Borrower shall cause Owner to diligently prosecute the completion of any building or other improvement that is at any time in the process of construction on the Property, and shall promptly repair, restore, replace, or rebuild any part of the Property or the Chattels that may be affected by any casualty or any public or private taking or injury to the Property or the Chattels.  All costs and expenses arising out of the foregoing shall be paid by Borrower or Owner whether or not the applicable Capital Proceeds shall be sufficient or available therefor.  Borrower shall cause Owner to maintain access to and egress from the Property by public streets.  Borrower shall cause Owner to maintain all public utility services (including water supply, storm and sanitary sewer facilities, and natural gas, electric, telephone, cable television and broadband internet access facilities) necessary for the operation and maintenance of the Property (including the Improvements) for the Property's intended purposes, and shall use reasonable efforts as within the control of Borrower or Owner to cause all such utilities to be connected so as to serve the Property without passing over other property except for land or easement areas of or available to the utility company providing such utility service.

(b)    Borrower shall cause Owner to at all times maintain, preserve and protect all Intellectual Property (including franchises and trade names), and preserve all of the remainder of Owner's property necessary for the continued conduct of Owner's business.

(c)    Borrower shall cause Owner to timely pay and perform each of Owner's obligations under or in connection with the Contracts.  Neither Borrower nor any Borrower Control Person shall enter into any contract or agreement that contravenes any of the Loan Documents or Senior Loan Documents or that provides or has the effect that the performance of the Loan Documents or Senior Loan Documents constitutes a default under such contract or agreement or results in the creation of any Lien upon or with respect to the Collateral, Property, Chattels, or other Senior Collateral.  Borrower shall perform, observe and fulfill, and shall cause Owner and Guarantor to perform, observe and fulfill, all of the obligations, covenants and conditions set forth in any agreement or instrument to which Borrower, Owner or Guarantor, as the case may be, or any of the properties, assets or revenues of Borrower, Owner or Guarantor, as the case may be, are bound, if the failure to perform, observe or fulfill any such obligation, covenant or condition would materially and adversely affect the properties, assets, operations or financial condition of Borrower, Owner or Guarantor, as the case may be, or the ability of any party to the Loan Documents or Senior Loan Documents to perform such party's obligations under the Loan Documents or Senior Loan Documents.

(d)    Borrower shall cause Owner to use the Property solely for the operation of a hotel and any other use consistent therewith and not otherwise in violation of any Legal Requirements and for no other use or purpose.

(e)     If recommended by any environmental assessment or audit of the Property (including any assessment or audit performed in connection with the closing of the Mezzanine Loan or following the Closing Date), Borrower shall cause Owner to establish and comply with an operations and maintenance program with respect to the Property, in form and substance reasonably acceptable to Senior Lender and Lender and prepared by an environmental consultant reasonably acceptable to Senior Lender and Lender (each such program, as applicable, the "**O&M Program**").   Borrower shall not permit, and Borrower shall cause Owner to not permit, any O&M Program to be amended, terminated, replaced or otherwise modified, in each case, without obtaining the prior written consent of Senior Lender and Lender.   Any construction, rehabilitation, modification or renovation at the Property, including any such work that requires the removal of any materials or improvements of any kind in connection with the O&M Program, shall be implemented pursuant to and in accordance with the procedures and programs as set forth in the O&M Program and all applicable Legal Requirements. The O&M Program and work resulting therefrom shall be conducted by an accredited, licensed, abatement contractor approved by Senior Lender and Lender.   All fees and expenses incurred by Senior Lender and Lender for all inspections and review and approval of the O&M Program shall be paid by Owner not later than 10 days following written demand therefor by Senior Lender and Lender.

7.1.5   <u>Condemnation; Casualty; Capital Proceeds</u>. Notwithstanding anything to the contrary in this <u>Section 7.1.5</u>, (i) the rights of Lender under this <u>Section 7.1.5</u> shall be subject and subordinate to the rights of Senior Lender under <u>Section 6.2</u> (Casualty), <u>6.3</u> (Condemnation) and <u>6.4</u> (Restoration) of the Senior Loan Agreement and (ii) Borrower shall have no obligation to cause Owner to deliver any portion of the Capital Proceeds or Liquidation Proceeds to Lender if such delivery would be a violation of the Senior Loan Documents, including, without limitation, any provisions thereunder restricting distributions.   If, pursuant to the terms of the Senior Loan Documents, Owner is ever entitled to receive and retain any portion of any Capital Proceeds or Liquidation Proceeds (i.e., such amounts are not required under the Senior Loan Documents or the Loan Documents (i) to be used for restoration of the Property (and Owner elects not to restore) or (ii) to be applied to the repayment, in part or in whole, of the Senior Loan Indebtedness), Borrower shall cause Owner to cause such portion of such Capital  Proceeds or Liquidation Proceeds to be delivered to Lender and all such amounts shall then be applied to the repayment of the Mezzanine Loan in accordance with this Agreement.   Notwithstanding the foregoing sentence, if the net amount of Capital Proceeds received by Lender is equal to or greater than the outstanding amount then due under the Senior Loan, such Capital Proceeds may be retained and applied by Lender toward the repayment of Owner's obligations under the Senior Loan Documents and (as to any remaining amount) Borrower's obligations under the Note and any other Loan Documents, whether or not then due and payable, and (as to amounts applied to the Mezzanine Loan) in such order and priority as Lender in its discretion shall deem proper or, at the discretion of Lender, the same may be paid, either in whole or in part, to Borrower for such purposes as Lender shall designate. If Lender shall receive and apply the Capital Proceeds or Liquidation Proceeds toward the payment of the Mezzanine Loan, the obligations of Borrower evidenced by the Loan Documents shall be reduced only by the net amount of such Capital Proceeds or

Liquidation Proceeds so received and applied. Borrower hereby grants Lender full power and authority as attorney irrevocable of Borrower, acting for and on behalf of Owner, exercisable only upon the completion of a foreclosure by Lender or its Affiliate of the Collateral pursuant to the terms of the Loan Documents, to transfer such insurance or award, to collect and endorse any checks issued in the name of Borrower or Owner, and to retain any proceeds and to apply the same to the obligations owing under this Agreement and the Note. Notwithstanding the foregoing, no Minimum Interest shall be payable in connection with a prepayment of the Mezzanine Loan resulting from Capital Proceeds. Notwithstanding anything herein to the contrary, if Capital Proceeds are used to pay the Senior Indebtedness in full, then the Principal Indebtedness and all other amounts due under this Mezzanine Loan shall be immediately due and payable by Borrower.

(a)      Notice and Settlement.  If all or any part of the Property, Chattels or other Senior Collateral (i) is taken, or is threatened (in writing) to be taken, by eminent domain or any other public or private action (including any voluntary conveyance in lieu or in anticipation thereof), (ii) shall become the subject of a pending condemnation of which Owner or any Borrower Owner Person has received written notice, or (iii) is damaged by any casualty, then Borrower shall cause Owner to, promptly after obtaining actual knowledge thereof, provide Lender with written notice thereof and of the time and place of all meetings, hearings, trials, and other proceedings relating to such taking, pending condemnation or casualty, together with all papers served and settlement offers and appraisals received in connection therewith.  To the extent not prohibited by the Senior Loan Documents, Lender may (x) participate in all negotiations and appear and participate in all judicial or arbitration proceedings concerning any Capital Proceeds that may be payable as a result of such condemnation or casualty and (y) in its sole discretion, compromise or settle, in the names of both Borrower and Lender, any claim for any such Capital Proceeds.  Whether or not Lender is involved in any such negotiation or settlement, any such compromise or settlement shall be subject to the prior written consent of Lender if such Lender's consent would not be a violation of the Senior Loan Documents.

(b)      Business/Rental Loss Insurance Proceeds.  Any business or rental loss insurance proceeds payable as a result of any condemnation, casualty or damage with respect to the Property, Chattels or other Senior Collateral shall be paid directly to Lender and shall be applied first to reimburse Lender for all costs and expenses, including out-of-pocket attorneys' fees, incurred by Lender in connection with the ascertainment and collection of such insurance proceeds.  The balance, if any, of such insurance proceeds shall (i) for so long as no Event of Default exists, be applied to the payment of any reserve accounts hereunder, Operating Expenses, Loan Debt Service Payments and other amounts that Borrower is required to pay pursuant to this Agreement and the other Loan Documents during the period of restoration, or (ii) if an Event of Default exists, at Lender's option, be applied to the payment of the Secured Obligations, in such order and manner as Lender deems appropriate.

(c)     <u>Maintenance of Capital Proceeds</u>.  Lender will have no obligation to see to the proper application of any Capital Proceeds paid over to Borrower, nor will any such Capital Proceeds received by Lender bear interest or be subject to any other charge for the benefit of Borrower.  If the Security Instrument has been foreclosed prior to Lender's receipt of such Capital Proceeds, then Lender shall be entitled to receive and retain such Capital Proceeds to the extent required to reimburse Lender for all costs and expenses, including out-of-pocket attorneys' fees, incurred in connection therewith, and to discharge any deficiency remaining with respect to the Secured Obligations.

7.1.6   <u>Financial Reporting</u>.

(a)     <u>Monthly Statements</u>.  Within 25 days following the end of each calendar month, Borrower shall deliver to Lender (i) Owner's Financial Statements for the Property as of the end of and for the preceding calendar month, including a balance sheet, income statement (showing a comparison to budget and prior year for both the corresponding month and year-to-date period), statement of cash flow, statements of retained earnings and shareholders' equity (if such are scheduled separately), (ii) the monthly Smith Travel Research Report ("**STR Report**") for the preceding calendar month, and (iii) supporting documents, upon Lender's request, which may include bank account reconciliation(s), accounts receivable aging, accounts payable aging, general ledgers, guest satisfaction survey reports, and FF&E reports for the Property.   Upon demand by Lender following any Default or Event of Default, or if Lender intends to securitize the Mezzanine Loan (and, if so, until the Mezzanine Loan is contributed to a securitization structure), Borrower shall deliver to Lender the items required in this <u>Section 7.1.6(a)</u> not later than the 20th Day of each calendar month.

(b)     <u>Quarterly Statements</u>.  Within 45 days following the end of each calendar quarter, Borrower shall deliver to Lender (i) Owner's quarterly operating statements for the Property as of the end of and for the preceding calendar quarter, setting forth all Gross Revenues received and Operating Expenses and Capital Expenditures incurred during such calendar quarter and compared against the operating budget for such calendar quarter and the actual operation for the corresponding calendar quarter of the prior year, (ii) income statement on a trailing twelve month basis, (iii) complete Financial Statements of Borrower and complete Financial Statements of Guarantor, to the extent available, (iv) if there are any Leases in place in respect of the Property other than in respect of any Hotel Transactions, a then-current Rent Roll, (v) standard hotel data of rooms sold and rooms available for the Property for the calendar quarter (shown fiscal year-to-date) then ended, as well as Gross Revenue breakdown of room revenue from other revenue for such period, so that occupancy average daily rate and RevPAR statistics for such fiscal quarter can be calculated, and STR Reports for the Property for such fiscal quarter then ended, (vi) copies of the most recent IHG Licensor quality assurance reports issued to Owner, (vii) all IHG Licensor royalty billing statements for the Property for such calendar quarter then ended (shown year-to-date, if available), (viii) Borrower's calculation of the Debt Service Coverage Ratio and

Debt Yield as of the last day of the preceding calendar quarter (including a summary of how the Debt Service Coverage Ratio was calculated and including all financial statements and/or other reports reasonably required by Lender to verify Borrower's Debt Service Coverage Ratio calculation), (ix) a certification by the Chief Executive Officer (CEO) or Chief Financial Officer (CFO) (or the equivalent of either officer) of Borrower of compliance with all covenants contained in this Agreement and the other Loan Documents, and (x) supporting documents, upon Lender's request, which may include bank account reconciliation(s), accounts receivable aging, accounts payable aging, general ledgers, guest satisfaction survey reports, and FF&E reports for the Property.

(c)    <u>Annual Statements</u>.  Within 90 days following the end of each fiscal year of Borrower, Borrower shall deliver to Lender (i) the annual balance sheet, profit and loss statement, statement of cash flow and statement of any change of financial condition of Borrower, Owner and Guarantor (demonstrating that Guarantor satisfies the Minimum Guarantor Financial Requirement), (ii) Owner's annual operating statements (on a trailing twelve month basis) for the Property as of the end of and for the preceding fiscal year, setting forth all Gross Revenues received and Operating Expenses and Capital Expenditures incurred during such fiscal year and compared against the operating budget for such fiscal year and actual operations of the prior year, (iii) copies of the most recent IHG Licensor quality assurance reports issued to Owner, (iv) all IHG Licensor royalty billing statements for the Property for such fiscal year, and (v) a certification by the CEO or CFO (or the equivalent of either officer) of Borrower of compliance with all covenants contained in this Agreement and the other Loan Documents.

(d)    <u>Preparation and Certification of Statements</u>.  The Financial Statements described in this <u>Section 7.1.6</u> may be prepared by Borrower, Owner or Guarantor, as applicable; provided, however, if any Event of Default exists or if Lender's review of such statements indicates possible material irregularities in such Financial Statements or the internal controls, then Lender may, in its sole discretion, require Borrower, Owner and/or Guarantor, as applicable, to provide Financial Statements audited by an independent certified public accountant reasonably acceptable to Lender and at Borrower's sole cost and expense, no later than 60 days following Lender's written request.  The operating and profit and loss statements described in this <u>Section 7.1.6</u> shall be (i) in such detail as Lender may require and shall be prepared in accordance with the Uniform System of Accounts, and (ii) consolidated or consolidating, to the extent applicable.  The operating and profit and loss statements, and other information and reports delivered by Borrower, Owner or Guarantor pursuant to this <u>Section 7.1.6</u> shall be certified to Lender as true, correct and complete by Borrower, Owner or Guarantor, as applicable.

(e)    <u>Budgets</u>.

(i)    By the date that is 30 days prior to the beginning of any fiscal year of Borrower (which begins on January 1), Borrower will deliver to Lender operating and capital budgets, including projections of Gross

Revenue, Operating Expenses, and Capital Expenditures for the operation of the Property for the upcoming fiscal year (or other consecutive 12-month period), in form and content satisfactory to Lender. All budgets shall be subject to Lender's reasonable approval. Lender shall approve or disapprove the proposed projections and budget within 30 days after Lender's receipt thereof. Once a proposed budget has been reviewed and approved by Lender, and Borrower has made all reasonable revisions requested by Lender, if any, such revised budget shall be delivered to Lender and shall thereafter, subject to Senior Lender's consent, become the budget for the Property for the applicable fiscal year (the "**Approved Budget**").

(ii)     Borrower shall cause Owner to use commercially reasonable efforts to operate the Property in accordance with the Approved Budget for the applicable fiscal year (or portion thereof).

(f)     <u>Other Statements and Reports</u>.  Not later than 5 Business Days following Owner's receipt, copies of any management reports delivered by any Property Manager to Owner under any Property Management Agreement or by IHG Licensor to Owner under the IHG License (or any replacement license or franchise agreement) shall be delivered to Lender.  In addition to the Financial Statements and reports listed above in this <u>Section 7.1.6</u>, Borrower, Owner and Guarantor shall also promptly furnish or cause to be furnished to Lender, within 10 Business Days following Lender's request, any other financial reports or statements of Borrower, Owner and Guarantor, including balance sheets, profit and loss statements, and any other Financial Statements required under any of the Loan Documents, requested by any Governmental Authority exercising jurisdiction over Lender, or reasonably requested by Lender from time to time. If required by Lender, such information may include, without limitation, the following with regards to Guarantor: statement of assets and liabilities, summary of annual income and annual expenses, bank and/or brokerage statements including all pages, in form satisfactory to Lender, and/or other information requested. Such information must be dated no earlier than 90 days prior to the date provided.

(g)     <u>Tax Returns</u>. Within the earlier of (i) 30 days of filing of all Tax Returns with the appropriate Governmental Authorities; or (ii) November 15th of each fiscal year, Borrower shall deliver to Lender true and complete copies of all such Tax Returns filed by each of the Borrower Control Persons.

(h)     <u>Hotel Related Statements and Reports</u>.  Borrower shall furnish Lender with an updated Merchant Schedule (i) within 90 days following the end of each fiscal year of Owner, (ii) upon the termination of any agreement with any such third party merchant and (iii) upon the execution and delivery to Owner of any new agreement with any such third party merchant.

(i)     Borrower agrees that Lender may forward to each purchaser, transferee, assignee, servicer, participant or investor in all or any portion of the

Loan and any organization maintaining databases on the underwriting and performance of commercial mortgage loans, all documents and information which Lender now has or may hereafter acquire relating to the Principal Indebtedness and to Owner, Borrower, any Guarantor and the Property, whether furnished by Borrower, any Guarantor or otherwise, as Lender determines reasonably necessary or desirable. Borrower and Guarantor irrevocably waives any and all rights it may have under any applicable laws to prohibit such disclosure, including, but not limited, to any right of privacy.

7.1.7   <u>Books and Records; Inspection Rights; Access to Property</u>.

(a)    <u>Books and Records</u>. Borrower shall cause Owner to keep and maintain at the offices of Owner accurate and complete records and books of account, in which complete entries shall be made, reflecting all financial transactions of Owner relating to the Property, including records adequate to correctly reflect all items required in order to determine all Gross Revenue, Operating Expenses, Capital Expenditures and other matters contemplated by this Agreement.

(b)    <u>Inspection Rights</u>. At any reasonable time during regular business hours, and from time to time, upon at least 24 hours prior written notice from Lender, Borrower shall cause Owner to permit Lender, or any agents or representatives thereof, to (i) examine and make copies of and abstracts from the records and books of account of Borrower, Owner and the Property, (ii) enter and inspect the Property and the Chattels (subject to the rights of Tenants under Leases), and (iii) discuss with Borrower and Owner the affairs, finances and accounts of Borrower and Owner.  Borrower shall cause Owner to take all commercially reasonable actions necessary or required under the Leases to effect such right of Lender to inspect the Property and Chattels.

(c)    <u>Access to Property</u>.  At any time and from time to time upon reasonable request and reasonable written notice by Lender, Borrower shall cause Owner to (i) provide Lender with copies of all bank statements, invoices, cancelled checks and other information relating to any accounts maintained by Owner, any asset manager or any Property Manager with respect to the Property and (ii) deliver to Lender a current inventory of the Chattels, and the other Senior Collateral, in such detail as Lender may reasonably require.  During the existence of any Senior Event of Default, Borrower shall cause Owner to, at Senior Lender's request, assemble the Chattels and make them available to Senior Lender at any place designated by Senior Lender that is reasonably convenient to both parties.

7.1.8   <u>Cooperate in Legal Proceedings; Notices of Litigation</u>.  Without limiting any other rights of Lender under this Agreement, Borrower shall reasonably cooperate with Lender with respect to any arbitration proceedings or any proceedings before any Governmental Authority that are reasonably likely to in any way materially affect the rights of Lender hereunder or any rights obtained by Lender under any of the Loan Documents and, in connection therewith, shall not prohibit Lender, at Lender's election, from

participating in any such proceedings. Borrower shall, promptly after receiving written notice thereof, notify Lender in writing of any litigation, action, proceeding or investigation against Borrower, Owner, Guarantor or any other Borrower Control Person or the Property and, upon reasonable request of Lender, from time to time provide Lender with status or other information in respect thereof.

7.1.9   <u>Further Assurances</u>.

(a)     Borrower shall, at Borrower's sole cost and expense, upon the reasonable request of Lender, execute and/or deliver to Lender all instruments, documents, certificates, title and other insurance reports and agreements, required to be furnished pursuant to the terms of the Loan Documents or reasonably required by Lender to evidence, preserve and/or protect the Collateral and the Liens of the Loan Documents (including any amendment or replacement to the Security Instrument, any UCC-1 Financing Statements or other Loan Documents) and do such other acts necessary, to evidence, preserve and/or protect the Collateral or to better and more effectively carry out the intents and purposes of this Agreement and the other Loan Documents, as Lender shall reasonably require from time to time. Borrower hereby authorizes the filing of any financing statements (including any UCC-1 Financing Statement) or continuation statements, and amendments to financing statements, in any jurisdictions and with any recording and/or filing offices as Lender may determine are necessary or advisable to perfect the security interests granted to Lender in connection with the Loan Documents. Such financing statements may describe the collateral secured thereby (i) in the same manner as described in any security agreement or pledge agreement entered into by the parties in connection herewith or (ii) in any other manner as Lender may determine is necessary, advisable or prudent to ensure the perfection of the security interests in the collateral granted to Lender in connection herewith, including describing such collateral as "all assets" or "all personal property" of Borrower, whether now owned or hereafter acquired.

(b)     Borrower shall, at Borrower's sole cost and expense, upon the reasonable request of Lender, during the existence of a Default or Event of Default, deliver to Lender UCC, tax Lien, judgment and litigation searches with respect to any Borrower Control Person, and searches of title to the Property and the other Senior Collateral, each such search to be conducted by search firms designated by Lender in each of the locations designated by Lender.

7.1.10  <u>Management and Leasing of the Property</u>.

(a)     The Property shall be managed by a property manager approved by Senior Lender and Lender (the "**Property Manager**") pursuant to a property management agreement delivered to, and approved by, Senior Lender and Lender (the "**Property Management Agreement**"). Lender hereby approves as of the Effective Date (i) TPG Hotels & Resorts, Inc., a Rhode Island corporation ("**TPG Manager**"), as the Property Manager and (ii) the Hotel Management Agreement, dated as of December 31, 2021, between Owner and TPG Manager (as the initial

Property Manager) attached as **Exhibit E**. Borrower represents to Lender that a true, correct and complete copy of such Property Management Agreement with TPG Manager has been delivered to Lender prior to the Closing Date.  Any substitute or replacement Property Manager or any other change in Property Manager shall be subject to the prior written approval of Senior Lender and Lender. Borrower shall not permit Owner to make or enter into any amendment to or modification of any Property Management Agreement or management of the Property by any Person other than Borrower or Property Manager, as applicable, without the prior written approval of Senior Lender and Lender.  Any such Property Manager shall execute a Subordination of Property Management Agreement in respect of its Property Management Agreement in form and substance satisfactory to Senior Lender. Lender hereby approves the Assignment and Subordination of Management Agreement, by and among TPG Manager, Owner and Senior Lender, dated December 31, 2021. As a condition to Closing, Borrower shall provide to Lender a recognition agreement from TPG Manager in favor of Lender (and acknowledged to by Owner) with respect to the Mezzanine Loan, in form and substance reasonably acceptable to Lender ("**TPG Recognition Agreement**").

(b)     Pursuant to that certain Letter Agreement from IHG Licensor to Owner, dated January 31, 2022 (the "**IHG Consent**"), IHG Licensor consented to TPG Manager as the initial Property Manager for the Property, including the restaurant, subject to certain terms and conditions for which TPG Manager shall comply with.  The IHG Consent provides, in part, that TPG Manager's failure to comply with any of the requirements set forth in the IHG Consent will constitute a "Change in Circumstances" under paragraph 6.1.4 of the IHG License pursuant to which IHG Licensor may require Owner to terminate its agreement with TPG Manager and retain a replacement management company that will be subject to IHG Licensor's approval.  Borrower and each Guarantor represents to Lender that all terms and conditions in the IHG Consent have been complied with as of the Closing Date.  Borrower shall cause Owner to cause the Property to be managed and operated by TPG Manager in accordance with the IHG License and the terms and conditions set forth in the IHG Consent so that IHG Licensor's consent is not withdrawn and rescinded with respect to TPG Manager as the initial Property Manager.

(c)     Borrower shall not (and shall not cause Owner to) enter into, amend or modify any listing agreement or brokerage agreement for the Property (a "**Listing Agreement**") without Lender's prior written consent; provided, however, Lender's prior written consent shall not be required, and Borrower shall only be required to provide 10 days' prior written notice to Lender, if any Listing Agreement expressly provides that such agreement shall automatically terminate (at no cost to Owner or Borrower) if the membership interests in Owner is transferred to a lender of Owner's owner or to another party acquiring the membership interests in Owner in connection with an enforcement action against Owner's owner (by foreclosure, assignment-in-lieu of foreclosure or otherwise). Borrower shall use (and shall cause Owner to use) commercially reasonable efforts to cause any listing agent that enters into a Listing Agreement to execute a

Subordination of Listing Agreement in respect of its Listing Agreement in form and substance reasonably satisfactory to Lender.

(d)     So long as no Default or Event of Default then exists, Lender's approval of the matters under this Section 7.1.10 shall not be unreasonably withheld, conditioned or delayed.

7.1.11  Compliance with Legal Requirements.

(a)     Compliance.  Borrower and each Borrower Control Person shall comply with all applicable Legal Requirements in all material respects and shall timely make all required notices and filings with any Governmental Authority. Borrower shall obtain (or cause to be obtained) all Permits.  Borrower shall cause Owner to maintain all Permits in full force and effect, timely pay all amounts due and payable by or on behalf of Owner in respect of such Permits and renew such Permits prior to the expiration thereof.  Borrower shall, promptly after receiving written notice thereof, notify Lender in writing of any litigation, action, proceeding or investigation against Borrower or any Borrower Control Person or the Property before any Governmental Authority and, upon reasonable request of Lender, from time to time provide Lender with status or other information in respect thereof.

(b)     Right to Contest.  Notwithstanding any other provision of this Agreement, Borrower shall not be deemed to be in Default solely by reason of Borrower's failure to comply with any Legal Requirement, so long as Borrower has notified Lender of such failure pursuant to Section 7.1.11(a) and, in Lender's reasonable judgment, each of the following conditions is satisfied:

(i)     Borrower is engaged in and diligently pursuing in good faith administrative or judicial proceedings appropriate to contest the validity or applicability of such Legal Requirement;

(ii)    Noncompliance with any such Legal Requirement will not result in (x) the loss, forfeiture or encumbrance of the Property or Collateral (or any portion thereof) or any interest of Borrower or Lender therein, (y) any other punitive actions or (z) any loss or impairment of insurance coverage; and

(iii)   Borrower deposits with Lender, as security for any payment or performance that may ultimately be required, the amount of any fine, assessment or charge plus the interest, penalties, and other costs that Lender estimates are likely to become payable if Borrower's contest is unsuccessful.

(c)     Failure to Comply with Contest Requirements.  If Lender determines that any one or more of the conditions set forth in Section 7.1.11(b) is not satisfied or is no longer satisfied, then Borrower shall comply with the Legal Requirement in question, not later than the date that is 5 Business Days following the date that Lender provides written notice to Borrower of such determination.

7.1.12  <u>Single Purpose Entity; Preservation of Existence; Non-Foreign Status</u>.

(a)      Borrower shall at all times be a Single Purpose Entity and Borrower shall cause Owner to comply with the single purpose entity provisions in <u>Section 4.1.35</u> of the Senior Loan Agreement.

(b)      Borrower and each Borrower Control Person shall do or cause to be done all things necessary to (i) preserve, renew and keep in full force and effect the existence of Borrower and each other Borrower Control Person (that is an entity) as a limited liability company, limited partnership, corporation or other entity, as may be applicable, and (ii) maintain the authorization of Borrower and each other Borrower Control Person to perform their respective obligations under the Loan Documents.

(c)      Neither Borrower nor any Borrower Control Person shall amend or modify its organizational documents without the prior written consent of Lender.

(d)      No Borrower Control Person shall at any time be a "foreign person" within the meaning of Sections 1445 and 7701 of the Code, as amended, and the regulations issued thereunder, except for AGRON AG Guarantor and ACRON 2 Porsche Drive Atlanta AG, both Swiss stock corporations.

7.1.13  <u>Leases</u>.

(a)      <u>Performance; Notices</u>.  Borrower shall cause Owner to timely pay and perform each of the obligations of Owner under or in connection with each Lease and shall otherwise pay such sums and take such action as shall be necessary or required in order to maintain such Lease in full force and effect in accordance with its terms.  With respect to any Lease that is not a Hotel Transaction, Borrower shall cause Owner to within 5 Business Days following receipt thereof, furnish to Lender copies of (i) any notices given to Owner by the Tenant under any such Lease (a) alleging the default by Owner in the timely payment or performance of Owner's obligations under such Lease, (b) purporting to terminate or cancel such Lease prior to its stated expiration date, or (c) requiring or demanding the expenditure of any sum by Owner (or demanding the taking of any action by Owner), and (ii) any subsequent communications related thereto.  Borrower shall cause Owner to enforce all of the material terms, covenants and conditions contained in the Leases upon the part of the Tenant or any other party that is not Owner thereunder to be observed or performed.  Borrower shall not permit Owner to permit or consent to any assignment or subletting of any Lease unless such assignment or subletting is consummated in accordance with the terms of such Lease.

(b)      <u>Execution, Termination or Modification of Leases</u>.  Borrower shall not permit Owner to do, nor neglect to do, anything that may cause or permit the termination of any Lease, or cause or permit the withholding or abatement of any Gross Revenue payable under any such Lease.  With respect to any Lease that is not a Hotel Transaction, without Lender's prior written consent, Borrower shall not

permit Owner to (i) enter into or modify, amend, supplement, terminate or cancel any Lease, (ii) collect any Gross Revenue from all or any part of the Property for more than one month in advance, (iii) assign any Gross Revenue from the Property or any part thereof or (iv) consent to the cancellation or surrender of all or any part of any Lease. Borrower shall deliver to Lender an executed copy of each Lease (including any amendment, supplement or modification thereof) not later than 5 Business Days following the execution thereof.

(c)     <u>Senior Lender's Consent</u>. Any submission by Borrower or Owner for Senior Lender's consent to a Lease or to a modification, amendment, supplement, renewal, termination or cancellation of any Lease shall be in accordance with the provisions of <u>Section 5.1.17</u> of the Senior Loan Agreement.

(d)     <u>Termination Fees</u>. Without limiting the generality of this <u>Section 7.1.13</u>, Borrower shall notify Lender in writing of any cancellation penalties, termination fees or other consideration payable to Owner in connection with any cancellation, termination or surrender of any Lease (excluding Hotel Transactions) (any such penalties or fees are referred to herein as "**Termination Fees**"), which written notice shall be delivered to Lender not later than the date that is three Business Days following the date that Owner has received notice from the applicable Tenant under such Lease of the intention of such Tenant to cancel, terminate or surrender such Lease, but in any event prior to the payment by the applicable Tenant under such Lease of any such Termination Fees to Owner.

(e)     <u>Security Deposits</u>. Borrower shall cause Owner to deposit any cash security deposits of Tenants under Leases (excluding Hotel Transactions) that are turned over to or for the benefit of Owner or otherwise collected by or on behalf of Owner, into a separate account maintained with a reputable financial institution in compliance with applicable Legal Requirements, and Borrower shall cause Owner to not commingle such funds with any funds of Owner. Any letter of credit or other instrument that Borrower or Owner is permitted to hold in lieu of cash security deposits under any applicable Legal Requirements (i) shall be maintained in full force and effect unless replaced by cash deposits as hereinabove described (or unless applied pursuant to the terms of the applicable Lease), (ii) if permitted pursuant to Legal Requirements, shall name Senior Lender as payee or mortgagee thereunder (or at Senior Lender's option, be fully assignable to Senior Lender) and (iii) shall comply with all applicable Legal Requirements and otherwise be reasonably satisfactory to Senior Lender. Borrower shall, upon request, cause Owner to provide Senior Lender with evidence reasonably satisfactory to Senior Lender of Owner's compliance with the foregoing. Upon the occurrence and during the continuance of any Senior Event of Default, Borrower shall cause Owner to, upon Senior Lender's request, if permitted by applicable Legal Requirements, (a) assign to Senior Lender any such letter of credit security deposits (or cause such letter of credit security deposits to be re-issued in favor of Senior Lender) and (b) turn over to Senior Lender all other security deposits (and any interest theretofore earned thereon), in each case, to be held by Senior Lender subject to the terms of the Leases.

(f)      Insurance.  Borrower shall cause Owner to require, in all Leases (excluding Hotel Transactions) entered into after the Closing Date, that the Tenant's property insurance policy in connection with each such Lease (i) provide for a standard waiver of subrogation clause benefiting Owner, Lender and Senior Lender and (ii) include Senior Lender and Lender as an additional insured.

7.1.14  Prohibited Persons; Economic Sanctions; Anti-Money Laundering; Corporate Transparency Act.

(a)      Borrower and each Guarantor hereby represents, warrants and covenants and agrees that:

(i)      no Borrower Owner Person or any officer or director of any of them, (a) is or shall become a Prohibited Person, or (b) is or shall become directly or indirectly owned or Controlled by any Prohibited Person;

(ii)      at all times until the full satisfaction of the Secured Obligations, none of the funds of Borrower, Guarantor or any other Person that are used to repay the Secured Obligations shall be derived from (a) conducting business or transacting with any Prohibited Person (including making or receiving any contribution of funds, goods or services to or for the benefit of any Prohibited Person), (b) dealing in any property or interests in property blocked pursuant to the Executive Order, or (c) activities involving the violation of any Anti-Money Laundering Laws;

(iii)      none of the proceeds of the Mezzanine Loan shall be used to facilitate any business, transactions, or other activity with any Prohibited Person or activities involving the violation of any Anti-Money Laundering Laws; and

(iv)      Borrower shall promptly deliver to Lender any certification and other evidence reasonably requested from time to time by Lender confirming compliance by Borrower with this Section 7.1.14.

(b)      At all times until the full satisfaction of the Secured Obligations, (i) none of the funds or other assets of any of Borrower, Guarantor, any Borrower Control Person or any Person that Controls Guarantor shall constitute property of, or shall be beneficially owned, directly or indirectly, by any Person subject to trade restrictions under United States law, including the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et. seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder or any other laws, regulations or executive orders administered by OFAC with the result that an investment in Borrower (whether directly or indirectly) is prohibited by Legal Requirements or the Mezzanine Loan made by Lender is in violation of law (an "**Embargoed Person**"), (ii) no Embargoed Person shall have any direct or indirect interest of any nature whatsoever in Borrower with the result that such investment in Borrower (whether direct or indirect) is prohibited

by Legal Requirements or that any of the Transactions are in violation of any Legal Requirements, and (iii) none of the funds of any of Borrower, Guarantor, any Borrower Control Person or any Person that Controls Guarantor shall be derived from any unlawful activity with the result that the investment in Borrower (whether directly or indirectly) is prohibited by Legal Requirements or that any of the Transactions are in violation of any law.

(c)     Borrower and each Guarantor hereby represents and warrants to Lender that as of the Closing Date, each Reporting Company is in compliance with the terms, conditions, regulations and reporting and disclosure requirements of the Corporate Transparency Act.

(d)     Borrower hereby covenants and agrees with Lender that, from and after the Closing Date, Borrower shall cause each Reporting Company to (i) at all times comply with the terms, conditions, regulations and reporting and disclosure requirements of the Corporate Transparency Act and (ii) provide to Lender upon request by Lender any information necessary (a) for Lender to confirm that any such Reporting Company has complied with all reporting and disclosure requirements under the Corporate Transparency Act and (b) to permit Lender to comply with the terms, conditions, regulations and reporting and disclosure requirements of the Corporate Transparency Act in respect of the Mezzanine Loan and the transactions contemplated by this Agreement and the other Loan Documents.  Borrower shall promptly deliver to Lender any certification and other evidence reasonably requested from time to time by Lender confirming compliance by Borrower and each other Reporting Company with this <u>Section 7.1.14</u>.

(e)     Borrower hereby consents, on behalf of Borrower and each Reporting Company, to permit FinCEN to disclose the beneficial ownership information of each Reporting Company and any other information disclosed to FinCEN pursuant to the Corporate Transparency Act to Lender in accordance with the terms of the Corporate Transparency Act.  Borrower and each Guarantor hereby (i) represents and warrants that each Reporting Company has, on behalf of such Reporting Company, provided such a consent in writing, and (ii) covenants and agrees that Borrower shall obtain and deliver to Lender any additional consents and/or documentation from any such Reporting Company necessary to effectuate such a consent from any such Reporting Company as may be required by FinCEN, from time to time, for FinCEN to release to Lender all such beneficial ownership information and other information disclosed to FinCEN pursuant to the Corporate Transparency Act.

(f)     Notwithstanding the foregoing, with respect to any direct or indirect constituent of Borrower or Guarantor that is not a U.S. Person, such non-U.S. Person shall not be required to comply with any of the provisions in this <u>Section 7.1.14</u> if doing so would constitute a violation of the domiciliary law applicable to such non-U.S. Person, provided, however, that if such non-U.S. Person is not required to comply with the provisions of this <u>Section 7.1.14</u>, Borrower shall deliver written notice to Lender which written notice shall include, among other

things, (i) the identity of such non-U.S. Person, (ii) the justification for such non-U.S. Person's non-compliance and (iii) such other written evidence reasonably required by Lender confirming the same.

(g)    The representations, warranties, covenants and agreements set forth in this Section 7.1.14 shall be deemed remade and reaffirmed by Borrower and each Guarantor as of each date that Borrower (i) makes a payment to Lender under this Agreement and/or the other Loan Documents or (ii) receives any advance or disbursement of the proceeds of the Mezzanine Loan or any payment from Lender. Borrower shall promptly notify Lender in writing should Borrower become aware of any change in the information set forth in the representations, warranties, covenants and agreements in this Section 7.1.14 or if any of the representations or warranties in this Section 7.1.14 become untrue or incomplete in any respect.

7.1.15    Replacement Guarantor.  Within 45 days after the death or incapacity of any individual Guarantor, Borrower shall notify Lender in writing of such death or incapacity and provide to Lender the names and current Financial Statements of one or more replacement guarantors reasonably acceptable to Lender (i) who, following such replacement, will own not less than 1% of the direct or indirect ownership interests in Borrower, (ii) who has (together with any remaining Guarantor following such replacement) an aggregate Net Worth sufficient to satisfy the Minimum Guarantor Financial Requirement, and (iii) (a) whose Net Worth and financial condition is, in Lender's reasonable discretion, equivalent to or better than the deceased Guarantor based upon the Financial Statements and other financial information delivered to Lender in respect of the individual that is the Guarantor immediately prior to such replacement, or (b) who are the heirs, devisees and beneficiaries of substantially all of the deceased Guarantor's assets and who have an aggregate Net Worth sufficient to satisfy the Minimum Guarantor Financial Requirement.  Within 60 days after the death or incapacitation of such individual Guarantor, each substitute guarantor(s) shall (A) deliver to Lender the financial reports and statements required to be delivered by Guarantor pursuant to Section 7.1.6, (B) execute and deliver to Lender a guaranty agreement and environmental indemnity agreement in substantially the same form as the ACRON Guaranty, TH Investment Guaranty and Environmental Indemnity Agreement and (C) execute and deliver to Lender such other instruments as Lender may reasonably require in connection with such replacement.

7.1.16    Minimum Guarantor Financial Requirement.  At all times until repayment in full of the Secured Obligations, Borrower shall cause ACRON Guarantors and TH Investment Guarantor to satisfy the Minimum Guarantor Financial Requirement.

7.1.17    General Indemnity.

(a)    Borrower shall, at Borrower's sole cost and expense, protect, defend, release, indemnify and hold harmless the Indemnified Parties from any Losses imposed on, incurred by, or asserted against any of the Indemnified Parties, directly or indirectly, in each case, arising out of or in connection with any of the Secured Obligations, the Property (or any portion thereof), any Lien on any portion

of the Property or Collateral, the Mezzanine Loan, the Loan Documents (or any of them), the Senior Loan, the Senior Loan Documents (or any of them), and any and all claims for brokerage, leasing, finders or similar fees that may be made relating to the Property and the Secured Obligations or the Senior Loan, any accident, injury or death of person or loss of or damage to property occurring in respect of the Property, the performance of any labor or services or the furnishing of any materials or other property in respect of the Property, any tax (including any mortgage recording tax) imposed in respect of the Mezzanine Loan or the recording or filing of the Security Instrument or any other Loan Document, any wire fraud or similar fraud in connection with the payment or prepayment of any funds to Lender by wire transfer or other means of payment pursuant to this Agreement or the other Loan Documents, any breach of the terms of Section 7.1.14 hereof, or the exercise by Lender of any rights or remedies granted to Lender pursuant to this Agreement, the other Loan Documents or applicable law; provided, however, that the foregoing shall not apply to any Losses caused solely and directly by the willful misconduct or gross negligence of the Indemnified Parties, as determined by a final decision of a court of competent jurisdiction. THE FOREGOING INDEMNITIES SHALL APPLY TO EACH INDEMNIFIED PARTY WITH RESPECT TO LOSSES THAT IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF THE ORDINARY NEGLIGENCE OF SUCH (AND/OR ANY OTHER) INDEMNIFIED PARTY OR ANY STRICT LIABILITY.

(b)     Upon request, whether Borrower's obligation to indemnify any Indemnified Party arises under this Section 7.1.17 or elsewhere in the Loan Documents, Borrower shall defend the Indemnified Parties (in Borrower's or the Indemnified Parties' names) by attorneys and other professionals approved by the Indemnified Parties.  Notwithstanding the foregoing, the Indemnified Parties may, in their sole discretion, engage their own attorneys and professionals to defend or assist them and, at their option, their attorneys shall control the resolution of any claims or proceedings.  Borrower shall not, without the prior written consent of an Indemnified Party, settle or compromise or consent to the entry of any judgment with respect to any pending or threatened claim, action, suit or proceeding in respect of which indemnification is sought hereunder (whether or not such Indemnified Party is an actual or potential party to such claim or action) unless such settlement, compromise or consent includes an unconditional release of each Indemnified Party from all liability arising out of such claim, action, suit or proceeding.

(c)     Any amounts payable to an Indemnified Party pursuant to this Section 7.1.17 shall be due and payable 5 days after written demand and shall bear interest at the Default Rate from the date of such demand until paid, and shall constitute part of the Secured Obligations.

(d)     The provisions of and undertakings and indemnification set forth in this Section 7.1.17 shall survive the satisfaction and payment of the Secured Obligations and termination of this Agreement.

7.1.18  <u>Title to Collateral</u>.  Borrower shall warrant and defend the validity of the Lien of the Security Instrument against the claims of every Person whomsoever, in accordance with <u>Section 6.2.1</u> and <u>Section 6.3.1</u> and subject to the Liens of the Borrower Rental Agreement, Senior Loan Documents and the Permitted Encumbrances.

7.1.19  <u>IHG License and Property Manager's Hotel Operations</u>.

(a)  Borrower shall cause Owner to cause the Property to be operated in accordance with the IHG License.  Borrower shall cause Owner to timely pay and perform each of its obligations under or in connection with the IHG License, if any, and shall otherwise pay such sums and take such action as shall be necessary or required in order to maintain the IHG License in full force and effect in accordance with its terms.

(b)  Borrower shall cause Owner to cause the Property Manager to manage the Property in an industry standard or better manner consistent with normal reasonable procedures undertaken by similar hospitality projects in the region where the Property is located and, in any event, in a manner consistent with the requirements of the Property Manager pursuant to the Property Management Agreement.  Rates for overnight guests shall be established in a competitive manner taking into account competing facilities with (i) overnight guests subject to standard commercially reasonable registration cards and procedures, and (ii) the use of banquet facilities, meeting rooms or food and beverage service being provided on an arm's length basis in a commercially reasonable manner and in the ordinary course of business.  Borrower shall not (and shall not permit Owner and/or Property Manager to) enter into any bulk room contracts, discount programs or patronage agreements without Lender's prior written consent (and Senior Lender's prior written consent if required under the Senior Loan Documents) unless such programs and agreements are in accordance with industry customs and standards; provided, however, that Hotel Transactions shall not require Lender's and Senior Lender's prior written consent.

(c)  Absent obtaining the prior written consent of Lender (and Senior Lender, if applicable under the Senior Loan Documents), Borrower shall not permit Owner to (i) enter into or allow to be entered into any employment or incentive contract or system which would be binding on subsequent owners of the Property or provide funding to individuals other than industry standard compensation (including incentive compensation) designed to promote increased customer use of the Property; or (ii) enter into or allow to be entered into any plan or agreement under which "fringe benefits" (including, but not limited to, vacation plans or programs, and related or similar dental or medical plans or programs, and related or similar benefits) are provided or denied in any manner which violates in any material respects any applicable laws, rules and regulations relating to the employment of labor, including those relating to wages, hours, collective bargaining or the payment or withholding of taxes or other sums as required by appropriate governmental authorities.

(d)    Borrower shall, within five days following receipt thereof, furnish to Lender copies of any written notices given to Owner by any other party under the IHG License or Property Management Agreement, alleging the default by Owner in the timely payment or performance of its obligations under the IHG License or Property Management Agreement, or purporting to terminate or cancel the IHG License or Property Management Agreement prior to its stated expiration date, or requiring or demanding the expenditure of any sum by Owner (or demanding the taking of any action by Owner), and any subsequent communications related thereto.

(e)    Borrower agrees that, upon the occurrence and during the continuance of an Event of Default, Lender may advance any sum or take any action that Lender reasonably believes is necessary or required to maintain the IHG License or Property Management Agreement in full force and effect, and all such sums advanced by Lender, together with all costs and expenses incurred by Lender in connection with any action taken by Lender pursuant to this Section 7.1.19, shall be due and payable by Borrower to Lender within 10 days following demand thereof, and shall bear interest after such 10 day period until paid at the Default Rate.

7.1.20  Senior Loan Covenants. Borrower shall cause Owner, in a timely manner, subject to any applicable cure periods under the Senior Loan Documents, to observe, perform and fulfill each and every covenant, term and provision of each Senior Loan Document until such time that the Senior Loan has been repaid or the applicable Senior Loan Document has been terminated, unless otherwise consented to in writing by Lender.

7.1.21  Meetings in Texas. As set forth in the ACRON Guaranty, one or more representatives from Borrower and ACRON Guarantors shall participate with Lender in annual (or quarterly) meetings held in the State of Texas to discuss ongoing matters relating to performance of the Property, the Mezzanine Loan and the Loan Documents.

7.2.    Negative Covenants.

From the Effective Date and until payment and performance in full of all obligations of Borrower under the Loan Documents or the earlier release of the Lien of the Security Instrument (and all related obligations) in accordance with the terms of this Agreement and the other Loan Documents, Borrower covenants and agrees with Lender that it will not do, directly or indirectly, any of the following:

7.2.1    Waste and Alterations.  Borrower shall not, and shall not permit Owner to, commit or permit any waste with respect to the Property or the Chattels, or make or permit any change in the use of the Property which shall in any way invalidate or give cause for cancellation of any Required Insurance Policies, or do or permit to be done thereon anything that may in any way materially impair the value of the Property or the security for the Mezzanine Loan.  Without the prior written consent of Lender, Borrower shall not (i) cause or permit any part of the Property, including any building, structure, parking lot, access points, curb cuts, driveway, landscape scheme, timber, or other ground

improvement, to be removed, demolished, or materially altered, or (ii) construct any Improvements on the Property.

7.2.2  <u>Zoning and Private Covenants</u>.  Borrower shall not, and shall not permit Owner to, initiate, join in, or consent to any change in any zoning ordinance or classification, any change in the "zoning lot" or "zoning lots" (or similar zoning unit or units) presently comprising the Property, any transfer of development rights, any private restrictive covenant, or any other public or private restriction limiting or defining the uses that may be made of the Property or any part thereof.  If under applicable zoning provisions the use of all or any part of the Property is or becomes a nonconforming use, Borrower shall not, and shall not permit Owner to, cause such use to be discontinued or abandoned, and Borrower shall cause Owner to use its best efforts to prevent any Tenant under any Lease from discontinuing or abandoning such use.  Borrower shall not, and shall not permit Owner to, establish any condominium or cooperative regime with respect to the Property without the prior written consent of Lender and Senior Lender.

7.2.3  <u>Liens on the Property or other Collateral</u>.

(a)  <u>General Prohibition on Liens</u>.  Borrower shall neither create nor permit, nor allow Owner to create or permit, to exist any direct or indirect Lien against the Collateral or the Property, Chattels, or other Senior Collateral, or any part thereof or direct or indirect interest therein, other than the Liens created by the Loan Documents, the Senior Loan Documents, and the Permitted Encumbrances.  Notwithstanding the immediately preceding sentence, Mechanic's Liens shall be governed by <u>Section 7.2.3(b)</u>.

(b)  <u>Mechanic's Liens</u>.  Borrower shall cause Owner to keep the Property and the Chattels free and clear of all Mechanic's Liens, and Borrower shall cause Owner to cause any recorded statement of any such Mechanic's Lien to be released of record or bonded off not later than the date that is 45 days following the date of the recording thereof.  Notwithstanding the preceding sentence, Borrower shall not be deemed to be in Default under this <u>Section 7.2.3(b)</u> if and so long as Owner (i) contests in good faith the validity or amount of any asserted Lien, (ii) diligently prosecutes or defends an action appropriate to obtain a binding determination of the disputed matter, and (iii) provides Senior Lender with such security as Senior Lender may require to protect Senior Lender against all Losses that Senior Lender might incur if the asserted Mechanic's Lien is determined to be valid (which security may, at the option of Borrower, be in the form of a bond over such Mechanic's Lien, provided that such bond removes any such Mechanic's Lien of record and prevents the filing of or enforcement of any such Mechanic's Lien of record).

7.2.4  <u>Indebtedness</u>.  Borrower shall not incur any Indebtedness other than the Secured Obligations and any Permitted Indebtedness.

7.2.5  <u>Property Record Agreements</u>.  Borrower shall not permit Owner to enter into, amend, supplement, cancel, modify or terminate any Property Record Agreements.

7.2.6   ERISA; Labor Matters.  Borrower shall not, and shall not permit Owner to, (i) become a party to any collective bargaining agreements or similar labor agreements or (ii) permit any portion of the Property to become subject to any collective bargaining agreements or similar labor agreements, except for any Permitted Labor Agreements. Borrower shall not engage in or permit any transaction that would cause the Mezzanine Loan (or the exercise by Lender of any of Lender's rights under the Loan Documents) to be a non-exempt, prohibited transaction under ERISA (including for this purpose the parallel provisions of Section 4975 of the Code), or otherwise result in liability to Lender due to Borrower being deemed in violation of any applicable provisions of ERISA. Borrower shall indemnify, protect, defend, and hold each Indemnified Party harmless from and against any and all Losses (which term shall include, for the purposes of this Section 7.2.6, excise taxes, and attorneys' fees and costs incurred in the investigation, defense, and settlement of claims and in obtaining any individual ERISA exemption or state administrative exception that may be required, in Lender's sole and absolute discretion) that any Indemnified Party may incur, directly or indirectly, as the result of the breach by Borrower of any warranty or representation set forth in Section 6.1.14 or the breach by Borrower of any covenant contained in this Section 7.2.6.  This indemnity shall survive any termination, satisfaction or foreclosure of the Security Instrument or a deed in lieu of such foreclosure and shall not be subject to the limitation on personal liability described in Article 12 or in the other Loan Documents.

7.2.7   Distributions.  Borrower shall not, and shall not permit Owner to, make any distributions of Gross Revenue to any Borrower Owner Person or any of Borrower's Affiliates (including those made for purposes such as the return of such parties' equity in Borrower) (i) during the existence of any Senior Event of Default or Event of Default as defined herein or (ii) in violation of the provisions of the Senior Loan Agreement, any of the other Senior Loan Documents, this Agreement, or any of the other Loan Documents.

7.2.8   Improper Use of Property, Chattels, or other Collateral.  Borrower shall not, and shall not permit Owner to, use (or permit the use of) the Property, the Chattels, or the other Collateral for any purpose or in any manner that violates any Legal Requirements or the requirements or conditions of any Required Insurance Policy.

7.2.9   Name and Business of Borrower; Jurisdiction of Organization.  Borrower shall not, and shall not permit Owner to, (i) make any material change in the scope or nature of the business objectives, purposes or operations of Borrower or Owner, or undertake or participate in activities other than the continuance of the present business of Borrower or Owner, (ii) change the chief executive office or the principal place of business of Borrower or Owner without giving Lender at least 30 days' prior written notice thereof and promptly providing Lender such information as Lender may reasonably request in connection therewith, (iii) change or permit a change of the jurisdiction of organization of Borrower or Owner without first notifying Lender in writing of Borrower's intention to do so and delivering to Lender any financing statement that may be filed in connection with any of the Loan Documents as Lender may require, or (iv) change the name under which Borrower or Owner does business, or adopt or begin doing business under any other name or assumed or trade name, without first notifying Lender of Borrower's or Owner's intention to do so and delivering to Lender such executed modifications or supplements to

this Agreement and/or any of the other Loan Documents (and to any UCC-1 Financing Statement that may be filed in connection with any of the Loan Documents) as Senior Lender or Lender may require.

7.2.10  Use of Proceeds.  Borrower shall not use the proceeds of the Mezzanine Loan or any funds advanced by Lender under the Loan Documents (i) for household or agricultural purposes, (ii) to purchase any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System, (iii) for any purpose that would be inconsistent with such Regulation U or any other regulations of the Board of Governors of the Federal Reserve System, or (iv) for any purpose prohibited by any Legal Requirements.

7.2.11  Assessments against Property.  Other than the Bond pursuant to the Bond Documents, Borrower shall not consent to or take, or refrain from taking, any action that would permit (i) the creation of any so-called special districts, special improvement districts, benefit assessment districts or similar districts, or any other body or entity of any type, or (ii) the occurrence of any other event, that may reasonably be expected to result in the imposition of any additional Property Impositions or other material monetary obligations or burdens on the Property.

7.2.12  Property Management Agreement.  As set forth herein, Borrower shall not permit Owner to modify, amend, supplement, cancel or terminate the Property Management Agreement or enter into any substitute or replacement Property Management Agreement without Lender's and Senior Lender's prior written consent.  Any submission by Borrower or Owner for Lender's and Senior Lender's written consent to a modification, amendment, supplement, cancelation or termination of the Property Management Agreement, or any substitute or replacement Property Management Agreement, shall be accompanied by a copy of such modification, amendment, supplement, cancelation or termination, or such substitute or replacement Property Management Agreement, and a cover letter requesting Lender's and Senior Lender's written consent that contains a signature line upon which Lender and Senior Lender may evidence their consent to such modification, amendment, supplement, cancelation or termination of the Property Management Agreement, or such substitute or replacement Property Management Agreement.  Borrower shall not do, nor neglect to do, nor permit Owner to do or neglect to do, anything that may cause or permit the cancelation or termination of the Property Management Agreement.

7.2.13  IHG License.  Borrower shall not permit Owner to modify, amend, supplement, cancel or terminate the IHG License or enter into any substitute or replacement IHG License without Lender's and Senior Lender's prior written consent.  Any submission by Borrower or Owner for Lender's and Senior Lender's written consent to a modification, amendment, supplement, cancelation or termination of the IHG License, or any substitute or replacement IHG License, shall be accompanied by a copy of such modification, amendment, supplement, cancelation or termination, or such substitute or replacement IHG License, and a cover letter requesting Lender's and Senior Lender's written consent that contains a signature line upon which Lender and Senior Lender may evidence their consent to such modification, amendment, supplement, cancelation or termination of the IHG

License, or such substitute or replacement IHG License. Borrower shall not do, nor neglect to do, nor permit Owner to do or neglect to do, anything that may cause or permit the cancelation or termination of the IHG License.

7.2.14 <u>Bond Documents</u>. Borrower shall not, and shall not permit Owner to, amend, restate, replace, supplement, cancel, terminate or otherwise modify the Bond Documents without the prior written consent of Senior Lender and Lender. Without the prior written consent of Lender and Senior Lender, Borrower shall not, and shall not permit Owner to, fail to exercise any renewal option under the Borrower Rental Agreement.

7.2.15 <u>Combined Loan Amount</u>. The Combined Loan Amount shall not exceed $36,600,000.

7.2.16 <u>Senior Loan Amount</u>. Borrower shall not permit Owner to have the principal sum of the Senior Loan exceed $25,000,000.

7.3. <u>Compliance Certificate</u>. Borrower shall deliver to Lender a compliance certificate on a monthly basis certifying its compliance with the obligations and covenants of this <u>Article 7</u> and other applicable provisions of this Agreement and the other Loan Documents. Guarantor shall deliver to Lender a compliance certificate on a quarterly basis certifying its compliance with the obligations and covenants of this <u>Article 7</u> and other applicable provisions of this Agreement and the other Loan Documents. Each certificate shall be delivered within 15 days of the end of each month or quarter, as applicable.

7.4. <u>Post-Closing Obligations</u>. Borrower shall, at Borrower's sole cost and expense, undertake, perform and complete all of the items set forth on **Schedule 3** within the applicable time periods set forth on **Schedule 3** and shall provide evidence reasonably satisfactory to Lender that such items have been undertaken, performed and completed within such time periods. Without limitation to the foregoing, if any post-closing item set forth in **Schedule 3** is an item that must be obtained by Owner, then Borrower shall cause Owner to use its best efforts in each case to obtain such item by the deadline set forth in **Schedule 3**.

## ARTICLE 8

## TRANSFERS

8.1. <u>Transfer, Encumbrance and Change of Control Prohibition Regarding Owner and Property</u>. Except as provided in this <u>Article 8</u>, without Senior Lender's and Lender's prior written consent, Borrower shall not, and shall not permit Owner to, (i) directly or indirectly sell, assign, convey, transfer or otherwise dispose of the Property or other Collateral or any portion thereof or any direct or indirect legal, beneficial or equitable interest in all or any part of the Property or Senior Collateral, (ii) permit or suffer any owner, directly or indirectly, voluntarily or involuntarily, of any direct or indirect ownership or beneficial interest in Owner, the Property or other Senior Collateral to transfer such interest, whether by transfer of partnership, membership, stock or other beneficial interest in any entity or otherwise, (iii) mortgage, pledge, hypothecate or otherwise permit or suffer to be subject to, or encumbered by, a Lien or grant or permit to be granted a security interest in all or any part of Owner, the Property or other Senior Collateral or

any direct or indirect legal, beneficial or equitable interest therein, (iv) permit or suffer any change of Control of Owner or (v) amend or modify the organizational structure of Owner to split or divide Owner into multiple Persons.

8.2.   <u>Chattel Transfers</u>.   Notwithstanding the provisions of <u>Section 8.1</u>, Borrower shall be permitted to permit Owner to sell, transfer or remove Chattels from the Property in the ordinary course of operation and management of the Property as a prudent owner, operator and manager of properties that are similar to the Property would own, operate, and manage the Property, if (i) such Chattel is contemporaneously replaced with similar items of equal or greater value and of similar utility or (ii) such Chattel is obsolete and has no material value or is non-essential to the use, management, and operation of the Property.

8.3.   <u>Transfer, Encumbrance and Change of Control Prohibition Regarding Collateral and Borrower</u>.   Except as provided in this <u>Article 8</u>, without Lender's prior written consent, Borrower shall not (i) directly or indirectly sell, assign, convey, transfer or otherwise dispose of the Collateral or any portion thereof or any direct or indirect legal, beneficial or equitable interest in all or any part of the Collateral, (ii) permit or suffer any owner, directly or indirectly, voluntarily or involuntarily, of any direct or indirect ownership or beneficial interest in Borrower or Collateral to transfer such interest, whether by transfer of partnership, membership, stock or other beneficial interest in any entity or otherwise, (iii) mortgage, pledge, hypothecate or otherwise permit or suffer to be subject to, or encumbered by, a Lien or grant or permit to be granted a security interest in all or any part of Borrower or the Collateral or any direct or indirect legal, beneficial or equitable interest therein, (iv) permit or suffer any change of Control of Borrower or (v) amend or modify the organizational structure of Borrower to split or divide Borrower into multiple Persons.

8.4.   <u>Permitted Transfers</u>.

8.4.1   <u>Transfers of Direct or Indirect Ownership Interests in Borrower and Owner</u>. Notwithstanding the provisions of <u>Section 8.1</u> and <u>Section 8.3</u>, the following transfers of direct or indirect interests in Borrower or Owner shall be permitted:

(a)   Transfers (other than encumbrances) of direct or indirect ownership interests in Borrower or Owner from an individual to any Family Member or Family Entity of such individual, or to any entity wholly owned (directly or indirectly) by one or more Family Members or Family Entities of such individual and Controlled by a Family Member of such individual, in each case, made for bona fide estate planning purposes (without consideration), provided, however, that each of the Permitted Transfer Conditions shall be satisfied.

(b)   Transfers (other than encumbrances) of direct or indirect ownership interests in Borrower or Owner from an individual to any Family Member or Family Entity of such individual, or to any entity wholly owned (directly or indirectly) by one or more Family Members or Family Entities of such individual and Controlled by a Family Member of such individual, in each case, made by operation of law or testate succession (without consideration) upon the death of a Family Member, provided, however, that each of the Permitted Transfer Conditions in <u>Section 8.4.2(b)</u> and in <u>Sections 8.4.2(e)</u> through <u>(l)</u> shall be satisfied.

(c)      Transfers (other than encumbrances) of indirect interests in Borrower, provided, however, that each of the Permitted Transfer Conditions shall be satisfied.

8.4.2   Permitted Transfer Conditions. "**Permitted Transfer Conditions**" means, collectively, each of the following conditions:

(a)      Such transfer shall not result in any breach or violation of the IHG License or render any provision of the IHG Comfort Letter (Mezz Loan) or IHG Comfort Letter (Senior Loan) null and void.

(b)      Immediately following the consummation of any such transfer, (i) Partnership Guarantor, and ACRON US Management Inc., a Nevada corporation, continue to Control Borrower and (ii) ACRON AG Guarantor continues to own not less than 51% of the direct or indirect ownership interests in Borrower.

(c)      No Default or Event of Default exists as of the date of the Permitted Transfer Notice (as defined below) or as of the date of such transfer.

(d)      Not less than 30 days prior to the consummation of any such transfer, Borrower shall (i) deliver to Lender written notice of the proposed transfer (the "**Permitted Transfer Notice**"), together with Organizational Charts that (a) illustrate the ownership structure of Borrower, Owner and Guarantor both before and after the consummation of the proposed transfer and (b) specifically identify and highlight any Person that would, as a result of the proposed transfer, hold 20% or more of the direct or indirect interests in Borrower, Owner or Guarantor if such Person held less than 20% of such interests prior to giving effect to the proposed transfer (any such Person, a "**New Borrower Party**"), in which case Borrower shall provide Lender with such additional information as may be reasonably requested by Lender in order for Lender to determine that the condition set forth in Section 8.4.2(f) has been satisfied), (ii) deposit with Lender an amount equal to Lender's estimate of all out-of-pocket costs and expenses (including attorneys' fees and costs) that Lender will incur in connection with its review, processing and documentation of such proposed transfer (the "**Permitted Transfer Deposit**"), which Permitted Transfer Deposit may be applied by Lender to such costs and expenses whether or not such transfer is actually consummated, and (iii) pay an administrative review fee equal to $5,000 to Lender.

(e)      At the time of such transfer, Borrower shall pay or reimburse Lender for all of the actual, out-of-pocket costs, fees and expenses incurred by Lender in respect of any such transfer (including all actual, out-of-pocket legal, processing, accounting, insurance and Appraisal fees and costs), as follows: (i) Lender shall apply any Permitted Transfer Deposit to the payment of such costs, fees, and expenses; (ii) if the amount of such costs, fees, and expenses exceeds any such Permitted Transfer Deposit, then Borrower shall pay such excess amount to Lender; and (iii) if the amount of any such Permitted Transfer Deposit exceeds such costs, fees, and expenses, then Lender shall return such excess amount to Borrower.

(f)    Any Person to whom or to which any such direct or indirect ownership interest is transferred shall comply with the requirements of Borrower and the Borrower Owner Persons as set forth in <u>Section 7.1.14</u> and if Lender requests, the proposed transferees and the constituent members and other owners of such transferees shall execute a certificate in form and substance reasonably satisfactory to Lender confirming such compliance and identifying the transferees with sufficient information to enable Lender to perform searches confirming compliance with <u>Section 7.1.14</u>, except that identifying information need not be provided for any transfers made in the ordinary course of business over a national securities exchange located in the United States of America.

(g)    Intentionally Omitted.

(h)    No Person to whom such direct or indirect ownership interest is transferred shall have (i) been convicted, indicted, or otherwise charged with a criminal act that would constitute a felony under the laws of the United States of America, including the laws of the various States and territories thereof, (ii) been a party to a bankruptcy, insolvency or other similar proceeding as a debtor, whether under the Bankruptcy Laws of the United States of America, or any State or other territory thereof, or any other country or jurisdiction, (iii) had a receiver, trustee, or liquidator appointed with respect to its property or any portion thereof, or (iv) any outstanding and unpaid judgements that would be a breach of any of the terms and provisions of any of the Loan Documents.

(i)    Such transfer shall not have a Material Adverse Effect on Lender's security under the Loan Documents, including the obligations of Borrower under this Agreement, the Bond Documents, and the Security Instrument and the obligations of ACRON Guarantors and TH Investment Guarantor under the ACRON Guaranty and TH Investment Guaranty, as applicable, and the Environmental Indemnity Agreement.

(j)    Such transfer could not subject Lender or any of Lender's Affiliates to any civil or criminal penalties in any jurisdiction or otherwise constitute an unlawful act, offence or crime by Lender or any of Lender's Affiliates, including under any Executive Order or any statutes, laws or regulations referred to in the definition of "Prohibited Person", and no transfer may cause Lender to be in violation of any law or regulation, including any law or regulation relating to lending limits or concentrations and Borrower shall provide to Lender such information regarding any such transfer as is necessary for Lender to comply with regulatory requirements applicable to Lender.

(k)    Immediately following the consummation of such transfer, all of the representations and warranties set forth in <u>Section 6.2</u> and <u>Section 6.3</u>, as modified by the consummation of such transfer, shall remain true, complete and correct, except solely to reflect the changes resulting from such transfer.

(l)      Not later than 10 days following any such transfer, Borrower shall provide Lender with (i) evidence reasonably satisfactory to Lender that all of the required Permitted Transfer Conditions have been satisfied with respect to such transfer and (ii) a certificate signed by Borrower and each Guarantor that (a) certifies to Lender that all of the required Permitted Transfer Conditions have been satisfied with respect to such transfer, and (b) attaches (1) a final Organizational Chart confirming the new ownership structure of Borrower or Owner and highlighting each New Borrower Party (certified as being true, complete and correct by Borrower and each Guarantor), (2) a copy of the documents effectuating the transfer and a copy of the organizational documents of the entities affected by such transfer, as amended (certified as being true, complete and correct by Borrower and Guarantor), and (3) any other information that Lender may reasonably request.

(m)      Such transfer shall not result in any breach or violation of any transfer restrictions under the Senior Loan Agreement or other Senior Loan Documents.

8.4.3   Lender's Costs.  If any proposed transfer is not consummated on or prior to the date set forth in the applicable Permitted Transfer Notice, then (notwithstanding that such proposed transfer was not timely consummated) (i) Lender may apply the Permitted Transfer Deposit to the payment of all of the actual, out-of-pocket costs, fees and expenses incurred by Lender in respect of such proposed transfer, including actual, out-of-pocket attorneys' fees incurred by Lender, and (ii) if the amount of such costs, fees, and expenses exceeds the Permitted Transfer Deposit, then Borrower shall pay such excess amount to Lender not later than 10 days following written demand therefor.

8.5.   Permitted Indebtedness.

8.5.1   Trade Payables; Permitted Equipment Financing.   Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, subject to the satisfaction of each of the conditions set forth in Section 8.5.2, Borrower may permit Owner to incur the following Indebtedness without the consent of Lender:  (i) unsecured indebtedness in respect of trade payables incurred in the ordinary course of business relating to the ownership, maintenance and operation of the Property ("**Permitted Trade Payables**"); and (ii) equipment financing entered into in the ordinary course of Owner's business for non-fixture equipment related to the ownership, maintenance and operation of the Property ("**Permitted Equipment Financing**").

8.5.2   Permitted Indebtedness Conditions.  Borrower may permit Owner to incur Permitted Trade Payables and Permitted Equipment Financing only if each of the following conditions is satisfied:  (i) the maximum aggregate amount of Permitted Trade Payables and Permitted Equipment Financing outstanding at any one time shall not exceed, in the aggregate, 2.0% of the Combined Loan Amount (including any then-outstanding senior loan); (ii) Borrower shall be responsible for any closing costs in connection with any Permitted Trade Payables or Permitted Equipment Financing, including the legal, appraisal, engineering and environmental, title and escrow costs of Lender and the lender

or other party providing any Permitted Trade Payables or Permitted Equipment Financing; (iii) any interest rate payable under, and each of the other terms and provisions of, any Permitted Trade Payables or any Permitted Equipment Financing shall be on arms'-length, market rate terms, but in no event with a financing term in excess of 60 days; (iv) the Permitted Equipment Financing shall be either (a) unsecured or (b) secured solely by security interests that encumber only equipment located at the Property that does not constitute or become a "fixture", and whose removal would not be overly burdensome or damage or impair the operation or value of the Property; provided, however, that in no event shall any Permitted Equipment Financing be secured by any fixtures or structural components or mechanical or other operating systems of the Improvements (including elevators, electrical systems and components, plumbing systems and components and lighting systems and components); and (v) not less than 10 Business Days prior to the funding of any Permitted Trade Payables or Permitted Equipment Financing, Borrower shall provide Lender with a copy of any loan documents or other transaction documents to be executed or delivered in connection therewith, and Borrower shall provide Lender with written evidence satisfactory to Lender that such Permitted Trade Payables or Permitted Equipment Financing complies with the foregoing restrictions.

       8.5.3   <u>Permitted Subordinated Member Loans</u>. Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, Borrower may permit certain of its Affiliates to incur Indebtedness relating to subordinated member loans that are above the Borrower entity ("**Permitted Subordinated Member Loans**") subject to the satisfaction of each of the following conditions:  (i) Borrower shall be responsible for any closing costs in connection with any Permitted Subordinated Member Loans, including the legal, appraisal, engineering and environmental, title and escrow costs of Lender and the lender or other party providing any Permitted Subordinated Member Loans; (ii) not less than 15 Business Days prior to the funding of any Permitted Subordinated Member Loans, Borrower shall provide Lender with a copy of any loan documents or other transaction documents to be executed or delivered in connection therewith, (iii) the Permitted Subordinated Member Loans do not impact Lender's UCC interests in the Owner and/or Borrower; (iv) the terms of the Permitted Subordinated Member Loans do not create a potential maturity default during the Mezzanine Loan term, (v) Lender's acceptance of any Permitted Subordinated Member Loans is subject to Lender's review of Borrower's partnership loan documents to confirm that Lender's Collateral is not impacted, and (vi) Borrower shall provide Lender with written evidence satisfactory to Lender that such Permitted Subordinated Member Loans comply with the foregoing restrictions.

       8.6.   <u>Immediate Event of Default</u>.  The violation of any provision of this <u>Article 8</u> shall constitute an Event of Default under this Agreement and the other Loan Documents, whether or not Borrower or Lender has received notice thereof or has knowledge of the occurrence thereof.

## ARTICLE 9

## INSURANCE

       Borrower shall cause Owner to obtain and keep in full force and with respect to the Property, for the mutual benefit of Borrower and Lender, at all times, the following policies of

insurance from insurer(s) with a claims-paying ability rated "A-" or better by A.M. Best or its equivalent by Standard and Poor's Rating Services and/or as Lender may further specify from time to time in a letter or other written communication from Lender to Borrower referencing this Article 9.

9.1.    Property and Related Insurance.

9.1.1    Property Insurance.  Borrower shall cause Owner to insure the Property for the benefit of Owner, Borrower, Senior Lender and Lender on a Full Replacement Cost basis on a Special or "All Risk" policy form.  The Required Insurance Policy providing such insurance shall (i) not be subject to coinsurance (ii) provide that the release of the insurance proceeds to Senior Lender and Lender, as applicable, after a loss shall not be contingent upon the construction of any Improvements, (iii) provide that Owner shall not be unreasonably restricted from applying such proceeds to the building of the Improvements at such other location as Owner and/or Senior Lender and Lender shall elect and (iv) provide ordinance or law coverage, including demolition and increased cost of construction coverage.  The insurance coverages required under Section 9.1.2, Section 9.1.3, Section 9.1.4, Section 9.1.5 and Section 9.1.6 may be provided under the Required Insurance Policy obtained pursuant to this Section 9.1.1.

9.1.2    Rental Loss/Business Interruption.  Borrower shall cause Owner to maintain loss of rental income or business interruption insurance (i) on an actual loss sustained basis or as sufficient to prevent Senior Lender or Lender from being a co-insurer under the terms of such insurance policy, (ii) covering all risks required to be covered by the insurance provided for herein, including, but not limited to, Earthquake (Section 9.1.6), Boiler and Machinery (Section 9.1.3), Builder's Risk for restoration (Section 9.1.4), and Terrorism (Property) (Section 9.1.8), (iii) in an amount not less than the projected Gross Revenue for the longer of (a) eighteen (18) months (covering the 18-month period from the date of any casualty or damage with respect to the Property) or (b) the period continuing until the restoration of the Property is completed and/or the period of time it would take to rebuild the Property, if available, (iv) containing an extended period of indemnity endorsement covering the 12-month period commencing on the date on which the Property has been restored, repaired, or replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period, and (v) including coverage for extra expense.  The amount of such insurance shall be increased from time to time as and when the Gross Revenue from the Property increases.

9.1.3    Boiler and Machinery.  Borrower shall cause Owner to maintain boiler and machinery insurance covering physical damage to the Property and to the major components of any central heating, air conditioning or ventilation systems, and such other equipment as Senior Lender and/or Lender may require.  Such insurance shall include coverage for business interruption due to mechanical equipment malfunctions, including expediting and extra expense, in an amount usual and customary for similar risks, as determined by Senior Lender and/or Lender.

9.1.4    Builder's Risk.  During the period of any construction, demolition, repair, renovation, restoration or replacement of any of the Improvements or portion thereof,

Borrower shall cause Owner to obtain and maintain a builder's risk policy, on an "All Risk" basis, in an amount equal to the Full Replacement Cost of the completed work.

9.1.5    <u>Flood</u>.  If at any time the Property is located in an area that has been identified by the Federal Insurance Administration, HUD, FEMA or another Governmental Authority as being high hazard for flood and/or mudslides, and the sale of flood insurance for such area has been made available under the National Flood Insurance Act of 1968, then (i) Borrower shall cause Owner to purchase and maintain a flood insurance policy satisfactory to Senior Lender and Lender and (ii) Borrower shall cause Owner to deliver to Senior Lender and Lender on or prior to the Closing Date (if applicable) and thereafter within ten (10) days following Senior Lender's and/or Lender's request, a certificate or letter in a form satisfactory to Senior Lender and Lender stating that the Property is insured for losses arising out of floods or mudslides.

9.1.6    <u>Earthquake</u>.  If the Property is located in an area identified by any governmental, engineering or any hazard underwriting agencies as being subject to the peril of earthquake, with a scenario expected loss (SEL) over a 475 year return event exceeding 20%, then Borrower shall cause Owner to maintain earthquake insurance for the Full Replacement Cost.

9.1.7    <u>Pollution/Environmental</u>. Borrower shall cause Owner to purchase and maintain pollution/environmental insurance if Senior Lender or Lender reasonably determines (based on any potential pollution conditions on the Property) that such insurance is necessary, in such form and amounts as Senior Lender or Lender determines and (if applicable) in accordance with the provisions of the Environmental Indemnity Agreement.

9.1.8    <u>Terrorism (Property)</u>.  Borrower shall cause Owner to maintain coverage for property loss arising out of acts of terrorism in amounts, for such periods, and in such form, as reasonably approved by Senior Lender and Lender.  Without limiting the foregoing, such coverage may be provided (i) under the Property insurance policy required under <u>Section 9.1.1</u> as an individual sub-limit of coverage, (ii) by electing coverage under the Terrorism Risk Insurance Program Reauthorization Act of 2015 and subsequent renewals thereof or (c) if Owner's Property insurance policy does not cover terrorism, under a stand-alone policy containing coverage with substantially similar coverage as provided under the Terrorism Risk Insurance Program Reauthorization Act of 2015.

9.2.    <u>Liability Insurance</u>.

9.2.1    <u>General Liability Insurance</u>.  Borrower shall cause Owner to obtain and maintain commercial general liability insurance on the broadest forms available, written on an "occurrence" basis, against all claims for bodily injury, disease or death, property damage, personal injury, contractual liability and similar risks to third parties in an amount not less than (i) One Million Dollars ($1,000,000) per occurrence and (ii) Two Million Dollars ($2,000,000) in the aggregate. If Beer/Liquor/Wine is sold or served at the Property, Liquor Liability of $1,000,000 per occurrence is required. Liquor liability shall be covered on the Umbrella/Excess liability with no additional limitations.

9.2.2   Commercial General Liability Insurance for Construction.   During any period of construction, repair, restoration, renovation or replacement of Improvements, Borrower shall cause Owner to cause any general contractor or construction manager to maintain commercial general liability insurance, including coverage for products and completed operations, with limits of not less than One Million Dollars ($1,000,000) per occurrence and Two Million Dollars ($2,000,000) in the aggregate.   Borrower shall also cause the general contractor or construction manager to require any and all of its subcontractors of any tier to provide a certificate of insurance evidencing commercial general liability insurance (including products and completed operations), with a limit of not less than One Million Dollars ($1,000,000) per occurrence, and upon demand by Senior Lender and/or Lender, provide evidence that is reasonably satisfactory to Senior Lender and Lender that Borrower has complied with this requirement.   Borrower shall cause Owner to cause the general contractors, construction managers and subcontractors to include Owner, Senior Lender, and Lender as additional insureds on all of their insurance policies required pursuant to this Agreement.

9.2.3   Insurance for Independent Vendors.   Borrower shall cause Owner to require vendors that will operate independently or perform services for (or on behalf of) Owner on or in connection with the Property to maintain commercial general liability insurance (including products and completed operations) with limits of not less than One Million Dollars ($1,000,000) per occurrence.

9.2.4   Workers' Compensation and Employer's Liability Insurance.   Borrower shall cause Owner to maintain workers' compensation and employer's liability insurance (or insurance equivalents thereto) for all of Owner's employees, and Borrower shall cause Owner to cause any and all of Owner's engineers, contractors, subcontractors (of any tier), Property Managers, agents, vendors and similar entities to maintain similar insurance for all their respective employees, in such amounts and to the fullest extent (i) required under applicable Legal Requirements or (ii) otherwise required by Senior Lender and/or Lender. Upon demand by Senior Lender and/or Lender, Borrower shall cause Owner to provide evidence reasonably satisfactory to Senior Lender and Lender that all of Owner's agents, contractors, subcontractors (of any tier), Property Managers, vendors, and similar entities are in full compliance with the aforementioned requirements.

9.2.5   Excess/Umbrella Liability Insurance.   Borrower shall cause Owner to obtain and maintain umbrella/excess liability insurance providing coverage in excess of the insurance required pursuant to Section 9.2.1, Section 9.2.2, Section 9.2.3 and Section 9.2.4. Such insurance shall be written on an "occurrence" basis with limits of no less than Twenty-Five Million ($25,000,000) per occurrence and Twenty-Five Million ($25,000,000) in the aggregate (and, if written on a blanket policy, such umbrella/excess liability insurance shall contain a per location aggregate limit).  If Beer/Liquor/Wine is sold or served at the Property, Liquor Liability shall be covered on the Umbrella/Excess liability with no additional limitations.

9.3.   Other Insurance Coverage.   The types and limits of insurance coverage stipulated in this Article 9 represent the minimum insurance requirements to be satisfied by Borrower (through Owner).   Senior Lender and/or Lender may make any changes to these minimum

requirements as Senior Lender and/or Lender reasonably deems necessary or appropriate. In addition to the requirements set forth herein, Borrower shall also cause Owner to maintain (i) all insurance, surety and fidelity bonds that Owner is required to maintain as landlord under any Leases and (ii) any other insurance and bonds in amounts, and for such periods that are deemed to be prudent, or are customarily maintained by Persons operating properties of type, construction and occupancy similar to the Property in the locality of the Property.

9.4.    <u>Other Requirements With Respect to Insurance</u>.

9.4.1    <u>Insurance Companies</u>. All Required Insurance Policies herein shall be issued by insurance companies (i) reasonably approved by Lender, (ii) with a rating of at least " A- " or better by A.M. Best or its equivalent by Standard and Poor's Rating Services and (iii) of recognized good standing and licensed to do business in the state or jurisdiction in which the Property is located (each, an "**Approved Insurer**").

9.4.2    <u>Deductibles</u>. No policy shall have a deductible exceeding Ten Thousand Dollars ($10,000) for any one occurrence, except (x) in the case of water damage which shall have deductibles not in excess of $15,000 per occurrence and (y) in the case of wind/hail which shall have deductibles not in excess of $25,000 per occurrence, unless (i) Senior Lender and Lender approves a higher deductible, (ii) a higher deductible is required under applicable Legal Requirements, or (iii) a higher deductible is required by insurers for specific catastrophic perils, such as earthquake, flood and named windstorm which shall not exceed $50,000 for earthquake and flood and 2% for Named Storm (and evidence of such mandatory or insurer-specific requirements is satisfactorily provided to Senior Lender and Lender by Owner).

9.4.3    <u>Automatic Reinstatement; Blanket Policies; Joint Loss Agreement</u>. Notwithstanding anything contained in this <u>Article 9</u>, if any of the insurance required of Borrower or other Persons under this Agreement is included under one or more blanket policies carried by Borrower or such other Person, then such policies shall include warranties of the right to reinstate coverage and policy limits of not less than the amount specified in the applicable subsection hereof, if any. Senior Lender and/or Lender may determine, in its own reasonable discretion, whether such blanket policies provide sufficient limits of insurance. Coverage under blanket policies may be extended by endorsements, provided that the insurer providing such blanket policy is an Approved Insurer. Unless the insurance required pursuant to <u>Section 9.1</u> is provided on a single policy, a Joint Loss Agreement between each of the separate policies must be executed and delivered to Senior Lender and Lender.

9.4.4    <u>Evidence of Insurance</u>. Borrower represents and warrants to Lender that Borrower has delivered, or has caused Owner to deliver, to Senior Lender and Lender true, correct and complete copies of all of the Required Insurance Policies, evidencing that all coverage required under this Agreement is in full force and effect. At least ten (10) Business Days prior to the expiration date of any Required Insurance Policy, Borrower shall deliver, or shall cause Owner to deliver, to Servicer and Lender a certified copy of the applicable renewal policy, or detailed binder or endorsement or certificate in form and content satisfactory to Senior Lender and Lender. Whenever a certificate of insurance is

issued in connection with any Required Insurance Policy, such certificate shall, at the minimum: (i) be on an Accord 28 form for Property insurance and an Accord 25 form for liability insurance, (ii) indicate Owner as the named insured; (iii) indicate the required limits of insurance for property and liability; (iv) indicate the Property as a covered location; (v) specify Senior Lender and Lender as a "mortgagee" and "lender loss payee" (on Property insurance certificates) and an additional insured (on liability insurance certificates); (vi) show Senior Lender and Lender as the "Certificate Holder" c/o: Servicer (with Servicer's address); (vii) indicate policy numbers and policy term dates; (viii) identify the insurance companies responsible for each type of coverage; and (ix) bear a duly authorized signature.

9.4.5   Other Contents of Required Insurance Policies.  Each of the Required Insurance Policies shall (i) contain a standard waiver of subrogation provision benefiting Senior Lender and Lender, (ii) explicitly specify the Property as an insured location, (iii) provide that the insurance coverage in effect at any time under each such Required Insurance Policy is not contributory, participating with, or excess coverage over any other insurance policy (unless such other insurance policy is a Required Insurance Policy), and (iv) include a standard non-contributing, non-reporting mortgagee/lender loss payee clause (or its equivalent satisfactory to Senior Lender and Lender) on such Required Insurance Policy, (a) naming Senior Lender and Lender as "First Mortgagee and Lender Loss Payee" entitled to collect, directly from the insurers, any proceeds payable under such policy, as Senior Lender's and Lender's interests may appear in such policy and (b) stipulating that Senior Lender's and Lender's entitlement to so collect directly from the insurer will in no way be adversely affected by any act, error or omission of Owner that may otherwise void any or all coverage provided under such policy.  Senior Lender and/or Lender may require a "cut-through" clause in any Required Insurance Policy at any time, should Senior Lender and/or Lender determine that the insurer's actual or projected solvency jeopardizes the interest of Senior Lender or Lender as a mortgagee or lender loss payee or additional insured.

9.4.6   Cancellation; Replacement.  Borrower shall cause Owner to immediately notify Senior Lender and Lender of any cancellation of, non-renewal of, or any other material change that may adversely affect any Required Insurance Policy or coverage in effect under such Required Insurance Policy.  Each Required Insurance Policy shall contain a provision that (i) requires the insurer under such Required Insurance Policy to give Senior Lender and Lender at least thirty (30) days prior written notice of such insurer's intent to cancel, or make a change to, such Required Insurance Policy and (ii) specifies that any loss otherwise payable to Senior Lender and/or Lender under such Required Insurance Policy shall be paid, notwithstanding any act or negligence of Senior Lender, Lender, or Owner that might, absent of such provision, result in a forfeiture of all or part of such insurance payment.  Borrower shall not, nor shall Borrower permit Owner to, replace any Required Insurance Policy without Senior Lender's and Lender's prior written consent.

9.4.7   Separate Insurance.  Borrower shall not, nor shall Borrower permit Owner to, without Senior Lender's and Lender's express written prior consent, purchase any separate insurance concurrent in form or contributing, in the event of loss, with the Required Insurance Policies hereunder.

9.4.8   Contravention of Insurance. Borrower shall not intentionally do, or allow or permit to be done, anything on or with respect to the Property that may in any way affect, impair or contravene any insurance policies then in effect for the Property or any part thereof. Further, Borrower at Borrower's sole cost and expense, shall cause Owner to comply and cause compliance of the Property, and the operations, maintenance and use thereof, with all insurance requirements set forth in this Article 9 and with all Required Insurance Policies, whether or not such compliance shall require structural changes in, or interfere with the use and enjoyment of the Property, or any part thereof.

9.4.9   Payment of Premium; Failure of the Borrower to Effect Insurance. Borrower shall cause Owner to (i) pay, before delinquency and before the imposition of any penalty or interest, any and all premiums for all Required Insurance Policies annually (and Borrower shall not permit Owner to finance or pay any such premiums in installments), and (ii) deliver to Senior Lender and Lender, without notice or demand, satisfactory evidence of the payment of the premiums of all such insurance not later than the date that is ten (10) days following the date that any such payment is made. Notwithstanding the foregoing, so long as Borrower has caused Owner to deposit funds with Senior Lender or Borrower has deposited funds with Lender pursuant to Section 4.2 for the payment of insurance premiums for all of the Required Insurance Policies, then Borrower shall not be obligated to cause Owner to pay such insurance premiums or provide such written evidence of payment pursuant to this Section 9.4.9. If Borrower fails to cause Owner to effect, maintain or renew any of the Required Insurance Policies as stipulated in this Agreement or fails to pay the premiums thereof (or fails to deliver to Senior Lender or Lender any evidence of the Required Insurance Policies), then Lender may procure replacement insurance to implement or replace, as the case may be, the coverage to be provided by the Required Insurance Policies. Any sums expended by Lender to procure such replacement insurance shall be due and payable by Borrower to Lender not later than five (5) days following Lender's demand therefor, shall bear interest at the Default Rate from the date such sums are advanced by Lender until the date such sums (together with the applicable interest thereon at the Default Rate) are paid by Borrower to Lender, and shall be part of the Secured Obligations; provided that Borrower agrees that procurement by Lender of any such insurance shall not be deemed to waive or release any Event of Default, or the right of Lender, at Lender's option, to exercise the remedies set forth in the Loan Documents with respect to any Event of Default. Lender shall not be responsible for obtaining or maintaining any insurance required hereunder and shall not, by reason of accepting, rejecting, approving or obtaining any such insurance, incur any liability for the existence, nonexistence of, or insufficient coverage; or from legal liability arising therefrom.

9.4.10  Successor's Rights. Any Person that acquires title to the Property, the Chattels, or the other Senior Collateral upon foreclosure or deed or assignment-in-lieu of foreclosure will succeed to all of Owner's rights under all policies of insurance maintained pursuant to this Article 9.

9.4.11  Notice of Changes. Upon a change in ownership, use or occupancy of the Property, Borrower shall promptly notify Lender and all other Persons insured under the Required Insurance Policies of such change in writing; provided, that nothing in this

Section 9.4.11 shall be construed to permit such change in ownership, use or occupancy of the Property. With the exception of Workers' Compensation, all Required Insurance Policies will allow, but not obligate, Senior Lender to participate in the adjustment and settlement process of all claims expected to exceed One Hundred Thousand Dollars ($100,000).

9.4.12 <u>Leases</u>. Borrower shall comply with the terms of <u>Section 7.1.13(f)</u>.

## ARTICLE 10

## EVENTS OF DEFAULT; REMEDIES

10.1. <u>Event of Default</u>. The occurrence of one or more of the following events shall be an "**Event of Default**" hereunder and under each of the other Loan Documents:

10.1.1 <u>Failure to Pay Scheduled Amounts</u>. Borrower fails to pay when due any Loan Debt Service Payments or other amount in a sum certain under this Agreement (including under Article 2) or under any of the other Loan Documents for which sum there is a scheduled date for payment or for which there is a date certain for payment (including the payment of all outstanding Secured Obligations on the Maturity Date).

10.1.2 <u>Failure to Pay Other Amounts</u>. Borrower fails to pay any amount due under the Loan Documents, other than any amount described in <u>Section 10.1.1</u>, on or prior to the date that is 5 Business Days following written demand by Lender.

10.1.3 <u>Violation of Certain Covenants</u>.

A. The occurrence of any violation of any covenant contained in <u>Section 7.1.12</u>, <u>Section 7.1.13</u>, <u>Section 7.1.14</u>, <u>Section 7.1.15</u>, <u>Section 7.1.16</u>, <u>Section 7.1.19</u>, <u>Section 7.2.3</u>, <u>Section 7.2.4</u>, <u>Section 7.2.5</u>, <u>Section 7.2.6</u>, <u>Section 7.2.7</u>, <u>Section 7.2.12</u>, <u>Section 7.2.13</u>, <u>Article 8</u>, or <u>Section 11.17</u>.

B. The occurrence of any violation of the covenant contained in <u>Section 11.15.1</u> and such violation continues for a period of 5 Business Days following written demand by Lender.

10.1.4 <u>Other Obligations</u>. Borrower and/or Guarantor fails to perform any of the obligations contained in this Agreement or any of the other Loan Documents to which Borrower and/or Guarantor is a party (other than any obligation that is covered by any other provision in this <u>Section 10.1</u>), and such failure continues for a period of 30 days following written notice thereof from Lender to Borrower and/or Guarantor; provided, however, that if such failure is not curable within such 30 day period, then, so long as Borrower and/or Guarantor commences to cure such failure within such 30 day period and is continually and diligently attempting to cure such failure to completion, then such failure shall not be an Event of Default unless such failure remains uncured for 90 days after such written notice to Borrower and/or Guarantor. For the avoidance of doubt, the cure periods set forth in this <u>Section 10.1.4</u> shall not be applicable to the Events of Default described in the other subsections of this <u>Section 10.1</u>.

10.1.5 <u>Levy Against Property</u>. The levy against any of the Collateral of any execution, attachment, sequestration or other writ that shall remain unvacated, or not set aside, or unstayed, for 30 days.

10.1.6 <u>Liquidation; Division</u>. The liquidation, termination or dissolution of any Borrower Control Person, or division of any Borrower Control Person into multiple entities or series pursuant to Section 18-217 of the Delaware Limited Liability Company Act (or similar provision under the law of the applicable Person's state of formation) or otherwise.

10.1.7 <u>Appointment of Receiver</u>. The appointment of a trustee, receiver or liquidator for the assets, or any part thereof, of any Borrower Control Person, other than by the request of Lender.

10.1.8 <u>Assignments</u>. Any Borrower Control Person makes a transfer in fraud of creditors or makes an assignment for the benefit of creditors.

10.1.9 <u>Order for Relief</u>. The entry in bankruptcy of an order for relief for or against any Borrower Control Person.

10.1.10 <u>Bankruptcy</u>. The filing of any petition (or answer admitting the material allegations of any petition), or other pleading, seeking entry of an order for relief for or against any Borrower Control Person as a debtor or bankrupt or seeking an adjustment of any of such parties' debts, or any other relief under any Bankruptcy Law, including a petition or answer seeking reorganization or admitting the material allegations of a petition filed against any such party in any bankruptcy or reorganization proceeding, or the act of any of such parties in instituting or voluntarily being or becoming a party to any other judicial proceedings intended to effect a discharge of the debts of any such parties, in whole or in part, or a postponement of the maturity or the collection thereof, or a suspension of any of the rights or powers of a trustee or of any of the rights or powers granted to Lender herein or in any other Loan Document, and any such petition, if involuntary, is not dismissed within 60 days following the filing thereof.

10.1.11 <u>Admission Regarding Debt</u>. Any Borrower Control Person admits in writing any such Borrower Control Person's inability to pay such Borrower Control Person's debts as they become due (other than to Lender).

10.1.12 <u>Misrepresentation</u>. Any representation, warranty or certification made by any Borrower Control Person herein, or in any of the other Loan Documents or any certificate delivered to Lender under or in connection with any of the Loan Documents, is false, misleading or erroneous in any material respect at the time when made.

10.1.13 <u>Judgments</u>. Any failure (i) of Borrower or Owner to pay any money judgment in excess of $50,000 against such Person, or (ii) of Guarantor to pay any money judgment in excess of $300,000 against Guarantor, in either case, before the expiration of 30 days after such judgment becomes final and no longer appealable.

10.1.14 <u>Assertion of Priority</u>. Any assertion of any claim of priority over the Security Instrument, by title, Lien, or otherwise.

10.1.15 <u>Other Loan Documents</u>.  The occurrence of any event or circumstance defined as or deemed to be an "Event of Default" under this Agreement or any other Loan Document.

10.1.16 <u>Other Liens</u>.  The occurrence of any default after the lapse of any applicable grace or cure period, or the occurrence of any event or circumstance defined as an "Event of Default" under any consensual Lien encumbering the Collateral or the Property or any part thereof or interest therein, or any document or instrument evidencing obligations secured thereby; provided, however, that nothing in this <u>Section 10.1.16</u> shall be deemed to permit any such consensual Lien to be executed by Borrower or any other Person in contravention of any other express provision under this Agreement or any other Loan Document.

10.1.17 <u>Other Indebtedness</u>.  The occurrence of any default after the lapse of any applicable grace or cure period, or the occurrence of any event or circumstance defined as an "Event of Default" under any Indebtedness incurred or owing by Borrower or Owner, or any document or instrument evidencing any obligation to pay such Indebtedness; provided, however, that nothing in this <u>Section 10.1.17</u> shall be deemed to permit Borrower to incur such Indebtedness.

10.1.18 <u>Injunction</u>.  Any order or decree is entered by any court of competent jurisdiction (i) enjoining the rental of any space at the Property or (ii) enjoining or prohibiting Borrower or Guarantor, from substantially performing any of its respective obligations under this Agreement or any other Loan Document and such order or decree is not stayed or vacated, or the proceedings out of which such order or decree arose are not dismissed, within 45 days after the granting of such decree or order.

10.1.19 <u>Validity of Loan Documents</u>.  Any Borrower Control Person shall purport to, terminate, revoke, repudiate, declare voidable or void or otherwise contest the validity or enforceability of any of the Loan Documents or any provision thereof or any of the obligations of any Borrower Control Person under any Loan Document.

10.1.20 <u>Cash Management; Accounts</u>.  Owner spends or uses any funds disbursed to Owner from any accounts in violation of the terms and conditions of the Senior Loan Documents, this Agreement and any other Loan Documents.

10.1.21 <u>Financial Statements</u>.  Borrower fails to comply with any of the terms of <u>Section 7.1.6</u>, and such failure continues for a period of 10 Business Days following written notice thereof from Lender to Borrower.

10.1.22 <u>Property Management Agreement</u>.  The occurrence of any default by Owner after the lapse of any applicable notice or grace period or the occurrence of any event or circumstance defined as or deemed to be an "Event of Default" under the Property Management Agreement.

10.1.23 <u>IHG License</u>.  The occurrence of any default by Owner after the lapse of any applicable notice or grace period or the occurrence of any event or circumstance defined as or deemed to be an "Event of Default" under the IHG License.

10.1.24 Senior Event of Default. A Senior Event of Default has occurred that is not waived by Senior Lender, or Owner enters into or otherwise suffers or permits an amendment, waiver, supplement, termination, extension, renewal, replacement, or other modification of any Senior Loan Document without the prior written approval of Lender.

10.2.   Remedies.   Immediately upon or any time and from time to time after the occurrence and during the continuation of any Event of Default hereunder, Lender may exercise any remedy not prohibited at law, in equity or otherwise, including those listed below and those listed in the other Loan Documents, in such sequence or combination as Lender may determine. The rights, powers and remedies of Lender under this Agreement and each other Loan Document shall be cumulative and not exclusive of any other right, power or remedy that Lender may have against Borrower and/or Guarantor pursuant to this Agreement or any other Loan Document, or existing at law or in equity or otherwise.  Lender's rights, powers and remedies may be pursued singly, concurrently, successively, jointly or otherwise, against Borrower, the Collateral, or against Guarantor or any obligor under, or guarantor of, the Note or the other Loan Documents, at such time and in such order as Lender may determine.  No act of Lender shall be construed as an election to proceed under any particular provision of any Loan Document to the exclusion of any other provision in the same or any other Loan Document, or as an election of remedies to the exclusion of any other remedy that may then or thereafter be available to Lender.

10.2.1 Performance of Defaulted Obligations and Protective Advances.  Lender may make any payment (including Protective Advances) or perform any other obligation under the Loan Documents or Leases that Borrower has failed to make or perform, and Borrower hereby irrevocably appoints Lender as the true and lawful attorney-in-fact for Borrower to make any such payment and perform any such obligation in the name of Borrower; provided that no such sum expended by Lender (and no reimbursement thereof by Borrower) shall be deemed to cure any Event of Default unless Lender shall waive such Event of Default in writing.  All payments made and expenses (including attorneys' fees) incurred by Lender in this connection, together with interest thereon at the Default Rate from the date paid or incurred by Lender until repaid by Borrower, shall become part of the Secured Obligations and shall become immediately due and payable by Borrower to Lender.  In lieu of advancing Lender's own funds for such purposes, Lender may use any funds of Borrower that may be in Lender's possession, including any funds in any of the Accounts.

10.2.2 Specific Performance and Injunctive Relief.   Notwithstanding the availability of legal remedies, Lender shall be entitled to obtain specific performance, mandatory or prohibitory injunctive relief, or other equitable relief requiring Borrower or Guarantor to cure or refrain from repeating any Default or Event of Default.

10.2.3 Acceleration of Secured Obligations.   Lender may, without notice or demand, declare all of the Secured Obligations immediately due and payable in full.

10.2.4 Suit for Monetary Relief.   Subject to the non-recourse provisions of Article 12, with or without accelerating the maturity of the Secured Obligations, Lender may sue from time to time for any payment due under any of the Loan Documents, or for

money damages in respect of any Default or Event of Default under any of the Loan Documents.

# ARTICLE 11

## GENERAL PROVISIONS

11.1.   <u>Expiration of Borrower Claims</u>.  Lender shall not be in default or breach under this Agreement, or under any of the other Loan Documents, unless a written notice specifically setting forth the claim of Borrower shall have been given to Lender within 30 days after Borrower first obtains actual knowledge of the occurrence of the event that Borrower alleges gave rise to such claim.  Borrower waives any claim, set off or defense against Lender arising by reason of any alleged default or breach by Lender as to which Borrower does not give such notice timely as aforesaid.  Borrower acknowledges that such waiver is or may be essential to Lender's ability to enforce Lender's remedies without delay and that such waiver therefore constitutes a substantial part of the bargain between Lender and Borrower with respect to the Mezzanine Loan.

11.2.   <u>Time of the Essence</u>.  Time is of the essence with regard to the obligations of Borrower and Guarantor under this Agreement and each other Loan Document.

11.3.   <u>Joint and Several Obligation</u>.  If Borrower is more than one Person, then:  (i) all Persons comprising Borrower are jointly and severally liable for all of the Secured Obligations; (ii) representations, warranties, and covenants made by any Person comprising Borrower shall be deemed representations, warranties, and covenants of all of the Persons comprising Borrower; (iii) any breach, Default or Event of Default by any of the Persons comprising Borrower shall be deemed to be a breach, Default, or Event of Default of all of the Persons comprising Borrower; and (iv) any event creating personal liability of any of the Persons comprising Borrower shall create personal liability for all of the Persons comprising Borrower.

11.4.   <u>Waivers by Borrower</u>.

11.4.1   <u>Homestead, Marshaling of Assets and other Rights</u>.  Borrower agrees not to assert (and, to the extent not prohibited by Legal Requirements, Borrower hereby waives) any right under any Legal Requirements pertaining to the marshaling of assets, the sale in inverse order of alienation, any homestead exemption or the administration of estates of decedents to defeat, reduce or affect the right of Lender under the Loan Documents to a sale of any Collateral for the collection of the Secured Obligations.  Notwithstanding the existence of interests in the Collateral other than that created by the Loan Documents, and notwithstanding any other provision of the Loan Documents, upon an Event of Default, to the extent permitted by applicable Legal Requirements, Lender shall have the right to determine the order and manner in which the Collateral shall be subjected to the remedies provided for in the Loan Documents and to determine the order and manner in which all or any part of the Secured Obligations are satisfied from the proceeds realized upon the exercise of the remedies provided for in the Loan Documents.

11.4.2   <u>Claims for Monetary Damages</u>.  Borrower hereby (i) waives any claim that Borrower may have against any of the Indemnified Parties based upon any assertion that

any such Indemnified Party has acted unreasonably or that any such Indemnified Party has unreasonably withheld or unreasonably delayed any action, in each case, to the extent that such Indemnified Party had an obligation, either at law or pursuant to the Loan Documents, to act reasonably and (b) agrees that the sole remedy of Borrower based upon any such claim against any of the Indemnified Parties shall be an action for specific performance, injunctive relief or declaratory judgment.  Borrower hereby further agrees that the Indemnified Parties shall not be liable for any monetary damages (including compensatory, consequential or punitive damages) in respect of any such claim by Borrower and that Borrower's sole remedy in respect of any such claim shall be limited to specific performance, injunctive relief or declaratory judgment.

11.4.3  <u>Required Notices</u>.  Borrower shall not be entitled to any notices of any nature whatsoever from Lender, except with respect to matters for which this Agreement or another Loan Document specifically and expressly provides for the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice.  Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Agreement or the other Loan Documents does not specifically and expressly provide for the giving of notice by Lender to Borrower.

11.4.4  <u>Offsets; Counterclaims</u>.  Any assignee of Lender's interest in and to this Agreement and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses that are unrelated to this Agreement and the other Loan Documents that Borrower may otherwise have against any assignor of this Agreement and the other Loan Documents.  No such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon this Agreement or upon any other Loan Document.  Any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower, unless and to the extent Borrower would be permanently barred from asserting such claim in any action or proceeding.

11.5.  <u>Entire Agreement; Modification in Writing; No Implied Waivers by Lender</u>.  This Agreement, together with the other Loan Documents, contains the entire understanding between the parties to the matters addressed herein and supersedes any other understandings or agreements with respect to the matters covered hereby.  No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement or any other Loan Document, or consent or waiver referred to in any Loan Document or consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by Lender, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.  Without limiting the generality of the preceding sentence, neither Lender's acceptance of any payment with knowledge of a Default or Event of Default, nor any failure by Lender to exercise any remedy following a Default or Event of Default, shall be deemed a waiver of such Default or Event of Default, and no waiver by Lender of any particular Default or Event of Default shall be deemed a waiver of any other Default or Event of Default or of any similar Default or Event of Default in the future.  No course of conduct, dealing or performance (including any delays by Lender in enforcing any remedies) by Lender shall be deemed to constitute a waiver by Lender of any rights under any of the Loan Documents.  Except as otherwise expressly provided

herein, no notice to or demand on Borrower shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

11.6.  <u>Lender's Discretion; Binding Action</u>.  Whenever pursuant to this Agreement or the other Loan Documents, Lender exercises any right to approve or disapprove any matter, or make any determination, or any arrangement or term is required to be satisfactory to Lender, the decision of Lender to approve or disapprove such matter or to make such determination or to decide whether such arrangement or term is satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the sole and absolute discretion of Lender and shall be final and conclusive (absent manifest error).  Borrower agrees that with respect to any consent, direction, approval or action that is required of Borrower under this Agreement or any other Loan Document, any consent, direction, approval or action by Borrower shall be binding on Borrower and that Lender shall have no obligation to confirm any such consent, direction, approval or action and may act in reliance upon any such consent, direction, approval or action.

11.7.  <u>Headings; Exhibits and Schedules Incorporated</u>.  The Article and Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.  The information set forth on the cover, the heading and the recitals hereof, and the Exhibits and the Schedules attached hereto, are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

11.8.  <u>Governing Law; Forum</u>.  Except as otherwise provided in the Security Instrument, the substantive laws of the State of Texas shall govern the validity, construction, enforcement and interpretation of this Agreement and the other Loan Documents, without reference to conflicts of law principles. Any legal suit, action or proceeding against Lender or Borrower arising out of or relating to this Agreement or the other Loan Documents shall be instituted in any federal or state court located in the County of Dallas, State of Texas, and Borrower waives any objections that Borrower may now or hereafter have based on venue and/or forum non conveniens of any such suit, action or proceeding, and Borrower hereby irrevocably submits to the jurisdiction of any such court in any suit, action or proceeding.

11.9.  <u>WAIVER OF TRIAL BY JURY</u>.  BORROWER AND LENDER KNOWINGLY, IRREVOCABLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT EITHER MAY HAVE TO, AND AGREE NOT TO SEEK, A TRIAL BY JURY IN RESPECT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM BASED ON THIS AGREEMENT, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY HERETO OR TO ANY OTHER LOAN DOCUMENT.  BORROWER AND LENDER FURTHER AGREE THAT NO SUCH ACTION WITH RESPECT TO WHICH A JURY TRIAL HAS BEEN WAIVED SHALL BE SOUGHT TO BE CONSOLIDATED WITH ANY OTHER ACTION WITH RESPECT TO WHICH A JURY TRIAL CANNOT OR HAS NOT BEEN WAIVED.  THIS SECTION HAS BEEN FULLY DISCUSSED BY BORROWER AND LENDER, EACH OF WHOM HAS BEEN REPRESENTED BY COUNSEL, AND THIS SECTION SHALL NOT BE SUBJECT TO ANY EXCEPTIONS.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR LENDER AND BORROWER TO ENTER INTO THE TRANSACTIONS.

11.10.  <u>Notices</u>.  All notices pursuant to any provisions of this Agreement or of the other Loan Documents which require the giving of notice as a condition to creating or effectuating an obligation of Borrower to Lender or a right on the part of Lender to exercise rights or remedies against Borrower or any collateral, and any notice by Borrower to Lender to the effect that Lender has not fulfilled one or more of any obligation to Borrower under this Agreement or under any other Loan Documents, must be in writing.  Such notice shall be given by messenger, facsimile or mail (registered or certified, return receipt requested) or email effective when received by the party to whom addressed or when delivered to such address, and shall be addressed to the parties at the addresses given below.  Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of the notice, demand or request sent.  By giving at least 10 Business Days written notice thereof, Borrower or Lender shall have the right from time to time and at any time during the term of this Agreement to change their respective addresses and each shall have the right to specify as its address any other address within the United States of America.

If to Borrower:

ACRON 2 Porsche Drive Mezzco LLC
c/o ACRON U.S. Management
2424 E. 21st Street, Suite 150
Tulsa, OK 74114
Attention:  Greg Wilson
Email: gw@acronusa.com

with a copy to:

Baker & Hostetler LLP
200 South Orange Avenue, Suite 2300
Orlando, Florida 32801
Attention: Jessica Malchow, Esq. & Jason Brady, Esq.
Emails: nbhjmalchow@bakerlaw.com
        jbrady@bakerlaw.com

If to Lender:

CAI Overland Lender, LLC
c/o Civitas Capital Group
1722 Routh Street, Suite 800
Dallas, Texas 75201
Attention: Austin Khan, Marisa Lizak
Emails: austin.khan@civitascapital.com
        marisa.lizak@civitascapital.com

With a copy to:

Elkins Kalt Weintraub Reuben Gartside LLP
10345 West Olympic Boulevard

Los Angeles, California 90064
Attention: Shai Halbe, Esq., Daniel Abram, Esq.
Emails: SHalbe@elkinskalt.com
          DAbram@elkinskalt.com

Any communication so addressed and mailed shall be deemed to be given on the earliest of (1) when actually delivered, (2) on the 1st Business Day after deposit with an overnight air courier service, or (3) on the 3rd Business Day after deposit in the United States mail, certified mail with postage prepaid and return receipt requested, in each case to the address of the intended addressee, and any communication so delivered in person shall be deemed to be given when receipted for by, or actually received by Borrower or Lender, as the case may be, or (4) if given by email, when transmitted to the party's email address specified above and confirmation of complete delivery is received by the transmitting party during normal business hours or on the next Business Day if not confirmed during normal business hours, and an identical notice is also sent simultaneously by mail, overnight courier, or personal delivery as otherwise provided in this Section 11.10.

11.11.  Severability.  Wherever possible, each provision of this Agreement and each other Loan Document shall be interpreted in such manner as to be effective and valid under Legal Requirements, but if any provision of this Agreement or any other Loan Document is held to be illegal, invalid or unenforceable under Legal Requirements, then the legality, validity, and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected thereby, and in lieu of each such illegal, invalid or unenforceable provision there shall be added automatically as a part of this Agreement or such other Loan Documents (as applicable) a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid, and enforceable.  If the rights and Liens created by this Agreement or any other Loan Documents shall be invalid or unenforceable as to any part of the Secured Obligations, then the unsecured portion of the Secured Obligations shall be completely paid prior to the payment of the remaining and secured portion of the Secured Obligations, and all payments made on the Secured Obligations shall be considered to have been paid on and applied first to the complete payment of the unsecured portion of the Secured Obligations.

11.12.  Preferences; Reinstatement.  Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the Secured Obligations.  To the extent Borrower makes a payment or payments to Lender for Borrower's benefit, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any Legal Requirements, then, to the extent of such payment or proceeds received, this Agreement shall continue to be effective or be reinstated, as applicable, and the obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

11.13.  No Joint Venture or Partnership.  Borrower and Lender intend that the relationship created hereunder and under the other Loan Documents be solely that of borrower and lender. Nothing herein or in the other Loan Documents is intended to create a joint venture, partnership,

tenancy-in-common, or joint tenancy relationship between Borrower and Lender nor to grant Lender any interest in the Collateral other than that of secured party, mortgagee or lender.

11.14.  Conflict; Construction; Counterparts.  In the event of any conflict between the provisions of this Agreement and the provisions of any of the other Loan Documents, the provisions of this Agreement shall prevail.  The parties hereto acknowledge that they were represented by counsel in connection with the negotiation and drafting of the Loan Documents and that the Loan Documents shall not be subject to the principle of construing their meaning against the party that drafted the same.  This Agreement may be executed in any number of counterparts, all of which shall together constitute one and the same instrument.  This Agreement, to the extent signed and delivered by means of electronic transmission in portable document format (pdf), shall be treated in all manner and respects (and shall have the same binding legal effect) as a fully executed original Agreement.

11.15.  Estoppel Certificates; Appraisals.

11.15.1 Estoppel Certificates.  Borrower hereby agrees, at any time and from time to time upon not less than 10 days' prior written notice by Lender, to execute, acknowledge and deliver to the party specified in such notice, a statement, in writing, signed and acknowledged, certifying to Lender and such specified party (i) the balance of principal, interest, and other sums then outstanding under the Note and the other Loan Documents, (ii) stating whether or not, to the knowledge of Borrower, Lender is in default of any of the obligations of Lender under this Agreement or the other Loan Documents, and if so, the nature of any such default or defaults, (iii) whether or not Borrower claims to have any offsets or defenses with respect to the Secured Obligations and, if so, the nature of such offsets or defenses, (iv) that this Agreement and the other Loan Documents are unmodified and in full force and effect (or if there have been modifications, that the same, as modified, is in full force and effect and stating the modifications hereto), and (v) stating whether or not, to the knowledge of Borrower, any Default or Event of Default has occurred and is then continuing, and, if so, specifying each such Default or Event of Default.

11.15.2 Appraisals.  Without limiting any right of Lender to obtain an Appraisal at Borrower's sole cost and expense pursuant to the express terms of this Agreement or any other Loan Document (including at any time during an Event of Default and each time after receiving Borrower's request to exercise the Extension Option), Lender may obtain additional Appraisals of the Property limited to one time in any 12 month period in the discretion of Lender and at the sole cost and expense of Lender.  Borrower shall reasonably cooperate with Lender and the appraiser preparing such Appraisal and provide reasonable access to the Property, in each case, in respect of any such Appraisal obtained by Lender pursuant to this Section 11.15.2.  Borrower shall reimburse Lender for the cost of any Appraisal obtained during the existence of an Event of Default pursuant to this Section 11.15.2 within 10 days following written demand for such reimbursement by Lender.

11.16.  No Third Party Beneficiaries; Successors and Assigns.  Nothing in this Agreement or in any of the other Loan Documents shall confer upon any Person (other than the holder(s) of the Mezzanine Loan or any portion thereof, the parties hereto and their successors and permitted assigns) any rights or remedies under or by reason of this Agreement.  Without limiting the

foregoing, this Agreement is binding upon and shall inure to the benefit of Borrower and Borrower's successors and assigns, and Lender, and Lender's successors and assigns. The duties, covenants, conditions, obligations, and warranties of Borrower in this Agreement shall be joint and several obligations of Borrower and Borrower's successors and assigns.

11.17.  Sale of Mezzanine Loan and Securitization; Future Loan Modification.

11.17.1 Loan Modifications. Lender shall have the right, from time-to-time, to (i) sell, assign or transfer all or any portion of the Mezzanine Loan or any interest in the Mezzanine Loan, including participation interests in all or any portion of the Mezzanine Loan and (ii) modify, split and/or sever any portion of the Mezzanine Loan (any such modification, split or severance of all or any portion of the Mezzanine Loan, a "**Loan Modification**"). Borrower shall cooperate, and cause Guarantor and each of the Borrower Control Persons to cooperate, with Lender to effectuate such Loan Modification (including by providing updated representations and warranties regarding the Mezzanine Loan and the Property and providing updated legal opinions) and shall execute, acknowledge and deliver such documents as Lender may reasonably request to evidence such Loan Modification; provided, however, Borrower shall not be obligated to incur any costs or expenses in connection with the foregoing.  Upon the election of Lender at any time to effectuate a Loan Modification, Lender may (a) cause the Note and the Security Instrument and any of the other Loan Documents evidencing and securing the Mezzanine Loan to be split into two or more additional tranches of notes (i.e., an A-1/A-2 structure), (b) create two or more senior and subordinate notes (i.e., an A/B or A/B/C structure), (c) create multiple components of the Note, and/or (d) otherwise split or sever the Mezzanine Loan and the Note into two or more loans and notes secured by a pledge of the Collateral and, in each such case, allocate or reallocate the Principal Indebtedness among such split, severed or component loans and notes in whatever proportion and whatever priority Lender determines; provided, however, that, in each such instance, immediately after the effective date of such Loan Modification, (1) the outstanding principal balance of the note or notes evidencing the Mezzanine Loan (or split, severed or component notes evidencing the Mezzanine Loan) equals the Principal Indebtedness immediately prior to such Loan Modification, (2) the weighted average of the interest rates for the note or notes evidencing the Mezzanine Loan (or split, severed or component notes evidencing the Mezzanine Loan) equals the interest rate of the Note immediately prior to such Loan Modification, and (3) there shall be no change to (x) the economic terms of the Loan Documents or (y) to the rights or obligations of Borrower or Guarantor, other than *de-minimis* changes to reflect the revised structure of the Mezzanine Loan and the Note (provided, that, Borrower acknowledges and agrees that in the event there is one or more senior/subordinate components of the Mezzanine Loan, "rate creep" will result from the application of prepayments in connection with a casualty or condemnation, application of payments during an Event of Default and/or voluntary partial prepayments to the extent permitted under the Loan Documents, and such "rate creep" will not be deemed a violation of clause (2) above or this clause (3)).  Borrower shall reasonably cooperate with Lender in effecting any such Loan Modification.

11.17.2 Securitization.  Notwithstanding anything set forth herein to the contrary, and without limiting the generality of the foregoing, Lender shall have the right to

securitize the Mezzanine Loan (or any portion thereof or interest therein) in a commercial mortgage backed securitization or any other public offering or private placement (a "**Securitization**"), and Borrower shall reasonably cooperate with Lender in effecting any such Securitization (without cost or expense to Borrower). Borrower authorizes Lender to disclose to any actual or prospective participant or transferee of the Mezzanine Loan (or any investor in such securities issued in connection with a Securitization or any rating agency rating such securities) any and all financial and other information then in Lender's possession concerning the Property, the Borrower Control Persons and their respective Affiliates, or the Mezzanine Loan. If requested by Lender, whether prior to, on or following the Closing Date, Borrower shall assist Lender in satisfying the market standards to which Lender customarily adheres or which may be reasonably required in the marketplace or by any rating agency to be included in any loan documentation and/or disclosure documentation or otherwise in connection with any such Securitization; provided, however, Borrower shall not be obligated to incur any costs or expenses in connection with the foregoing. Borrower shall indemnify Lender (and its Affiliates) in connection with any material misstatement or material omission in the offering materials for such Securitization provided that such disclosure is based on information delivered by Borrower to Lender in connection with the underwriting and origination of the Mezzanine Loan and is accurately presented therein.

> 11.17.3 <u>Disclosure of Lease Information</u>. To the extent that a Lease is subject to a confidentiality provision that prohibits Lender (or requires the landlord thereunder to prohibit Lender) from disclosing such Lease or information regarding the Tenant in connection with a Securitization or other disposition of the Mezzanine Loan, Borrower will use reasonable efforts to obtain (or has obtained) a waiver of such confidentiality provision for Lender's benefit to permit disclosure of such information by Lender.

11.18. <u>Subrogation of Lender</u>. Lender shall be subrogated to the Lien of any previous encumbrance discharged with funds advanced by Lender under the Loan Documents, regardless of whether such previous encumbrance has been released of record.

11.19. <u>Appointment of Servicer and Delegation of Lender Responsibilities</u>.

> 11.19.1 <u>Appointment and Replacement of Servicer</u>. Borrower acknowledges and agrees that, at the sole option of Lender, the Mezzanine Loan may be serviced by a servicer. Lender may, by written notice to Borrower, appoint a successor servicer to act as servicer under this Agreement and the other Loan Documents. Borrower hereby irrevocably authorizes Lender to make any such appointment that Lender deems advisable in Lender's sole discretion, and Borrower hereby irrevocably consents and agrees to any such appointment. Neither the resignation nor the removal of any servicer hereunder shall release, discharge, waive or satisfy any of Borrower's obligations under this Agreement.

> 11.19.2 <u>Servicer Fees; Designation of Lender Responsibilities</u>. Other than the Servicing Fee, Borrower shall not be responsible for the payment of servicer fees to any servicer appointed pursuant to this <u>Section 11.19</u>; provided, however, Borrower shall pay all third-party, out-of-pocket fees and expenses incurred by any servicer in connection with the services performed by servicer in connection with the Secured Obligations (including

disbursements under this Agreement, the establishment and maintenance of any Accounts and the documentation thereof, attorneys' fees and costs and bank fees and charges, inspections of the Property, casualty and condemnation matters and matters concerning Defaults and Events of Default). Without limiting the foregoing, Borrower acknowledges and agrees that Lender may delegate the administration and review of Disbursement Requests (including review of any and all materials submitted by Borrower in connection with such request and preparation of written reports to Lender summarizing such materials and recommending whether the request should be granted) to the servicer, that Lender may cause the servicer to open and maintain any Accounts on behalf of Lender or in Lender's name, and that Borrower shall pay all third-party, out-of-pocket fees and expenses in connection therewith. Borrower shall indemnify and hold harmless Lender from and against any liability to the servicer in respect of such fees and expenses described in this Section 11.19.2. The servicer shall not be responsible or liable in any manner whatsoever for the correctness, genuineness or validity of any document or instrument, or any signature thereon, deposited with or delivered to the servicer pursuant to this Agreement.

11.20.  Payment of Expenses.

    11.20.1 Payment of Lender's Costs and Expenses. In addition to the expenses of the servicer described in Section 11.19, Borrower shall pay all out-of-pocket costs and expenses of Lender (including attorney's fees) in connection with (i) the negotiation, preparation, execution and delivery of the Loan Documents and any other document being prepared in connection with the consummation of the Transactions (including costs and expenses for which invoices were not available at the closing of the Mezzanine Loan, or costs and expenses that are incurred by Lender after the closing of the Mezzanine Loan), (ii) the creation, perfection, preservation or protection of Lender's Liens in the Collateral (including fees and expenses for title and Lien searches or amended or replacement mortgages, UCC-1 Financing Statements or Loan Documents, Survey fees and charges, title insurance premiums and filing and recording taxes, fees and charges and the costs and fees incurred in connection with arranging, setting up, servicing and maintaining any Accounts), (iii) Lender's due diligence with respect to the Property, including the fees and disbursements of the third parties that have prepared the Third Party Reports and any other third party due diligence expenses for the Property, including travel expenses, (iv) the negotiation, preparation, execution and delivery of any amendment, modification, supplement, waiver, restructuring or consent relating to any of the Loan Documents, and (v) any effort or action (whether or not litigation or foreclosure is involved) to enforce or defend Lender's rights and remedies under any of the Loan Documents, including all fees and expenses incurred by Lender in securing title to or possession of, and realizing upon, security for the Secured Obligations, or any other costs and expenses incurred in any workout, restructuring or similar arrangements or in connection with any collection or bankruptcy proceedings with respect to Borrower or any other Borrower Control Person. All such costs and expenses shall be due and payable by Borrower to Lender not later than 5 Business Days following Lender's demand therefor, shall bear interest at the Default Rate from the date such costs and expenses are incurred by Lender until the date such costs and expenses (together with the applicable interest thereon at the Default Rate) are paid by Borrower to Lender, and shall be part of the Secured Obligations.

11.20.2 <u>Attorneys' Fees References</u>.  Any reference in this Agreement to attorneys' or counsels' fees paid or incurred by Lender shall be deemed to include paralegals' fees and legal assistants' fees.  Moreover, wherever provision is made herein for payment of attorneys' or counsels' fees or expenses incurred by Lender, such provision shall include such fees or expenses incurred in any and all judicial, bankruptcy, reorganization, administrative, or other proceedings, including appellate proceedings, whether such fees or expenses arise before proceedings are commenced, during such proceedings or after entry of a final judgment.  Notwithstanding anything to the contrary in this Agreement or any other Loan Document, during the existence of any Event of Default, any reference to "reasonable" attorneys' or counsels' fees in this Agreement or any other Loan Document shall be deemed to refer to "actual, out-of-pocket" attorneys' or counsels' fees.

11.20.3 <u>Fee Deposit</u>.  As a condition precedent to reviewing any request of Borrower or any other matter that Lender reasonably believes will result in Lender incurring any out-of-pocket costs, fees or expenses (including attorneys' fees), Lender may require Borrower to deposit with Lender, Servicer or Lender's counsel an amount reasonably determined by Lender to cover such costs, fees and expenses (the "**Fee Deposit**").  Lender shall apply the Fee Deposit to the payment of any such out-of-pocket costs and expenses incurred in connection with the applicable request or other matter (regardless of whether such request or other matter is approved, denied or consummated); provided that (i) if the actual amount of such costs, fees, and expenses exceeds the amount of the Fee Deposit, then Borrower shall promptly pay such excess amount to Lender, and (ii) if the amount of the Fee Deposit exceeds the actual amount of such costs, fees, and expenses, then Lender shall return such excess amount to Borrower.  Notwithstanding that the Fee Deposit may be wired to Lender's counsel, Borrower and Lender hereby acknowledge and agree that in no way will any such remittance of the Fee Deposit to Lender's counsel give rise to an attorney-client relationship between Borrower on the one hand, and Lender's counsel on the other hand.

11.21. <u>Disclaimer Regarding Third Party Reports</u>.  Borrower acknowledges that, in connection with the Mezzanine Loan, Lender has ordered, or may in the future order, certain reports (collectively, the "**Third Party Reports**") from third-party service providers, including, without limitation, (as applicable) an environmental report, engineering report, zoning report, seismic report, and an Appraisal.  Borrower hereby agrees and acknowledges that, with respect to the Third Party Reports, (i) neither Lender nor any of Lender's Affiliates were, or shall be, responsible for the production of or content of the Third Party Reports, (ii) even if Lender or Lender's Affiliates has provided (or hereafter provides) Borrower with a copy of any Third Party Report, Lender and Lender's Affiliates are not making any representation or warranty, either express or implied, and hereby expressly disclaim any representation or warranty, whether express or implied, regarding (a) the contents, accuracy, completeness, or conclusions of the Third Party Reports, (b) whether Borrower is an intended user of the Third Party Reports, or (c) whether Borrower has any right to rely upon the Third Party Reports or has any rights or remedies against the applicable service provider related to the contents of such Third Party Reports, and (iii) Lender and Lender's Affiliates disclaim any and all liability to Borrower or any other Person.  Borrower for itself and on behalf of Borrower's Affiliates, hereby releases Lender and Lender's Affiliates from any Losses related to or arising out of the Third Party Reports or their contents or the accuracy, completeness, or conclusions thereof.  Without limiting the foregoing terms of this

Section 11.21, Borrower hereby agrees and acknowledges that Borrower is not an intended user of any Appraisal, and absent a separate agreement between Borrower and the applicable appraiser, Borrower has no rights or remedies arising out of any Appraisal against such appraiser or any other Person.

11.22. <u>Acceptance of Cures for Events of Default</u>. Notwithstanding anything to the contrary contained in this Agreement or the other Loan Documents (including any reference to the "continuance", the "continuation" or the "existence" of an Event of Default or that an Event of Default is "continuing" (or variations thereof)), Lender shall in no event or under any circumstance be obligated or required to waive or accept a cure by Borrower, Guarantor, or by any other Person of an Event of Default unless Lender expressly agrees in writing to do so in the exercise of Lender's sole and absolute discretion, it being agreed that once an Event of Default has occurred and so long as Lender has not determined and expressly agreed in writing to waive or accept a cure of such Event of Default, Lender shall be absolutely and unconditionally entitled to pursue all rights and remedies available to Lender under this Agreement, the Security Instrument or the other Loan Documents or otherwise at law or in equity.

## ARTICLE 12

## LIMITATION ON LIABILITY

12.1. <u>General Limitation on Liability</u>. Nothing contained in the Loan Documents shall be deemed to impair, limit or prejudice Lender's rights (i) in foreclosure proceedings or in any ancillary proceedings brought to facilitate Lender's foreclosure on the Collateral or to exercise any specific rights or remedies afforded to Lender under any other provisions of the Loan Documents or by law, in equity or otherwise, subject to the non-recourse provisions set forth in <u>Section 12.2</u> and <u>Section 12.3</u>, (ii) to recover under any guaranty given in connection with the Secured Obligations, or (iii) to pursue any personal liability of Borrower and/or Guarantor under the ACRON Guaranty, the TH Investment Guaranty, the Environmental Indemnity Agreement or the ERISA indemnity provisions of <u>Section 7.2.6</u>. Except as expressly set forth in this <u>Article 12</u>, the recourse of Lender with respect to the obligations evidenced by this Agreement and the other Loan Documents (except for the ACRON Guaranty, TH Investment Guaranty and the Environmental Indemnity Agreement) shall be solely to the Collateral. For the avoidance of doubt, the matters set forth in <u>Section 12.2</u> and <u>Section 12.3</u> shall be fully recourse to Borrower and Guarantor.

12.2. <u>Loss Recourse Events</u>. Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, nothing shall be deemed in any way to impair, limit or prejudice the rights of Lender to collect or recover from (i) Borrower and/or ACRON Guarantors under the ACRON Guaranty the amount of the Loss Recourse Obligations (as defined in <u>Section 1</u> of the ACRON Guaranty), and (ii) Borrower and/or TH Investment Guarantor under the TH Investment Guaranty the amount of the Loss Recourse Obligations (as defined in <u>Section 1</u> of the TH Investment Guaranty).

12.3. <u>Springing Recourse Events</u>. Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, the agreement contained in <u>Section 12.1</u> to limit the personal liability of Borrower to Borrower's interest in the Collateral shall become null and void and be of no further force and effect, and (i) Borrower and ACRON Guarantors shall be personally

liable for the repayment of the Secured Obligations in the event of a Springing Recourse Event (as defined in the ACRON Guaranty) and (ii) Borrower and TH Investment Guarantor shall be personally liable for the repayment of the Secured Obligations in the event of a Springing Recourse Event (as defined in the TH Investment Guaranty).

# ARTICLE 13

# SENIOR LOAN

13.1.    Borrower shall deliver to Lender, promptly after the receipt or delivery, a copy of any notice of default received by it or Owner or sent by Owner with respect to the Senior Loan.

13.2.    If any action, proposed action or other decision is consented to or approved by Senior Lender, such consent or approval shall not be binding or controlling on Lender.  Borrower hereby acknowledges and agrees that (i) the risks of Senior Lender in making the Senior Loan are different from the risks of Lender in making the Mezzanine Loan, (ii) in determining whether to grant, deny, withhold or condition any requested consent or approval, Senior Lender and Lender may reasonably reach different conclusions, and (iii) Lender has an absolute independent right to grant, deny, withhold or condition any requested consent or approval based on its own point of view, but subject to the standards of consent set forth herein.  Furthermore, the denial by Lender of a requested consent or approval shall not create any liability or other obligation of Lender if the denial of such consent or approval results directly or indirectly in a default under the Senior Loan Documents, and Borrower hereby waives any claim of liability against Lender arising from any such denial unless Lender has not complied with any applicable standard for consent.  The rights described above may be exercised by any entity which owns and controls, directly or indirectly, substantially all of the interests in Lender.

13.3.    Borrower hereby acknowledges and agrees that the Intercreditor Agreement will be solely for the benefit of Senior Lender and Lender, and that neither Borrower nor Owner shall be third-party beneficiaries (intended or otherwise) of any of the provisions therein, have any rights thereunder, or be entitled to rely on any of the provisions contained therein.  Lender and Senior Lender have no obligation to disclose to Borrower or Owner the contents of the Intercreditor Agreement.  Borrower's obligations hereunder are and will be independent of the Intercreditor Agreement and shall remain unmodified by the terms and provisions thereof.

13.4.    Without Lender's prior written consent, which consent shall not be unreasonably withheld, neither Borrower nor any other Borrower Control Persons shall permit Owner to amend, restate, modify, supplement, replace, or terminate any of the Senior Loan Documents.

13.5.    The Senior Loan shall be secured solely by the Senior Collateral and may not encumber all or any portion of the Collateral.  The Senior Loan shall not require any balloon payment to be due or payable prior to the Maturity Date and shall not have any amortization and shall be interest only.

13.6.    Neither Borrower nor any Affiliate shall purchase or otherwise acquire any interest in the Senior Loan, and any interest so acquired shall be held in trust for Lender as additional collateral for the Mezzanine Loan.

13.7.    In the event Lender is required pursuant to the terms of the Intercreditor Agreement to pay over any payment or distribution of assets, whether in cash, property or securities which is applied to the Principal Indebtedness, including, without limitation, any proceeds of the Collateral or the Property previously received by Lender on account of the Mezzanine Loan to Senior Lender, then Borrower agrees to indemnify Lender for any amounts so paid, and any amount so paid shall continue to be owing pursuant to the Loan Documents as part of the Principal Indebtedness notwithstanding the prior receipt of such payment by Lender.

13.8.    Without limiting the generality of the other provisions of this Agreement, and without waiving or releasing Borrower or any other Borrower Control Person from any of its obligations under the Loan Documents, if there shall occur and be continuing a Senior Event of Default, Borrower hereby expressly agrees that Lender shall have the immediate right, without notice to or demand on Borrower, but shall be under no obligation: (i) to pay all or any part of the Senior Loan, and any other sums, that are then due and payable under the Senior Loan Documents and, on behalf of Borrower, for itself and on behalf of Owner, to perform any act or take any action, as may be appropriate, to cause all of the terms, covenants and conditions of the Senior Loan Documents on the part of Owner or any other Person to be performed or observed thereunder to be promptly performed or observed; and (ii) to pay any other amounts and take any other action as Lender, in its sole and absolute discretion, shall deem advisable to protect or preserve the rights and interests of Lender in the Mezzanine Loan and/or the Collateral. Without limiting the foregoing, Borrower acknowledges that the Intercreditor Agreement may contain certain restrictions on the ability of the Lender to cure defaults by the Owner under the Senior Loan Documents. In that regard, Borrower understands that, to the extent a Senior Event of Default has occurred and is continuing, Lender may thereafter make payments or otherwise cause performance of Owner under the Senior Loan Documents prior to any subsequent Senior Event of Default so as to avoid multiple or further Senior Events of Default. All sums so paid and the costs and expenses incurred by Lender in exercising its rights under this Section 13.8 (including, without limitation, reasonable attorneys' and other professional fees), with interest at the Default Rate, for the period from the date of demand by Lender to Borrower for such payments to the date of payment to Lender, shall constitute a portion of the Principal Indebtedness, shall be secured by the Security Instrument and shall be due and payable to Lender within 5 days following delivery to Borrower of written demand therefor.

13.9.    Subject to the rights of Tenants, Borrower hereby grants, and on behalf of Owner, hereby grants, to Lender and any Person designated by Lender the right to enter upon the Property at any time for the purpose of carrying out the rights granted to Lender under this Article 13. Borrower shall not, and shall not cause, suffer, permit or allow Owner or any other Person to impede, interfere with, hinder or delay, any effort or action on the part of Lender to cure any default or asserted default under the Senior Loan, or to otherwise protect or preserve the Property and/or Lender's interests in the Mezzanine Loan and the Collateral in accordance with the provisions of this Agreement and the other Loan Documents.

13.10.    Borrower hereby indemnifies Lender from and against all out-of-pocket liabilities, obligations, losses, damages, penalties, assessments, actions, or causes of action, judgments, suits, claims, demands, costs, expenses (including, without limitation, attorneys' and other professional fees, whether or not suit is brought, and settlement costs), and disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against Lender as a result of the

foregoing actions described in this <u>Article 13</u>. Notwithstanding the foregoing, (i) Borrower shall not have any obligation to Lender hereunder to the extent that such liabilities, obligations, losses, damages, penalties, assessments, actions, or causes of action, judgments, suits, claims, demands, costs, expenses or disbursements were caused by the fraud, gross negligence or willful misconduct of Lender and (ii) the indemnification obligations under this <u>Article 13</u> shall not apply to any special, exemplary, unforeseeable consequential, or punitive damages except to the extent such damages are owed by Lender to a third party as the result of the applicable act. Lender shall have no obligation to Borrower, any other Borrower Control Person or any other Person to make any such payment or performance.

13.11.  If Lender shall receive a copy of any notice of a Senior Event of Default, such notice shall constitute full protection to Lender for any action taken or omitted to be taken by Lender, in good faith, in reliance thereon. As a material inducement to Lender's making the Loan, Borrower, on behalf of itself and Owner, hereby absolutely and unconditionally releases and waives all claims against Lender arising out of Lender's exercise of its rights and remedies provided in this <u>Article 13</u> other than claims arising out of the fraud, gross negligence or willful misconduct of Lender (provided that in no event shall Lender be liable for any consequential, special, exemplary or punitive damages except to the extent such damages are owed by any Borrower Control Person to a third party as the result of the applicable act).

13.12.  In the event that Lender makes any payment in respect of the Senior Loan or Senior Loan Documents, Lender shall be subrogated to all of the rights of Senior Lender under the Senior Loan Documents against the Property and the obligors under the Senior Loan Documents in addition to all other rights Lender may have under the Loan Documents or applicable law.

13.13.  In connection with the exercise of its rights set forth in the Loan Documents, Lender shall have the right at any time to discuss the Property, the Senior Loan, the Mezzanine Loan or any other matter directly with Senior Lender or Senior Lender's consultants, agents or representatives without notice to or permission from Borrower or any other Borrower Control Person, nor shall Lender have any obligation to disclose such discussions or the contents thereof with Borrower or any other Borrower Control Person.

13.14.  Each of Borrower and Lender hereby acknowledge and agree that (a) compliance by Owner, as "Borrower" under the Senior Loan Documents, of any obligation of Borrower under the Loan Documents shall be deemed (without duplication) compliance by Borrower under the Loan Documents of such obligation (provided, however, that any such deemed compliance shall not relieve Borrower from compliance with any separate obligation of Borrower under the Loan Documents that is not also an obligation of Owner, as "Borrower" under the Senior Loan Documents) and (b) the rights and remedies of Lender as set forth in the Loan Documents shall be subject and subordinate to the rights and remedies of the Senior Lender under the Senior Loan Documents, in each case, as between Lender and Senior Lender pursuant to the terms and provisions as set forth in the Intercreditor Agreement.

*[Signature pages follow]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed, by their duly authorized representatives, as of the Effective Date.

**LENDER:**

**CAI OVERLAND LENDER, LLC,**
a Delaware limited liability company

By: _____
Name:  Austin Khan
Title:   Authorized Signatory

**BORROWER:**

**ACRON 2 PORSCHE DRIVE MEZZCO LLC,**
a Delaware limited liability company

By:    ACRON (USA) L.P.,
      a Texas limited partnership,
      its Manager

        By:    ACRON U.S. Management, Inc.,
            a Nevada corporation
            its sole General Partner

By: _____
Name: Greg Wilson
Title:  President

Each Guarantor hereby joins in the execution of this Agreement for the purpose of making and agreeing to be bound by the respective representations, warranties, covenants and agreements made by each Guarantor in this Agreement.

**GUARANTORS:**

**ACRON (USA) L.P.,**
a Texas limited partnership

By:    ACRON U.S. Management, Inc.,
       a Nevada corporation
       its sole General Partner

       By: _____
       Name: Greg Wilson
       Title:  President

**ACRON AG,**
a Swiss stock corporation

By: _____

Name: Greg Wilson
Title: Authorized Signatory

**TH INVESTMENT HOLDINGS II, LLC,**
a Delaware limited liability company

By: _____

Name: _____James A. Procaccianti_____

Title: _____Manager_____

## Exhibit A

## Property Description

PARCEL 1:

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOT 96 OF THE 14TH DISTRICT, CITY OF HAPEVILLE, FULTON COUNTY, GEORGIA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A NAIL SET ON THE SOUTHWESTERLY RIGHT-OF-WAY OF PORSCHE AVENUE (FORMERLY KNOWN AS HENRY FORD II AVENUE AND HAVING A VARIED RIGHT-OF-WAY) AT ITS INTERSECTION WITH THE WESTERLY RIGHT-OF-WAY OF PORSCHE DRIVE (HAVING A VARIED RIGHT-OF-WAY); THENCE RUNNING ALONG THE WESTERLY RIGHT-OF-WAY OF PORSCHE DRIVE SOUTH 63 DEGREES 35 MINUTES 46 SECONDS EAST A DISTANCE OF 21.49 FEET TO A NAIL SET; THENCE CONTINUING ALONG SAID RIGHT-OF-WAY SOUTH 49 DEGREES 10 MINUTES 54 SECONDS EAST A DISTANCE OF 21.67 FEET TO A NAIL SET; THENCE LEAVING SAID RIGHT-OF-WAY AND RUNNING ALONG A CURVE TO THE RIGHT AN ARC DISTANCE OF 44.79 FEET (SAID ARC HAVING A RADIUS OF 45.00 FEET AND BEING SUBTENDED BY A CHORD 42.97 FEET IN LENGTH LYING TO THE SOUTHWEST OF SAID ARC AND BEARING SOUTH 05 DEGREES 43 MINUTES 43 SECONDS EAST) TO A POINT; THENCE RUNNING SOUTH 22 DEGREES 47 MINUTES 15 SECONDS WEST A DISTANCE OF 230.40 FEET TO A POINT; THENCE RUNNING ALONG A CURVE TO THE LEFT AN ARC DISTANCE OF 126.77 FEET (SAID ARC HAVING A RADIUS OF 432.62 FEET AND BEING SUBTENDED BY A CHORD 126.32 FEET IN LENGTH LYING TO THE SOUTHEAST OF SAID ARC AND BEARING SOUTH 13 DEGREES 57 MINUTES 08 SECONDS WEST) TO A 1/2 INCH REBAR SET; THENCE RUNNING SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST A DISTANCE OF 212.04 FEET TO A NAIL SET; THENCE RUNNING NORTH 70 DEGREES 00 MINUTES 00 SECONDS WEST A DISTANCE OF 208.76 FEET TO A 1/2 INCH REBAR SET; THENCE RUNNING NORTH 00 DEGREES 00 MINUTES 00 SECONDS WEST A DISTANCE OF 181.08 FEET TO A 1/2 INCH REBAR SET; THENCE RUNNING NORTH 44 DEGREES 40 MINUTES 27 SECONDS EAST A DISTANCE OF 257.60 FEET TO A 1/2 INCH REBAR SET; THENCE RUNNING SOUTH 45 DEGREES 00 MINUTES 00 SECONDS EAST A DISTANCE OF 122.00 FEET TO A 1/2 INCH REBAR SET; THENCE RUNNING NORTH 45 DEGREES 00 MINUTES 00 SECONDS EAST A DISTANCE OF 144.04 FEET TO A NAIL SET ON THE SOUTHWESTERLY RIGHT-OF-WAY OF PORSCHE AVENUE; THENCE RUNNING ALONG SAID RIGHT-OF-WAY ALONG A CURVE TO THE LEFT AN ARC DISTANCE OF 128.77 FEET (SAID ARC HAVING A RADIUS OF 2437.76 FEET AND BEING SUBTENDED BY A CHORD 128.75 FEET IN LENGTH LYING TO THE SOUTHWEST OF SAID ARC AND BEARING SOUTH 67 DEGREES 15 MINUTES 42 SECONDS EAST) TO A NAIL SET AND THE POINT OF BEGINNING;

SAID TRACT CONTAINS 3.98 ACRES (173,460 SQUARE FEET), MORE OR LESS. BEING THE SAME PROPERTY DEPICTED AS THE "3.98 ACRE TRACT" ON THAT CERTAIN ALTA/ACSM SURVEY PREPARED BY LOWE ENGINEERS, BEARING THE SEAL AND SIGNATURE OF WILLIAM J. DANIEL III, G.R.L.S. NO. 2257, SAID PLAT DATED DECEMBER 4, 2015, BEING JOB NO. 15-0120, AS REVISED.

PARCEL 2:

EASEMENTS AND OTHER INTERESTS IN REAL PROPERTY CONTAINED IN THAT CERTAIN DECLARATION OF EASEMENT, COVENANTS, CONDITIONS AND RESTRICTIONS BETWEEN PORSCHE CARS NORTH AMERICA, INC., A DELAWARE CORPORATION AND ACRON 2 PORSCHE DRIVE, ATLANTA LLC, LLC, A DELAWARE LIMITED LIABILITY COMPANY, DATED DECEMBER 30, 2015, FILED FOR RECORD DECEMBER 31, 2015, RECORDED IN DEED BOOK 55721, PAGE 498 , RECORDS OF FULTON COUNTY, GEORGIA.

PARCEL 3:

BENEFICIAL EASEMENTS CREATED PURSUANT TO THAT CERTAIN EASEMENT AGREEMENT DATED SEPTEMBER 30, 2011, FILED FOR RECORD OCTOBER 5, 2011, RECORDED IN DEED BOOK 50440, PAGE 499, aforesaid records; AS AMENDED BY THAT CERTAIN AMENDED AND RESTATED EASEMENT AGREEMENT, DATED MAY 11, 2012, FILED FOR THE RECORD JUNE 25, 2012, RECORDED IN DEED BOOK 51337, PAGE 235, aforesaid records; AS AFFECTED BY THAT CERTAIN ASSIGNMENT AND ASSUMPTION OF AMENDED AND RESTATED EASEMENT AGREEMENT DATED FEBRUARY 27, 2017, FILED FOR RECORD FEBRUARY 28, 2017, AND RECORDED IN DEED BOOK 57228, PAGE 93.

PARCEL 4:

BENEFICIAL EASEMENTS CREATED PURSUANT TO THAT EASEMENT AND OPERATION AGREEMENT, DATED JUNE 21, 2012, FILED FOR RECORD JUNE 25, 2012, AND RECORDED IN DEED BOOK 51337, PAGE 322, AFORESAID RECORDS; AND AS AFFECTED BY THAT CERTAIN ASSIGNMENT AND ASSUMPTION OF EASEMENT AND OPERATION AGREEMENT DATED FEBRUARY 23, 2017, FILED FOR RECORD FEBRUARY 28, 2017, AND RECORDED IN DEED BOOK 57228, PAGE 111, AFORESAID RECORDS.

## <u>Exhibit B</u>

**Organizational Chart**

[Attached.]

ACRON 2 Porsche Drive Atlanta LLC
& ACRON 2 Porsche Drive Mezzco LLC
Organizational Chart as of October 25, 2023



\* ACRON AG Board of Directors, Klaus Bender - Chairman, Peer Bender - CEO

\*\* ACRON US Management Inc  Board of Directors, Klaus Bender - Chairman, Peer Bender, Kai Bender

\*\*\* ACRON 2 Porsche Drive Atlanta AG Board of Directors, Peer Bender – President, Juerg Greter, Andre Lagler

\*\*\*\* Project Owner owns a leasehold estate in the Project

Note: Except as shown herein, no entity or individual or their affiliates or family members has a controlling interest in, or owns ten percent (10%) or greater of the direct or indirect interests, of either Borrower or Guarantor.

# ACRON 2 Porsche Drive, Atlanta LLC

## Organizational Chart – page 2



# ACRON 2 Porsche Drive Mezzco LLC

## Organizational Chart – page 3



## Exhibit C

**FF&E Budget**

[Attached.]

# PROCACCIANTI
## COMPANIES

| CapEx Categories | General Description |
|---|---|
| **Back of House** *(Housekeeping, Laundry, Engineering)* | Physical areas and Back of House FF&E. Washers/Dryers, Ironer, flooring, laundry carts, shelving, vacuums, carpets, lint-collector systems. |
| **Business Center** | Accessories, Soft Goods, Computer/Printer, Audio/Visual Equipment, Flooring, Lighting, Lighting Equipment, Chairs/Tables, Artwork |
| **Concierge Lounge** | Concierge/Front Desk area - Case goods, front desk/pods, flooring, soft goods, lighting and sound, sundry, artwork |
| **Contingency** | Place holder for emergency funds in current year. Place holder for undefined expenses in future years |
| **Exterior** | Roof, building envelope, windows and doors, siding/façade, awnings, painting, signage, irrigation systems, paving, garage, fencing/guardrails, landscaping, parking lot, curbing and sidewalks, patio areas |
| **Fitness Center/Pool** | Indoor and outdoor exercise facilities and pool areas. Architectural finishes, flooring, fitness equipment, weights, water cooler, Treadmills. Pools - Pool resurfacing, hot tub, deck, flooring, mechanical equipment, lighting, sauna, chairs, furniture, pool locker room areas - pool dehumidification system |
| **Gift Shop / Coffee Shop** | Food, Vending, microwave, refrigerator/freezer, merchandise, equipment/accessories, etc. in Lobby |
| **Guest Corridors** | Laundry - Washer/Dryer, Ice Machines, Paint/Vinyl, General Equipment, Flooring, doors, vinyl, siding, soft goods, signage, case goods, Elevator landing seating - Other general corridor work |
| **Guest Room & Bath** | All guestroom related work, including televisions. Ceilings, artwork, mirrors, window treatments, mattresses, bedding, closets, case goods, lounge chairs, ottomans, thermostats, phones, mini fridges, safes, desk/desk chairs, light fixtures, flooring, microwaves, doors, shower/bath hardware |
| **Kitchen** | Kitchen - equipment, flooring, walk-in refrigerators/freezers, range, dishwasherm shelving, storage |
| **Life Safety / ADA** | Fire alarm systems, sprinkler systems, Exit signs, ADA upgrades |
| **Lobby** | Main lobby area, including lobby construction projects. Case goods, tables, chairs, desks, couches, soft goods, artwork, TV's, lighting and sound, carpet/flooring |
| **Mechanicals -** *Elevator / Escalator* | Elevator/Escalator Work - Cab Renovation, Equipment (sensors, generators, controls), Skins, Modernization |
| **Mechanicals -** *HVAC* | Cooling towers, chillers, boilers, distribution systems, fan coil units, package HVAC units, PTACs, VTACs, heat pumps , emergency generator |
| **Mechanicals -** *Plumbing / Electrical* | Boilers, holding tanks, piping, distribution systems. Electrical systems - mechanical, wiring, etc |
| **Mtg Rms /Pre-Func** | Ballroom, meeting rooms, board rooms, indoor and outdoor special event areas, exhibition halls, meeting specific public areas. Banquet specific service areas and kitchens. Soft Goods, Audio/Visual Equipment, Doors/Hardware, Artwork, Accessories, Tables, Chairs, AC, Lighting Equipment, Tent/Pavilion, etc |
| **Public Restrooms** | Guest Restroom areas - Accessories, faucets, stalls, hardware, soft goods, flooring, AC |
| **Restaurant Lounge** | All F&B areas, including any outdoor seating areas. Kitchen, bar, and service areas. Equipment, POS, case goods, buffet equipment, china/utensils/supplies, cabinetry, flooring, lighting/lamps, soft goods, chairs/tables |
| **Stairwells** | All stairwell-related projects. Paint,flooring, doors, lighting/lamps, rails, safety measures |
| **Technology** *(Computer / Com)* | POS, PMS, internet infrastructure, phone switch, in room entertainment. IT Needs - Server, PCI, Firewall refresh, door locking system, telephone switch, card readers, security systems |
| **Vehicles** | Purchased vehicles - Van, service vehicle needs |

| Priority Categories |
| --- |
| 1 - High Priority |
| 2 - Moderate Priority |
| 3 - Low Priority |

| Expense Years |
| --- |
| 2024 |
| 2025 |
| 2026 |



### 2024 Capital Expense Plan

| | |
|---|---|
| Property | Kimpton Overland Atlanta Airport |

| | |
|---|---|
| Owner | Acron 2 Porsche Drive Atlanta LLC |
| Management | TPG |
| # of Keys | 214 |
| Year Built | 2017 |
| Age (Years) | 6 |
| Last Guestroom Reno | N/A |
| Last Public Space Reno | N/A |

| Plan Year | 2024 | 2025 | 2026 |
|---|---|---|---|
| Revenues | $ 14,410,419 | $ 14,842,732 | $ 15,288,014 |
| Revenue Change | 3.0% | 3.0% | 3.0% |
| Funding % | 4.0% | 4.0% | 4.0% |
| | | | |
| Starting Balance | $ - | $ 430,417 | $ 1,024,126 |
| Projected Funding | $ 576,417 | $ 593,709 | $ 611,521 |
| Projected Projects | $ (146,000) | $ - | $ - |
| Projected Ending Balance | $ 430,417 | $ 1,024,126 | $ 1,635,647 |

| Year | 2024 | 2025 | 2026 | Total Cost |
|---|---|---|---|---|
| Budgeted Project Cost | $ 146,000 | $ - | $ - | $ 146,000 |

| Category | Requested CapEx Project | Reason for Request | Priority | Year | Quantity/ Allowance | Unit Cost | Total Cost | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|---|---|---|---|---|
| *Pick List* | | | *Pick List* | *Pick List* | | | | | | |
| Fitness Center/Pool | refinish pool | surface stained | 2 - Moderate Priority | 2024 | 10,000 | $ 1 | $ 10,000 | $ 10,000 | $ 0 | $ 0 |
| Gift Shop / Coffee Shop | Bodega | re-design to IHG closet size project | 1 - High Priority | 2024 | 25,000 | $ 1 | $ 25,000 | $ 25,000 | $ 0 | $ 0 |
| Guest Corridors | Ice machines | replace 3 ice machines on guest floors | 1 - High Priority | 2024 | 11,000 | $ 1 | $ 11,000 | $ 11,000 | $ 0 | $ 0 |
| Restaurant Lounge | Rooftop renovation | add bar at window, add heat overhead, add seating, | 3 - Low Priority | 2024 | 100,000 | $ 1 | $ 100,000 | $ 100,000 | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | $ - | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | $ - | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | $ - | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | $ - | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | $ - | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | $ - | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | $ - | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | $ - | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | $ - | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | $ - | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | $ - | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | $ - | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | $ - | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | $ - | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | $ - | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | $ - | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | $ - | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | $ - | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | $ - | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | $ - | $ - | $ - | $ 0 | $ 0 |


PROCACCIANTI
C O M P A N I E S

### 2024 Capital Expense Plan

| | Plan Year | 2024 | 2025 | 2026 |
|---|---|---|---|---|
| | Revenues | $ 14,410,419 | $ 14,842,732 | $ 15,288,014 |
| | Revenue Change | 3.0% | 3.0% | 3.0% |
| | Funding % | 4.0% | 4.0% | 4.0% |

| Property | Kimpton Overland Atlanta Airport |
|---|---|

| | | | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|
| Owner | Acron 2 Porsche Drive Atlanta LLC | Starting Balance | $ - | $ 430,417 | $ 1,024,126 |
| Management | TPG | Projected Funding | $ 576,417 | $ 593,709 | $ 611,521 |
| # of Keys | 214 | Projected Projects | $ (146,000) | $ - | $ - |
| Year Built | 2017 | Projected Ending Balance | $ 430,417 | $ 1,024,126 | $ 1,635,647 |
| Age (Years) | 6 | | | | |
| Last Guestroom Reno | N/A | Year | 2024 | 2025 | 2026 | Total Cost |
| Last Public Space Reno | N/A | Budgeted Project Cost | $ 146,000 | $ - | $ - | $ 146,000 |

| Category | Requested CapEx Project | Reason for Request | Priority | Year | Quantity/ Allowance | Unit Cost | Total Cost | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|---|---|---|---|---|
| *Pick List* | | | *Pick List* | *Pick List* | | | | | | |
| | | | 3 - Low Priority | 2024 | | | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | | $ - | $ - | $ 0 | $ 0 |



### 2024 Capital Expense Plan

| Plan Year | 2024 | 2025 | 2026 |
|---|---|---|---|
| Revenues | $ 14,410,419 | $ 14,842,732 | $ 15,288,014 |
| Revenue Change | 3.0% | 3.0% | 3.0% |
| Funding % | 4.0% | 4.0% | 4.0% |
| | | | |
| Starting Balance | $ - | $ 430,417 | $ 1,024,126 |
| Projected Funding | $ 576,417 | $ 593,709 | $ 611,521 |
| Projected Projects | $ (146,000) | $ - | $ - |
| Projected Ending Balance | $ 430,417 | $ 1,024,126 | $ 1,635,647 |

| Property | Kimpton Overland Atlanta Airport |
|---|---|

| Owner | Acron 2 Porsche Drive Atlanta LLC |
|---|---|
| Management | TPG |
| # of Keys | 214 |
| Year Built | 2017 |
| Age (Years) | 6 |
| Last Guestroom Reno | N/A |
| Last Public Space Reno | N/A |

| Year | 2024 | 2025 | 2026 | Total Cost |
|---|---|---|---|---|
| Budgeted Project Cost | $ 146,000 | $ - | $ - | $ 146,000 |

| Category | Requested CapEx Project | Reason for Request | Priority | Year | Quantity/ Allowance | Unit Cost | Total Cost | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|---|---|---|---|---|
| *Pick List* | | | *Pick List* | *Pick List* | | | | | | |
| | | | 3 - Low Priority | 2024 | | | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | | $ - | $ - | $ 0 | $ 0 |
| | | | 3 - Low Priority | 2024 | | | $ - | $ - | $ 0 | $ 0 |

## **Exhibit D**

**Borrower Rental Agreement**

[Attached.]

---------------------------------------------Space Above This Line for Recorder's Use---------------------------------------------

After recording, please return to:
Nelson Mullins Riley & Scarborough LLP
201 17th Street, N.W. - Suite 1700
Atlanta, Georgia 30363
Attn: Marjorie Jordan

**STATE OF GEORGIA**    )
                              )

**COUNTY OF FULTON**    )

---

## DEVELOPMENT AUTHORITY OF THE CITY OF HAPEVILLE
as Landlord

and

## ACRON 2 PORSCHE DRIVE, ATLANTA LLC
as Tenant

---

### RENTAL AGREEMENT

---

Dated May 5, 2017

---

THE RIGHTS AND INTERESTS OF THE DEVELOPMENT AUTHORITY OF THE CITY OF HAPEVILLE IN THIS RENTAL AGREEMENT AND THE REVENUES AND RECEIPTS DERIVED HEREFROM, EXCEPT FOR ITS UNASSIGNED RIGHTS, AS DEFINED HEREIN, HAVE BEEN ASSIGNED AND ARE THE SUBJECT OF A GRANT OF A SECURITY INTEREST TO ACRON 2 PORSCHE DRIVE, ATLANTA LLC, UNDER A LOAN AND SECURITY AGREEMENT DATED THIS DATE.

# RENTAL AGREEMENT

## TABLE OF CONTENTS

(This Table of Contents is not a part of the Rental Agreement
and is only for convenience of reference.)

Page

**PARTIES AND RECITALS** ................................................................................1

**ARTICLE I    -- DEFINITIONS** ......................................................................1

**ARTICLE II    -- REPRESENTATIONS AND WARRANTIES** ....................**6**

Section 2.01.    Representations by the Landlord ............................................ 6
Section 2.02.    Representations by the Tenant ............................................... 8
Section 2.03.    Reliance by Lender .............................................................. 11
Section 2.04.    Ad Valorem Tax Status of Facilities .................................... 12

**ARTICLE III    -- DEMISING CLAUSE; COLLATERAL ASSIGNMENT; TITLE** ........**12**

Section 3.01.    Demise of the Facilities ....................................................... 12
Section 3.02.    Acknowledgment of Collateral Assignment; Perfection ......... 12
Section 3.03.    Warranty of Title ................................................................. 13
Section 3.04.    Title Insurance .................................................................... 13
Section 3.05.    Tenant's Covenants Regarding Title ..................................... 13

**ARTICLE IV    -- OCCUPANCY TERM; RENTAL PROVISIONS; NATURE OF OBLIGATIONS OF TENANT** ....................**14**

Section 4.01.    Occupancy Term .................................................................. 14
Section 4.02.    Delivery and Acceptance of Possession ................................ 14
Section 4.03.    Rents and Other Amounts Payable ....................................... 14
Section 4.04.    Place of Rental Payments .................................................... 16
Section 4.05.    Nature of Obligations of Tenant Hereunder .......................... 16

**ARTICLE V    -- MAINTENANCE, TAXES, AND INSURANCE** ....................**17**

Section 5.01.    Maintenance and Modification of Facilities by the Tenant ..... 17
Section 5.02.    Taxes, Other Governmental Charges, and Utility Charges ..... 18
Section 5.03.    Insurance Required .............................................................. 18
Section 5.04.    Application of Net Proceeds of Insurance ............................. 19
Section 5.05.    Additional Provisions Respecting Insurance .......................... 19
Section 5.06.    Insurance Maintained under Secured Loan Documentation ..... 20
Section 5.07.    Advances by the Landlord or the Lender ............................... 20
Section 5.08.    Contest of Liens ................................................................... 21

(i)

Page

**ARTICLE VI    -- DAMAGE, DESTRUCTION, CONDEMNATION, AND FAILURE OF TITLE** ....................................................**21**

Section 6.01.    Damage and Destruction ................................................... 21
Section 6.02.    Condemnation and Failure of Title .................................. 22
Section 6.03.    Condemnation of Tenant-Owned Property ........................ 22

**ARTICLE VII    -- ADDITIONAL COVENANTS** ...........................................**22**

Section 7.01.    No Warranty of Condition or Suitability by the Landlord ..... 22
Section 7.02.    Access to Facilities and Records ...................................... 22
Section 7.03.    Tenant to Maintain its Existence; Conditions Under Which Exceptions Permitted ...................................................... 23
Section 7.04.    Qualification in the State .................................................. 24
Section 7.05.    Indemnity ........................................................................ 24
Section 7.06.    Information and Notices ................................................... 25
Section 7.07.    Use of Party Walls .......................................................... 25
Section 7.08.    Operation of Facilities and Safety Code ........................... 26
Section 7.09.    Hazardous Materials ........................................................ 26
Section 7.10.    Permitted Uses ................................................................ 27

**ARTICLE VIII  -- ASSIGNMENT, SUBLEASING, ENCUMBERING, AND SELLING; INSTALLATION OF TENANT'S OWN MACHINERY AND EQUIPMENT** .................................**27**

Section 8.01.    Assignment and Subleasing .............................................. 27
Section 8.02.    Restrictions on Sale, Encumbrance, or Conveyance of the Facilities by the Landlord ...................................... 28
Section 8.03.    Installation of Tenant's Own Machinery and Equipment ...... 29
Section 8.04.    Documents Required for Financing; Estoppel Certificates ..... 29

**ARTICLE IX    -- EVENTS OF DEFAULT AND REMEDIES** ...........................**30**

Section 9.01.    Events of Default Defined ................................................ 30
Section 9.02.    Remedies on Default ....................................................... 31
Section 9.03.    No Remedy Exclusive ...................................................... 32
Section 9.04.    Agreement to Pay Attorneys' Fees and Expenses .............. 33
Section 9.05.    Waiver of Events of Default ............................................. 33

**ARTICLE X    -- OPTIONS IN FAVOR OF TENANT; RENT PREPAYMENTS AND ABATEMENT** .................................................**33**

Section 10.01.  Options to Terminate Occupancy Term .............................. 33
Section 10.02.  Prepayment of Bond ........................................................ 34
Section 10.03.  Prepayment of Bond Rent ................................................ 34
Section 10.04.  Option to Prepay Bond Rent and Prepay the Bond at Prior Optional Prepayment Dates .................................... 34
Section 10.05.  No Obligation to Prepay Rents ......................................... 34
Section 10.06.  Reference to Bond Ineffective After Bond Paid .................. 34

(ii)

Page

Section 10.07.   Tenant Entitled to Certain Rent Abatements if Bond Paid Prior to Maturity ........................................................................................... 34
Section 10.08.   Granting of Easements .......................................................................... 34

**ARTICLE XI   -- MISCELLANEOUS** ...............................................................**35**
Section 11.01.   Notices.................................................................................................. 35
Section 11.02.   Recording and Filing ............................................................................ 35
Section 11.03.   Construction and Binding Effect ......................................................... 35
Section 11.04.   Severability........................................................................................... 36
Section 11.05.   [Reserved] ............................................................................................ 36
Section 11.06.   Amendments, Changes, and Modifications........................................... 36
Section 11.07.   Execution of Counterparts.................................................................... 36
Section 11.08.   Law Governing Construction of this Rental Agreement........................ 36
Section 11.09.   Quiet Enjoyment................................................................................... 36
Section 11.10.   Time of Essence ................................................................................... 36
Section 11.11.   No Estate .............................................................................................. 36
Section 11.12.   No Merger ............................................................................................. 36
Section 11.13.   Covenants Run with Premises............................................................... 36
Section 11.14.   Triple Net Rental Agreement ............................................................... 37
Section 11.15.   Surrender of Facilities .......................................................................... 37
Section 11.16.   Tenancy at Sufferance .......................................................................... 37

**SIGNATURES AND SEALS** .....................................................................**38**

**EXHIBIT A   --   DESCRIPTION OF SITE** ...............................................**A-1**

**EXHIBIT B   --   DESCRIPTION OF EQUIPMENT** ...............................**B-1**

~#4814-4034-6951 v.2~

## RENTAL AGREEMENT

This **RENTAL AGREEMENT,** dated May 5, 2017, by and between the Development Authority of the City of Hapeville (the "Landlord"), a public body corporate and politic created and existing under the laws of the State of Georgia, whose mailing address is 3468 North Fulton Avenue, Hapeville, Georgia 30354, Attention: Executive Director, and ACRON 2 Porsche Drive, Atlanta LLC (the "Tenant"), a limited liability company formed and existing under the laws of the State of Delaware, whose mailing address is c/o ACRON (USA) L.P., 2424 E. 21st Street, Suite 150, Tulsa, Oklahoma 74114, Attention: Greg W. Wilson.

## W I T N E S S E T H:

**IN CONSIDERATION OF** the respective representations and agreements hereinafter contained, the parties hereto agree as follows, provided, that in the performance of the agreements of the Landlord herein contained, any obligation it may thereby incur for the payment of money shall not constitute a general obligation of the Landlord but shall be payable solely out of the Security, and the Bond shall not constitute a general obligation of the Landlord nor constitute an indebtedness or general obligation of the City of Hapeville or of the State of Georgia or any other agency or political subdivision of the State of Georgia or the City of Hapeville, within the meaning of any constitutional or statutory provision whatsoever:

## ARTICLE I

## DEFINITIONS

Unless the context clearly otherwise requires or unless otherwise defined herein, the capitalized terms used in this Rental Agreement shall have the respective meanings specified below.

**"Additional Rent"** means the rent payable by the Tenant to the Landlord, described under the subheading "Additional Rent" in Section 4.03(d) of this Rental Agreement.

**"Additional Rent Prepayment Amount"** means the Discounted Value of the Remaining Scheduled Payments of Net Additional Rent.

**"Additions or Alterations"** means modifications, repairs, renewals, improvements, replacements, alterations, additions, enlargements, or expansions in, on, or to the Facilities, including any and all machinery, furnishings, fixtures, and equipment therefor, and including the restoration, reconstruction, or replacement of buildings, equipment, or other property damaged or destroyed by fire or other casualty or taken by or under the threat of condemnation or for which title is lost.

**"Administrative Rent"** means the rent payable by the Tenant to the Landlord, described under the subheading "Administrative Rent" in Section 4.03(b) of this Rental Agreement.

**"Affiliate"** of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, (i) "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the power to appoint and remove its directors, the ownership of voting securities, by contract,

membership, or otherwise, and (ii) the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"**Bond**" means the Economic Development Revenue Bond (Solis Hotel 2 Porsche Drive Project), Series 2017, dated this date, of the Landlord, in the original principal amount not to exceed $424,097,500, to be issued pursuant to the Loan Agreement, and any revenue bond issued in substitution or exchange therefor.

"**Bond Documents**" means, collectively, this Rental Agreement, the Purchase and Sale Agreement, the Loan Agreement, and the Bond.

"**Bond Rent**" means the rent payable by the Tenant to the Landlord, described under the subheading "Bond Rent" in Section 4.03(a) of this Rental Agreement.

"**Buildings**" means those certain buildings and all other facilities and improvements constituting part of the Facilities and not constituting part of the Equipment, which are or will be located on the Site.

"**Commencement Date**" means the date that the Seller conveys the Facilities to the Landlord pursuant to the Purchase and Sale Agreement.

"**Default**" means an event or condition the occurrence or existence of which would, with the lapse of time or the giving of notice or both, become an Event of Default.

"**Deferred Purchase Price Rent**" means the rent payable by the Tenant to the Landlord, described under the subheading "Deferred Purchase Price Rent" in Section 4.03(c) of this Rental Agreement.

"**Discounted Value**" means the amount obtained by discounting all Remaining Scheduled Payments of Net Additional Rent from their respective scheduled due dates to the date of payment of the Additional Rent Prepayment Amount, in accordance with accepted financial practice and at a discount factor (applied on an annual basis) equal to the greater of (i) 4.50% or (ii) the weighted average rate of the Secured Loans then outstanding.

"**Environmental Laws**" means all federal, state, and local laws, rules, regulations, ordinances, programs, permits, guidances, orders, and consent decrees relating to health, safety, and environmental matters, now or hereafter in effect, of any governmental authority having jurisdiction over the Facilities, including, but not limited to, the Resource Conservation and Recovery Act, as amended, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, the Toxic Substances Control Act, as amended, the Clean Water Act, as amended, the Clean Air Act, as amended, the Superfund Amendments and Reauthorization Act of 1986, as amended, the Federal Water Pollution Control Act, as amended, the Oil Pollution Act, as amended, the Emergency Planning and Community Right-to-Know Act, as amended, the Safe Drinking Water Act, as amended, state and federal superlien and environmental cleanup programs and laws, and U.S. Department of Transportation regulations.

-2-

**"Equipment"** means the equipment, machinery, furnishings, and other personal property described in Exhibit B attached hereto, which, by this reference thereto, is incorporated herein, and all replacements, substitutions, and additions thereto.

**"Event of Default"** means the events specified in Section 9.01 of this Rental Agreement.

**"Facilities"** means the Site and the Buildings located thereon and the Equipment, which are the subject of this Rental Agreement.

**"Insurance Requirements"** means all terms of any insurance policy required to be obtained under this Rental Agreement covering or applicable to the Facilities or any part thereof; all requirements of the issuer of any such policy; and all orders, rules, regulations, and other requirements of the national board of fire underwriters (or any other body exercising similar functions) applicable to or affecting the Facilities or any part thereof or any use of the Facilities or any part thereof.

**"Landlord"** means the Development Authority of the City of Hapeville, a public body corporate and politic created and existing under the laws of the State, and its successors and assigns.

**"Landlord Contracts"** means, collectively, this Rental Agreement, the Loan Agreement, the Bond, and the Purchase and Sale Agreement.

**"Lender"** means ACRON 2 Porsche Drive, Atlanta LLC, a limited liability company formed and existing under the laws of the State of Delaware, and its successors and assigns, in its capacity as lender pursuant to the Loan Agreement.

**"Lien"** means any interest in Property securing an obligation owed to, or a claim by, a person other than the owner of the Property, whether such interest is based on the common law, statute, or contract, and including, but not limited to, the security interest, security title, or lien arising from a security agreement, mortgage, deed of trust, security deed, encumbrance, pledge, conditional sale, or trust receipt or a lease, consignment, or bailment for security purposes. The term "Lien" shall include reservations, exceptions, encroachments, easements, rights-of-way, covenants, conditions, restrictions, leases, and other title exceptions and encumbrances affecting Property.

**"Loan Agreement"** means the Loan and Security Agreement, dated this date, between the Landlord, as borrower, and the Lender, as the same may be amended or supplemented from time to time in accordance with the terms thereof.

**"Net Proceeds"** means, when used with respect to any insurance or condemnation award, the gross proceeds from the insurance or condemnation award with respect to which that term is used remaining after payment of all expenses (including attorney's fees, adjuster's fees, and any other expenses) incurred in the collection of such gross proceeds.

**"Occupancy Term"** means the duration of the right of occupancy created in this Rental Agreement, as specified in Section 4.01 hereof.

**"Permitted Encumbrance"** means, with respect to the Facilities, any of the following:

(i)    the Lien on the Facilities created by this Rental Agreement;

(ii)    any judgment lien or notice of pending action against the Tenant so long as such judgment or pending action is being contested and execution thereon has been stayed or the period for responsive pleading or appeal has not lapsed, and neither the Lien of this Rental Agreement nor the Facilities will be materially impaired or subject to material loss or forfeiture;

(iii)    (A)  rights reserved to or vested in any municipality or public authority by the terms of any right, power, franchise, grant, license, permit, or provision of law affecting the Facilities, to (1) terminate such right, power, franchise, grant, license, or permit, provided that the exercise of such right would not, in the opinion of the Tenant, materially impair the use of the Facilities or materially and adversely affect the value thereof; or (2) purchase, condemn, appropriate, or recapture, or designate a purchaser of, the Facilities; (B) any Liens (or deposits to obtain the release of such Liens) on the Facilities for taxes, assessments, levies, fees, water and sewer charges, and other governmental and similar charges, and any Liens of mechanics, materialmen, laborers, suppliers, or vendors for work or services performed or materials furnished in connection with the Facilities, which, in the opinion of the Tenant, are not material in amount or which are not due and payable or which are not delinquent or which, or the amount or validity of which, are being contested in good faith and execution thereon is stayed or, with respect to Liens of mechanics, materialmen, laborers, suppliers, or vendors, have been due for less than 90 days; (C) utility, access, and other easements, rights-of-way, servitudes, restrictions, and other minor defects, encumbrances, encroachments, and irregularities in the title to the Facilities that do not, in the opinion of the Tenant, materially impair the use of the Facilities or materially and adversely affect the value thereof; (D) rights reserved to or vested in any municipality or public authority to control or regulate the Facilities or to use the Facilities in any manner, which rights do not, in the opinion of the Tenant, materially impair the use of the Facilities or materially and adversely affect the value thereof; and (E) landlord's liens;

(iv)    any matters revealed by the title insurance binder or policy required by Section 3.04 hereof;

(v)    any Lien on the right of occupancy created by this Rental Agreement; and

(vi)    any Lien that secures indebtedness which financed or refinanced costs of the Facilities that would, if financed by the Landlord, constitute "cost of project" (as defined in Section 36-62-2(2) of the Official Code of Georgia Annotated); and

(vii)    subleases and sublicenses permitted by Section 8.01 hereof.

**"Person"** means an individual, a corporation, a partnership, a limited liability company, an association, a joint stock company, a joint venture, a trust, an unincorporated organization, a governmental unit or an agency, a political subdivision or instrumentality thereof, or any other group or organization of individuals.

-4-

**"Prime Rate"** means the rate quoted from time to time as the "U.S. Prime Rate" in the Money Rates column of *The Wall Street Journal* (or if more than one U.S. prime rate is quoted, the average of such rates). If *The Wall Street Journal* is not published on any day, "Prime Rate" shall be determined from the last date *The Wall Street Journal* was published.

**"Property"** means, with respect to any Person, any and all rights, titles, and interests of such Person in and to any and all property, whether real or personal, tangible or intangible, and wherever situated.

**"Purchase and Sale Agreement"** means the Purchase, Sale, Financing, and Option Agreement, dated this date, between the Seller, as seller, and the Landlord, as purchaser, as the same may be amended or supplemented from time to time in accordance with the terms thereof.

**"Regulatory Body"** means any federal, state, or local government, department, agency, or instrumentality and other public or private body, including accrediting organizations, having regulatory jurisdiction and authority over the Tenant or its facilities or operations.

**"Remaining Scheduled Payments of Net Additional Rent"** means all payments of Additional Rent that would be due after the date of prepayment of Additional Rent if no prepayment of Additional Rent were made prior to their scheduled due dates, reduced by the following amounts on September 30 of the following numbered years, commencing with the calendar year following the calendar year of the Commencement Date:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1 | $    -0- | 16 | $355,800 |
| 2 | -0- | 17 | 359,358 |
| 3 | -0- | 18 | 362,952 |
| 4 | -0- | 19 | 366,581 |
| 5 | -0- | 20 | 370,247 |
| 6 | 322,101 | 21 | 373,949 |
| 7 | 325,322 | 22 | 377,689 |
| 8 | 328,575 | 23 | 381,466 |
| 9 | 331,861 | 24 | 385,280 |
| 10 | 335,180 | 25 | 389,133 |
| 11 | 338,532 | 26 | 393,025 |
| 12 | 341,917 | 27 | 396,955 |
| 13 | 345,336 | 28 | 400,924 |
| 14 | 348,789 | 29 | 404,934 |
| 15 | 352,277 | 30 | 408,983 |

**"Rental Agreement"** means this Rental Agreement between the Landlord and the Tenant, as it may be supplemented and amended from time to time in accordance with the provisions hereof.

**"Secured Loans"** means indebtedness that financed or refinanced costs of the Facilities and that is secured by a Lien on the Facilities.

-5-

**"Security"** means any of the property subject to the operation of the assignment and pledge and grant of lien and security interest contained in the Loan Agreement.

**"Seller"** means ACRON 2 Porsche Drive, Atlanta LLC, a limited liability company formed and existing under the laws of the State of Delaware, and its successors and assigns, in its capacity as the seller of the Facilities pursuant to the Purchase and Sale Agreement.

**"Site"** means the real estate described in Exhibit A attached hereto, which, by this reference thereto, is incorporated herein.

**"Specially Designated National or Blocked Person"** means (i) Persons designated by the U.S. Department of Treasury's Office of Foreign Assets Control, or other governmental entity, from time to time as a "specially designated national or blocked person" or similar status and (ii) a Person described in Section 1 of U.S. Executive Order 13224 issued on September 23, 2001.

**"State"** means the State of Georgia.

**"Tenant"** means ACRON 2 Porsche Drive, Atlanta LLC, a limited liability company duly formed and existing under the laws of the State of Delaware, and its successors and assigns.

**"Tenant Contracts"** means this Rental Agreement.

**"Unassigned Rights"** means all of the rights of the Landlord pursuant to Sections 3.03, 3.04, 3.05, 4.02, 4.03(b), 4.03(c), 4.03(d), 4.03(e), 7.02, 7.05, 7.06, 7.08, 7.09, and 8.01 hereof; pursuant to Articles V and VI hereof; and, to the extent relating solely to the foregoing, pursuant to Article IX hereof.

**ARTICLE II**

**REPRESENTATIONS AND WARRANTIES**

**Section 2.01.  Representations by the Landlord**.  The Landlord makes the following representations and warranties as the basis for the undertakings on its part herein contained:

(a)  Creation and Authority.  The Landlord is a public body corporate and politic duly created and validly existing under the laws of the State.  The Landlord has all requisite power and authority (1) to issue the Bond to finance the costs of acquiring the Facilities and to finance related costs; (2) to acquire the Facilities and to rent the Facilities to the Tenant; and (3) to enter into, perform its obligations under, and exercise its rights under the Landlord Contracts.

(b)  Pending Litigation. There are no actions, suits, proceedings, inquiries, or investigations pending or, to the knowledge of the Landlord, after making due inquiry with respect thereto, threatened against or affecting the Landlord in any court or by or before any governmental authority or arbitration board or tribunal, which involve the possibility of materially and adversely affecting the transactions contemplated by the Landlord Contracts or which, in any way, would adversely affect the validity or enforceability of the Landlord Contracts or any agreement or instrument to which the Landlord is a party and which is used

~#4814-4034-6951 v.2~

or contemplated for use in the consummation of the transactions contemplated hereby or thereby, nor is the Landlord aware of any facts or circumstances presently existing that would form the basis for any such actions, suits, or proceedings.

(c)  <u>Agreements Are Authorized</u>.  The execution and delivery by the Landlord of the Landlord Contracts and the compliance by the Landlord with all of the provisions of each thereof (i) are within the purposes, powers, and authority of the Landlord; (ii) have been done in full compliance with the provisions of the laws of the State and have been approved by its Board of Directors and will not conflict with or constitute on the part of the Landlord a violation of or a breach of or a default under, or result in the creation or imposition of any lien, charge, restriction, or encumbrance (other than Permitted Encumbrances) upon any property of the Landlord under the provisions of, any charter instrument, bylaw, indenture, mortgage, security deed, pledge, note, lease, loan, or installment sale agreement, contract, or other agreement or instrument to which the Landlord is a party or by which the Landlord or its properties are otherwise subject or bound, or any license, judgment, decree, law, statute, order, writ, injunction, demand, rule, or regulation of any court or governmental agency or body having jurisdiction over the Landlord or any of its activities or properties, which involve the possibility of materially and adversely affecting the transactions contemplated by the Landlord Contracts; and (iii) have been duly authorized by all necessary corporate action on the part of the Landlord.  The Landlord Contracts are the valid, legal, and binding obligations of the Landlord enforceable against the Landlord in accordance with their terms, except as such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium, or other similar laws affecting the enforcement of creditors' rights generally and (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).  The officers of the Landlord executing the Landlord Contracts are duly and properly in office and are fully authorized and empowered to execute the same for and on behalf of the Landlord.

(d)  <u>Governmental Consents</u>.  Neither the nature of the Landlord nor any of its activities or properties, nor any relationship between the Landlord and any other Person, nor any circumstance in connection with the transactions contemplated by the Landlord Contracts is such as to require the consent, approval, permission, order, license, or authorization of, or the filing, registration, or qualification with, any governmental authority on the part of the Landlord in connection with the execution, delivery, and performance of the Landlord Contracts or the consummation of any transaction therein contemplated, which are presently obtainable, except as shall have been obtained or made and as are in full force and effect.

(e)  <u>No Defaults</u>.  To the knowledge of the Landlord, after making due inquiry with respect thereto, the Landlord is not in default or violation in any material respect under its authorizing legislation or under any charter instrument, bylaw, or other agreement or instrument to which it is a party or by which it may be bound, which involve the possibility of materially and adversely affecting the transactions contemplated by the Landlord Contracts.

(f)  <u>No Prior Pledge</u>.  Neither the Landlord Contracts or the Facilities nor any of the payments or amounts to be received by the Landlord under the Landlord Contracts or with

-7-

respect to the Facilities have been or will be pledged or hypothecated in any manner or for any purpose or have been or will be the subject of a grant of a security interest by the Landlord other than as provided in the Landlord Contracts.

(g)   <u>Disclosure</u>.  To the best knowledge of the Landlord, the representations of the Landlord contained in this Rental Agreement and any certificate, document, written statement, or other instrument furnished by or on behalf of the Landlord to the Tenant in connection with the transactions contemplated hereby do not contain any untrue statement of a material fact and do not omit to state a material fact necessary to make the statements contained herein or therein not misleading.  There is no fact that the Landlord has not disclosed to the Tenant in writing that materially and adversely affects or in the future may (so far as the Landlord can now reasonably foresee) materially and adversely affect the acquisition of the Facilities or the rental of the Facilities or the ability of the Landlord to perform its obligations under the Landlord Contracts or any of the documents or transactions contemplated hereby or thereby or any other transactions contemplated by the Bond Documents that has not been set forth in writing to the Tenant or in the other certificates, documents, and instruments furnished to the Tenant by or on behalf of the Landlord prior to the date hereof in connection with the transactions contemplated hereby.

   **Section 2.02.  <u>Representations by the Tenant</u>**.   The Tenant makes the following representations and warranties as the basis for the undertakings on its part herein contained:

(a)   <u>Formation and Power</u>. The Tenant is a limited liability company duly formed, validly existing, and in good standing under and by virtue of the laws of the State of Georgia, without limit as to the duration of its existence, and is duly qualified to do business as a foreign limited liability company in good standing in all jurisdictions in which such qualification is required, and has all requisite power and authority and all necessary licenses and permits to own and operate its properties and to carry on its operations as they are now being conducted and as they are presently proposed to be conducted.

(b)   <u>Pending Litigation and Taxes</u>. There are no actions, suits, proceedings, inquiries, or investigations pending or, to the knowledge of the Tenant, after making due inquiry with respect thereto, threatened against or affecting the Tenant in any court or by or before any governmental authority or arbitration board or tribunal, which involve the possibility of materially and adversely affecting the ability of the Tenant to perform its obligations under the Tenant Contracts or the transactions contemplated by the Tenant Contracts or which, in any way, would adversely affect the validity or enforceability of the Tenant Contracts or any agreement or instrument to which the Tenant is a party and which is used or contemplated for use in the consummation of the transactions contemplated hereby or thereby, nor is the Tenant aware of any facts or circumstances presently existing that would form the basis for any such actions, suits, or proceedings. The Tenant is not in default with respect to any judgment, order, writ, injunction, decree, demand, rule, or regulation of any court, governmental authority, or arbitration board or tribunal, which would have a material adverse effect on the transactions contemplated by the Tenant Contracts.  All tax returns (federal, state, and local) required to be filed by or on behalf of the Tenant have been duly filed, and all taxes, assessments, and other governmental charges shown thereon to be due, including interest and penalties, except such, if any, as are being actively contested by

-8-

the Tenant in good faith, have been paid or adequate reserves have been made for the payment thereof.

(c) <u>Agreements Are Authorized</u>. The execution and delivery by the Tenant of the Tenant Contracts, the consummation of the transactions herein and therein contemplated, and the fulfillment of or the compliance with all of the provisions hereof and thereof (i) are within the power, legal right, and authority of the Tenant; (ii) will not conflict with or constitute on the part of the Tenant a violation of or a breach of or a default under, or result in the creation or imposition of any lien, charge, restriction, or encumbrance (other than Permitted Encumbrances) upon any property of the Tenant under the provisions of, any organic document, indenture, mortgage, security deed, pledge, note, lease, loan, or installment sale agreement, contract, or other agreement or instrument to which the Tenant is a party or by which the Tenant or its properties are otherwise subject or bound, or any license, law, statute, rule, regulation, judgment, order, writ, injunction, decree, or demand of any court or governmental agency or body having jurisdiction over the Tenant or any of its activities or properties, which involve the possibility of materially and adversely affecting the ability of the Tenant to perform its obligations under the Tenant Contracts or the transactions contemplated by the Tenant Contracts; and (iii) have been duly authorized by all necessary and appropriate company action on the part of the governing body of the Tenant. The Tenant Contracts are the valid, legal, and binding obligations of the Tenant enforceable against the Tenant in accordance with their terms, except as such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium, or other similar laws affecting the enforcement of creditors' rights generally and (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law). The officers of the Tenant executing the Tenant Contracts are duly and properly in office and are fully authorized and empowered to execute the same for and on behalf of the Tenant.

(d) <u>Governmental Consents</u>. Neither the Tenant nor any of its activities or properties, nor any relationship between the Tenant and any other Person, nor any circumstances in connection with the execution, delivery, and performance by the Tenant of its obligations under the Tenant Contracts is such as to require the consent, approval, permission, order, license, or authorization of, or the filing, registration, or qualification with, any governmental authority on the part of the Tenant in connection with the execution, delivery, and performance of the Tenant Contracts or the consummation of any transaction therein contemplated, which are presently obtainable, except as shall have been obtained or made and as are in full force and effect. To the knowledge of the Tenant, after making due inquiry with respect thereto, the Tenant will be able to obtain all such additional consents, approvals, permissions, orders, licenses, or authorizations of governmental authorities as may be required on or prior to the date the Tenant is legally required to obtain the same.

(e) <u>No Defaults</u>. To the knowledge of the Tenant, after making due inquiry with respect thereto, no event has occurred and no condition exists that would constitute an Event of Default or that, with the lapse of time or with the giving of notice or both, would become an Event of Default. To the knowledge of the Tenant, after making due inquiry with respect thereto, the Tenant is not in default or violation in any material respect under any organic document or other agreement or instrument to which it is a party or by which it may be bound, which involve the possibility of materially and adversely affecting the ability of the

Tenant to perform its obligations under the Tenant Contracts, or the transactions contemplated by the Tenant Contracts.

(f)  <u>Compliance with Law</u>.  To the knowledge of the Tenant, after making due inquiry with respect thereto, the Tenant is not in violation of any laws, ordinances, or governmental rules or regulations (including, without limitation, all Environmental Laws) to which it or its properties are subject and has not failed to obtain any licenses, permits, franchises, or other governmental authorizations (which are presently obtainable) necessary to the ownership of its properties or to the conduct of its business, which violation or failure to obtain might materially and adversely affect the ability of the Tenant to perform its obligations under the Tenant Contracts or the transactions contemplated by the Tenant Contracts, and there have been no citations, notices, or orders of noncompliance issued to the Tenant under any such law, ordinance, rule, or regulation.

(g)  <u>Restrictions on the Tenant</u>.  The Tenant is not a party to or bound by any contract, instrument, or agreement, or subject to any other restriction (other than Permitted Encumbrances), that materially and adversely affects the ability of the Tenant to perform its obligations under the Tenant Contracts or the transactions contemplated by the Tenant Contracts.  The Tenant has satisfied the conditions of any contract or agreement that restricts the right or ability of the Tenant to incur indebtedness for borrowed money or to enter into long-term leases, so that the Tenant may enter into and perform its obligations under this Rental Agreement.

(h)  <u>Disclosure</u>.  To the best knowledge of the Tenant, the representations of the Tenant contained in this Rental Agreement and any certificate, document, written statement, or other instrument furnished by or on behalf of the Tenant to the Landlord or the Lender in connection with the transactions contemplated hereby do not contain any untrue statement of a material fact and do not omit to state a material fact necessary to make the statements contained herein or therein not misleading.  There is no fact that the Tenant has not disclosed to the Landlord and to the Lender in writing that materially and adversely affects or in the future may (so far as the Tenant can now reasonably foresee) materially and adversely affect the acquisition, rental, or operation of the Facilities or the ability of the Tenant to perform its obligations under the Tenant Contracts or any of the documents or transactions contemplated hereby or thereby or any other transactions contemplated by the Bond Documents that has not been set forth in writing to the Landlord and the Lender or in the other certificates, documents, and instruments furnished to the Landlord and the Lender by or on behalf of the Tenant prior to the date hereof in connection with the transactions contemplated hereby.

(i)  <u>Facilities Legal Compliance</u>.  To the knowledge of the Tenant, after making due inquiry with respect thereto, the operation of the Facilities in the manner presently contemplated will not conflict in any material respect with any zoning, water or air pollution or other ordinance, order, law, rule, or regulation applicable to the Facilities, including, without limitation, Environmental Laws.  The Tenant has caused or will cause the Facilities to be designed in accordance with all applicable federal, state, and local laws or ordinances (including rules and regulations) relating to zoning, planning, building, safety, and environmental quality.  The Tenant will operate or will cause the Facilities to be operated in compliance in all material respects with the requirements of all such laws, ordinances, rules,

-10-

and regulations, including, without limitation, Environmental Laws. The Tenant further covenants and agrees to comply in all material respects with, or use its reasonable efforts to cause other Persons whose obligation it is to so comply by contract or pursuant to law to comply in all material respects with, and materially conform to, all present and future laws, statutes, codes, ordinances, orders, judgments, decrees, injunctions, rules, regulations, and requirements applicable to the Facilities, and irrespective of the nature of the work to be done, of every applicable governmental authority, including Environmental Laws applicable to the Facilities, and all covenants, restrictions, and conditions now or hereafter of record that may be applicable to the use, manner of use, occupancy, possession, operation, maintenance, alteration, repair, or reconstruction of the Facilities, including building and zoning codes and ordinances (collectively, the "Legal Requirements"), provided that the Tenant shall not be in default hereunder so long as the Tenant, promptly after receiving an actual written notice of any noncompliance, commences and uses its diligent efforts to cause compliance with such Legal Requirements, and as long as the failure to comply does not subject the Facilities to any material and imminent danger of being forfeited or lost as a result thereof. The Tenant possesses or will possess, and the Tenant hereby agrees to maintain and obtain in the future, all necessary licenses and permits, or rights thereto, to operate the Facilities as presently proposed to be operated, and all such licenses, permits, or other approvals required in connection with the operation of the Facilities have been duly obtained and are in full force and effect except for any such licenses, permits, or other approvals that are not yet required and that will be duly obtained not later than the time required or the failure to obtain which will not materially and adversely affect the operation of the Facilities. The Tenant covenants and agrees to do all commercially reasonable things necessary to preserve and keep in full force and effect its franchises, rights, powers, and privileges as the same relate to the Facilities.

(j)    Statutory Liens. There are no mechanics' or materialmen's liens or other statutory liens on the Facilities, except for Permitted Encumbrances and except as the Landlord shall be advised in writing, and in the event the Landlord is so advised in writing of any such liens, the Tenant will provide the Landlord with waivers of all such liens in such form as may be reasonably satisfactory to the Landlord, subject to the Tenant's right to contest such liens contained in Section 5.08 hereof.

(k)    Utilities. All utility services and facilities necessary for the operation of the Facilities for their intended purposes are available at the Site.

(l)    Condemnation. No condemnation or eminent domain proceeding has been commenced and is currently pending or, to the knowledge of the Tenant, threatened against the Facilities.

**Section 2.03.    Reliance by Lender**. The Landlord and the Tenant acknowledge and agree that these representations and warranties are made to induce the Lender to make the loan contemplated by the Loan Agreement, and that such representations and warranties and any other representations and warranties made by the Landlord and the Tenant in the Bond Documents are made for the benefit of the Lender and may be relied upon by the Lender.

-11-

**Section 2.04.  Ad Valorem Tax Status of Facilities**.  (a)  It is the understanding of the parties that the Landlord does not pay ad valorem property taxes on its interest in the Facilities. The Tenant's interest in the Facilities under this Rental Agreement constitutes a mere usufruct and bailment for hire (which are not separately taxable estates) and does not constitute an estate for years (which would be an estate in which the leasehold interest would be taxable based on the value of the leasehold interest). Thus, while this Rental Agreement is in effect, the parties hereto contemplate that the Tenant shall be liable for no actual ad valorem property taxes on its occupancy or bailment for hire interest in the Facilities.  Notwithstanding anything herein to the contrary, the Landlord cannot and does not warrant, guarantee, or promise any particular *ad valorem* tax treatment resulting from this Rental Agreement.  In the event that (1) any tangible property interest of the Tenant in the Facilities becomes subject to ad valorem property taxation during the period of time that title to the Facilities is vested in the Landlord or (2) this Rental Agreement is determined to grant to the Tenant a "special franchise" or an "unenumerated franchise" within the meaning of Article 9 of Chapter 5 of Title 48 of the Official Code of Georgia Annotated or any successor statutes, the amounts to be paid hereunder as Bond Rent and Additional Rent (but not as Administrative Rent or Deferred Purchase Price Rent) shall be reduced (but not below zero) by the actual cumulative payments made by the Tenant as ad valorem property taxes on the Tenant's tangible property interest in the Facilities or on any special franchise or unenumerated franchise determined to be granted by this Rental Agreement. The Tenant shall furnish to the Landlord and to the Lender, upon request, validated receipts showing the payment of any ad valorem property taxes on the Tenant's tangible property interest in the Facilities or on any special franchise or unenumerated franchise determined to be granted by this Rental Agreement.

(b)  In the event that the Tax Commissioner of Fulton County or any other tax collector attempts to collect ad valorem property taxes from the Tenant on its interest in the Facilities or on any special franchise or unenumerated franchise determined to be granted by this Rental Agreement, the Tenant shall exercise commercially reasonable efforts to contest the collection of such ad valorem property taxes.  The Landlord shall cooperate fully with the Tenant in any such contest.

## ARTICLE III

## DEMISING CLAUSE; COLLATERAL ASSIGNMENT; TITLE

**Section 3.01.  Demise of the Facilities**.  The Landlord demises and rents to the Tenant, and the Tenant rents from the Landlord, the Facilities at the rentals set forth in Section 4.03 hereof and for the Occupancy Term and in accordance with the provisions of this Rental Agreement, subject to Permitted Encumbrances.  Nothing in this Rental Agreement shall be construed to require the Landlord to operate the Facilities other than as landlord.

**Section 3.02.  Acknowledgment of Collateral Assignment; Perfection**.  The Tenant hereby assents to the collateral assignment and grant of a first priority security interest made of the Landlord's rights hereunder (except for Unassigned Rights) in the Loan Agreement and hereby agrees that its obligations to make all payments of Bond Rent under this Rental Agreement shall be absolute and shall not be subject to any defense, except payment, or to any right of setoff, counterclaim, or recoupment arising out of any breach by the Landlord of any obligation to the Tenant, whether hereunder or otherwise, or arising out of any indebtedness or liability at any time owing to the Tenant by the Landlord, except as provided in Section 2.04 of this Rental Agreement.

-12-

The Tenant further agrees that all payments required to be made under this Rental Agreement, except for those arising out of Unassigned Rights, shall be paid directly to the Lender for the account of the Landlord. The Lender shall have all rights and remedies herein accorded to the Landlord (except for Unassigned Rights), and any reference herein to the Landlord shall be deemed, with the necessary changes in detail, to include the Lender, and the Lender is deemed to be and is a third party beneficiary of the representations, covenants, and agreements of the Tenant herein contained.

Upon reasonable and timely written request from the Lender or the Landlord as to the required form, substance, timing, and place for filing, refiling, recording, or re-recording, or for taking possession of any collateral, the Tenant shall file, refile, record, or re-record all financing statements, continuation statements, documents, and notices or deliver possession of any instrument or cash necessary to perfect and maintain any lien or security interest created by the Loan Agreement for the benefit of the Lender as a first and preferred pledge, lien, encumbrance, and security interest in and to the Security. The Landlord agrees that it will cooperate fully and will take any action required to assist the Tenant in meeting the provisions of this Section 3.02.

**Section 3.03.   Warranty of Title**.  The Landlord warrants that (a) the Landlord has the right to acquire good and marketable fee simple title to the Site pursuant to the Purchase and Sale Agreement, (b) the Landlord has the right to acquire legal title to the Buildings and good and merchantable title to the Equipment pursuant to the Purchase and Sale Agreement, and (c) the Seller is required to convey the Facilities to the Landlord free of all adverse claims and Liens, other than Permitted Encumbrances, pursuant to the Purchase and Sale Agreement.

**Section 3.04.   Title Insurance**.  The Tenant shall, on or before the Commencement Date, furnish title insurance in the form of an ALTA owner's title policy issued by a title insurance company reasonably acceptable to the Landlord in the face amount of at least the purchase price established for the Site and the Buildings pursuant to the Purchase and Sale Agreement and shall furnish a copy of such binder or policy to the Landlord. The owner's title policy shall insure that the Tenant, as beneficial owner, has good and marketable fee simple title to the Site and the Buildings subject only to Permitted Encumbrances. Such policy shall not contain the standard exceptions for discrepancies, encroachments, overlaps, conflicts in boundary lines, or other matters that would be disclosed by an accurate survey and inspection of the Site, for mechanics' and materialmen's liens, or for rights or claims of parties in possession and easements or claims of easements not shown by the public records. Any Net Proceeds payable to the Tenant under such policy shall be applied as provided in Section 6.02 hereof.

**Section 3.05.   Tenant's Covenants Regarding Title**.  The Tenant agrees to protect, preserve, and defend the Landlord's interest in the Facilities and its title thereto, to appear and defend such interest and title in any action or proceeding affecting or purporting to affect such interest and title, and to pay on demand all reasonable costs and expenses actually incurred by the Landlord in or in connection with any such action or proceeding, including reasonable attorneys' fees actually incurred, as described in Section 9.04 of this Rental Agreement, whether any such action or proceeding progresses to judgment and whether brought by or against the Landlord. The Landlord shall be reimbursed for any such costs and expenses in accordance with the provisions of Section 5.07 hereof. If the Tenant does not take the action contemplated herein, the Landlord may, after providing thirty (30) days prior written notice to the Tenant, but shall not be under any obligation to, appear or intervene in any such action or proceeding and retain counsel therein and

-13-

defend the same or otherwise take such action therein as it may be advised and may settle or compromise the same and, in that behalf and for any of such purposes, may expend and advance such sums of money as it may deem necessary, and such sums shall be an advance payable in accordance with Section 5.07 of this Rental Agreement. The Landlord agrees that it shall, upon the written request of the Tenant, join where necessary in any proceeding to protect and defend the Landlord's title in and to the Facilities, provided that the Tenant shall pay the entire cost of any such proceeding and reimburse and indemnify and hold harmless the Landlord from any cost or liability whatsoever, except for costs and liabilities resulting from the gross negligence or willful misconduct of the Landlord.

## ARTICLE IV

## OCCUPANCY TERM; RENTAL PROVISIONS; NATURE OF OBLIGATIONS OF TENANT

**Section 4.01.  Occupancy Term**.  This Rental Agreement shall become effective upon the Commencement Date and shall be in full force and effect until midnight on December 1 of the 30th calendar year following the calendar year of the Commencement Date, subject to the provisions of this Rental Agreement permitting earlier termination (including particularly Articles IX and X hereof), or if the Bond has not been paid in full, until the date that such payment shall have been made; provided, however, that the covenants and obligations expressed herein to so survive shall survive the termination of this Rental Agreement.

**Section 4.02.  Delivery and Acceptance of Possession**.  The Landlord agrees to deliver to the Tenant sole and exclusive possession of the Facilities upon the Commencement Date (subject to Permitted Encumbrances and the right of the Landlord to enter thereon for inspection purposes and subject to the other provisions of Section 7.02 hereof), and the Tenant agrees to accept possession of the Facilities upon the Commencement Date.  The Landlord shall be permitted such continued possession of the Facilities as shall be necessary and convenient for it to make or cause to be made any repairs or restorations required or permitted to be made by the Landlord pursuant to the provisions of Section 5.07 hereof.  The Landlord covenants and agrees that it shall not take any action, other than pursuant to Article IX of this Rental Agreement, to prevent the Tenant from having quiet and peaceable possession and enjoyment of the Facilities during the Occupancy Term and shall, at the request of the Tenant and at the cost of the Tenant, cooperate with the Tenant in order that the Tenant may have quiet and peaceable possession and enjoyment of the Facilities.

**Section 4.03.  Rents and Other Amounts Payable**.  (a) Bond Rent:  Until the principal of, premium, if any, and interest on the Bond shall have been fully paid, the Tenant shall pay to the Lender for the account of the Landlord rent for the Facilities, on or before each date on which any payment of principal of, premium, if any, or interest on the Bond is due and payable, in a sum equal to the amount payable on such date as principal of, premium, if any, and interest on the Bond, as provided in the Loan Agreement, but subject to the credit provisions of Section 2.04 hereof.  Each installment of Bond Rent under this Section due on an interest or principal payment date or prepayment date until the Bond is fully paid shall in all events be sufficient to pay the total amount of interest, principal, prepayment requirement, and premium, if any, payable on the Bond on the principal or interest payment date or on the prepayment date, but subject to the credit provisions of Section 2.04 hereof.  Any installment of Bond Rent not received by the Lender when due shall

-14-

continue as an obligation of the Tenant until paid and shall bear interest at the rate of interest on the Bond to which such installment of Bond Rent relates.

(b)    <u>Administrative Rent</u>:  The Tenant agrees to pay rent for the Facilities, upon the delivery of the Bond, in a sum equal to $202,500 as partial reimbursement for the reasonable out-of-pocket costs and expenses of the Landlord actually incurred in connection with its negotiation, structuring, documenting, and closing the Bond Documents, including, without limitation, the reasonable fees and disbursements of counsel for the Landlord.  The Tenant agrees to pay rent for the Facilities in a sum equal to all reasonable out-of-pocket costs and expenses of the Landlord actually incurred in connection with its administration or modification of, or in connection with the preservation of its rights under, enforcement of, or any refinancing, renegotiation, restructuring, or termination of, any Bond Document or any instruments referred to therein or any amendment, waiver, or consent relating thereto, including, without limitation, the reasonable fees and disbursements of counsel for the Landlord actually incurred by the Landlord.

Such Administrative Rent shall be billed to the Tenant by the Landlord or the Lender, as applicable, from time to time, together with (i) a statement certifying that the amount billed has been incurred or paid by such party for one or more of the above items and (ii) copies of invoices, bills, or other evidence reasonably acceptable to the Tenant substantiating the amount billed.  Amounts so billed shall be paid by the Tenant within thirty (30) days after receipt of the bill by the Tenant.

In the event the Tenant shall fail to make any of the payments required in this subsection, the item or installment so in default shall continue as an obligation of the Tenant until the amount in default shall have been fully paid.

(c)    <u>Deferred Purchase Price Rent</u>:  Until the expiration of the term of the Purchase and Sale Agreement or earlier termination of the Purchase and Sale Agreement, the Tenant shall pay to the Seller for the account of the Landlord rent for the Facilities, on or before each payment date of Deferred Purchase Price (as defined in the Purchase and Sale Agreement) due under the Purchase and Sale Agreement, a sum equal to the amount payable on such payment date as Deferred Purchase Price due under the Purchase and Sale Agreement, subject to a credit for any such Deferred Purchase Price financed by Lender Loans (as defined in the Purchase and Sale Agreement).  Each installment of Deferred Purchase Price Rent under this Section due on each payment date of Deferred Purchase Price under the Purchase and Sale Agreement while the Purchase and Sale Agreement is in effect shall in all events be sufficient to pay the total amount of Deferred Purchase Price due under the Purchase and Sale Agreement on each such payment date of Deferred Purchase Price.

(d)    <u>Additional Rent</u>:  The Tenant shall pay to the Landlord rent for the Facilities, on or before each September 30, in a sum equal to the following amounts in the following numbered years, commencing with the calendar year following the calendar year of the Commencement Date:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1 | $   -0- | 16 | $  503,315 |
| 2 | -0- | 17 | 508,348 |
| 3 | -0- | 18 | 513,431 |
| 4 | -0- | 19 | 518,566 |
| 5 | -0- | 20 | 523,751 |
| 6 | 455,644 | 21 | 952,180 |
| 7 | 460,201 | 22 | 961,701 |
| 8 | 464,803 | 23 | 971,318 |
| 9 | 469,451 | 24 | 981,032 |
| 10 | 474,145 | 25 | 990,842 |
| 11 | 478,887 | 26 | 1,000,750 |
| 12 | 483,675 | 27 | 1,010,758 |
| 13 | 488,512 | 28 | 1,020,865 |
| 14 | 493,397 | 29 | 1,031,074 |
| 15 | 498,331 | 30 | 1,041,385 |

Any installment of Additional Rent not paid by the Tenant when due shall continue as an obligation of the Tenant until paid and shall bear interest at the Prime Rate plus two percent (2.00%) per annum.

(e)    Landlord's Fee:  The Tenant shall pay to the Landlord, upon the delivery of the Bond, a fee equal to $92,500.

**Section 4.04.  Place of Rental Payments**.  The Bond Rent provided for in Section 4.03(a) hereof shall be paid in lawful money of the United States of America directly to the Lender for the account of the Landlord.  The payments of the Administrative Rent pursuant to Section 4.03(b) hereof shall be paid in lawful money of the United States of America directly to the Landlord for its own use.  The Deferred Purchase Price Rent provided for in Section 4.03(c) hereof shall be paid in lawful money of the United States of America directly to the Seller for the account of the Landlord.  The Additional Rent provided for in Section 4.03(d) hereof shall be paid in lawful money of the United States of America directly to the Landlord for its own use.

**Section 4.05.  Nature of Obligations of Tenant Hereunder**.  (a)  The obligations of the Tenant to make the payments required in Section 4.03 hereof and other sections hereof and to perform and observe any and all of the other covenants and agreements on its part contained herein shall be a general obligation of the Tenant and shall be absolute and unconditional irrespective of any defense or any rights of setoff, recoupment, or counterclaim, except for payment, it may otherwise have against the Landlord, but subject to the credit provisions of Section 2.04 hereof. The Tenant agrees that it shall not (i) suspend, abate, reduce, abrogate, diminish, postpone, modify, or discontinue any payments provided for in Section 4.03 hereof, except as provided in Section 2.04 hereof; (ii) fail to observe in any material respect any of its other agreements contained in the Tenant Contracts; or (iii) except as provided in Section 10.01 hereof, terminate its obligations under the Tenant Contracts for any contingency, act of God, event, or cause whatsoever, including, without limiting the generality of the foregoing, failure of the Tenant to occupy or to use the Facilities as contemplated in this Rental Agreement or otherwise; any change or delay in the time of availability

-16-

of the Facilities; any acts or circumstances that may impair or preclude the use or possession of the Facilities; any defect in the title, design, operation, merchantability, fitness, or condition of the Facilities or in the suitability of the Facilities for the Tenant's purposes or needs; failure of consideration; any declaration or finding that the Bond is unenforceable or invalid; the invalidity of any provision of the Tenant Contracts; any acts or circumstances that may constitute an eviction or constructive eviction; destruction of or damage to the Facilities; the taking by eminent domain of title to or the use of all or any part of the Facilities; failure of the Landlord's title to the Facilities or any part thereof; commercial frustration of purpose; any change in the tax or other laws of the United States of America or of the State or any political subdivision of either thereof or in the rules or regulations of any governmental authority; or any failure of the Landlord to perform and observe any agreement, whether express or implied, or any duty, liability, or obligation arising out of or connected with the Tenant Contracts.

(b)    Nothing contained in this Section shall be construed to release the Landlord from the performance of any of the agreements on its part herein contained.  In the event the Landlord should fail to perform any such agreement on its part, the Tenant may institute such action against the Landlord as the Tenant may deem necessary to compel performance so long as such action does not abrogate the Tenant's obligations hereunder.  The Landlord hereby agrees that it shall not take or omit to take any action that would cause this Rental Agreement to be terminated, other than the exercise of its rights contained in Section 9.02 hereof.  The Tenant may, however, at its own cost and expense and in its own name or in the name of the Landlord, prosecute or defend any action or proceeding or take any other action involving third persons that the Tenant deems reasonably necessary in order to secure or protect its right of possession, occupancy, and use hereunder, and in such event the Landlord hereby agrees to cooperate fully with the Tenant and to take all action necessary to effect the substitution of the Tenant for the Landlord in any such action or proceeding if the Tenant shall so request.

## ARTICLE V

### MAINTENANCE, TAXES, AND INSURANCE

**Section 5.01.  <u>Maintenance and Modification of Facilities by the Tenant</u>**.  The Tenant agrees that during the Occupancy Term it shall at its own expense exercise commercially reasonable efforts to (i) keep the Facilities in as reasonably safe condition as its operations shall permit; (ii) keep the Buildings and all other improvements forming a part of the Facilities in good repair and in good operating condition, making from time to time all necessary and proper repairs thereto and renewals and replacements thereof, including external and structural repairs, renewals, and replacements; and (iii) use the Equipment in the regular course of its business only, within the normal capacity of the Equipment, without abuse, and in a manner contemplated by the manufacturer thereof, and cause the Equipment to be maintained in accordance with the manufacturer's then currently published standard maintenance contract and recommendations.  The Tenant may, also at its own expense, from time to time make any Additions or Alterations it may deem desirable for its business purposes that do not, in the Tenant's reasonable opinion, materially and adversely affect the operation or value of the Facilities.  Subject to the provisions of Section 8.03 hereof, Additions or Alterations so made by the Tenant shall be on the Site, shall become a part of the Facilities, shall become subject to the demise of this Rental Agreement, and shall be made in accordance with applicable law.  The Landlord shall cooperate with the Tenant in satisfying any applicable requirements of procurement and bonding

-17-

laws for public works projects, which cooperation shall not be unreasonably withheld, conditioned, or delayed.

The Tenant shall not permit any mechanics' or materialmen's or other statutory liens to be perfected or remain against the Facilities for labor or materials furnished in connection with any Additions or Alterations so made by it, provided that it shall not constitute an Event of Default hereunder upon such lien being filed, if the Tenant shall promptly notify the Landlord of any such liens, and the Tenant in good faith promptly contests such liens in accordance with the provisions of Section 5.08 hereof. The Tenant shall not do or permit others under its control to do any work in or about the Facilities or related to any repair, rebuilding, restoration, replacement, alteration of, or addition to the Facilities, or any part thereof, unless the Tenant shall have first procured and paid for all requisite municipal and other governmental permits and authorizations. All such work shall be done in a good and workmanlike manner and in compliance in all material respects with all applicable building, zoning, and other laws, ordinances, governmental regulations, and requirements and in accordance with the Insurance Requirements.

**Section 5.02. Taxes, Other Governmental Charges, and Utility Charges**. The Tenant shall during the Occupancy Term duly pay and discharge, as the same become due and payable, (i) all taxes and governmental charges of any kind whatsoever that may at any time be lawfully assessed or levied against or with respect to the Facilities, including, without limiting the generality of the foregoing, all ad valorem taxes or payments in lieu of such taxes lawfully assessed upon the Tenant's rights in and to the Facilities, and all sales and use taxes lawfully assessed upon the Landlord or the Tenant in connection with the Facilities; (ii) all utility and other charges incurred in the ownership, operation, maintenance, use, occupancy, and upkeep of the Facilities; and (iii) all assessments and charges lawfully made by any governmental body for public improvements that may be secured by a lien on the Facilities; provided, that with respect to special assessments or other governmental charges that may lawfully be paid in installments over a period of years, the Tenant shall be obligated to pay only such installments as are required to be paid during the Occupancy Term.

If the Tenant shall first notify the Landlord of its intention so to do, the Tenant may, at its own expense and in its own name and behalf or in the name and behalf of the Landlord and in good faith, contest any such taxes, assessments, and other charges in accordance with the provisions of Section 5.08 hereof and, in the event of any such contest, may permit the taxes, assessments, or other charges so contested to remain unpaid during the period of such contest and any appeal therefrom.

**Section 5.03. Insurance Required**. Throughout the Occupancy Term, the Tenant shall keep the Facilities and its operations or cause the same to be kept continuously insured against such casualties, contingencies, and risks as are customarily insured against with respect to facilities of like size and type and entities engaged in the same or similar activities, paying as the same become due all premiums in respect thereto, including but not limited to:

(a)    insurance upon the repair or replacement basis in an amount of not less than 100% of the then actual cost of replacement (excluding costs of replacing excavations and foundations but without deduction for depreciation) of the Buildings and the Equipment (with deductible provisions not to exceed $250,000 in any one casualty) against loss or damage by fire, lightning, windstorm, hail, explosion, riot, riot attending a strike, civil

-18-

commotion, aircraft, vehicles, and smoke and such other risks as are now or hereafter included in the extended coverage endorsement then in use in the State for similar structures (including vandalism and malicious mischief);

(b)    workers' compensation coverage, or other provision therefor, as required by the laws of the State;

(c)    comprehensive general liability insurance providing insurance (with deductible provisions not to exceed $250,000 per occurrence) to the extent of not less than $1,000,000 per occurrence against liability for personal and bodily injury including death resulting therefrom and $1,000,000 per occurrence for damage to property, including loss of use thereof, occurring on or in any way related to the Facilities or any part thereof or the operation thereof, with excess coverage or "umbrella" insurance for claims under such coverage in the aggregate of not less than $5,000,000 for any one occurrence;

(d)    insurance under the Federal Flood Insurance Program shall be maintained at all times within the minimum requirements and amounts required for federally financed or assisted loans under the Flood Disaster Protection Act of 1973, as amended, if any portion of the Site is eligible under such program; and

(e)    boiler explosion insurance on steam boilers, if any, pressure vessels, and pressure piping in an amount not less than 100% of the then actual cost of replacement (excluding costs of replacing excavations and foundations but without deduction for depreciation) of the Buildings and the Equipment (with deductible provisions not to exceed $250,000 in any one occurrence) provided, that such insurance need not be taken out until steam boilers, pressure vessels, or pressure piping are installed on the Site and then only for the portion of the Site on which steam boilers, pressure vessels, or pressure piping are installed.

The Tenant shall comply or cause compliance in all material respects with all Insurance Requirements before the expiration of any applicable extension or grace period and shall not bring or knowingly keep or permit to be brought or kept any article upon the Facilities or knowingly cause or permit any condition to exist thereon that would be prohibited by any Insurance Requirement, or would invalidate insurance coverage required hereunder to be maintained by the Tenant on or with respect to any part of the Facilities.

**Section 5.04.    Application of Net Proceeds of Insurance**.    The Net Proceeds of the insurance carried pursuant to the provisions of Section 5.03(a), (d), and (e) hereof shall be paid and applied as provided in Section 6.01 hereof, and the Net Proceeds of insurance carried pursuant to the provisions of Section 5.03(b) and (c) hereof shall be applied toward extinguishment or satisfaction of the liability with respect to which such insurance proceeds have been paid.

**Section 5.05.    Additional Provisions Respecting Insurance**.    All insurance required by Section 5.03 hereof shall be taken out and maintained in generally recognized responsible insurance companies authorized by law to insure risks in the State, selected by the Tenant and, except as provided in Section 5.06 hereof, subject to the approval of the Landlord, which approval shall not be unreasonably withheld, conditioned, or delayed.  Subject to the provisions of Section 5.06 hereof, all

-19-

policies evidencing such insurance shall be subject to the approval of the Landlord, which approval shall not be unreasonably withheld, conditioned, or delayed. All policies evidencing such insurance shall provide for payment to the Landlord, the Tenant, and the Lender as their respective interests may appear, and the policies required by Section 5.03 hereof (except for Section 5.03(b) hereof) shall name the Lender and the Landlord as additional insureds. A certificate or certificates of the insurers that such insurance is in force and effect shall be deposited with the Landlord and the Lender, and prior to or as soon as practicable after the expiration of any such policy the Tenant shall furnish the Landlord and the Lender with evidence reasonably satisfactory to the Landlord and the Lender that the policy has been renewed or replaced or is no longer required by this Rental Agreement. In lieu of separate policies, the Tenant may maintain one or more blanket policies of insurance having the coverage required by Section 5.03 hereof. If any such insurance policies are modified adversely in any material respect to the interests of the Landlord or the Lender or are cancelled by the issuer thereof before the termination of the Occupancy Term, the Tenant shall provide written notice to the Landlord and the Lender as soon as practicable after it receives notice of any such event.

    **Section 5.06.  Insurance Maintained under Secured Loan Documentation**. During any period in which insurance coverage of the type specified in Section 5.03(a), (b), (c), (d), or (e) hereof is maintained pursuant to contracts relating to Secured Loans, the contracts relating to such Secured Loans shall govern the selection of the insurer, the form of the insurance policy, and the amounts, coverages, and deductibles required for such insurance policies, instead of Section 5.03(a), (b), (c), (d), or (e) hereof and Section 5.05 hereof, provided that the Landlord is named as an additional insured as required by Section 5.05 hereof. The Tenant shall furnish to the Landlord and the Lender the evidence required by Section 5.05 hereof that such insurance is in force and effect.

    **Section 5.07.  Advances by the Landlord or the Lender**. If the Tenant shall fail to maintain the insurance coverages required by this Rental Agreement or shall fail to pay the taxes and other charges required to be paid by this Rental Agreement or shall fail to keep the Facilities in as reasonably safe condition as its operations shall permit or shall fail to keep the Buildings and the Equipment in good repair and good operating condition, the Landlord or the Lender may (but shall be under no obligation to), after notifying the Tenant in writing of its intention to do so and after affording the Tenant thirty (30) days after such written notice to correct such failure, take out the required policies of insurance and pay the premiums on the same or pay the taxes or other charges or make the required repairs, renewals, and replacements. In addition, if the Tenant should fail to make any payment or to perform or comply with any of the agreements, covenants, or obligations of the Tenant under the Tenant Contracts, then the Landlord or the Lender, at the option of either one after notifying the Tenant in writing of such failure and after affording the Tenant thirty (30) days after such written notice to correct such failure, may make such payment or perform such agreement, covenant, or obligation for the account and at the expense of the Tenant, but shall not be obligated to do so. Any and all payments and expenses incurred or paid in so doing shall become an additional obligation of the Tenant to the one making the advancement, which amounts, together with interest thereon from the date of payment at the Prime Rate plus two percent (2.00%) per annum, the Tenant agrees to pay on demand. Any remedy herein vested in the Landlord or the Lender for the collection of amounts due under Section 9.02 hereof shall also be available to the Landlord and the Lender for the collection of all such amounts so advanced.

~#4814-4034-6951 v.2~

**Section 5.08.  Contest of Liens**.  In the event the Tenant in good faith contests Liens pursuant to Sections 5.01 or 5.02 of this Rental Agreement, the Tenant may permit the items so contested to remain undischarged and unsatisfied during the period of such contest and any appeal therefrom, provided the Tenant shall furnish the Landlord and the Lender with a bond equal to at least the amount so contested or an opinion of counsel reasonably acceptable to the Landlord and the Lender stating that by nonpayment of such items the title of the Landlord as to any material part of the Facilities will not be materially and imminently endangered and neither the Facilities nor any material part thereof will be subject to imminent loss or forfeiture.  If the Tenant is unable or otherwise fails to obtain such a bond or an opinion of counsel, the Tenant shall promptly cause to be satisfied and discharged all such unpaid items by payment thereof, by causing the lien to be transferred from the Facilities to other security as permitted by State law, or by payment of the amount so contested into a reserve held by the Landlord or any holder of a Secured Loan.  Such reserve may be used by or at the written direction of the Landlord or any holder of a Secured Loan to satisfy the items if action is taken to enforce the lien and such action is not stayed.  Such reserve will be returned to the Tenant if the items are successfully contested.  In the event the Tenant shall fail to pay any of the foregoing items required by this Section to be paid by the Tenant, the Landlord or the Lender may (but shall be under no obligation to) pay the same, and any amounts so advanced therefor by the Landlord or the Lender shall become an advance repayable in accordance with Section 5.07 of this Rental Agreement.  The Landlord shall, at the expense of the Tenant, cooperate fully with the Tenant in any such contest.

## ARTICLE VI

## DAMAGE, DESTRUCTION, CONDEMNATION, AND FAILURE OF TITLE

**Section 6.01.  Damage and Destruction**.  (a)  Subject to the rights of holders of Secured Loans to require the hereinafter described Net Proceeds to be applied to retire such Secured Loans, if prior to the termination of the Occupancy Term, the Facilities are destroyed or are damaged (in whole or in part) by fire or other casualty, the Tenant (i) shall, if reasonably practicable, promptly repair, rebuild, restore, or re-equip the Facilities to substantially the same condition thereof as existed prior to the event causing such damage or destruction with such changes, alterations, and modifications (including the substitution and addition of other property) as may be desired by the Tenant and as will not materially impair the value or the character of the Facilities and (ii) shall apply for such purpose so much as may be necessary of any Net Proceeds of insurance resulting from such recovery.  All such Net Proceeds of insurance shall be paid to the Tenant, to be applied as provided in this Section 6.01(a).

(b)  In the event the Net Proceeds are not sufficient to pay in full the costs of any such repair, rebuilding, restoration, or re-equipping, the Tenant shall nonetheless complete such work and shall pay that portion of the costs thereof in excess of the amount of such Net Proceeds.  Any Net Proceeds remaining after the payment in full of the costs of any such repair, rebuilding, restoration, or re-equipping shall belong to the Tenant and become the property of the Tenant.

(c)  The Tenant shall not, by reason of the payment of such excess costs, be entitled to any reimbursement from the Landlord or the Lender or any abatement or diminution of the rents payable under Section 4.03 hereof.

-21-

**Section 6.02.  Condemnation and Failure of Title**.  Subject to the rights of holders of Secured Loans to require the hereinafter described Net Proceeds to be applied to retire such Secured Loans, in the event that title to any portion of the Facilities fails or title to or the temporary use of the Facilities or any part thereof is taken under the exercise of the power of eminent domain by any governmental body or by any Person acting under governmental authority, the Landlord and the Tenant shall, if reasonably practicable, cause the Net Proceeds received by them or either of them from any title insurance policy or any award made in such eminent domain proceedings to be applied to the restoration of the Facilities to substantially the same condition thereof as existed prior to the failure of title or the exercise of the power of eminent domain with such changes, alterations, and modifications (including the substitution and addition of other property) as may be desired by the Tenant and as will not materially impair the value or the character of the Facilities.

Within ninety (90) days from the date of failure of title or the date of entry of a final order in any eminent domain proceedings granting condemnation, the Tenant shall direct the Landlord in writing as to how the title insurance proceeds or condemnation award will be applied.

The Landlord shall cooperate fully with the Tenant in handling and conducting any prospective or pending condemnation proceeding with respect to the Facilities or any part thereof and shall, to the extent it may lawfully do so, permit the Tenant to litigate in any such proceeding in the name and behalf of the Landlord.  In no event shall the Landlord voluntarily settle, or consent to the settlement of, any prospective or pending condemnation proceeding with respect to the Facilities or any part thereof without the prior written consent of the Tenant.

The Tenant shall be entitled to pursue any claims it may have as tenant of the Facilities under this Rental Agreement in any prospective or pending condemnation proceeding, independent and separate from any claims of the Landlord as owner of the Facilities.

**Section 6.03.  Condemnation of Tenant-Owned Property**.  The Tenant shall be entitled to the Net Proceeds of any condemnation award or portion thereof made for damages to or for taking of its own property not included in the Facilities (except for damages for the value of its right of occupancy in the Facilities under this Rental Agreement, which shall be applied pursuant to Section 6.02 hereof).

## ARTICLE VII

## ADDITIONAL COVENANTS

**Section 7.01.  No Warranty of Condition or Suitability by the Landlord**.  THE LANDLORD MAKES NO WARRANTY, EITHER EXPRESS OR IMPLIED, AS TO THE HABITABILITY, MERCHANTABILITY, CONDITION, OR WORKMANSHIP OF ANY PART OF THE FACILITIES OR THAT THEY WILL BE SUITABLE FOR THE TENANT'S PURPOSES OR NEEDS.

**Section 7.02.  Access to Facilities and Records**.  The Tenant agrees that the Landlord, the Lender, and their duly authorized representatives and agents shall have the right, upon reasonable prior written notice, to enter the Facilities at all reasonable times during the Occupancy Term for the purpose of (i) examining and inspecting the Facilities, including any construction or renovation

-22-

thereof; (ii) performing such work in and about the Facilities made necessary by reason of an Event of Default; and (iii) upon an Event of Default, exhibiting the Facilities to prospective purchasers, lessees, or mortgagees. Any such entry shall be subject to the reasonable requirements imposed by the Tenant or its operator and shall not unreasonably interfere with the Tenant's use, occupancy, or operation of the Facilities. Any representatives or agents of the Landlord or the Lender accessing the Facilities pursuant to this Section 7.02 must at all times be accompanied by a representative or agent of the Tenant. The Landlord and the Lender shall also have the right at all reasonable times to examine the books and records of the Tenant, insofar as necessary to ascertain compliance with this Rental Agreement.

**Section 7.03. <u>Tenant to Maintain its Existence; Conditions Under Which Exceptions Permitted</u>**. (a) The Tenant agrees that during the Occupancy Term it shall maintain its legal existence as a Delaware limited liability company, shall not consolidate with or merge into another entity or permit one or more other entities to consolidate with or merge into it, and shall not dissolve or otherwise dispose of all or substantially all of its assets. The Tenant may, without violating the agreement contained in this Section, consolidate with or merge into another domestic entity (that is, an entity organized and existing under the laws of one or more states of the United States of America), or permit one or more such domestic entities to consolidate with or merge into it, or sell or otherwise transfer to another Person all or substantially all of its assets as an entirety and thereafter dissolve, if the surviving, resulting, or transferee Person:

(1)   is authorized to do business in the State;

(2)   is a domestic corporation, partnership, limited liability company, or other entity, or if a natural person, is a resident of the United States of America;

(3)   assumes in writing all of the obligations of the Tenant under the Tenant Contracts arising from and after the date of the consolidation, merger, sale, or transfer;

(4)   has not been convicted of a felony in any state or federal court, and is not in control or controlled by Persons who have been convicted of felonies in any state or federal court, and it and its Affiliates are not Specially Designated National or Blocked Persons; and

(5)   if and only if the surviving, resulting, or transferee Person is not an Affiliate of the Tenant prior to the consolidation, merger, sale, or transfer, the Tenant obtains the prior written consent of the Landlord to the consolidation, merger, sale, or transfer, which consent shall not be unreasonably withheld, conditioned, or delayed and shall be granted or withheld strictly in accordance with customary commercial practices.

(b)   With respect to whether the Landlord's consent to the consolidation, merger, sale, or transfer may be reasonably withheld, by way of example only, it shall be reasonable for the Landlord to: (a) evaluate whether the proposed successor Person has, in the Landlord's reasonable judgment, sufficient financial resources to fulfill the Tenant's obligations under this Rental Agreement (provided, however, it being understood that any successor Person with a verifiable net worth of at

least twenty-five percent (25%) of the total consideration paid for the consolidation, merger, sale, or transfer, including, without limitation, the amount of all assumed debt, shall be deemed to have such sufficient financial resources) and (b) evaluate whether the proposed successor Person has, in the Landlord's reasonable judgment, sufficient experience in owning a full service hotel.

(c)    The Landlord shall be deemed to have consented to any consolidation, merger, sale, or transfer if the Tenant shall submit a request in writing to the Landlord for such consent and the Landlord does not respond in writing to such request within thirty (30) days of the receipt of such request from the Tenant, provided that the Tenant has furnished to the Landlord all information reasonably requested by the Landlord to permit the Landlord to make an informed decision about such request within the thirty (30) day period referenced above.

(d)    If the requirements of this Section 7.03 regarding consolidation, merger, sale, or transfer are met, the Tenant shall be relieved from its obligations arising from and after the date of the consolidation, merger, sale, or transfer, and such successor Person shall succeed to and be substituted for the Tenant, under the Tenant Contracts, with the same effect as if such successor Person had originally been a party to such instruments.

**Section 7.04.    Qualification in the State.**  The Tenant warrants that it is and while this Rental Agreement is in effect it (or the surviving, resulting, or transferee entity permitted by Section 7.03 hereof) will continue to be duly qualified to do business in the State.

**Section 7.05.    Indemnity.**  (a)  The Tenant shall and agrees to indemnify and save the Landlord, the Lender, and their respective directors, officers, members, and employees harmless against and from all claims by or on behalf of any Person arising from the conduct or management of or from any work or thing done on the Facilities and against and from all third party claims arising from (i) any condition of or operation of the Facilities; (ii) any breach or default on the part of the Tenant in the performance of any of its obligations under the Tenant Contracts; (iii) any act or negligence of the Tenant or of any of its agents, contractors, servants, employees, or licensees; (iv) any failure by the Tenant, in making Additions or Alterations, to comply with the applicable requirements of procurement or bonding laws for public works projects (including, without limitation, Chapter 91 of Title 36 of the Official Code of Georgia Annotated); or (v) any act or negligence of any assignee or sublessee of the Tenant or of any agents, contractors, servants, employees, or licensees of any assignee or sublessee of the Tenant, provided, however, this indemnity shall not apply to any acts of negligence or willful or intentional misconduct of the Landlord or the Lender or their directors, officers, members, or employees.  The indemnities set forth above specifically extend to, but are in no way limited to, governmental or other claims relating to any actual or alleged violation of any Environmental Laws.  The Tenant shall indemnify and save the Landlord and the Lender harmless from and against all costs and expenses actually incurred in or in connection with any such claim arising as aforesaid from clauses (i), (ii), (iii), (iv), or (v), *supra*, or in connection with any action or proceeding brought thereon, including reasonable attorneys' fees actually incurred as provided in Section 9.04 hereof, and upon notice from the Landlord or the Lender, the Tenant shall defend them or either of them in any such action or proceeding.

(b)    If the Landlord, the Lender, or their respective directors, officers, members, and employees incur pecuniary liability by reason of the terms of the Bond Documents (other than obligations expressly created by the Bond Documents) or the undertakings required of the Landlord

-24-

under the Landlord Contracts or the Lender under the Loan Agreement, by reason of (i) the issuance of the Bond; (ii) the execution of the Bond Documents; (iii) the performance of any act required by the Bond Documents; (iv) the performance of any act requested by the Tenant; or (v) any other costs, fees, or expenses incurred by the Landlord or the Lender and their respective directors, officers, members, and employees with respect to the Facilities or the financing thereof, including all claims, liabilities, or losses arising in connection with the violation of any statutes or regulations pertaining to the foregoing, the Tenant shall indemnify and hold harmless the Landlord and the Lender and their respective directors, officers, members, and employees against all claims by or on behalf of any Person arising out of the same and all costs and expenses incurred in connection with any such claim or in connection with any action or proceeding brought thereon, including reasonable attorneys' fees actually incurred as provided in Section 9.04 hereof, and upon notice from the Landlord or the Lender, the Tenant shall defend the Landlord and the Lender in any such action or proceeding. The indemnity contained in this Section 7.05(b) shall not apply to any acts of negligence or willful or intentional misconduct of the Landlord, the Lender, or their respective directors, officers, members, or employees.

(c)    Nothing contained in this Section 7.05 shall require the Tenant to indemnify the Landlord or the Lender or their respective officers, directors, members, or employees for any claim or liability that the Tenant was not given any opportunity to contest or for any settlement of any such action effected without the Tenant's consent, if such opportunity is available and has not been waived in writing by the Tenant. The indemnity of the Landlord and the Lender and their respective officers, directors, members, and employees contained in this Section 7.05 shall survive the termination of this Rental Agreement.

Section 7.06.  **Information and Notices**.  The Tenant shall provide the Landlord and the Lender (1) promptly upon obtaining knowledge of an Event of Default, a certificate specifying the nature and period of existence thereof and what action the Tenant proposes to take with respect thereto, and (2) promptly after (i) the occurrence thereof, notice of the institution by any Person of any action, suit, or proceeding or any governmental investigation or any arbitration, before any court or arbitrator or any governmental or administrative body, agency, or official, against the Tenant or the Facilities, which could reasonably be expected to have a material adverse effect upon, or a material adverse change in, the ability of the Tenant to perform its obligations under the Tenant Contracts or (ii) the receipt of actual knowledge thereof, notice of the threat of any such action, suit, proceeding, investigation, or arbitration that could reasonably be expected to have such a material adverse effect or material adverse change as described above, each such notice under this section to specify, if known, the amount of damages being claimed or other relief being sought, the nature of the claim, the Person instituting the action, suit, proceeding, investigation, or arbitration, and any other significant features of the claim.

Section 7.07.  **Use of Party Walls**.  If the Tenant acquires or leases real property adjacent to the Site, the Tenant and the Landlord agree that all walls presently standing or hereafter erected by the Landlord or the Tenant as a part of the Facilities on or contiguous to the boundary line of the portion of or interest in the Site or other real property so purchased, acquired, or leased shall be party walls, and each party grants to the other a 10-foot easement adjacent to any such party wall for the purpose of inspection, maintenance, repair, and replacement thereof and the tying-in of new construction. If the Tenant utilizes any party wall for the purpose of tying in new construction that will be utilized under common control with the Facilities, the Tenant may also tie into the utility

-25-

facilities on the Site for the purpose of serving the new construction and may remove any non-loadbearing wall panels in the party wall; provided, however, that if the property so owned, purchased, acquired, or leased by the Tenant ceases to be operated under common control with the Facilities, the Tenant covenants that it shall install non-loadbearing wall panels similar in quality to those that have been removed and shall provide separate utility services for the new construction. If the improvements resulting from such new construction will be utilized under common control with the Facilities, the Landlord grants an easement to the Tenant to use the Facilities as necessary or desirable to serve the new improvements and to permit the new improvements to encroach upon the Site; provided, however, that if the property so owned, purchased, acquired, or leased by the Tenant ceases to be operated under common control with the Facilities, the easements granted in this sentence shall terminate.

**Section 7.08.** **Operation of Facilities and Safety Code**. (a) The Tenant warrants that throughout the Occupancy Term it shall operate and maintain the Facilities in a manner consistent with the operational and physical standards for the brands that are identified as "Upper Upscale" hotels under the then applicable STR Chain Scales published by STR, Inc., or if the STR Chain Scales are no longer published by STR, Inc., then in a manner consistent with such comparable standards of such other hotel rating system as is reasonably selected by the Landlord.

(b)  The Tenant warrants that throughout the Occupancy Term it shall exercise commercially reasonable efforts to operate and maintain the Facilities in compliance in all material respects with all applicable life and safety codes and all applicable building and zoning, health, and safety ordinances and laws; all applicable Environmental Laws; and all other applicable laws, ordinances, rules, and regulations of the United States of America, the State, and any political subdivision or agency thereof having jurisdiction over the Facilities.

**Section 7.09.** **Hazardous Materials**. (a)  In addition to and without limitation of all other representations, warranties, and covenants made by the Tenant under this Rental Agreement and except as disclosed in writing to the Landlord before the execution and delivery of this Rental Agreement, the Tenant further represents, warrants, and covenants that the Tenant has not and, to the best of its knowledge, any contractors responsible for constructing the Facilities have not, used Hazardous Materials (as hereinafter defined) on, from, or affecting the Facilities in any manner that violates any Environmental Laws. The Tenant shall keep or cause the Facilities to be kept free of Hazardous Materials except as otherwise provided in this Section 7.09.

(b)  Without limiting the generality of the foregoing, the Tenant shall not cause or permit the Facilities or any part thereof to be used to generate, manufacture, refine, transport, treat, store, handle, dispose of, transfer, produce, or process Hazardous Materials, except in compliance with all applicable Environmental Laws, nor shall the Tenant cause or permit, as a result of any intentional or unintentional act or omission on the part of the Tenant or any tenant or subtenant, a release of Hazardous Materials onto the Site, except in compliance with all applicable Environmental Laws. The Tenant shall comply in all material respects with and ensure compliance by all tenants and subtenants in all material respects with all applicable Environmental Laws, whenever and by whomever invoked, and shall obtain and comply in all material respects with, and ensure that all tenants and subtenants obtain and comply in all material respects with, any and all approvals, registrations, or permits required thereunder. The Tenant shall (i) conduct and complete all investigations, studies, samplings, and testing and all remedial, removal, and other actions necessary

-26-

under applicable Environmental Laws to clean up and remove all Hazardous Materials on, from, or affecting the Facilities (A) in accordance with all applicable Environmental Laws and (B) in accordance with the directives of all federal, state, and local governmental authorities and (ii) defend, indemnify, and hold harmless the Landlord and the Lender from and against any claims, demands, penalties, fines, liabilities, settlements, damages, costs, or expenses of whatever kind or nature, known or unknown, contingent or otherwise arising out of or in any way related to (x) the presence, disposal, release, or threatened release of any Hazardous Materials that are on, from, or affecting the soil, water, vegetation, buildings, personal property, persons, animals, or otherwise of the Facilities or (y) any violation of Environmental Laws or any policies or requirements of the Landlord or the Lender, which are based upon or in any way related to such Hazardous Materials including, without limitation, reasonable attorneys' fees, investigation and laboratory fees, court costs, and litigation expenses actually incurred. In the event of the termination of this Rental Agreement, the Tenant shall surrender possession of the Facilities free of any and all Hazardous Materials existing in violation of Environmental Laws so that the condition of the Facilities shall conform in all material respects with all applicable Environmental Laws affecting the Facilities.

(c)    For purposes of this Section 7.09, "Hazardous Materials" includes, without limitation, any flammable explosives, radioactive materials, hazardous materials or wastes, hazardous or toxic substances, or related materials defined in any Environmental Law; provided, however, that Hazardous Materials shall not include, for purposes of this Section 7.09, nonfriable asbestos or cleaning products, medical supplies, or other substances used by the Tenant in the ordinary course of conduct of its operations at the Facilities. The provisions of this Section 7.09 shall be in addition to any and all other obligations and liabilities the Tenant may have to the Landlord and the Lender at common law and shall survive the termination of this Rental Agreement.

(d)    The indemnifications and protections set forth in this Section 7.09 shall be extended, with respect to the Landlord and the Lender, to their respective members, directors, officers, employees, and agents.

Section 7.10.  **Permitted Uses**. The Tenant may use and occupy the Facilities for lodging, restaurant, conferencing, and parking purposes and for other purposes as are reasonably related to lodging, restaurant, conferencing, and parking purposes, but for no other uses or purposes without the prior written consent of the Landlord, which consent shall not be unreasonably withheld, conditioned, or delayed.

## ARTICLE VIII

## ASSIGNMENT, SUBLEASING, ENCUMBERING, AND SELLING; INSTALLATION OF TENANT'S OWN MACHINERY AND EQUIPMENT

Section 8.01.  **Assignment and Subleasing**. (a) The rights and obligations of the Tenant under this Rental Agreement may be assigned and delegated, and the Facilities may be subleased, as a whole or in part, by the Tenant with the prior written consent of the Landlord, which consent shall not be unreasonably withheld, conditioned, or delayed and shall be granted or withheld strictly in accordance with customary commercial practices. Notwithstanding the foregoing, any such assignment or sublease to an Affiliate of the Tenant shall not require the consent of the Landlord but shall require prior written notice to the Landlord of such assignment or sublease and the identity of

-27-

the assignee or subtenant. Notwithstanding the foregoing, the Tenant may, without the prior written consent of the Landlord, assign or pledge its rights under this Rental Agreement as collateral for any loan then outstanding that was incurred or guaranteed to finance the acquisition, construction, and installation of the Facilities or any portion thereof (including any refinancing and any other loan incurred or continued pursuant to Article II of the Purchase and Sale Agreement). Notwithstanding the foregoing, the Tenant may also, without the prior written consent of the Landlord, sublease or sublicense any portion of the Facilities not exceeding 25,000 square feet and for a term not exceeding ten (10) years (with up to two 5-year renewal terms) to any subtenant or sublicensee that furnishes to the Landlord an affidavit to the effect that (1) such subtenant or sublicensee has not been convicted of a felony in any state or federal court, and is not in control or controlled by Persons who have been convicted of felonies in any state or federal court and (2) such subtenant or sublicensee and its Affiliates are not Specially Designated National or Blocked Persons. No sublease or sublicense of all or any part of the Facilities shall relieve the Tenant from any of its obligations under this Rental Agreement. Nothing in this Rental Agreement shall be construed to restrict the ability of owners of equity interests in the Tenant to sell, transfer, pledge, hypothecate, or convey such equity interests.

(b)    With respect to whether the Landlord's consent to the assignment or sublease may be reasonably withheld, by way of example only, it shall be reasonable for the Landlord to: (1) evaluate whether the proposed assignee or sublessee has, in the Landlord's reasonable judgment, sufficient financial resources to fulfill the Tenant's obligations under this Rental Agreement (provided, however, it being understood that any assignee or sublessee with a verifiable net worth of at least twenty-five percent (25%) of the total consideration paid for the assignment or sublease, including, without limitation, the amount of all assumed debt, shall be deemed to have such sufficient financial resources); (2) evaluate whether the proposed assignee or sublessee has, in the Landlord's reasonable judgment, sufficient experience in owning a full service hotel; (3) determine whether the proposed assignee or sublessee has been convicted of a felony in any state or federal court, or is in control of or controlled by Persons who have been convicted of felonies in any state or federal court; and (4) determine whether the proposed assignee or sublessee or its Affiliates are Specially Designated National or Blocked Persons.

(c)    The Landlord shall be deemed to have consented to any assignment or sublease, if the Tenant shall submit a request in writing to the Landlord for such consent and the Landlord does not respond in writing to such request within thirty (30) days of the receipt of such request from the Tenant, provided that the Tenant has furnished to the Landlord all information reasonably requested by the Landlord to permit the Landlord to make an informed decision about such request within the thirty (30) day period referenced above.

**Section 8.02. Restrictions on Sale, Encumbrance, or Conveyance of the Facilities by the Landlord**. The Landlord agrees that it shall not (1) directly, indirectly, or beneficially sell, convey, or otherwise dispose of any part of its interest in the Facilities during the Occupancy Term; (2) permit any part of the Facilities or the Site to become subject to any mortgage, lien, claim of title, encumbrance, security interest, conditional sale contract, title retention arrangement, finance lease, servitude, easement, license, restriction, reservation, defect in or cloud on title, or other charge or Lien of any kind, except for Permitted Encumbrances or except as otherwise permitted under this Rental Agreement; and (3) assign, transfer, or hypothecate (other than Bond Rent to the Lender pursuant to the Loan Agreement or Additional Rent) any rent (or analogous payment) then due or to

-28-

accrue in the future under any lease of the Facilities or the Site, except for Permitted Encumbrances or except as otherwise permitted in this Rental Agreement, except that if the laws of the State at the time shall permit, nothing contained in this Section shall prevent the consolidation of the Landlord with, or merger of the Landlord into, or transfer of the Facilities as an entirety to, any political subdivision, public corporation, or agency of the State whose property and income are not subject to taxation and which has authority to carry on the business of owning, encumbering, and renting the Facilities, provided, that upon any such consolidation, merger, or transfer, (1) the due and punctual payment of the principal of, premium, if any, and interest on the Bond according to its tenor, and the due and punctual performance and observance of all the agreements and conditions of the Landlord Contracts to be kept and performed by the Landlord, shall be expressly assumed in writing by the political subdivision, public corporation, or agency resulting from such consolidation or surviving such merger or to which the Facilities shall be transferred as an entirety and (2) the exemption from ad valorem property taxation of the Facilities shall not be adversely affected by such consolidation, merger, or transfer.

  **Section 8.03. Installation of Tenant's Own Machinery and Equipment**.  The Tenant may from time to time, in its sole discretion and at its own expense, install machinery, equipment, furnishings, and other personal property in the Buildings or on the Site, which may be attached or affixed to the Buildings or the Site.  All such machinery, equipment, furnishings, and other personal property shall remain the sole property of the Tenant, and the Tenant may remove the same from the Buildings or the Site at any time, in its sole discretion and at its own expense; provided, that any damage to the Facilities resulting from any such removal shall be repaired by the Tenant at the expense of the Tenant.  The Tenant may create any security interest, encumbrance, lien, or charge in or on any such machinery, equipment, furnishings, and other personal property.  Neither the Landlord nor the Lender shall have any interest in or landlord's lien on any such machinery, equipment, furnishings, or personal property so installed pursuant to this Section, and all such machinery, equipment, furnishings, and personal property shall be and remain identified as the property of the Tenant by appropriate tags or other markings.

  **Section 8.04. Documents Required for Financing; Estoppel Certificates**.  (a)  In connection with any collateral assignment or pledge by the Tenant as described in Section 8.01 hereof, the Landlord shall execute and deliver a consent (in such form as any lender may reasonably request) for the benefit of any lender.  The Landlord further agrees, at the expense of the Tenant, to furnish any lender with such other documents as may be reasonably requested by such lender.

  (b) Within fifteen (15) days after the Tenant requests an estoppel certificate, the Landlord shall issue and deliver an estoppel certificate to the Tenant and to any lender requested by the Tenant.  The Landlord, in such estoppel certificate, shall certify as follows to the best of its knowledge:

   (i) that this Rental Agreement has not been supplemented or amended (or if it shall have been supplemented or amended, specifying the manner in which it shall have been supplemented or amended);

   (ii) that this Rental Agreement is in full force and effect (or if it is alleged that this Rental Agreement is not in full force and effect, specifying the reasons therefor);

-29-

(iii)   that no Default or Event of Default exists or, if such Default or Event of Default exists, specifying the nature thereof; and

(iv)   as to such other matters as the Tenant or any such lender may reasonably request.

Any such certificate may be relied upon by the Tenant and any lender requested by the Tenant or any other Person to whom or to which it may be delivered, and the contents of any such certificate shall be binding on the Landlord.

## ARTICLE IX

## EVENTS OF DEFAULT AND REMEDIES

**Section 9.01.   Events of Default Defined**.  The following shall be "Events of Default" under this Rental Agreement, and the term "Event of Default" shall mean, whenever it is used in this Rental Agreement, any one or more of the following events:

(a)   The Tenant's failure to pay the rents required to be paid under Section 4.03 of this Rental Agreement at the times specified therein and continuing for a period of ten (10) days after written notice in the manner provided in Section 11.01 of this Rental Agreement is given to the Tenant by either the Landlord or the Lender that the payment referred to in such notice has not been received.

(b)   The Tenant's breach in any material respect of any representation or warranty contained in the Tenant Contracts or the Tenant's failure to observe, perform, or comply in any material respect with any covenant, condition, or agreement in the Tenant Contracts on the part of the Tenant to be observed or performed, other than as referred to in subsection (a) of this Section, in either case continuing uncured for a period of thirty (30) days after written notice specifying such breach or failure and requesting that it be remedied, given to the Tenant by the Landlord or the Lender, unless the Landlord and the Lender shall agree in writing to an extension of such time prior to its expiration.  In the case of any such breach or default that cannot with due diligence be cured within such thirty (30) day period but can be wholly cured within a period of time not materially detrimental to the rights of the Landlord and the Lender, to be determined conclusively by the Lender, it shall not constitute an Event of Default if corrective action is instituted by the Tenant within the applicable period and diligently pursued until the breach or default is corrected in accordance with and subject to any directions or limitations of time established by the Lender.

(c)   The Tenant shall (i) apply for or consent to the appointment of or the taking of possession by a receiver, custodian, trustee, or liquidator of it or of all or a substantial part of its property or of the Facilities; (ii) fail to promptly lift, release, vacate, stay, or fully bond-off, within thirty (30) days after receipt of written demand therefor, any execution, garnishment, or attachment of such consequence as will (A) have a material adverse effect upon, or a material adverse change in, any of the business, results of operations, properties, prospects, or condition (financial or other) of the Tenant or the ability of the Tenant to perform its obligations under the Tenant Contracts or (B) as will impair the ability of the Tenant to carry on its operations at the Facilities; (iii) enter into an agreement of composition

-30-

with its creditors; (iv) admit in writing its inability to pay its debts generally as such debts become due; (v) make a general assignment for the benefit of its creditors; (vi) commence a voluntary case under the federal bankruptcy law or any similar law in effect in a foreign jurisdiction (as now or hereafter in effect); (vii) file a petition or answer seeking to take advantage of any other law relating to bankruptcy, insolvency, reorganization, winding-up, or composition or adjustment of debts; (viii) fail to controvert in a timely or appropriate manner or acquiesce in writing to any petition filed against it in an involuntary case under such federal bankruptcy law or any similar law in effect in a foreign jurisdiction; or (ix) take any action for the purpose of effecting any of the foregoing.

(d)  A proceeding or case shall be commenced, without the application of the Tenant, in any court of competent jurisdiction, seeking (i) the liquidation, reorganization, dissolution, winding-up, or composition or adjustment of debts of the Tenant; (ii) the appointment of a trustee, receiver, custodian, liquidator, or the like of the Tenant or of all or any substantial part of the assets of it or of the Facilities; or (iii) similar relief in respect of the Tenant under any law relating to bankruptcy, insolvency, reorganization, winding-up, or composition and adjustment of debts, and such proceeding or case shall continue undismissed or an order, judgment, or  decree approving or ordering any of the foregoing shall be entered and shall continue unvacated and unstayed and in effect for a period of ninety (90) days, whether consecutive or not.

**Section 9.02.  Remedies on Default**.  (a)  Whenever any Event of Default referred to in Section 9.01 hereof shall have happened and be subsisting, the Landlord, to the extent permitted by law, may take any one or more of the following remedial steps:

(1)  The Landlord, upon thirty (30) days' prior written notice to the Tenant and with the prior written consent of the Lender, may terminate this Rental Agreement and exclude the Tenant from possession of the Facilities.

(2)  The Landlord, upon thirty (30) days' prior written notice to the Tenant and with the prior written consent of the Lender, may, without terminating this Rental Agreement, exclude the Tenant from possession of the Facilities and use its best efforts to sublease the Facilities to another for the account of the Tenant, holding the Tenant liable for all rent and other payments due up to the effective date of such sublease and for the excess, if any, of the rent and other amounts payable by the Tenant under this Rental Agreement over the rents and other amounts that are payable by such new sublessee under such new sublease.

(3)  The Landlord may have access to and inspect, examine, and make copies of the books and records and any and all accounts, similar data, and income tax and other tax returns of the Tenant related to the Facilities, but only insofar as necessary to exercise its remedies contained in this Section 9.02.

(4)  The Landlord may from time to time take whatever action at law or in equity or under the terms of the Bond Documents may appear necessary or desirable to collect the rent and other amounts payable by the Tenant hereunder then due or thereafter to become due, or to enforce performance and observance of any obligation, agreement, or covenant of the Tenant under the Tenant Contracts.

-31-

(5)   At any time after the expiration of the Occupancy Term pursuant to paragraph (1) hereof, whether or not the Landlord shall have collected any current damages, the Landlord shall, at its option, be entitled to recover from the Tenant, and the Tenant will pay to the Landlord on demand, as and for liquidated and agreed final damages for the Tenant's default and in lieu of all current damages beyond the date of such demand, an amount equal to all unpaid installments of rent as hereinafter defined, and if any statute or rule of law shall validly limit the amount of such liquidated final damages to less than the amount agreed upon, the Landlord shall be entitled to the maximum amount allowable under such statute or rule of law.  The term "all unpaid installments of rent" shall mean an amount equal to the entire unpaid principal amount of the Bond, together with any applicable prepayment premiums and all interest accrued or to accrue on and prior to the next succeeding prepayment date on which the Bond can be prepaid after giving notice to the Lender as required by the Loan Agreement, plus any other payments due or to become due hereunder, including, without limitation, any unpaid fees and expenses of the Landlord and the Lender that are then due or will become due prior to the time that the Bond is paid in full, plus an amount equal to the Additional Rent Prepayment Amount, plus an amount equal to the sum of all unpaid installments of Deferred Purchase Price Rent due and to become due hereunder until the termination of the Purchase and Sale Agreement, regardless of the expiration of the Occupancy Term pursuant to paragraph (1) hereof.

(b)   Any Bond Rent collected pursuant to action taken under this Section shall be paid to the Lender and applied in accordance with the provisions of the Loan Agreement.  Any other rent collected pursuant to action taken under this Section shall be paid to the Landlord or to the Person to whom the Landlord has pledged such rent.

(c)   No action taken pursuant to this Section (including repossession of the Facilities or termination of this Rental Agreement) shall relieve the Tenant from its obligations pursuant to Section 4.03 hereof, all of which shall survive any such action, and the Landlord may take whatever action at law or in equity as may appear necessary and desirable to collect the rent and other amounts then due and thereafter to become due or to enforce the performance and observance of any obligation, agreement, or covenant of the Tenant hereunder.

(d)   No Event of Default shall impair the Seller's right to exercise its option to purchase the Facilities pursuant to Article III of the Purchase and Sale Agreement.

**Section 9.03.   <u>No Remedy Exclusive</u>**.  No remedy herein conferred upon or reserved to the Landlord is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Rental Agreement or now or hereafter existing at law or in equity or by statute.  No delay or omission to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver thereof, but any such right and power may be exercised from time to time and as often as may be deemed expedient.  In order to entitle the Landlord to exercise any remedy reserved to it in this Article, it shall not be necessary to give any notice, other than such notice as may be herein expressly required.  Such rights and remedies as are given the Landlord hereunder shall also extend to the Lender, and the Lender shall be deemed a third party beneficiary of all covenants and agreements herein contained.

-32-

**Section 9.04.  Agreement to Pay Attorneys' Fees and Expenses**.  In the event of the occurrence of an Event of Default and if the Landlord or the Lender should employ attorneys, accountants, or other experts or incur other expenses for the collection of amounts due hereunder or the enforcement of performance or observance of any obligation or agreement on the part of the Tenant herein contained or contained in the Tenant Contracts, the Tenant agrees that it shall on demand therefor pay to the Landlord or the Lender the reasonable fees of such attorneys, accountants, or other experts actually incurred and such other expenses actually incurred by the Landlord or the Lender.  Any attorneys' fees required to be paid by the Tenant under this Rental Agreement shall include attorneys' and paralegals' fees through all proceedings, including, but not limited to, negotiations, administrative hearings, trials, and appeals.

**Section 9.05.  Waiver of Events of Default**.  The Landlord or the Lender (except with respect to Unassigned Rights) may waive any Event of Default hereunder and its consequences.  In case of any such waiver, or in case any proceeding taken by the Landlord or the Lender on account of any such Event of Default shall be discontinued or abandoned or determined adversely to the Landlord or the Lender, then and in every such case the Landlord and the Tenant shall be restored to their former position and rights hereunder, but no such waiver shall extend to or affect any subsequent or other Event of Default or impair or exhaust any right, power, or remedy consequent thereon.

## ARTICLE X

## OPTIONS IN FAVOR OF TENANT; RENT PREPAYMENTS AND ABATEMENT

**Section 10.01.  Options to Terminate Occupancy Term**.  (a) Upon full payment of the Bond, any Administrative Rent then due, and any and all sums then due to the Landlord and the Lender under this Rental Agreement prior to the end of the Occupancy Term, an amount equal to the sum of all unpaid installments of Deferred Purchase Price Rent due and to become due hereunder until the termination of the Purchase and Sale Agreement, regardless of the early termination of the Occupancy Term pursuant to this Section 10.01(a), and an amount equal to the Additional Rent Prepayment Amount, the Tenant may terminate the Occupancy Term by giving the Landlord notice in writing of such termination, which shall forthwith become effective.

(b)  In the event the Facilities cannot be repaired, rebuilt, restored, or re-equipped as required by Sections 6.01 or 6.02 hereof, because (i) it is not reasonably practicable to do so or (ii) the holder of any Secured Loan required a substantial portion of the Net Proceeds to be applied to retire all or a portion of such Secured Loan, upon full payment of the Bond, any Administrative Rent then due, any and all sums then due to the Landlord and the Lender under this Rental Agreement prior to the end of the Occupancy Term (specifically excluding Additional Rent to become due after the effective date of the termination of the Occupancy Term), and an amount equal to the sum of all unpaid installments of Deferred Purchase Price Rent due and to become due hereunder until the termination of the Purchase and Sale Agreement, regardless of the early termination of the Occupancy Term pursuant to this Section 10.01(b), the Tenant may terminate the Occupancy Term by giving the Landlord notice in writing of such termination, which shall forthwith become effective. In no event shall the Tenant be obligated to pay the Additional Rent Prepayment Amount in the event the Occupancy Term is terminated pursuant to this Section 10.01(b).

-33-

**Section 10.02.   Prepayment of Bond**.  The Landlord, at the written request of the Tenant at any time and if the Bond is then prepayable, and if there are funds available therefor, shall forthwith take all steps that may be necessary under the applicable prepayment provisions of the Loan Agreement to effect prepayment of all or part of the then outstanding Bond, as may be specified by the Tenant, on the earliest date on which such prepayment may be made under such applicable provisions.

**Section 10.03.   Prepayment of Bond Rent**.  There is expressly reserved to the Tenant the right, and the Tenant is authorized and permitted, at any time it may choose, to prepay all or any part of the Bond Rent, and the Landlord agrees that the Lender may accept such prepayments of Bond Rent when the same are tendered by the Tenant.  All Bond Rent so prepaid shall at the written direction of the Tenant be credited toward the Bond Rent specified in Section 4.03(a) hereof, in the order of their due dates, or applied to the retirement of the Bond prior to maturity (by prepayment) in accordance with the Loan Agreement.  The Tenant shall also have the right to surrender the Bond acquired by it in any manner whatsoever to the Landlord for cancellation, and the Bond, upon such surrender and cancellation, shall be deemed to be paid and retired and shall be allocated as credits to Bond Rent.

**Section 10.04.   Option to Prepay Bond Rent and Prepay the Bond at Prior Optional Prepayment Dates**.  The Tenant shall also have the option to prepay Bond Rent in such manner and amounts as will enable the Landlord to prepay the Bond prior to maturity, in whole or in part on any date, as provided in Section 6 of the Loan Agreement.  The Bond Rent payable by the Tenant in the event of its exercise of the option granted under this Section shall be the amount necessary to pay principal, all interest to accrue to the prepayment date, the applicable prepayment premium, as provided in Section 6 of the Loan Agreement, and any prepayment expense.

**Section 10.05.   No Obligation to Prepay Rents**.  The Tenant shall be under no obligation to prepay the rents payable hereunder except as herein expressly required or provided.

**Section 10.06.   Reference to Bond Ineffective After Bond Paid**.  Upon payment in full of the Bond, all references in this Rental Agreement to the Bond and the Lender shall be ineffective, and the Lender shall not thereafter have any rights hereunder, saving and excepting those that shall have theretofore vested.

**Section 10.07.   Tenant Entitled to Certain Rent Abatements if Bond Paid Prior to Maturity**.  Upon full payment of the Bond under circumstances not resulting in termination of the Occupancy Term, and if the Tenant is not at the time otherwise in default hereunder, the Tenant shall be entitled to use and occupy the Facilities, from such date to and including the end of the Occupancy Term, with no obligation to make payments of Bond Rent specified in Section 4.03(a) hereof during that interval (but otherwise on the terms and conditions hereof, including, without limitation, with an obligation to continue to make payments of Deferred Purchase Price Rent specified in Section 4.03(c) hereof and Additional Rent specified in Section 4.03(d) hereof).

**Section 10.08.   Granting of Easements**.  If no Event of Default shall then be continuing, the Landlord, at the written request of the Tenant, shall at any time or times grant easements, licenses, rights of way (including the dedication of public highways), and other rights or privileges in the nature of easements with respect to any of the Site, or the Landlord, at the written request of the

-34-

Tenant, shall release existing easements, licenses, rights of way, and other rights or privileges with or without consideration.  The Landlord agrees that it shall execute and deliver any instrument necessary or appropriate to confirm and grant or release any such easement, license, right of way, or other right or privilege upon receipt of (i) a copy of the instrument of grant or release, (ii) a written application signed by the Tenant requesting such instrument, and (iii) a certificate of the Tenant, dated not more than sixty (60) days prior to the date of such grant or release, stating that such grant or release will not impair the effective use or materially and adversely interfere with the operation of the Facilities and will not materially and adversely impair the means of ingress thereto and egress therefrom.  Any money consideration received by the Landlord in connection with the granting or release of an easement pursuant to this Section 10.08 shall be used to redeem the Bond.  No grant or release effected under the provisions of this Section shall entitle the Tenant to any abatement or diminution of the rents payable under Section 4.03 hereof.

## ARTICLE XI

## MISCELLANEOUS

**Section 11.01.  Notices**.  All notices, certificates, and other communications provided for hereunder shall be in writing and sent (a) by telecopy if the sender on the same day sends a confirming copy of such notice by a recognized overnight delivery service (charges prepaid), or (b) by registered or certified mail with return receipt requested (postage prepaid), or (c) by a recognized overnight delivery service (with charges prepaid).  Any such notice must be sent to any party hereto at the addresses set forth on the first page of this Rental Agreement or to such other address as any party hereto shall have specified in writing to the other party.  Notices under this Section 11.01 will be deemed given only when actually received.  A duplicate copy of each notice, certificate, or other communication given hereunder shall also be given to the Lender.

**Section 11.02.  Recording and Filing**.  This Rental Agreement or an appropriate notice or memorandum hereof shall be recorded in all offices as may at the time be provided by law as the proper place for recordation thereof.  The security interest of the Lender created by the Loan Agreement shall be perfected by the filing of a financing statement or an instrument effective as a financing statement, which fully complies with the State Uniform Commercial Code or by the taking of possession of appropriate collateral.  The Tenant further agrees that all necessary continuation statements shall be filed within the time prescribed by the State Uniform Commercial Code and the appropriate parties shall maintain possession of appropriate collateral in order to continue the security interest identified in this Section 11.02, to the end that the rights of the Lender in the Security shall be fully preserved as against third party creditors of, or purchasers for value in good faith from, the Landlord.

**Section 11.03.  Construction and Binding Effect**.  This Rental Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes any prior agreements.  This Rental Agreement shall inure to the benefit of and shall be binding upon the Landlord, the Tenant, and their respective successors and assigns, subject, however, to the limitations contained in Section 8.01 hereof.

**Section 11.04.  Severability**.  In the event any provision of this Rental Agreement shall be held invalid or unenforceable by any court of competent jurisdiction, such holding shall not invalidate or render unenforceable any other provision hereof.

**Section 11.05.  [Reserved]**.

**Section 11.06.  Amendments, Changes, and Modifications**.  The Tenant Contracts may not be amended, changed, modified, altered, or terminated, and the observance of any term thereof may not be waived, without the prior written consent of the Lender.

**Section 11.07.  Execution of Counterparts**.  This Rental Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

**Section 11.08.  Law Governing Construction of this Rental Agreement**.  This Rental Agreement is prepared and entered into with the intention that the law of the State of Georgia, exclusive of such state's rules governing choice of law, shall govern its construction.

**Section 11.09.  Quiet Enjoyment**.  The Landlord agrees that so long as the Tenant shall fully and punctually pay all of the rents and other amounts provided to be paid hereunder by the Tenant and shall fully and punctually perform all of its other covenants and agreements hereunder, the Tenant shall peaceably and quietly have, hold, and enjoy the Facilities during the Occupancy Term, and the Landlord warrants and covenants that it shall defend the Tenant in such peaceable and quiet possession of the Facilities from claims arising by, through, or under the Landlord.

**Section 11.10.  Time of Essence**.  Time is of the essence of this Rental Agreement. Anywhere a day certain is stated for payment or for performance of any obligation, the day certain so stated enters into and becomes a part of the consideration for this Rental Agreement.

**Section 11.11.  No Estate**.  This Rental Agreement shall be deemed and construed to only create the relationship of landlord and tenant between the Landlord and the Tenant, and no estate shall pass out of the Landlord.  The Tenant shall have only a usufruct with respect to the real property demised by this Rental Agreement and only a contract for hiring with respect to the personal property demised by this Rental Agreement, not subject to levy and sale and not assignable in whole or in part by the Tenant, except as expressly provided for herein and in compliance herewith.

**Section 11.12.  No Merger**.  There shall be no merger of this Rental Agreement or the right of occupancy created hereby with the fee simple estate in the Facilities or any part thereof, by reason of the fact that the same person or entity may acquire, own, or hold, directly or indirectly, this Rental Agreement or the right of occupancy created hereby or any interest in this Rental Agreement or such right of occupancy and the fee simple estate in the Facilities or any interest in such fee simple estate, and this Rental Agreement shall not be terminated except as expressly provided herein.

**Section 11.13.  Covenants Run with Premises**.  The covenants, agreements, and conditions herein contained shall run with the property and premises hereby rented and shall be binding upon, inure to the benefit of, and be enforceable by the parties hereto and their respective successors and assigns.

-36-

**Section 11.14.  <u>Triple Net Rental Agreement</u>**. This Rental Agreement shall be deemed and construed to be a "net, net, net rental agreement," and the Tenant shall pay absolutely net during the Occupancy Term the rent and all other payments required hereunder, free of any deductions, without abatement, diminution, or set-off other than those herein expressly provided (including, without limitation, in Section 2.04 hereof).

**Section 11.15. <u>Surrender of Facilities</u>**.  Except as otherwise provided in this Rental Agreement, at the expiration or sooner termination of the Occupancy Term, the Tenant agrees to surrender possession of the Facilities peaceably and promptly to the Landlord in as good condition as at the commencement of the Occupancy Term, ordinary wear, tear, and obsolescence only excepted.

**Section 11.16.  <u>Tenancy at Sufferance</u>**. If the Tenant remains in possession of the Facilities after expiration of the Occupancy Term, without any express written agreement by the Landlord, the Tenant shall be and become a tenant at sufferance, and there shall be no renewal or extension of this Rental Agreement by operation of law.

[Signatures and Seals To Follow]

-37-

## SIGNATURES AND SEALS

**IN WITNESS WHEREOF,** the Landlord has executed this Rental Agreement by causing its name to be hereunto subscribed by its Chairman and by causing the official seal of the Landlord to be impressed hereon and attested by its Secretary, and the Tenant has executed this Rental Agreement by causing its name to be hereunto subscribed by the General Partner of its Manager.

**DEVELOPMENT AUTHORITY OF THE CITY OF HAPEVILLE**

By: _____
      Chairman

(SEAL)

Attest: _____

_____
Secretary

As to the Landlord, signed, sealed, and delivered on the 5th day of May 2017, in the presence of:

_____
Unofficial Witness

_____
Notary Public

My Commission Expires:

_____
                                Date

(NOTARIAL SEAL)

[Signatures and Seals Continued on Following Page]

~#4814-4034-6951 v.2~

[Signatures and Seals Continued From Preceding Page]

**ACRON 2 PORSCHE DRIVE, ATLANTA LLC**

BY: ACRON (USA) L.P., its Manager

BY: ACRON U.S. MANAGEMENT, INC.,
its sole General Partner

By: _____
President

As to the Tenant, signed, sealed, and
delivered on the 5th day of May 2017,
in the presence of:

_____
Unofficial Witness

_____
Notary Public

My Commission Expires:

_____
(date)


(NOTARIAL SEAL)

SUSAN LOWE
Notary Public
State of Oklahoma
Commission # 14002837
My Commission Expires Mar 24, 2018

~#4814-4034-6951 v.2~

**EXHIBIT A**

## DESCRIPTION OF SITE

All that tract or parcel of land lying and being in Land Lot 96 of the 14th District, City of Hapeville, Fulton County, Georgia and being more particularly described as follows:

Beginning at a nail set on the southwesterly right-of-way of Porsche Avenue (formerly known as Henry Ford II Avenue and having a varied right-of-way) at its intersection with the westerly right-of-way of Porsche Drive (having a varied right-of-way); Thence running along the westerly right-of-way of Porsche Drive South 63 degrees 35 minutes 46 seconds East a distance of 21.49 feet to a nail set; Thence continuing along said right-of-way South 49 degrees 10 minutes 54 seconds East a distance of 21.67 feet to a nail set; Thence leaving said right-of-way and running along a curve to the right an arc distance of 44.79 feet (said arc having a radius of 45.00 feet and being subtended by a chord 42.97 feet in length lying to the southwest of said arc and bearing South 05 degrees 43 minutes 43 seconds East) to a point; Thence running South 22 degrees 47 minutes 15 seconds West a distance of 230.40 feet to a point; Thence running along a curve to the left an arc distance of 126.77 feet (said arc having a radius of 432.62 feet and being subtended by a chord 126.32 feet in length lying to the southeast of said arc and bearing South 13 degrees 57 minutes 08 seconds West) to a ½" rebar set; Thence running South 90 degrees 00 minutes 00 seconds West a distance of 212.04 feet to a nail set; Thence running North 70 degrees 00 minutes 00 seconds West a distance of 208.76 feet to a ½" rebar set; Thence running North 00 degrees 00 minutes 00 seconds West a distance of 181.08 feet to a ½" rebar set; Thence running North 44 degrees 40 minutes 27 seconds East a distance of 257.60 feet to a ½" rebar set; Thence running South 45 degrees 00 minutes 00 seconds East a distance of 122.00 feet to a ½" rebar set; Thence running North 45 degrees 00 minutes 00 seconds East a distance of 144.04 feet to a nail set on the southwesterly right-of-way of Porsche Avenue; Thence running along said right-of-way along a curve to the left an arc distance of 128.77 feet (said arc having a radius of 2437.76 feet and being subtended by a chord 128.75 feet in length lying to the southwest of said arc and bearing South 67 degrees 15 minutes 42 seconds East) to a nail set and The Point of Beginning;

Said tract contains 3.98 acres (173,460 square feet), more or less. Being the same property depicted as the "3.98 Acre Tract" on that certain ALTA/ACSM Survey prepared by Lowe Engineers, bearing the seal and signature of William J. Daniel III, G.R.L.S. No. 2257, said plat dated December 4, 2015, being Job No. 15-0120, as revised.

**EXHIBIT B**

**DESCRIPTION OF EQUIPMENT**

Any and all personal property acquired with proceeds of the Bond or with proceeds of casualty insurance policies or condemnation awards.

Deed Book 57489 Pg   218
Filed and Recorded May-09-2017 08:30am
2017-0176171
Georgia Intangible Tax Paid $0.00
Cathelene Robinson
Clerk of Superior Court
Fulton County, Georgia

---------------------------------------------Space Above This Line for Recorder's Use---------------------------------------------

After recording, please return to:
Nelson Mullins Riley & Scarborough LLP
201 17th Street, N.W. - Suite 1700
Atlanta, Georgia 30363
Attn: Marjorie Jordan

**STATE OF GEORGIA**    )
                       )
**COUNTY OF FULTON**    )

---

### SHORT FORM RENTAL AGREEMENT

**DEVELOPMENT AUTHORITY OF THE CITY OF HAPEVILLE** ("Landlord"), a public body corporate and politic created and existing under the laws of the State of Georgia, hereby rents and demises to **ACRON 2 PORSCHE DRIVE, ATLANTA LLC** ("Tenant"), a limited liability company formed and existing under the laws of the State of Delaware, the real property described on Exhibit "A" attached hereto and incorporated herein by reference, pursuant to the terms and provisions of that certain Rental Agreement, dated the date hereof (the "Rental Agreement"), between Landlord and Tenant.

The term of the Rental Agreement will commence on the Commencement Date (as defined in the Rental Agreement) and will continue until midnight on December 1 of the 30th calendar year following the calendar year of the Commencement Date, unless the Rental Agreement is sooner terminated in accordance with the provisions thereof.

The terms and conditions of the Rental Agreement are incorporated herein by reference. It is understood that the purpose of this Short Form Rental Agreement is to give notice of the Rental Agreement and the terms thereof and that all rights, titles, interests, and obligations of the parties hereto are to be governed by and subject to the terms of the Rental Agreement. In the event of any conflict between the terms of the Rental Agreement and the terms of this Short Form Rental Agreement, the terms of the Rental Agreement shall control.

~#4835-2478-4711 v.3~

Deed Book 57489 Pg 219

**IN WITNESS WHEREOF,** Landlord and Tenant have caused this **SHORT FORM RENTAL AGREEMENT** to be executed, sealed, and delivered by their duly authorized representatives as of the 5th day of May 2017.

**DEVELOPMENT AUTHORITY OF THE CITY OF HAPEVILLE**

By: _____
   Chairman

As to Landlord, signed, sealed, and delivered on May 5, 2017, in the presence of:

_____
Unofficial Witness

_____
Notary Public

(SEAL)

Attest: _____

Secretary

My Commission Expires: _____
                      (date)

(NOTARIAL SEAL)

**ACRON 2 PORSCHE DRIVE, ATLANTA LLC**

As to Tenant, signed, sealed, and delivered on May 5, 2017, in the presence of:

BY: ACRON (USA) L.P., its Manager

    BY: ACRON U.S. MANAGEMENT, INC.,
       its sole General Partner

_____
Unofficial Witness

    By: _____
       President

_____
Notary Public

My Commission Expires: _____
                      (date)

(NOTARIAL SEAL)

~#4835-2478-4711 v.3~

Deed Book 57489 Pg   220
Cathelene Robinson
Clerk of Superior Court
Fulton County, Georgia

[Signatures and Seals Continued From Preceding Page]

**ACRON 2 PORSCHE DRIVE, ATLANTA LLC**

BY: ACRON (USA) L.P., its Manager

BY: ACRON U.S. MANAGEMENT, INC.,
its sole General Partner

By: _____
President

As to Optionee, signed, sealed, and
delivered on May 5, 2017, in the
presence of:

_____
Unofficial Witness

_____
Notary Public

My Commission Expires: March 24, 2018
(date)

(NOTARIAL SEAL)

SUSAN LOWE
Notary Public
State of Oklahoma
Commission # 14002837
My Commission Expires Mar 24, 2018

-3-

~#4835-2478-4711 v.3~

③

Deed Book 59576 Page 216
Filed and Recorded 1/2/2019 10:56:00 AM
2019-0000366
Cathelene Robinson
Clerk of Superior Court
Fulton County, GA
Participant IDs: 1983094574
7067927936

Parcel No. 14 0096 LL 0627

-----------------------------Space Above This Line for Recorder's Use-----------------------------

**When Recorded Return To:**
Sheree Esquilin
National Commercial Services
First American Title Insurance Company
Six Concourse Parkway, Ste. 2000
Atlanta, GA 30328
**File No: NCS** 430923

After recording, ~~please return to~~:
Jessica P. Malchow. Esq.
Baker Hostetler, LLP
200 South Orange Avenue
Suite 2300
Orlando, FL 32802

STATE OF GEORGIA     )
                     )
COUNTY OF FULTON     )

*THIS INSTRUMENT IS BEING RECORDED WITH <u>EXHIBIT "A"</u> ATTACHED HERETO SOLELY TO CORRECT THAT CERTAIN SHORT FORM RENTAL AGREEMENT DATED MAY 5, 2017 AND FILED MAY 9, 2017 IN DEED BOOK 57489, PAGE 218, FULTON COUNTY, GEORGIA TO WHICH <u>EXHIBIT "A"</u> WAS INADVERTANTLY NOT ATTACHED.*

## CORRECTIVE SHORT FORM RENTAL AGREEMENT

**DEVELOPMENT AUTHORITY OF THE CITY OF HAPEVILLE** ("**Landlord**"), a public body corporate and politic created and existing under the laws of the State of Georgia, hereby rents and demises to **ACRON 2 PORSCHE DRIVE, ATLANTA LLC** ("**Tenant'**), a limited liability company formed and existing under the laws of the State of Delaware, the real property described on **Exhibit "A"** attached hereto and incorporated herein by reference, pursuant to the terms and provisions of that certain Rental Agreement, dated May 5, 2017 (the "**Rental Agreement**"), between Landlord and Tenant

The term of the Rental Agreement will commence on the Commencement Date (as defined in the Rental Agreement) and will continue until midnight on December 1 of the 30th calendar year following the calendar year of the Commencement Date, unless the Rental Agreement is sooner terminated in accordance with the provisions thereof.

The terms and conditions of the Rental Agreement are incorporated herein by reference.  It is understood that the purpose of this Short Form Rental Agreement is to give notice of the Rental Agreement and the terms thereof and that all rights, titles, interests, and obligations of the parties

4847-9310-0162.2

Deed Book 59576 Page 217

hereto are to be governed by and subject to the terms of the Rental Agreement. In the event of any conflict between the terms of the Rental Agreement and the terms of this Short Form Rental Agreement, the terms of the Rental Agreement shall control.

**IN WITNESS WHEREOF,** Landlord and Tenant have caused this **CORRECTIVE SHORT FORM RENTAL AGREEMENT** to be executed, sealed, and delivered by their duly authorized representatives as of the _14th_ day of December 2018.

**DEVELOPMENT AUTHORITY OF THE CITY OF HAPEVILLE**

As to Landlord, signed, sealed, and delivered on December _14th_, 2018, in the presence of:

By: _____
Chairman

_____
Unofficial Witness

_____
Notary Public

My Commission Expires: 3 | 11 | 22 (Date)

NOTARY SEAL

2

Deed Book 59576 Page 218

**ACRON 2 PORSCHE DRIVE, ATLANTA LLC**

As to Tenant, signed, sealed, and
delivered on December 21, 2018,
in the presence of:

By: ACRON (USA) L.P., its Manager

By: ACRON U.S. MANAGEMENT, INC.,
Its sole General Partner

_____
Unofficial Witness

By: _____
Name: Greg Wilson
Title: President

_____
Notary Public

My Commission Expires: __3/24/22__
                          (date)

NOTARIAL SEAL

SUSAN LOWE
Notary Public – State of Oklahoma
Commission Number 14002837
My Commission Expires Mar 24, 2022

3

Deed Book 59576 Page 219
Cathelene Robinson
Clerk of Superior Court

## EXHIBIT "A"

### Legal Description

PARCEL 1

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOT 96 OF THE 14TH DISTRICT, CITY OF HAPEVILLE, FULTON COUNTY, GEORGIA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A NAIL SET ON THE SOUTHWESTERLY RIGHT-OF-WAY OF PORSCHE AVENUE (FORMERLY KNOWN AS HENRY FORD II AVENUE AND HAVING A VARIED RIGHT-OF-WAY) AT ITS INTERSECTION WITH THE WESTERLY RIGHT-OF-WAY OF PORSCHE DRIVE (HAVING A VARIED RIGHT-OF-WAY); THENCE RUNNING ALONG THE WESTERLY RIGHT-OF-WAY OF PORSCHE DRIVE SOUTH 63 DEGREES 35 MINUTES 46 SECONDS EAST A DISTANCE OF 21.49 FEET TO A NAIL SET; THENCE CONTINUING ALONG SAID RIGHT-OF-WAY SOUTH 49 DEGREES 10 MINUTES 54 SECONDS EAST A DISTANCE OF 21.67 FEET TO A NAIL SET; THENCE LEAVING SAID RIGHT-OF-WAY AND RUNNING ALONG A CURVE TO THE RIGHT AN ARC DISTANCE OF 44.79 FEET (SAID ARC HAVING A RADIUS OF 45.00 FEET AND BEING SUBTENDED BY A CHORD 42.97 FEET IN LENGTH LYING TO THE SOUTHWEST OF SAID ARC AND BEARING SOUTH 05 DEGREES 43 MINUTES 43 SECONDS EAST) TO A POINT; THENCE RUNNING SOUTH 22 DEGREES 47 MINUTES 15 SECONDS WEST A DISTANCE OF 230.40 FEET TO A POINT; THENCE RUNNING ALONG A CURVE TO THE LEFT AN ARC DISTANCE OF 126.77 FEET (SAID ARC HAVING A RADIUS OF 432.62 FEET AND BEING SUBTENDED BY A CHORD 126.32 FEET IN LENGTH LYING TO THE SOUTHEAST OF SAID ARC AND BEARING SOUTH 13 DEGREES 57 MINUTES 08 SECONDS WEST) TO A 1/2 INCH REBAR SET; THENCE RUNNING SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST A DISTANCE OF 212.04 FEET TO A NAIL SET; THENCE RUNNING NORTH 70 DEGREES 00 MINUTES 00 SECONDS WEST A DISTANCE OF 208.76 FEET TO A 1/2 INCH REBAR SET; THENCE RUNNING NORTH 00 DEGREES 00 MINUTES 00 SECONDS WEST A DISTANCE OF 181.08 FEET TO A 1/2 INCH REBAR SET; THENCE RUNNING NORTH 44 DEGREES 40 MINUTES 27 SECONDS EAST A DISTANCE OF 257.60 FEET TO A 1/2 INCH REBAR SET; THENCE RUNNING SOUTH 45 DEGREES 00 MINUTES 00 SECONDS EAST A DISTANCE OF 122.00 FEET TO A 1/2 INCH REBAR SET; THENCE RUNNING NORTH 45 DEGREES 00 MINUTES 00 SECONDS EAST A DISTANCE OF 144.04 FEET TO A NAIL SET ON THE SOUTHWESTERLY RIGHT-OF-WAY OF PORSCHE AVENUE; THENCE RUNNING ALONG SAID RIGHT-OF-WAY ALONG A CURVE TO THE LEFT AN ARC DISTANCE OF 128.77 FEET (SAID ARC HAVING A RADIUS OF 2437.76 FEET AND BEING SUBTENDED BY A CHORD 128.75 FEET IN LENGTH LYING TO THE SOUTHWEST OF SAID ARC AND BEARING SOUTH 67 DEGREES 15 MINUTES 42 SECONDS EAST) TO A NAIL SET AND THE POINT OF BEGINNING;

SAID TRACT CONTAINS 3.98 ACRES (173,460 SQUARE FEET), MORE OR LESS. BEING THE SAME PROPERTY DEPICTED AS THE "3,98 ACRE TRACT" ON THAT CERTAIN ALTA/ACSM SURVEY PREPARED BY LOWE ENGINEERS, BEARING THE SEAL AND SIGNATURE OF WILLIAM J. DANIEL III, G.R.L.S. NO. 2257, SAID PLAT DATED DECEMBER 4, 2015, BEING JOB NO. 15-0120, AS REVISED.

PARCEL 2

EASEMENTS AND OTHER INTERESTS IN REAL PROPERTY CONTAINED IN THAT CERTAIN DECLARATION OF EASEMENT, COVENANTS, CONDITIONS AND RESTRICTIONS BETWEEN PORSCHE CARS NORTH AMERICA, INC., A DELAWARE CORPORATION AND ACRON 2 PORSCHE DRIVE, ATLANTA LLC, LLC, A DELAWARE LIMITED LIABILITY COMPANY, DATED DECEMBER 30, 2015, FILED FOR RECORD DECEMBER 31, 2015, RECORDED IN DEED BOOK 55721, PAGE 498 , RECORDS OF FULTON COUNTY, GEORGIA.

**<u>Exhibit E</u>**

**Property Management Agreement**

[Attached.]

**HOTEL MANAGEMENT AGREEMENT**

between

**ACRON 2 PORSCHE DRIVE ATLANTA, LLC**
as Owner

and

**TPG HOTELS & RESORTS, INC.,**
as Manager

FOR

**KIMPTON OVERLAND HOTEL**

2 Porsche Drive, Atlanta, GA  30354

# HOTEL MANAGEMENT AGREEMENT

This Hotel Management Agreement (the "**Agreement**") made as of this 31st day of December, 2021 between ACRON 2 PORSCHE DRIVE ATLANTA, LLC, a Delaware limited liability company **("Owner")**, as Owner, and TPG HOTELS & RESORTS, INC., a Rhode Island corporation **("Manager")**, as Manager.

## RECITALS:

A.  Owner is the fee owner of the Hotel (as defined below).

B.  Manager is experienced in the management and operation of hotels, directly and through affiliated entities.

C.  Owner and Manager desire to enter into this Agreement for the management and operation of the Hotel in accordance with the terms and conditions and subject to the limitations contained in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner and Manager covenant and agree as follows:

## ARTICLE 1
## DEFINITIONS, TERMS AND REFERENCES

1.1     Definitions.   In this Agreement and any Exhibits, the following terms shall have the following meanings:

"**AAA**" shall have the meaning set forth in Article 30.

"**Accounting Period**" shall mean each calendar month (whether of 28, 29, 30 or 31 days) during each Fiscal Year.

"**Accounting Fee**" shall have the meaning set forth in Section 4.12.

"**Accounting Services**" shall have the meaning set forth in Section 4.12.

"**Affiliate**" shall mean any person or entity that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with another person or entity. The term "**control**" (and correlative terms) shall mean the power, whether by contract, equity ownership or otherwise, to direct the policies or management of a person or entity. Without limiting the foregoing, an "**Affiliate**" also includes any partner or a partnership of any party to this Agreement, any member or membership parties thereto and any corporation, partnership, individual or trust related to or controlling or controlled by such partnership, individual or trust related to or controlling or controlled by such partnership party or its partners or such membership

party or its members.  A natural person is related to another natural person if he or she is a spouse, parent, or lineal descendant of the other person.

"**Allocated Services**" shall mean certain support services that Manager obtains from a third party and provides on a central or regional basis to at least seventy five percent (75%) of the hotels that it manages because such support services can be provided on a more efficient, effective and economical basis to each individual Manager managed hotel if the expenses of such support services are shared by other Manager managed hotels.  Such support services include services in the areas of sales and marketing, purchasing, food and beverage, human resources, insurance, technology, training and payroll (each such service, an "**Allocated Service**"; collectively, the "**Allocated Services**").  Owner and Manager agree that Manager shall provide Allocated Services to the Hotel and that the Hotel's portion of the cost thereof shall constitute a Gross Operating Expense so long as (i) the costs of the Allocated Services are allocated in a commercially reasonable fashion on a proportionate basis among the Hotel and the other Manager managed hotels benefiting therefrom; and (ii) the Allocated Services shall not include services that do not benefit the Hotel.  The parties agree that Manager (or its Affiliates) and the Hotel shall each be returned a one-half of the proportionate share of any rebates received by Manager with respect to any of the Allocated Services on a proportionate basis as compared to other hotels managed by Manager or its Affiliates.

"**Annual Operating Budget**" shall mean each annual operating projection for the Hotel prepared and submitted by Manager to Owner, and as approved by Owner, for each Fiscal Year pursuant to Section 4.4(a).

"**Annual Plan**" shall mean an annual business plan for the operation of the Hotel prepared and submitted by Manager to Owner, and as approved by the Owner, which shall include (a) the Annual Operating Budget, Annual Capital Budget, (b) a description or narrative that describes in reasonable detail the methods to be employed and the strategies to be adopted in order to achieve the revenue estimates set forth in such budgets, (c) a staffing guide for the Hotel, (d) an estimated cash flow statement for each calendar month during the applicable Operating Year (including a schedule of any amounts anticipated to be funded by Owner), and (e) a plan that describes in reasonable detail the sales, marketing, advertising and promotional activities to be undertaken, and the pricing strategies and customer relations program to be implemented, during the applicable Operating Year (including descriptions of the Hotel's target markets, its relative position in those markets, the proposed room rate structure for each market segment and the rates and allocations to be made available on a discounted or complimentary basis).

"**Approved Capital Budget**" shall have the meaning set forth in Section 4.4(b).

"**Base Management Fee**" shall have the meaning set forth in Article 11.

"**Building and Appurtenances**" shall mean (i) the hotel building located on the Premises, and (ii) landscaping and other related facilities, together with all installations located at, or used in connection with the operation of the building for hotel purposes including, without limitation, any swimming pools, health club and recreational facilities, walkways, parking facilities, heating,

4836-4873-7791.6
C:\Users\jmelicharek\Desktop\Hotel Management Agreement - TPG - Porsche Atlanta (003).docx

lighting, sanitation equipment, air conditioning, laundry facilities, refrigeration, built-in kitchen equipment, and elevators.

"**Capital Budget**" shall mean Manager's proposed estimate of Capital Expenditures prepared and submitted by Manager to Owner, and as approved by Owner, each Fiscal Year pursuant to Section 4.4.

"**Capital Expenditure**" means an expenditure for or on account of Capital Improvements or Capital Renewals unless such expenditure for a Capital Renewal is properly chargeable to "Property Operation and Maintenance" under the Uniform System of Accounts.

"**Capital Improvements**" means any major capital repairs, alterations, improvements, renewals and replacements (which repairs, alterations, improvements, renewals and replacements are not Capital Renewals) to the structural, mechanical, electrical, heating, ventilating, air conditioning, plumbing and vertical transportation elements of the Hotel building.

"**Capital Renewals**" means (i) normal capital replacements of, or additions to, FF&E, (ii) special projects designed to maintain the Hotel in accordance with this Agreement, including renovation of the guest room areas, public space food and beverage facilities, or back of the house areas, which projects will generally comprise replacements of, or additions to, FF&E, but may include revisions and alterations in the improvements.  "Capital Renewals" does not include Capital Improvements, whether structural, FF&E or otherwise incident to a redesign of any space within the Hotel.

"**Commencement Date**" shall mean the date on which Manager assumes the management and operation of the Hotel.

"**Competitive Set**" shall mean the properties listed on Exhibit D attached hereto and any revisions to such list agreed upon by Owner and Manager from time to time**.**

"**Corporate Level Employees**" means those individuals employed by Manager or its Affiliates and performing services on a corporate executive level, system wide basis, or for substantially all other hotels managed by Manager or its Affiliates.

"**Cross Indemnity Agreement**" means that certain Cross-Indemnity Agreement entered into as of the date hereof by and among TH INVESTMENT HOLDINGS II, LLC, a Delaware limited liability company and an Affiliate of Manager ("**TH Guarantor**"), ACRON (USA) L.P., a Texas limited partnership ("**ACRON (USA)**"), ACRON AG, a Swiss stock corporation ("**ACRON AG**") and Owner.

"**CPI**" shall mean the Consumer Price Index for All Urban Consumers, United States City Average, All Items (1982-84=100), issued by the Bureau of Labor Statistics of the United States Department of Labor.

"**Default Rate**" shall mean the lesser of (i) the Prime Rate plus four percent (4%) per annum or (ii) the highest lawful rate permitted by applicable Legal Requirements from time to time.

"**Earnings Before Interest, Taxes, Depreciation and Amortization**" or "**EBITDA**" shall Total Operating Revenues less Gross Operating Expenses (which excludes taxes, interest, depreciation, amortization, and reserves).

"**Environmental Indemnity**" means that certain Environmental Indemnity Agreement dated as of the date hereof among TH Guarantor, ACRON (USA), ACRON AG, Owner and Lender.

"**Effective Date**" shall mean the date of this Agreement as set forth on page 1 hereof.

"**ERISA**" shall have the meaning set forth in Section 4.2(a).

"**Event of Default**" shall mean any of the events described in Article 16, provided that any condition contained therein for the giving of notice or the lapse of time, or both, has been satisfied.

"**Executive Personnel**" shall mean the General Manager, Finance Director, and Director of Sales and Marketing for the Hotel.

"**Executive Team**" shall have the meaning set forth in Article 23.

"**Expert**" shall mean an independent, nationally recognized consulting firm or individual with a minimum of ten (10) years of experience in the hotel industry and qualified to resolve the issue in question. The Expert may not include any individual who is, as of the date of appointment or within thirty-six (36) months prior to such date, employed, either directly or indirectly as a consultant in connection with any other matter, by a Party attempting to appoint such person or an Affiliate of a Party. If a Party is entitled to and elects to have an Expert designated, the Party shall notify the other Party in writing and the Parties shall attempt to designate a mutually acceptable Expert within five (5) Business Days of such notice. In the event that the Parties are unable to agree on naming an Expert within such period, then the matter shall be resolved in accordance with the arbitration process established in Section 26.1.

"**Fiscal Year**" shall mean the fiscal year that ends on the last day of each calendar year. The first Fiscal Year shall be the period commencing on the Commencement Date and ending on December 31st of the same calendar year in which the Commencement Date occurs. The last Fiscal Year shall be the period commencing on January 1st of the same calendar year in which the last day of the Term of this Agreement occurs and ending on such last day of the Term. The words "full Fiscal Year" shall mean any Fiscal Year containing not fewer than 365 days. A partial Fiscal Year after the end of the last full Fiscal Year and ending with the expiration or earlier termination of the Term shall constitute a separate Fiscal Year.

"**Furniture, Fixtures and Equipment**" or "**FF&E**" shall mean all furniture, furnishings, wall coverings, fixtures, carpeting, rugs, fine arts, paintings, statuary, decorations, and hotel

4836-4873-7791.6
C:\Users\jmelicharek\Desktop\Hotel Management Agreement - TPG - Porsche Atlanta (003).docx

equipment and systems (including the costs associated with the purchase, installation and delivery thereof) located at, or used in connection with, the operation of the Building and Appurtenances as a hotel, including without limitation, major equipment and systems required for the operation of kitchens, bars, laundry and dry cleaning facilities, office equipment, dining room wagons, major material handling equipment, major cleaning and engineering equipment, telephone systems, computerized accounting and vehicles (including the costs associated with the purchase, installation and delivery thereof) together with all replacements therefor and additions thereto, but in all events excluding Operating Equipment and Supplies.

"**GAAP**" shall have the meaning set forth in Section 4.2.

"**GOP Threshold**" shall have the meaning set forth in Section 18.

"**Gross Operating Expenses**" shall have the meaning contained on Schedule II attached hereto.

"**Gross Operating Profit**" or "**GOP**" shall mean for the applicable period, the Total Operating Revenues for that period minus the Gross Operating Expenses for that period.

"**Guaranty of Recourse Obligations**" means that certain Guaranty of Recourse Obligations of even date herewith made by TH Guarantor, ACRON USA and ACRON AG in favor of Lender

"**Hotel**" shall mean (a) the Building and Appurtenances and the Premises owned by Owner and (b) all FF&E, all Operating Equipment and Supplies, and all Inventories owned by Owner located at the address set forth on Schedule I.

"**hotel**" shall mean any hotel (other than the Hotel), inn, motor inn, motor hotel, motel, suite hotel, conference center, meeting center or any other facility providing either or both of short-term lodging and meeting arrangements.

"**Hotel Employees**" shall have the meaning set forth in Section 4.2.

"**Incentive Management Fee**" shall have the meaning set forth in Article 11.

"**Inventories**" shall mean inventories of supplies, in accordance with the Uniform System of Accounts, such as soap, toilet paper, stationery, writing pens, food and beverage inventories, paper products, menus, expendable office and kitchen supplies, fuel, supplies and items similar to any of the foregoing.

"**Legal Proceedings**" shall mean all complaints, counterclaims or cross-claims filed in a court of competent jurisdiction, any notice of any claim of violation of any legal requirement by any governmental agency or authority, or any summons or other legal process, in each instance by or against the Hotel, or by or against Owner or Manager, in connection with the Hotel.

"**Legal Requirements**" shall mean all public laws, statutes, ordinances, orders, rules, regulations, permits, licenses, authorizations, directions and requirements of all governments and governmental authorities, which, now or hereafter, may be applicable to the Hotel and the operation thereof, including those relating to zoning, building, life/safety, environmental and health, employment, collective bargaining, employee benefits.

"**Liabilities**" shall have the meaning set forth in Section 24.1.

"**License Agreement**" shall mean the License Agreement issued to Owner by the franchising entity for the brand set forth on Schedule I, any Commitment therefor and such brand's hotel standards manual; should for any reason the License Agreement as above defined terminate or cease to exist, then the term "**License Agreement**" shall thereafter mean the franchise or license agreement from time to time entered into by Owner with respect to the branding and operation of the Hotel.  For the purposes of this definition, the following terms used in said section shall have the following meaning: "**Licensor**" shall have the meaning set forth on Schedule I (should for any reason the License Agreement as hereinafter defined terminate or cease to exist, then the term "**Licensor**" shall thereafter mean the franchisor or licensor under the franchise or license agreement from time to time entered into by Owner with respect to the branding and operation of the Hotel); "**Licensee**" shall mean Owner; and the "**Manual**" shall mean the Licensor's operating manual and other manuals for Licensor described in the License Agreement.

"**Management Fees**" shall mean collectively, the Base Management Fee, the Accounting Fee, the Incentive Management Fee, and other fees payable or due hereunder, all as set forth in Article 11 hereof and Schedule I attached hereto.

"**Manager**" shall have the meaning set forth in the introductory section of this Agreement.

"**Manager's Liability Cap**" shall have the meaning set forth in Article 33.

"**MEPPA**" shall have the meaning set forth in Section 4.2(a).

"**Minimum Cost**" shall have the meaning set forth in Section 15.1.

"**Mortgage**" shall mean, collectively, each of the documents evidencing or securing current or future indebtedness on the Hotel in favor of a third-party lender or financial institution or any successor thereto or replacement thereof (the "**Lender**").

"**OFAC**" shall have the meaning set forth in Section 26.18.

"**Open for Business**" shall mean the period of time during which all or substantially all of the Hotel is open for business to the general public.

"**Operating Account**" shall mean a special account or accounts, established by Owner in accordance with Section 9.3, in a federally insured bank or trust company selected by Owner.

"**Operating Equipment and Supplies**" shall mean supply items which constitute "Operating Equipment and Supplies" under the Uniform System of Accounts, all miscellaneous serving equipment, linen, towels, uniforms, silver, glassware, china and similar items.

"**Operating Standards**" shall mean the operation of the Hotel in a manner consistent with the highest of (i) the requirements under the License Agreement; (ii) the condition of the Hotel as of the Commencement Date (or, following completion of a Renovation, the condition of the Hotel as of the completion of the Renovation), normal wear and tear excepted; (iii) the condition and level of the operation of hotels of comparable class and standing to the Hotel in its market area; (iv) then current market conditions regarding rental rates and lease terms and conditions with respect to Hotels of comparable class and standing to the Hotel (including but not limited to the Competitive Set); and (v) then current business and management practices (including those related to compliance with Legal Requirements) applicable to the management, operation, leasing, maintenance and repair of a hotel comparable in size, character and location to the Hotel.

"**Owner**" shall have the meaning set forth in the introductory section of this Agreement.

"**Owner's Annual Plan Objections**" shall have the meaning set forth in Section 4.4.

"**Performance Standard**" shall have the meaning set forth in Section 18.2.

"**Permits**" shall mean all governmental or quasi-governmental licenses and permits, including but not limited to any certificate of occupancy, business licenses and liquor licenses.

"**Permitted Investments**" shall mean (subject to modification, addition or deletion from time to time at the option of Owner by written request to Manager) all of which shall be in the name of Owner:

      (a)     interest-bearing deposit accounts (which may be represented by certificates of deposit, time deposit open account agreements or other deposit instruments) in commercial banks having a combined capital and surplus of not less than $100,000,000; or

      (b)     all other investments approved by Owner.

"**Permitted Variations**" means (i) unapproved variations up to an aggregate of five percent (5%) per annum of all costs and expenses in the approved Annual Plan for the period such approval is effective, (ii) certain expenses, such as impositions, taxes, occupancy fees and charges, reservation fees, real estate taxes, utilities, insurance premiums, license and permit fees and charges, are not within the control of the Manager, (iii) emergency expenditures, (iv) expenditure necessary to comply with any Legal Requirements or to cure or prevent any violation of any Legal Requirements.

"**Premises**" shall mean the land on which the Hotel is located, which land is described in Exhibit B attached hereto.

4836-4873-7791.6
C:\Users\jmelicharek\Desktop\Hotel Management Agreement - TPG - Porsche Atlanta (003).docx

"**Prime Rate**" shall mean the rate per annum announced, designated or published from time to time by JP Morgan Chase Bank N.A. as its "prime", "reference" or "base" rate of interest for commercial loans.

"**Privileged Information**" shall have the meaning set forth in Section 26.19.

"**Prohibited Persons**" shall have the meaning set forth in Section 26.18.

"**Proposed Capital Expenditures Budget**" shall have the meaning set forth in Section 4.4.

"**Proposed FF&E Budget**" shall have the meaning set forth in Section 4.4.

"**Proposed Operating Budget**" shall have the meaning set forth in Section 4.4.

"**Reimbursable Expenses**" shall mean all reasonable travel, lodging, entertainment, telephone, facsimile, postage, courier, delivery, employee training and other expenses incurred by Manager in accordance with the standard policies for expenses incurred by Manager on its own behalf and which are directly related to its performance of this Agreement, but in no event will Reimbursable Expenses include or duplicate expenses for Manager's overhead or Allocated Services.

"**Renovation**" shall mean a renovation of any portion of the Hotel during the Term, whether pursuant to a plan proposed by Manager and approved by Owner, or otherwise adopted by Owner subject to the terms hereof, to, among other things, bring the Hotel to a physical condition that satisfies the standards under the License Agreement and to operate in a manner consistent with the assumptions for the then-current Annual Operating Budget and then-current Annual Plan.  A Renovation shall be carried out at the expense of Owner pursuant to plans and specifications and a schedule prepared by Manager and approved by Owner and, to the extent required under the License Agreement, by Licensor.

"**Repairs and Maintenance**" shall have the meaning as defined in Section 8.1.

"**Reserve**" shall mean an account maintained as a Permitted Investment for Reserve for replacement of FF&E and/or Capital Improvements and/or Capital Renewals, as described in Section 7.1 and funded as provided in Section 7.2.

"**Revenue Data Publication**" shall mean Smith's STR Report, a monthly publication distributed by Smith Travel Research, Inc., or an alternative source, reasonably satisfactory to both parties, of data regarding the average daily rate, occupancy and RevPAR of hotels in the general area of the Hotel, including, without limitation, the Competitive Set.

"**Revenue Per Available Room**" or "**RevPAR** " shall mean for any Fiscal Year the number derived by dividing (i) net room revenue (in accordance with the Uniform System of Accounts), by (ii) the number of available guest rooms in the subject hotel.

4836-4873-7791.6
C:\Users\jmelicharek\Desktop\Hotel Management Agreement - TPG - Porsche Atlanta (003).docx

"**RevPAR Threshold**" shall mean eighty five percent (85%) of the average RevPAR of the Hotel's Competitive Set, as set forth in the applicable Revenue Data Publication, or such other amount as may be agreed to by Owner and Manager as part of the approved Annual Plan for the applicable Fiscal Year.

"**Schedule I**" shall mean Schedule I attached to and made a part of this Agreement.

"**Schedule II**" shall mean Schedule II attached to and made a part of this Agreement.

"**Schedule III**" shall mean Schedule III attached to and made a part of this Agreement.

"**State**" shall mean the State in which the Hotel is located or other as designated.

"**Term**" shall mean the term of this Agreement, which shall be an initial three (3) year term commencing on the Commencement Date and expiring on the third (3rd) anniversary of the Commencement Date, as such Term may be extended or shortened as expressly set forth in this Agreement or as otherwise agreed to by Owner and Manager.

"**Test Year**" shall mean each twelve (12) month period during the Term commencing on the first day of the second full Fiscal Year after the Commencement Date (such date the "**Testing Start Date**"). In the event that this Agreement shall terminate on a date other than the last day of a calendar year, the last Test Year shall end on the date of termination. The term "full Test Year" means any Test Year containing not fewer than 365 days.

"**Third Party Purchaser**" shall have the meaning set forth in Section 18.1.

"**Total Operating Revenues**" has the meaning set forth on Schedule III attached hereto.

"**Unavoidable Interruptions**" shall mean interruptions in the operation of or access to the Hotel or any of its essential services on account of an interruption in any one or more of the utility services described in Section 13.2, or on account of labor disputes, strikes, lockouts, fire or other casualty, war, terrorist actions, acts of God and other similar causes beyond the reasonable control of the party claiming an unavoidable interruption, but never financial inability. Other than obligations accruing prior to the occurrence of an event of Unavoidable Interruption or obligations that, if not performed, would cause a material adverse effect on the Hotel or its operations (for instance, the requirement to maintain the Permits or insurance obligations hereunder), the obligations of the party hereunder shall be suspended during the period of an Unavoidable Interruption.

"**Uniform System of Accounts**" shall mean the Uniform System of Accounts for the Lodging Industry, 11th Revised Edition, 2014, as published by the Hotel Association of New York City, Inc. or any later edition thereof.

"**Working Capital**" shall mean and refer to the funds which are reasonably necessary for the day-to-day operation of the Hotel's business, including, without limitation, amounts sufficient for the maintenance of petty cash funds, operating bank accounts, receivables, payrolls, prepaid

expenses, advance deposits, funds required to maintain inventories, and amounts due to/or from Manager and/or Owner less accounts payable and accrued current liabilities.

1.2 **Terminology**. All personal pronouns used in this Agreement, whether used in the masculine, feminine or neuter gender, shall include all genders; the singular shall include the plural, and the plural shall include the singular. The titles of Articles, Sections and Subsections in this Agreement are for convenience only, and neither limit nor amplify the provisions of this Agreement, and all references in this Agreement to Articles, Sections, Subsections, paragraphs, clauses, sub-clauses or exhibits shall refer to the corresponding Article, Section, Subsection, paragraph, clause or sub-clause of, or exhibit attached to, this Agreement, unless specific reference is made to the articles, sections or other subdivisions of, or exhibits to, another document or instrument.

1.3 **Exhibits**. All exhibits, schedules and other attachments attached hereto are by this reference made a part of this Agreement.

## ARTICLE 2
## MANAGEMENT OF HOTEL

Owner hereby engages and appoints Manager, pursuant to the terms of this Agreement, to operate and manage the Hotel, and Manager hereby agrees and contracts to plan, operate, repair and manage the Hotel pursuant to the terms of this Agreement.

Subject to the terms of this Agreement, Hotel operations shall be under the exclusive supervision of Manager, which, except as otherwise specifically provided in this Agreement, shall be responsible for the proper and efficient operation, maintenance and repair of the Hotel in accordance with the terms of this Agreement, including the Operating Standards. Except as specifically set forth in this Agreement, Manager shall have discretion and control, consistent with the Operating Standards and the Annual Plan, respecting matters relating to management and operation of the Hotel, including, without limitation, charges for rooms and commercial space, credit policies, food and beverage services, other Hotel services, employment policies, granting of concessions within the Hotel, procurement of inventories, supplies and services, promotion and publicity and, in general, all activities necessary for day to day operation of the Hotel.

Manager shall devote its knowledge, experience and efforts to operate and manage the Hotel pursuant to this Agreement in a businesslike manner in accordance with the Operating Standards. Manager shall make available to Owner the full benefit of the judgment, experience and advice of the members of Manager's organization and staff with respect to the policies pursued by Owner in operating, maintaining, and servicing the Hotel with the aim to achieve long-term profitability for the business of the Hotel.

## ARTICLE 3
## TERM

3.1 **Term**. This Agreement shall be in effect for the initial Term. If this Agreement has not been otherwise terminated in accordance with the terms of this Agreement, upon the expiration of

4836-4873-7791.6
C:\Users\jmelicharek\Desktop\Hotel Management Agreement - TPG - Porsche Atlanta (003).docx

the initial Term, the initial Term shall automatically renew for consecutive one (1) year periods, unless either party provides written notice to the other party not less than one hundred twenty (120) days' prior to  the expiration of the Term (as it may be extended).  Notwithstanding the foregoing, this Agreement may be terminated prior to the scheduled expiration of the Term or any extension thereof (i) upon the sale of the Hotel to a bona fide Third-Party Purchaser, as provided in Article 18 hereof, provided that Owner provides Manager with not less than sixty (60) days written notice of such termination; and (ii) as otherwise provided in Articles 15, 17 and 18.

3.2      **Surrender.**  On the expiration or sooner termination of the Term, Manager shall quit and surrender the Premises to Owner in the condition required pursuant to this Agreement and take such other actions as contemplated by Article 20 hereof.

## ARTICLE 4
## USE AND OPERATION OF THE HOTEL

4.1      **Operation**.  Manager shall be the sole and exclusive manager of the Hotel during the Term and shall operate the Hotel in accordance with the Operating Standards and the provisions of this Agreement.  Manager shall act in good faith with respect to the proper protection of and accounting for Owner's assets and shall deal at arm's length with Owner and all third parties.

4.2      **Employment**.  (a)  Subject to the terms of this Agreement, Manager shall select, employ, promote, transfer, compensate, terminate where appropriate, supervise, direct, train, and assign the duties of the Executive Personnel and, through the Executive Personnel, a sufficient number of personnel whom Manager reasonably determines to be necessary or appropriate for the proper, adequate and safe operation and management of the Hotel consistent with the Operating Standards (collectively, the "**Hotel Employees**").  All such employees of the Hotel shall be employees of Manager or Manager's Affiliate (in which case such Affiliate shall execute a joinder to this Agreement). Notwithstanding the foregoing, Manager shall not hire any Executive Personnel for the Hotel without the prior written consent of Owner, which consent shall not be unreasonably withheld, conditioned or delayed.  Manager shall provide Owner with a written summary of the candidate's professional experience and qualifications, and provide Owner the opportunity to interview the candidate at the Hotel, by teleconference or another mutually acceptable location, as reasonably determined by Manager. Owner shall be deemed to have approved any Executive Personnel candidate selected by Manager if Owner has not notified Manager in writing of Owner's disapproval of such candidate within the later of (x) five (5) days following Manager's request for such approval (which shall be accompanied by a resume or other written summary of such candidate's professional experience and qualifications) and (y) three (3) days following Owner's interview of such candidate, if Owner elects to interview such candidate, and Owner may not reject more than three candidates for each Executive Personnel position. In addition, Manager may, with Owner's prior approval, from time to time, assign one or more of its employees to the staff of the Hotel on an as needed, task-force basis.  Notwithstanding the provisions of this Section 4.2 or any other provision of this Agreement, all costs, expenses and liabilities relating to Hotel Employees shall be expenses of operating the Hotel and the responsibility of Manager for acts or omissions of Hotel Employees shall not extend beyond responsibility for the gross negligence or willful misconduct of, or the willful violation of Legal Requirements by the Executive Personnel, including such Executive Personnel's gross negligence or willful misconduct in the training, supervision or direction of Hotel Employees.

4836-4873-7791.6
C:\Users\jmelicharek\Desktop\Hotel Management Agreement - TPG - Porsche Atlanta (003).docx

Manager will communicate with Owner prior to corporate employees making visits to the Hotel, being cognizant to use commercially reasonable efforts not to incur Reimbursable Expenses for such visits not contemplated by the Annual Plan. Manager shall fully comply with all Legal Requirements having to do with worker's compensation, social security, unemployment insurance, hours of labor, wages, working conditions, and other employer-employee related subjects. The cost of all labor, employees and employment arrangements and any benefits and taxes related thereto shall be charged as Gross Operating Expenses of the Hotel and shall be accrued in accordance with generally accepted accounting principles ("**GAAP**") and shall be promptly paid from the Operating Account in accordance with the terms of this Agreement. The costs provided for in the immediately preceding sentence shall include, by way of example and not limitation, all reasonable costs and expenses (including, without limitation, all employment related expenses incurred by Manager with respect to the Hotel Employees), such as severance pay, unemployment compensation and health insurance and related costs (i.e., in order to comply with COBRA-type regulations) as a result of the termination of employees and which shall have been paid or accrued in accordance with GAAP. Manager shall use commercially reasonable efforts and exercise reasonable care to select qualified, competent, and trustworthy employees. The Hotel's general cashier and all employees having check signing authority shall be adequately bonded or insured to the reasonable satisfaction of Owner (or as provided herein) and the cost of such bonds or insurance shall be a Gross Operating Expense of the Hotel. To the extent possible and reasonably available, Manager shall use local labor to fill non-Executive Personnel positions in the operation of the Hotel. Owner may at any time consult or communicate with the General Manager, Finance Director, or Director of Sales and Marketing regarding any of the Hotel Employees, but will not interfere in the day-to-day activities of Hotel Employees; provided that Manager will be afforded prior notice to have opportunity to observe and participate in all material discussions and meetings. The Manager shall not discriminate against any employee or applicant for employment because of race, color, religion, national origin, ancestry, age, sex or sexual orientation, and all employment advertising shall indicate that Manager and Owner are each an Equal Opportunity Employer as that term is defined under Legal Requirements.

Notwithstanding anything to the contrary contained in this Agreement, the following subparagraphs (b) and (c) shall apply to any liability that may, from time to time, arise out of the Employee Retirement Income Security Act of 1974 ("**ERISA**") and the Multi-employer Pension Plan Amendments Acts of 1980 ("**MEPPA**"), respectively, as from time to time amended.

       (b)     Employee Benefits: Any Hotel Employees who are not then represented by a collective bargaining representative shall be entitled to participate in the incentive programs, profit sharing and/or other employee retirement, disability, health, welfare or other benefit plan or plans then made available by Manager to similarly situated employees of other hotels managed by Manager or its Affiliates, in accordance with their respective terms. Manager will have the right to charge the Hotel with its allocable share of the cost of any such plan or plans and any contributions to be made thereunder provided that such charges and contributions shall be determined by Manager in good faith on a uniform basis with respect to charges and contributions imposed for the same or similar plans at other hotels then managed by Manager or its Affiliates, subject to Legal Requirements. Manager's rights under this Subsection (b) shall be subject to the condition that Manager shall not put into effect any amendment to any existing plan, or adopt any additional plan, which is not imposed upon all other similarly situated hotels managed by Manager

4836-4873-7791.6
C:\Users\jmelicharek\Desktop\Hotel Management Agreement - TPG - Porsche Atlanta (003).docx

or its Affiliates. In addition, as part of the Annual Plan, Manager will disclose the details, thresholds and conditions of the employee bonus plan in effect for that year. A change to the bonus plan during the year will be subject to Owner approval.

Upon the expiration or termination of this Agreement, the sale of the Hotel or other similar event, Manager shall cooperate with the Owner with respect to disposition of such plan or plans (or plan assets) in a mutually satisfactory manner, all in compliance with then applicable Legal Requirements.

(c)     Collective Bargaining or Other Multi-employer Plans: Manager and Owner agree that with respect to any withdrawal liability arising under any collective bargaining agreement or other "multi-employer plan" (as defined in Section 3(37) of ERISA) in which the Hotel Employees become participants, the obligations of the parties shall be determined as follows:

(1)     Withdrawal liability arising with respect to Hotel Employees shall be the responsibility of Owner, and Owner shall either pay the amount of such withdrawal liability directly to such plan or reimburse Manager for withdrawal liability payments made to such plan by Manager with respect to Hotel Employees (including withdrawal liability arising after the sale or other termination of this Agreement, provided that such liability arises as a result of such sale, disposition, termination or other similar event). To the extent permitted under then applicable laws, regulations and agreements, Manager shall cooperate with Owner in structuring transactions and transferring actual or contingent withdrawal liability to a successor in ownership or purchaser of the Hotel in accordance with "relief" provisions of ERISA, such as ERISA Section 4204 or then applicable statutory or regulatory provisions of a similar nature.

(2)     For purpose of this subparagraph (c), the term "withdrawal liability" shall mean the actual amount assessed by and payable to a multi-employer pension fund upon a complete or partial withdrawal of the Hotel or Hotel Employees from such fund. Manager shall cooperate with Owner in challenging a plan's assessment of such liability, provided that all costs of litigation, arbitration or other procedures shall be paid by Owner (including any bonds that must be posted). If Manager or its Affiliates have employees at other locations who participate in the same multi-employer plan as Hotel Employees, Owner shall be charged with and be responsible only for multi-employer plan withdrawal liability arising solely with respect to the participation of Hotel Employees in such plan.

(d)     Manager shall keep Owner advised as to any union organizational activity at or with respect to the Hotel to which Manager becomes aware. Manager shall not enter into any collective bargaining agreement concerning any Hotel Employees, without first informing Owner of Manager's intention to do so. Manager and Owner (or Owner's appointed legal representative, if any) shall jointly conduct any negotiations with any labor union and any agreements resulting therefrom shall be subject to Owner's approval in its discretion.

(e)     In the event that Owner (acting reasonably) has concerns with any Hotel Employees (including any executive personnel), including their ability or performance, Owner may notify Manager, and Manager shall consult with Owner on any measures to be taken, including but not limited to the reassignment, replacement and termination of the relevant

employee or individual and work cooperatively, in good faith, to resolve the matter, subject to compliance with the relevant individual's terms of employment and relevant Legal Requirements.

4.3    **Legal Proceedings**.  Legal Proceedings of a "non-extraordinary nature" (hereafter defined) with respect to the operation of the Hotel, may be instituted by Manager, in accordance with guidelines and policies determined from time to time by Manager and Owner, in the name of Manager or the Hotel or Owner and by counsel designated by Manager pursuant to such guidelines and policies.  Institution of Legal Proceedings of an "extraordinary nature" (hereafter defined) shall require Owner's prior approval, in its sole discretion, of the proceedings and counsel to be engaged.  Manager shall furnish Owner with quarterly status reports with respect to all Legal Proceedings of an extraordinary nature (except during times in extraordinary litigation when significant activity (motions, depositions, trials) are taking place in which case reports shall be given monthly). In addition, Manager shall have the right to defend, through counsel designated by Manager, Legal Proceedings of a non-extraordinary nature against Owner or Manager resulting from the operation of the Hotel.  The defense of Legal Proceedings against the Hotel of an extraordinary nature (including, without limitation, any aspect of any claims against Manager or Owner arising out of the operation of the Hotel as to which the insurance company denies coverage) shall be coordinated with Owner, designated counsel shall be subject to Owner's reasonable approval and Manager shall furnish Owner with quarterly status reports with respect to such actions.  All claims against Owner and/or Manager arising out of the management or operation of the Hotel which (i) are not covered by insurance shall be promptly communicated to Owner and (ii) are covered in whole or in part by insurance shall be promptly forwarded by Manager to the appropriate insurer (with a copy thereof to Owner in the case of claims against Owner).  Legal Proceedings of a "non-extraordinary nature" shall be proceedings in which the monetary exposure is less than $15,000 that are (i) initiated by Manager or Owner relating to the operation of the Hotel for matters such as collections, maintenance of licenses and permits, enforcement of contracts and proceedings against Hotel tenants; and/or (ii) defense of actions against the Owner or Manager resulting from the operation of the Hotel, for matters such as guest claims for loss of property or injury to persons and claims relating to employment or the application for employment at the Hotel.  Legal Proceedings of an "extraordinary nature" shall mean all Legal Proceedings that are not of a "non-extraordinary nature".  All costs, expenses, fees and liability associated with any Legal Proceedings arising from the operation of the Hotel shall be included in Gross Operating Expenses.

4.4    **Annual Plan**.  Manager shall operate the Hotel after the Commencement Date and for the remainder of calendar year 2021 based on the Hotel's budgets in effect prior to the Effective Date.  As soon as reasonably practicable after the Effective Date, Manager shall submit to Owner a proposed Annual Plan in Manager's format for Fiscal Year 2022 and Owner and Manager shall reasonably cooperate and work in good faith to agree on the Annual Plan for 2022 on or before December 31, 2021.  On or before November 15th of each year thereafter, Manager shall submit to Owner a proposed Annual Plan in Manager's format for the next Fiscal Year.  On or before December 1st of each such year, Owner either shall accept the proposed Annual Plan submitted to Owner by Manager or shall submit to Manager a detailed list of Owner's objections or questions to the proposed Annual Plan ("**Owner's Annual Plan Objections**").  Within fifteen (15) days after Manager's receipt of Owner's Annual Plan Objections, Owner and Manager shall meet and discuss Owner's Annual Plan Objections with the goal of agreeing upon an Annual Plan for the subject

Fiscal Year (the "**Annual Plan**"). Owner, as part of Owner's Annual Plan Objections, shall have the right to object to the entire proposed Annual Plan or to any specific item or items contained in the proposed Annual Plan.  If Owner and Manager are unable to agree upon the Annual Plan prior to December 31, the items in dispute will be submitted to an Expert for resolution in accordance with the procedures set forth in ARTICLE 26 of this Agreement.  Notwithstanding anything to the contrary in this Agreement, in making a ruling as to any given disputed component of the Annual Plan, the Expert shall (i) give due consideration to the intent of the Parties as set forth in this Agreement, (ii) shall only consider comparable statistics of hotels that are similarly positioned to the Hotel, or in the absence of any hotels similarly positioned to the Hotel, hotels that are similarly positioned to hotels operating under the trademarks licensed to Owner under the License Agreement, and (iii) give due consideration to the requirements of the License Agreement.  Until such determination is made by an Expert or a new Annual Plan is agreed to by the Parties, Manager shall operate the Hotel (a) in accordance with those aspects of the Annual Plan which were not objected to by Owner, and (b) for those areas for which there is an objection, in accordance with the actual expenses for the prior year, subject to increase based on the Inflation Increase.  The Inflation Increase in the preceding sentence may be exceeded solely to account for increases in Hotel occupancy and utilization of other revenue producing areas of the Hotel.

(a)     The Annual Operating Budget shall be prepared in accordance with the Uniform System of Accounts.  The proposed Annual Operating Budget shall incorporate Manager's good faith reasonable estimates of the items of revenue and expense contained therein and shall contain the Proposed Operating Budget for the succeeding Fiscal Year.  When approved by Owner, the proposed Annual Operating Budget shall be the approved Annual Operating Budget.  Any revisions, substitutions or additions to the Annual Operating Budget must be approved by the Owner in writing.  The proposed Annual Plan shall include for the ensuing Fiscal Year, the following proposed budgets and programs:

A.     A proposed operating budget (the "**Proposed Operating Budget**") on a monthly and yearly basis with detailed departmental schedules for each line item and the assumptions underlying the same, including, without limitation:  (a) projected occupancy and average room rates by month broken down by room segment; (b) projected Total Operating Revenues; (c) proposed Hotel room rates and charges for other services; (d) projected Gross Operating Expenses; (e) projected EBITDA; (f) proposed staff scheduling and compensation (including, without limitation, any bonuses or other incentive compensation for Hotel Employees which may take the form of a "bonus pool" stating an aggregate amount to be distributed among the Hotel Employees as appropriate, rather than separately setting forth incentive and/or bonus compensation for each Hotel Employee), including the terms, thresholds, manner of calculation of any such bonus plan; (g) a narrative comparison of budgeted revenue and expense levels to the previous Fiscal Year's estimated and actual results, highlighting material changes for the upcoming Fiscal Year; (h) anticipated depreciation and amortization of fixed assets at the Hotel; (i) annual debt service with respect to the Hotel; (j) projected contributions by, and distributions to, Owner as the result of Hotel operations; (k) an estimate of the working capital funds required to be maintained, as of the end of each month; (l) a year-over-year comparison with comments regarding variance; (m) the cost of the Allocated Services, and(o) all other items reasonably requested by Owner in order to provide the projected cash flow for the Hotel during such upcoming Fiscal year.

B.        A proposed budget (the "**Proposed Capital Expenditures Budget**" or "**Capital Budget**" and when the Annual Plan is approved and agreed, the "**Approved Capital Budget**") setting forth Manager's estimate of the Capital Expenditures to be made respecting the Hotel for both Capital Renewals and Capital Improvements.

C.        A proposed budget (the "**Proposed FF&E Budget**") setting forth Manager's estimate of the FF&E expenditures to be made and the sources of funds for the replacements and renewals to the Hotel's FF&E, including all information necessary to satisfy the reporting requirements in the License Agreement and the Mortgage relating to the FF&E Reserve.

D.        A market overview of local competitive properties of the Hotel including narrative descriptions of (a) the Hotel's target market, (b) the Hotel's relative position in such market, and (c) the proposed room rate structures and occupancy for the target market.

E.        A marketing plan for the Hotel including narrative descriptions and Hotel allocable costs, of (a) Manager's national or regional or business segment marketing plans, (b) local Hotel marketing, and (c) intended sales initiatives.

F.        A staffing plan describing the general staffing needs for the operation and management of the Hotel.

G.        A schedule of all allocated costs inclusive of any corporate office reimbursables.

H.        A proposed list of competitive set hotels if a change thereto is requested.

(b)    In preparing the Proposed Operating Budget, or otherwise from time to time upon the request of Owner, Manager shall use commercially reasonable efforts to investigate, consider and incorporate into the day-to-day operations of the Hotel certain efficiencies and economies of scale that may be achieved by outsourcing some or all services that may be currently provided "in-house", so long as to not compromise quality of service.

(c)    In addition, Manager shall provide to Owner for Owner's review, a written schedule for the Hotel listing all executive and management employees to be employed "on-site" in the direct management of the Hotel including, but not limited to the positions of General Manager, Director of Sales, Director of Food & Beverage, Director of Finance, and Chief Engineer. These schedules shall include such employee's title or job description and the salary range including additional compensation or prerequisites such as lodging, meals, maintenance, moving expenses, bonus/incentive compensation and the like. In the event that any employee's services are shared with (or subsidized through a sharing arrangement with) another hotel, the employee shall be identified together with a description of his/her responsibilities and the amount and source of any subsidy, together with a breakdown of the relative time expended with respect to the Hotel and each other hotel. If Owner notifies Manager that Owner does not believe that some or all of the scheduled wages and salaries are reasonable and customary as required above,

then Manager shall promptly provide to Owner a wage and salary survey that supports the scheduled wages and salaries. No proposed amendment including changes in salary or other compensation shall be effective unless the salary or other compensation as changed is reasonable and customary as required above.

(d)    In discharging its duties and responsibilities under this Agreement, except as otherwise specifically provided herein to the contrary, Manager shall at all times use commercially reasonable efforts to operate the Hotel in accordance with the Approved Operating Budget and Approved Capital Budget for the Hotel and pursuant to the objective of maximizing the economic return from the Hotel to Owner. Except for Permitted Variations and other provisions hereof specifically providing that Manager may depart or vary from the applicable budget or a specified amount of money is permitted hereunder to be spent by Manage, Manager shall use commercially reasonable efforts not to take any action, make any expenditure or incur any obligation by or on behalf of Owner, the Hotel or the operations of either that varies materially from or will cause a material variance from any applicable budget. Manager shall be authorized to make expenditures in excess of budgeted amounts within the limits of the Permitted Variations, and Manager shall also be authorized to make expenditures for ordinary and necessary expenses, whether or not budgeted and whether or not the same exceed the Permitted Variations, provided that (a) Owner is given written notice of such expenditures for Permitted Variations and (b) the expenditures for Permitted Variations were reasonably unforeseen at the time of the Proposed Annual Plan. Manager shall also be authorized to make expenditures in excess of the Permitted Variations for costs and expenses that vary based upon the occupancy of the Hotel to the extent that occupancy exceeds the projections contained in the applicable Budget. References in this Agreement to the limitations imposed by the Approved Operating Budget shall be deemed to incorporate Manager's authority to expend funds in excess of the Operating Budget as set forth or referenced in this Section.

4.5     **Contracts; Equipment Leases**. Subject to the terms of this Section 4.5, Manager may contract for the purchase of goods and services for the Hotel with third parties that have other contractual relationships with Manager or its Affiliates, so long as the terms of such contracts, taken in their entirety, are substantially not less favorable to the Hotel than those reasonably obtainable by the Hotel from an unrelated party. In addition:

A.     Contracts. Manager is authorized, without the prior written approval of Owner if not otherwise expressly contemplated by the Annual Plan, to enter into in the name of Owner, any contracts for or covering the Hotel (except for Equipment Leases and Space Leases as more fully described in subparagraph B below) with vendors of its choice; provided, however, if not otherwise expressly contemplated by the Annual Plan, Manager may not enter into any contract for or covering the Hotel without Owner's prior written approval if (a) the contract term is longer than one (1) year and is not terminable by Owner without penalty upon 30 days' prior written notice, or (b) the total expenditure by the Hotel pursuant to such contract shall be in excess $15,000. Manager shall make available to Owner upon written request of Owner, all executed counterparts of all contracts entered into in accordance with Manager's authority under this Agreement;

B.     Equipment Leases. Manager shall not, without the prior written approval of Owner (which consent shall not be unreasonably withheld, conditioned or

<u>**Management Agreement - Page**</u> 17

delayed)unless expressly referred to and described in the Annual Plan, enter in the name of Owner any equipment leases and Space Leases covering the Hotel.

4.6      **Labor Relations**.  Manager shall have no right to enter into any collective bargaining agreement concerning any employees of the Hotel without the prior written approval of Owner, which may be granted or withheld in its reasonable discretion.   Upon Owner's approval of any such agreement, Manager shall be responsible to perform such agreements.    To the extent applicable, Manager: (a) represents that it is an equal opportunity employer as described in Section 202 of Executive Order 11246 dated September 24, 1965, as amended, and as such agrees to comply with the provisions of Paragraphs 1 through 7 of Section 202 of said Executive Order during the performance of this Agreement, (b) agrees to comply with the affirmative action requirements of Part 60.741 of Title 41, Code of Federal Regulations, with respect to handicapped workers during the performance of this Agreement, (c) agrees to comply with the affirmative action requirements of Part 60.250 of Title 41, Code of Federal Regulations, with respect to Disabled Veterans and Veterans of the Vietnam Era during the performance of this  Agreement, and (d) shall submit to Owner in the form approved by the Director of the Office of Federal Contract Compliance, U.S. Department of Labor, a certification that Manager does not and will not maintain any facilities that provide for their employees in a segregated manner, or permit their employees to perform their services at any location under its control, where segregated facilities are maintained, and that Manager will obtain a similar certification from its contractors.

4.7      **Liquor License**.  Manager (or its affiliate) shall obtain and maintain throughout the Term all alcoholic beverage licenses either in its name or its designee and shall maintain the alcoholic beverage licenses in good standing and effect, free of all liens (and in compliance with the conditions imposed upon such alcoholic beverage licenses by any alcoholic beverage control commission or other governmental authority or agency, pursuant to the License Agreement.  Upon termination or expiration of this Agreement, Manager shall (if allowed by law) transfer such licenses to Owner or Owner's designee at no cost or expense to Manager.

4.8      **Employee Discount**.  To the extent Manager provides discounted rates to Manager's employees at other hotels managed by Manager or its Affiliates, pursuant to discount rate programs applicable to at least seventy five percent (75%) of the other hotels managed by Manager or its Affiliates, Manager agrees to include this Hotel in such discounted rate programs (subject to availability and black-out periods determined by Owner and Manager during the Annual Plan process, or as otherwise approved by Manager or Owner as part of the revenue management of this Hotel) and to provide the same discounted rates to the Hotel Employees, to the extent allowed under the Franchise Agreement.

4.9      **Forms**.  Manager shall prepare or cause to be prepared for execution by Owner all forms, reports and returns, if any, required to be filed by Owner under applicable Legal Requirements with respect to the operation of the Hotel; however, Manager shall not be obligated to prepare any of Owner's income tax returns.  Without limitation, Manager shall timely prepare and deliver, as required by law, an Internal Revenue Service Tax Form 1099 with respect to payments made during a calendar year to third party contractors and professionals.

4.10      **Notice of Violations**.  Manager shall promptly notify Owner in writing of any written notice received from any regulatory or governmental body regarding an actual or perceived

4836-4873-7791.6
C:\Users\jmelicharek\Desktop\Hotel Management Agreement - TPG - Porsche Atlanta (003).docx

violation of any Legal Requirements. Manager shall promptly use commercially reasonable efforts to remedy any violation of any such Legal Requirement which comes to its attention, all as a Gross Operating Expense in accordance with this Agreement. If the cost of compliance exceeds $10,000 in any instance, Manager shall notify Owner promptly and obtain Owner's prior written approval prior to making the expenditure.

4.11   **In-House Services**. Manager may provide in-house services to the Hotel, including without limitation, legal counsel, the reasonable costs of which shall not exceed current market rates for similar services and shall be paid to Manager or its Affiliates as an Gross Operating Expense of the Hotel; provided, however, that if the cost of such in-house services is expected to exceed $15,000 in the aggregate in any Fiscal Year, Manager shall receive Owner's prior written approval (which consent shall not be unreasonably withheld, conditioned, or delayed) for such expenditure. In the event Manager desires to enter into any transaction with an Affiliate or any person in which Manager or any of its Affiliates has any ownership, investment or management interest or responsibility which is on terms that are not arms-length, Manager shall (i) disclose to Owner the nature of such affiliation prior to engaging in any transaction in connection with the Hotel; and (ii) obtain the prior written approval of Owner (which consent may be withheld in Owner's sole discretion), regardless if such transaction was included in the approved Annual Plan.

4.12   **Accounting Services and Allocated Services**. (a) Subject to the terms and conditions of this Agreement, Manager shall furnish or cause its Affiliates to furnish to the Hotel, the Allocated Services Included and approved by Owner each Fiscal Year as part of the Annual Plan. Subject to the approved Annual Plan and the terms and conditions of this Agreement, Owner shall pay to Manager the Hotel's allocable share of the Allocated Services actually incurred by Manager or its Affiliates (without profit, premium or mark-up or other element of compensation of any kind). Allocated Services may be added from time to time as reasonably determined by Manager and as provided for in an approved Annual Plan. The Allocated Services shall not include any charge any general corporate overhead of Manager or Affiliates. As part of the Proposed Annual Plan, Manager will set forth a list of those Allocated Services and additional services (if any) that are furnished generally on a central or system-wide basis to Managed Hotels, together with Manager's proposal as to which of such additional services are appropriate for the Hotel. For clarity, Allocated Services may only include out of pocket costs incurred by Manager or its Affiliates.

(b)    In connection the accounting services to be provided by the Manager pursuant to the terms hereof, including without limitation, routine accounting services with respect to the Hotel in the ordinary course of business (the "**Accounting Services**"), in addition to the Base Management Fee, Owner shall pay to Manager, on a monthly basis, for its accounting services a fee (the "**Accounting Fee**") equal to $2,500.00 per month during the Term and for two (2) months after the termination of this Agreement provided that Manager finalizes all books and records through the date of any termination and if requested in writing by Owner using commercially reasonable efforts to completing all accounts receivable collections after termination. The Accounting Fee shall be increased (but not decreased) following the initial Term by the same percentage as any percentage increase in the CPI from the first day of the calendar month in which the Commencement Date occurs through the first day of the first (1st) month of the then current fiscal year.

**Management Agreement - Page** 19

# ARTICLE 5
## RELATIONSHIP OF PARTIES

Owner and Manager acknowledge and agree that this Agreement creates an agency relationship; provided, however, that (a) each Hotel Employee shall be the employee of Manager or Manager's Affiliate and not of Owner, (b) Manager's authority is subject to the terms and conditions of this Agreement, and (c) nothing in this Agreement shall constitute, or be construed to be, or create, a partnership, joint venture or lease or employment arrangement between Owner and Manager with respect to the Hotel or the operation thereof. Employees or agents of Manager are not by this Agreement or by any actions of Owner and/or Manager hereunder made employees of Owner, and are not entitled to the benefits provided by Owner or its Affiliates to its employees, including but not limited to, group insurance, leave and pension plan. This Agreement shall not be deemed at any time to be an interest in real estate or a lien or security interest of any nature against the Hotel, the Premises or any other land used in connection with the Hotel, or any equipment, fixtures, inventory, motor vehicles, contracts, documents, accounts, notes, drafts, acceptances, instruments, chattel paper, general intangibles, or other personal property now existing or that may hereafter be acquired or entered into with respect to the Hotel or the operation thereof.

# ARTICLE 6
## ADVERTISING

Subject to and in strict compliance with the provisions of the License Agreement, Manager shall arrange and contract for all advertising, which Manager may reasonably deem necessary, in accordance with Section 4.4, for the operation of the Hotel. So long as the License Agreement may be in effect, Manager generally shall advertise the Hotel under the name of the Hotel set forth on Schedule I or such other name as Owner may designate or approve.

# ARTICLE 7
## RESERVE FOR FF&E

7.1.    **Reserve for Replacement of FF&E.** The Reserve shall be funded pursuant to Section 7.2, and Manager shall use amounts in the Reserve to cover the cost of FF&E expenditures and Capital Improvements, as described in Section 4.4 in conjunction with the Approved Capital Budget. All FF&E, Capital Renewals, Capital Improvements and the Reserve shall be the property of Owner.

7.2    **Transfers to Reserve for FF&E.** Commencing on the Commencement Date and continuing thereafter during the remainder of the Term, Manager shall deposit monthly from Total Operating Revenues into the Reserve for FF&E an amount equal to the amounts required by Lender and/or by Licensor; provided that in no event will the amounts to be deposited monthly into the Reserve be less than an amount equal to such amounts required by the Owner's Lender or the Franchisor.

7.3     **Annual Adjustment**.  At the end of each Fiscal Year and following receipt by Manager of the annual accounting referred to in Article 10, an adjustment will be made to such Reserve account, if necessary and if available, so that the appropriate amount shall have been deposited in the Reserve.

7.4     **Maintenance of Reserve**.  Checks or other documents of withdrawal shall be signed by representatives of Manager who shall be bonded or otherwise insured pursuant to insurance provisions of this Agreement.  The proceeds from the sale of FF&E no longer needed for the operation of the Hotel shall be deposited in the Reserve, but not be credited against the obligation to deposit cash in such fund for the then current Fiscal Year.  All interest earned or accrued on amounts invested from the Reserve shall be added to the Reserve (but shall not be credited against Owner's obligations to fund the Reserve), and shall not constitute Total Operating Revenues or be included therein.

7.5     **Accumulation of Reserve and Additional Cost of FF&E and Capital Improvements**.  Owner and Manager acknowledge and agree that portions of the Reserve may, from time to time in accordance with the then-current Annual Plan, be used for more significant expenditures than could be reserved for in a single year.  Accordingly, at the end of each Fiscal Year, any amounts remaining in the Reserve shall be carried forward to the next Fiscal Year, and shall be in addition to the amount to be reserved in the next Fiscal Year.  In the event at any time there are insufficient funds in the Reserve for any Fiscal Year to pay the cost of FF&E in accordance with the Annual Operating Budget and the Approved Capital Budget, then Owner will, at Owner's option, within sixty (60) days after request therefor by Manager shall provide the additional cash to the Manager.

7.6.    **Final Remittance**.  Upon expiration or termination of this Agreement, all remaining amounts in the Reserve shall be remitted forthwith to Owner.

## ARTICLE 8
## REPAIRS AND MAINTENANCE AND CAPITAL IMPROVEMENTS

8.1     **Repairs and Maintenance**.  Subject to the terms hereof, Manager shall, from time to time, make such expenditures from Total Operating Revenues for repairs and maintenance including service contracts ("**Repairs and Maintenance**") as required by the Lender, the License Agreement, the Operating Standards, Legal Requirements, the then current Annual Plan or as necessary to maintain the Hotel in good operating condition in compliance with the License Agreement and otherwise in the condition required by this Agreement, including but not limited to repairs and maintenance of HVAC, mechanical and electrical systems, exterior and interior repainting, resurfacing building walls and parking areas, waterproofing of exterior surfaces of floors, roofs, and replacement of plate glass, or the like.  It is Owner's intent that the sums allocated for Repairs and Maintenance in accordance with the then current Annual Plan are to be fully expended during that Fiscal Year exclusively for the purposes identified in such Annual Plan.  Except in the event of an emergency due to casualty, act of God or otherwise under circumstances in which it would be unreasonable to seek to obtain prior approval (and provided that Manager shall notify Owner of any such expenditure within a reasonable time given the nature and scope of the emergency), all expenditures for the foregoing shall be as provided in the Annual Operating Budget and the Approved Capital Budget.  If any such Repairs or Maintenance shall be made

necessary by any condition against the occurrence of which Owner has received the guaranty or warranty of the builder or the Hotel or of any supplier of labor or materials for the Hotel or of any supplier of labor or materials for the construction of the Hotel, then Manager may invoke said guarantees or warranties in Owner's or Manager's name and Owner shall cooperate in all reasonable respects with Manager in the enforcement thereof.

8.2   **Capital Improvements and Capital Renewals**.  Owner may, from time to time, at its sole expense, make such Capital Improvements and/or Capital Renewals in or to the Hotel as Owner shall determine are necessary to comply with the Operating Standards, Legal Requirements, or as Owner may otherwise desire.  If Capital Improvements and/or Capital Renewals shall be required at any time during the Term by the terms of any Mortgage, the License Agreement, to maintain the Hotel in good operating condition or by reason of any Legal Requirements, or because Manager and Owner jointly agree upon the desirability thereof, then in such event all such Capital Improvements and/or Capital Renewals shall be made with as little hindrance to the operation of the Hotel as reasonably possible.  Notwithstanding the foregoing, as long as the Hotel can continue to operate without interruption, Owner shall have the right to contest the need for any such Capital Improvements and/or Capital Renewals required by any Legal Requirements and may postpone compliance therewith, if so permitted by law and if such postponement will not expose Manager to any civil or criminal liability.  All recommendations by Manager of Capital Improvements and/or Capital Renewals shall be submitted in conjunction with the Capital Budget for the Fiscal Year described in Section 4.4(b).  In the event that Owner elects to perform Capital Improvements and/or Capital Renewals to the Hotel, Manager shall have the right to bid to provide oversight of the performance of the same.  With respect to Capital Improvements and/or Capital Renewals as contemplated by this Agreement which Owner elects not to have Manager oversee, Manager shall have no responsibility or obligations with respect to the same, however Manager will cooperate in a commercially reasonable manner with any party selected for any Capital Improvements and/or Capital Renewals.

8.3   **Omitted**.

8.4   **Liens**.  Owner and Manager shall cooperate and use all commercially reasonable efforts to prevent any liens from being filed against the Hotel that arise from any maintenance, changes, repairs, alterations, improvements, renewals or replacements in or to the Hotel. If any such liens are filed, Manager shall, subject to the availability of funds therefor in the Operating Accounts or as otherwise supplied by Owner, obtain the release thereof prior to the institution of legal proceedings in connection therewith.  The cost of obtaining such release shall be included in Gross Operating Expenses, unless the imposition of the lien results from a default by Owner or Manager, in which event the cost of obtaining such release shall be borne by such defaulting party.

8.5   **Notice of Unavoidable Interruptions**.  In the event of any occurrence constituting an Unavoidable Interruption, Manager shall promptly notify Owner of such occurrence and shall keep Owner informed as to the extent and impact thereof on the Hotel.

**ARTICLE 9**
**WORKING CAPITAL AND BANK ACCOUNTS; DISTRIBUTIONS**

4836-4873-7791.6
C:\Users\jmelicharek\Desktop\Hotel Management Agreement - TPG - Porsche Atlanta (003).docx

9.1      **Working Capital**.  Owner shall provide initial Working Capital in the amount set forth on Schedule I in addition to the value of all Inventories.  Owner shall at all times cause sufficient funds to be on hand in the Operating Accounts to assure the timely payment of all current liabilities of the Hotel, including but not limited to Gross Operating Expenses, all other costs and expenses incurred in connection with the Hotel pursuant to this Agreement and the performance by Manager of its obligations under this Agreement, all fees, charges and reimbursements payable to Manager hereunder and all amounts required hereunder to be transferred into the Reserve.  In no event shall Owner permit the balance in the Operating Accounts to be less than an amount equal to the estimated monthly Gross Operating Expenses of the Hotel as reflected in the then current Annual Operating Budget.  From time to time, upon fifteen (15) days prior written notice from Manager that such funds are required, Owner shall furnish to Manager funds that Manager deems reasonably necessary to assure that the Hotel shall have adequate working capital as herein provided.  In the event Owner fails to supply required working capital in accordance with the provisions of this Section or if Manager otherwise deems such action to be necessary, Manager may, after notice to Owner, use all or part of the funds in the Reserve to supplement the Operating Accounts in order to defray or pay the Hotel's operating costs and expenses, to the extent permitted by the Mortgage.  Owner shall promptly reimburse the Reserve for all sums so used or transferred.  All unexpended Working Capital, Inventories and Operating Equipment and Supplies purchased with Working Capital shall remain the property of Owner.

9.2      **Operating Account**.  All funds (exclusive of funds deposited in the Reserve and house banks at the Hotel) received by Manager in the operation of or otherwise relating to the Hotel, and funds for Working Capital provided by Owner or retained by Manager from Total Operating Revenues, shall be deposited in the Operating Account, provided that in connection with any cash management arrangements with the Lender, all Total Operating Revenues shall be deposited to the Operating Account upon being swept out of the accounts associated with such cash management arrangements.  No funds shall be deposited into the Operating Account attributable to any other property.  To the extent permitted by the Mortgage, amounts in the Operating Account may be temporarily withdrawn and invested by Manager in any Permitted Investments, having due regard for the timing of cash needs, but in no event shall such funds be co-mingled by Manager with any other funds attributable to any other property.  From the Operating Account, Manager shall pay all Gross Operating Expenses (other than the excess FF&E if funded by or through Owner) before any penalty or interest accrues thereon, however, taking into account sound cash management.  All interest earned or accrued on amounts invested from the Operating Account shall be added to the Operating Account.  All checks or other documents of withdrawal from the Operating Account shall be signed by bonded or insured representatives of Manager except as provided in Section 9.3 hereof.  Notwithstanding the aforementioned in this Section, any payments, transfers or disbursements over $15,000 shall be signed by Corporate Level Employees in accordance with Manager's customary accounts payable processes.

9.3      **Maintenance of Operating Account**.  Subject to Section 9.4, the Operating Account shall be opened and maintained at all times by Manager and Owner and checks and other documents of withdrawal shall be signed by representatives of Manager who are covered by the insurance required herein. Manager shall provide Owner with "read only" rights to access and view the Operating Account.  The Operating Account and any other bank accounts approved by Owner shall be in Owner's name (for example, "*[Owner's name]* d/b/a/ *[trade name of Hotel]*").

<u>**Management Agreement - Page**</u> 23

Manager shall not change the bank or open or close any bank account described in this Article 9 without Owner's prior written approval, which approval Owner shall not unreasonably withhold, but which shall in all events be subject to approval of Owner's Lender. Owner, in its reasonable discretion or if required by its Lender, may in writing direct Manager to change any such bank, signatories or arrangements.

9.4     **Final Remittance**. Upon the expiration or termination of this Agreement, after payment of all Gross Operating Expenses for which bills were received to such date, Manager's Management Fee, Reimbursable Expenses, any earned by unpaid Incentive Management Fee, and any other amounts then due and payable to Manager, all remaining amounts in (i) the Reserve, (ii) the Operating Account and (iii) the Permitted Investments, shall be transferred forthwith to Owner by Manager. Owner shall pay Manager any remaining Management Fee, any Reimbursable Expenses and any other amounts then due and payable to Manager and Owner shall pay, or cause to be paid, and shall hold Manager harmless from and against all Gross Operating Expenses or other costs or expenses received after Manager has so transferred all funds. The provisions hereof shall survive any termination of this Agreement.

9.5     **Distributions of Excess Cash**. The Owner agrees that no distributions of cash shall be made to Owner or any other party designated by Owner from the Operating Account except in accordance with the following:

> (i) Full payment of the following items in the following order has occurred:
>
> > (A) all due and payable Management Fees, Accounting Fees, Allocated Services expenses, Reimbursable Expenses and/or any other amounts due hereunder to Manager;
> > (B) due and payable Gross Operating Expenses; and
> > (C) the deposit of any reserves required to be held hereunder, under the Mortgage or the License Agreement.

Upon payment of the same, Manager shall distribute from the Operating Account to Owner all sums in the Operating Accounts in excess of the then current working capital requirements of the Hotel determined in accordance with Section 9.1 of this Agreement.

## ARTICLE 10
## BOOKS, RECORDS AND STATEMENTS

10.1    **Books and Records**. Manager (at the cost of Owner) shall keep full and adequate books of account and other records reflecting the results of operation of the Hotel in accordance with the Uniform System of Accounts and GAAP  The books of account and all other records relating to or reflecting the operation of the Hotel shall be kept either at the Hotel or at Manager's corporate offices and shall be available to Owner and its representatives and its auditors or accountants, at all reasonable times for examination, audit, inspection and transcription at Owner's sole cost and expense. All of such books and records pertaining to the Hotel including, without limitation, books of account, guest records and front office records at all times shall be the property of Owner. Upon

any termination of this Agreement, all of such books and records forthwith shall be turned over to Owner at a location designated by Owner so as to insure the orderly continuance of the operation of the Hotel, but such books and records shall thereafter be available to Manager at all reasonable times for inspection, audit, examination and transcription for a period of two (2) years. Any books and records relating to Hotel Employees and Payroll Costs shall be the property of the Manager, but upon termination of this Agreement, Manager shall provide to Owner or its successor management company basic information related to Hotel Employees being re-hired by Owner or its successor management company, such as names, positions and compensation rate.

10.2    **Financial Reports**.

(a)    Manager shall deliver to Owner within twenty (20) days following the close of each Accounting Period a monthly profit and loss statement reflecting a comparison of periodic and year-to-date actual revenues and expenses with the Annual Operating Budget as well as a periodic and year-to-date comparison of such actual revenues and expenses with those of the prior Fiscal Year. The monthly reporting will include (but not limited to): (i) a balance sheet with current month and prior year-end comparisons and differences in reasonable detail, (ii) a profit and loss statement (including Total Operating Revenue, Total Departmental Expenses, Total Undistributed Expenses, Gross Operating Profit, and, to the extent then available, RevPAR), containing a statement of income and expenses for the preceding calendar month and for the elapsed portion of the then-current year through the end of such month and an estimate of the projected income and expenses through the end of such year (using Manager's customary forecast report for such projections), (iii) a statement of net cash flow from the operation of the Hotel in reasonable detail, containing a statement of net cash flow for such month and for the elapsed portion of the then-current year through the end of such month and an estimate of the projected income and expenses through the end of such year, (iv) statements and calculations of the Management Fees, the reimbursable expenses and any other amounts payable to Manager or its Affiliates hereunder, (v) omitted, (vi) an estimate of the projected upcoming remittance to Owner, showing in reasonable detail the calculation thereof, (vii) a statement of any variances that have occurred and that are anticipated to occur between the applicable Annual Plan and actual results, (viii) STR Report, Revenue Management Recap, along with Manager's customary channel segmentation, marketing plan action plan updated group rooms pace report, transient rooms pace report, bank statements and reconciliations, certification that all balance sheet accounts have been reconciled, accounts payable aging, accounts receivable aging, and (ix) any other reasonable or industry standard reports as may be requested by Owner.

(b)    Further, Manager shall provide to Owner within fifteen (15) days following the close of each Accounting Period a report prepared in accordance with the example set forth in Exhibit C attached hereto and made a part hereof.

(c)    Further, within forty-five (45) days after (i) the end of each Fiscal Year and (ii) the end of the Term of this Agreement , Manager shall deliver to Owner an annual accounting, showing the results of operation of the Hotel during the Fiscal Year and a computation of Total Operating Revenues, Gross Operating Expenses, and EBITDA, if any, and any other information necessary to make the computations required hereby or which may be requested by Owner, all for such Fiscal

4836-4873-7791.6
C:\Users\jmelicharek\Desktop\Hotel Management Agreement - TPG - Porsche Atlanta (003).docx

Year.  The annual accounting for any Fiscal Year shall be controlling over the interim accountings for such Fiscal Year.  Owner shall have the right to conduct an audit of the books.

(d)    Further, Manager shall work with Owner in preparing and delivering any customary and reasonable additional reports or information requested or as Owner is required to provide under the License Agreement with respect to the operations of the Hotel.

10.3    **Audits by Owner**.  Owner shall have the right to audit, conducted either by Owner's internal personnel or by a third-party auditor retained by Owner at its expense, all items of expense and revenue under this Agreement including, but not limited to, Total Operating Revenues, Gross Operating Expenses, depreciation, the Management Fee and Reserve.  Manager shall cooperate and assist with such audit.  In the event that an audit reflects an underpayment to Owner or Manager or an overpayment to Manager or Owner, Manager shall correct same by a corrective payment to Owner or Manager, as appropriate, within ten (10) days following notice of the audit results to Manager, subject to Owner's and Manager's right to challenge the audit results in accordance with the provisions of Article 30 of this Agreement.  If an audit determines any weaknesses or need for reasonable changes in the internal control systems pertaining to the safeguarding of Owner's assets, Manager will promptly make all reasonable and necessary changes.

10.4    **Segregation of Accounts**.  In any instance where Manager manages several properties for Owner, Manager shall segregate the income and expenses of each property so that Total Operating Revenues from each property will be applied only to the bills and charges from that property.

10.5    **Meetings**.  In addition to Manager's obligations to make books and records available and deliver reports and information to Owner, Manager shall cause Executive Personnel to be available to consult with and advise Owner or its asset manager or designated representative regarding the operation of the Hotel on a reasonable basis by telephone upon prior written request; provided that Manager may include such additional Corporate Level Employees to participate on such calls. In addition, Owner or its representative shall have the right to meet with Executive Personnel monthly to review operational and financial performance on a quarterly basis; provided that Manager may include such additional Corporate Level Employees to participate in such meetings.   Owner or it's representative shall have the right to attend revenue management and sales meetings telephonically. At least quarterly, applicable Manager's Executive Team shall meet with Owner over teleconference to review the Hotel's performance for the preceding quarter provided that Manager may include such additional Corporate Level Employees to participate in such meetings.

**ARTICLE 11**
**MANAGER'S MANAGEMENT FEES; TIMING OF**
**PAYMENT TO MANAGER**

11.1    **Fees.**  For each Fiscal Year or portion thereof, Manager shall receive, by a payment made by Manager out of Total Operating Revenues at the end of each Accounting Period (in respect of its management services hereunder, the following fees (collectively, the **"Management Fees"**) calculated as follows:

(a) the Base Management Fee set forth on Schedule I; plus
(b) the Incentive Management Fee set forth on Schedule I; plus
(c) The Accounting Fee.

The Management Fees shall be computed and accounted for separately for each Fiscal Year and shall not be accumulated from Fiscal Year to Fiscal Year.  Owner shall reimburse Manager for all Reimbursable Expenses incurred by it in connection with the performance of this Agreement.  Any such amount shall be payable within thirty (30) days of billing, and upon request of Owner, Manager shall provide a statement showing in reasonable detail the nature and amount of such expenses, together with supporting documentation reasonably requested by Owner.

**11.2    Treatment of Proceeds of Business Interruption Insurance and Condemnation Awards**.  In the event of a casualty or condemnation for temporary use resulting in the payment of business interruption insurance (with respect to such casualty) or a condemnation award (with respect to such condemnation for temporary use), the amount of such business interruption insurance proceeds or condemnation award shall be considered a part of Total Operating Revenues for the purpose of computing Manager's Management Fees.

**ARTICLE 12
INSURANCE**

Except to the extent caused by Manager's or its Affiliate's gross negligence or willful misconduct, Owner assumes all risks in connection with the adequacy of any insurance and waives any claim against Manager and its Affiliates for any liability, cost, or expense arising out of any uninsured or under-insured claim.  All insurance for the Hotel that is obtained by Manager will terminate effective upon Termination.  Except as otherwise provided herein, the costs and expense of the insurance required by the Manager under this Article 12 shall be a Gross Operating Expense or otherwise paid by Owner.

12.1    Property Insurance.  Owner shall obtain and maintain property insurance (including business interruption insurance for a minimum 12 month indemnity period) on the Hotel (including the improvements and contents) against loss or damage on an all risk coverage basis and all other risks covered by the usual standard extended coverage endorsements,  insuring against loss or damage from windstorm, flood, hail and earthquake, all to the extent as required by Owner's Lender.

12.2    Operational Insurance.  Except as specifically provided below to the contrary, the following insurance requirements in this Section 12.2 shall be obtained by Owner. Further, except as specifically provided below to the contrary the cost and expense of the following insurance requirements in this Section 12.2 shall be Gross Operating Expense or otherwise paid by Owner.

12.2.1 Workers' Compensation and employer's liability insurance as may be required under Legal requirements covering all of the Hotel Employees, with such deductible limits in an amount not to exceed $25,000 and waiver of subrogation in favor of Owner will be procured by the Manager.

12.2.2  Fidelity bonds or insurance, subject to a deductible of not more than $25,000 per loss, covering Manager's on site Hotel Employees in job classifications normally bonded in the hotel industry or as otherwise required by law will be procured by the Manager. Such coverage shall include a loss payable endorsement in favor of Owner and, to the extent available on commercially reasonable terms, shall include an extension for third party coverage with an endorsement confirming such extension that protects Owner's property, including, without limitation, monies and securities, will be procured by the Manager.

12.2.3  Commercial general public liability insurance and excess umbrella liability insurance, including, but not limited to, coverage against claims for personal injury, death or property damage occurring on, in, or about the Hotel, including, without limitation, innkeeper's liability, garage liability, garage keeper's legal liability, liquor liability and automobile insurance on vehicles operated in conjunction with the Hotel, as applicable, with single-limit coverage for personal and bodily injury and bodily damage of at least $1,000,000 per occurrence and $2,000,000 in the aggregate and protection for third party claims will be procured and maintained by the Owner.  Manager and any other party or interest requested by Manager shall be included as an additional named insured under the coverages required in this subsection.

12.2.4  Employment practices liability insurance with an extension for third party claims will be procured by the Manager.

12.2.5  Umbrella liability insurance coverage to a limit of not less than $25,000,000 which shall provide excess coverage of all underlying insurances will be procured by the Owner. Manager and any other party or interest requested by Manager shall be included as an additional named insured under the coverages required in this subsection.

12.2.6  Manager's or Manager's Affiliates' corporate office professional liability/errors and omissions insurance with a minimum amount of a $2,000,000 limit of liability, covering financial loss arising from errors and omissions committed in the performance of Hotel Management services at the Hotel shall be procured and maintained by Manager.  Such insurance shall provide coverage for claims arising from professional services performed by Manager for wrongful acts which shall be defined as any actual or alleged negligent act, error or omission, misstatement or misleading statement or personal injury offense committed by the Manager or by any other person or entity acting on Manager's behalf in the performance of or failure to perform professional services.  Personal injury offense also means any actual or alleged false arrest, detention or imprisonment, malicious prosecution, defamation including libel, slander and disparagement, publication or an utterance in violation of an individual's right to privacy and invasion of the right to private occupancy, including wrongful entry or eviction.  The cost of this insurance shall be borne by Manager and is not an Operating Expense.

12.2.7  Owner will procure and maintain Cyber Liability Insurance, covering privacy liability, data breach, network security, network extortion, and business interruption, against loss from the failure by the Owner or the Hotel or by an independent contractor for which the Insured is legally responsible (including Manager) to properly handle, manage, store, destroy or otherwise control any: (i) personal information; (ii) third party corporate information in any format provided to the Insured, the Hotel or the Manager and specifically identified as confidential and protected

under a nondisclosure agreement or similar contract; (iii) an unintentional violation of the Owner's, Manager's or the Hotel's privacy policy that results in the violation of any law or regulation with respect to privacy and personal information; (iv) a failure of computer network security. Such coverage will provide minimum limits of Five Million Dollars ($5,000,000).

12.3    Cost and Expense. Except as otherwise provided herein, insurance premiums and any costs or expenses respecting the insurance described in this Article 12 shall be a Gross Operating Expense of the Hotel or otherwise paid by Owner. Premiums on policies for more than one year shall be charged pro rata over the period of the policies. Any reserves, losses, costs, damages or expenses which are uninsured, or fall within deductible limits or self-insured retentions, shall be treated as a cost of insurance and shall be a Gross Operating Expense.

12.4    Coverage. All insurance described in this Article 12 to be obtained by Manager (at Owner's request) may be obtained by endorsement or equivalent means under Manager's blanket insurance policies, provided that such blanket policies substantially fulfill the requirements specified herein. Deductible limits and self-insured retentions shall be as provided in the blanket policies covering the hotels leased or managed by Manager or its Affiliates. In addition, Manager shall not self-insure or otherwise retain such risks or portions thereof as it may respecting other hotels it leases or manages. Notwithstanding the foregoing, all insurance policies and coverages shall be subject to the requirements of all Mortgages and any License Agreement.

12.5    Policies and Endorsements.

12.5.1 Where permitted and as applicable, all insurance provided under this Article 12 shall be carried in the name of Manager. Owner and its officers, members, partners, shareholders, directors, agents, Affiliates, employees, successors and assigns, Licensor and the holder of the Mortgage on the Hotel, if any, shall be named as additional insureds on any insurance hereunder and any losses thereunder shall be payable to the parties as their respective interests may appear. To the extent any insurance is carried in the name of Owner, Manager and its officers, members, partners, shareholders, directors and employees shall be named as additional insureds on any such policies and any losses thereunder shall be payable to the parties as their respective interests may appear. The party procuring such insurance shall deliver to the other party certificates of insurance respecting all policies so procured, including existing, additional and renewal policies and, in the case of insurance about to expire, shall deliver certificates of insurance respecting the renewal policies within ten (10) days of the respective expiration dates.

12.5.2 All policies of insurance provided under this Article 12 shall, to the extent obtainable, have attached an endorsement that such policy shall not be canceled or materially changed without at least thirty (30) days prior notice to Owner, Manager, any Franchisor and the holder of the Mortgage. All insurance coverages provided for under this Agreement shall be affected by policies issued by insurance companies that are of good reputation and of sound and adequate financial responsibility, having a Best's rating of A-VII, or better, or a comparable rating if Best's ceases to publish its ratings or materially changes its rating standards or procedures. All such policies of insurance shall be written on an "occurrence" basis.

12.6   **Waiver of Subrogation**.   Owner and Manager each waive their respective rights of subrogation against each other.

12.7.   **Mortgage Requirements**.  Insurance shall be maintained in a manner consistent with the terms and conditions of any Mortgage and any conflict between those terms and conditions and the provisions of this Agreement shall be resolved in favor of the Mortgage.

## ARTICLE 13
## REAL AND PERSONAL PROPERTY TAXES; UTILITIES

13.1   **Taxes**.  Owner shall pay, on or before the dates the same become delinquent, with the right to pay the same in installments to the extent permitted by law, all real estate taxes, all personal property taxes and all betterment assessments levied against the Hotel or any of its component parts.  Manager shall promptly deliver to Owner all notices of assessments, valuations and similar documents to be filed by Manager or Owner, which are received from taxing authorities by Manager.  Owner shall have the right to hire property tax consultants or like professionals that reasonably provide economic benefits to Owner and the costs thereof shall be a part of Gross Operating Expenses.  Owner may elect to contest the validity or the amount of any such tax or assessment, provided that such contest does not materially jeopardize Manager's rights under this Agreement.  Manager agrees to cooperate with Owner and execute any documents or pleadings required for such purpose, provided Owner agrees to reimburse Manager for any out-of-pocket costs occasioned to Manager by any such contest.  At Owner's election, all costs relating to any such contest may be paid from the Operating Account but will not be included as Gross Operating Expenses.

13.2   **Utilities, Etc**.  Manager shall promptly pay, on or before the dates the same become delinquent, all fuel, gas, light, power, water, sewage, garbage disposal, telephone and other utility bills currently as required to operate the Hotel from the Total Operating Revenues.

## ARTICLE 14
## USE OF NAME

14.1   **Name**.  During the Term of this Agreement, the Hotel shall at all times be known by the hotel name designated in the License Agreement or by such other name as from time to time may be agreed upon by Owner and Manager.  Manager shall not use or employ such name unless such use fully complies with the terms of the License Agreement, if any.

## ARTICLE 15
## DAMAGE OR DESTRUCTION; CONDEMNATION

15.1   **Damage or Destruction**.  (a) If the Hotel or any portion thereof shall be damaged or destroyed at any time or times during the Term by fire, casualty or any other cause commonly covered by fire and extended coverage insurance and the cost of repairing such damage and restoring the Hotel to substantially its condition immediately prior to such damage or destruction, as reasonably estimated by Owner based upon estimates Owner receives from contractors and

other reasonable and customary evidence, will not exceed the sum of $1,000,000 plus adjustments to reflect increases in the CPI for each Fiscal Year after 2019 exclusive of the cost of the foundation and footings ("**Minimum Cost**"), Owner will, at its own cost and expense (subject to Owner's receipt of insurance proceeds sufficient to pay such costs and expenses) and with due diligence repair and/or restore the Hotel so that after such repair and/or restoration, the Hotel shall be in substantially the same condition as it was immediately prior to such damage or destruction.

(b)      If the cost of such repair and/or restoration will, as so reasonably estimated by Owner, exceed the Minimum Cost, then Owner shall, within one hundred twenty (120) days after such damage or destruction, elect by notice to Manager either (x) to carry out such repair and/or restoration, in which case Owner shall complete such repair and/or restoration pursuant to the last sentence of Section 15.1(a) or (y) to terminate this Agreement should Owner so elect to terminate this Agreement.

(c)      In the case of damage or destruction which Owner is required by the preceding provisions of this Section 15.1 to repair or restore or where Owner has not elected under said preceding provisions to terminate this Agreement, Owner shall undertake to so repair and/or restore such damage or destruction and neither Owner nor Manager shall have a right to terminate this Agreement on account of such damage or destruction.

15.2      **Condemnation**.  If the whole of the Hotel shall be taken or condemned in any eminent domain, condemnation, compulsory acquisition or like proceeding by any competent authority or if such a portion thereof shall be taken or condemned as to make it imprudent or unreasonable, in the sole opinion of Owner, to use the remaining portion as a hotel of the type and class immediately preceding such taking or condemnation, then the Term shall terminate as of the date title vests in the condemning authority.  Manager has no interest in any award paid to Owner and Manager shall make no claim against the condemnor for any loss to its business as a result of such condemnation or otherwise.  If only a part of the Hotel shall be taken or condemned and the taking or condemnation of such part does not, in the opinion of Owner, make it unreasonable or imprudent to operate the remainder as a hotel of the type and class immediately preceding such taking or condemnation, this Agreement shall not terminate, and so much of any award to Owner shall be made available as shall be reasonably necessary for making alterations or modifications of the Hotel, or any part thereof, so as to make it a satisfactory architectural unit as a hotel of similar type and class as prior to the taking or condemnation.

15.3.      **Mortgage Requirements**.  Actions as to damage or destruction and condemnation shall be taken only in a manner that is consistent with the terms and conditions of the Mortgage and any conflict between those terms and conditions and the provisions of this Agreement shall be resolved in favor of the Mortgage.

## ARTICLE 16
## EVENTS OF DEFAULT

16.1      **Manager Defaults**.  Subject to the conditions contained in Section 17.3 below, each of the following shall constitute an Event of Default by Manager:

(a)      The failure of Manager to pay any sum of money to Owner provided for herein when the same is payable, if such failure is not cured within five (5) Business Days after written notice specifying such failure is given by Owner to Manager

(b)      An assignment by Manager in violation of the provisions of Article 23 hereof.

(c)      If Manager shall fail to keep, observe or perform any other material covenant, agreement, term or provision of this Agreement to be kept, observed or performed by Manager and such failure shall continue for a period of thirty (30) days after written notice specifying such failure given by Owner to Manager, or if Manager due to any act or omission on the part of Manager and without the fault of Owner, shall fail to maintain the Permits and such failure shall continue for a period of thirty (30) days after written notice specifying such failure given by Owner to Manager; provided that if such failure is incapable of cure within such thirty (30) day period, then the cure period shall be extended for up to ninety (90) days provided that Manager commenced the cure during such initial thirty (30) day period and thereafter diligently and continuously pursues the cure thereof to completion.

(d)      If because of any act or omission on the part of Manager, and without the fault of Owner, either (i) the License Agreement or (ii) any required license for the sale of alcoholic beverages at the Hotel, is at any time suspended, terminated or revoked for a period of more than thirty (30) consecutive days, provided, however, if, at the end of such thirty (30) day period the cure has not been effectuated notwithstanding Manager's diligent and continuous attempts to cure, then the cure period shall be extended for an additional period of ninety (90) days.

(e)      If Manager shall fail to maintain and operate the Hotel in accordance with the standards required under Section 4.1 and such failure shall not be due to a refusal on the part of Owner to approve the Annual Plan submitted by Manager under Section 4.4 or Owner's failure to properly provide funds requested pursuant to the provisions of Article 9 and such failure shall continue for a period of thirty (30) days after written notice by Owner to Manager specifying the matters or conditions which constitute the basis for such Event of Default, provided that if such failure is not reasonably capable of cure within such thirty (30) day period, then the cure period shall be extended for up to ninety (90) days provided that Manager commences the cure during such initial thirty (30) day period and thereafter diligently and continuously pursues the cure thereof to completion.

(f)      If Manager shall apply for or consent to the appointment of a receiver, trustee or liquidator of Manager or of all or a substantial part of its assets, admit in writing its inability to pay its debts as they come due, make a general assignment for the benefit of creditors, take advantage of any insolvency law, or file an answer admitting the material allegations of a petition filed against Manager in any bankruptcy, reorganization or judgment or if an order, judgment or decree shall be entered by any court of competition jurisdiction, on the application of a creditor, adjudicating Manager bankrupt or insolvent or approving a petition seeking reorganization of Manager or appointing a receiver, trustee or liquidator of Manager or of all or a substantial part of its assets, and such order, judgment or decree shall continue unstayed and in effect for any period of ninety (90) consecutive days.

**Management Agreement - Page** 32

(g)    The filing of a voluntary petition in bankruptcy or insolvency or a petition for liquidation or reorganization under any bankruptcy law by Manager, or Manager shall consent to, acquiesce in, or fail timely to controvert, an involuntary petition in bankruptcy, insolvency or an involuntary petition for liquidation or reorganization filed against it.

(h)    The filing against Manager of a petition seeking adjudication of Manager as insolvent or seeking liquidation or reorganization or appointment of a receiver, trustee or liquidator of all or a substantial part of Manager's assets, if such petition is not dismissed within ninety (90) days.

(i)    Failure of Manager (but excluding such a failure which results from the failure by Owner to provide the necessary funds therefor) to maintain at all times throughout the term hereof all of the insurance required to be maintained by Manager under Article 12, if such failure is not cured within fifteen (15) days after written notice specifying such failure is given by Owner to Manager.

(j)    The fraud, gross negligence, willful misconduct or criminal conduct of or by Manager in connection with the Hotel.

16.2    **Owner Defaults**.  Each of the following shall constitute an Event of Default by Owner:

(a)    The failure of Owner to pay or furnish to Manager any money Owner is required to pay or furnish to Manager in accordance with the terms hereof on the date the same is payable, if such failure is not cured within ten (10) days after written notice specifying such failure is given by Manager to Owner.  If any sum of money is not paid within ten (10) days following the date same becomes due and payable under this Agreement, and Manager has advanced such sum on behalf of Owner, such sum shall bear interest at the Default Rate from the date Manager advanced such sum on behalf of Owner until the date Owner actually pays such sum.  If the failure to pay relates to the Management Fee, such sum shall bear interest at the Default Rate from the date due until the date actually paid.

(b)    If because of a default under the Mortgage, if any, not caused by the act or omission of Manager, the Mortgage shall be foreclosed, or the Hotel sold in lieu of foreclosure.

(c)    If Owner shall apply for or consent to the appointment of a receiver, trustee or liquidator of Owner or of all or a substantial part of its assets, or admit in writing its inability to pay its debts as they come due, make a general assignment for the benefit of creditors, take advantage of any insolvency law, or file an answer admitting the material allegations of a petition filed against Owner in any bankruptcy, reorganization or insolvency proceeding, or if an order, judgment or decree shall be entered by any court of competent jurisdiction, on the application of a creditor, adjudicating Owner a bankrupt or insolvent or approving a petition seeking reorganization of Owner or appointing a receiver, trustee or liquidator of Owner or of all or a substantial part of its assets, and such order, judgment or decree shall continue unstayed and in effect for any period of ninety (90) consecutive days.

(d)      The filing of a voluntary petition in bankruptcy or insolvency or a petition for liquidation or reorganization under any bankruptcy law by Owner, or Owner shall consent to, acquiesce in, or fail timely to controvert, an involuntary petition in bankruptcy, insolvency or an involuntary petition for liquidation or reorganization filed against it.

(e)      The filing against Owner of a petition seeking adjudication of Owner as insolvent or seeking liquidation or reorganization or appointment of a receiver, trustee or liquidator of all or a substantial part of Owner's assets, if such petition is not dismissed within ninety (90) days.

(f)      Failure of Owner to maintain at all times throughout the term hereof all of the insurance required to be maintained by Owner under Article 12, if such failure is not cured within fifteen (15) days after written notice specifying such failure is given by Manager to Owner.

(g)      The failure of Owner to perform, keep or fulfill any of the other covenants, undertakings, obligations or conditions set forth in this Agreement, or the failure of Owner to approve expenditures or to authorize procedures necessary to maintain the standards of the Hotel in accordance with the Operating Standards, if such failure shall continue for a period of thirty (30) days after written notice by Manager or Licensor to Owner specifying the matters or conditions which constitute the basis for such Event of Default, provided that if such failure is incapable of cure within such thirty (30) day period, then the cure period shall be extended for up to ninety (90) days provided that Owner commences the cure during such initial thirty (30) day period and thereafter diligently and continuously pursues the cure thereof to completion.

(h)      The failure of Owner, ACRON (USA) or ACRON AG to perform, keep or fulfill any of the other covenants, undertakings, obligations or conditions set forth in the Cross Indemnity Agreement if such failure shall continue for a period of thirty (30) days after written notice by Manager.

(i)      The failure of the Commencement Date to occur on or before February 15, 2022 unless caused solely by a breach hereof by Manager.

## ARTICLE 17
## TERMINATION UPON EVENT OF DEFAULT; OTHER REMEDIES; OTHER MANAGER TERMINATION

17.1    **Termination**.  Upon the occurrence of an Event of Default, in addition to and cumulative of any and all rights and remedies available to the non-defaulting party under this Agreement, at law or in equity, the non-defaulting party may: (a) terminate this Agreement without penalty, effective upon receipt of written notice of termination to the defaulting party, provided that termination may be effective immediately in the case of fraud, gross negligence, willful misconduct, criminal conduct or misappropriation of funds; and (b) pursue any and all other remedies available to the non-defaulting party at law or in equity.  In addition to and cumulative of the foregoing, upon the occurrence of any Event of Default on the part of Owner, all Management Fees, Reimbursable Expenses and all other sums payable to Manager under this Agreement shall be immediately due and payable without notice.  In no event shall the provisions of this Agreement with respect to the any allowed termination of this Agreement under certain

circumstances be construed as defining or limiting the amount recoverable by Manager from Owner by reason of any Event of Default on the part of Owner.

17.2    **Manager's Rights to Perform**.  If Owner shall fail to make any payment or to perform any act required of Owner pursuant to this Agreement, Manager may (but shall not be obligated to), without further notice to, or demand upon, Owner and without waiving or releasing Owner from any obligations under this Agreement, make such payment (either with its own funds or with funds withdrawn for such purpose from the Operating Accounts or the Reserve) or perform such act.  All sums so paid by Manager and all necessary incidental costs and expenses incurred by Manager in connection with the performance of any such act, together with interest thereon at the Default Rate from the date of making such expenditure by Manager, shall be payable to Manager on demand.

Manager shall have the right, after giving fifteen (15) days advance notice to Owner, to set-off against any payments to be made to Owner by Manager under any provision of this Agreement and against all funds from time to time in the Operating Accounts and the Reserve, any and all liabilities of Owner to Manager. Manager may withdraw from the Operating Accounts and the Reserve from time to time such amounts as Manager deems desirable in partial or full payment of all or any portion of said liabilities, the amount of such withdrawals to be paid by Owner to Manager on demand and to be replaced in the respective account and fund.

17.3    **Excused Non-Performance**.  Notwithstanding any contrary provision of this Agreement, Manager shall be excused from the performance of any obligation hereunder (including the obligation to operate the Hotel in conformity with the Operating Standards), and shall not be deemed in default, for such period of time as such performance is prevented by a breach of this Agreement by Owner or a limitation imposed on Manager's ability to expend funds in respect of the Hotel, due to Owner's act or Owner's failure to act upon Manager's request for funds or payment of Gross Operating Expenses, including, Working Capital and/or payroll costs (provided Manager has provided Owner with reasonably timely notice pursuant to this Agreement of the need for additional funds and that the failure to expend or make payment of the same shall reasonably prevent Manager from meeting such obligation).

17.4    **Pre-requisite for Termination by Owner**.  Notwithstanding any contrary provision of this Agreement, Owner shall not have the right to terminate this Agreement for any reason unless and until TH Guarantor is provided with a release in writing of its obligations under the Guaranty of Recourse Obligations and the Environmental Indemnity Agreement to the extent arising from and after the date of termination of this Agreement. For the avoidance of doubt, the Cross Indemnity Agreement shall survive the termination of this Agreement.

## ARTICLE 18
## OWNER'S ADDITIONAL TERMINATION RIGHTS

18.1    **Sale of the Hotel**.  If Owner proposes to sell or otherwise dispose of the Hotel or Owner's interests therein, to a bona fide third-party (the "**Third-Party Purchaser**") during the Term, this Agreement will terminate effective upon the consummation of the closing of such sale.  Owner shall provide Manager with written notice of termination of this Agreement not less than sixty (60)

4836-4873-7791.6
C:\Users\jmelicharek\Desktop\Hotel Management Agreement - TPG - Porsche Atlanta (003).docx

days prior to the scheduled date of closing of the sale of the Hotel; provided, however, if such a sale does not actually occur, the notice of termination shall be deemed ineffective.

18.2    **Performance Standard**.

(a)    Notwithstanding anything to the contrary in this Agreement but subject to the provisions of Section 18.2(b) and Section 17.3, Owner shall have the right to terminate this Agreement in accordance with this Section 18.2 if, for any reason other than Unavoidable Interruptions, for the time periods commencing after the Testing Start Date: (i) the Hotel fails to achieve 85% of the budgeted Gross Operating Profit set forth in the applicable Annual Plan for two (2) consecutive six (6) month periods; and  (ii) the Hotel fails to achieve a RevPAR equal to at least the RevPAR Threshold for two (2) consecutive six (6) month periods (Subsections 18.2(a)(i) and 18.2(a)(ii) may hereafter collectively be referred to as the "**Performance Standard**").  For the purposes of this Agreement, "**GOP Threshold**" means the applicable percentage of Gross Operating Profit set forth in subsections (i) and (ii) of this Section 18(a) above.

(b) If the Performance Standard is not satisfied and Owner elects to exercise its right to terminate this Agreement pursuant to this Section, Owner shall give written notice to Manager of such election within sixty (60) days after the receipt by Owner of the annual accounting (as set forth in Section 10.2) for such Test Year; and (ii) the notice shall specify a termination date no sooner than sixty (60) days after the giving of such notice.  Manager may (without any obligation to do so), within sixty (60) days following its receipt of Owner's notice of termination, pay to the Owner an amount which, when added to the actual aggregate amount of the Income Before Fixed Expenses for the applicable period in question, equals the aggregate GOP Threshold for such period.  Upon such payment, the Performance Standard shall be deemed to have been satisfied for each such period, Owner shall not have a right to terminate this agreement based upon such periods and Owner's election to do so shall be of no further force and effect.

(c) The Competitive Set shall be reviewed from time to time by Manager and Owner (but not less than annually during the Term) and may be adjusted at any time upon Manager's reasonable recommendation and Owner's reasonable approval of such recommendation in the event there is a change in the market that supports an adjustment in the Competitive Set.  By way of example only and not of limitation, changes in the market may include the construction of a new hotel or the conversion and/or the renovation of an existing hotel that results in such hotel becoming competitive with the Hotel.

**ARTICLE 19**
**INTENTIONALLY OMITTED**

**ARTICLE 20**
**TRANSFER TO OWNER UPON TERMINATION**

Upon the termination or expiration of the Term of this Agreement, whether due to the occurrence of an Event of Default or otherwise, Manager shall cooperate with Owner and shall execute those documents or instruments reasonably requested by Owner in connection with the transfer or reissue the Permits, without payment of a fee to Manager, to Owner or its nominee, provided that Manager shall not be required to incur liability or out of pocket cost in connection with such transfer.  Without limiting the generality of the foregoing, Manager shall cause its

officials to execute documents and visit licensing authorities, along with Owner's representatives, in order to expedite the orderly transfer or reissuance to Owner or its designee of the Permits. Following the termination or expiration of the Term, Manager will prepare and provide a final accounting report in accordance with the provisions set forth in Section 10.2(c) of this Agreement and in the same manner and scope as previously provided by Manager following prior Fiscal Years under this Agreement.  In the event that Owner requests additional reports or assistance from Manager following the termination or expiration of this Agreement, Owner shall pay to Manager such reasonable fees as determined by the Manager through the date on which such additional services or assistance are to be provided.  In the event that this Agreement terminates due to any reason other than a default by Manager under this Agreement, a sufficient number of Hotel Employees will be hired by Owner or its successor, assign or designee, and retained for at least 90 days thereafter, so as not to cause a "mass layoff" or "plant closing", as defined in the Workers Adjustment and Retraining Act, 29 USC, sec 2101 et seq.

## ARTICLE 21
## NOTICES

All notices, elections, acceptances, demands, consents and reports (collectively "notice") provided for in this Agreement shall be in writing and shall be given to the other party at the address set forth below or at such other address as any of the parties hereto may hereafter specify in writing.

To Owner:    ACRON 2 Porsche Drive, Atlanta, LLC
             c/o ACRON (USA), L.P.
             2424 East 21st St Suite 150
             Tulsa, OK 74114
             Attn: Greg Wilson

With a copy to: Baker & Hostetler LLP
             200 South Orange Avenue, Suite 2300
             Orlando, Florida 32801
             Attention:  John Melicharek, Jr., Esq.
             Telephone: (407) 649-4086
             Fax: (407) 841-0168
             Email: jmelicharek@bakerlaw.com

4836-4873-7791.6
C:\Users\jmelicharek\Desktop\Hotel Management Agreement - TPG - Porsche Atlanta (003).docx

To Manager:    1140 Reservoir Avenue
Cranston, Rhode Island 02920
Attn:  Gregory D. Vickowski
Telephone:  (401) 946-4600
Facsimile:  (401) 943-6320

With copy to:
Ron M. Hadar, Esq.
General Counsel
Procaccianti Companies
1140 Reservoir Avenue
Cranston, Rhode Island 02920
Telephone:  (401) 946-4600
Facsimile:  (401) 943-6320

Such notice or other communication may be given by Federal Express or other nationally recognized overnight carrier or by electronic facsimile in which case notice shall be deemed given upon confirmed delivery.  Notice may be mailed by United States registered or certified mail, return receipt requested, postage prepaid, deposited in a United States post office or a depository for the receipt of mail regularly maintained by the post office.  If mailed, then such notice or other communication shall be deemed to have been received by the addressee on the fifth (5th) Business Day following the date of such mailing.  Such notices, demands, consents and reports may also be delivered by hand, in which case it shall be deemed received upon delivery.

## ARTICLE 22
## CONSENT AND APPROVAL

Except as herein otherwise provided, whenever in this Agreement the consent or approval of Manager or Owner is required, such consent or approval shall not be unreasonably withheld or delayed.  Such consent or approval shall also be in writing only and shall be executed only by an authorized officer or agent of the party granting such consent or approval.

## ARTICLE 23
## NON-ASSIGNABILITY

This Agreement shall not be assignable by Manager or Owner; provided however, that either party shall be entitled to assign this Agreement to an Affiliate of such party as part of a modification to such party's company structure in which all or substantially all of such party's assets are transferred to an Affiliate of such party (which in the case of Manager, has the right, power and authority to provide to Owner the delegated or assigned services and organizational expertise that Manager is required to provide under this Agreement); and Manager shall have the right to assign its rights to receive payments under this Agreement as security for indebtedness or other obligations.  Notwithstanding the foregoing, any "assignment" by Manager to a successor entity resulting from a merger, acquisition, disposition or consolidation of all or substantially all of the equity or assets of Manager shall be permitted and not require the consent of Owner hereunder so long as (i) either (A) the "Manager" under this Agreement remains controlled by at

<u>**Management Agreement - Page**</u> 38

least any two of James A. Procaccianti, Elizabeth A. Procaccianti, Gregory D. Vickowski, Robert Leven, or Mark Bacon (the "**Executive Team**") or, (B) if Manager is itself, or is controlled by, a corporation whose stock is listed and publicly traded over-the-counter on a nationally recognized stock exchange in the United States, so long as at least two (2) members of the Executive Team are on the Board of that corporation, (ii) the assignee continues to comply with all of the obligations of Manager hereunder, (iii) the assignee, in Owner's good faith reasonable judgment, has the skill, experience, professional resources and financial ability to perform under this Agreement and can provide the comparable operating, management and financial reporting functions of Manager under this Agreement consistent with the Operating Standards, and (iv) no such assignment shall cause Owner to be in default under the Franchise Agreement or under the Mortgage.

# ARTICLE 24
# INDEMNITY

24.1    **Indemnity by Manager**.  To the extent that Owner shall not be fully covered by insurance required to be maintained pursuant to this Agreement, Manager shall indemnify, defend and hold harmless Owner, its Affiliates, officers, members, managers, agents and employees thereof, from and against any damages, loss, liability, cost, action, cause, claim or expense, including attorneys' fees, arising out of or in connection with the management and operation of the Hotel including, without limitation, all employment related claims and litigation (collectively, the "**Liabilities**"). The costs of such indemnity shall be borne as follows:

(a)    If the Liabilities are attributable to the gross negligence or willful misconduct of Corporate Level Employees of Manager or the Executive Personnel, the cost thereof shall be borne solely by Manager and not paid out of Total Operating Revenues.

(b)    If the Liabilities are attributable to any other reason or cause, the cost of such indemnification shall be paid as a Gross Operating Expense of the Hotel or failing payment of the same, by Owner.

Manager's obligations under this Section 24.1 shall not include any losses, expenses or damages arising from any matters relating to the structural integrity of the Hotel or other matters relating to defects in design, materials or workmanship in the construction of the Hotel.

24.2    **Indemnity by Owner**.  To the extent that Manager shall not be fully covered by insurance required to be maintained pursuant to this Agreement or if, after giving effect to the provisions of Section 24.1(b) of this Agreement, Total Operating Revenues are not sufficient to pay all Liabilities, Owner shall indemnify, defend and hold harmless Manager and its directors, officers, employees and agents from and against any damages, loss, liability, cost, action, cause, claim or expense, including attorneys' fees, arising out of, or incurred in connection with the management and operation of the Hotel, unless attributable to the gross negligence or willful misconduct of Corporate Level Employees of Manager or the Executive Personnel.

24.3    **Survival**.  The provisions of this Article 24 shall survive the expiration or earlier termination of this Agreement.

4836-4873-7791.6
C:\Users\jmelicharek\Desktop\Hotel Management Agreement - TPG - Porsche Atlanta (003).docx

# ARTICLE 25
# PARTIAL INVALIDITY

In the event that any one or more of the phrases, sentences, clauses or paragraphs contained in this Agreement shall be declared invalid by the final and unappealable order, decree or judgment of any court, this Agreement shall be construed as if such phrases, sentences, clauses or paragraphs had not been inserted, unless such construction would substantially destroy the benefit of the bargain of this Agreement to either of the parties hereto.

# ARTICLE 26
# MISCELLANEOUS

26.1    **Disputes**.  Except as otherwise expressly stated in this Agreement, the parties shall resolve any dispute, claim or issue arising under this Agreement ("**Dispute**") in accordance with this Section 26.1.

A.    Any dispute with respect to (i) the proper inclusion or exclusion of items in Gross Revenue or Gross Operating Expenses, (ii) the proper computation of any amounts payable to Manager, (iii) the approval of the Annual Plan, (iv) and any other matter reserved herein for resolution by the Expert, shall be exclusively resolved in accordance with this Section 26.1.A. Either party may commence the Expert resolution process by providing notice to the other party. The decision of the Expert shall be final and conclusive with respect to such submitted matter(s) and the Expert shall not have any right or power to consider, determine or resolve any other issue or dispute between the parties, or to alter, modify or amend any of the provisions of this Agreement.  The party subject to an adverse expert determination shall be responsible for all reasonable costs and fees of such expert resolution process (to the extent such Expert determination is adverse to such party), but each party shall separately pay for its own attorneys' fees and costs. The Expert may conduct the expert resolution process informally and without strict adherence to the rules of evidence and may, applying such Expert's experience, consider such matters as such Expert deems appropriate to reach a decision, provided that each party shall be entitled to make written submissions to the Expert and, if requested by either party, the Expert shall hold at least one hearing at which each party may be heard.  If a party makes any submission to the Expert, such party shall also provide a copy of its submission to the other party and the other party shall have the right to respond in writing to such submission.  Each party will cooperate with the Expert and will provide to the Expert all data and information reasonably requested by such Expert to the end that such Expert may reach a decision as rapidly as possible.

B.    Except for Disputes subject to resolution by the Expert, and actions for injunctive or other provisional, expedited or extraordinary relief, all Disputes must be resolved by final, binding arbitration administered by the American Arbitration Association ("**AAA**") as provided in this Section 26.1 and the Commercial Arbitration Rules of the AAA (the "**AAA Rules**") in effect as of the commencement of the applicable arbitration proceeding, subject to the following terms:

(i)    If either party asserts that a Dispute has arisen and is not subject to resolution by the Expert, then such asserting Party shall give prompt written notice thereof to the

4836-4873-7791.6
C:\Users\jmelicharek\Desktop\Hotel Management Agreement - TPG - Porsche Atlanta (003).docx

other party and to the AAA.  Any arbitration pursuant to this Agreement shall be conducted exclusively in Atlanta, Georgia.

(ii)      The arbitration shall be conducted by an arbitrator selected in accordance with the AAA Rules, who shall have had experience in the arbitration of hotel related disputes.

(iii)      Except in connection with claims by third parties for which a party is entitled to indemnification pursuant to this Agreement, the award may not include, and the parties hereto specifically waive, any right to an award of multiple, exemplary or punitive damages.

(iv)      The arbitrators may consolidate proceedings with respect to any Dispute under this Agreement with proceedings relating to any other Dispute under this Agreement. However, except as specifically set forth in the preceding sentence: (i) arbitration only will be conducted on an individual, not class-wide, basis; (ii) only Manager (and its affiliates and their respect officers, directors, owners, employees, agents and representatives) and Owner (and its affiliates and their respect officers, directors, owners, employees, agents and representatives) may be parties to any arbitration proceeding described in this Section; and (iii) no such arbitration proceeding shall be consolidated with any other arbitration proceeding involving Manager or any other person or entity.

(v)      In connection with any arbitration proceeding, each party must submit or file any claim that constitutes a compulsory counterclaim (as defined by the Federal Rules of Civil Procedure) within the same proceeding as the claims to which it relates.  Any such claim that is not submitted or filed will be forever barred.

C.      During the pendency of the arbitration or Expert resolution, the parties shall share equally the fees and expenses of the arbitrator or Expert.  In rendering its decision, the arbitrator or Expert may designate the party whose position is substantially upheld, and the arbitrator or Expert may award such party its share of the fees and costs so paid.  The arbitrator or Expert may determine that neither party's position was substantially upheld.  The parties shall otherwise bear their own costs and expenses of the arbitration.

26.2    **Further Assurances**.  Owner and Manager shall execute and deliver all other appropriate supplemental agreements and other instruments, and take any other action necessary to make this Agreement fully and legally effective, binding and enforceable as between them and as against third parties.

26.3    **Waiver**.  The waiver of any of the terms and conditions of this Agreement on any occasion or occasions shall not be deemed a waiver of such terms and conditions on any future occasion.

26.4    **Successors and Assigns**.  Subject to and limited by Article 23, this Agreement shall be binding upon and inure to the benefit of Owner, its successors and permitted assigns, and shall be binding upon and inure to the benefit of Manager, its successors and permitted assigns.

26.5    **Governing Law**.  This Agreement shall be construed, both as to its validity and as to the performance of the parties, in accordance with the laws of the State of Georgia.

<u>**Management Agreement - Page**</u> 41

26.6    **Compliance with Mortgage and License Agreement**.  In carrying out their respective duties and obligations under the terms of this Agreement, Owner and Manager shall take no action that could reasonably be expected to constitute a material default under any Mortgage or the License Agreement and will take such actions as are reasonably necessary to comply therewith.

26.7    **Amendments**.  This Agreement may not be modified, amended, surrendered or changed, except by a written document signed by the Owner and Manager agreeing to be bound thereby.

26.8    **Estoppel Certificates**.  Owner and Manager agree, at any time and from time to time, as requested by the other party, upon not less than ten (10) days' prior written notice, to execute and deliver to the other a statement certifying that this Agreement is unmodified and in full force and effect (or if there have been modifications, that the same are in full force and effect as modified and stating the modifications), certifying the dates to which required payments have been paid, and stating whether or not, to the best knowledge of the signer, the other party is in default in performance of any of its obligations under this Agreement, and if so, specifying each such default of which the signer may have knowledge, it being intended that such statement delivered pursuant hereto may be relied upon by others with whom the party requesting such certificate may be dealing

26.9    **Unavoidable Interruptions**.  Subject to the express limitations set forth in this Agreement and excluding those obligations that accrue prior to the occurrence of an event of Unavoidable Interruption or obligations that, if not performed, would cause a material adverse effect on the Hotel or its operations (for instance, the requirement to maintain the Permits or insurance obligations hereunder), if either party's failure to comply with, perform or satisfy any representation, warranty, covenant, undertaking, obligation or condition set forth in this Agreement is caused by or due to, in whole or in part, any Unavoidable Interruption, such representation, warranty, covenant, undertaking, obligation or condition (except regarding insurance coverages and monetary payments) shall be adjusted to the extent and for so long as such party's failure is caused by or due to, in whole or in part, such Unavoidable Interruption.

26.10   **Inspection Rights**.  Owner shall have the right to inspect the Hotel and examine the books and records of Manager pertaining to the Hotel at all reasonable times during the Term upon not less than two business days' prior notice to Manager, and Owner and the holder of any Mortgage shall have access to the Hotel and the books and records pertaining thereto at all times during the Term to the extent necessary to comply with the terms of any Mortgage, all to the extent consistent with applicable law and regulations and the rights of guests, tenants and concessionaires of the Hotel.

26.11   **Subordination**.  This Agreement, any extension hereof and any modification hereof shall be subject and subordinate to a Mortgage as provided therein.  The provisions of this Section shall be self-operative and no further instrument of subordination shall be required; however, Manager will execute and return to Owner (or to Lender, as designated by Owner) such documentation as Owner or Lender may reasonably request to evidence the subordination of this Agreement to the Mortgage.

26.12  **Effect of Approval of Plans and Specifications**.  Owner and Manager agree that in each instance in this Agreement or elsewhere wherein Manager is required to give its approval of plans, specifications, budgets and/or financing, no such approval shall imply or be deemed to constitute an opinion by Manager, nor impose upon Manager any responsibility for the design or construction of additions to or improvements of the Hotel, including but not limited to structural integrity or life/safety requirements or adequacy of budgets and/or financing.  The scope of Manager's review and approval of plans and specifications is limited solely to the adequacy and relationship of spaces and aesthetics of the Hotel in order to comply with the Operating Standards.

26.13  **Entire Agreement**.  This Agreement constitutes the entire agreement between the parties relating to the subject matter hereof, superseding all prior agreements or undertakings, oral or written.

26.14  **Time is of the Essence**.  Time is of the essence in this Agreement.

26.15  **Interpretation**.  No provision of this Agreement shall be construed against or interpreted to the disadvantage of any party hereto by any court or other governmental or judicial authority by reason of such party having or being deemed to have structured or dictated such provision.

26.16  **Counterparts**.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and need not be signed by more than one of the parties hereto and all of which shall constitute one and the same agreement.

26.17  **No Electronic Transactions**.   The parties hereby acknowledge and agree that this Agreement shall not be executed, entered into, altered, amended or modified by electronic means. Without limiting the generality of the foregoing, the parties hereby agree that the transactions contemplated by this Agreement shall not be conducted by electronic means, except as specifically set forth in Article 21 of this Agreement.

26.18  **Prohibited Persons and Transactions**.

   (a)    Manager is not, and shall not become, a person or entity with whom U. S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("**OFAC**") of the Department of the Treasury (including those named in OFAC's Specially Designated and Blocked Person's List) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, or Support Terrorism), or other governmental action (such persons and entities being "**Prohibited Persons**").

   (b)    Owner is not and shall not become a Prohibited Person.

26.19    **Confidentiality.**  Owner and Manager agree to keep the terms and conditions of all leases and other occupancy agreements in effect at the Hotel (if any) and all other accruements relating to the Hotel, together with all information and data obtained, possessed, or generated by Manager in connection with the Hotel (collectively, "**Privileged Information**"), strictly confidential and not to make any public announcements or any disclosures to any third parties,

either orally or in writing, with respect to any Privileged Information without the express written consent of the other party hereunder; provided, however, the restrictions imposed hereby shall not apply to any Privileged Information (1) which is required to be disclosed in order to comply with any law, ordinance, governmental decree or any rule, regulation or decree of any interested governmental body or (2) which must otherwise be disclosed to relevant third parties, including accountants, attorneys and lenders, in the course of reasonable and diligent management and operation of the Hotel or the business of Owner, or any subsidiary or Affiliate of Owner or Manager.  If Manager makes such disclosure, it shall notify such third party of this provision and of the requirement of Owner for confidentiality.  The provisions of this Section 26.19 shall survive the expiration or termination of this Agreement.

26.20      **No Third-Party Rights**.  This Agreement shall inure solely to the parties hereto. Notwithstanding any other provision of this Agreement, no third party shall have any rights pursuant to the terms of this Agreement.

## ARTICLE 27
## NO REPRESENTATIONS AS TO INCOME OR FINANCIAL SUCCESS OF HOTEL

In entering into this Agreement, Manager and Owner acknowledge that neither Owner nor Manager has made any representation to the other regarding projected earnings, the possibility of future success or any other similar matter respecting the Hotel, and that Manager and Owner understand that no guarantee is made to the other as to any specific amount of income to be received by Manager or Owner or as to the future financial success of the Hotel.

## ARTICLE 28
## REPRESENTATIONS OF MANAGER

In order to induce Owner to enter into this Agreement, Manager does hereby make the following representations and warranties:

(a)      the execution of this Agreement is permitted by the certificate of formation and partnership agreement of Manager and this Agreement has been duly authorized, executed and delivered and constitutes the legal, valid and binding obligation of Manager enforceable in accordance with the terms hereof;

(b)      to the best knowledge of Manager, there is no claim, litigation, proceeding or governmental investigation pending, or, as far as is known to Manager, threatened, against or relating to Manager, the properties or business of Manager or the transactions contemplated by this Agreement which does, or may reasonably be expected to, materially and adversely affect the ability of Manager to enter into this Agreement or to carry out its obligations hereunder, and to the best knowledge of Manager, there is no basis for any such claim, litigation, proceedings or governmental investigation, except as has been fully disclosed in writing to Owner; and

(c)      neither the consummation of the transactions contemplated by this Agreement on the part of Manager or to be performed, nor the fulfillment of the terms, conditions and provisions of this Agreement, conflicts with or will result in the breach of any of the terms, conditions or

provisions of, or constitute a default under, any agreement, indenture, instrument or undertaking to which Manager is a party or by which it is bound.

## ARTICLE 29
## REPRESENTATIONS OF OWNER

In order to induce Manager to enter into this Agreement, Owner does hereby make the following representations and warranties:

(a)    the execution of this Agreement is permitted by the Limited Liability Company Agreement of Owner and this Agreement has been duly authorized, executed and delivered and constitutes the legal, valid and binding obligation of Owner enforceable in accordance with the terms hereof;

(b)    there is no claim, litigation, proceeding or governmental investigation pending, or as far as is known to Owner, threatened, against or relating to Owner, the properties or business of Owner or the transactions contemplated by this Agreement which does, or may reasonably be expected to, materially and adversely affect the ability of Owner to enter into this Agreement or to carry out its obligations hereunder, and there is no basis for any such claim, litigation, proceedings or governmental investigation, except as has been fully disclosed in writing to Manager; and

(c)    neither the consummation of the transactions contemplated by this Agreement by this Agreement on the part of Owner to be performed nor the fulfillment of the terms, conditions and provisions of this Agreement, conflicts with or will result in the breach of any of the terms, conditions or provisions of, or constitute a default under, any agreement, indenture, instrument or undertaking to which Owner is a party or by which it is bound.

## ARTICLE 30

## INTENTIONALLY OMITTED

## ARTICLE 31

.

## ARTICLE 32
## TERMINATION OF THE LICENSE AGREEMENT

Owner reserves and shall have the absolute right in its sole and unfettered discretion, at any time and without the consent or approval of (but with notice to) Manager, to terminate the License Agreement, provided, however, that (i) Owner shall have no such right in order to establish its own independent operations, such as an operation without a franchise or license or in its own hotel name; (ii) in the event of such a termination of the License Agreement by Owner, Manager shall have the right to terminate this Agreement, as its sole remedy, if any new franchise or license for the Hotel is unacceptable to Manager; and (iii) if Owner's decision to terminate the License Agreement is made without the consent of Manager, then the provisions of Section 18.2 of this Agreement shall no longer apply.

4836-4873-7791.6
C:\Users\jmelicharek\Desktop\Hotel Management Agreement - TPG - Porsche Atlanta (003).docx

# ARTICLE 33
## RECOURSE

Any provision of this Agreement to the contrary notwithstanding, Manager hereby agrees that no personal, partnership or corporate liability of any kind or character (including, without limitation, the payment of any judgment) whatsoever now attaches or at any time hereafter under any condition shall attach to Owner or any of Owner's constituent entities and affiliates or any mortgagee for payment of any amount payable under this Agreement or for the performance of any obligation under this Agreement.  The exclusive remedies of Manager for the failure of Owner to perform any of its obligations under this Agreement shall be to proceed against the interest of Owner in and to the Hotel for Manager's actual, out-of-pocket damages (and not any consequential, punitive or exemplary damages), and Owner shall not be personally liable for any deficiency.

Notwithstanding any other provision of this Agreement to the contrary, the liability of Manager arising out of or in connection with this Agreement and the transactions and obligations contemplated hereby shall at all times be limited to the aggregate amount of management fees payable to Manager under this Agreement during the initial Term (the "**Manager's Liability Cap**"), and in any litigation, arbitration or any other dispute, neither Owner nor any other party shall seek or have recourse to any other asset of Manager's members, partners, directors, officers, employees, associates, agents, executives or affiliates.  Without limiting the foregoing, neither Manager nor any party associated with Manager shall have any liability in excess of the Manager's Liability Cap for any act by Manager (either prior to or during the Operating Term of or after the expiration or earlier termination of this Agreement); provided, however, that the Manager Liability Cap shall not apply to any liability of Manager or its Affiliates resulting from the fraud, gross negligence or willful misconduct of Manager or its Affiliates.  Notwithstanding anything contained in this Agreement to the contrary in no event shall Manager or Owner be liable under this Agreement for any consequential, speculative, punitive, treble, or other special damages.

*The rest of this page is intentionally left blank.*

IN WITNESS WHEREOF, Owner has caused this Agreement to be executed and its seal affixed by its partners duly authorized thereunto and Manager has caused this Agreement to be executed and its seal affixed by its officer duly authorized thereunto, the day and year first above written, in duplicate.

**OWNER**:

**ACRON 2 PORSCHE DRIVE ATLANTA, LLC**, a Delaware limited liability company

By: _____
Name:   Greg W. Wilson
Title:    Manager

**MANAGER**:
**TPG HOTELS & RESORTS, INC.**, a Rhode Island  corporation ("Manager"), as Manager.

By: _____
Name:
Title:

IN WITNESS WHEREOF, Owner has caused this Agreement to be executed and its seal affixed by its partners duly authorized thereunto and Manager has caused this Agreement to be executed and its seal affixed by its officer duly authorized thereunto, the day and year first above written, in duplicate.

**OWNER**:

**ACRON 2 PORSCHE DRIVE ATLANTA, LLC**, a Delaware limited liability company

By: _____
Name:
Title:

**MANAGER**:
**TPG HOTELS & RESORTS, INC.**, a Rhode Island corporation ("Manager"), as Manager.

By: _____
Name: Elizabeth A. Protaciciant
Title: Treasurer

4836-4873-7791.5

## SCHEDULE I

**Trade Name of Hotel:**     Kimpton Overland Hotel

**Physical Address of Hotel:**  2 Porsche Drive, Atlanta, GA  30354

**Number of Guest Rooms:**   214

**Licensor**:  [IHG]

**Initial Working Capital**: TBD

**Accounting Fees:**     $2,500 per month, as increased and provided in Section 4.12 of this Agreement

**Base Management Fee:**

A Base Management Fee (the "**Base Management Fee**") in an amount equal to two and one half percent (2.5%) of Total Operating Revenues.

**Incentive Management Fee**:

Manager will be entitled to an incentive fee for each Fiscal Year equal to the lesser of (a) fifteen percent (15%) of the amount by which Gross Operating Profit (which for the avoidance of any doubt is calculated prior to deduction for taxes, insurance and reserves) for such Fiscal Year exceeds the Hotel's budgeted Gross Operating Profit (which for the avoidance of any doubt is calculated prior to deduction for taxes, insurance and reserves) set forth in the approved Annual Plan for such Fiscal Year and (b) 1.0% of Gross Revenues for such Fiscal Year (the "**Incentive Management Fee**").

The Incentive Management Fee will be due and payable to Manager on an annual basis.  The payment of the Incentive Management Fee shall occur within forty-five (45) days of Owner's receipt of the annual audit of the Annual Operating Budget under Section 4.4, or if there is no such annual audit, within forty-five (45) days of Owner's receipt of the Annual Operating Budget, which Annual Operating Budget shall include Manager's calculation of the amount of the Incentive Management Fee then due and payable.  The obligation to pay any Incentive Management Fee for any period shall survive any termination or expiration of this Agreement.

## SCHEDULE II
## Gross Operating Expenses

1.1    <u>Gross Operating Expenses</u>.  "**Gross Operating Expenses**" means, except to the extent excluded below or in the Agreement, all costs and expenses of operating the Hotel during the Term pursuant to this Agreement and the Uniform System of Accounts, attributable to the Accounting Period, Fiscal Year or portion of a Fiscal Year under consideration including, without limitation or duplication, the following:

(a)    salaries and wages of Hotel Employees, including employee benefits, costs of payroll, and payroll and similar taxes (which includes Payroll Costs as defined in this Agreement), but only to the extent such expenses are attributable to such Hotel Employee's employment at the Hotel;

(b)    costs incurred with respect to sales and other revenues generated at the Hotel;

(c)    the costs of all utilities and services including, without limitation, heat, air conditioning, water, light and power, local and long-distance telephone service, and data communication and computer services, except as such costs may be appropriately capitalized in accordance with GAAP;

(d)    the costs of all food and beverages sold or consumed and of all Operating Equipment and Inventories and Consumable Supplies placed in use, including the sale, consumption and placement in use of Operating Equipment and Supplies initially supplied pursuant to this Agreement;

(e)    the costs of all other goods and services provided, arranged or obtained by Manager in connection with its operation of the Hotel, including, without limitation, public utilities charges and the cost of accounting systems, data processing, payroll processing and telecommunications equipment, office supplies, services performed by third parties and all other supplies, services and hotel equipment of the nature and type normally used by operators of hotels similar to the Hotel and as is common in the industry, except as such costs may be appropriately capitalized in accordance with GAAP;

(f)    all costs and fees of any arbitrators, auditors, lawyers and similar persons who perform services required or permitted and determined pursuant to this Agreement;

(g)    all costs and expenses of technical consultants and specialized operational experts or personnel for services rendered to the Hotel, except if such costs are incurred in connection with a capital transaction outside of the normal operations of the Hotel;

(h)    all expenses related to marketing of the Hotel;

(i)    the costs of maintaining books of account and other records and producing statements pursuant to <u>Article 7</u> of this Agreement;

**<u>Schedules – Page 2</u>**

(j)      the actual amount of any goods and services or other similar value added taxes imposed by any governmental authority having jurisdiction and paid as a result of the operations of the Hotel, less any credits with respect to such taxes otherwise granted with respect to the operations of the Hotel;

(k)      reasonable reserves for bad debts in accordance with GAAP;

(l)      any insurance premiums for insurance obtained by or on behalf of Manager or Owner with respect to the Hotel, except for insurance premiums for Manager's or Manager's Affiliates' corporate office professional liability/errors and omissions;

(m)      any deposits into any Reserve;

(n)      all Property taxes and any similar taxes, charges and assessments against the Hotel;

(o)      any fees payable under the License Agreement to Licensor;

(p)      the Base Management Fee and the Allocated Services;

(q)      the Accounting Fee;

(r)      the cost of non-capital repairs to and maintenance of the Hotel;

(s)      all expenses otherwise contemplated by this Agreement that are to be treated or contemplated to be treated as Gross Operating Expenses pursuant to the Uniform System of Accounts; and

(t)      all expenses reimbursable to Manager pursuant to the terms and conditions of this Agreement.

1.2    <u>Exclusions from Gross Operating Expenses</u>.  For purposes of calculating the GOP Threshold, Operating Expenses shall not include any of the following:

(a)      Incentive Management Fees paid under this Agreement;

(b)      any repayments of advances by Manager on account of Capital Expenditures pursuant to this Agreement;

(c)      any payments from the FF&E Reserve, whether principal or interest, relating to capital improvements to or encumbrances with respect to the Hotel, including, without limitation, any payments relating to expenditures for initial FF&E and replacements or substitutions therefor or additions thereto;

(d)      land or building rental or mortgage payments;

(e)      depreciation and amortization expenses, including costs of capital improvements which are made in accordance with this Agreement;

<u>**Schedules – Page 3**</u>

(f)       income, capital or franchise taxes of a party hereto;

(g)       any Capital Expenditures;

(h)       excise, sales, use and other taxes (including room taxes) or similar charges (i) collected directly from patrons or guests or as part of the sale price of any goods or services or displays, (ii) remitted to a governmental authority and (iii) excluded from Gross Revenues;

(i)       salaries, wages, asset management fees or amounts paid to individuals or entities by or upon the instruction of Owner to the extent such individuals or entities are not under the supervision or direction of Manager;

(j)       interest payable on any credit facility provided to fund working capital; and

(k)       expenses of Owner related to asset management.

## SCHEDULE III

## Total Operating Revenues

1.1    "**Total Operating Revenues**" means, subject to the exclusions provided for herein, all of the following revenue, income and proceeds resulting from the operation of the Hotel and properly attributable to the Accounting Period, Fiscal Year or portion of a Fiscal Year under consideration:

(a)    Subject to the provisions below and in the Agreement, all revenues from the rental of guest rooms and suites in the Hotel and all revenues earned from guests, patrons and other persons occupying space in or using the Hotel, including, without limitation, all revenues derived from goods sold, food and beverage sales, meetings and other events, parking services, spa, health club or other Hotel facilities' use or membership, telephone, cable or access television or internet use and all other services provided in connection with Hotel activities;

(b)    the net proceeds actually received by Owner of use and occupancy or business interruption insurance with respect to the operation of the Hotel after deduction from such proceeds of all necessary expenses incurred in the adjustment or collection thereof.

1.2    <u>Exclusions from Total Operating Revenues</u>.  For purposes of calculating the Incentive Fee payable pursuant to this Agreement, Total Operating Revenues shall not include any of the following:

(a)    excise, sales, use and other similar taxes (including room taxes) or similar charges which are required by Applicable Laws to be collected directly from patrons or guests or as part of the sale price of any goods or services or displays and which must be remitted to a governmental authority;

(b)    gratuities, service charges or other similar receipts collected for payment to and paid to Hotel Employees;

(c)    revenues, including gains or losses arising from the sale or other disposition of capital assets, including, without limitation, FF&E no longer required for the operation of the Hotel;

(d)    proceeds or awards arising from a taking or condemnation of capital property;

(e)    receipts or credits for settlement of claims for loss or theft of or damage to personal property or furnishings, or any recoveries relating to a breach of warranty or guaranty, excluding, however, those amounts that are compensation for items that would otherwise be included in Total Operating Revenues hereunder;

(f)    proceeds from any insurance policy other than the proceeds of use and occupancy or business interruption insurance;

4836-4873-7791.6
C:\Users\jmelicharek\Desktop\Hotel Management Agreement - TPG - Porsche Atlanta (003).docx

(g)     receipts of a capital nature, including any financing of the Hotel;

(h)     working capital provided by Owner.

# EXHIBIT B

## DESCRIPTION OF PREMISES

**Exhibit "A"**
**Legal Description**
PARCEL 1:
ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOT 96 OF THE 14TH
DISTRICT,
CITY OF HAPEVILLE, FULTON COUNTY, GEORGIA AND BEING MORE PARTICULARLY DESCRIBED
AS
FOLLOWS:
BEGINNING AT A NAIL SET ON THE SOUTHWESTERLY RIGHT-OF-WAY OF PORSCHE AVENUE
(FORMERLY KNOWN AS HENRY FORD II AVENUE AND HAVING A VARIED RIGHT-OF-WAY) AT
ITS
INTERSECTION WITH THE WESTERLY RIGHT-OF-WAY OF PORSCHE DRIVE (HAVING A VARIED
RIGHTOF-
WAY); THENCE RUNNING ALONG THE WESTERLY RIGHT-OF-WAY OF PORSCHE DRIVE SOUTH
63
DEGREES 35 MINUTES 46 SECONDS EAST A DISTANCE OF 21.49 FEET TO A NAIL SET; THENCE
CONTINUING ALONG SAID RIGHT-OF-WAY SOUTH 49 DEGREES 10 MINUTES 54 SECONDS EAST
A
DISTANCE OF 21.67 FEET TO A NAIL SET; THENCE LEAVING SAID RIGHT-OF-WAY AND
RUNNING
ALONG A CURVE TO THE RIGHT AN ARC DISTANCE OF 44.79 FEET (SAID ARC HAVING A
RADIUS OF
45.00 FEET AND BEING SUBTENDED BY A CHORD 42.97 FEET IN LENGTH LYING TO THE
SOUTHWEST
OF SAID ARC AND BEARING SOUTH 05 DEGREES 43 MINUTES 43 SECONDS EAST) TO A POINT;
THENCE RUNNING SOUTH 22 DEGREES 47 MINUTES 15 SECONDS WEST A DISTANCE OF
230.40 FEET
TO A POINT; THENCE RUNNING ALONG A CURVE TO THE LEFT AN ARC DISTANCE OF 126.77
FEET
(SAID ARC HAVING A RADIUS OF 432.62 FEET AND BEING SUBTENDED BY A CHORD 126.32
FEET IN
LENGTH LYING TO THE SOUTHEAST OF SAID ARC AND BEARING SOUTH 13 DEGREES 57
MINUTES 08
SECONDS WEST) TO A 1/2 INCH REBAR SET; THENCE RUNNING SOUTH 90 DEGREES 00
MINUTES 00
SECONDS WEST A DISTANCE OF 212.04 FEET TO A NAIL SET; THENCE RUNNING NORTH 70
DEGREES
00 MINUTES 00 SECONDS WEST A DISTANCE OF 208.76 FEET TO A 1/2 INCH REBAR SET;
THENCE
RUNNING NORTH 00 DEGREES 00 MINUTES 00 SECONDS WEST A DISTANCE OF 181.08 FEET
TO A 1/2
INCH REBAR SET; THENCE RUNNING NORTH 44 DEGREES 40 MINUTES 27 SECONDS EAST A
DISTANCE
OF 257.60 FEET TO A 1/2 INCH REBAR SET; THENCE RUNNING SOUTH 45 DEGREES 00
MINUTES 00
SECONDS EAST A DISTANCE OF 122.00 FEET TO A 1/2 INCH REBAR SET; THENCE RUNNING
NORTH 45

**<u>Exhibit B - Page 1</u>**

DEGREES 00 MINUTES 00 SECONDS EAST A DISTANCE OF 144.04 FEET TO A NAIL SET ON THE
SOUTHWESTERLY RIGHT-OF-WAY OF PORSCHE AVENUE; THENCE RUNNING ALONG SAID
RIGHT-OFWAY
ALONG A CURVE TO THE LEFT AN ARC DISTANCE OF 128.77 FEET (SAID ARC HAVING A
RADIUS
OF 2437.76 FEET AND BEING SUBTENDED BY A CHORD 128.75 FEET IN LENGTH LYING TO THE
SOUTHWEST OF SAID ARC AND BEARING SOUTH 67 DEGREES 15 MINUTES 42 SECONDS EAST)
TO A
NAIL SET AND THE POINT OF BEGINNING;
SAID TRACT CONTAINS 3.98 ACRES (173,460 SQUARE FEET), MORE OR LESS. BEING THE SAME
PROPERTY DEPICTED AS THE "3.98 ACRE TRACT" ON THAT CERTAIN ALTA/ACSM SURVEY
PREPARED
BY LOWE ENGINEERS, BEARING THE SEAL AND SIGNATURE OF WILLIAM J. DANIEL III, G.R.L.S.
NO.
2257, SAID PLAT DATED DECEMBER 4, 2015, BEING JOB NO. 15-0120, AS REVISED.

PARCEL 2:
EASEMENTS AND OTHER INTERESTS IN REAL PROPERTY CONTAINED IN THAT CERTAIN
DECLARATION
OF EASEMENT, COVENANTS, CONDITIONS AND RESTRICTIONS BETWEEN PORSCHE CARS
NORTH
AMERICA, INC., A DELAWARE CORPORATION AND ACRON 2 PORSCHE DRIVE, ATLANTA LLC,
LLC, A
DELAWARE LIMITED LIABILITY COMPANY, DATED DECEMBER 30, 2015, FILED FOR RECORD
DECEMBER
31, 2015, RECORDED IN DEED BOOK 55721, PAGE 498 , RECORDS OF FULTON COUNTY,
GEORGIA.


PARCEL 3:
BENEFICIAL EASEMENTS CREATED PURSUANT TO THAT CERTAIN EASEMENT AGREEMENT
DATED
SEPTEMBER 30, 2011, FILED FOR RECORD OCTOBER 5, 2011, RECORDED IN DEED BOOK
50440, PAGE
499, aforesaid records; AS AMENDED BY THAT CERTAIN AMENDED AND RESTATED EASEMENT
AGREEMENT, DATED MAY 11, 2012, FILED FOR THE RECORD JUNE 25, 2012, RECORDED IN
DEED
BOOK 51337, PAGE 235, aforesaid records; AS AFFECTED BY THAT CERTAIN ASSIGNMENT AND
ASSUMPTION OF AMENDED AND RESTATED EASEMENT AGREEMENT DATED FEBRUARY 27,
2017, FILED
FOR RECORD FEBRUARY 28, 2017, AND RECORDED IN DEED BOOK 57228, PAGE 93.

PARCEL 4:
BENEFICIAL EASEMENTS CREATED PURSUANT TO THAT EASEMENT AND OPERATION
AGREEMENT,
DATED JUNE 21, 2012, FILED FOR RECORD JUNE 25, 2012, AND RECORDED IN DEED BOOK
51337,
PAGE 322, AFORESAID RECORDS; AND AS AFFECTED BY THAT CERTAIN ASSIGNMENT AND
ASSUMPTION OF EASEMENT AND OPERATION AGREEMENT DATED FEBRUARY 23, 2017, FILED
FOR
RECORD FEBRUARY 28, 2017, AND RECORDED IN DEED BOOK 57228, PAGE 111, AFORESAID
RECORDS.


**Exhibit B - Page 2**

**EXHIBIT C**

**EXAMPLE OF MONTHLY TRANSACTIONS REPORT**

(SEE ATTACHED)

<u>**Exhibit C - Page 1**</u>

4836-4873-7791.6
C:\Users\jmelicharek\Desktop\Hotel Management Agreement - TPG - Porsche Atlanta (003).docx

**EXHIBIT D**

**COMPETITIVE SET**

- Hilton (507 rooms)
- Sonesta (378 rooms)
- Marriott Gateway (403 rooms)
- Renaissance Gateway (204 rooms)

**<u>Exhibit F</u>**

**IHG License (including First Amendment)**

[Attached.]



**LICENSE AGREEMENT**

**BETWEEN**

**IHG FRANCHISING, LLC**

**AND**

**ACRON 2 PORSCHE DRIVE, ATLANTA, LLC**

**LICENSED BRAND: KIMPTON HOTELS & RESTAURANTS**

**LOCATION: 2 PORSCHE DRIVE ATLANTA, GA 30354/Loc. #20713**

**DATE:** _____ February 1, 2022 _____

# TABLE OF CONTENTS

1. GRANT OF LICENSE .................................................................................................... 1

   1.1. Limited Grant .......................................................................................................... 1
   1.2. IHG's Reserved Rights ............................................................................................ 1

2. TERM .............................................................................................................................. 2

   2.1. Term ........................................................................................................................ 2
   2.2. Not Renewable ........................................................................................................ 2

3. FEES, PAYMENTS AND TAXES ................................................................................. 2

   3.1. Initial License Fee ................................................................................................... 2
   3.2. Rooms Addition Fee ................................................................................................ 2
   3.3. Royalty Fee .............................................................................................................. 2
   3.4. System Fund Contributions ..................................................................................... 2
   3.5. Technology Services Fee ......................................................................................... 2
   3.6. Travel Agent Commissions, Reimbursement ......................................................... 2
   3.7. Other Fees and Payments ........................................................................................ 2
   3.8. Timing for Payments and IHG's Designees for Performance of Services ............. 3
   3.9. Interest on Late Payments ....................................................................................... 3
   3.10. Taxes ....................................................................................................................... 4

4. HOTEL CONSTRUCTION, RENOVATION AND MAINTENANCE ......................... 4

   4.1. Number of Guestrooms; Expansion ........................................................................ 4
   4.2. Initial Construction or Renovation of Hotel ........................................................... 4
   4.3. Periodic Renovations .............................................................................................. 4
   4.4. Capital Reserve ....................................................................................................... 5

5. FURNITURE, FIXTURES, EQUIPMENT, INVENTORIES AND SUPPLIERS ......... 5

   5.1. Uniformity of the Brand System ............................................................................ 5
   5.2. Suppliers .................................................................................................................. 6
   5.3. System-wide Supply Contracts ............................................................................... 6

6. HOTEL OPERATIONS ................................................................................................... 6

   6.1. Operator of the Hotel .............................................................................................. 6
   6.2. Employees ............................................................................................................... 7
   6.3. Brand System Promotion and Referral to Other IHG Portfolio Brand Hotels ....... 8
   6.4. Operating the Hotel ................................................................................................. 9

7. TRAINING AND COUNSELING ................................................................................ 10

   7.1. Training ................................................................................................................. 10
   7.2. Counseling by IHG ............................................................................................... 10

8. SYSTEM AND BRAND STANDARDS; IHG OWNERS ASSOCIATION ............... 10

   8.1. Compliance with Brand System and Brand Standards .......................................... 10
   8.2. Modifications of the Brand System and Brand Standards ..................................... 10
   8.3. Access to Brand Standards .................................................................................... 11
   8.4. IHG Owners Association ....................................................................................... 11

9. ADVERTISING AND MARKETING; RATES AND RESERVATIONS ................... 11

   9.1. Licensee's Local Advertising and Marketing Programs ....................................... 11
   9.2. System Fund .......................................................................................................... 11
   9.3. Additional Marketing Programs ............................................................................ 12
   9.4. Digital Marketing .................................................................................................. 12
   9.5. Pricing, Rates and Reservations ........................................................................... 13

10. TECHNOLOGY ........................................................................................................... 13

   10.1. Access to Technology Systems ............................................................................ 13
   10.2. IHG Technology Systems User Agreement ......................................................... 13
   10.3. Approved Items .................................................................................................... 13

**11.   INTELLECTUAL PROPERTY** ...................................................................................................**14**

11.1.   Ownership of Brand System and Intellectual Property ..................................................14
11.2.   Third-Party Challenges..................................................................................................14
11.3.   Protection of Intellectual Property ................................................................................15
11.4.   Use of Intellectual Property ..........................................................................................15
11.5.   Restrictions on Use of Marks ........................................................................................15
11.6.   Modification or Discontinuation of the Intellectual Property.......................................15
11.7.   Post-Termination or Expiration .....................................................................................16

**12.   CONFIDENTIAL INFORMATION; DATA & GUEST DATA AND DATA PROTECTION LAWS**....................**16**

12.1.   Confidential Information ...............................................................................................16
12.2.   Data. ..............................................................................................................................17

**13.   RECORDS AND AUDITS** ....................................................................................................**18**

13.1.   Maintenance of Books, Records ...................................................................................18
13.2.   Accounting Statements. ................................................................................................18
13.3.   Audit ..............................................................................................................................18

**14.   INDEMNIFICATION** ..........................................................................................................**19**

**15.   INSURANCE** ......................................................................................................................**20**

15.1.   Types of Insurance ........................................................................................................20
15.2.   Insurance Policies Requirements ..................................................................................20
15.3.   Evidence of Insurance ...................................................................................................20

**16.   TRANSFER** ........................................................................................................................**20**

16.1.   Transfer by IHG ............................................................................................................20
16.2.   Ownership of Licensee ..................................................................................................21
16.3.   Transfer by Licensee .....................................................................................................21
16.4.   Non-Control Transfers ..................................................................................................21
16.5.   Control Transfers ..........................................................................................................21
16.6.   Transfers for Estate Planning; Upon Death or Mental Incapacity ...............................23
16.7.   Publicly-Traded Securities and Securities Offerings ...................................................24
16.8.   Transfer of Real Estate .................................................................................................24
16.9.   Security Interests ..........................................................................................................25
16.10.   Bankruptcy .................................................................................................................25
16.11.   Right of First Refusal.  ...............................................................................................25

**17.   CONDEMNATION AND CASUALTY** ...................................................................................**26**

17.1.   Condemnation ...............................................................................................................26
17.2.   Casualty .........................................................................................................................26

**18.   TERMINATION** .................................................................................................................**27**

18.1.   Termination by IHG Upon Notice with Opportunity to Cure .......................................27
18.2.   Interim Remedies...........................................................................................................28
18.3.   Immediate Termination by IHG.....................................................................................28
18.5.   Continuance of Business Relations ...............................................................................30
18.6.   IHG's Right to Send Notifications of Termination:.......................................................30
18.7.   De-Identification of Hotel Upon Termination ...............................................................30
18.8.   IHG's Rights on Expiration or Termination ..................................................................31

**19.   LIQUIDATED DAMAGES** ...................................................................................................**31**

19.1   Payment of Liquidated Damages ...................................................................................31
19.2.   Payment of the Lump Sum.............................................................................................31
19.3.   Reasonable Estimation of Probable Loss ......................................................................32
19.4.   Ability to Seek Actual Damages and Attorneys' Fees ..................................................32
19.5.   No Licensee Right of Termination ................................................................................32

**20.   RELATIONSHIP OF PARTIES** ............................................................................................**32**

20.1.   No Agency Relationship.................................................................................................32

| 20.2. | Licensee's Notices to Public Concerning Independent Status | 32 |
| 20.3. | Business Judgment | 33 |
| **21.** | **COMPLIANCE WITH LAWS** | **33** |
| 21.1. | Applicable Law | 33 |
| 21.2. | Anti-Terrorism, Anti-Bribery and Trade Sanctions Compliance | 33 |
| **22.** | **DISPUTE RESOLUTION** | **34** |
| 22.1. | Choice of Law | 34 |
| 22.2. | The ADR Process | 34 |
| 22.3. | Venue | 35 |
| 22.4. | Individual Action | 35 |
| 22.5. | Waiver of Jury Trial | 35 |
| 22.6. | Damages Waiver | 35 |
| 22.7. | Injunctive Relief | 36 |
| 22.8. | Licensee's Procurement of Consents | 36 |
| **23.** | **MISCELLANEOUS** | **34** |
| 23.1. | Severability and Interpretation | 36 |
| 23.2. | No Third-Party Beneficiary; Exclusive Benefit | 36 |
| 23.3. | Entire Agreement | 36 |
| 23.4. | Guarantors. | 37 |
| 23.5. | Amendments | 37 |
| 23.6. | IHG Withholding Consent | 37 |
| 23.7. | Notices | 37 |
| 23.8. | Waiver of Obligations | 37 |
| 23.9. | Authority | 37 |
| 23.10. | General Release and Covenant Not to Sue | 38 |
| 23.11. | Reimbursement of Expenses | 38 |
| 23.12. | Descriptive Headings | 38 |
| 23.13. | Definitions | 38 |
| 23.14. | Additional Licensee Acknowledgments and Representations. | 38 |
| 23.15. | Survival | 40 |
| 23.16. | Counterparts | 40 |

# DEFINITIONS

# ATTACHMENT A – DEFINITIONS IN THE LICENSE

# ATTACHMENT B – KEY TERMS AND STIPULATIONS

# ATTACHMENT C – OWNERSHIP INTEREST IN LICENSEE

# ATTACHMENT D – INTENTIONALLY OMITTED

# ATTACHMENT E – GUARANTY

# ATTACHMENT F – ACCESSIBILITY CERTIFICATION

# ATTACHMENT G – FIRE & LIFE SAFETY CERTIFICATION

# ATTACHMENT H – OPENING LETTER

# ATTACHMENT I – INSURANCE REQUIREMENTS

## LICENSE AGREEMENT

This license agreement (this "**License**") between **IHG FRANCHISING, LLC**, a Delaware limited liability company ("**IHG**"), and **ACRON 2 PORSCHE DRIVE, ATLANTA, LLC**, a Delaware limited liability company ("**Licensee**"), is effective as of the Effective Date.

### RECITALS

A.      IHG owns the Brand System. Licensee is the owner of the Hotel and has requested a license to use the Brand System to operate the Hotel as a Brand System Hotel.

B.      IHG shall grant to Licensee a non-exclusive license to operate the Hotel as a Brand System Hotel, subject to the terms of this License.

C.      Guarantor will provide the Guaranty.

D.      In granting this non-exclusive license, IHG has relied upon the business skill, financial capacity, and character of Licensee and the Guaranty to be provided by the Guarantor(s).

NOW, THEREFORE, in consideration of the promises and covenants in this License, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, IHG and Licensee agree as follows:

## 1.      GRANT OF LICENSE.

**1.1.      Limited Grant**.  IHG grants to Licensee a limited, non-exclusive license to use the Brand System, including the Marks, to operate the Hotel as a Brand System Hotel solely at the Location during the Term.  Licensee acknowledges that IHG may in the future engage in other business activities (including lodging and related activities) and that Licensee is acquiring no rights except for the right to use the Brand System at the Hotel in accordance with this License.

**1.2.      IHG's Reserved Rights**.

**1.2.1.      Except as expressly set forth in Section 16.B of Attachment B to this License,** IHG reserves the right to use and license the Brand System (and any part or Component thereof), and to engage in any business activity at any other location, including, without limitation, the right to use and license the Brand System (and any part or Component thereof) in connection with the development, promotion, construction, lease, licensing, franchising, ownership, operation and/or management of any Licensed Brand guest lodging or other facility.

**1.2.2.      Licensee agrees that, except as expressly set forth in Section 16.B of Attachment B to this License,** IHG: (i) retains the right, anywhere other than the Location, to develop, promote, construct, own, lease, acquire and/or operate, or authorize or otherwise license or franchise to other Persons the right to develop, promote, construct, own, lease, acquire and/or operate any IHG Portfolio Brand Hotels (which may use and/or share with the Hotel any or all Components of the Brand System other than, if the subject IHG Portfolio Brand Hotel is not a Brand System Hotel, the Licensed Brand Marks) and other business operations, regardless of their proximity to the Hotel; and (ii) may exercise such right without notice to, or compensation of any kind to, Licensee.  Licensee covenants that it will not do anything that will interfere with the exercise of such right by IHG.  IHG further understands and agrees that this License does not confer upon Licensee any right to participate in or benefit from such other concepts or business activities, regardless of whether they are conducted under the Marks or not.

**1.2.3.**      Licensee agrees that IHG may allow other non-Brand System IHG Portfolio Brand

1

Hotels to use and/or share with the Hotel certain Components of the Brand System, including the Technology Systems but excluding the Marks (other than Marks commonly shared by IHG Portfolio Brand Hotels, such as 'IHG Rewards and 'IHG Concerto'), regardless of the proximity of that other IHG Portfolio Brand Hotel to the Hotel.  IHG shall also have the right to permit Loyalty Program members of IHG Portfolio Brand Hotels (or members of similar guest recognition programs) to redeem awards for stays at any IHG Portfolio Brand Hotel, including at the Hotel.  IHG may also require Licensee to use and/or share Components (whether or not part of the Brand System) being used by other IHG Portfolio Brand Hotels.

       **1.2.4.   Notice of Other Licensee Hotel Activity**.  Licensee will promptly notify IHG if it or any of its Affiliates, Owners or Guarantors acquires any Ownership Interest in any full service or limited service hotel located or to be located within five miles of the Hotel.

## 2.   <u>TERM</u>.

    **2.1.**   **Term**.  The term of this License is stated in Item 6 of <u>Attachment B</u>.

    **2.2.**   **Not Renewable**. This License expires on the last day of the Term, and the rights granted hereunder are not renewable, and Licensee agrees it has no rights to extend or renew the Term.

## 3.   <u>FEES, PAYMENTS AND TAXES</u>.

    **3.1.**   **Initial License Fee.**  Licensee has paid IHG the non-refundable Initial License Fee as set forth in Item 7 of **<u>Attachment B.</u>**

    **3.2.**   **Rooms Addition Fee**.  If IHG approves an increase in the number of Guestrooms in the Hotel pursuant to <u>Paragraph 4.1</u>, Licensee will pay a Rooms Addition Fee equal to the charge per Guestroom used to calculate the Initial License Fee for Brand System Hotels at the time of such IHG approval, multiplied by the number of additional Guestrooms so approved.

    **3.3.**   **Royalty Fee**.  Beginning on the Opening Date, Licensee must pay IHG a monthly Royalty Fee in the amount set forth in Item 8 of **<u>Attachment B</u>**.  Licensee agrees and acknowledges that additional royalties may be charged on revenues from any activity if it is added at the Hotel by mutual agreement and it is not now offered at Brand System Hotels generally or it is designed or developed by or for IHG or its Affiliates.  The Royalty Fee is solely in consideration of our granting you the franchise conferred by this License and is not in exchange for any particular goods, services or assistance we may furnish you.

    **3.4.**   **System Fund Contributions.**   Licensee must pay IHG monthly System Fund Contributions comprised of a Marketing and Reservation Contribution and the Loyalty Marketing Contribution in the amounts set forth in Item 9 of **<u>Attachment B.</u>** The System Fund Contributions shall be used by IHG in accordance with <u>Paragraph 9.2.</u>

    **3.5.**   **Technology Services Fee**.  Licensee must pay IHG a monthly Technology Services Fee as set forth in Item 10 of **<u>Attachment B</u>**.  The Technology Services Fee does not include the costs for installation, maintenance or repair of any part of the Technology Systems at the Hotel.

    **3.6.**   **Travel Agent Commissions, Reimbursement and Additional Marketing Programs**.  Licensee must pay IHG all fees due for travel agent commission programs, including electronic commission services, and any other transactional based fees due. Licensee must also pay for any commercial services programs attributable to the Hotel and as required by IHG, and all fees due in connection with mandatory marketing, technology, guest satisfaction, quality assurance, training, new hotel opening and other systems and programs established by IHG relating to the Brand System.

    **3.7.**   **Other Fees and Payments.**  Licensee shall pay to IHG or its Affiliates all amounts IHG

or its Affiliates advance, pay or become obligated to pay on Licensee's behalf for any reason and any amount to reimburse IHG or its Affiliates for costs and commissions paid or due to a collection agency or in connection with IHG's collection efforts; and all amounts Licensee owes IHG or its Affiliates for programs, products or services that Licensee purchases from IHG or its Affiliates.

**3.8.    Timing for Payments and IHG's Designees for Performance of Services**. *Timing of Payments*.  All monthly fees are due and will be paid to IHG in the manner and at the place specified by IHG by the fifteenth (15th) calendar day of the month for fees accrued during the immediately preceding month, except for the Technology Services Fee which is payable monthly in advance.  IHG may, at its election, require Licensee to pay all outstanding fees by electronic funds transfer, direct account debit or other similar technology now or hereafter developed or designed to accomplish the same purposes as may be designated by IHG. If IHG requires you to make payments by direct account debit, electronic funds transfer or other similar technology IHG designates, Licensee agrees to deposit and maintain at all times sufficient funds to cover all fees and payments Licensee owes to IHG and its Affiliates in a segregated bank account (the "Bank Account") that Licensee forms and maintains for the Hotel.  The Bank Account must have the capacity to make payments through the means IHG **reasonably** designates, and Licensee must sign all documents required by its bank, IHG's bank and IHG or for approval and implementation of the debit or transfer process. If and when IHG implements this requirement, Licensee may not change the Bank Account without IHG's advance written approval. Licensee agrees to pay all costs of direct account debit, electronic funds transfer or other similar technology IHG designates.

**3.8.1.** *Monthly Statement of Payments*. All payments made under this <u>Paragraph 3</u>, except for the Rooms Addition Fee and any other fee not based upon Gross Rooms Revenue, shall be accompanied by the monthly statement referred to in <u>Paragraph 13.2</u>.  IHG may apply any amounts received under this License to any amounts due under this License.

**3.8.2.** *Performance of IHG's Obligations by Designees*. ANY OR ALL OF IHG'S OBLIGATIONS UNDER THIS LICENSE MAY BE PERFORMED DIRECTLY BY IHG OR, ON IHG'S BEHALF, BY ITS AFFILIATES AND/OR ITS THIRD PARTY DESIGNEES. ANY REFERENCE IN THIS LICENSE TO IHG CONCERNING PAYMENTS OR PERFORMANCE OF SERVICES INCLUDES SUCH IHG AFFILIATES AND OTHER DESIGNEES. IHG HAS THE RIGHT, AT ITS ELECTION, TO REQUIRE LICENSEE TO TENDER ALL OR ANY PART OF THE PAYMENTS DUE TO IHG UNDER THIS LICENSE TO IHG, ITS AFFILIATES AND/OR ITS THIRD PARTY DESIGNEES (AS APPLICABLE).  ANY SUCH IHG DESIGNATION FOR THE PERFORMANCE OR DELEGATION OF IHG DUTIES, OBLIGATIONS AND SERVICES SHALL NOT RELIEVE IHG OR LICENSEE FROM ANY OF THEIR OBLIGATIONS UNDER THIS LICENSE. LICENSEE UNDERSTANDS AND AGREES THAT, DESPITE ANY SUCH IHG DELEGATION, IHG ALONE SHALL AT ALL TIMES REMAIN THE SOLE PARTY RESPONSIBLE AND LIABLE FOR THE FULFILLMENT OF IHG'S DUTIES, SERVICES AND OBLIGATIONS OWED TO LICENSEE UNDER THIS LICENSE AND LICENSEE COVENANTS NEVER TO CONTEND OR COMPLAIN OTHERWISE.

**3.9.    Interest on Late Payments**.  If any payment by Licensee under this License is not received by its due date, such payment will be overdue and constitute a breach of this License, and IHG may require Licensee to pay interest that will accrue at a rate of one and one-half percent (1.5%) per month (or, if less, the maximum interest permitted by Applicable Law) from the date such overdue amount was due until paid. IHG's right to receive interest is in addition to any other remedies IHG may have. This provision does not constitute consent to late payments or an agreement to extend credit.  If Licensee is delinquent in any required payment, IHG or its Affiliates may apply any payment from Licensee to any obligation due in whatever order and for whatever purposes as IHG determines, whether or not there is any contrary designation by Licensee.  Licensee may not withhold, set-off or recoup payment of any amount due on the grounds of the alleged non-performance or breach of any of IHG's or IHG's Affiliates' obligations under

3

this License or any other agreement.

**3.10.  Taxes**.

**3.10.1.** *Payment of Taxes*.  Licensee must promptly pay when due all Taxes levied or assessed by any tax authority relating to the Hotel, Licensee, this License, any other IHG Agreement or in connection with operating the Hotel.

**3.10.2.** *Taxes Imposed on Payments to IHG, its Affiliates and its Third Party Designees*. In addition to all other payments under this License, Licensee agrees to pay IHG, its Affiliates and/or its third party designees (as applicable) immediately upon demand: (a) all sales taxes, trademark license taxes, gross receipts taxes and any other taxes imposed on or required to be collected or paid by IHG, its Affiliates and/or its third party designees (as applicable) (excluding any corporate income taxes imposed on IHG, its Affiliates and/or its third party designees) because IHG, its Affiliates and/or its third party designees (as applicable) have furnished programs or services to Licensee, collected any fee from Licensee, licensed the Marks to Licensee and/or entered into this License with Licensee.  If Applicable Law imposes an obligation on Licensee to deduct or withhold Taxes directly from any amount paid to IHG, then Licensee will deduct or withhold the required amount and will timely pay the full amount deducted or withheld to the relevant governmental authority in accordance with Applicable Law. The amount paid to IHG will be increased so that after the deduction or withholding has been made in accordance with Applicable Law, the net amount actually received by IHG will equal the full amount originally invoiced or otherwise payable.

If Applicable Law does not impose an obligation on Licensee to deduct or withhold Taxes directly from any amount paid to IHG, but requires IHG to pay such Taxes, then Licensee will pay IHG, within fifteen days after request, the full amount of the Taxes paid or payable by IHG with respect to such payment so that the net amount actually retained by IHG after payment of Taxes (other than taxes assessed on IHG's net income) will equal the full amount originally invoiced or otherwise payable.

The amounts payable to IHG will not be reduced by any sales, goods and services, value added or similar taxes, all of which will be paid by Licensee.  Therefore, in addition to making any payment to IHG required under this License, Licensee will: (i) pay IHG the amount of these taxes due with respect to the payment; or (ii) if required or permitted by Applicable Law, pay those taxes directly to the relevant taxing authority.

If there is a dispute by Licensee as to any liability for Taxes, Licensee may contest the liability in accordance with Applicable Law, but Licensee will not permit a sale, seizure or attachment to occur against the Hotel. If such dispute involves payments of Taxes that will be withheld, deducted and paid by Licensee related to payments to IHG as provided in this Paragraph 3.10, Licensee will notify IHG and cooperate with IHG in preparing a response. Upon IHG's request, Licensee will pay such Taxes and seek reimbursement from the governmental authority. Licensee will be responsible for any interest and penalties assessed.

## 4.  HOTEL CONSTRUCTION, RENOVATION AND MAINTENANCE.

**4.1.  Number of Guestrooms; Expansion**. The Hotel will have the number of Guestrooms and suites, if any, stated in Item 11 of Attachment B, or such other number as may be approved by IHG. Licensee may expand the Hotel or build additional Guestrooms in compliance with this License only with IHG's prior written approval. If additional Guestrooms are approved, Licensee will pay the Rooms Addition Fee under Paragraph 3.2.

**4.2.  Intentionally Omitted**.

**4.3.  Periodic Renovations**.  Throughout the Term, regardless of whether IHG has required

Licensee to establish a Capital Reserve, Licensee must complete significant renovations of the Guestrooms and Public Facilities of the Hotel in order to maintain the Hotel as a first class facility, including: (a) replacing Soft Goods at least every five (5) to six (6) years after such Soft Goods were installed and (b) replacing Case Goods at least every ten (10) to twelve (12) years after such Case Goods were installed: and, if necessary replacing such Soft Goods and Case Goods more frequently in order (i) to maintain compliance with the Brand Standards and IHG's quality and guest satisfaction programs; (ii) to remove risk of injury to persons or property; or (iii) to ensure compliance with all applicable laws. Licensee must fund all ordinary and extraordinary maintenance and repairs, capital improvements and renovations of the Hotel. Licensee shall inform IHG of the dates of installation of Soft Goods and Case Goods, which dates IHG shall be entitled to verify. Licensee must submit its renovation plans for the Hotel to IHG for IHG's review and approval prior to starting any renovations and Licensee shall not start any renovations until IHG has approved the scope of the plans and the plans' compliance with the Brand Standards. IHG shall have the right to require Licensee to make renovations to the Hotel to conform the Hotel's FF&E to then-current Brand Standards and the Licensed Brand's design criteria.

**4.4.    Capital Reserve.**  At any time during the Term, upon not less than ninety (90) days' prior notice, IHG may require Licensee to establish a capital reserve (the "**Capital Reserve**") in an amount not to exceed **four percent (4%)** of annual Gross Revenue, to be used for capital expenditures and upgrading of the Hotel (including, renovation of Guestrooms, Guestroom corridors and other public areas and replacement of furniture, fixtures and equipment). In the event IHG requires Licensee to maintain a Capital Reserve, Licensee must establish a Capital Reserve account funded monthly in a bank selected by Licensee. Licensee shall make expenditures from such account in accordance with IHG's requirements. Any amount remaining in the Capital Reserve account at the end of any year will remain in the Capital Reserve and will not diminish the amount required to be deposited into the Capital Reserve in the next or any succeeding year. Licensee acknowledges that the Capital Reserve may not be sufficient to maintain the Hotel as a first class facility in accordance with the Brand Standards and Licensee shall promptly provide any necessary additional funds to meet IHG's product quality and consumer quality requirements, as well as Licensee's renovation obligations specified in Paragraph 4.3 above.

**4.5    Approval of Certain Consultants**.  In order to complete the Work and as needed for any periodic renovations throughout the Term, Licensee will retain a qualified architect and interior designers and, based on the nature of the project, IHG may require that Licensee retain other specialty consultants. Licensee must obtain IHG's prior written consent before retaining or engaging any architect, interior designer for the Hotel, interior designer for any food and beverage outlet at the Hotel, and the project manager or general contractor, which consent shall not be unreasonably withheld. Such consultants shall be qualified to provide the services required for the Hotel project and maintain appropriate insurance coverages. IHG is not liable for the unsatisfactory performance of any Person retained by Licensee.

**4.6    Design and Concept Development.** Licensee and IHG must mutually agree upon a brand agency to support the process for development the Hotel's positioning and concept, which serves as the foundation for the identity and operation of the Hotel in the market. Licensee will pay IHG a Brand Design and Concept Fee as outlined on Attachment B. Licensee and IHG must mutually agree upon a brand agency to support the Restaurant + Bar concept development process. In the event Licensee retains IHG's design and brand team to develop the Restaurant + Bar concept, Licensee will pay the Restaurant + Bar Concept Development Fee as outlined on Attachment B.

**5.    FURNITURE, FIXTURES, EQUIPMENT, INVENTORIES AND SUPPLIERS**.

**5.1.    Uniformity of the Brand System**.  Licensee will use only such FF&E, Inventories and Fixed Asset Supplies that comply with the Brand Standards. The requirements of this paragraph are intended to maintain the identity, integrity and reputation of the Brand System. Before purchasing FF&E to be used in constructing or renovating the Hotel, Licensee will prepare furnished models of Guestrooms,

5

color boards and drawings for IHG's confirmation that such proposed FF&E will meet the Brand Standards.

**5.2.    Suppliers**.  IHG may designate suppliers, including IHG and/or any of its Affiliates (which may be the only designated supplier for certain items), for certain items related to FF&E, Inventories and Fixed Asset Supplies.  IHG is not obligated to designate such suppliers, however, and Licensee is under no obligation to use such suppliers, unless expressly required to do so by this License, the Brand Standards or otherwise. IHG's designation of a supplier is not a warranty of the financial condition or performance of such supplier, and while Licensee's use of a designated supplier may facilitate compliance with the Brand Standards, it is not a substitute for such compliance.  IHG may from time to time provide Licensee with specifications governing products, services and/or equipment required to be used in the Hotel for which IHG does not designate a required source of supply. IHG will set forth such specifications in the Brand Standards or in other written or electronic notices IHG transmits to Licensee.  All of the foregoing designated sources and specifications are subject to addition, modification, revocation and/or deletion by IHG from time to time upon notice given to Licensee. If IHG revokes or deletes any product, supply, equipment, component or approved supplier, then you must cease using any such disapproved item or supplier (or any items purchased from a revoked source of supply) which are used at Licensee's Hotel within ten days following Licensee's receipt of written or electronic notice from IHG, unless the item or sources of supply poses a threat to the health or safety of the public, in which case Licensee must cease using such item or source of supply immediately upon receipt of oral, written or electronic notice from IHG.

**5.3.    System-wide Supply Contracts**.  IHG may, in the exercise of its Business Judgment, enter into supply contracts either for all Brand System Hotels or a subset of Brand System Hotels situated within one or more geographic regions (each, a "System-wide Supply Contract").  IHG may enter in such System-wide Supply Contracts with one or more vendors for programs, products, supplies, equipment, materials and services that all Brand System Hotels in the United States, or all Brand System Hotels in a designated geographic area, will be required to purchase, use and/or sell.  If IHG does so, then immediately upon notification, Licensee and all other Brand System Hotels (or, as applicable, those in the designated geographic area) must purchase the specified program, product, supplies, equipment, material or service only from the designated supplier.  However, if at the time of IHG's notification (or at the Effective Date of this License if the System-wide Supply Contract is already in effect), Licensee is already a party to a non-terminable supply contract with another vendor or supplier for the item in question, then Licensee's obligation to purchase from IHG's designated supplier under the System-wide Supply Contract will not begin until the scheduled expiration (or earlier termination) of Licensee's pre-existing supply contract.

IHG makes no representation that IHG will enter into any System-wide Supply Contracts or other exclusive supply arrangements or, if IHG does so, that Licensee would not otherwise be able to purchase the same programs, products, supplies, equipment and/or services at a lower price from another supplier. IHG may add to, modify, substitute or discontinue System-wide Supply Contracts or exclusive supply arrangements in the exercise of its Business Judgment.

## 6.    HOTEL OPERATIONS.

### 6.1.    Operator of the Hotel.

**6.1.1.    *IHG Consent Required for Management Company*.**  Except as expressly permitted in this Paragraph 6.1 or unless otherwise consented to in writing by IHG, Licensee must operate the Hotel and not enter into any lease, management agreement, or other similar arrangement for the operation of the Hotel.  Licensee will at all times be responsible for complying with the obligations of this License.  Any consent by IHG of a lease, management agreement, or other similar arrangement for the operation of the Hotel shall in no way relieve, reduce, mitigate or waive any of Licensee's obligations under this License. IHG has the right to review any proposed management agreement between Licensee and its proposed

6

management company, which agreement must be submitted by Licensee to IHG concurrent with Licensee's request for IHG's consent to such proposed management company. If Licensee submits a request, and IHG consents to such request, for retaining a management company to operate the Hotel, the Person consented to by IHG shall be identified as the Management Company in a separate letter from IHG to Licensee. IHG's consent may be withdrawn at any time if IHG determines that such Person is no longer qualified to operate the Hotel.

**6.1.2.** *Conditions for Consent of Management Company*. IHG in its Business Judgment may withhold its consent to any proposed management company that: (i) IHG determines (a) is not financially capable, (b) does not have the managerial skills, reputation, managerial and business experience, credit standing or operational capacity required to operate the Hotel in accordance with the Brand Standards and this License, or (c) is a Competitor; (ii) does not provide IHG with all information and access that IHG reasonably requests or agree to operate the Hotel in accordance with IHG's requirements and the terms of this License; or (iii) has (or any of its Affiliates has) (a) been convicted of a crime punishable by either or both imprisonment of one (1) year or more, or payment of a fine or penalty of Ten Thousand U.S. Dollars ($10,000) (or the foreign currency equivalent) or more; (b) engaged in conduct that IHG determines may adversely affect the Hotel, the Brand System, the Marks or IHG's interests; (c) been a party to any material civil litigation with IHG or its Affiliates; or (d) is the subject of a pending material civil action, or been held liable in a concluded material civil action, alleging fraud, deception, theft, conversion or similar illegality. In addition, IHG will not consent to any proposed management company that is a Prohibited Person, is an Affiliate of a Prohibited Person, or in which a Prohibited Person has an interest.

**6.1.3.** *Management Company Required by IHG*. At any time during the Term, IHG may, by written notice to Licensee, require the retention of a Management Company if Licensee, in IHG's view and sole discretion, is not adequately experienced in the operation of hotels or does not have the managerial skills or capacity required to operate the Hotel in accordance with the Brand Standards and this License.

**6.1.4.** *Change in Circumstances*. If there is a change in Control of the Management Company or if the Management Company becomes a Competitor (or an Affiliate of a Competitor) or a Prohibited Person (or an Affiliate of a Prohibited Person), or if the Management Company becomes the principal operator for a Competitor or if there is a material adverse change to the financial condition or operational capacity of the Management Company, Licensee will promptly notify IHG of any such event together with such additional information that IHG may reasonably request. Based on these changed circumstances, IHG may require Licensee to terminate its agreement with such Management Company and retain a replacement management company that will be subject to IHG's consent. After IHG receives such notice and any such additional information IHG reasonably requests, IHG will respond to Licensee within thirty days.

**6.2.** **Employees**.

**6.2.1.** *Staffing.* Licensee must ensure suitable, qualified individuals are employed at the Hotel sufficient to staff all positions at the Hotel in accordance with the Brand Standards. The Licensee, through its managers at the Hotel shall be responsible for the management and operation of the Hotel and supervision of employees. Managers at the Hotel will devote their full time to the management and operation of the Hotel and supervision of the employees. Licensee or its Management Company (if any) shall promptly inform IHG whenever it hires a general manager.

**6.2.2.** *Employment Decision-making*. No employees of Licensee or its Management Company (if any) shall be deemed to be employees of IHG, joint or otherwise. Licensee or its Management Company (if any) is the sole employer of the employees at the Hotel. All hiring and employment decisions at the Hotel will be made solely by Licensee **or its Management Company**, not IHG, and neither Licensee nor its Management Company (if any) is IHG's agent for any purpose with regard to Hotel employees. IHG

7

does not exercise any direction nor hold or exercise any control over the employment policies and practices or employment decisions at the Hotel. Any authority IHG may have under this License to approve certain of Licensee's employees for qualification to perform certain functions for the Hotel does not directly or indirectly vest in IHG the power to hire, fire or control any such employee.  Any such minimum qualification requirements established by IHG are solely for the purpose of ensuring that the Hotel is at all times operated in accordance with the Brand Standards and with the attributes of the Licensed Brand known to, and desired by, the consuming public and associated with the Marks.  Moreover, Licensee agrees that any training provided by IHG for Licensee's **or its Management Company's** employees is intended to impart to Licensee's **or its Management Company's** employees the various procedures, protocols, systems and operations of the Hotel in accordance with the Brand Standards and in no fashion reflects any employment relationship between IHG and Licensee's **or its Management Company's** employees.

Licensee hereby irrevocably affirms, attests and covenants its understanding that its employees**, if any,** are employed exclusively by Licensee and in no fashion is any such employee either employed, jointly employed or co-employed by IHG.  Licensee further affirms and attests that each of its employees**, if any,** is under the exclusive dominion and control of Licensee and never under the direct or indirect control of IHG in any fashion whatsoever.  Licensee, **or its Management Company,** alone hires each of **the Hotel's** employees; sets their schedules; establishes their compensation rates; and, pays all salaries, benefits and employment-related liabilities (including, without limitation, workers' compensation insurance premiums/payroll taxes/Social Security contributions/Affordable Care Act contributions/unemployment insurance premiums).  Licensee, **or its Management Company,** alone has the ability to discipline or terminate its employees to the exclusion of IHG, which has no such authority or ability.  Licensee further attests and affirms that any minimum staffing requirements IHG establishes are solely for the purpose of ensuring that the Hotel is at all times operated in conformity with the Brand System and Brand Standards and the lodging, products, services, standards of quality and efficiency, and other Brand System attributes known to and desired by the consuming public and associated with the Marks. Finally, should it ever be asserted that IHG is the employer, joint employer or co-employer of any of Licensee's employees in any private or government investigation, action, proceeding, arbitration or other setting, Licensee irrevocably agrees to assist IHG in defending said allegation, including (if necessary) appearing at any venue requested by IHG to testify on IHG's behalf (and, as may be necessary, submitting itself to depositions, other appearances and/or preparing affidavits dismissive of any allegation that IHG is the employer, joint employer or co-employer of any of Licensee's employees).

**6.3.**      **Brand System Promotion and Referral to Other IHG Portfolio Brand Hotels**.

**6.3.1.**   *Brand System Promotion*.  Licensee will use reasonable efforts to encourage and promote the use of Brand System Hotels and will refer all requests for reservations, hotel services, accommodations, and usage of Public Facilities that cannot be fulfilled by the Hotel to other Brand System Hotels or IHG Portfolio Brand Hotels in accordance with the Brand Standards. Licensee must display all material, including brochures and promotional material provided by IHG to promote Brand System Hotels or IHG Portfolio Brand Hotels.

**6.3.2.**   *No Diversion to Other Businesses*. Licensee will not, without obtaining IHG's prior written consent, associate or affiliate with any hotel business organization that requires Licensee to refer business to other members of that organization.  Unless Licensee obtains IHG's prior approval, which approval IHG has the sole and absolute right to withhold, Licensee will ensure that no part of the Hotel or the Brand System is used to promote or divert business to any lodging business (including any other hotel operated by Licensee or its Affiliates or in which Licensee, its Affiliates or an Owner of Licensee or of its Affiliates owns or holds an Ownership Interest) not operated as an IHG Portfolio Brand Hotel, including advertising or promotion of hotels, vacation or time-sharing facilities (or any similar product sold on a fractional or other basis with use rights on a weekly or other periodic basis), conference centers, or other lodging products.

**6.4.    Operating the Hotel**. In addition to the other requirements for operating the Hotel set forth in the Brand Standards, and Licensee's obligation to comply with the Brand Standards, as stated in Paragraph 8, Licensee shall operate the Hotel in accordance with the requirements set forth in this paragraph and shall in all respects use Licensee's best efforts to reflect positively upon and create favorable public response to the Licensed Brand.

**6.4.1.    *Quality*.**  Licensee shall maintain high moral and ethical standards and atmosphere at the Hotel, and provide efficient, courteous and high-quality service to the public including, in a clean, safe and orderly manner, without limitation, maintaining minimum product and service quality standards and scores for quality assurance programs established and maintained by IHG, as such programs may be modified by IHG from time to time.

**6.4.2.    *Guest Satisfaction*.**  Licensee shall strictly comply with IHG's requirements as to guest satisfaction and guest complaint programs, as such programs may be modified by IHG from time to time.

**6.4.3.    *Inspection*.**  Licensee shall permit inspection of the Hotel by IHG's representatives at any time and give them free lodging for such time as may be reasonably necessary to complete their inspections. IHG's representatives may confer with Licensee's employees (or its Management Company's employee, as applicable) and guests, and assess Licensee's operations and compliance with this License and the Brand Standards. IHG may conduct such inspections with or without prior notice to Licensee. Licensee shall cooperate with IHG's representatives conducting such inspections by rendering any assistance they may reasonably request. Following any such inspection, Licensee shall take such steps as are necessary to incorporate into its Hotel operations any corrections and modifications IHG requires to maintain the Brand Standards, as quickly as is reasonably possible and using all resources at Licensee's disposal.

**6.4.4.    *Hours of Operation*.**  Licensee shall operate the Hotel 24 hours a day every day in accordance with the Brand Standards, except as otherwise permitted by IHG.

**6.4.5.    *Services*.**  Licensee shall strictly comply with IHG's requirements as to the types and quality of services and products that may be used, promoted or offered at the Hotel, including the supplemental services listed on Item 12 of Attachment B.

**6.4.6.    *Listings*.**  Licensee shall strictly comply with IHG's requirements as to listings in directories, any online listings or other listings of the Hotel.

**6.4.7.    *Telecommunications*.**  Licensee shall use all technology services required by IHG.

**6.4.8.    *Promotion*.**  Licensee shall promote the Hotel on a local or regional basis subject to IHG's requirements as to form, content and prior approvals.

**6.4.9.    *Name*.**  IHG has the exclusive right to name the Hotel, including, without limitation, the right to any trade name which is developed specifically for use at the Hotel (the "Second Name").  Licensee shall not change the name of the Hotel or the Second Name (which names shall be determined by IHG in its sole discretion) without the consent of IHG and shall effectuate any change in the naming of the Hotel as may be required by IHG.  IHG shall conduct search and clearance and maintain the trademark registration for the Second Name and Licensee shall pay for all brand agency fees, search and clearance fees and maintenance costs and fees in connection with selecting, trademarking and creating a logo and identity for the Second Name (the "Second Name IP Costs").  **Notwithstanding the foregoing, at all times during the Term the Hotel name shall include the word "Kimpton".**

**6.4.10.    *Co-branding*.**  IHG may determine from time to time to incorporate in the Brand

9

System programs, products or services which IHG either develops or otherwise obtains rights to, which are offered and sold under names, trademarks and/or service marks other than the Marks and which Licensee's Hotel, along with **substantially** all other Brand System Hotels, will be required to offer and sell. This activity, referred to as "co-branding", may involve additions to the licensed Marks and may require Licensee to make modification to the Hotel's premises. If IHG gives written notice to Licensee that it is instituting a co-branding program **for substantially all other Brand System Hotels**, Licensee agrees promptly to implement any program required by IHG at its Hotel at the earliest commercially reasonable time and to execute any and all instruments required to do so.

## 7.   TRAINING AND COUNSELING.

**7.1.    Training**.  From time to time, IHG may specify and provide required and/or optional training programs, for which training fees may be charged.  Licensee will pay for all of its trainees' tuition, training materials, supplies, and travel costs (i.e., travel, food and lodging, living, and other out-of-pocket costs) and allocations of internal costs and overhead of IHG for any training in which Licensee, Licensee's employees or its management company participates.  IHG reserves the right at all of its training programs to determine the duration of such programs, what subjects are included in the curriculum of its training programs and to train any number of individuals from any number of Brand System Hotels, whether licensed or otherwise affiliated with IHG, at the same time.  IHG reserves the right to furnish its training programs by means of a company intranet or other electronic means of communication (such as web based tutorials, video streaming, or through other now or hereafter developed media).  In addition, IHG may from time to time conduct an annual conference, convention or training session.  IHG will determine the duration, curriculum and location of these events. Licensee or, if applicable, its approved management company must attend each annual or bi-annual conference, convention or training session at Licensee's sole expense (including any Travel Costs).  Licensee may also at any time communicate with IHG for consultation and guidance with respect to certain operational issues. The timing of IHG's field support and consultation services will be subject to availability of IHG's personnel.  Licensee will provide training required by IHG for personnel working at the Hotel.

**7.2.    Counseling by IHG**. IHG may, from time to time and at IHG's election, make consultation and advice services available to Licensee about the design and operation of the Hotel as a Brand System Hotel.  IHG may require Licensee to pay the Travel Costs and other out-of-pocket costs of such representatives of IHG who consult at the Hotel.

## 8.   SYSTEM AND BRAND STANDARDS; IHG OWNERS ASSOCIATION.

**8.1.    Compliance with Brand System and Brand Standards**.  Licensee agrees that conformity with all aspects of the Brand System and the Brand Standards is essential in order to maintain the uniform quality and guest service of Brand System Hotels.  Licensee shall operate the Hotel in compliance with the Brand Standards, this License, the IHG Agreements, and all other policies, procedures and requirements of IHG, established at IHG's option, which may be communicated to Licensee from time to time.

**8.2.    Modifications of the Brand System and Brand Standards**.  IHG may modify the Brand System and Brand Standards or any Component and such modifications may include materially changing, adding or deleting any part, at IHG's option, of the Brand System or Brand Standards.  Licensee agrees that modifications to the Brand System (including, the Brand Standards) may be made for all or a group of Brand System Hotels (for example, Brand System Hotels in certain local, regional or national markets, or Brand System Hotels that are deemed resorts, urban, or suburban). Each change in the Brand Standards shall be communicated in writing to Licensee at least thirty days before it goes into effect (which communication may be in hard paper copy or, at IHG's option, in digital, electronic or other computerized

10

form, and if such communication is in digital, electronic or other computerized form, Licensee must pay any costs to retrieve, review, use or access same). IHG's franchise committee or its equivalent, or designee subcommittee, must approve any such change and must determine that the change was formulated in good faith in the best interests of the System.

**8.3.** **Access to Brand Standards**. IHG shall make the Brand Standards and any modification thereto available to Licensee in digital, electronic or other computerized form or, at IHG's option, in hard paper copy. If communicated in digital, electronic or other computerized form, Licensee must pay any costs of its Equipment, Software and internet access to retrieve, review, use or access the Brand Standards. The Brand Standards are Confidential Information and at all times remain the sole property of IHG. If there is any dispute as to the contents of the Brand Standards or, as to which item or element of the Brand Standards should apply, the then-current Brand Standards, as maintained by IHG, will control.

**8.4.** **IHG Owners Association**. An association (the "**IHG Owners Association**") has been established and sanctioned by IHG to consider and make recommendations on matters related to the operation of IHG Portfolio Brand Hotels (including, Brand System Hotels). Licensee (and other licensees of IHG Portfolio Brand Hotels) and IHG are eligible for membership in the IHG Owners Association. IHG may regard opinions and recommendations of the IHG Owners Association, or any successor body, as expressing the consensus of licensees of all Brand System Hotels.

**9.** **ADVERTISING AND MARKETING; RATES AND RESERVATIONS.**

**9.1.** **Licensee's Local Advertising and Marketing Programs.**

**9.1.1.** *Local Advertising*. Licensee will undertake, at IHG's request, and at Licensee's expense, local advertising, marketing, promotional, sales and public relations programs and activities for the Hotel, including preparing and using any Marketing Materials, in accordance with the Brand Standards.

**9.1.2.** *Use of Marketing Materials in Compliance with Brand Standards*. All advertising (including, IHG's requirements as to the use, display, style and type of Marketing Materials) by Licensee shall be conducted only in the places and manner approved or required by IHG and in compliance with the Brand Standards and Applicable Law. Licensee shall submit to IHG (in hard copy by mail, or by digital, electronic or other computerized format, directed to Vice President or Senior Director of Brand for Kimpton Hotels & Restaurants), for its prior approval, samples of all Marketing Materials that Licensee wishes to use which have not been either provided or previously approved by IHG. Any Marketing Materials proposed or developed by Licensee for the Hotel and approved by IHG may be copied and used by IHG, its Affiliates or other IHG Portfolio Brand Hotels without compensation to Licensee. IHG reserves the absolute right to disapprove and discontinue the use of any Marketing Materials previously provided to Licensee or approved by IHG. Any local and regional marketing programs and related activities may be conducted by Licensee, but only at Licensee's expense and subject to the Brand Standards. Additional charges may be imposed for optional Marketing Materials ordered or supplied by IHG to Licensee.

**9.2.** **System Fund.**

**9.2.1.** *System Fund Activities*. Licensee hereby understands, acknowledges and agrees that System Fund Contributions are collected as part of System Fund arrangements operated by IHG and its Affiliates, in accordance with the protocols and governance arrangements established from time to time for the purpose of conducting designated System Fund activities. IHG will use System Fund Contributions in order to undertake all or any of the System Fund Activities. To the extent such contributions are part of the System Fund, the following terms shall apply:

(a)    To promote general public recognition of, use of, and loyalty to, Kimpton Hotels & Restaurants and the other IHG Portfolio Brand Hotels, IHG and its Affiliates may undertake activities they deem appropriate, in their sole discretion, to be in furtherance of the purposes of the System Fund ("**System Fund Activities**"). These activities may be conducted on a local, regional, national, continental or international basis or for all, or a group of, IHG Portfolio Brand hotels. IHG and its Affiliates may modify, in their absolute discretion, the System Fund Activities from time to time.

(b)    IHG and its Affiliates will administer the System Fund in their sole discretion. The System Fund may be used (within IHG's and its Affiliates sole discretion) for purposes that benefit or include Brand System Hotels, as a whole, groups of Brand System Hotels, and other IHG Portfolio Brand Hotels. IHG and its Affiliates have no obligation to ensure that any particular IHG Portfolio Brand Hotel, or particular group of Brand System Hotels, including the Hotel, benefits from the System Fund Activities on a pro-rata or other basis or that the Hotel will benefit from the System Fund Activities proportionate to the contributions paid by Licensee.

(c)    IHG may change the local, country, regional, continental or international scope of the System Fund or System Fund Activities.

**9.2.2.**    *Changes to System Fund Contributions.* IHG may change the method of funding System Fund Activities or may change the System Fund Contributions from time to time (including by establishing methods of funding System Fund Activities other than by System Fund Contributions). IHG may, in its sole judgment, upon thirty (30) days' prior notice, increase the System Fund Contribution by an amount not to exceed one percent (1%) of Gross Rooms Revenue and such increase shall be effective for a period no longer than 12 months; provided, that in the event of such increase, IHG shall not make such a discretionary increase again for a period of twenty-four (24) months after the expiration of any such increase.

**9.3.    Additional Marketing Programs.** IHG may, at its option, establish and coordinate advertising, marketing and sales programs, customer satisfaction programs and other activities among Brand System Hotels and other IHG Portfolio Brand Hotels on a local, regional, national or world-wide basis and provide for participation therein by Licensee. Licensee shall participate in and pay for such programs and activities on the same basis as other similarly situated Brand System Hotels (including hotels owned or managed by IHG's Affiliates) as determined by IHG, and such programs and activities will be paid for by Licensee and not by the System Fund.

**9.4.    Digital Marketing**. IHG may, in its sole discretion, establish and operate websites, social media accounts, applications, keyword or ad word purchasing programs, or other means of digital advertising on the internet or any electronic communications network (collectively, "**Digital Marketing**"). IHG will have the sole right to control all aspects of any Digital Marketing, including those related to the Hotel. Licensee must engage a search engine optimization firm and search engine marketing firm as required by the Brand Standards. IHG will operate and maintain a website for IHG Portfolio Brand Hotels, which will include basic information related to the Hotel. Licensee further acknowledges that the www.ihg.com domain name is the sole property of IHG, and is one of the landing pages for other IHG Portfolio Brand Hotels. Licensee shall not, directly or indirectly, use, register, obtain or maintain a registration for any Internet domain name, address, or other designation that contains any Mark or any mark that is in IHG's sole opinion confusingly similar, including misspellings and acronyms. Upon IHG's request, Licensee must promptly take all steps to cancel or transfer to IHG or its designee any such domain

name, address, or other designation under its control, without payment of any compensation to Licensee. If IHG does permit Licensee to conduct any Digital Marketing, Licensee must comply with any policies, standards, guidelines, or content requirements established by IHG periodically and must immediately modify or delete any Digital Marketing that IHG determines, in its sole discretion, is not compliant with such policies, standards, guidelines, or requirements.  IHG may withdraw its approval of any Digital Marketing at any time.

### 9.5.    Pricing, Rates and Reservations.

**9.5.1.**   *Pricing and Rates*. Licensee is responsible for setting its own prices and rates for Guestrooms and other products and services at the Hotel, including determining any prices or rates that appear in the Reservation System. IHG may, however: (i) prohibit certain types of charges or billing practices that IHG determines are misleading or detrimental to the System; (ii) require that Licensee price consistently in all distribution channels; or (iii) impose other pricing requirements permitted by Applicable Law.

**9.5.2.**   *Pricing Recommendations; Participation in Programs*. IHG may recommend prices or rates for the products and services offered by Licensee or require participation in various sales or inventory management programs or promotions offered by IHG. IHG's recommendations are not mandatory; Licensee is ultimately responsible for determining the prices or rates at which it offers its products and services, and IHG's recommendations are not a representation or warranty by IHG that the use of such recommended prices or rates will produce, increase, or optimize Licensee's profits. IHG will have no liability for any such recommendations, including those made in connection with any sales activity or inventory management.

**9.5.3.**   *Honoring Reservations*. Licensee will provide its prices and rates for use in the Reservation System in accordance with the Brand Standards. Licensee will: (i) honor any prices, rates or discounts that appear in the Reservation System or elsewhere; (ii) honor all reservations made through the Reservation System or that are confirmed; and (iii) not charge any Hotel guest a rate higher than the rate specified for the Hotel guest's reservation in the Reservation System or, if not made through the Reservation System, in the reservation confirmation. Licensee will also honor all pricing and terms for any other product or service specified by IHG and offered in connection with the Hotel through the Reservation System or otherwise.

## 10.   <u>TECHNOLOGY</u>.

The terms and conditions of access to and use of the Technology Systems are stated and contained in the IHG Technology Systems User Agreement and must be adhered to strictly by Licensee.

**10.1.**   **Access to Technology Systems**.  Licensee must at its cost purchase or lease, install, maintain and use the Reservation System, the Property Management System and all other elements of the Technology Systems designated and required by IHG. IHG will make the Reservation System available to Licensee, subject to <u>Paragraph 18.2</u> of this License.  IHG will not make the Reservation System available to Licensee for reservations made for any date after the expiration or termination of this License.

**10.2.**   **IHG Technology Systems User Agreement**.  Licensee must execute the IHG Technology Systems User Agreement in order to access the Technology Systems.  Any part of the Technology Systems may be modified or replace.  If IHG determines that technological advances warrant amendment or replacement of the IHG Technology Systems User Agreement, Licensee will execute the then current amended or replacement IHG Technology Systems User Agreement.

**10.3.**   **Approved Items**.  Licensee must use only Approved Software, Approved Equipment and the Network Connectivity and must use the Technology Systems only for the purposes designated by IHG

or otherwise authorized by this License or the IHG Technology Systems User Agreement. Licensee understands and agrees that modes of computerization and communication are rapidly evolving and that, accordingly, IHG may require Licensee at its expense to purchase, install and utilize at the Hotel such hereafter developed modes of computerization, computer programs, applications, communications modes, media and/or interfaces as License, in its Business Judgment, determines to incorporate into the Brand System.  Licensee shall do so at such time and in such manner as IHG designates, in the Brand Standards or other written or electronic notices.

## 11.    INTELLECTUAL PROPERTY.

**11.1.    Ownership of Brand System and Intellectual Property**. IHG represents and Licensee acknowledges and agrees that IHG is the owner or authorized licensee of all right, title, and interest in and to all Components, including, without limitation, the Intellectual Property, and Licensee has no interest in or rights to the Brand System or the Intellectual Property beyond the non-exclusive license granted in this License.  Licensee will not contest or challenge, either directly or indirectly during or after the Term: (i) IHG's rights in and right to license others to use, the Brand System and any Components of the Brand System, including, without limitation, the Intellectual Property, (ii) the validity of any or part of the Intellectual Property, and (iii) the exclusive right of IHG to register the Intellectual Property in any jurisdiction.  All improvements, modifications and additions whenever made to or associated with the Brand System by the parties hereto or anyone else, and all service marks, trademarks, copyrights, and service mark, trademark, domain name or similar registrations at any time used, applied for or granted in connection with the Brand System, and all goodwill arising from Licensee's use of the Marks and other Intellectual Property, including (without limitation) local goodwill, shall inure solely to the benefit of and become the property of IHG.  Licensee acknowledges that IHG's and its Affiliates' rights in the Marks are not limited to the specific presentation or configuration of any of them, but rather extend to all combinations and displays of the words and/or design elements thereof and extend to all translations of them in any language.  Further, Licensee acknowledges and agrees that IHG's and its Affiliates' rights in and to the Marks are not limited to such rights as may be conferred by registrations thereof or by applications for registrations but, instead, include extensive common law and other rights in the Marks vested as a result of their use by IHG, its Affiliates and other authorized parties. Upon expiration or termination of this License, no monetary amount will be attributable to any goodwill associated with Licensee's activities as a licensee under this License or Licensee's use of the Brand System or any Components of the Brand System.

**11.2.    Third-Party Challenges**.

**11.2.1** *Notice to IHG*.  Licensee shall promptly notify IHG of (i) any objections, demands, controversies, allegations, or actions asserted or taken by third parties involving any Component of which Licensee becomes aware and (ii) any potentially infringing or unauthorized uses of any Component of which Licensee becomes aware.  IHG has the exclusive right, but no obligation, to initiate, direct, and control any litigation, administrative proceeding, or dispute relating to the Intellectual Property or the Brand System, including, but not limited to, any settlement.   IHG will be entitled to retain any and all proceeds, damages, and other sums, including attorneys' fees, recovered or owed to IHG in connection with any such action.  Licensee may not initiate any suit or proceeding against alleged imitators or infringers or any other suit or proceeding to enforce or protect the Intellectual Property or the Brand System unless at the direction of IHG.

**11.2.2** *IHG's Defense of the Marks*. If Licensee receives notice, is informed of or learns of any claim, suit or demand against Licensee on account of any alleged infringement, unfair competition, or similar matter relating to Licensee's use of the Marks (each, a "claim"), Licensee agrees to promptly notify IHG. IHG will then promptly take any action it may consider necessary to protect and defend Licensee against the claim and indemnify Licensee against any loss, cost or expense incurred in connection with the claim, so long as the claim is based solely on any alleged infringement, unfair competition, or

similar matter relating to Licensee's use of the Marks. Licensee may not settle or compromise any claim of a third party without IHG's prior written consent. IHG will have the right to defend, compromise and settle the claim at IHG's sole cost and expense, using IHG's own counsel. Licensee agrees to cooperate **in all reasonable respects** with IHG in connection with the defense of the claim and to execute any and all documents, and do any and all things, as IHG's counsel deems **reasonably** necessary, including (but not limited to) becoming a nominal party to any legal action. If Licensee does so, then IHG shall reimburse Licensee for its out-of-pocket costs in doing such acts and things, but Licensee will bear the salary costs of its employees and IHG will bear the costs of any judgment or settlement. Licensee grants irrevocable authority to IHG, and appoints IHG as Licensee's attorney in fact, to defend and/or settle all claims of this type. Licensee may participate at its own expense in the defense or settlement, but IHG's decisions with regard to the defense or settlement will be final. IHG will have no obligation to defend or indemnify Licensee pursuant to this <u>Paragraph 11.2.2</u> if the claim arises out of or relates to Licensee's use of any of the Marks in violation of the terms of this License.

**11.3.    Protection of Intellectual Property**. Licensee will make **commercially reasonable efforts** effort to protect and maintain the Marks.  Licensee will promptly execute all documents and render any other assistance IHG may deem necessary to maintain the continued validity and enforceability of the Intellectual Property, including cooperating in any action specified in <u>Paragraph 11.2</u>.

**11.4.    Use of Intellectual Property**. Licensee will use the Intellectual Property (i) only in connection with the operation of the Hotel during the Term, (ii) only in the manner as provided in this License, the Brand Standards, and as otherwise expressly authorized by IHG, and (iii) only in a manner that will not harm or damage the Brand System, the Marks, or IHG.  Licensee must post in a prominent place in the Hotel readily visible to the public and on any other materials required by IHG a notice indicating that Licensee is a licensed operator under the Brand System and that Licensee is using the Marks under a license. Licensee acknowledges that any unauthorized, unpermitted, or prohibited use of any of the Intellectual Property will constitute infringement of IHG's rights. Licensee may not take any action to record this License or to apply for any rights, registrations, or interests in any part of the Intellectual Property or any parts similar to the Intellectual Property (as determined by IHG in its sole discretion) in any jurisdiction, unless at the direction of IHG. If Licensee registers or applies to register any part of the Intellectual Property in violation of this License, in addition to all other remedies available, IHG shall have the right to require Licensee, at Licensee's expense, to cancel such application or registration or transfer such application or registration to IHG.

**11.5.    Restrictions on Use of Marks**. Except as otherwise provided by IHG in writing, Licensee may not use the Marks (i) as part of any entity name, (ii) as part of a required business, trade, fictitious, assumed, or similar name registration, except as the Licensed Brand in accordance with instructions provided by IHG, (iii) as part of a street name, address, or development name, (iv) with any prefix, suffix or other modifying words, terms, designs or symbols (other than logos licensed to Licensee under this License), (v) in any domain names or on any website on the Internet or any other electronic communication network, (vi) in conjunction with any unauthorized products or services, (vii) in conjunction with any business venture other than the Hotel, including related restaurants, spas, clubs, stores, or facilities, (viii) in any manner that would cause the Marks to become generic or lose their distinctiveness, or (ix) in any manner that would mislead or confuse the public or infringe on the Marks. The restrictions and requirements that limit Licensee's use of the Marks and identifications apply to all formats, including print, electronic and other media, and include domain names, URLs, and other identifications or elements used in electronic commerce.

**11.6.    Modification or Discontinuation of the Intellectual Property**.

**11.6.1.** *Modification, Discontinuation and Substitution*.  IHG has the right, upon reasonable notice and in its sole discretion, to change, discontinue, or substitute for any of the Intellectual

Property and to adopt entirely different or new Intellectual Property for use with the Brand System without any liability to Licensee**; provided, that the Hotel name continues to include the word "Kimpton"**. Licensee agrees to implement any such changes at Licensee's expense in accordance with IHG's instructions within the time period IHG reasonably specifies.  Licensee further agrees that it will have no right to any compensation or other remedies from IHG or any of its Affiliates as a consequence of any such modification.  Licensee waives any claim for expenses, losses or damages related to such Intellectual Property change, discontinuation or substitution and covenants not to commence or join in any litigation or other proceeding against IHG or any of its affiliates for any such expenses, losses or damages.

**11.6.2.** *Improvements.*  Any modifications, improvements, changes, substitutions or additions to the Brand System or to the Brand System and/or the Brand Standards that are developed or proposed by or on behalf of Licensee (whether or not consented to by IHG), including, without limitation, any modifications to architectural drawings or architectural works licensed to Licensee as part of the System (collectively, "**Improvements**"), are hereby automatically and irrevocably assigned to IHG, in perpetuity throughout the world, without payment of any compensation to Licensee.  If such Improvements may be protected by way of trademark, copyright, patent, trade secret, or otherwise, Licensee will execute (and will cause each of its employees or independent contractors who contributed to such Improvements to execute), upon IHG's request, such documentation as IHG may reasonably require to evidence IHG's ownership of such Improvements and to transfer ownership of such Improvements to IHG.  Except to the extent prohibited by Applicable Law, Licensee waives, and will cause each of its employees or independent contractors who contributed to Brand System modifications to waive all "moral rights of authors" or any similar rights in or to such Improvements.  IHG may authorize itself, its Affiliates and/or other IHG Portfolio Brands and Hotels to use and exploit any such rights which are assigned to IHG hereunder.  The sole consideration for Licensee's assignment to IHG of all of the foregoing rights shall be IHG's grant of the license conferred upon Licensee by this License.

**11.7.**    **Post-Termination or Expiration**. Upon the expiration or termination of this License for any reason, all of Licensee's rights to use the Intellectual Property will automatically revert to IHG without cost and without the execution or delivery of any document.  Upon IHG's request, Licensee will execute all documents that IHG requires to confirm such reversion.

## 12.    CONFIDENTIAL INFORMATION; DATA & GUEST DATA AND DATA PROTECTION LAWS.

**12.1.**    **Confidential Information**.

**12.1.1.** *Confidentiality Obligation.*  Licensee will not, during the Term or thereafter, without IHG's prior written consent, which consent may be granted or withheld in IHG's sole discretion, copy, duplicate, record, reproduce, in whole or in part, or otherwise transmit or make available to any unauthorized Person any Confidential Information.  Licensee may divulge such Confidential Information only to such of Licensee's employees or agents as require access to it in order to operate the Hotel, and only if such employees or agents are apprised of the confidential nature of such information before it is divulged to them and they are bound by confidentiality obligations substantially similar to those listed above.  All other Persons are unauthorized for purposes of this License.  Licensee agrees that the Confidential Information has commercial value and that IHG has taken reasonable measures to maintain its confidentiality, and, as such, the Confidential Information is proprietary and a trade secret of IHG.  Licensee will be liable to IHG for any breaches of the confidentiality obligations in this paragraph by its employees and agents.  Licensee will maintain the Confidential Information in a safe and secure location and will immediately report to IHG the theft or loss of all or any part of the Confidential Information.

**12.1.2.** *Confidentiality of Terms*. Licensee agrees it will not disclose to any Person the content of the key terms of this License or other IHG Agreements without the prior written consent of IHG

16

except: (i) as required by Applicable Law; (ii) as may be necessary in any legal proceedings; and (iii) to those of Licensee's managers, members, officers, directors, employees, attorneys, accountants, agents or lenders to the extent necessary for the operation or financing of the Hotel and only if Licensee informs such Persons of the confidentiality of the commercial terms. Licensee will be in default under this License for any disclosure of commercial terms by any such Persons.

### 12.2. Data.

**12.2.1** *IHG Personal Data and Licensee Personal Data*. Subject to the provisions of any Applicable Law, including but not limited to Data Protection Laws; as between Licensee and IHG, all IHG Personal Data is the property of IHG, and IHG shall have the right to use and transfer such data on a worldwide basis during and after the Term. Licensee hereby grants to IHG and its Affiliates a non-exclusive, worldwide, perpetual and royalty-free license to use (including the right to sublicense) the Licensee Personal Data free of charge, for the purposes of IHG's performance of its obligations under this License, including, without limitation, the right to transfer Licensee Personal Data across national borders and to transfer Licensee Personal Data to third parties. IHG may retain a copy of Licensee Personal Data upon the termination or expiration of this License.

**12.2.2** *Use of IHG Personal Data*. During and after the term of this License, Licensee shall have a non-exclusive, royalty-free license to use any IHG Personal Data (but excluding all IHG Marketing Data) stored in the Hotel's property management system only  for purposes of operating the Hotel provided that: (i) Licensee shall have no right to use the IHG Marketing Data except for the purpose of operating the Loyalty Program, and Licensee must remove, or IHG and its Affiliates shall have the right, at Licensee's cost, to remove all IHG Marketing Data from the Hotel's property management system and other Hotel records upon expiration or termination of this License; (ii) Licensee shall retain, use and transmit (and procure that any agent or representative of Licensee that manages the Hotel after the termination of this License retain, use and transmit) such IHG Personal Data only (a) in accordance with all Data Protection Laws, and (b) to the extent permitted pursuant to any consents obtained from the relevant guests, employees or other individuals (the parties acknowledging that IHG provides no warranty or guaranty regarding any such consents); (iii)  Licensee shall not sell or transfer the IHG Personal Data including but not limited to any Affiliate or other hotel of Licensee and will not combine IHG Personal Data with the Personal Data of any other hotel brand, company or operator; and (iv) Licensee may not use IHG Personal Data for any marketing purpose.

**12.2.3** *Operating Data and Guest Data*. Operating Data includes all information concerning Gross Rooms Revenue and Gross Revenue, other revenues generated at the Hotel, Guestroom occupancy rates, reservation data and other information required by IHG that may be useful (in IHG's sole Business Judgment) in connection with marketing, reservations, guest loyalty and satisfaction and other functions, purposes or requirements of IHG and its Affiliates the (collectively, the "**Operating Data**"). "**Guest Data**" means Personal Data containing personally identifiable information of Hotel guests and other Hotel customers, including their preferences, and related information. Operating Data and Guest Data may be used by IHG for its reasonable purposes, including without limitation for company and industry reporting purposes. Licensee agrees that any Operating Data and any Guest Data provided by it pursuant to this License, as well as any other reports, data, information or material provided to IHG pursuant to or in connection with this License, shall be true and correct and not misleading and shall comply with all standards, policies and requirements of IHG with respect to privacy and security of Operating Data and Guest Data of the Hotel. Licensee acknowledges and agrees that IHG will retrieve Operating Data, Guest Data and Licensee Personal Data through the Reservation System.

**12.3** **Data Protection Laws.** Licensee will: (i) comply with all applicable Data Protection Laws; (ii) comply with all of IHG's requirements regarding data protection contained in the Brand Standards or otherwise; (iii) refrain from any action or inaction that could cause IHG or its Affiliates to

breach any of the Data Protection Laws; (iv) do and execute, or arrange to be done and executed, each act, document and thing necessary or desirable to keep IHG in compliance with any of the Data Protection Laws; (v) reimburse IHG for any and all costs incurred in connection with the breach by Licensee of such Data Protection Laws or Brand Standards; (vi) immediately report to IHG the theft or loss of Personal Data or Guest Data or "personal information" as that term is defined by Data Protection Laws; and (vii) permit IHG and its Affiliates to use any data or other information each of them gathers concerning Licensee, its Affiliates and/or the Hotel in connection with the establishment and operation of Brand System Hotels by IHG and its Affiliates.

## 13.   RECORDS AND AUDITS.

**13.1.   Maintenance of Books, Records, Accounts**.   Licensee will maintain and preserve complete and accurate books, records and accounts for the Hotel in accordance with the Uniform System and United States generally accepted accounting principles, consistently applied, Applicable Law and the Brand Standards. Licensee will preserve these books, records and accounts for at least four (4) years from the dates of their preparation.

**13.2.   Accounting Statements.**

**13.2.1.** *Monthly Statements*.   If requested by IHG, Licensee will submit to IHG an operating statement containing Gross Rooms Revenue, Gross Revenue, and all other financial and non-financial information required by IHG. The statement will be in such form and detail as IHG may reasonably request from time to time.

**13.2.2.** *Annual Financial Statements*.   If requested by IHG, Licensee will submit to IHG as soon as available, but not later than ninety (90) days after the end of Licensee's fiscal year, complete financial statements for such year.   Licensee will certify them to be true and correct and to have been prepared in accordance with generally accepted accounting principles consistently applied, and any false certification will be a breach of this License.   The financial statements will be prepared in accordance with the Uniform System and the United States generally accepted accounting principles, consistently applied, Applicable Law, the Brand Standards, and the Uniform System "Income Statement" with standard line items specified by IHG, and Licensee will provide such supporting documentation and other information that IHG may require relating to this statement. In addition, Licensee will promptly deliver to IHG such other reports and financial information relating to Licensee and the Hotel as IHG may request.

**13.3.   Audit**.   During the Term and for two (2) years afterward IHG and its authorized agents will have the right to verify information required under this License by requesting, inspecting and auditing, at all reasonable times, any and all records referred to in this Paragraph 13 wherever they may be located (or elsewhere if reasonably requested by IHG) including all records on any electronic devices, to which IHG and its authorized agents will have the right to access onsite or remotely, as determined by IHG.   If any such inspection or audit discloses a deficiency in any payments due hereunder), and the deficiency in any payment is not offset by overpayment, Licensee shall immediately pay IHG the deficiency and interest thereon as provided in Paragraph 3.8. If an examination or audit finds that Licensee has understated payments due IHG by five percent (5%) or more for the relevant period, or if the examination or audit reveals that the accounting procedures are insufficient to determine the accuracy of the calculation of payments due, Licensee will reimburse IHG for all costs relating to the examination or audit (including reasonable accounting and legal fees). No acceptance by IHG of any audit fee or deficiency payment shall be deemed to waive any right of IHG to pursue a default under this License by reason of such underpayment. If IHG's examination or audit establishes a pattern of underreporting, IHG may require that the subsequent annual financial statements due under Paragraph 13.2.2 be audited by an independent accounting firm consented to by IHG.   If the audit discloses an overpayment, IHG will credit this overpayment, without interest, against future payments due from Licensee under this License or if this License has terminated,

promptly refund it, without interest, to Licensee.

## 14.    <u>INDEMNIFICATION</u>.

Licensee, at its sole cost,  will indemnify, defend and hold harmless IHG and its Affiliates  (and each of their respective officers, directors, managers, shareholders, members, employees, agents, successors and assigns) (collectively, the "**Indemnitees**") against any and all claims, losses, liabilities and costs (as denominated in the following paragraph) incurred in connection with any judicial, administrative or arbitration action or proceeding (including bankruptcy, insolvency, debtor/creditor or similar proceedings), suit, claim, demand, investigation, or formal or informal inquiry (regardless of whether any of the foregoing is reduced to judgment) or any settlement of the foregoing, which actually or allegedly, directly or indirectly, arises out of, is based upon, is a result of or is related in any way to any element of Licensee's entry into this License; Licensee's establishment, construction, ownership, opening and operation of the Hotel and Location, including any other  business operating within or in relation to the Hotel (which other business, if any, shall be subsumed within this paragraph's references to the Hotel) and further including (without limitation) any personal, bodily or mental injury, death, property damage or loss, suffered by any guest, visitor, manager, operator, supplier or employee of the Hotel or Location; crimes committed on or near any of the premises or facilities of the Hotel or Location or vehicles used by the Hotel; all acts, errors, neglects or omissions engaged in by Licensee, its contractors or subcontractors, as well as any third party, arising out of or related to the design, construction, conversion, build-out, outfitting, remodeling, renovation or upgrading of the Hotel, whether or not any of the foregoing was approved by IHG; defects in the Hotel or Location, whether or not discoverable by Licensee or IHG; all acts, errors, neglects or omissions of Licensee and/or the owners, officers, directors, managers, shareholders, members, management, employees, agents, servants, contractors, partners, proprietors, affiliates or representatives of Licensee and/or the Hotel and/or or Location (or any third party acting on Licensee's behalf or at its direction), whether in connection with the Hotel,  the Location or otherwise, including (without limitation) any property damage, injury or death suffered or caused by any vehicle serving the Hotel and/or furnishing transportation to or from the Hotel; any claim, however and wherever asserted, that IHG or its Affiliates are the employer, joint employer or co-employer of Licensee and/or Licensee's employees; third party claims against IHG arising from or related to Licensee's breach of the terms, restrictions and requirements of this License  (including, without limitation, Licensee's unauthorized use of the Marks, violation of Applicable Law or failure to comply with Data Protection Laws); Licensee's violation of Data Protection Laws; Licensee's offer, sale and/or delivery of securities, equity interests or other ownership interests in Licensee or the Hotel; all activities, conduct and representations which Licensee may engage in connected to any actual or attempted Transfer of any interest whatsoever in Licensee or the Hotel (or any entity which Controls Licensee or the Hotel); and, any action by any guest of or visitor to the Hotel, the Location or any other facility operated in conjunction with the Hotel (collectively, an "**Indemnification Claim")**.

As used above, the phrase "claims, losses, liabilities and costs" includes all claims; causes of action; fines; penalties; liabilities; losses; employment liabilities; compensatory, exemplary, statutory or punitive damages or liabilities; costs of investigation; lost profits; court costs and expenses; reasonable attorneys' and experts' fees and disbursements; settlement amounts; judgments; compensation for damage to IHG or its Affiliates' reputation and goodwill; costs of or resulting from delays; travel, food, lodging and other living expenses necessitated by the need or desire to appear before (or witness the proceedings of) courts or tribunals (including arbitration tribunals), or government or quasi-governmental entities (including those incurred by the Indemnitees' attorneys and/or experts); all expenses of recall, refunds, compensation and public notices; and, other such amounts incurred in connection with the matters described. All such losses and expenses incurred under this indemnification provision will be chargeable to and paid by Licensee pursuant hereto, regardless of any actions, activity or defense undertaken by IHG or its Affiliates or the subsequent success or failure of the actions, activity or defense.

Licensee agrees to give IHG written notice of any suit, judicial or administrative investigation,

proceeding, claim, demand, inquiry or any other event that could be the basis for an Indemnification Claim within three (3) days of Licensee's actual or constructive knowledge of it. At the election of IHG, Licensee will also defend IHG and the other Indemnitees (including IHG) against the Indemnification Claim. IHG will have the right, at Licensee's cost, to control the defense of any Indemnification Claim (including the right to select its counsel or defend or settle any Indemnification Claim at Licensee's sole expense) if IHG determines that such Indemnification Claim may directly or indirectly affect the interests of any of the Indemnitees (including IHG). IHG's undertaking of defense and/or settlement will in no way diminish Licensee's obligation to indemnify the Indemnitees and hold them harmless. IHG will have the right, at any time it considers appropriate, to offer, order, consent or agree to settlements or take any other remedial or corrective actions it considers expedient with respect to any Indemnification Claim if, in IHG's sole judgment, there are reasonable grounds to do so. None of the Indemnitees (including IHG) shall be required to seek recovery from third parties or otherwise mitigate their losses to claim indemnification from the Licensee. Licensee agrees that any failure to pursue recovery from third parties or mitigate loss will in no way reduce the amounts recoverable from Licensee by any of the Indemnitees (including IHG).

## 15.   **INSURANCE**

**15.1.   Types of Insurance**.  During the Term, Licensee will procure and maintain insurance with the coverages, deductibles, limits, carrier ratings, and policy obligations required by IHG. Such insurance requirements may include: property insurance including business interruption, earthquake, flood, terrorism and windstorm; workers' compensation; commercial general liability; liquor liability; business auto liability; umbrella or excess liability; fidelity coverage; employment practices liability; cyber liability; and such other insurance customarily carried on hotels similar to the Hotel. IHG may change such requirements by written or electronic notice to Brand System Hotels and may also require Licensee to obtain additional types of insurance or increase the amount of coverages.  Licensor's current insurance requirements are set forth on Attachment I. Licensee shall renew all insurance policies and documents and furnish renewal certificates of insurance to IHG before the expiration date of the expiring policy in question.

**15.2.   Insurance Policies Requirements**.   All insurance policies must: (i) name as unrestricted additional insureds IHG, its Affiliates and their employees and agents and provide that the coverage afforded separately to each insured against whom a claim is brought as though a separate policy had been issued to each insured (except for workers' compensation, employer's liability, any other employee insurance mandated by Applicable Law, and fidelity insurance); (ii) provide that the coverages will be primary and that any insurance carried by any additional insured will be excess and non-contributory; (iii) contain a waiver of subrogation in favor of IHG and its Affiliates; (iv) extend to and cover Licensee's indemnification obligations under this License; and (v)  provide that the policies will not be canceled, non-renewed or reduced without at least thirty (30) days' prior notice to IHG.

**15.3.   Evidence of Insurance**.  Licensee shall furnish to IHG certificates of insurance evidencing the term and limits of coverage in force, names of applicable insurers and persons insured at least ten (10) days prior to Licensee commencing any of the activities or operations contemplated by this License. Revised certificates of insurance shall be forwarded to IHG each time a change in coverage or insurance carrier is made by Licensee, and/or upon renewal of expired coverages.  At IHG's option, Licensee may be required to provide certified insurance policy copies. If Licensee fails to procure or maintain the insurance coverages and limits required by IHG, IHG will have the right and authority, but not the obligation, to procure such insurance at Licensee's cost, including any costs incurred by IHG for procurement and maintenance of such insurance.

## 16.   **TRANSFER**.

**16.1.   Transfer by IHG**. IHG shall have the right to Transfer this License or all or any part of its rights, duties or obligations under this License, to any Person.  If IHG Transfers this License, Licensee

expressly agrees that immediately upon and following such Transfer, IHG will no longer have any obligation, directly, indirectly or contingently, to perform or fulfill the duties or obligations imposed upon "IHG" hereunder. Moreover, to the extent that IHG has arranged for one or more of its Affiliates to perform certain activities on IHG's behalf and at IHG's direction, as contemplated by this License, IHG's Affiliates will similarly have no obligation, contingent or otherwise, to continue to perform such activities following any such Transfer of this License by IHG. Instead, all of IHG's duties and obligations will be performed solely by IHG's assignee following any such Transfer, and Licensee will never assert, contend or complain otherwise. Licensee agrees that any such Transfer will constitute a release of IHG and novation of this License. Licensee agrees and affirms that IHG and/or its Affiliates may undertake a refinancing, recapitalization, securitization, leveraged buyout or other economic or financial restructuring. Licensee expressly waives any and all claims, demands or damages arising from or related to such activities.

**16.2.    Ownership of Licensee**. Licensee represents, warrants and agrees (on behalf of itself and its Owners) that Attachment C is current, complete and accurate. Without limiting IHG's rights or Licensee's obligations under this paragraph, upon the reasonable request of IHG, Licensee will submit to IHG evidence, in the form and substance satisfactory to IHG, confirming that the Ownership Interests in Licensee are directly owned (and if applicable, indirectly owned) by the Owners as set forth on Attachment C. Upon any Transfer under this Paragraph 16 or otherwise permitted by IHG, Licensee will provide a list of the names and addresses of the new Owners and update Attachment C.

**16.3.    Transfer by Licensee**. Licensee understands and acknowledges that the rights and duties set forth in this License are personal to Licensee, and that IHG has granted this License in reliance on Licensee's business skill, financial capacity, and reputation. Accordingly, this License; any direct or indirect Ownership Interest in Licensee, or the Hotel; all, or substantially all, of the assets of the Hotel; or any lease, management agreement or other agreement that involves a material asset or control of all or any part of Licensee's licensed business may not in whole or in part be Transferred, voluntarily or involuntarily, directly or indirectly, by operation of law or otherwise, in any fashion without first obtaining IHG's prior written consent in accordance with this Paragraph 16. Any actual or attempted assignment in violation of the terms of this Paragraph 16 will be null, void and of no effect, and will be a material and incurable breach of this License which, unless IHG waives the breach, will entitle IHG to terminate this License immediately

**16.4.    Non-Control Transfers**. Notwithstanding Paragraph 16.3, if Licensee is in compliance with this License and all other IHG Agreements, then, Licensee and/or any of its Owners may consummate any Transfer of a direct or indirect non-Controlling Ownership Interest in Licensee, or effect a transaction that does not result in a direct or indirect change of Control in Licensee, without IHG's consent, if: (a) Licensee notifies IHG in writing at least twenty (20) days before the Transfer's effective date; (b) Licensee provides IHG with the identity of the proposed transferee and its owners, together with all other related information reasonably requested by IHG and the proposed transferee and its owners meet IHG's then-current ownership criteria (including not being a Prohibited Person or a Competitor); and (c) such Transfer does not, whether in one transaction or a series of related transactions, result in the transfer or creation of a Controlling Ownership Interest in Licensee; and (d) such Transfer does not, whether in one transaction or a series of related transactions, result in the Transfer of all of Guarantor's Ownership Interest in Licensee. At IHG's request, Licensee and any such transferees shall execute (or re-execute) a general release of any and all claims against IHG and its Affiliates, and their respective officers, directors, agents and employees. If IHG requests, Licensee will execute an amendment to this License that updates the ownership information in Attachment C.

**16.5.    Control Transfers**. Notwithstanding Paragraph 16.3, if Licensee or any Owner wishes to Transfer the Hotel, its Ownership Interest in the Hotel, a direct or indirect Controlling Ownership Interest in Licensee, all, or substantially all, of the assets of the Hotel, or effect a transaction that otherwise results in a direct or indirect change of Control in Licensee, Licensee will provide written notice of such proposed Transfer to IHG and request for IHG's consent to such Transfer at least thirty (30) days before the  effective

21

date of the proposed Transfer. The notice will state the full name and identity of all of the parties to the proposed Transfer, including owners of such parties and the terms of the Transfer, together with all other related information that is reasonably requested by IHG. Prior Transfers of Ownership Interests by or to the same Person or an Affiliate of such Person will be considered in determining whether a Transfer of a Controlling Ownership Interest or change of Control has occurred.

16.5.1. IHG's election to consent to such Transfer shall be subject to Licensee's satisfaction of the following conditions:

(a)     Licensee must deliver to IHG all documents, information and representations and warranties with respect to transferee's corporate organization, authority, and ownership requested by IHG, including a complete copy of the sale and purchase agreement or similar document effecting the Transfer;

(b)     Licensee must satisfy all of its accrued monetary obligations to IHG and its Affiliates, including an amount equal to a reasonable estimate of the costs and fees not yet accumulated and/or invoiced, and will execute (on Licensee's behalf and on behalf of its Affiliates), in a form prescribed by IHG, a general release of any and all claims against IHG and its Affiliates, and their respective officers, directors, agents and employees;

(c)     the proposed transferee must complete and submit to IHG a new franchise application together with the then-current Initial License Fee being charged to Brand System Hotel Licensees ("**Transfer Fee**"). If IHG does not consent to the Transfer application, IHG will refund the Transfer Fee, less fifteen thousand U.S. Dollars ($15,000.00), which IHG will retain;

(d)     the proposed transferee and its owners meet IHG's then-current ownership criteria (including, without limitation, not being a Prohibited Person or a Competitor);

(e)     the transferee must enter into IHG's then-current form of license agreement and relevant ancillary agreements (including, the Guaranty), which will contain the standard terms then being issued for Brand System Hotels, including the then-current fees and charges. The new license agreement will be for at least the unexpired portion of the Term and provide for the upgrade of the Hotel to address any needed renovations and to bring the Hotel into compliance with IHG's then-current Brand Standards pursuant to a property improvement plan ("**PIP**"). Licensee will pay IHG's then-current, non-refundable property improvement plan fee (currently, eight thousand five hundred U.S. Dollars ($ 8,500.00) to cover IHG's costs associated with creating the PIP;

(f)     the transferee must retain a Management Company consented to in writing by IHG to control the day-to-day operations of the Hotel if IHG determines that transferee is not qualified to operate the Hotel;

(g)     IHG will have the right to require that the transferee pay IHG's outside counsel costs in connection with any such Transfer;

(h)     If, due to the ownership structure of the transferee or the Hotel, the debt service on the Hotel, the financial status of the transferee and its owners, or other revenues, IHG determines that additional protections are necessary, IHG may, among other things, require the transferee to establish and maintain an additional reserve to support the cost of future repairs and replacements of FF&E or other expenditures under the PIP and capital improvements, and the transferee will deposit into such reserve the amount required by IHG at the time of the Transfer and each month throughout the term of the license agreement;

(i)     The proposed transferee possesses the skills, qualifications, financial

condition, background and history, reputation, economic resources, organizational, managerial and financial structure and resources, education, managerial and business experience, moral character, credit rating and ability to assume Licensee's duties and obligations under this License or any successor agreement. Licensee must pay the reasonable costs of any investigation required to be conducted by IHG;

(j)     That, upon IHG's request, the proposed transferee appear for a personal interview at IHG's corporate office, or any other mutually agreeable location, at a date and time IHG reasonably requests, without expense to IHG. IHG may determine to meet with the proposed transferee at its principal place of business or another mutually agreeable location and, if IHG does so, Licensee will reimburse IHG for all reasonable travel, lodging, meal and personal expenses related to such meeting; and

(k)     That the transferee has acquired, or will be able to immediately acquire following the execution of the new license agreement, all permits, licenses and other authorizations required by Applicable Law to operate the Hotel. If Applicable Law enables Licensee to assign any of the aforementioned permits, licenses and/or authorizations which Licensee possesses to the transferee, then Licensee agrees to do so immediately following IHG's execution of the transferee's new license agreement.

(l)     Notwithstanding the foregoing, Licensee understands and agrees that it will remain fully liable and responsible for all of its obligations to IHG and its Affiliates under this License which arose in connection with the operation of the Hotel prior to the effective date of the transferee's new license agreement and for any such obligations to IHG under this License which, by their nature, are intended to survive the termination or expiration of this License (specifically including Licensee's indemnification obligations under <u>Paragraph 14</u>) and Licensee agrees to execute any and all documents IHG reasonably requests to further evidence such liability.

### 16.6.    Transfers for Estate Planning; Upon Death or Mental Incapacity.

**16.6.1.**    Notwithstanding <u>Paragraph 16.3</u>, Licensee may, for estate planning, Transfer an Ownership Interest in Licensee to a member of Licensee's family (<u>i.e.</u>, a spouse, parent, sibling, son, daughter, niece or nephew), or to a trust for the benefit of such immediate family member, or to a Person in which Licensee owns and controls a majority of the Ownership Interests and voting power; *provided, however,* that prior to such transfer the following requirements are met: (a) adequate provision acceptable to IHG is made for the management of the Hotel; (b) the obligations of Licensee under this License are satisfied pending the Transfer; (c) the transferee executes IHG's then-current form of license agreement used to license Brand System Hotels for at least the unexpired portion of the Term (as determined by IHG), except that the fees charged thereunder shall be the same as those contained in this License (including any adjustments to such fees as may have been implemented from time to time in accordance with the terms of this License); (d) Licensee executes a termination agreement of this License on IHG's then-current form (which shall contain a general release of any and all claims of Licensee (and any of Licensee's Affiliates) against IHG and its Affiliates, and their respective officers, directors, managers, members, shareholders, agents and employees); and (e) each Guarantor acknowledges the Transfer and reaffirms its obligations under the Guaranty and, if required by IHG, Licensee guarantees, on IHG's then-current form (which shall contain a general release of any and all claims against IHG and its Affiliates (including, IHG), and their respective officers, directors, agents and employees), the performance of the new licensee's obligations under the newly executed license agreement.

**16.6.2.**    Upon the death or mental incompetency of Licensee or an Owner with a Controlling Ownership Interest in Licensee, such interest may be transferred in accordance with and subject to the terms of <u>Paragraph 16.5</u>, provided that: (i) any such Transfer will be made within six (6) months of the date of death or mental incompetency, (ii) the obligations of Licensee under this License are satisfied pending the Transfer, and (iii) the Hotel will be continuously operated by Licensee or a Management Company as required under <u>Paragraph 6.1</u>.

23

**16.7.    Publicly-Traded Securities and Securities Offerings**.

**16.7.1.**  Publicly-traded or privately placed securities in Licensee of any type or nature may be transferred in compliance with Applicable Law without IHG's consent if the Transfer will not result in a Transfer of Control (as determined by IHG) in Licensee.  Any Transfer of Ownership Interests in Licensee that will result in a Transfer of Control of Licensee (as determined by IHG) will be subject to Paragraph 16.5.

**16.7.2.**  Licensee must submit to IHG for its approval the Prospectus (or similar document) that Licensee or any Owner provides to any offeree or prospective purchaser of any Ownership Interests or other securities in Licensee or any Owner which contain information about this License, the Marks (including any display thereof), IHG's relationship with Licensee, or the network of Brand System Hotels or other IHG Portfolio Brand Hotels.  Any Prospectus must include legends and statements as IHG may specify, including legends and statements which disclaim IHG's liability for, or involvement in, Licensee's offer and sale of securities or other Ownership Interests, and must advise all offerees that IHG's review of Licensee's offering materials must not be deemed in any fashion IHG's approval, endorsement, acceptance or adoption of any representation, warranty, covenant or projection contained in the Prospectus.  In addition, the Prospectus must (i) state that IHG is not participating as an underwriter, issuer, or as Licensee's representative; (ii) state that IHG is not endorsing the offering or agreeing with any financial projections; (iii) use the Marks only as consented to by IHG; and, (iv) must not contain any information about IHG, this License, other IHG Agreements, the Brand System, the Marks or IHG Portfolio Brand Hotels that IHG disapproves.  Licensee shall submit to IHG for its review at least sixty (60) days before the earliest date on which any Prospectus is disseminated or distributed to a potential investor or filed with the Securities and Exchange Commission or any other governmental authority responsible for the regulation of the sale of securities, a copy of the proposed Prospectus, all supporting and related materials and releases.  If IHG requests, Licensee must pay IHG's reasonable attorney fees for the review of such Prospectus, IHG may require changes to the Prospectus for the purposes specified above and has the right to request and receive full and unconditional indemnification from all participants in the offering before issuing IHG's consent.  IHG's consent does not constitute an endorsement of the Prospectus.  IHG's consent relates only to Licensee's compliance with the requirements of this Paragraph 16.7.

**16.7.3.**  IHG's review of the Prospectus will be conducted solely for the benefit of IHG to determine the accuracy and completeness of any description of IHG's relationship with Licensee and compliance with the other requirements of this Paragraph 16.7 and not to benefit any other Person, and its consent will not constitute any kind of authorization, acceptance or agreement, endorsement, or ratification of the offering or Prospectus or of its contents, either express or implied.

**16.7.4.**  Licensee's offer and sale of securities and other Ownership Interests is specifically embraced by Licensee's indemnification of the Indemnitees identified in Paragraph 14 of this License.  Any other participant in Licensee's offer of securities or other Ownership Interests must agree to indemnify IHG and its Affiliates fully in a parallel fashion in that form which IHG prescribes.

**16.8.    Transfer of Real Estate**. If (i) the real property used in the operation of the Hotel is owned directly or indirectly by Licensee or by a Person that owns any Ownership Interest in Licensee and (ii) Licensee or that Person proposes to transfer all or a substantial part of such property to a third party, such transfer shall constitute a Transfer under the provisions of Paragraph 16.5 of this License requiring an application for a new license agreement, unless Licensee receives IHG's prior written consent for the transaction.  Licensee may however, without IHG's consent, mortgage or otherwise grant a security interest in the real estate or other tangible assets of the Hotel (but specifically excluding this License or any right or interest herein) in connection with commercially reasonable financing for the Hotel with a third party bank or other commercial lending institution which is not a Competitor.  The selling, offering for sale, or establishment or registration of any condominium, cooperative, flat, timeshare, fractional interest, or

interval ownership or regime or any similar type of ownership or regime relating to all or any part of the Hotel is prohibited.

**16.9.   Security Interests.**  Licensee and each Owner may grant a lien or other security interest in the Hotel or the revenues of the Hotel, or pledge Ownership Interests in Licensee or an Affiliate as collateral for the financing of the Hotel. If any Person exercises its rights under such lien, security interest or pledge, IHG will have the rights under Paragraph 19.1. However, Licensee will not pledge this License as collateral or grant a security interest in this License, but IHG may, in its sole discretion, provide a comfort letter to a lender in its standard form and, if it does so, Licensee will pay any lender comfort letter processing fee required by IHG.

**16.10.   Bankruptcy**.  If Licensee, the Hotel, or any Owner of Licensee and/or the Hotel is the subject of any voluntary or involuntary proceeding under the U.S. Bankruptcy Code, as amended, and if this License does not terminate as provided in Paragraph 18 below but, instead, is to be assumed by, or assigned to, a third party individual or entity which has made a bona fide offer to accept an assignment of this License as contemplated by the U.S. Bankruptcy Code, then Licensee must notify IHG of any such proposed assignment or assumption within five (5) days after IHG's receipt of such proposed assignee's offer to accept assignment or to assume Licensee's rights and obligations under this License.  Such notice must be given to IHG, in any event, no later than ten (10) days prior to the date application is made to a court of competent jurisdiction for authority and approval to enter into such assignment and assumption.

The notice required above must contain the following: (i) the name and address of the proposed assignee; (ii) all of the terms and conditions of the proposed assignment and assumption; and, (iii) adequate assurance to be provided to us to assure the proposed assignee's future performance (as defined below) under this License, including (without limitation) the assurance referred to in Section 365 of the U.S. Bankruptcy Code and the satisfaction of the preconditions to assignment set forth in Paragraph 16.5 of this License.

IHG will then have the prior right and option, to be exercised by notice given at any time prior to the effective date of the proposed assignment and assumption, to accept an assignment of this License to itself, an Affiliate or another licensee, upon the same terms and conditions, and for the same consideration (if any), as in the bona fide offer made by the proposed assignee, less any brokerage commissions or other expenses which may be saved by Licensee as a result of IHG's exercise of the rights and options granted to IHG herein.  Under no circumstance shall IHG be liable for the payment of any brokerage commissions or other expenses as a result of our exercise of its rights and options hereunder unless IHG otherwise agrees in writing.

"Adequate assurance of future performance", as used above, shall mean that IHG shall have been furnished with specific evidence that any proposed assignee of this License can and will comply with all operational and other performance requirements, and with all conditions, obligations, duties, covenants and requirements of a licensee under: (i) this License; (ii) the standard form license agreement then being offered to IHG's licensees; (iii) such other ancillary agreements as IHG may require; and (iv) any of IHG's policies describing its licensees' duties, obligations, conditions, covenants or performance requirements. Licensee understands and agrees that adequate assurance of future performance shall mean that any proposed assignee must satisfy the conditions set forth in Paragraph 16.5 above.

**16.11.   Right of First Refusal.**  Notwithstanding anything else to the contrary in this License, if Licensee receives an offer for, and wishes to sell the Hotel (including all or a portion of the Hotel, or the right, in any form other than a bona fide debt instrument, to receive income from the Hotel), Licensee shall give IHG written notice along with a complete copy of the offer ("**ROFR Notice**") within ten (10) days of its receipt and shall offer to sell the Hotel to IHG on the same terms and conditions as the offer ("**Right of First Refusal**"); provided however, that if any portion of the consideration contemplated by the offer is in a form other than cash, IHG shall have the right to purchase the Hotel for its fair market value in lieu of any

25

non-cash consideration; if Licensee and IHG are unable to agree on the fair market value within fourteen (14) days of IHG's election, IHG will promptly provide Licensee with a list of at least three nationally recognized appraisers of hotel properties, and within five days Licensee will select one of such appraisers to appraise the Hotel. IHG and Licensee will share the costs of the appraisal equally. Such appraisal will constitute the fair market value of the Hotel for purposes of this Paragraph. IHG shall notify Licensee, within thirty (30) days of its actual receipt of such notice or the appraisal, as applicable, if it intends to accept the Licensee's offer. Any acceptance of the offer by IHG shall be subject to compliance with any Applicable Laws which are a pre-condition to consummation of the transaction. IHG's acceptance may provide for preparation of a definitive agreement consistent with the offer and acceptance; however, such definitive agreement shall not be a condition precedent to an effective agreement between IHG and Licensee. If IHG has not given notice to Licensee that it intends to accept the offer, Licensee may proceed to sell the Hotel on the same terms and conditions contained in the offer notified to IHG without regard to this Right of First Refusal, but only if such sale is consummated within one hundred fifty (150) days from the date of Licensee's notice to IHG. If such sale is not consummated within such one hundred fifty (150) day period or if the terms of such sale differ materially from the terms and conditions presented in the ROFR Notice, then Licensee shall be required to deliver another ROFR Notice and again follow the process set forth above. In the event that IHG waives this Right of First Refusal in accordance with the terms set forth herein, then the sale of the Hotel to a purchaser other than IHG shall proceed subject to the provisions of this <u>Paragraph 16</u>.

## 17.    <u>CONDEMNATION AND CASUALTY</u>

### 17.1.    **Condemnation**.

**17.1.1.** *Condemnation Notification*. Licensee shall immediately notify IHG of any proposed taking of all or any part of the Hotel by eminent domain, condemnation, compulsory acquisition or similar proceeding by any governmental authority.

**17.1.2.** *Condemnation Restoration and Termination*. If the condemnation award is sufficient to restore the Hotel so as to meet the Brand Standards **and such restoration is not prohibited by applicable governmental authorities**, Licensee will cause the Hotel to be promptly restored and reopened within a reasonable time. If **all of** the Hotel or a substantial part will be taken, IHG or Licensee may terminate this License. If a termination takes place pursuant to this paragraph, Licensee shall have no liability for the liquidated damages set forth in <u>Paragraph 19</u> of this License.

### 17.2.    **Casualty**.

**17.2.1.** *Casualty Notification*. Licensee shall immediately notify IHG if the Hotel is damaged by any casualty (including, fire).

**17.2.2.** *Casualty Restoration and Termination*. If the Hotel is damaged by casualty, Licensee will immediately notify IHG and expeditiously repair the damage; provided, however, if all or **substantially** all of the Hotel is destroyed by such casualty, either party (unless caused by the intentional act of Licensee or its agent) may terminate this License by fifteen (15) days prior notice to the other delivered within sixty (60) days of the date of the casualty.  If Licensee terminates this License in accordance with this provision, Licensee shall have no liability for the liquidated damages set forth in <u>Paragraph 19</u> of this License so long as (i) neither Licensee nor its agent by intentional act caused the casualty and (ii) so long as neither Licensee nor any of its Affiliates, principals, shareholders, members, partners or other owners, either directly or through another person or entity, develops, leases or operates the site as a hotel or other lodging or residential facility of any kind or sort for at least five (5) years following the date of termination (or the originally scheduled termination date of this License, if earlier) other than pursuant to another license with IHG.  Unless this License is terminated pursuant to this

paragraph, Licensee will close the Hotel if required by the extent of the damage or if otherwise required by IHG; and then will, **subject to the consent of its mortgage lender,** repair or rebuild the Hotel in accordance with the Brand Standards; commence reconstruction within six (6) months after the casualty; expeditiously continue on an uninterrupted basis with such reconstruction and will, if the Hotel was closed, reopen the Hotel for continuous business operations as soon as practicable (but in any event within twenty-four (24) months after the casualty), giving IHG at least forty-five (45) days advance notice of the date of reopening if the Hotel was closed. If the Hotel was closed, Licensee may not reopen the Hotel or promote or otherwise hold the Hotel out as a hotel in the Brand System unless and until IHG determines that the reconstruction is completed in accordance with the Brand Standards. If the Hotel is not required to be closed, all work to repair damage shall be conducted so as to minimize interference with the Hotel's operation and guests. If the damage is not repaired in accordance with this paragraph, this License will forthwith terminate upon notice thereof by IHG to Licensee and Licensee shall be responsible for full liquidated damages under <u>Paragraph 19</u> of this License. Notwithstanding anything else herein to the contrary, during the time the Hotel is closed, Licensee shall pay IHG a monthly royalty of two percent (2%) of Gross Rooms Revenue based on the average monthly Gross Rooms Revenue for the preceding twelve (12) months prior to the date of the casualty or if the Hotel has not been in the Brand System for twelve (12) months, based on the average monthly Gross Rooms Revenue for the period during which the Hotel has been in operation in the Brand System. This payment shall be in lieu of all other fees under <u>Paragraph 3</u> of this License **and, as long as Licensee is not in default of its obligation to maintain business interruption insurance coverage as required by this License, such payment shall be only required to the extent Licensee receives proceeds from such business interruption insurance**.

## 18.    <u>TERMINATION</u>.

    **18.1.**    **Termination by IHG Upon Notice with Opportunity to Cure**. Licensee will be in breach of this License for any failure to comply substantially with any of the requirements imposed upon Licensee and its Owners and Guarantors by this License and the Brand Standards or if Licensee and/or its Owners or Guarantors otherwise fail to fulfill the terms of this License in good faith. IHG may terminate this License and all rights granted to Licensee hereunder, provided that: (i) IHG gives Licensee notice of breach that provides thirty (30) days to cure the breach (or longer, if required by Applicable Law **or if such breach is not reasonably able to be cured within 30 days and Licensee commences to cure within 30 days and thereafter diligently pursues cure of such breach**); (ii) the notice reasonably identifies one or more breaches of the Licensee's obligations; and (iii) Licensee fails to cure such breach in the time and manner specified in the notice or as otherwise provided in this <u>Paragraph 18</u>. In any judicial proceeding in which the validity of any termination is at issue, IHG will not be limited to the reasons set forth in any notice sent under this paragraph. IHG's notice of breach or suspension of services shall not relieve Licensee of continuing to perform all of its obligations under this License and any IHG Agreement. Examples of breaches that constitute reasons for such termination include, without limitation:

    **18.1.1.**   Licensee fails to do any of the following in a timely manner to IHG's satisfaction: (i) perform any of the requirements stated in <u>Attachment D</u> by the dates required for commencement or completion of such requirements; or (ii) begin or complete any renovation, repair, refurbishment, upgrading or remodeling of the Hotel as required by IHG or any Brand Standards for the renovation, repair, refurbishment, upgrading or remodeling of the Hotel.

    **18.1.2.**   Licensee or its Affiliates fail to pay any indebtedness to IHG or any of its Affiliates when same becomes due and payable.

    **18.1.3.**   Licensee (or any Location Owner referenced or should be referenced in Item 17 of <u>Attachment B</u>) fails to comply fully with the Brand Standards or there occurs any other breach of this License or any of the IHG Agreements.

**18.1.4.**  To the extent permitted by Applicable Law, if Licensee has previously been in breach of any term of this License within the preceding twelve (12) months, for which breach a notice was sent to Licensee pursuant to Paragraph 18.1, the period given to remedy such breach shall be ten (10) days instead of thirty (30) days; provided, however, that if two (2) or more breaches of this License have occurred in the preceding twelve (12) months for which notices of breach were sent to Licensee (whether or not the prior breaches were cured timely), then, upon the next breach, this License may be terminated by IHG immediately upon written notice to Licensee.

**18.2.    Interim Remedies.**  If Licensee fails to cure its breach of its obligations timely and in the manner required by IHG, IHG may in its sole discretion suspend the Hotel from access to the Reservation System, any other part of or all of the Technology Systems.  IHG may also in its sole discretion remove the Hotel's listing from any website services and divert reservations previously made for the Hotel to other Brand System Hotels or IHG Portfolio Brand Hotels. Licensee must pay all costs arising from suspension from the Reservation System, any other part of or all of the Technology Systems.  IHG's election to suspend the Hotel from said access rather than terminate this License will not: (i) constitute a waiver of any breach by Licensee or of any rights IHG otherwise has to terminate the License; (ii) actual or constructive termination of this License; (iii) constitute an abandonment by IHG of this License; and, (iv) entitle Licensee to any compensation of any kind for any alleged losses Licensee might incur as a result of said suspension.

**18.3.    Immediate Termination by IHG**. Notwithstanding anything to the contrary in Paragraph 18.1, IHG may terminate this License and all rights granted to Licensee under this License without affording Licensee any opportunity to cure the default, effective immediately upon notice to Licensee (or, if later, at the earliest time permitted by Applicable Law) if:

**18.3.1.**  Licensee or any Guarantor shall generally not pay its debts as they become due, or shall admit in writing its inability to pay its debts, or shall make a general assignment for the benefit of creditors, or proceedings for a compromise with creditors are instituted by, against, or consented to by Licensee or any Guarantor;

**18.3.2.**  Licensee or any Guarantor shall commence any case, proceeding or other action seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts under any Applicable Law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property;

**18.3.3.**  Licensee or any Guarantor shall take any corporate or other action to authorize any of the actions set forth in Paragraphs 18.3.1 and 18.3.2 above;

**18.3.4.**  any case, proceeding or other action against Licensee or any Guarantor shall be commenced seeking to have an order for relief entered against it as debtor, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts under any Applicable Law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property, and such case, proceeding or other action: (i) results in the entry of any order for relief against it which is not fully stayed within seven (7) business days after the entry thereof, or (ii) remains un-dismissed for a period of forty-five (45) days after the date of entry thereof;

**18.3.5.**  an attachment remains on all or a substantial part of the Hotel or of Licensee's or any Guarantor's assets for thirty (30) days or more;

**18.3.6.**  Licensee or any Guarantor fails, within sixty (60) days of the date of entry of a

final judgment or tax lien against Licensee or a Guarantor of this License in any amount exceeding Fifty Thousand ($50,000), to discharge, vacate or reverse the judgment or tax lien, or, to stay execution of it, or if appealed, to discharge the judgment within thirty (30) days after a final decision is rendered in the appeal;

**18.3.7.**   Licensee voluntarily or involuntarily loses possession or the right to possession of all or a significant part of the Hotel, except as otherwise provided in <u>Paragraph 17</u> (Condemnation and Casualty), or, if the Hotel is subject to a lease referenced in Item 15 of Attachment B, Licensee of the Location Owner referenced in Item 15 of Attachment B is in default under such lease, or such lease is terminated for any reason;

**18.3.8.**   Licensee or any of its Owners contests in any court or proceeding IHG's or its Affiliates' ownership of the Brand System, or the validity of any of the Marks, or Intellectual Property;

**18.3.9.**   A breach of <u>Paragraph 14</u> (Indemnity), <u>Paragraph 15</u> (Insurance) or <u>Paragraph 16</u> (Transfer) occurs;

**18.3.10.**    Licensee fails to continue to identify the Hotel to the public as a Brand System Hotel, engages in any action that violates IHG's proprietary rights under <u>Paragraph 11</u> or ceases to operate the Hotel as a Brand System Hotel;

**18.3.11.**    Any action is taken toward dissolving or liquidating Licensee or any Guarantor hereunder, except for any such actions resulting from the death of a partner;

**18.3.12.**    Licensee (or any of its Owners) is, or is discovered to have been, convicted of a felony (or any other offense if it is likely to adversely reflect upon or affect the Hotel, the Brand System or IHG and its Affiliates  in any way);

**18.3.13.**    Licensee maintains false books and records of account or submits false reports or information to IHG;

**18.3.14.**    Licensee knowingly fails to comply with the requirements of this License and/or the Brand Standards on safety, security, or privacy for its guests at the Hotel, or fails to uphold the reputation of the management, employees or operation of the Hotel, and such failure may significantly adversely reflect upon or affect the Hotel, the Brand System, IHG or its Affiliates in any way;

**18.3.15.**    A breach of <u>Paragraph 21.2</u> (Anti-Terrorism, Anti-Bribery and Trade Sanction Compliance) occurs;

**18.3.16.**    Licensee omitted or misrepresented any material fact in the information that it furnished to IHG in connection with IHG's decision to enter into this License;

**18.3.17.**    Licensee operates the Hotel in a fashion that, in IHG's Business Judgment, in any way, jeopardizes the life, health or safety of the general public, guests or employees of the Hotel.  If Licensee does so, then not only may IHG terminate this License upon notice, but Licensee agrees that IHG may either beforehand or concurrently direct Licensee to close immediately the Hotel. Licensee shall immediately comply with such direction (which may be given orally or in writing); and, Licensee shall hold IHG and its Affiliates harmless from and against any claims whatsoever relating to IHG's direction to close the Hotel.

**18.3.18.**    Licensee interferes or attempts to interfere in any manner with IHG's and its Affiliates' contractual relations and/or relationships with other licensees; any supplier of Licensee, IHG or other licensees; any government or quasi-governmental authority; IHG's employees; or, any third party.

**18.3.19.**    Licensee uses any of the Marks before being authorized to do so by IHG;

**18.3.20.**    Licensee uses any of the Marks in any manner prohibited or not expressly authorized or permitted, by this License; or

**18.3.21.**    Licensee refuses to allow, or refuses to cooperate with, IHG's inspection or audit of the Hotel following a reasonable attempt by IHG to schedule during normal business hours.

**18.3.22.**    Licensee or its Affiliates defaults under any other agreement with IHG or with an Affiliate of IHG.

**18.4.    Description of Breach**. The description of any breach in any notice that IHG transmits to Licensee will in no way preclude IHG from specifying additional or supplemental defaults under this License in any action, proceeding, hearing or lawsuit relating to this License or the termination of this License.

**18.5.    Continuance of Business Relations**. Any continuance of business relations between IHG and Licensee after the termination or expiration of this License will not constitute, and may not be construed as, a reinstatement, renewal, extension or continuation of this License unless IHG and Licensee agree in writing to any such renewal, extension or continuation.

**18.6.    IHG's Right to Send Notifications of Termination:** Before or on the expiration or termination of this License, IHG may give notice that the Hotel is leaving the Brand System and take any other action related to guests, travel agents, suppliers and all other Persons affected by such expiration or termination.

**18.7.    De-Identification of Hotel Upon Termination** Upon expiration or other termination of this License, all rights granted under this License to Licensee will immediately terminate and Licensee, at its expense, will comply with each of the following obligations, among other things:

**18.7.1.**    Returning to IHG the Brand Standards and all other materials proprietary to IHG, ceasing the use of any of IHG's trademarks or service marks, effecting physical changes to distinctive Brand System features of the Hotel, including removal of the primary freestanding sign down to the structural steel, and all other actions required to preclude any possibility of confusion on the part of the public and to ensure that the Hotel is no longer using all or any Component or otherwise holding itself out to the public as a Brand System Hotel. Anything not done by Licensee in this regard within thirty (30) days after termination may be done at Licensee's expense by IHG or its agents who may enter upon the premises of the Hotel for that purpose, without any need to provide notice to Licensee, and whom Licensee hereby appoints as its attorney(s)-in-fact with full authority to do so with no liability for trespass or any other illegality;

**18.7.2.**    Licensee must cancel any fictitious, trade, or assumed name or equivalent registration that contains any Marks or any variations thereof, and Licensee must furnish IHG with evidence satisfactory to IHG of compliance with this obligation within thirty (30) days after termination or expiration of this License;

**18.7.3.**    Licensee will immediately turn over to IHG the originals and all copies of any Confidential Information, Intellectual Property, and all other Brand System materials relating to the operation of the Hotel in the Brand System, or such other information generated by Licensee through its use of the Brand System that is deemed confidential by IHG, all of which are acknowledged by Licensee to be IHG's property. If IHG permits Licensee to continue to use any Intellectual Property after the termination or expiration date (such permission to be explicit and specific), such use by Licensee will be in accordance with the terms of this License;

**18.7.4.** Licensee agrees that it will make no use of any of the Confidential Information or Brand System or disclose or reveal it or any portion thereof to anyone not employed by IHG or its licensees. Additionally, Licensee will not assist anyone not franchised or licensed to use the Brand System in constructing or equipping any hotel premises incorporating the distinctive features or layout that IHG (or its Affiliates ) owns, has originated, or developed and which are identifying characteristics of businesses using the Brand System;

**18.7.5.** Licensee will immediately make such alterations as may be necessary to distinguish the Hotel clearly from its former appearance and other Brand System Hotels in order to prevent any possibility of confusion by the public.  Licensee will make such specific additional changes as IHG may reasonably request for this purpose; and

**18.7.6.** Licensee will promptly pay all amounts owing to IHG and its Affiliates.

**18.8.** **IHG's Rights on Expiration or Termination**.  Before or on the expiration or termination of this License, IHG may give notice that the Hotel is leaving the Brand System and take any other action related to customers, Travel Management Companies, suppliers and other Persons affected by such expiration or termination.

## 19.    LIQUIDATED DAMAGES.

**19.1.** **Payment of Liquidated Damages**. If this License terminates pursuant to Paragraphs 18.1 or 18.3 above, in addition to the amounts payable under Paragraphs 3.1 to 3.6 (the "**Required Fees**") that may be owed, Licensee will promptly pay Liquidated Damages to IHG.  For purposes of this Paragraph 19, "**Liquidated Damages**" shall collectively mean the Lump Sum and Additional Lump Sum (as those terms are defined below).

**19.2.** **Payment of the Lump Sum**.  The "**Lump Sum**" shall mean:

**19.2.1.** if the Hotel was in operation pursuant to this License for at least five (5) years prior to the date of the notice of termination, and the unexpired Term is equal to or greater than five (5)  years, a sum equal to the total Required Fees paid or payable to IHG and/or its Affiliates for the five (5)  years preceding the date of the notice of termination;

**19.2.2.** if the Hotel was in operation pursuant to this License for at least five (5) years prior to the date of the notice of termination, and the unexpired Term is less than five (5) years, a sum equal to the monthly average of the Required Fees payable to IHG and/or its Affiliates for the five (5) years preceding the date of the notice of termination multiplied by the number of months remaining in the Term; or

**19.2.3.** if the Hotel has been in operation pursuant to this License for less than five (5) years), the greater of:

(a) a sum equal to the monthly average of the Required Fees payable to IHG and/or its Affiliates for the months that the Hotel was in operation multiplied by sixty (60); or

(b) a sum equal to the Required Fees payable to IHG and/or its Affiliates for the one (1) month immediately preceding the date of notice of the termination multiplied by sixty (60).

**19.2.4.** if IHG terminates this License due to Licensee's breach of any of its obligations under the License prior to the time that Licensee is authorized to use the Brand System at the Hotel, the monthly average of the Required Fees that would have been due to IHG assuming the Hotel had collected Gross Rooms Revenue based on the average daily revenue per available room for all hotels in the Brand

System for the previous (12) months, as determined by IHG, multiplied by the greater of (a) six (6) or (b) the number of full and partial months from the Effective Date to the termination date of this License.

**19.3.    Reasonable Estimation of Probable Loss**. IHG and Licensee acknowledge and agree that it would be difficult to determine the injury caused to IHG by the termination of this License. IHG and Licensee therefore intend and agree that the Liquidated Damages calculation set forth in this paragraph is a reasonable estimate of IHG's probable loss as a result of Licensee's failure to operate the Hotel for the entire Term and in accordance with this License, and not a penalty or in lieu of any other payment.

**19.4.    Ability to Seek Actual Damages and Attorneys' Fees**.

**19.4.1.**  If payment of the Liquidated Damages is not enforceable (whether partially or entirely), IHG may seek actual damages from Licensee.

**19.4.2.**  In addition to Liquidated Damages, IHG will have the right to recover reasonable attorneys' fees and court costs incurred in collecting such sums plus interest on all amounts due under Paragraph 19, to remedy any defaults of this License, effect termination of this License, or any attorneys' fees or costs incurred by IHG to defend itself or enforce any rights under this License (including without limitation any claim, cross-claim, or counter-claim brought by Licensee). Such legal remedies will not preclude IHG from any equitable remedies to which it may be entitled under applicable law. Licensee's obligation to pay IHG Liquidated Damages, if applicable, and other sums pursuant to this Paragraph 19, will survive termination of this License.

**19.5.    No Licensee Right of Termination**. Nothing in this paragraph shall be construed to allow Licensee to terminate this License. Any such termination by Licensee shall be a breach of this License and shall entitle IHG to any and all remedies available.

**20.    RELATIONSHIP OF PARTIES**.

**20.1.    No Agency Relationship**. Licensee is an independent contractor.  Neither party is the legal representative nor agent of, or has the power to obligate (or has the right to direct or supervise the daily affairs of) the other for any purpose whatsoever.  IHG and Licensee expressly acknowledge that the relationship intended by them is a business relationship based entirely on and circumscribed by the express provisions of this License and that no partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this License.  Licensee acknowledges and agrees, and will never contend otherwise, that Licensee alone will exercise day-to-day control over all operations, activities and elements of Licensee and the Hotel and that under no circumstance shall IHG do so or be deemed to do so.  Licensee further acknowledges and agrees, and will never contend otherwise, that the various requirements, restrictions, prohibitions, specifications and procedures of the Brand System which Licensee is required to comply with under this License, whether set forth in the Brand Standards or otherwise, do not directly or indirectly constitute, suggest, infer or imply that IHG controls any aspect or element of the day-to-day operations of Licensee or the Hotel, which Licensee alone controls, but only constitute standards Licensee must adhere to when exercising its control of the day-to-day operations of Licensee and the Hotel. No employee of Licensee or its Management Company (if any) shall be deemed to be, joint or otherwise, an employee of IHG.

**20.2.    Licensee's Notices to Public Concerning Independent Status**. Licensee will take such steps as are necessary and such steps as IHG may from time to time reasonably request to minimize the chance of a claim being made against IHG for anything that occurs at the Hotel or for acts, omissions or obligations of Licensee or anyone associated or affiliated with Licensee or the Hotel.  Such steps may, for example, include giving notice in Guestrooms, public rooms and advertisements and on business forms and stationery, etc., making clear to the public that IHG is not the owner or operator of the Hotel and is not

accountable for what happens at the Hotel.  Unless required by Applicable Law, Licensee will not use IHG's name, the Marks or any other trademarks, service marks or other intellectual property owned or licensed by IHG, or any similar words in its corporate, partnership, entity or trade name, nor authorize or permit such use by anyone else.  Licensee will not use IHG's name, the Marks or any other trademarks, service marks or other intellectual property owned or licensed by IHG to incur any obligation or indebtedness on behalf of IHG. Licensee shall not register IHG's name, the Marks or any other trademarks, service marks or other intellectual property owned or licensed by IHG and its Affiliates as part of any internet domain name or Uniform Resource Locator (URL), and may not display or use any of the Marks or other intellectual property rights related to the Brand System in connection with any web site.  Licensee shall not promote, maintain, implement or be responsible for any web site in connection with the licensed Hotel without the prior written approval of IHG, and if approved by IHG, any such web site shall comply with all of IHG's web site requirements as set forth in the Brand Standards or otherwise and ownership of the URL and other identifiers associated with any such approved web site shall vest exclusively in IHG.

**20.3.    Business Judgment**. IHG and Licensee recognize and agree that certain provisions of this License describe the right of IHG (or its designee) to take (or refrain from taking) certain actions in the exercise of its business judgment as to the long-term overall interests of the Brand System, and/or upon its determination that the change was adopted in good faith and is consistent with the long-term overall interests of the Brand System (IHG's "**Business Judgment**").  Where such judgment has been exercised by IHG (or its designee), neither a mediator, nor a judge, nor any trier of fact, shall substitute his, her or their judgment for the judgment so exercised by IHG.  Licensee will have the burden of establishing that IHG failed to exercise its Business Judgment.  The fact that any particular Brand System Hotel did or did not benefit from any action or decision, or that another reasonable alternative was available, does not mean that IHG failed to exercise its Business Judgment.

## 21.    <u>COMPLIANCE WITH LAWS</u>.

**21.1.    Applicable Law**. Licensee will comply with all Applicable Law, and will obtain in a timely manner all permits, certificates, and licenses necessary for the full and proper operation of the Hotel and compliance with the IHG Agreements.

**21.2.    Anti-Terrorism, Anti-Bribery and Trade Sanctions Compliance**. Licensee represents, warrants and covenants that: (A) neither it nor any Person having a direct or indirect ownership interest in Licensee, its Owners (excluding shareholders of publicly traded entities), nor any Guarantor of Licensee's obligations under this License, nor any Person [affiliated or associated] with Licensee, including any officer, director, employee, member, manager, partner or shareholder  (excluding shareholders of publicly traded entities) or Affiliate thereof has been, is now, or will be: (i)  directly or indirectly owned or controlled by the government of any nation subject to trade sanctions or embargoes imposed by any of the Sanctioning Bodies; (ii) acting on behalf of any government of any nation subject to trade sanctions or embargoes imposed by an of the Sanctioning Bodies; (iii) a Prohibited Person or (iv) convicted of any offence nor in violation of, nor will it in the future engage in any activity, practice or conduct which would constitute an offence under any applicable law relating to anti-money laundering, anti-terrorism, anti-bribery, trade sanctions or embargoes, narcotics, illegal immigration, or human trafficking, including without limitation, the Relevant Laws;  (B)  its employees, representatives or agents or those of any of its related or affiliated companies will not at any time engage in any form of corruption or bribery (including commercial bribery) or in any activity which contravenes any Anti-Corruption Laws in connection with Owner's performance of this License (including, without limitation, in connection with the construction, pre-opening or operations of the Hotel); (C) Licensee will ensure that all persons who perform services for the Licensee in connection with Licensee's performance of this License (including, without limitation, in connection with the construction, pre-opening or operations of the Hotel) comply with Anti-Corruption Laws and do not engage in any form of corruption or bribery (including commercial bribery); (D) Licensee will maintain an Anti-Corruption Policy during the Term to ensure compliance with this <u>Paragraph 21.2</u>; (E)  On request,

33

Licensee will certify to IHG in a written statement, compliance with the terms of this <u>Paragraph 21.2</u>; (F) On request, Licensee will put in place any additional policies and procedures reasonably requested by IHG regarding compliance with Anti-Corruption Laws; and (G) Licensee will immediately notify IHG if Licensee knows or has reason to believe that a violation of this <u>Paragraph 21.2</u> has occurred.

## 22.    DISPUTE RESOLUTION.

**22.1.    Choice of Law**. This License and all disputes, claims, controversies or causes of action (whether in contract, tort or otherwise) between IHG and Licensee (and any of their respective Affiliates, and/or Owners, members, officers, directors or managers of each of the foregoing) that may be based upon, arise out of, or relate to this License, the negotiation, execution, or performance of this License, the relationship between IHG and Licensee or Licensee's operation of the Hotel or any other dispute between or among any of the above-referenced parties (individually, a "**Claim**," and collectively, "**Claims**") shall be interpreted and construed exclusively under the laws of the State of Georgia, which laws shall prevail in the event of any conflict of law (without regard to, and without giving effect to, the application of the choice-of-law rules of such state).  Nothing in this paragraph is intended by the parties to subject this License to any franchise or similar law, rule, or regulation which, by virtue of its denominated geographic or subject matter scope, would not by its terms otherwise apply.

**22.2.    The ADR Process**. Except as otherwise provided in this License, any Claim shall, as a condition to filing any Claim, first be subject to the alternative dispute resolution process set forth in this paragraph ("**ADR Process**").  The ADR Process shall not be required by either IHG or Licensee with respect to (a) any claim or dispute involving actual or threatened disclosure or misuse of the Confidential Information of IHG or (b) any claim or dispute involving the ownership, validity or use of the Marks.

**22.2.1.**  The ADR Process is not intended to alter or suspend the rights or obligations of the parties under this License or to determine the validity or effect of any provision of this License, but is intended to furnish the parties an opportunity to resolve disputes amicably, expeditiously and in a cost-effective manner on mutually acceptable terms.

**22.2.2.**  The ADR Process provided for hereunder shall be commenced by a party wishing to resolve a Claim (the "**Complainant**").  The Complainant shall initiate negotiation proceedings by sending a letter by Federal Express or comparable overnight courier service to the party with whom dispute resolution is sought (the "**Respondent**") setting forth the particulars of the Claim, the term(s) of the License (if any) that are involved, and a proposed resolution of the Claim.

**22.2.3.**  If the Complainant and Respondent  are unable to resolve the Claim within thirty (30) days of Respondent's receipt of the initial letter (or within such extended period of time as the Complainant and Respondent shall agree upon in writing), the parties may by mutual consent submit the Claim to non-binding mediation.

**22.2.4.**  Non-binding mediation shall be conducted by a mediator (the "**Designated Mediator**") mutually agreeable to IHG and Licensee.  The parties shall attempt to agree upon a mediator within one hundred and twenty (120) days of receipt of the Complainant's initial letter or within sixty (60) days of any extended period as may be agreed upon by the parties in writing. If the parties are unable to agree mutually upon a mediator within this time period, the Complainant may seek the appointment of a mediator through JAMS, Inc. (and if JAMS, Inc. is no longer operational, a comparable mediator service) and the procedures for selecting the mediator shall be those of JAMS, Inc. (or, if applicable, of the comparable mediation service) in effect at the time.  The parties agree that in the event of the initiation of individual mediations involving the same or similar issues at or about the same time, IHG shall have the option to determine that no Designated Mediator shall be a mediator in more than one of those mediations.

**22.2.5.**  Non-binding mediation hereunder shall be concluded within sixty (60) days of the date the Designated Mediator is agreed upon in writing (or selected through JAMS, Inc. or the comparable mediation service) or such longer period as may be agreed upon by the parties in writing. Complainant and Respondent shall each bear their own costs of mediation, and shall each bear one-half (1/2) the cost of the Designated Mediator, including any mediation service fees.

**22.2.6.**  If the parties do not conclude mediation within sixty (60) days of the date the Designated Mediator is agreed upon in writing (or selected through JAMS, Inc. or the comparable mediation service) or such longer period as may be agreed upon by the parties in writing, or conclude mediation within sixty (60) days of the date the Designated Mediator is agreed upon in writing (or selected through JAMS, Inc. or the comparable mediation service) or such longer period as may be agreed upon by the parties in writing, but fail to resolve all Claims, either party may file a lawsuit or otherwise proceed with pursuit of its Claim(s) outside the ADR Process.

**22.3.    Venue**.  Any action or proceeding brought by IHG or Licensee (and/or any of their respective Affiliates, and the Owners, members, shareholders, officers, directors or managers)  against any other such party, whether sounding in law or equity, will be instituted, litigated through conclusion and, if necessary, appealed through final, irrevocable judgment in the U.S. District Court for the Northern District of Georgia, Atlanta Division and the State and Superior Courts of DeKalb County, Georgia for the purpose of any and all disputes. Should Licensee initiate litigation against IHG or its parents, subsidiaries or one of its affiliated entities, Licensee must bring such action in the courts identified above; provided, however, the foregoing will not constitute a waiver of any of Licensee's rights under any applicable franchise law of the state in which the Hotel is located. Licensee (and its Affiliates, and the Owners, members, officers, directors or managers of each of the foregoing) hereby irrevocably submit themselves to the jurisdiction of such court and waive all questions of personal jurisdiction for the purpose of carrying out this provision. Licensee (and its Affiliates, and the Owners, members, officers, directors or managers of each of the foregoing) agrees that any dispute as to the venue for litigation will be submitted to and resolved exclusively by such aforementioned court. Notwithstanding the foregoing, however, with respect to any action for monies owed, injunctive or other extraordinary or equitable relief, or involving possession or disposition of, or other relief relating to, the Hotel or Location, IHG may bring such an action in any state or federal district court which has jurisdiction. Licensee, on behalf of itself and its Affiliates, and the Owners, members, officers, directors or managers of each of the foregoing hereby waives and covenants never to assert or claim that the venue designated for litigation by this License is for any reason improper, inconvenient, prejudicial or otherwise inappropriate (including any claim under the judicial doctrine of "forum non conveniens"). The parties agree that this Paragraph 22.3 shall not be construed as preventing either party from removing an action or proceeding from state to federal court.

**22.4.    Individual Action**.  Any action or proceeding to resolve a dispute shall be conducted on an individual basis, and not as part of a consolidated, common, representative, group, joint or class action.

**22.5.    Waiver of Jury Trial**.  **IHG AND LICENSEE (AND ANY OF THEIR RESPECTIVE AFFILIATES, AND/OR THE OWNERS, MEMBERS, SHAREHOLDERS, OFFICERS, DIRECTORS OR MANAGERS OF EACH OF THE FOREGOING) IRREVOCABLY WAIVE TRIAL BY JURY OF ANY ACTION OR PROCEEDING, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER OF THEM AGAINST THE OTHER, WHETHER OR NOT THERE ARE OTHER PARTIES IN THE ACTION OR PROCEEDING.**

**22.6.    Damages Waiver**.  **LICENSEE AND IHG (AND ANY OF THEIR RESPECTIVE AFFILIATES, AND/OR THEIR OWNERS, MEMBERS, SHAREHOLDERS, OFFICERS, DIRECTORS OR MANAGERS OF EACH OF THE FOREGOING) HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT TO OR CLAIM OF ANY PUNITIVE, EXEMPLARY, MULTIPLE (INCLUDING TREBLE), INCIDENTAL,**

INDIRECT, CONSEQUENTIAL OR SIMILAR DAMAGES AGAINST THE OTHER AND AGREE THAT IN THE EVENT OF A DISPUTE BETWEEN THEM, EACH SHALL BE LIMITED TO THE RECOVERY OF ONLY ACTUAL DAMAGES SUSTAINED BY IT.

**22.7.    Injunctive Relief.**  Nothing herein contained shall bar the right of either party to obtain, without invoking the ADR Process, injunctive relief against threatened conduct that will cause it loss or damages under the usual equity rules, including the applicable rules for obtaining restraining orders and preliminary injunctions. Licensee explicitly affirms and recognizes the unique value and secondary meaning associated with the Brand System and the Marks. Accordingly, Licensee agrees that any noncompliance by it with the terms of this License, or any unauthorized or improper use of the Brand System or the Marks by Licensee, will cause irreparable harm to IHG and other Brand System licensees. Licensee therefore agrees that if it engages in such noncompliance, or unauthorized and/or improper use of the Brand System or Marks, during or after the term of this License, IHG and its Affiliates will be entitled to both temporary and permanent injunctive relief against Licensee from any court of competent jurisdiction, in addition to all other remedies which IHG may have at law. Licensee consents to the entry of these temporary and permanent injunctions without the requirement that IHG post a bond of any type or nature, or any other form of security, be required to prove the inadequacy of money damages as a remedy, and without waiving any other rights or remedies at law or in equity. Licensee will be responsible for payment of all costs and expenses, including reasonable attorneys' and expert fees, which IHG and/or its Affiliates may incur in connection with IHG's efforts to secure such injunctive relief.

**22.8.    Licensee's Procurement of Consents.** Licensee represents that it has secured from each of its Affiliates and the Owners, members, officers, directors or managers of Licensee and its Affiliates who do not execute this License, his/her/its express consent irrevocably confirmation of the applicability to them of the provisions of this Paragraph 22.

**23.    MISCELLANEOUS.**

**23.1.    Severability and Interpretation**. The remedies provided in this License are not exclusive. In the event any provision of this License is held to be unenforceable, void or voidable as being contrary to Applicable Law or public policy of the United States or any other jurisdiction entitled to exercise authority hereunder, the affected provision of this License will be curtailed and limited only to the extent necessary to bring it within the requirement of Applicable Law; the court may declare a reasonable modification of this License (but not any of its payment provisions) and the parties agree to be bound by and perform this License as so modified; and all remaining provisions shall nevertheless continue in full force and effect, unless deletion of the subject provision(s) deemed unenforceable, void or voidable impairs the consideration for this License in a manner which frustrates the purpose of the parties or makes performance commercially impracticable. In the event any provision of this License requires interpretation, such interpretation shall be based on the reasonable intention of the parties in the context of this transaction without interpreting any provision in favor of, or against, any party hereto by reason of the draftsmanship of the party or its position relative to the other party.

**23.2.    No Third-Party Beneficiary; Exclusive Benefit**.  Nothing in this License is intended to create any third-party beneficiary or give any rights or remedies to any Person except and Licensee, its Affiliates and their respective permitted successors and assigns.  No agreement between an Affiliate of IHG and any Person (except Licensee) is for the benefit of Licensee.

**23.3.    Entire Agreement**. This is the entire agreement between the parties pertaining to the licensing of the Hotel and supersedes all previous negotiations and agreements between the parties pertaining to the licensing of the Hotel as a Brand System Hotel.  Nothing in the preceding sentence is intended, however, to disclaim any representations IHG has made in the Franchise Disclosure Document that IHG provided to Licensee.

36

**23.4.    Guarantors.**  IHG shall require certain individuals or other entities (the "Guarantors") to guarantee all of Licensee's duties, requirements and obligations under this License, both financial and non-financial, by executing a guarantee substantially in the form of Attachment E (the "Guaranty").  In the event of the death or bankruptcy of any Guarantor, IHG may require replacement guarantees sufficient in IHG's Business Judgment to provide IHG with the same protection as IHG had originally bargained for. If Licensee is in breach or default under this License, IHG may proceed directly against each such individual and/or business entity Guarantor without first proceeding against Licensee and without proceeding against or naming in the action or proceeding any other such Guarantor. Licensee's obligations and those of each such Guarantor will be joint and several. Notice to or demand upon one such Guarantor will be considered notice to or demand upon Licensee and all such Guarantors.  No notice or demand need be made to or upon all such Guarantors. The cessation of or release from liability of Licensee or any such Guarantor will not relieve Licensee or any other Guarantor, as applicable, from liability under this License, except to the extent that the breach or default has been remedied or money owed has been paid.

**23.5.    Amendments**. This License may only be amended in a written document that has been duly executed by the parties and may not be amended by conduct manifesting assent or by a previous course of dealing between the parties, and each party is put on notice that any individual purporting to amend this License by conduct manifesting assent is not authorized to do so.

**23.6.    IHG Withholding Consent**. In no event may Licensee make any claim for money damages based on any claim or assertion that IHG has unreasonably withheld, delayed and/or denied any consent or approval under this License. Licensee waives any such claim for damages. Licensee may not claim any such damages by way of setoff, counterclaim or defense. Licensee's sole remedy for such a claim will be an action or proceeding to enforce the subject License provision(s) for specific performance or for declaratory judgment.  IHG's consent, whenever required, may be withheld if any breach by Licensee exists under this License.  Approvals and consents by IHG will not be effective unless evidenced by a writing duly executed on behalf of IHG.

**23.7.    Notices**. Except as otherwise specifically provided elsewhere in this License, notices will be effective hereunder when and only when they are reduced to writing and delivered personally or mailed by Federal Express or comparable overnight or express delivery service or by certified mail to the appropriate party at its address (in the case of IHG, to the address stated in Item 13 of Attachment B; in the case of Licensee, to the address stated in Item 14 of Attachment B), or to such person and at such address as may subsequently be designated by one party to the other.  IHG may provide Licensee with electronic delivery of routine information, invoices, Brand Standards and other Brand System requirements and programs. IHG and Licensee will cooperate with each other to adapt to new technologies that may be available for the transmission of such information.

**23.8.    Waiver of Obligations**  IHG may by written instrument unilaterally waive or reduce any obligation of Licensee under this License.  Any waiver granted by IHG shall be without prejudice to any other rights IHG may have.  IHG shall not be deemed to have waived any of its rights under this License by virtue of: (a) any custom or practice of IHG at variance with it; (b) any failure, refusal or neglect by IHG to exercise any right under this License or to insist upon exact compliance by Licensee with its obligations hereunder; (c) any waiver, forbearance, delay, failure or omission by IHG to exercise any right, whether of the same, similar or different nature, with respect to the Hotel; or (d) the acceptance by IHG of any payments due from Licensee after any breach of this License.

**23.9.    Authority**. Licensee represents and warrants to IHG that the entities and persons signing this License on behalf of Licensee are duly authorized to do so and to bind Licensee to enter into and perform this License.  Licensee further represents and warrants to IHG that Licensee and the entities and persons signing this License on behalf of Licensee have obtained all necessary approvals and that their execution, delivery and performance of this License will not violate, create a default under or breach any

charter, bylaws, agreement or other contract, license, permit, order or decree to which they are a party or to which they are subject or to which the Hotel is subject. If Licensee has not already done so prior to the execution of this License, Licensee agrees to submit to IHG by the date specified by IHG all of the documents and information that IHG required or requested in the license application and in connection with the licensing process. Licensee acknowledges that its breach of the representations and warranties in this paragraph, its failure to comply with IHG's requirements for the submission of information and documents, or any omission or misrepresentation of any material fact in the information or documents submitted to IHG in connection with the license application and/or the licensing process will constitute a material breach of Licensee's obligations under this License entitling IHG, at its option, to terminate this License immediately upon notice to Licensee.

**23.10.  General Release and Covenant Not to Sue**. Licensee, its Affiliates, and their respective heirs, representatives, successors and assigns, hereby release, remise and forever discharge  IHG and its Affiliates  and their past and current directors, employees, agents, attorneys, successors and assigns from any and all claims, whether known or unknown, of any kind or nature, absolute or contingent, if any there be, at law or in equity, from the beginning of time to and including, the date of IHG's execution of this License, and Licensee and its respective heirs, representatives, successors and assigns do hereby covenant and agree that they will not institute any suit or action at law or otherwise against IHG, directly or indirectly, relating to any claim released hereby by Licensee; provided, however, that nothing contained in this release is intended to disclaim or require Licensee to waive reliance on any representation that IHG made in the Franchise Disclosure Document that it provided to Licensee. This release and covenant not to sue shall survive the termination and expiration of this License. Licensee shall take whatever steps are necessary or appropriate to carry out the terms of this release and covenant not to sue.

**23.11.  Reimbursement of Expenses**. Licensee agrees to pay IHG all expenses to remedy any defaults of or enforce or defend itself or any of its rights under this License (including without limitation any claim, cross-claim or counter-claim brought by Licensee), effect termination of this License or collect any amounts due under this License.

**23.12.  Descriptive Headings**. The descriptive headings in this License are for convenience only and shall not control or affect the meaning or construction of any provision in this License.

**23.13.  Definitions**.  Capitalized terms in this License have the meanings stated in **Attachment A**.

**23.14.  Additional Licensee Acknowledgments and Representations.**

**23.14.1. *NO RELIANCE. IN ENTERING THIS LICENSE***. LICENSEE REPRESENTS AND WARRANTS, WITH THE INTENTION THAT IHG WILL BE RELYING THEREON, THAT: (I) IT DID NOT RELY ON, AND NEITHER IHG NOR ANY OF ITS AFFILIATES HAS MADE, ANY PROMISES, REPRESENTATIONS, WARRANTIES OR AGREEMENTS RELATING TO THE BRAND SYSTEM, THE HOTEL, OR THE LOCATION OR THE SYSTEM, UNLESS CONTAINED IN THIS LICENSE OR IHG'S FRANCHISE DISCLOSURE DOCUMENT, AND THAT (II) NO REPRESENTATION HAS BEEN MADE BY IHG OR ITS AFFILIATES (OR ANY OF ITS OR THEIR OFFICERS, DIRECTORS, MANAGERS, EMPLOYEES, AGENTS OR "FRANCHISE SELLER," AS THAT TERM IS DEFINED BY LAW) AND RELIED ON BY LICENSEE OR ANY OF ITS AFFILIATES (AND/OR ANY OF THE OFFICERS, DIRECTORS, MANAGERS, MEMBERS OR OWNERS OF THEM) AS TO THE FUTURE OR PAST REVENUES, OCCUPANCY RATES, YIELD, EXPENSES, OCCUPANCY OR POTENTIAL PROFITABILITY, EARNINGS OR INCOME OF THE HOTEL, OR ANY OTHER HOTEL, OTHER THAN ANY INFORMATION IHG MAY HAVE PROVIDED IN ITS FRANCHISE DISCLOSURE DOCUMENT, NOR HAVE IHG OR ANY OF THE FOREGOING MADE ANY REPRESENTATIONS, STATEMENTS OR PROMISES TO LICENSEE WHICH CONFLICT WITH, CONTRAVENE OR VARY FROM THE CONTENTS OF IHG'S

FRANCHISE DISCLOSURE DOCUMENT. LICENSEE ACKNOWLEDGES AND AGREES, AND COVENANTS NEVER TO ASSERT OTHERWISE IN ANY SETTING, THAT THE FOREGOING REPRESENTATIONS (AND LICENSEE'S OTHER REPRESENTATIONS IN THIS LICENSE) ARE STATEMENTS OF INDISPUTABLE FACT AND THUS DO NOT CONSTITUTE ANY WAIVER OF ANY RIGHTS OR PROTECTIONS WHICH LICENSEE MAY ENJOY UNDER ANY FRANCHISE OR SIMILAR LAW, RULE OR REGULATION.

23.14.2. *BUSINESS RISK*. LICENSEE AGREES THAT THE BUSINESS VENTURE CONTEMPLATED BY THIS LICENSE INVOLVES SUBSTANTIAL BUSINESS RISK, IS A VENTURE WITH WHICH LICENSEE HAS RELEVANT EXPERIENCE AND ITS SUCCESS IS LARGELY DEPENDENT ON LICENSEE'S ABILITY AS AN INDEPENDENT BUSINESS. IHG DISCLAIMS THE MAKING OF, AND LICENSEE AGREES IT HAS NOT RECEIVED, ANY INFORMATION, WARRANTY OR GUARANTEE, EXPRESS OR IMPLIED, AS TO THE POTENTIAL REVENUES, PROFITS OR SUCCESS OF SUCH BUSINESS VENTURE. IHG WILL NOT INCUR ANY LIABILITY FOR ANY ERROR, OMISSION OR FAILURE CONCERNING ANY ADVICE, TRAINING OR OTHER ASSISTANCE FOR THE HOTEL PROVIDED TO LICENSEE, INCLUDING FINANCING, DESIGN, CONSTRUCTION, RENOVATION OR OPERATIONAL ADVICE.

23.14.3. *DISCLOSURE*. LICENSEE ACKNOWLEDGES THAT IT HAS READ AND UNDERSTOOD THIS LICENSE, THE FRANCHISE DISCLOSURE DOCUMENT AND THE IHG AGREEMENTS. LICENSEE HAS HAD SUFFICIENT TIME AND OPPORTUNITY TO CONSULT WITH ITS ADVISORS ABOUT THE POTENTIAL BENEFITS AND RISKS OF ENTERING INTO THIS LICENSE.

23.14.4. *HOLDING PERIODS*. LICENSEE ACKNOWLEDGES THAT IT RECEIVED A COPY OF THIS LICENSE, ITS ATTACHMENTS (INCLUDING ANY ADDITIONS OR DELETIONS UNILATERALLY MADE BY IHG) AND IHG AGREEMENTS, IF ANY, AT LEAST SEVEN (7) DAYS BEFORE THE DATE ON WHICH THIS LICENSE WAS EXECUTED. LICENSEE FURTHER ACKNOWLEDGES THAT IT HAS RECEIVED IHG'S FRANCHISE DISCLOSURE DOCUMENT AT LEAST FOURTEEN (14) DAYS BEFORE THE DATE ON WHICH IT EXECUTED THIS LICENSE OR MADE ANY PAYMENT TO IHG IN CONNECTION WITH THIS LICENSE (UNLESS IHG WAS RELIEVED FROM ANY REQUIREMENT TO FURNISH SUCH A FRANCHISE DISCLOSURE DOCUMENT PURSUANT TO ANY EXEMPTION AFFORDED BY APPLICABLE LAW).

23.14.5. *DISCLOSURE EXEMPTION*. NOTWITHSTANDING LICENSEE'S ACKNOWLEDGMENT IN PARAGRAPH 23.12.4, LICENSEE REPRESENTS AND ACKNOWLEDGES THAT THIS FRANCHISE SALE IS FOR MORE THAN ONE MILLION ONE HUNDRED FORTY-THREE THOUSAND ONE HUNDRED DOLLARS ($1,143,100) (EXCLUDING THE COST OF UNIMPROVED LAND AND ANY FINANCING RECEIVED FROM IHG OR ITS AFFILIATES), AND THUS IS EXEMPTED FROM THE FEDERAL TRADE COMMISSION'S FRANCHISE RULE DISCLOSURE REQUIREMENTS PURSUANT TO 16 CFR 436.8(a)(5)(i).

23.14.6. *NO PENDING LITIGATION*. Licensee represents that as of the date of execution of this License, there are no actions, suits, proceedings or investigations pending or, to its knowledge or the knowledge any of its officers, directors, shareholders, partners, members, managers, Guarantors, shareholders, or any other Owner of a direct or indirect, partial or whole interest in Licensee (as applicable), after due inquiry, threatened, in any court or arbitral forum, or before any governmental agency or instrumentality, nor to the best of Licensee's knowledge or the knowledge of any such persons or entities (after due inquiry) is there any basis for any claim, action, suit, proceeding or investigation, which affects or could affect, directly or indirectly, any of Licensee's assets, properties, rights or business;

39

Licensee's right to operate and use its assets, properties or rights to operate the Hotel; and/or, which affects or could affect Licensee's right or ability to assume and carry out in all respects the duties, obligations and responsibilities specified in this License.

**23.15.  Survival**. All obligations under this License, which expressly or by their nature are intended to survive the expiration or termination of this License, including, but not limited to Paragraphs 11, 12, 13.3, 14, 17, 18, 19, 22, and 23 shall continue in full force and effect until they are satisfied in full or by their nature expire.

**23.16.  Counterparts.**  This License may be executed in any number of counterparts, each of which will be deemed an original and all of which constitute one and the same instrument.  IHG and Licensee hereby acknowledge and agree that electronic signatures, facsimile signatures or signatures transmitted by electronic mail in "pdf" format shall be legal and binding and shall have the same full force and effect as delivery of an original signed counterpart.

**[Signature Page Follows]**

**IN WITNESS WHEREOF**, the parties have executed this License, as of the date first stated above.

**Licensee:**

**ACRON 2 PORSCHE DRIVE, ATLANTA, LLC**
a Delaware limited liability company

By:    ACRON (USA) L.P.
      its manager

      By:    ACRON U.S. Management, Inc.
            its sole general partner

            By: _____
               Greg Wilson
               President

**IHG:**

**IHG FRANCHISING, LLC**

By:    **Six Continents Hotels, Inc.,**
      **its sole managing member**

      By: _____
          Jenny Tidwell
         Vice President
         Franchise Licensing and Compliance

## ATTACHMENT A

## DEFINITIONS IN THE LICENSE

When used in this License the following terms have the meanings indicated below (such definitions shall apply. As applicable, whether terms used in the License are used in the singular or plural):

"**Additional Lump Sum**" has the meaning stated in Paragraph 19.3.

"**Additional Marketing Programs**" means advertising, marketing, promotional, public relations, and sales programs and activities that are not funded by the System Fund, each of which may vary in duration, apply to all or a group of IHG Portfolio Brand Hotels, locally, regionally, nationally or internationally or include other IHG Portfolio Brand Hotels. Examples include, without limitation, email marketing, internet search engine marketing, transaction-based paid internet searches, sales lead referrals and bookings, cooperative advertising programs, travel management companies programs, incentive awards, gift cards and other similar programs.

"**ADR Process**" means the alternative dispute resolution process that is described in Paragraph 22.2.

"**Affiliate**" means, for any Person, a Person that is directly (or indirectly through one or more intermediaries) Controlling, Controlled by, or under common Control with, such Person.

"**Anti-Corruption Laws**" means any US or international laws, regulations, codes or sanctions relating to bribery and corruption including but not limited to the UK Bribery Act 2010 and the US Foreign Corrupt Practices Act 1977.

"**Anti-Corruption Policy**" means a written policy prohibiting bribery and corruption and requiring compliance with Anti-Corruption Laws.

"**Applicable Law**" means all laws, regulations, ordinances, rules, orders, decrees, and requirements of any governmental authority having jurisdiction over the Hotel, Licensee, Guarantor or any of the IHG Agreements.

"**Approved Equipment**" means the Equipment materially conforming to the specifications and configuration set forth by IHG in the Technology Requirements or otherwise in, which are subject to change periodically.

"**Approved Software**" means the Software, including the Property Management System, materially conforming to the specifications set forth by IHG in the Technology Requirements or otherwise in the Brand Standards, which are subject to change periodically.

"**Brand Marketing**" means marketing activities that are focused on defining and positioning the brands in relation to target markets and consumers of hotels operating under the Brand and IHG Portfolio Brands, both in terms of tangible and intangible characteristics and pursuing associated marketing strategies and programs to help drive hotel revenues. It includes advertising, publicity and other marketing and awareness programs and materials (including social media campaigns and activities); research, consumer insight and performance analysis resources

"**Brand Marketing Services**" means services provided by IHG and its Affiliates for marketing programs (including tactical marketing campaigns; brand awareness campaigns; online marketing, web adverts, search engine marketing, email communications and marketing, social media campaigns and prime travel agency placements); research, consumer insight, performance analysis and other service necessary to drive

A-1

Brand Marketing objectives; and associated training programs and materials.

"**Brand Standards**" means all standards and specifications now or in the future identified by IHG or its Affiliates concerning the design, construction and operations of Brand System Hotels. IHG or its Affiliates may modify, alter, add or delete aspects of the Brand Standards in accordance with Paragraph 8.2 (and which may, with IHG's prior written approval, take into account specific characteristics and conditions of the local market). The Brand Standards may be communicated to Licensee in paper or in electronic format, as determined by IHG or its Affiliates.

"**Brand System**" means a proprietary business format and system for constructing, opening and operating Brand System Hotels and providing hotel services to the public under a distinctive business format which associates hotels or other lodging facilities with the Licensed Brand, which identifies or reflects the quality standards and common business practices of such Brand System Hotels, and systems which they implement, all as may be designated, expanded, limited and changed from time to time by IHG in its sole discretion. Elements of the Brand System may include proprietary systems or indicia authorized for IHG's and/or its licensees' use and/or participation. The Brand System includes, without limitation, the following as of the date hereof:

(i)     The Marks and the Brand Standards;

(ii)    registered and unregistered intellectual property, including without limitation copyrights, trademarks, service marks, logos, designs, know-how, confidential or proprietary information standards, specifications and policies for construction, furnishing, operation, appearance and service of hotels operating as Brand System Hotels, and similar property rights;

(iii)    all rights to the domain names and other identifications or elements used in electronic commerce as may be designated from time to time by IHG in accordance with IHG's specifications to be part of the Brand System;

(iv)    access through IHG or its Affiliates to the Technology Systems, Loyalty Programs, sales and catering system and other related systems operated in accordance with specifications established by IHG;

(v)     access through IHG or its Affiliates to multiple call centers and central reservations offices around the world handling reservations;

(vi)    access through IHG or its Affiliates to Brand Marketing Services and Distribution Marketing Services including global advertising and publicity and other marketing programs and materials;

(vii)   training programs and materials;

(viii)  a worldwide hotel distribution, operated for the Licensed Brand and all other IHG Portfolio Brand Hotels;

(ix)    a guest loyalty program currently named IHG® Rewards;

(x)     a recognized presence on the internet;

(xi)    an e-commerce team and presence for the Licensed Brand and other IHG Portfolio Brands on the internet;

(xii)   a global sales team;

(xiii)  global market coverage;

A-2

(xiv)    Brand Standards and other requirements as stated or referred to in this License and from time to time in in other written communications issued by IHG;

(xv)     programs for inspecting the Hotel, measuring and assessing service and consumer opinion.

For the avoidance of doubt, the Brand System includes all information, databases, know-how, copyrights or other registered or unregistered intellectual property, whether owned by IHG or licensed for use by IHG by its Affiliates or other third parties, which is used for the purpose of, or supports or contributes to the constitution of, the Licensed Brand business format, whether such items of intellectual property are considered in isolation or combination.

"**Brand System Hotel(s)**" means the hotel(s) operated by IHG, an Affiliate of IHG, or a licensee or franchisee of IHG under the Licensed Brand in any of the fifty (50) states of the United States of America, the District of Columbia or Canada, and does not include any IHG Portfolio Brand Hotel operated under a different brand from the Licensed Brand or any other business operation.

"**Business Judgment**" has the meaning stated in Paragraph 20.3.

"**Capital Reserve**" has the meaning stated in Paragraph 4.4.

"**Case Goods**" means furniture and fixtures used in the Hotel (including, in Guestrooms, Guestroom corridors and public areas) such as cabinets, chests, armoires, chairs, beds, headboards, desks, tables, television sets, mirrors, lighting fixtures and all other unspecified items of the same class.

"**Claim**" has the meaning stated in Paragraph 22.1.

"**Competitor**" means any Person (including, Licensee or its Affiliates, or their Owners) that: (i) has a direct or indirect Ownership Interest in a lodging business not operated as an IHG Portfolio Brand Hotel; (ii) has an Affiliate of such a Person described in (i); (iii) is any Person that is a Master Licensee of a hotel brand not operated as an IHG Portfolio Brand Hotel; or (iv) is any officer, manager or director of such Persons identified in (i), (ii) or (iii). No Person will be considered a Competitor if such Person has an interest in a competing hotel brand merely as: (i) a franchisee; (ii) a management company that operates hotels on behalf of multiple brands; or (iii) a passive investor that has no Control over the business decisions of the competing lodging business.

"**Complainant**" has the meaning stated in Paragraph 22.2.2.

"**Components**" means the elements, intellectual property, standards, characteristics, programs, offerings, features, and/or parts of any IHG Portfolio Brand Hotel (including of the Brand System Hotels).

"**Confidential Information**" includes (without limitation) all information, knowledge, trade secrets or know-how utilized or embraced by the Brand System and/or imparted to Licensee by IHG or any of its Affiliates which concerns Licensee's or IHG's systems of operation, programs, services, products, guests, practices, materials, books, records, manuals, computer files, databases or software; all programs, products, services, equipment, technologies, recipes, food and beverage preparation techniques, policies, standards, requirements, criteria and procedures that now or in the future are a part of the Brand System; the Brand Standards (including modifications to same); all pricing paradigms established by IHG or Licensee; all of IHG's and/or Licensee's sources (or prospective sources) of supply and all information pertaining to same (including wholesale pricing structures, the contents of sourcing agreements and the identity of suppliers); IHG's specifications, and Licensee's final plans, for the construction, build out, design, renovation, décor, equipment, signage, furniture, fixtures and trade dress elements of the Hotel; the identity of, and all information relating to, Technology Systems; all elements of IHG's recommended staffing, staff training and staff certification policies and procedures; all communications between IHG and Licensee; and, all

A-3

other information, knowledge and know-how which either IHG or its Affiliates, now or in the future, designate as confidential.

Confidential Information will not, however, include information which Licensee can demonstrate came to its attention before IHG or its Affiliates disclosed it to Licensee (unless illegally or improperly procured by Licensee before such disclosure) or which, at or after the time of disclosure, has become a part of the public domain through publication or communication by others, but not through any act of Licensee.

"**Control**" (and any form thereof, such as "**controlling**" or "**controlled**") means, with respect to any Person, the possession, directly or indirectly, of the power or ability to direct or cause the direction of the management or policies of such Person.

"**Data Protection Laws**" means all applicable international, national, federal, provincial, state, or local laws, codes or regulations that regulate the processing of information that can be used (alone or when Personal Data in any way, including, but not limited to, national data protection laws, laws regulating marketing communications and/or electronic communications, information security regulations and security breach notification rules. Data Protection Laws also means, without limitation, Payment Card Industry Data Security Standards.

"**Digital Marketing**" has the meaning stated in Paragraph 9.4.

"**Distribution Marketing Services**"  means services provided by IHG's and its Affiliates' multiple call centres and central reservations offices around the world handling reservation calls in multiple languages, IHG's and its Affiliates' global sales force and e-commerce and performance marketing teams; hotel performance support and revenue management support services; participation in the global distribution system (commonly called the 'GDS') and with IHG's and its Affiliates' internet sites; and the provision of associated training programs and materials.

"**Effective Date**" is the date the License is executed by IHG, which date is stated in Item 1 of Attachment B.

"**Equipment**" means computers, input and output devices, storage devices (including hard drives and installed and removable flash memory), portable computer and communications devices (including tablets and smartphones), devices which process or store data, other telecommunications equipment (including routers, servers, circuits, portals, and networks), cables, wireless interfaces, and other computer peripherals.

"**FF&E**" means all Case Goods, Soft Goods, signage and equipment (including telephone systems, printers, televisions, vending machines, electronic and video games, computer hardware and Software, networks, and the Technology Systems) and other items specified by IHG in the Brand Standards or otherwise in writing.  FF&E shall include any item included in Fixed Asset Supplies.

"**Fixed Asset Supplies**" means items such as linen, china, glassware, tableware, uniforms and similar items included within the definition of "Operating Equipment" under the Uniform System.

"**Franchise Disclosure Document**" means that certain document provided by IHG to prospective licensees of Brand System Hotels (unless an exemption from disclosure is afforded by Applicable Law) as required by the trade regulation rule of the Federal Trade Commission entitled "Disclosure Requirements and Prohibitions Concerning Franchising," and by certain state franchise laws, as such document may be updated from time to time by IHG.

"**Gross Food and Beverage Sales**" means all revenues and receipts of every kind that accrue from the sale of food and beverages associated with the Hotel, whether inside or outside the Hotel. Gross Food and Beverage Sales includes: (i) revenues from restaurants, bars, lounges, snack shops, and other food outlets

A-4

(including within any health club, spa or golf course), room service, honor bar, or other food and beverage services provided in Guestrooms, banquets, meetings, conventions or other catered events; (ii) revenues and commissions derived from supplying audiovisual equipment and services (whether the equipment is owned or rented by Licensee), rentals of public meeting rooms, cover charges, service charges and other sales or rentals of services, products, and equipment allocable to food and beverage revenues under the Uniform System, and supplying equipment and services (whether the equipment is owned or rented by Licensee) for connecting public meeting rooms to the internet; (iii) attrition or cancellation fees collected from unfulfilled reservations for food, beverage, and other services; (iv) the amount of all lost sales due to the non-availability of food, beverage, and other services, whether or not Licensee receives business interruption insurance proceeds; and (v) any awards, judgments or settlements representing payment for loss of food and beverage sales. No deductions shall be allowed for charge backs, credit card service charges, commissions, uncollectible amounts or similar items. Gross Food and Beverage Sales excludes sales tax, value added tax, or similar taxes on such food, beverage and other services.

"**Gross Revenue**" means all revenues and income of any nature derived directly or indirectly from the Hotel or from the use or operation thereof, whether received in cash, in services, in kind, from barter and/or exchange (valued at the full retail value of the goods or services received), on credit (whether or not Licensee ultimately receives payment on credit transactions), or otherwise. Gross Revenue includes without limitation Gross Rooms Revenues; Gross Food and Beverage Sales; telephone, fax, internet and any other telecommunications services revenues; parking revenues; equipment rental revenues; vending machine revenues; health club or spa revenues; revenues from sales of merchandise; revenues from service charges; condemnation proceeds for a temporary taking; rental or other payments from lessees, subleases, concessionaires and others occupying or using space or rendering services at the Hotel (but not the gross receipts of such lessees, subleases or concessionaires); the actual cash proceeds of business interruption, use, occupancy or similar insurance; and any awards, judgments or settlements representing payment for loss of revenues. Gross Revenues excludes: sales tax, value added tax, or similar taxes on such revenues and receipts; and proceeds from the sale of FF&E.

"**Gross Rooms Revenue**" means the gross revenue and receipts of every kind attributable to and payable for rental of Guestrooms at the Hotel including but not limited to no-show revenue, early departure or late check-out fees, attrition or cancellation fees, any mandatory fee or surcharge charged to all or substantially all guests (including but not limited to resort fees, although inclusion of such fees or surcharges does not constitute approval by IHG of such fees and surcharges, which may be limited or prohibited), the amount of all lost sales due to the non-availability of Guestrooms in connection with a casualty event, whether or not Licensee receives business interruption insurance proceeds, any awards, judgments or settlements representing payment for loss of room sales and any other revenues allocable to rooms revenue under the Uniform System.  No deductions shall be allowed for charge backs, credit card service charges, commissions, uncollectible amounts or similar items.  Charges for any item, including, but not limited to, telephone charges, entertainment, the cost of any food and beverage items, room service or other items provided or made available to a guest as an incident of a Guestroom rental shall not be considered a deduction from Gross Rooms Revenue. Gross Rooms Revenue excludes sales tax, value added tax, or similar taxes on such revenues and receipts.

"**Guarantor**" means individually and collectively the Person(s) who, among other things, guarantee(s) the performance of Licensee's obligations under this License and the other IHG Agreements under the Guaranty.

"**Guaranty**" means a guaranty executed and delivered by Guarantor for the benefit of IHG, the current form of which is attached hereto as **Attachment E**.

"**Guest Data**" has the meaning stated in Paragraph 12.2.

"**Guestroom**" means each rentable unit in the Hotel consisting of a room, suite or suite of rooms used for

overnight guest accommodation, the entrance to which is controlled by the same key; however, adjacent rooms with connecting doors that can be locked and rented as separate units are considered separate Guestrooms.

"**Hotel**" means the hotel licensed hereunder, all interior and exterior components thereof and all real property and fixtures used for the hotel located or to be located at the Location, including: all improvements, structures, facilities, entry and exit rights, parking, pools, landscaping, and other appurtenances (including the hotel building and all operating systems) at the Location; and all FF&E installed or at the Location.

"**IHG Agreement(s)**" means, collectively, this License, any other agreements executed in connection with this License, and any other agreement related to the Hotel to which Licensee, Guarantor or any of their respective Affiliates is a party and to which IHG or one of its Affiliates is also a party or beneficiary, as any may be amended, modified, supplemented, or restated.

"**IHG Owners Association**" means the association comprising IHG, Licensee, and other IHG Portfolio Brand Hotel licensees that may be (or has already been) established, authorized, or sanctioned by IHG to consider and make recommendations on matters related to the operation of IHG Portfolio Brand Hotels (including Brand System Hotels).

"**IHG Portfolio Brand(s)**" means any and all brands owned, controlled or under the direction of the IHG and its Affiliates, as they may be added to, deleted from or changed from time to time, including, without limitation, as of the date hereof, the following: hotel and other lodging facility, chain, brand, or hotel system that is owned, leased, under development, acquired , operated, franchised or licensed, now or in the future, by IHG and its Affiliates, including, but not limited to, any hotel and other lodging facility operating under the trademarks: "ATWELL™ SUITES", "avid hotels®", "CANDLEWOOD SUITES®", "CROWNE PLAZA® HOTELS & RESORTS", "EVEN® HOTELS", "HOLIDAY INN EXPRESS®", "HOLIDAY INN® RESORT", "HOLIDAY INN®", "HOTEL INDIGO®", "HUALUXE® HOTELS AND RESORTS", "INTERCONTINENTAL® HOTELS & RESORTS", "KIMPTON® HOTELS & RESTAURANTS", "REGENT", "STAYBRIDGE SUITES®", "voco™ Hotels", and other trademarks identified by IHG.

"**IHG Portfolio Brand Hotel(s)**" means any hotel, other lodging facility, chain, brand or hotel system, however named, that is constructed, converted to or operated under any IHG Portfolio Brand now or in the future. For purposes of clarification, any hotel, other lodging facility, chain, brand, or hotel system, however named, that is owned by IHG or one of its Affiliates  as of the Effective Date, or any subsequent date, but that is later sold to a Person who is not an Affiliate of IHG, shall not be considered an IHG Portfolio Brand Hotel during the time such hotel, other lodging facility, chain, brand, or hotel system, however named, is not owned by IHG or one of its Affiliates.

"**IHG Technology Systems User Agreement**" means the agreement Licensee must execute before being allowed access to the Technology Systems, the current form of which is included in the Franchise Disclosure Document for Brand System Hotels.

"**Improvements**" means any modifications, improvements, or additions to the Brand System that are developed or proposed by or on behalf of Licensee (whether or not consented to by IHG), including, without limitation, any modifications to architectural drawings or architectural works, layout schematics, design elements, the Brand Standards or the Intellectual Property licensed to Licensee as part of the Brand System.

"**Indemnitees**" has the meaning stated in Paragraph 14.

"**Initial License Fee**" has the meaning stated in Paragraph 3.1 and is set forth in Item 7 of Attachment B.

"**Intellectual Property**" means the following items, regardless of the form or medium (for example, paper, electronic, tangible or intangible): (i) all Software, including the data and information processed or stored

A-6

by such Software; (ii) all Marks; (iii) all Confidential Information; and (iv) all other information, materials, and subject matter that are copyrightable, patentable or can be protected under applicable intellectual property laws, and owned, developed, acquired, licensed, or used by IHG or its Affiliates for the Brand System.

"**Inventories**" means "Inventories" as defined in the Uniform System, including provisions in storerooms, refrigerators, pantries and kitchens; beverages; other merchandise intended for sale; fuel; mechanical supplies; stationery; and other expensed supplies and similar items.

"**Licensed Brand**" has the meaning set forth in Item 2 of Attachment B.

"**Licensee**" has the meaning stated in Item 6 of Attachment B.

"**Licensee Personal Data**" means any Personal Data collected prior to or during the Term by Licensee and its Affiliates, which is transferred to, disclosed to or accessed by the IHG during the Term.

"**IHG**" has the meaning stated in Item 5 of Attachment B.

"**IHG Marketing Data**" means Personal Data in respect of any member of the Loyalty Program.

"**IHG Personal Data**" means any Personal Data collected prior to or during the Term by IHG or its Affiliates (including without limitation, IHG Marketing Data and any Personal Data collected through any reservation channels operated by IHG) in relation to the Hotel.

"**Liquidated Damages**" has the meaning stated in Paragraph 19.1.

"**Location**" means the real property upon which the Hotel is or will be situated and all of the Hotel's related premises, easements or other rights of way, as located at the principal street address or other identified locations set forth in Item 3 of Attachment B.

"**Loyalty Marketing Contribution**" means one of the two elements of System Fund Contributions made by Licensee and which is used by IHG and its Affiliates for System Fund Activities. The Loyalty Marketing Contribution amount is set forth in Item 9 of Attachment B.

"**Loyalty Marketing Services**" means services provided by IHG and its Affiliates in organizing, administering and operating Loyalty Programs for IHG Portfolio Brand Hotels.

"**Loyalty Programs**" means all loyalty, recognition, affinity, frequency, and other programs designed to promote stays at, or usage of, the Hotel, Brand System Hotels and such other IHG Portfolio Brand Hotels designated by IHG or its Affiliates, or any similar, complementary, or successor programs. As of the Effective Date, such programs include the "IHG Rewards", and various programs sponsored by airlines, credit card and other companies.

"**Lump Sum**" has the meaning stated in Paragraph 19.2.

"**Management Company**" means a management company for the Hotel selected by Licensee and consented to by IHG.

"**Marketing and Reservation Contribution**" means one of the two elements of System Fund Contributions made by Licensee and which is used by IHG and its Affiliates for System Fund Activities. The Marketing and Reservation Contribution amount is set forth in Item 9 of Attachment B.

"**Marketing Materials**" means all advertising, marketing, promotional, sales and public relations concepts, press releases, materials, concepts, plans, programs, brochures, sponsorship, press releases, or other

A-7

information or materials to be released to the public, whether in paper, digital, broadcast or electronic, or any other form of now or hereafter developed modes of communication or media.

"**Marks**" means  any trademarks, trade names (including, without limitation, the Second Name), trade dress, words, symbols, logos, slogans, designs, insignia, emblems, devices, service marks, and indicia of origin (including restaurant names, lounge names, and other outlet names), or combinations thereof, that are registered or owned by or licensed to IHG or its Affiliates , and that are used to identify or are otherwise associated by virtue of usage with Brand System Hotels, all as may be changed, deleted, added to or otherwise modified by IHG (or its Affiliates) in its sole discretion.  The term applies whether these are owned currently by IHG (or its Affiliates), or are later developed or acquired, and whether or not they are registered in any state, foreign country or in the United States Patent and Trademark Office. As of the date hereof, the Marks include the Licensed Brand name and trademarks, "IHG Concerto" and "IHG Rewards".

"**Master Licensee**" means a Person that has the right to develop, operate or sublicense a hotel brand, trade name, trademark, system, or chain of hotels.

"**Network Connectivity**" means the network connectivity (including for voice and data over any medium) used in the Hotel as specified by IHG in Brand Standards and otherwise in writing, which are subject to change periodically.

"**Opening Date**" means the date identified as the Hotel opening date in the letter agreement issued by IHG described in Attachment H.

"**Owner**" means each Person that has a legal or beneficial Ownership Interest in Licensee (or another entity, if so indicated). The Owners of Licensee as of the Effective Date are set forth on Attachment C.

"**Ownership Interest**" means all forms of ownership, membership, stock, partnership or any other form of equity interests in legal entities or property, both legal and beneficial, voting and non-voting, including stock interests, partnership interests, limited liability company interests, joint tenancy interests, leasehold interests, proprietorship interests, trust beneficiary interests, proxy interests, power-of-attorney interests, and all options, warrants, and any other forms of interest evidencing ownership or Control.

"**Periodic Renovations**" has the meaning stated in Paragraph 4.3.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any national, provincial, state, county or municipal government or any bureau, office, department or agency thereof and any fiduciary acting in an agency capacity on behalf of any of the foregoing.

"**Personal Data**" means data which relates to a living individual who can be identified from that data, or from those data and other information which is in the possession of, or is likely to come into the possession of, IHG or Licensee, as applicable, including, without limitation, Guest Data and Personal Data of Hotel Guests, other Hotel customers and Licensee's or its Management Company's employees.

"**PIP**" has the meaning stated in Paragraph 16.5.1(e).

"**Prohibited Person**" means any Person with whom IHG, or any of its Affiliates, are prohibited or restricted from transacting business by the Sanctioning Bodies.

"**Property Management System**" means the Hotel-level management software and system, consisting of Approved Equipment and Approved Software designated by IHG for use by Brand System Hotels and which links to the Reservation System.

A-8

"**Prospectus**" means any registration statement, solicitation, prospectus (preliminary or otherwise), memorandum, offering document, or similar documentation used or disseminated in connection with the offer, sale or transfer of an Ownership Interest, including any related amendments.

"**Public Facilities**" means the lobby areas, meeting rooms, convention or banquet facilities, restaurants, bars, lounges, corridors and other similar facilities at the Hotel.

"**Qualified Full Folio Revenue**" means  (i) Qualifying Room Rates (ii) charges for food and beverage, telephone, laundry and pay-per-view movies, including applicable taxes, when charged to a member's room regardless of whether a Qualifying Room Rate was paid, and (iii) at Licensee's discretion, any other items charged to the member's room not defined in the previous items (i) or (ii); and, such modifications as may be made by IHG to this definition from time to time in the IHG Rewards program.

"**Qualifying Meeting Revenue**" means all Hotel revenue arising from negotiated guest room rates and meeting room usage associated with the rental of ten or more guest rooms consumed for at least one night of the meeting, including food and beverage and/or any other revenue associated with the meeting; and, such modifications as may be made by IHG to this definition from time to time in the IHG Rewards program.

"**Qualified Room Rates**" means qualifying room rates under the IHG® Rewards program including, without limitation, (i) non-discounted rates, (ii) standard corporate rates, (iii) leisure rates, (iv) government rates, (v) Corporate Gold rates and worldwide sales negotiated rates, (vi) conference and meeting rates; and (vii) individual Hotel contract rates; and, such modifications as may be made by IHG to this definition from time to time in the IHG Rewards program.

"**Relevant Laws**"  means the Anti-Corruption Laws, the US Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the US patriot Act) and related and comparable regulations and executive orders (as the same may be modified and superseded from time to time).

"**Required Fees**" has the meaning stated in Paragraph 19.1.

"**Reservation System**" means the reservation system owned, operated, or licensed and designated by IHG for booking, modifying, or communicating reservations for Brand System Hotels through any medium, including its Approved Software and Approved Equipment.

"**Respondent**" has the meaning stated in Paragraph 22.2.2.

"**Rooms Addition Fee**" has the meaning stated in Paragraph 3.2 and is equal to the then-current charge per Guestroom used to calculate the Initial License Fee for Brand System Hotels, multiplied by the number of additional Guestrooms.

"**Royalty Fee**" has the meaning stated in Paragraph 3.3 and is set forth in Item 8 of Attachment B.

"**Sanctioning Bodies**" means Her Majesty's Treasury of the United Kingdom, the Office of Foreign Assets Control of the Department of the Treasury of the United States, the European Union of the United Nations.

"**Soft Goods**" means textile, fabric, vinyl and similar products used in the Hotel (including, in Guestrooms, Guestroom corridors and public areas), such as wall and floor coverings, window treatments, carpeting, bedspreads, lamps, wall decoration and artwork, pictures, wall decorations, , upholstery and other decorative items.  "**Software**" means utilities, operating systems, programs, scripts, applications, system updates, add-ons, or other materials that can be installed on or used in connection with Equipment, whether in binary machine code or human-readable source code form.

A-9

"**System Fund**" means arrangements organized and operated by IHG and its Affiliates, and participated in by IHG Portfolio Brand Hotels, for the provision of Loyalty Marketing Services, Distribution Marketing Services, Brand Marketing Services and such other marketing and related programs and services for IHG Portfolio Brand hotels as may be determined as required by IHG and its Affiliates in connection with the operation of Brand Systems for IHG Portfolio Brand Hotels.

"**System Fund Activities**" has the meaning stated in Paragraph 9.2.1.

"**System Fund Contribution**" means the assessments paid by Licensee, comprised of a Marketing and Reservation Contribution and a Loyalty Marketing Contribution, for the System Fund Activities to be provided by IHG and its Affiliates, as described and determined in accordance with Paragraphs 3.4 and 9.2 and Attachment B, Item 9.

"**Taxes**" means all taxes (including any sales, gross receipts, value-added, goods and services, or similar taxes), levies, charges, impositions, stamp or other duties, fees, deductions, withholdings or other payments levied or assessed by any competent governmental authority, including by any federal, national, state, provincial, local, or other tax authority.

"**Technology Services Fee**" means the monthly fee charged to Licensee for the provision and use of selected technology services. The Technology Services Fee is set forth in Item 10 of Attachment B.

"**Technology Requirements**" means the rules, standard operating procedures and other procedures, systems, guides, programs, requirements, directives, specifications, guidelines, design criteria, and such other information, initiatives and controls that are necessary for acquiring, purchasing, implementing, deploying, maintaining, operating and disposing of the Technology Systems or any component thereof. The Technology Requirements may be provided to Licensee in electronic form.

"**Technology Systems**" means the Approved Equipment, Approved Software, Network Connectivity, Reservation System, Property Management System and any other hardware, software or services required and approved or optional but designated as approved by IHG to deliver technology to Brand System Hotels.

"**Term**" has the meaning stated in Paragraph 2.1.

"**Transfer**" means any sale, conveyance, assignment, exchange, pledge, encumbrance, lease or other transfer or disposition, directly or indirectly, voluntarily or involuntarily, absolutely or conditionally, by operation of law or otherwise.

"**Transfer Fee**" has the meaning stated in Paragraph 16.5.1(c).

"**Travel Costs**" means the cost of all travel, food, lodging, and other out-of-pocket costs incurred during travel.

"**Travel Management Companies**" means travel agencies, online travel agencies, group intermediaries, wholesalers, concessionaires, and other similar travel companies.

"**Uniform System**" means the Uniform System of Accounts for the Lodging Industry, Eleventh Revised Edition, 2014, as published by the American Hotel & Lodging Educational Institute, or any edition, revision or replacement that IHG designates.

"**Work**" means the initial construction or renovation of the Hotel, as applicable, and as further detailed in Attachment D.

## ATTACHMENT B

## KEY TERMS

| | | |
|---|---|---|
| 1. | **Effective Date:** | February 1, 2022 |
| 2. | **Licensed Brand:** | KIMPTON HOTELS & RESTAURANTS |
| 3. | **Location:** | 2 Porsche Drive, Atlanta, GA 30354 |
| 4. | **IHG:** | IHG Franchising, LLC, a Delaware (USA) limited liability company. |
| 5. | **Licensee:** | ACRON 2 PORSCHE DRIVE, ATLANTA, LLC, a Delaware limited liability company, with its principal place of business at 2424 East 21st Street, Suite 150, Tulsa, OK 74136. |
| 6. | **Term of License (Paragraph 2.1):** | Begins on the Effective Date and expires on **December 31, 2039**. |
| 7. | **Initial License Fee (Paragraph 3.1):** | Waived |
| 8. | **Royalty Fees (Paragraph 3.3):** | Six Percent (6%) of the Gross Rooms Revenue and two percent (2%) of Gross Food and Beverage Sales per month. |
| 9. | **System Fund Contributions (Paragraphs 3.4; 9.2.2) comprised of:** | |
| | (i)  Marketing and Reservation Contribution; and | Three Percent (3%) of the Gross Rooms Revenue per month. |
| | (ii)  Loyalty Marketing Contribution | The Initial Loyalty Marketing Contribution is a one-time fee of $10 per approved guest room payable in the first month following opening of the Hotel. Each month, the sum of four and three-quarters percent (4.75%) of Qualifying Full Folio Revenue received from any IHG Rewards member and $4.75 per enrolling stay of each IHG Rewards member with a flat 1,000 points issued; and 1.425% of Qualifying Meeting Revenue. |
| | | IHG may modify the foregoing amounts or the terms and conditions of the IHG Rewards program from time to time in accordance with paragraph 9.2 of this License. |
| 10. | **Technology Services Fee (Paragraph 3.5):** | Each month, the sum of $16.08 for each Guestroom at the Hotel. IHG may increase the Technology Services Fee in IHG's Business Judgment, but in no |

|     |     |     |
| --- | --- | --- |
|     |     | calendar year by an amount exceeding ten percent (10%) of the Technology Services Fee then in effect for that calendar year. |
| 11. | **# of Guestrooms (including Suites) (Paragraph 4.1):** | 214 |
| 12. | **Hotel Facilities and Services:** | Apron restaurant, roof-top lounge, approx. 6,300 sq ft meeting space, fitness center, indoor pool |
| 13. | **Restaurant & Bar** | The concept for a Restaurant & Bar at the Hotel can either be developed by a third-party, to be approved by IHG, or developed by IHG for a fee.  IHG has the right to approve the final concept and design.  If approved by IHG, the Restaurant & Bar outlet may be operated by a third-party under a lease, operating agreement, license agreement or similar arrangement. |
| 14. | **IHG Notice Address (Paragraph 23.3):** | IHG Franchising, LLC<br>Three Ravinia Drive, Suite 100<br>Atlanta, Georgia  30346<br>Attn:  Vice President, Franchise Licensing and Compliance<br><br>With a copy to: Kimpton Hotel & Restaurant Group, LLC<br>222 Kearny Street, Suite 200<br>San Francisco, CA 94108<br>Attn: Associate General Counsel |
| 15. | **Licensee Notice Address (Paragraph 23.3):** | ACRON 2 Porsche Drive, Atlanta, LLC<br>Attn: Greg Wilson<br>2424 East 21st Street, Suite 150<br>Tulsa, OK 74136 |

16.    **Additional Requirements:**

A.    **Management Company Requirement.**

Notwithstanding anything to the contrary set forth in the License, the Hotel shall at all times be operated by a management company acceptable to IHG.  IHG shall have the right to approve any proposed management company and to approve any contract with respect to the operation of the Hotel, and such management company's policies and procedures must comply with the Standards and the requirements of this License.  The management of the Hotel by an acceptable management company must be continuous and uninterrupted during the term of the License.  Licensee shall be in default under the License if any of the preceding conditions are not met.  Notwithstanding that the management company must be acceptable to IHG, Licensee acknowledges and agrees that it is solely responsible for the selection, conduct and performance of the management of the Hotel and IHG has no responsibility or obligation in connection

with such selection, conduct or performance.  If any approved management company stops operating the Hotel for the Licensee for any reason, Licensee must notify IHG immediately.

**B.      Protected Territory.**

Notwithstanding paragraph 1.2.2 of the License, as long as the Hotel remains a Kimpton Hotel and Licensee is not in default under the License, IHG will not open another hotel under the Kimpton Hotels brand (it being understood that this prohibition does not include any other of IHG's or its Affiliates existing or future brands including, without limitation, hotels under the following brands: Six Senses Hotels & Resorts, Regent Hotels & Resorts, InterContinental Hotels & Resorts, Crowne Plaza Hotels & Resorts, Hotel Indigo, voco Hotels, Vignette Collection, EVEN Hotels, Holiday Inn, Holiday Inn & Suites, Holiday Inn Resort, Holiday Inn Express, Holiday Inn Express & Suites, Staybridge Suites, Candlewood Suites, Atwell Suites, avid hotels, or Hualuxe Hotels & Resorts) for a period expiring on **January 22, 2024** (the "Protected Term") in the area outlined and described on Attachment "B-1" attached hereto (the "Protected Territory").

Notwithstanding anything else herein to the contrary, Licensee's rights under this stipulation shall automatically terminate (a) after the expiration of the respective Protected Term; (b) if the Hotel fails at any time to achieve and maintain the level determined by IHG to be the system average under IHG's then current program(s) for inspecting the Hotel and measuring and assessing quality, service, cleanliness, condition, brand standards and/or customer satisfaction (subject to any notice and cure periods applicable to such programs); (c) if IHG sends to Licensee a notice of default and termination; or (d) this License expires or terminates for any reason or the Hotel ceases for any reason to be a Kimpton Hotel.

Further notwithstanding any provision of this License to the contrary, (i) IHG or its Affiliates shall have the right to negotiate and enter into any agreements to develop, operate, market, brand, franchise or manage a hotel under the Kimpton Hotels & Restaurants brand and provide services thereunder within the respective Protected Territory during the respective Protected Term if the hotel will open after the expiration of the applicable Protected Term; (ii) the restrictions contained herein shall not apply to the branding of any facilities which are not hotels, including, without limitation, Holiday Inn Club Vacations Resorts and residential units; and (iii) IHG or its Affiliates shall have the right to develop and/or license a hotel within the Protected Territory during the Protected Term to serve as a replacement for any hotel (x) operating within the Protected Territory as of the date of this License or (y) licensed but not yet open or operating as of the date of this License.  As clarification, the boundaries of any areas shown on Attachment "B-1" attached hereto shall be deemed to be, as applicable, in the middle of the street (or other landmark) and shall not restrict activity by IHG or its affiliates outside of such boundary.

**C.      Licensee Termination Right.**

Notwithstanding anything to the contrary contained herein, if Licensee is not then in default under this License, Licensee shall have the right to terminate the License after **January 22, 2032** upon the closing of a sale of the Hotel to a bona fide third-party purchaser (in which neither Licensee nor any of its affiliates, subsidiaries or parents have any ownership interest) (the "Termination on Sale Right"); provided, (i) Licensee has first given IHG at least ninety (90) days prior written notice of termination; (ii) all fees and all amounts owing to Licensor and its affiliates, including, without limitation, the Repayment Amount and the "Termination on Sale Option Fee" described below, have been paid in full at the time of such termination; and (iii) Licensee performs all post termination obligations set forth in the License within the timeframes specified in the License. If Licensee intends to exercise the Termination on Sale Right in accordance with the preceding sentence, Licensee shall also pay Licensor a "Termination on Sale Option Fee" (which is reduced from and payable in lieu of the damages outlined in paragraph 19 of the License) equal to the "Average Annual Fee" (as hereinafter defined) multiplied by (A) four (4), if the termination occurs from January 23, 2032 through January 22, 2033; (B) three (3), if the termination occurs from

C-3

January 23, 2033 through January 22, 2035; (C) two (2), if the termination occurs from January 23, 2035 through January 22, 2037; (D) one (1), if the termination occurs from January 23, 2037 through January 22, 2038 or (D) a fraction in which the numerator will equal the number of months remaining in the Term and the denominator will equal 12, if the termination occurs in the final year of the Term. "Average Annual Fee" means the amount obtained by dividing *(x)* the total Required Fees payable during the 24 full consecutive months of operation preceding the termination of the License by *(y)* two. The Termination on Sale Right shall automatically terminate if Licensor sends to Licensee a notice of termination, or the License automatically terminates, or Licensor sends Licensee a notice of default and Licensee fails to cure the default within the time permitted, if any, in the notice of default.

## D.  Financial Enhancement.

Licensee and IHG acknowledge and agree that IHG previously funded a financial enhancement to Licensee in the amount of $2,000,000 (the "Enhancement") pursuant to the terms of a hotel operating agreement between Kimpton Hotel & Restaurant Group, LLC, an affiliate of IHG, and Licensee dated as of December 21, 2018 (the "HOA").  In consideration of Licensee's and IHG's termination of the HOA and execution of this License, IHG shall, subject to the remaining terms of this provision permit the continued amortization of the Enhancement as further provided herein. The Enhancement shall continue to amortize monthly on a straight-line basis over the Term.  Such amortization schedule commenced on January 19, 2019 and continues on the first day of each calendar month thereafter until the Enhancement has been fully amortized.

Licensee shall refund the unamortized Enhancement (such amount being the "Repayment Amount") to IHG upon the occurrence of (i) the termination of the License prior to the scheduled expiration of the Term for any reason or (ii) as may be expressly set forth otherwise in the License. The provisions of this Section shall be treated separately and apart from Licensee's other obligations hereunder, and Licensee's obligation to repay the Repayment Amount shall not be subject to any right of offset, counterclaim or defense hereunder. The provisions of this Section shall survive the Page expiration or earlier termination of the License.

### Attachment B-1

### Protected Territory

"Protected Territory" shall mean the area located within, and bounded by, the following rights of way, as such boundaries are defined as of the Term Commencement Date (and shall not include any location adjoining and on the outside of such area) and depicted on the map below:

Interstate 285 to the West, GA Routes 154 & 166 to the North, Interstate 75 to the East, and Interstate 285 to the South.



## <u>ATTACHMENT C</u>

## OWNERSHIP INTEREST IN LICENSEE

**ACRON 2 PORSCHE DRIVE, ATLANTA LLC**                                                **100%**

    ACRON 2 PORSCHE DRIVE HOLDING LLC, member                           99%

        ACRON 2 Porsche Drive Atlanta AG, member          99.9%

        ACRON (USA) L.P., member                       0.1%

    ACRON (USA) LP, member                              0.9%

        ACRON U.S. Management, Inc., general partner      0.1%

        ACRON US Holding Corp., limited partner         99%

    Castleton Holdings LLC, member                     0.1%

## **ATTACHMENT D**

Intentionally Omitted

**ATTACHMENT E**

**GUARANTY**

**THIS GUARANTY** (the "**Guaranty**") is made and entered into as of _____February 1_____, 20<u>22</u>, by and among:

A.    ACRON AG (the "**Guarantor**");

B.    ACRON 2 Porsche Drive, Atlanta, LLC, a limited liability company organized and existing under the laws of Delaware, with its principal address at 2424 East 21st Street, Suite 150, Tulsa, OK 74136 (the "**Licensee**"); and

C.    IHG Franchising, LLC, a Delaware (USA) limited liability company, with its principal address at Three Ravinia Drive, Suite 100 Atlanta, Georgia 30346 ("**IHG**").

WHEREAS, contemporaneous with the execution of this Guaranty, Licensee will enter into a license agreement with IHG, dated _____February 1, 2022_____, for the operation of a Hotel located at 2 Porsche Drive, Atlanta, GA 30354 (the "**License**");

WHEREAS, IHG is unwilling to enter into the License with Licensee without the guarantee by Guarantor as set forth below.

NOW THEREFORE, in consideration of the mutual covenants and promises herein contained, IHG and Guarantor agree as follows:

1.    GUARANTY.  In consideration for IHG's entry into the License with Licensee, Guarantor agrees to absolutely, unconditionally, irrevocably, jointly and severally, guarantee, as a primary obligor, the prompt and satisfactory performance of all of Licensee's payment and performance obligations under the License, regardless of the ability or inability of Licensee to make such payments or perform such obligations under the License, and to perform all other obligations set forth below (collectively, the "**Obligations**").

2.    NATURE OF THE GUARANTY.

2.1    This is a guaranty of both performance and payment.  The Obligations of Guarantor under Paragraph 1 are absolute, unconditional, and irrevocable and will not be affected, modified or impaired by reason of, or upon the happening of any event, including, without limitation, any of the following:  (i) any extensions or renewals of the License; (ii) the invalidity or unenforceability, in whole or in part, of the License or of any other guaranty agreements relating to the License; (iii) the compromise, settlement, release, or termination of all or any portion of any claims or actions relating to or arising out of the License or of any other guaranty agreements relating to the License; (iv) the voluntary or involuntary liquidation, sale or other disposition of any of Licensee's assets or the bankruptcy, receivership, insolvency or reorganization of Licensee or the release or discharge of Licensee obligations to IHG or the ordering of any court of competent jurisdiction that IHG to return any payments or other benefits in lieu of payment it may have received from Licensee on grounds of preferential payment status or otherwise avoided under bankruptcy, receivership or other fraudulent conveyance laws (v) the failure to give Guarantor notice of default, non-performance, or non-payment by Licensee of its obligations under the License or the failure of IHG to make demand on Licensee or any other guarantors of the License to perform in accordance with the License; (vi) the modification, alteration, amendment, expiration or termination of the License; or (vii) the

modification, alteration, amendment, expiration or termination of any other guaranty of Licensee's performance of the License.

2.2      Guarantor also may gain access to parts of IHG's Confidential Information as a result of this Guaranty. IHG's Confidential Information is proprietary and includes IHG's trade secrets. Guarantor hereby agrees that it: (a) will not use IHG's Confidential Information in any other business or capacity (such use being an unfair method of competition); (b) will maintain the confidentiality of IHG's Confidential Information; and (c) will not make unauthorized copies of any portion of IHG's Confidential Information disclosed in written, electronic or other form.

3.      <u>NO CONDITIONS</u>. Guarantor agrees that it is not a condition to its guaranty that IHG first proceed against Licensee or any other guarantor of the License or that IHG preserve or pursue remedies against any other person or entity.

4.      <u>INDEPENDENCE OF GUARANTY; WAIVER</u>. This Guaranty is independent of and in addition to any and all other security or guaranty agreements which IHG may now or hereafter have for the performance of the License. Guarantor hereby waives (i) notice of acceptance of this Guaranty, (ii) notice of default, non-performance, non-payment or extension of time for performance or payment by Licensee or any other guarantor of all or any portion of the License; (iii) notice of modification, alteration, amendment, expiration or termination of the License or of any other guaranty agreement relating to the License; and (iv) notice of extension or renewal of the License.

5.      <u>PAYMENT BY GUARANTOR</u>. If all or any part of the Obligations requiring payment shall not be punctually paid when due, Guarantor shall, immediately upon demand by IHG, and without any other notice whatsoever, pay in United States dollars, the amount due on the Obligations to IHG. Such demand(s) may be made at any time coincident with or after the time for payment of all or part of the Obligations and may be made from time to time with respect to the same or different items of the Obligations. Such demand shall be deemed made, given and received in accordance with the notice provisions hereof.

6.      <u>GUARANTEED OBLIGATIONS NOT REDUCED BY OFFSET</u>. The Obligations of Guarantor to IHG under this Guaranty shall not be reduced, discharged or released because or by reason of any existing or future offset, claim or defense of Licensee or any other party against IHG or against payment of the Obligations.

7.      <u>WAIVER OF SUBROGATION, REIMBURSEMENT AND CONTRIBUTION</u>. Notwithstanding anything to the contrary contained in this Guaranty, Guarantor shall have no right of subrogation to IHG's rights under the Obligations against the Licensee until the Obligations have been indefeasibly paid and discharged in full. Guarantor hereby unconditionally and irrevocably waives, releases and abrogates any and all rights they may now or hereafter have under any agreement, at law or in equity (including, without limitation, any Applicable Law subrogating the Guarantor to the rights of IHG), to assert any claim against or seek contribution, indemnification or any other form of reimbursement from Licensee or any other party liable for payment or performance of any or all of the Obligations for any payment made by Guarantor under or in connection with this Guaranty or otherwise until the Obligations under this Guaranty are satisfied in full.

8.      <u>WAIVER OF DEFENSES</u>. To the extent permitted by Applicable Law, Guarantor hereby waives and agrees not to assert or take advantage of any and all defenses to this Guaranty available to such Guarantor at law or in equity other than the defenses that the Obligations are not due and payable or that the Obligations have been satisfied in full by payment or performance by Licensee or the Guarantor.

9.    <u>TRANSFER OF SHARES BY GUARANTOR</u>.  Each Guarantor acknowledges that the License contains provisions restricting the transfer of an interest in Licensee, including but not limited to transfers of shares or other securities in Licensee.  Each Guarantor agrees not to transfer any interest in Licensee or under Guarantor's control except in compliance with the terms and conditions of the License.  In addition, Guarantor shall not transfer or otherwise encumber all or substantially all of its/his/her assets without the prior written approval of IHG.

10.    <u>EFFECT OF DELAY IN EXERCISE OF RIGHTS</u>.  No delay on the part of IHG in the exercise of any right or remedy will operate as a waiver thereof, and no single or partial exercise by IHG of any right or remedy will preclude any other or further exercise thereof or the exercise of any other right or remedy; nor will any modification or waiver of any of the provisions of this Guaranty be binding upon IHG except as expressly set forth in a writing duly signed by and delivered by IHG.  No actions of IHG permitted hereunder will in any way affect or impair the rights of IHG and the Obligations of Guarantor under this Guaranty.

11.    <u>DURATION</u>.  This Guaranty will continue in full force and effect until all of the Obligations have been fully and satisfactorily been paid or performed by Licensee or Guarantor or the Obligations have otherwise been completely discharged, and Guarantor will not be released from their Obligations under this Guaranty so long as any Obligations or claims arising out of or relating to this Guaranty remain outstanding.

12.    <u>IHG'S RIGHTS UNDER THE GUARANTY</u>.  IHG may at any time and from time to time, without any Guarantor's consent, and without notice to any Guarantor and without affecting or impairing any of Guarantor's Obligations under this Guaranty, do any of the following:  (i) renew or extend the License; (ii) compromise, settle, release, or terminate all or any portion of any claims or actions relating to or arising out of the License; or (iii) modify, alter, or otherwise amend the License.

13.    <u>NOTICES</u>.  All notices must be in writing and will be effective on the earlier of (a) the day it is sent by facsimile or email with a confirmation of receipt; or (b) the next business day after it is sent by a commercially recognized "next business day" delivery service (e.g., FedEx or UPS) to the appropriate party at the following single address, or such other single address as may be designated by the party to be notified. It is agreed that each Party can send communications to the other Parties by facsimile or email for the purposes of notices under this Guaranty, including this <u>Paragraph 13</u>, and/or to provide information to the other Parties by facsimile or email, subject to any applicable laws.

|   |   |
|---|---|
| IHG's notice address: | IHG Franchising, LLC |
|   | Three Ravinia Drive, Suite 100 |
|   | Atlanta, Georgia   30346 |
|   | Attn:  Vice President, Franchise Licensing |
|   | and Compliance |
|   |   |
| Licensee notice address: | ACRON 2 Porsche Drive, Atlanta, LLC |
|   | 2424 East 21st Street, Suite 150 |
|   | Tulsa, OK 74136 |
|   | Attn:  Greg Wilson |

Guarantor notice        _____
address:                    _____
                              _____
                              _____
                              Attn:

14.     GUARANTOR' REPRESENTATIONS AND WARRANTIES.  Each Guarantor represents and warrants to IHG, as of the date hereof, that: (a) the persons executing this Guaranty have been duly authorized to perform such actions on behalf of the Guarantor; and (b) its/his/her Guaranty constitutes the valid, legal and binding Obligations of the Guarantor, and to the best knowledge of Guarantor, is enforceable in accordance with its terms.

15.     FEES AND EXPENSES.  Each Guarantor jointly and severally agrees to pay all costs, expenses, and fees, including reasonable legal fees, court costs and other costs incurred by IHG or any assignee in enforcing this Guaranty.

16.     SUCCESSORS AND ASSIGNS.  This Guaranty will be binding on Guarantor and will inure to the benefit of IHG and its successors and assigns.  This Guaranty may not be assigned by any Guarantor.  This Guaranty may be freely assigned by IHG, including but not limited to any change of control of IHG, any transfer of all or part of IHG's business which includes the License, or any pledge or assignment of this Guaranty in connection with any financing of IHG's business, whether or not related to the License.

17.     GOVERNING LAW; DISPUTE RESOLUTION.  This Guaranty shall be governed by, and all disputes arising under or in connection with this Guaranty shall be resolved in accordance with the dispute resolution procedure (Paragraph 22) in the License, which is incorporated into this Guaranty by reference (with the language modified to refer to the Guarantors).

19.     SEVERABILITY.  If any provision of this Guaranty is held to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Guaranty, such provision shall be fully severable and this Guaranty shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Guaranty, and the remaining provisions of this Guaranty shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Guaranty.

20.     EXECUTION.  This Guaranty may be executed in two or more counterparts and delivered by e-mail or facsimile, all of which taken together will constitute one instrument.

21.     SURVIVAL.  This Guaranty will survive the expiration and termination of the License.

22.     DEFINITIONS.  Any initially capitalized terms not otherwise defined herein shall have the meanings given to them in the License.

[*Signature Page to Follow*]

E-4

IN WITNESS WHEREOF, the parties have executed this Guaranty as of the date first stated above.

**IHG:**

**IHG FRANCHISING, LLC**

By: Six Continents Hotels, Inc.,
    its sole managing member

By: _Jenny Tidwell_____
    Jenny Tidwell
    Vice President
    Franchise Licensing and Compliance

Signing Date: _____February 1, 2022_____

**LICENSEE:**

**ACRON 2 PORSCHE DRIVE, ATLANTA, LLC**
a Delaware limited liability company

By:  ACRON (USA) L.P.
    its manager

    By:  ACRON U.S. Management, Inc.
        its sole general partner

    By:_____
        Greg Wilson
        President

Signing Date: _1·31·22_____

**GUARANTOR:**

**ACRON AG**

By:_____

Name:_____

Title:_____

Signing Date: _____

IN WITNESS WHEREOF, the parties have executed this Guaranty as of the date first stated above.

**IHG:**

**IHG FRANCHISING, LLC**

By: Six Continents Hotels, Inc.,
    its sole managing member

By: _____
      Jenny Tidwell
      Vice President
      Franchise Licensing and Compliance

Signing Date: _____

**LICENSEE:**

**ACRON 2 PORSCHE DRIVE, ATLANTA, LLC**
a Delaware limited liability company

By: ACRON (USA) L.P.
    its manager

    By: ACRON U.S. Management, Inc.
      its sole general partner

    By: _____
       Greg Wilson
       President

Signing Date: _____

**GUARANTOR:**

**ACRON AG**

By: _____

Name: _Peer Bender_____

Title: _CEO_____

Signing Date: _Febr. 1st 2022_____

E-5

**ATTACHMENT F**

**IHG** HOTELS &
RESORTS

**ACCESSIBILITY CERTIFICATION**

**GRS Code:** _____

**Location #:** _____

**Hotel Name** (as it appears in the IHG Website): _____

**Hotel Address:** _____

**Licensee:** _____

This certification is intended to comply with the accessibility standards and/or the Travelers with Disabilities Section of the relevant brand standards as well as the InterContinental Hotels Group Design & Construction standards, all of which require compliance with Title III of the Americans with Disabilities Act (ADA), including the 1991 and/or 2010 ADA Standards for Accessible Design (ADA Standards), and all other applicable accessibility requirements. These standards require as follows:

    a.  For newly constructed hotels: (1) a pre-construction certification of the final plans for the building and building site submitted prior to the commencement of construction by an architect with professional experience applying the requirements of the ADA and the ADA Standards; and (2) a post-construction certification submitted after an inspection of as-built conditions signed by Licensee.

    b.  For renovations required for relicensing, conversions, brand changes or changes of ownership: a post-renovation certification submitted after an inspection of as-built conditions signed by Licensee.

    c.  For voluntary renovations: a post-renovation certification submitted after an inspection of as-built conditions signed by Licensee.

Please select the option for which this Certification is submitted:

☐  **Newly Constructed Hotel** (Must submit Certification Options A & B below)

☐  **Renovation Required for Relicensing, Conversion, Brand Change or Change of Ownership** (Must submit Certification Option B below)

☒  **Voluntary Renovation** (Must submit Certification Option B below)

F-1

**CERTIFICATION**

Please select the Option(s) for which Licensee is submitting this Certification.

☐  **Option A:  Newly Constructed Hotel - Pre-Construction Certification**

The undersigned certifies that (1) he/she is an architect with professional experience applying the requirements of the ADA and the ADA Standards; and (2) the final plans for construction of this building and building site are in compliance with Title III of the ADA and any other applicable accessibility laws, ordinances or requirements, to the best of his/her knowledge, information, and belief.

Name of Architect: _____

Name of Firm: _____

Signature: _____

Title: _____    Date: _____

☒  **Option B:  Licensee Post-Construction or Post-Renovation Certification**

The undersigned Licensee, to the best of his/her knowledge, information, and belief, certifies that this building and building site have been built, renovated or altered in compliance with Title III of the ADA and any other applicable accessibility laws, ordinances or requirements, including, but not limited to, any accessibility laws or requirements regarding the following:

- The appropriate number and distribution of accessible Guestrooms
- Features in accessible Guestrooms
- Parking and exterior accessible routes
- Public entrances and interior accessible routes
- Service counters
- Public and common restrooms
- Meeting rooms
- Food and beverage establishments
- Swimming pools, spas, and fitness centers

Name of Licensee Principal Correspondent: _Greg W. Wilson_

Signature: _GW_

Date: _1-31-22_

*By receiving or accepting this Certification, IHG is not confirming that Licensee and/or Licensee's property are in compliance with all applicable federal, state, and local accessibility requirements.  Per the relevant license agreement, Licensee is solely responsible for compliance with all applicable accessibility requirements, including the ADA and the 1991 and/or 2010 ADA Standards for Accessible Design.*

**ATTACHMENT G**



**FIRE & LIFE SAFETY CERTIFICATION**

(to be completed by Licensee's third-party licensed fire protection engineer, engineer or fire and life safety consultant)[1]

In connection with the [NAME AND LOCATION OF HOTEL] (the "Hotel"), I hereby certify to [LICENSEE] and to [IHG] that:

I have used professionally reasonable efforts to ensure that the Hotel complies with **IHG's Fire Protection and Life Safety Standards** in effect as of the [EFFECTIVE DATE OF LICENSE] ; and

In my professional judgment, the Hotel does in fact comply with such standards and the fire protection and life safety systems of the Hotel are operational.

By: _____

Print Name: _Greg W. Wilson_____

Firm: _AGRON US Management Inc.__

Date: _1.31.22_____

---

[1] Licensor may require that this certification be issued by a party that has not participated in the design of the fire protection and life safety systems of the Hotel.

## ATTACHMENT H

## AUTHORITY TO OPEN LETTER

Date

[Licensee name and address]
_____
_____
Attn: _____

      Re:    Authority to Open and Operate the [_____] Hotel located at [address] under the License
Agreement dated_____("License") between [IHG] and _____

Dear __:

Congratulations! You are authorized and directed to open for business as a Brand System Hotel at the
Location as of _____, which date is the Opening Date.

The number of Guestrooms at the Hotel authorized by IHG is _____. The License prohibits the
Licensee from changing the number of Guestrooms without the prior consent of IHG. [The number of
Guestrooms at the Hotel has increased by _____Guestrooms since the date of the License, and
Licensee must pay an expansion fee in the amount of $ _. Please send a check payable to [IHG] at the
address above to the attention of: Vice President, Franchise Licensing & Compliance.

[The Hotel has not been completed to IHG's specifications. However, based on your agreement to complete
the work in Attachment A (the "work") by the date(s) in that Attachment, IHG is willing to establish the
Opening Date as an accommodation to you. The work must be completed to the satisfaction of IHG by no
later than _____, or you will be in breach of the License, which may result in suspending the Hotel from
the Reservation System or termination of the License.]

All terms used and not defined in this Letter have the meanings stated in the License.

We wish you much success and thank you for your ongoing commitment to IHG and our brands.

Respectfully submitted,                AGREED AND ACCEPTED:

FOR IHG:                        FOR LICENSEE:

By:_____              By:_____
Name: _____           Name:_____
Title: _____             Title:_____

## ATTACHMENT I

## INSURANCE REQUIREMENTS

During the Term, Licensee will comply with all insurance requirements of any lease or mortgage covering the Hotel, and IHG's specifications for insurance as to the amount and type of coverage as may be reasonably specified by IHG from time to time in writing or by electronic notice, and will in any event maintain on the Hotel as a minimum, the following insurance underwritten by a reputable insurer approved by IHG:

(1)     employer's liability with minimum limits of $1,000,000 per occurrence;

(2)     worker's compensation insurance;

(3)     employment practices liability insurance (including coverage for harassment, discrimination and wrongful termination and covering defense and indemnity costs) with a limit of $1,000,000 in the aggregate;

(4)     the holder of the liquor license will maintain liquor liability insurance with single limit coverage for personal and bodily injury and property damage of at least $25,000,000 per occurrence naming IHG and its parents, subsidiaries and affiliates (and Licensee if applicable) as additional insureds; and

(5)     commercial general liability insurance (including coverage for product liability, completed operations, contractual liability, host liquor liability and fire legal liability) and business automobile liability insurance (including hired and non-owned liability) with single-limit coverage for personal and bodily injury and property damage of at least $25,000,000 for each occurrence, naming IHG and its parents, subsidiaries and affiliates as additional insureds. In connection with all construction at the Hotel during the License Term, Licensee will cause the general contractor to maintain commercial general liability insurance (including coverage for product liability, completed operations and contractual liability) and business automobile liability insurance (including hired and non-owned liability) with limits of at least $25,000,000 per occurrence for personal and bodily injury and property damage underwritten with insurers approved by IHG. IHG and its parents, subsidiaries and affiliates will be named as additional insureds.

(6)     If multiple locations are insured on policies containing an aggregate limit, then the aggregate limit must apply on a per location aggregate basis.

(7)     Licensee will ensure the royalties, Services Contributions and any other sums payable to IHG are insured within the Licensee's business interruption insurance policy. The policy should insure against 'all risks' of physical loss or damage, and be endorsed to provide for payments to be made directly to IHG.

(8)     All policies must be written on a fully insured basis. Deductibles or self-insured retentions are subject to IHG's approval on an individual basis.

## FIRST AMENDMENT TO LICENSE AGREEMENT

This First Amendment to License Agreement (the "First Amendment")  is made and entered into as of this **18** day of ~~December, 2023~~ January, 2024, by and between IHG Franchising, LLC, a Delaware limited liability company ("IHG") and ACRON 2 Porsche Drive, Atlanta LLC, a Delaware limited liability company ("Licensee").  This First Amendment supplements that certain License Agreement dated February 1, 2022, between the parties (the "License"), relating to a license to operate the Kimpton® Overland Hotel Atlanta Airport, GA#20713 (the "Hotel").  To the extent there is any conflict between the License, and this First Amendment, this First Amendment shall govern and control.

      1.     The License is hereby amended by deleting the "Ownership Interest in Licensee" section of Attachment C and replacing it with the following:

Ownership of Licensee:

| | |
|---|---|
| **ACRON 2 PORSCHE DRIVE, ATLANTA LLC** | **100%** |
| ACRON 2 Porsche Drive Mezzco LLC, sole member | 100% |
| Castleton Holdings LLC, member | 0.1% |
| ACRON (USA) LP, managing member | 0.9% |
| ACRON US Holding Corp., limited partner | 99% |
| ACRON AG, manager | 100% |
| ACRON US Management Inc., general partner | 1% |
| ACRON AG, manager | 100% |
| Norbert Ketterer, shareholder | 50% |
| Klaus W. Bender, shareholder | 27.17% |
| Individuals with less than 10% | 22.83% |
| ACRON 2 Porsche Drive Holding LLC, member | 99.0% |
| ACRON 2 Porsche Drive Atlanta AG, member | 99.9% |
| ACRON AG, manager | 61.81% |
| Norbert Ketterer, shareholder | 50% |
| Klaus W. Bender, shareholder | 27.17% |
| Individuals with less than 10% | 22.83% |
| Individuals with less than 10% | 38.19% |
| ACRON (USA) LP, Managing Member | 0.1% |

## SEE FULL ORGANIZATION CHART ATTACHED AS "EXHIBIT A" HERETO

      All future changes to the ownership structure will be calculated in accordance with the Licensee transfer provisions under paragraph 16. of the License, provided that Licensee must remain controlled, directly or indirectly, by Acron (USA) LP.

2.      Except as expressly stated in this First Amendment, no further additions, modification or deletions to the License are intended by the parties or made by this First Amendment.  All other terms and conditions of the License remain in full force and effect, including the Guaranty (as defined in the License).

*(Signature Page Follows)*

IN WITNESS WHEREOF, the parties have executed this First Amendment as of the day and year first above written:

**LICENSEE:**

**ACRON 2 PORSCHE DRIVE, ATLANTA LLC, a** Delaware limited liability company

By: ACRON 2 Porsche Drive Mezzco LLC, a Delaware limited liability company,
    Its sole member

      By: ACRON (USA) LP, a Texas limited partnership,
        Its Manager

          By: ACRON U.S. Management, Inc., a Nevada corporation,
           its sole general partner

            By: _____
                Greg W. Wilson
                President

**IHG:**

**IHG FRANCHISING, LLC,** a Delaware limited liability company

By:    Six Continents Hotels, Inc.,
        its sole managing member

      By: _____
         Jenny Tidwell
         Vice President
         Franchise Licensing and Compliance

AGREED AND ACCEPTED THIS 18th DAY OF ___January___, 2024 .

**GUARANTOR :**

**ACRON AG**

By: _____
     Greg Wilson
     Authorized Signatory



ACRON 2 Porsche Drive, Atlanta LLC
& ACRON 2 Porsche Drive Mezzco LLC
Organizational Chart as of October 25, 2023

* ACRON AG Board of Directors, Klaus Bender - Chairman, Peer Bender - CEO

** ACRON US Management Inc  Board of Directors, Klaus Bender - Chairman, Peer Bender, Kai Bender

*** ACRON 2 Porsche Drive Atlanta AG Board of Directors, Peer Bender -- President, Juerg Greter, Andre Lagler

**** Project Owner owns a leasehold estate in the Project

Note: Except as shown herein, no entity or individual or their affiliates or family members has a controlling interest in, or owns ten percent (10%) or greater of the direct or indirect interests, of either Borrower or Guarantor.

## Exhibit G

**Form of PCNA Estoppel**

[Attached.]

[INSERT DATE]

ACRON 2 Porsche Drive, Atlanta LLC
c/o ACRON (USA), L.P.
2424 East 21st Street, Suite 150
Tulsa, Oklahoma 74114
Attention: Greg Wilson

CAI Overland Lender, LLC
c/o Civitas Capital Group
1722 Routh Street, Suite 800
Dallas, Texas 75201
Attention: Austin Khan, Marisa Lizak

  Re: Property known as the Kimpton Overland Hotel Atlanta Airport located at Two Porsche Drive, Hapeville, Georgia 30354 (the "**Property**")

Ladies and Gentlemen:

  As of the date hereof, pursuant to Section 12(p) (Estoppel Certificates) of that certain Declaration of Easements, Covenants, Conditions and Restrictions, dated as of December 30, 2015 and recorded on December 31, 2015 in Deed Book 55721, Page 498 of the Official Records of Fulton County, Georgia (the "**Declaration**"), the undersigned, Porsche Cars North America, Inc., a Delaware corporation ("**PCNA**"), certifies to and agrees with ACRON 2 Porsche Drive, Atlanta LLC, a Delaware limited liability company (together with its successors and assigns, "**Acron**") and CAI Overland Lender, LLC, a Delaware limited liability company, any successor holder(s) or agent(s) of all or any portion of the Mezz Loan (as defined below), and each of their respective successors and assigns (collectively, "**Mezz Lender**"), as follows, in connection with that certain mezzanine loan of $11,600,000 (the "**Mezz Loan**") to be made by Mezz Lender to Acron's parent, ACRON 2 Porsche Drive Mezzco LLC, a Delaware limited liability company ("**Mezz Borrower**"), which Mezz Loan is secured by a pledge by Mezz Borrower of its limited liability company interests in Acron (the "**Mezz Pledge**").  All capitalized terms used herein but not defined in this PCNA Estoppel Certificate (this "**Certificate**") shall have the meanings ascribed to such terms in the Declaration.

  1. PCNA remains the fee owner of the property legally described on Exhibit B (Legal Description of Porsche Parcel) and Exhibit D (Legal Description of ROFR Parcel) attached to the Declaration.

  2. The Declaration is in full force and effect in accordance with its terms. The Declaration as recorded in the above-referenced Official Records has not been amended, modified or supplemented. There are no other agreements or understandings, whether written or oral, between PCNA and Acron with respect to the Declaration.

  3. No default or breach beyond any applicable notice and cure periods currently exists by any party to the Declaration and, to PCNA's knowledge, no event has occurred which,

with the passage of time or the giving of notice or both, would constitute a breach or default by Acron or PCNA thereunder.

4.      Either (select one):

[__] No payment is due or past due under the Declaration, including without limitation any Repair Costs.

OR

[__] A Repair Cost payment is due from Acron in the amount of $_____ and a Repair Cost payment is due from PCNA in the amount of $_____.

5.      In accordance with <u>Section 10(h)</u> and <u>Section 12(m)</u> of the Declaration, PCNA acknowledges and agrees that (a) Mezz Lender shall be considered a "Mortgagee" as such term is defined in <u>Exhibit A</u>, <u>Section 25</u> of the Declaration, and (b) this Certificate shall serve as Acron and Mezz Lender's notice to PCNA that a copy of all default notices delivered under this Declaration shall also simultaneously be delivered to Mezz Lender at the address set forth on the first page of this Certificate.

IN WITNESS WHEREOF, PCNA has caused this Certificate to be executed under seal by its duly authorized officers as of the date first written above.

*[Signature Page Follows]*

5129199.27

PCNA acknowledges that Acron and Mezz Lender will rely on this Certificate in connection with the Mezz Loan.  The information contained in this Certificate shall be for the benefit of Acron and Mezz Lender.

Very truly yours,

**PCNA**:

Signed, sealed and delivered in the presence of:

**PORSCHE CARS NORTH AMERICA, INC.**, a Delaware corporation

_____
Unofficial Witness

By:   [EXHIBIT ONLY – DO NOT SIGN]
Name: _____

_____
Notary Public

Title: _____

My Commission Expires:

By:   [EXHIBIT ONLY – DO NOT SIGN]
Name: _____

_____

Title: _____

[AFFIX NOTARY SEAL]

## **Schedules**

## **SCHEDULE 1**

**Contracts, Brokerage Agreements and Commissions**

[Attached.]

**Kimpton Overland/Porsche**
**Schedule of Contracts**
**Section 6.2.9 of Mezzanine Loan Agreement**

| | Vendor Name | Service Provided | Term | Description of Notice/Renewal/Fees |
|---|---|---|---|---|
| 1 | BMI | Music - license fee | 1/1/23 to 12/31/23 | Auto renewal unless 30 days written notice - annual term applies if not cancelled before 30 days lapses |
| 2 | SESAC | Music - license fee | 1/1/23 to 12/31/23 | Auto renewal unless 30 days written notice - annual term applies if not cancelled before 30 days lapses |
| 3 | Capital Document Solutions/Wells Fargo | Copier lease (3) | 1/1/23 to 12/31/25 | Non-cancelable during Term - Auto renews on a monthly basis unless at least 60 days notice |
| 4 | Master Security Company LLC | Security guard services (weekend) | 3/1/23 to 2/28/24 | Cancel with 30 days written notice - after initial term of 1 year, continues on month to month |
| 5 | PureHD LLC | HDTV Programming | Annual -  3/23 to 2/24 | Requires 90 days written notice to term or auto renews for another 1 year term. |
| 6 | SkyHop Global | Ground transportation for airline crew | 6/12/23 to 5/31/24 | Requires 90 days written notice to term |
| 7 | Creative Leasing /Wells Fargo | Lease of 2 shuttles/vans for operations | 48 months - 5/23 to 4/27 | No cancellation within initial term - Requires 90 written notice to exercise applicable options |
| 8 | Encore | Audio Visual Equipment rental | 36 months - 3/23 to 2/26 | Notice of "cause" required - early term requires repay of Bonus/penalty |
| 9 | Nitel LLC | Telecommunications (phone & internet) | 36 months - 9/20 to 8/23 - auto renewed 9/23 to 8/24 | Requires 60 days written notice to term prior to renewal term - auto renews for 1 year term. |
| 10 | Oracle America Inc | Cloud services - POS client | 11/1/23 to 10/31/24 | Annual contract - requires renewal |
| 11 | Birch Street | Procure to Pay - License and Maintenance | 12/22 to 11/23 - auto renewed 12/23 to 11/24 | Auto renewal for another 1 year term unless 90 day written notice |
| 12 | Sojern | E marketing | 6/1/23 to 12/31/23 | 7 months - no early termination language and no auto renewal |
| 13 | City of Hapeville Development Authority | 30 yr agreement for PILOT | 2017 to 2047 | Payment in Lieu of Taxes agreement |
| 14 | LAZ Parking | Parking services | 3 year term - 4/23 to 3/26 | Requires 30 days advance written notice to terminate & must pay remaining payments of capital improvements and equipment purchased if terminate within initial term.  Auto renewal unless 90 days notice given. |
| 15 | Delphi | IHG Interface - Opera PMS | 1 year - 10/23 - 9/24 | Requires 60 days written notice to term (by Oct 31 of each year) |
| 16 | IRIS | Food & beverage POS software | 3 year term - 2/23 to 1/26 | Requires 30 days written notice to term or auto renews for another 1 year period. |
| 17 | MPLC  (Motion Picture Licensing Corp) | Music license | 1 year (6/23 to 5/24) | Requires 60 days written notice to term or auto renews for another 1 year period. |
| 18 | Global Music Rights (GMR) | Music license | 1 year (Jan 23 - Dec 23) | Requires 90 days written notice to term or auto renews for another 1 year period. |
| 19 | Sertifi | eAuthorize, eSign, ePay, Opera | Annual - Aug 22 to Jul 23 | Requires 30 days written notice to term or auto renews for another 1 year period. |
| 20 | Trane | HVAC equipment maintenance and System monitoring/control | 3 years (1/20 to 12/22) - auto renewed 1/23 to 12/23 | Auto renewal for 1 year periods - unless terminated |
| 21 | Waste Management | Waste removal/trash | 3 years (1/21 to 12/23) | Auto renewal for 1 year periods - unless provide 30 days written notice prior to renewal.  Thereafter 30 days written notice for cause or sale |

## SCHEDULE 2

**Merchant Schedule**

[Attached.]

**Kimpton Overland/Porsche**
**Merchant Schedule**
**Section 6.2.21 of Mezzanine Loan Agreement**

| | Merchant | Payment Method | Description of Payments |
|---|---|---|---|
| 1 | LAZ Parking / Flash Parking | Auto/check | Settlements/reimbursements for outsourced parking services |
| 2 | American Express | Auto -DRR | Credit Card settlements - through Daily Revenue Report |
| 3 | Visa | Auto -DRR | Credit Card settlements - through Daily Revenue Report |
| 4 | MasterCard | Auto -DRR | Credit Card settlements - through Daily Revenue Report |
| 5 | Discover | Auto -DRR | Credit Card settlements - through Daily Revenue Report |
| 6 | Encore | Check | Payment/Bonus - Audio Visual Contract Usage/Services |
| 7 | ACFN | Check | ATM Commission Check |
| 8 | Atlanta Beverage Fintech | Auto | Reimburse overpayments/returns for liquor, beer and wine vendors according to payment process under Georgia state law |
| 9 | US Food, Inc. | Check | Food buy rebate |

## **SCHEDULE 3**

### **Post-Closing Obligations**

| <u>ITEMS</u> | <u>TIME PERIOD</u> |
|---|---|
| Borrower shall cause Owner to deliver fully executed copies of the following to Lender: | |
| (1) the PCNA Estoppel (as defined in <u>Section 1.1</u> above) in a form substantially similar to the form of PCNA Estoppel set forth in **<u>Exhibit G</u>** of this Agreement. | Not later than 60 days following the Closing Date. |
| (2) Commercial Property Insurance Policy #7011547663 evidencing endorsement to Lender as required under this Agreement | Not later than 10 Business Days following the Closing Date. |
| (3) Lender's Borrower Questionnaire/KYC Package completed by Mr. Norbert Ketterer with responses sufficient to Lender's satisfaction | Not later than 30 days following the Closing Date. |
| Borrower shall deliver to Texas Capital Bank (and confirm same with Lender) the following: | |
| (1) All outstanding KYC documentation required by Texas Capital Bank that has not already been provided by the Closing Date (including, without limitation, the CMDA and UBO forms executed by Greg Wilson) to Texas Capital Bank's satisfaction | Not later than 10 Business Days following the Closing Date. |

# **EXHIBIT B**

(Note)

## PROMISSORY NOTE

U.S. $11,600,000                                               January 18, 2024

**NOTICE TO BORROWER: THIS NOTE CONTAINS PROVISIONS FOR A VARIABLE INTEREST RATE AND FOR VARIABLE PAYMENT AMOUNTS.**

FOR VALUE RECEIVED, the undersigned ACRON 2 PORSCHE DRIVE MEZZCO LLC, a Delaware limited liability company ("**Borrower**"), promises to pay to the order of CAI OVERLAND LENDER, LLC, a Delaware limited liability company, and its successors and assigns (together with all subsequent holders of this Note, "**Lender**"), on or before the Maturity Date, as hereinafter provided, the principal sum of $11,600,000, together with interest on the unpaid principal balance from time to time outstanding, as hereinafter provided, in lawful money of the United States of America, commencing on the Closing Date and continuing until the Maturity Date, in accordance with this Promissory Note (this "**Note**") and that certain Loan Agreement (and this is the Note referred to in such Loan Agreement), dated as of the date hereof, between Borrower and Lender (such Loan Agreement, as the same may be amended, restated and/or supplemented from time to time, the "**Loan Agreement**").  All capitalized terms not defined herein shall have the meanings ascribed to such terms in the Loan Agreement.

By Borrower's execution and delivery of this Note, Borrower covenants and agrees as follows:

1.     <u>Interest Rate and Payments</u>.  The balance of principal that is outstanding from time to time under this Note shall bear interest at the Interest Rate in accordance with <u>Section 2.2.1</u> of the Loan Agreement (subject to the terms of <u>Section 4</u> hereof).  Interest only on this Note shall be payable on the Closing Date, in advance, for the Stub Interest Period in accordance with <u>Section  2.2.2</u> of the Loan Agreement.  Following the Closing Date, Borrower shall make payments of principal and/or interest due under this Note on each Installment Payment Date in accordance with <u>Section 2.2.3</u> of the Loan Agreement.  The entire principal balance of this Note and all other amounts due under this Note and the other Loan Documents (as defined in the Loan Agreement), together with all accrued and unpaid interest thereon, shall be due and payable in full on the Maturity Date in accordance with <u>Section 2.2.4</u> of the Loan Agreement.

2.     <u>Prepayment</u>.  Borrower shall have the right to prepay the Principal Indebtedness and all other amounts due under this Note and the other Loan Documents, together with all accrued but unpaid interest thereon as of the date of prepayment, pursuant to the terms of <u>Section 2.3</u> of the Loan Agreement.  As set forth therein, prepayment of the Principal Indebtedness shall only be made in whole, except for the limited purposes of satisfying any Extension Debt Yield Test, Extension DSCR Test, Extension LTV Test, or terminating the Cash Flow Sweep Period.

3.     <u>Method and Place of Payment to Lender; Application of Payments</u>.  All payments made by Borrower to Lender hereunder and under the other Loan Documents shall be

(i) made by Borrower in immediately available funds in accordance with Section 2.7 of the Loan Agreement and (ii) applied by Lender in accordance with Section 2.6 of the Loan Agreement.

4.     Default Rate. If any Event of Default shall exist, interest shall accrue on the Principal Indebtedness (and on all accrued but unpaid interest thereon and on any other amounts due under this Note and the other Loan Documents) at the Default Rate in accordance with Section 2.5 of the Loan Agreement.

5.     Late Charges. In addition to interest as set forth herein, Borrower shall pay to Lender late charges in such amounts and at such times as set forth in Section 2.4 of the Loan Agreement.

6.     Security.   This Note is secured by, among other things, the Security Instrument and the other Loan Documents.

7.     Events of Default and Remedies. Without notice or demand (which are hereby waived), the entire unpaid principal balance of, and all accrued interest on, this Note shall immediately become due and payable at the option of the holder hereof upon the occurrence of an Event of Default (as defined in the Loan Agreement).  In the event an Event of Default shall have occurred and is continuing, the holder of this Note shall have the immediate right, at the sole discretion of such holder, to exercise any and all remedies set forth in the Loan Documents (including, without limitation, acceleration of the indebtedness evidenced by this Note and commencement of foreclosure proceedings), and the holder of this Note may offset against this Note any sum or sums owed by the holder hereof to Borrower or any Guarantor, and/or may proceed to protect and enforce its rights either by suit in equity and/or by action at law, or by other appropriate proceedings, whether for the specific performance of any covenant or agreement contained in this Note or in any of the other Loan Documents, or in aid of the exercise of any power or right granted by this Note or to enforce any other legal or equitable right of the holder of this Note.

8.     Acceleration.  During the existence of any Event of Default, the entire outstanding balance of principal, accrued interest, and other sums owing hereunder and under the Loan Documents shall, at the option of Lender, become at once due and payable without notice or demand in accordance with Section 10.2.3 of the Loan Agreement.

9.     Maximum Interest Rate.

(a)     It is expressly stipulated and agreed to be the intent of Borrower and Lender at all times to comply strictly with the applicable Texas law governing the maximum rate or amount of interest payable on this Note (or applicable United States federal law to the extent that it permits Lender to contract for, charge, take, reserve or receive a greater amount of interest than under Texas law).

(b)     To the extent that Lender is relying on Chapter 303, as amended, of the Texas Finance Code to determine the maximum amount of interest permitted by applicable law on the principal of the Note, Lender will utilize the "weekly rate ceiling" from time to time in effect as provided in such Chapter 303, as amended.

2

(c)     To the extent United States federal law permits a greater amount of interest than is permitted under Texas law, Lender will rely on United States federal law instead of such Chapter 303, as amended, for the purpose of determining the maximum amount permitted by applicable law.

(d)     To the extent permitted by applicable law now or hereafter in effect, Lender may, at its option and from time to time, implement any other method of computing the maximum lawful rate under such Chapter 303, as amended, or under other applicable law by giving notice, if required, to Borrower as provided by applicable law now or hereafter in effect.  In no event shall the provisions of Chapter 346 of the Texas Finance Code (which regulates certain revolving credit loan accounts and revolving triparty accounts) apply to the indebtedness evidenced hereby.

(e)     If the applicable law is ever judicially interpreted so as to render usurious any amount: (i) contracted for, charged, taken, reserved or received pursuant to this Note, any of the other Loan Documents or any other communication or writing by or between Borrower and Lender related to the transaction or transactions that are the subject matter of the Loan Documents; (ii) contracted for, charged or received by reason of Lender's exercise of the option to accelerate the Maturity Date of this Note; or (iii) Borrower will have paid or Lender will have received by reason of any voluntary prepayment by Borrower of this Note, then it is Borrower's and Lender's express intent that all amounts charged in excess of the Maximum Lawful Rate shall be automatically cancelled, ab initio, and all amounts in excess of the Maximum Lawful Rate theretofore collected by Lender shall be credited on the principal balance of this Note (or, if this Note have been or would thereby be paid in full, refunded to Borrower), and the provisions of this Note and the other Loan Documents immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder and thereunder; provided, however, if this Note has been paid in full before the end of the stated term of this Note, then Borrower and Lender agree that Lender shall, with reasonable promptness after Lender discovers or is advised by Borrower that interest was received in an amount in excess of the Maximum Lawful Rate, either refund such excess interest to Borrower and/or credit such excess interest against this Note then owing by Borrower to Lender.

(f)     Borrower hereby agrees that as a condition precedent to any claim seeking usury penalties against Lender, Borrower will provide written notice to Lender, advising Lender in reasonable detail of the nature and amount of the violation, and Lender shall have 60 days after receipt of such notice in which to correct such usury violation, if any, by either refunding such excess interest to Borrower or crediting such excess interest against this Note then owing by Borrower to Lender.  All sums contracted for, charged or received by Lender for the use, forbearance or detention of any debt evidenced by this Note shall, to the extent permitted by applicable law, be amortized or spread, using the actuarial method, throughout the stated term of this Note (including any and all renewal and extension periods) until payment in full so that the rate or amount of interest on account of this Note does not exceed the Maximum Lawful Rate from time to time in effect and applicable to this Note  for so long as debt is outstanding.

(g)    Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, it is not the intention of Lender to accelerate the Maturity Date of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

10.    <u>Non-Recourse; Exceptions to Non-Recourse</u>.  The obligations of Borrower under this Note and the other Loan Documents shall be subject to the general limitations on liability set forth in <u>Article 12</u> of the Loan Agreement.

11.    <u>Interpretation.</u>  If any provision of this Note or any paragraph, sentence, clause, phrase or word, or the application thereof, is held invalid in any circumstance, the validity of the remainder of this Note shall be construed as if such invalid part were never included herein. In the event of any conflict between the terms hereof and the terms of the Loan Agreement, the terms of the Loan Agreement shall control and be binding.

12.    <u>Governing Law</u>.  Regardless of the place of the execution of this Note, this Note shall be construed and enforced in accordance with the substantive laws of the State of Texas, without reference to conflicts of law principles.

13.    <u>WAIVER OF JURY TRIAL</u>.  BORROWER, BY EXECUTING THIS NOTE, AND LENDER, BY ACCEPTING THIS NOTE, KNOWINGLY, IRREVOCABLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT EITHER MAY HAVE TO, AND AGREE NOT TO SEEK, A TRIAL BY JURY IN RESPECT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM BASED ON THIS NOTE, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS NOTE OR ANY OTHER LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY HERETO OR TO ANY OTHER LOAN DOCUMENT.  BORROWER, BY EXECUTING THIS NOTE, AND LENDER, BY ACCEPTING THIS NOTE, FURTHER AGREE THAT NO SUCH ACTION WITH RESPECT TO WHICH A JURY TRIAL HAS BEEN WAIVED SHALL BE SOUGHT TO BE CONSOLIDATED WITH ANY OTHER ACTION WITH RESPECT TO WHICH A JURY TRIAL CANNOT OR HAS NOT BEEN WAIVED.  THIS SECTION HAS BEEN FULLY DISCUSSED BY BORROWER AND LENDER, EACH OF WHOM HAS BEEN REPRESENTED BY COUNSEL, AND THIS SECTION SHALL NOT BE SUBJECT TO ANY EXCEPTIONS.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR BORROWER AND LENDER TO ENTER INTO THE TRANSACTIONS EVIDENCED BY THIS NOTE.

14.    <u>Waiver of Prepayment Right Without Premium</u>.  The terms of <u>Section 2.3.6</u> of the Loan Agreement are incorporated herein by this reference.

15.    <u>Transfer of Note</u>. Each provision of this Note shall remain in full force and effect notwithstanding any transfer hereof to any other lender or participant.

16.    <u>Successors and Assigns.</u>  All of the covenants, stipulations, promises and agreements in this Note contained by or on behalf of Borrower shall bind its successors and assigns, whether so expressed or not; provided, however, that Borrower may not, without the prior written consent of Lender, assign any rights, duties, or obligations under this Note.  Without the

consent of Borrower but subject to the terms of the Loan Agreement, Lender may, in its sole discretion, at any time or from time to time while any portion of the indebtedness evidenced hereby remains unpaid, transfer, sell, assign or pledge this Note (or any portion thereof) together with all of the other Loan Documents, and in connection therewith Lender may provide information concerning this Note or the Mezzanine Loan to any future transferee or participant (including, without limitation, financial information for Borrower or the Guarantor). The word "Lender," when used herein shall include Lender's successors and assigns, including all other holders, from time to time, of this Note.

17.    Notices.  Notices given in connection with this Note shall be given in the manner set forth in Section 11.10 of the Loan Agreement.

18.    Counterparts.  This Note may be executed in any number of original counterparts, all of which shall together constitute one and the same instrument.

19.    Certain Waivers and Consents.  Borrower and all parties now or hereafter liable for the payment hereof, primarily or secondarily, directly or indirectly, and whether as endorser, guarantor, surety, or otherwise, hereby severally (a) waive presentment, demand, protest, notice of protest and/or dishonor, and all other demands or notices of any sort whatever with respect to this Note, (b) consent to impairment or release of Collateral, extensions of time for payment, and acceptance of partial payments before, at, or after the Maturity Date, (c) waive any right to  require Lender to proceed against any security for this Note before proceeding hereunder, (d) waive diligence in the collection of this Note or in filing suit on this Note, and (e) agree to pay all costs and expenses, including, without limitation, attorneys' fees, which may be incurred in the collection of this Note or any part thereof or in preserving, securing possession of, and realizing upon any security for this Note.

20.    Time of the Essence.  TIME IS OF THE ESSENCE with regard to the obligations of Borrower under this Note.

21.    Joint and Several Obligations.  If Borrower is more than one Person, all Persons comprising Borrower shall be jointly and severally liable for all of Borrower's obligations hereunder in accordance with Section 11.3 of the Loan Agreement.

22.    Cumulative Rights.  No delay on the part of the holder of this Note in the exercise of any power or right under this Note, or under any of the other Loan Documents, shall operate as a waiver thereof, nor shall a single or partial exercise of any such power or right. Enforcement by the holder of this Note of any security for the payment hereof shall not constitute any election by it of remedies so as to preclude the exercise of any other remedy available to it.

23.    Waiver.  Borrower, and each surety, endorser, Guarantor and other party ever liable for the payment of any sum of money payable on this Note, jointly and severally waive demand, presentment, protest, notice of nonpayment, notice of intention to accelerate, notice of protest, notice of acceleration and any and all lack of notice or diligence or any delay in collection or the filing of suit hereon which may occur, and agree that their liability on this Note shall not be affected by any renewal or extension in the time of payment hereof, by any indulgences, by any release of any party primarily or secondarily liable hereon, or by any release, substitution,

subordination or change in any security for the payment of this Note, and hereby consent to any and all renewals, extensions, indulgences, releases, substitutions, subordinations, or changes, regardless of the number of such renewals, extensions, indulgences, releases, substitutions, subordinations, or changes, without notice thereof to any of them.

24.     Attorneys' Fees and Costs.  In the event an Event of Default shall occur, and in the event that thereafter this Note is placed in the hands of an attorney for collection, or in the event this Note is collected in whole or in part through legal proceedings of any nature, then and in any such case, Borrower shall pay all costs of collection, including, but not limited to, attorneys' fees incurred by the holder hereof on account of such collection, whether or not suit is filed.

25.     Headings; Construction.  The headings of the sections of this Note are inserted for convenience only and shall not be deemed to constitute a part hereof, words used herein of any gender shall be construed to include any other gender where appropriate, and words used herein which are either singular or plural shall be construed to include the other where appropriate.

26.     Negotiable Instrument.  Borrower agrees that this Note is a negotiable instrument, even though this Note, absent this section, may not otherwise qualify as a negotiable instrument under applicable law.

27.     Mezzanine Loan Payable at Maturity.  **IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT THIS NOTE WILL REQUIRE A "BALLOON" PAYMENT OF ALL UNPAID PRINCIPAL AND ACCRUED BUT UNPAID INTEREST ON THE MATURITY DATE.  THE PRINCIPAL INDEBTEDNESS EVIDENCED BY THIS NOTE IS PAYABLE IN FULL AT THE MATURITY DATE.  BORROWER MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THIS NOTE AND ACCRUED BUT UNPAID INTEREST THEN DUE.  LENDER IS UNDER NO OBLIGATION TO REFINANCE THIS NOTE AT THAT TIME.**

**[END OF TEXT]**

**IN WITNESS WHEREOF** this Note has been duly executed by an authorized signatory of Borrower and delivered to be effective as of the day and year first above written.

<u>**BORROWER:**</u>

**ACRON 2 PORSCHE DRIVE MEZZCO LLC,**
a Delaware limited liability company

By:    ACRON (USA) L.P.,
       a Texas limited partnership,
       its Manager

       By:    ACRON U.S. Management, Inc.,
           a Nevada corporation
           its sole General Partner

       By: _____
       Name: Greg Wilson
       Title:  President

## **EXHIBIT C**

(Pledge Agreement)

107074163.3

# PLEDGE AND SECURITY AGREEMENT

THIS PLEDGE AND SECURITY AGREEMENT (this "**Pledge Agreement**") is entered into as of January 18, 2024 ("**Effective Date**"), by and between ACRON 2 PORSCHE DRIVE MEZZCO LLC, a Delaware limited liability company, having its principal place of business at c/o Acron (USA), L.P., 2424 East 21st Street, Suite 150, Tulsa, Oklahoma 74114 (referred to herein as "**Pledgor**") and CAI OVERLAND LENDER, LLC, a Delaware limited liability company, having its principal place of business at c/o Civitas Capital Group, 1722 Routh Street, Suite 800, Dallas, Texas 75201 (together with its successor and assigns, collectively herein referred to as "**Lender**").

## RECITALS

WHEREAS, Pledgor was formed as a Delaware limited liability company on August 7, 2023 and is currently the owner of 100% of the limited liability company interests in ACRON 2 Porsche Drive, Atlanta LLC, a Delaware limited liability company ("**Owner**") pursuant to that certain Owner Operating Agreement (as defined in Section 1 below).

WHEREAS, the limited liability company interests in Owner were previously held by the following three entities: (i) ACRON 2 Porsche Drive Holding LLC, a Delaware limited liability company with a 99% limited liability company interest in Owner, (ii) ACRON (USA) L.P., a Texas limited partnership with a 0.9% limited liability company interest in Owner, and (iii) Castleton Holdings LLC, a District of Columbia limited liability company with a 0.1% limited liability company interest in Owner (collectively, "**Former Pledgors**").

WHEREAS, the Former Pledgors previously pledged all of their limited liability company interests in Owner to Senior Lender pursuant to the Original Pledge (as defined in Section 1 below) in connection with the Senior Loan Agreement and other Senior Loan Documents.

WHEREAS, Senior Lender previously filed certain UCC-1 Financing Statements to perfect its security interests under the Original Pledge (collectively, the "**Original Pledge UCCs**").

WHEREAS, in connection with the Loan Agreement (as defined below) and related transactions evidenced by the other Loan Documents (as defined below), concurrently with the Effective Date hereof, Senior Lender and Owner have amended the Senior Loan Agreement and certain other Senior Loan Documents in order to (i) acknowledge the change in the organizational structure of Owner such that Pledgor is now the sole member of Owner (instead of Former Pledgors), (ii) release the Original Pledge, (iii) terminate the Original Pledge UCCs, (iv) expressly permit Pledgor to pledge to Lender all of Pledgor's limited liability company interests in Owner, and (v) permit Lender to file one or more new UCC-1 Financing Statements to perfect such security interests in accordance with this Pledge Agreement.

WHEREAS, pursuant to the terms of that certain Loan Agreement, dated as of the Effective Date, between Lender and Pledgor (as the same may be amended, modified, supplemented, restated, or replaced from time to time, the "**Loan Agreement**"), Lender has made a mezzanine loan to Pledgor in the aggregate maximum principal amount of $11,600,000 (the "**Mezzanine Loan**"), as evidenced by that certain Promissory Note dated as of the Effective Date, made by Pledgor in favor of Lender (as the same may be amended, modified, supplemented, restated, or replaced from time to time, the "**Note**"). The Note, the Loan Agreement, this Pledge Agreement,

and all other documents evidencing or securing the Mezzanine Loan are sometimes referred to herein, collectively, as the "**Loan Documents**".

WHEREAS, as a condition precedent to making the Mezzanine Loan, Lender requires the Pledgor to execute and deliver this Pledge Agreement and the other Loan Documents to Lender.

WHEREAS, Pledgor is the sole member and the legal and beneficial owner of 100% of the issued and outstanding limited liability company interests in Owner and is pledging those limited liability company interests to Lender to secure Pledgor's obligations under the Mezzanine Loan.

WHEREAS, Pledgor acknowledges that it is the intent of the parties that Lender shall have at all times during the term of this Mezzanine Loan, possession, control, and a perfected, first-priority lien against the pledged limited liability company intertest in Owner and Pledgor has and shall receive material benefits from the making of the Mezzanine Loan.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and to induce Lender to make the Mezzanine Loan under the Loan Agreement, Pledgor hereby agrees with Lender as follows:

1.    <u>Defined Terms.</u>  In addition to the definitions set forth in the foregoing Recitals, all of which are hereby incorporated into the substantive provisions of this Pledge Agreement, unless otherwise provided herein, all capitalized terms used but not defined in this Pledge Agreement shall have the respective meanings ascribed thereto in the Loan Agreement. As used herein, the following terms shall have the following meanings:

(a)    "**Article 8 Matters**" shall mean any action, decision, determination, or election by Owner or its member(s) that its limited liability company interests or other equity interests, be, or cease to be, a "security" as defined in and governed by Article 8 of the UCC Code (as in effect in each of the State of Delaware or the State of Texas), and all other matters related to any such action, decision, determination or election.

(b)    "**Bankruptcy Code**" shall have the meaning given to such term in <u>Section 1.1</u> of the Loan Agreement.

(c)    "**Business Day**" shall have the meaning given to such term in <u>Section 1.1</u> of the Loan Agreement.

(d)    "**Certificate of LLC Interest**" shall mean the certificate representing the Pledged Interests (as herein defined) in Owner in suitable form for transfer, together with: (i) an undated stock power conveying ownership thereof, duly executed by Pledgor and indorsed in blank, each in the form attached hereto as **Exhibit D**; and (ii) all replacements, substitutions, or additions thereto.

(e)    "**Collateral**" shall have the meaning given to such term in <u>Section 2(a)</u> of this Pledge Agreement.

(f)     "**Confirmation Statement**" shall have the meaning given to such term in <u>Section 5(n)(iv)</u> of this Pledge Agreement.

(g)     "**Deed of Trust**" shall have the meaning given to such term in <u>Section 1.1</u> of the Loan Agreement.

(h)     "**Event of Default**" shall have the meaning given to such term in <u>Section 8</u> of this Pledge Agreement.

(i)     "**Governmental Authority**" shall have the meaning given to such term in <u>Section 1.1</u> of the Loan Agreement.

(j)     "**IHG Consent**" shall have the meaning given to such term in <u>Section 1.1</u> of the Loan Agreement.

(k)     "**Mezzanine Loan**" shall have the meaning set forth in the Recitals.

(l)     "**Original Pledge**" shall mean that certain Pledge Agreement, dated as of December 21, 2018, by and between Former Pledgors (as defined in the Recitals), on the one hand, and Senior Lender, on the other hand.

(m)     "**Owner Charter Documents**" shall mean the Owner Operating Agreement and other agreements and instruments of Owner listed on **Exhibit B** hereto, as each of the same may hereafter be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the Loan Documents and Senior Loan Documents.

(n)     "**Owner Operating Agreement**" shall mean that certain Second Amended and Restated Limited Liability Company Agreement of Owner, dated as of the Effective Date, as the foregoing may hereafter be amended from time to time subject, however, to the restrictions and limitations set forth in the Loan Documents and Senior Loan Documents.

(o)     "**Person**" shall have the meaning given to such term in <u>Section 1.1</u> of the Loan Agreement.

(p)     "**Pledged Interests**" shall mean 100% of the limited liability company interests in Owner, together with: (i) all rights, powers, privileges, benefits, options, claims, title, and remedies of any kind or nature in connection therewith, whether now existing or hereafter created; (ii) all tangible and intangible property, products, or instruments of any description issued or issuable in connection therewith, including, without limitation, the Certificate of LLC Interest; and (iii) all Proceeds (as hereinafter defined) derived from any of the foregoing.

(q)     "**Pledgor Charter Documents**" means the Pledgor Operating Agreement and other agreements and instruments of Pledgor listed on **Exhibit A** hereto, as each of the same may hereafter be amended, restated, replaced, supplemented, or otherwise modified from time to time in accordance with the Loan Documents.

(r)     "**Pledgor Obligations**" shall mean the due payment, performance, and observance by Pledgor of all of its covenants, agreements, and obligations from time to time existing under the Note, Loan Agreement, this Pledge Agreement, and the other Loan Documents.

(s)     "**Pledgor Operating Agreement**" shall mean that certain Limited Liability Company Agreement of Pledgor, dated as of the Effective Date (as the foregoing may hereafter be amended from time to time, subject, however, to the restrictions and limitations set forth in this Pledge Agreement and the other Loan Documents).

(t)     "**Proceeds**" shall have the meaning ascribed to such term in Section 9-102(64) of the UCC Code and, to the extent not included in that definition shall include Cash Proceeds, as that term is defined in Section 9-102(9) of the UCC Code, and to the extent not already included in either definition, all interest and profits derived from any collateral.

(u)     "**Senior Assignment of Agreements, Licenses, Permits and Contracts**" shall mean the "Assignment of Agreements, Licenses, Permits and Contracts" as defined in the Senior Loan Agreement.

(v)     "**Senior Lender**" shall have the meaning given to such term in <u>Section 1.1</u> of the Loan Agreement.

(w)     "**Senior Loan**" shall have the meaning given to such term in <u>Section 1.1</u> of the Loan Agreement.

(x)     "**Senior Loan Agreement**" shall have the meaning given to such term in <u>Section 1.1</u> of the Loan Agreement.

(y)     "**Senior Loan Documents**" shall have the meaning given to such term in <u>Section 1.1</u> of the Loan Agreement and such documents and instruments are listed on **Exhibit C**.

(z)     "**Single Purpose Entity**" shall have the meaning given to such term  in <u>Section 1.1</u> of the Loan Agreement.

(aa)    "**UCC Code**" shall mean the Uniform Commercial Code from time to time in effect in the State of Delaware or the State of Texas.

2.     <u>Pledge; Grant of Security Interest; Attachment</u>.

(a)     <u>Grant of Pledge</u>. Pledgor hereby absolutely, irrevocably, and unconditionally pledges and grants to Lender all of Pledgor's right, title, and interest in and to the following, whether now owned by Pledgor or hereafter acquired and whether now existing or hereafter coming into existence (all of which are herein collectively referred to as, the "**Collateral**"):

(i)     All Pledged Interests;

(ii)    All certificates, instruments, or other writings representing or evidencing the Pledged Interests, including, without limitation, the Certificate of LLC Interest;

(iii)    All income, dividends, distributions, including, without limitation, any return of capital, whether paid or payable in cash or in kind, now or hereafter earned, paid, or allocated to the Pledged Interests;

(iv)    All "accounts" as that term is defined in Section 9-102(a)(2) of the UCC Code;

(v)    All "general intangibles" as that term is defined in Section 9-102(a)(42) of the UCC Code;

(vi)    All "investment property" as that term is defined in Section 9-102(a)(49) of the UCC Code arising out of, or in connection with, the Pledged Interests;

(vii)    To the extent not otherwise included in clauses (i) through (vi) above, all Proceeds of and to any of the foregoing;

(viii)    All books, correspondence, files, records, invoices, and other papers relating to any of the foregoing; and

(ix)    All of Pledgor's "letter of credit rights" (as that term is defined in Section 9-102(a)(51) of the UCC Code).

(b)    <u>Attachment</u>. This Pledge Agreement shall constitute a "Security agreement" under the UCC Code.

(c)    <u>Obligations Unconditional</u>. The Pledgor Obligations hereunder are absolute and unconditional, irrespective of the value, genuineness, validity, regularity, or enforceability of the Loan Agreement, the Note or any other Loan Documents, or any substitution, release, or exchange of any guarantee of or security for any of the Pledgor Obligations, and, to the fullest extent permitted by applicable law, irrespective of any other circumstance whatsoever which might otherwise constitute a legal or equitable discharge or defense of a surety or Pledgor (except the defense of indefeasible payment in full of the Mezzanine Loan), it being the intent of this <u>Section 2(c)</u> that the Pledgor Obligations shall be absolute and unconditional under any and all circumstances, subject to a termination of this Pledge Agreement pursuant to <u>Section 10</u> hereof. Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not affect Pledgor's liability or constitute a defense to the Pledgor Obligations hereunder:

(i)    Lender shall extend the time for any performance of or compliance with any of the Pledgor Obligations, or such performance or compliance shall be waived by Lender either tacitly or expressly;

(ii)    The maturity of any of the Pledgor Obligations shall be accelerated;

(iii)    Any of the Pledgor Obligations shall be modified, supplemented, or amended in any respect;

(iv)     Any right under this Pledge Agreement, the Loan Agreement, the Note, or any other Loan Documents, or any other agreement or instrument related to the Mezzanine Loan shall be waived by Lender, whether by course of conduct or by agreement;

(v)      Any guaranty given to secure any of the Pledgor Obligations or any other security or collateral therefor shall be amended, terminated, released, transferred, or exchanged, in whole or in part; and/or

(vi)     Any lien or security interest granted to, or in favor of Lender as security for any of the Pledgor Obligations shall fail to be perfected, shall lapse, or shall be released (other than upon full indefeasible payment and performance of the Pledgor Obligations).

3.     <u>Delivery of the Collateral and Perfection of Security Interest</u>.

(a)     <u>Certificate of LLC Interest</u>. Concurrently with the execution and delivery of this Pledge Agreement, Pledgor shall deliver the Certificate of LLC Interest to Lender, in form and substance satisfactory to Lender in its sole discretion.

(b)     <u>Financing Statements</u>. Pledgor hereby authorizes Lender to file at any time or times, one or more Uniform Commercial Code financing statements covering the Collateral, together with all renewals, replacements, assignments, and terminations thereof as Lender shall determine and in any jurisdiction that Lender shall deem advisable. Such financing statements may describe the Collateral as "all assets of the debtor, whether now owned or hereafter acquired" or words to that effect, without affecting the validity or enforcement of the instrument.

4.     <u>Agreements Governing the Collateral</u>.

(a)     <u>Distributions</u>. So long as no Event of Default shall have occurred and be continuing, and to the extent otherwise not prohibited in the Loan Agreement, Pledgor shall be permitted to receive, use, and distribute all limited liability company interest distributions, cash dividends, and other cash payments in the normal course of business of Pledgor, as applicable, after deducting all payments of interest, principal, or other amounts due under the Mezzanine Loan and Senior Loan, and subject in all respects to the terms of this Pledge Agreement and the other Loan Documents.

(b)     <u>Voting and Other Rights</u>. Other than with respect to any Article 8 Matters, or as otherwise prohibited under the Loan Documents, Pledgor shall have the right, prior to the occurrence of any Event of Default, to exercise all rights and privileges in respect of the Collateral, including without limitation, voting rights under the Owner Charter Documents.

(c)     <u>Irrevocable Proxy</u>.

(i)     <u>Power Coupled with an Interest</u>. Solely with respect to Article 8 Matters, Pledgor hereby irrevocably grants and appoints Lender, from the Effective Date of this Pledge Agreement until the termination of this Pledge Agreement in

accordance with its terms, as Pledgor's true and lawful proxy, to vote the Pledged Interests with respect to any Article 8 Matters for and in Pledgor's name, place, and stead. **THE PROXY AND POWERS GRANTED TO LENDER BY PLEDGOR PURSUANT TO THIS PLEDGE AGREEMENT ARE COUPLED WITH AN INTEREST AND ARE GIVEN TO SECURE THE PERFORMANCE OF PLEDGOR'S OBLIGATIONS UNDER THIS PLEDGE AGREEMENT**.

(ii)    <u>Proxy Irrevocable</u>. The proxy granted and appointed in this <u>Section 4(c)</u> shall be irrevocable and shall include the right to: (A) sign Pledgor's name (as sole member of Owner) to any consent, certificate or other document relating to an Article 8 Matter and/or the Collateral permitted or required by applicable law; and (B) cause the Collateral to be voted in accordance with the preceding sentence. Pledgor hereby represents and warrants that it has granted no other proxies and/or powers of attorney with respect to any Article 8 Matter or the Collateral. Pledgor shall not grant any further proxy or power of attorney or enter into any other voting agreement with respect to the Collateral or with respect to any Article 8 Matter with any Person other than Lender and any attempt to do so shall be void *ab initio*.

(d)    <u>Payments Held in Trust</u>. If at any time during the term of this Pledge Agreement, Pledgor shall receive any property constituting Collateral as defined hereunder, whether now or hereafter existing, in violation of this Pledge Agreement, including, without limitation, any proceeds, distributions, general intangibles, or accounts relating to the Collateral, which Pledgor is not permitted to receive pursuant to <u>Section 4(a)</u> above, Pledgor agrees that it shall hold the same IN TRUST as agent for Lender. All cash shall be segregated from other funds belonging to Pledgor. Pledgor agrees such property shall constitute Collateral securing the Pledgor Obligations of this Mezzanine Loan. Pledgor shall deliver such property to Lender or, as Lender shall direct, within 5 Business Days after receipt. If requested by Lender, Pledgor shall deliver appropriate endorsements, releases, and/or assignments conveying such property.

(e)    <u>Distributions Upon the Sale, Dissolution, Liquidation, or Reorganization of Owner</u>. Without limiting the generality of <u>Section 4(d)</u> of this Pledge Agreement, any sums or property paid in respect of the Pledged Interests upon the sale, reorganization, liquidation, or dissolution of Owner shall be immediately paid over to Lender and shall be applied by Lender in its sole discretion towards any amounts due under the Mezzanine Loan, and any balance remaining thereafter shall be disbursed by Lender to Pledgor. Pledgor agrees to give Lender immediate notice of any such distribution actually received by Pledgor. The foregoing obligation shall not: (i) infer or give rise to any right of Pledgor to sell, reorganize, liquidate, or dissolve or, cause or permit the sale, reorganization, liquidation, or dissolution of Owner; or (ii) limit Lender's other rights and remedies in connection with such sale, dissolution, liquidation, or reorganization of Owner, whether such rights are derived under the Loan Documents, at law, or in equity.

5.    <u>Representations and Warranties</u>. Pledgor hereby represents, warrants, and agrees that:

(a)    Recitals. Each of the Recitals in this Pledge Agreement is true, correct, and complete in all material respects.

(b)    Due Organization, Existence; Capacity. Pledgor:

    (i)    Is a Single Purpose Entity, and a limited liability company duly organized and validly existing under the laws of the State of Delaware;

    (ii)    Has all requisite power, and has all governmental licenses, authorizations, consents, and approvals required to own its assets and carry on its business as it is now being and, as it is proposed hereunder to be conducted;

    (iii)    Is qualified to do business in all jurisdictions in which the nature of the business conducted by it makes such qualification necessary or advisable under applicable law.

(c)    Charter Documents.

    (i)    Pledgor has delivered true and complete copies of the Pledgor Charter Documents and the Owner Charter Documents.

    (ii)    The Pledgor Operating Agreement and Owner Operating Agreement are in full force and effect.

(d)    Incumbency; Authority. Pledgor has full power and authority to execute, deliver, and perform all of the covenants, agreements, and Pledgor Obligations under this Pledge Agreement. All necessary actions have been taken and all necessary consents and approvals received so that upon the execution and delivery to Lender of this Pledge Agreement by Pledgor, the execution, delivery, and performance of this Pledge Agreement shall have been duly authorized.

(e)    Pledgor's Identity.

    (i)    Pledgor's exact legal name as shown in the public records of the State of Delaware is: **ACRON 2 Porsche Drive Mezzco LLC**;

    (ii)    Pledgor has never been known by any other name and is not operating or doing business under any alias;

    (iii)    Pledgor's chief executive office and principal place of business is **c/o Acron (USA), L.P., 2424 East 21st Street, Suite 150, Tulsa, Oklahoma 74114**, which is the address where all records concerning the Collateral are kept and Pledgor has not been located at any other location in the last six years; and

    (iv)    Pledgor's organizational identification number assigned by the Office of the Division of Corporations, State of Delaware is **7608941**.

(f)    Owner's Identity.

(i)     Owner's exact legal name as shown in the public records of the State of Delaware is: **ACRON 2 Porsche Drive, Atlanta LLC**;

(ii)    Owner has never been known by any other name and is not operating or doing business under any alias;

(iii)   Owner's chief executive office and principal place of business is **c/o Acron (USA), L.P., 2424 East 21st Street, Suite 150, Tulsa, Oklahoma 74114**, which is the address where all records concerning the Pledged Interests are kept and Owner has not been located at any other location in the last six years; and

(iv)   Owner's organizational identification number assigned by the Office of the Division of Corporations, State of Delaware is **5778775**.

(g)    <u>No Litigation</u>. As of the Effective Date, there are no legal or arbitration proceedings or any other proceedings by or before any Governmental Authority or agency, now pending or, to the knowledge of Pledgor, threatened against Pledgor, the Collateral, or Owner, which, if adversely determined, would reasonably be expected to materially and adversely affect Pledgor, the Collateral, or Owner.

(h)    <u>Approvals</u>. Except for the consents from the Authority (as defined in the Loan Agreement), Senior Lender, Property Manager, and IHG Licensor permitting the Loan Agreement and this Pledge Agreement, which Borrower has delivered to Lender, no other authorizations, approvals, and consents of, and no filings and registrations with, any Governmental Authority or agency are necessary for:

(i)     The execution, delivery, or performance by Pledgor of this Pledge Agreement or for the validity or enforceability thereof;

(ii)    The grant by Pledgor of the pledge and security interests granted hereby, or the delivery of the Collateral pursuant hereto;

(iii)   The perfection of the pledge and security interest created hereby (except for the filing of UCC-1 financing statements); or

(iv)   Any exercise by Lender of the rights and remedies in respect of the Collateral pursuant to this Pledge Agreement.

(i)    <u>Ownership and Title to the Collateral</u>.

(i)     Pledgor is the sole record and beneficial owner of 100% of the issued and outstanding limited liability company interests in Owner which interests are, as of the Effective Date, evidenced by the Certificate of LLC Interest.

(ii)    Pledgor has delivered the original Certificate of LLC Interest to Lender in accordance with this Pledge Agreement as of the Effective Date. No duplicate or alternative certificate(s) exist that are, or purport to represent: (A) the Certificate of LLC Interest; or (B) all or any portion of the Pledged Interests.

(iii)    Pledgor has good and indefeasible title to the Collateral (including, without limitation, the Certificate of LLC Interest and the Pledged Interests represented thereby), free and clear of all liens, mortgages, hypothecations, security interests, charges, options, warrants, or other pledges or encumbrances whatsoever, other than the lien and security interest created under this Pledge Agreement and the other Loan Documents.

(j)    <u>Pledge Permitted; No Further Transfers Authorized</u>. The Pledge and other transactions contemplated by the Loan Documents have been expressly authorized under the Pledgor Charter Documents and, to the extent required, under the Owner Charter Documents. Except for the transfer evidenced by this Pledge Agreement and the other Loan Documents, no further transfer, assignment, lien, encumbrance, or hypothecation of the Pledged Interests or other Collateral is authorized under the Pledgor Charter Documents or Owner Charter Documents.

(k)    <u>No Other Security Interest Granted</u>. No security agreement, financing statement, mortgage, collateral assignment, lien instrument, or continuation statement covering any portion of the Pledged Interests or other Collateral is effective, on file, or of record in any public office in any jurisdiction, except for those relating to the Original Pledge, which shall be terminated concurrently with the Closing of the Mezzanine Loan and effectiveness of this Pledge Agreement as of the Effective Date.

(l)    <u>No Breach</u>. Neither the execution and delivery of this Pledge Agreement or the other Loan Documents, the consummation of the transactions herein or therein contemplated; nor the compliance with the terms and provisions hereof or thereof shall conflict with or result in a breach of, or require any consent (except such consents as have been obtained) under the Pledgor Charter Documents, the Owner Charter Documents, or any applicable law or regulation, or any order, writ, injunction, or decree of any court or Governmental Authority, or any agreement or instrument to which Pledgor or Owner is a party, or by which it is bound, or to which it is subject, or constitute a default under any such agreement or instrument, or (except for the security interest granted pursuant to this Pledge Agreement) shall result in the creation or imposition of any lien upon the Collateral.

(m)    <u>Valid Security Interest</u>. This Pledge Agreement creates a valid security interest in the Collateral, including, without limitation, the Pledged Interests and any Proceeds thereof, and upon the filing in the appropriate filing offices and upon the delivery of the Certificate of LLC Interest, such security interest shall be a perfected, first-priority security interest, enforceable as such against all creditors of Pledgor and any Persons purporting to have an interest in any Pledged Interests and related proceeds from Pledgor, and all filings and other actions necessary to perfect such security interests have been duly taken.

(n)    <u>Pledged Interests; Article 8 Matters</u>.

(i)    The Owner Operating Agreement designates the Pledged Interests as: (A) "securities" within the meaning of Sections 8-102(a)(15) and 8-103 of the UCC Code and prohibits any change to such designation without the express written consent of Lender in all instances; (B) "financial assets" (within the meaning of

Section 8-102(a)(9) of the Uniform Commercial Code); and (C) not credited to a "securities account" (within the meaning of Section 8-501(a) of the UCC Code);

(ii)    The Pledged Interests have been duly and validly issued and are fully paid and nonassessable and constitute all of the issued and outstanding limited liability interests of Owner; and

(iii)   There are no certificates, instruments, or writings representing the Pledged Interests other than the Certificates of LLC Interest.

(iv)    Pledgor has delivered to Lender an original Confirmation Statement, duly executed by Owner, in the form of **Exhibit E** attached hereto and made a part hereof (the "**Confirmation Statement**").

(o)    <u>Legal and Binding Obligations</u>. This Pledge Agreement constitutes the valid and legally binding obligations of Pledgor, enforceable in accordance with its terms.

6.    <u>Covenants of Pledgor</u>. Until all Pledgor Obligations are fully satisfied in accordance with the terms of the Loan Documents, Pledgor covenants and agrees as follows:

(a)    <u>Payment and Performance</u>. Pledgor shall pay, as and when due, all amounts payable at any time, and from time to time, under the Note and other Loan Documents and shall perform, as and when due, all Pledgor Obligations to be performed hereunder.

(b)    <u>Continuing Obligation to Deliver Collateral to Lender</u>. If at any time Owner shall issue any additional certificates, instruments, or writings representing all or any portion of the Pledged Interests, Pledgor shall immediately: (i) deliver, or cause to be delivered, all such additional certificates, instruments, or writings to Lender, together with such executed, undated stock powers, indorsed in blank as Lender shall request; and (ii) shall take such other action as Lender shall deem necessary or appropriate to effect the attachment and perfection of Lender's lien and security interest therein.

(c)    <u>No Amendment to Pledgor Charter Documents</u>. Pledgor shall not, directly or indirectly, without the prior written consent of Lender in each instance, waive, alter, amend, modify, or supplement any provision of the Pledgor Charter Documents.

(d)    <u>No Impairment of the Collateral</u>. Pledgor shall not assign, transfer, release, subordinate, terminate, encumber, or cancel the Pledged Interests in whole or in part, or give any consent under, any of the instruments, documents, or agreements constituting the Collateral or exercise any of the rights, options or interests of Pledgor except as permitted under the Loan Documents.

(e)    <u>Settlement and Release</u>. Pledgor shall not make any election, compromise, adjustment, or settlement in respect of any portion of the Collateral.

(f)    <u>Warranty of Title</u>. Pledgor warrants good, insurable, and indefeasible fee title to the Collateral and shall not create, permit, or suffer to exist any lien or encumbrance on the Collateral. Pledgor shall take such action as is necessary to remove, any lien or

encumbrance (other than liens in favor of Lender) and shall defend Lender's right, title, and interest in and to the Collateral against all claims and demands of all other Persons.

(g)  <u>Duty to Cause Owner Compliance.</u> Pledgor shall:

(i)    Preserve and maintain, and cause Owner to preserve and maintain, the existence and all of the material rights, franchises, and privileges of Owner;

(ii)   Comply, and cause Owner to comply, with all applicable laws, rules, regulations, and orders of Governmental Authorities;

(iii)  Comply, and cause Owner to comply, with all terms, covenants, and agreements contained in the Senior Loan Documents, including, without limitation, the obligation to pay and discharge prior to the date on which penalties attach thereon, all mechanics' liens and all taxes, assessments, charges, levies, and other amounts imposed on Owner or any property (real or personal) secured by the Senior Loan. Notwithstanding the foregoing, Pledgor may contest, or permit Owner to contest, the payment of any mechanic's lien, tax, assessment, charge, or levy, provided, however, such contest is made subject to, and in strict accordance with, the terms, covenants, and conditions contained in <u>Sections 7.2.3(b)</u> or <u>7.1.3(c)</u>, as applicable, of the Loan Agreement and Section 5.1.2, as applicable, of the Senior Loan Agreement, incorporated herein by specific reference;

(iv)   Perform and observe, and cause Owner to perform and observe, all of the terms and provisions of the Owner Charter Documents, provided that Pledgor shall take no action under the Owner Charter Documents that is prohibited under the Loan Documents;

(v)    Maintain, and cause Owner to maintain, the Owner in good standing in the jurisdiction where the Owner is formed and in each jurisdiction where it is required to be authorized to do business;

(vi)   Maintain, and cause Owner to maintain, the Owner Charter Documents in full force and effect in accordance with this Pledge Agreement and the Loan Documents;

(vii)  Enforce, and cause Owner to enforce, all rights and remedies reserved under the Owner Charter Documents, provided such enforcement is not prohibited under the Loan Documents; and

(viii) Take, and cause Owner to take, any and all actions relating to Owner or the Owner Charter Documents that Lender may reasonably request from time to time.

(h)  <u>Duty to Notify Lender.</u> Pledgor shall deliver to Lender, promptly upon receipt, a copy of: (i) any and all notices of default or suit (or threat of default or suit) sent or received by Pledgor in connection with the Senior Loan; and (ii) any other default notice, summons, complaint, notice of lien, or any other legal notice affecting the Pledgor, the Pledged Interests, the Pledgor Charter Documents, the Owner Charter Documents, the Senior Loan

Documents, or any collateral given to secure the Senior Loan, including, without limitation, any and all default notices sent to or received from any Tenant of the Property.

(i)     <u>Duty to Provide Additional Information</u>. Pledgor shall furnish to Lender promptly upon request such additional information, reports, or statements regarding Pledgor, Owner, or the Collateral in Pledgor's possession (or which can be reasonably obtained by Pledgor) as Lender may request from time to time.

(j)     <u>Pledgor's Formation and Charter Documents</u>. Pledgor shall maintain itself as a Single Purpose Entity in strict accordance with <u>Section 7.1.12</u> of the Loan Agreement and shall perform and observe all of the terms and provisions of the Pledgor Charter Documents in accordance with this Pledge Agreement and other Loan Documents. Pledgor shall maintain the Pledgor Charter Documents in full force and effect and shall take such action and make such modifications to the Pledgor Charter Documents as Lender may reasonably request from time to time in order to comply with the terms, covenants, and conditions contained in this Pledge Agreement.

(k)     <u>Books and Records</u>. Pledgor shall keep accurate and complete books, records, and financial statements pertaining to the Collateral using generally accepted accounting principles, consistently applied, and upon request, shall furnish to Lender copies of any financial reports or records in Pledgor's possession (or which may be reasonably obtained by Pledgor) as Lender shall reasonably request. Lender shall have the right to inspect the books and records pertaining to the Collateral, in person, at Pledgor's place of business and shall have the right to copy and make excerpts or request copies thereof. In-person inspections shall be conducted during normal business hours upon not less than 3 Business Days' advance notice unless an Event of Default is then existing, in which case Lender may inspect the books and records at any time and as often as Lender shall deem appropriate.

(l)     <u>Principal Place of Business</u>. Pledgor shall maintain its principal place of business at the location indicated in the preamble of this Pledge Agreement. Pledgor shall promptly notify Lender of any change of such principal place of business by giving Lender no less than 5 Business Days' prior written notice of any address change. Immediately upon request by Lender, Pledgor shall, at its sole cost and expense, execute such instruments or take such actions as Lender shall deem necessary or desirable in its sole discretion to preserve, create, or perfect Lender's lien and security interest in the Collateral due to any change in Pledgor's location.

(m)     <u>Negative Covenants in Respect of the Collateral</u>. Pledgor shall not:

(i)     Assign, pledge, transfer, hypothecate, distribute, or sell any of the Collateral (except as expressly permitted under the Loan Documents);

(ii)    Vote to: (A) authorize Owner to issue additional limited liability company interests; or (B) change the designation of the Pledged Interests as a "security" within the meaning of any Article 8 of the UCC Code;

(iii)   Take any other action (or permit Owner to take any action) which dilutes the Pledged Interests such that the Certificate of LLC Interest no longer represents 100% of the limited liability company interests in Owner. Without limiting the generality of any other provisions of this Pledge Agreement, Pledgor agrees that Lender shall have no obligation to allege, show, or prove any impairment to its security interest under this Mezzanine Loan in order to pursue Lender's legal and equitable remedies in connection with a breach of this negative covenant;

(iv)   Further borrow against the Collateral, without regard to whether such loan is secured or unsecured;

(v)   Sell, transfer, assign, or convey all or any portion of the Collateral to any Person other than Lender;

(vi)   Make any election, compromise, adjustment, or settlement in respect of any of the Collateral;

(vii)   Permit any levy or attachment to be made against any portion of the Collateral, except in favor of Lender;

(viii)   Permit any financing statement to be filed or recorded with respect to any of the Collateral, except financing statements in favor of Lender; or

(ix)   Take any action in violation of this Pledge Agreement or the other Loan Documents.

(n)   <u>Future Litigation</u>. Pledgor shall promptly give Lender notice of any and all pending or threatened legal proceedings of which (a) Pledgor has received written notice or (b) Pledgor has obtained actual knowledge, including, without limitation, alternate dispute resolution proceedings, and administrative proceedings pending before any Governmental Authority, to which Pledgor or Owner becomes a party, and which, if adversely decided, would materially affect Pledgor, Owner, the Collateral, or the real property collateral securing the Senior Loan.

(o)   <u>Further Assurances</u>. At any time and from time to time, upon the written request of Lender, Pledgor shall, at its sole cost and expense, promptly execute and deliver any and all such further instruments and documents and take such further actions as Lender may reasonably request to obtain the full benefits of this Pledge Agreement and other Loan Documents and to exercise the full rights and powers granted to Lender hereunder, at law and in equity.

7.   <u>Further Understandings, Agreements, and Assurances</u>. In furtherance of the grant of the pledge and security interest pursuant to <u>Section 2</u> hereof, Pledgor hereby agrees with Lender as follows:

(a)   <u>No Diminution of Rights</u>. The Collateral (including all additions or substitutions thereof), and any guarantor, indemnitor, or endorser under the Mezzanine Loan may be released, substituted, or added with respect to the Pledgor Obligations, in whole or in part,

without: (i) releasing or otherwise affecting the liability of Pledgor hereunder; (ii) diminishing the pledge and security interests granted hereunder; or (iii) constituting any legal or equitable discharge or defense of any surety.

(b)    <u>Lender as Secured Party</u>. Lender shall have all of rights and benefits of a secured party as set forth in the UCC Code; and to the extent permissible by law, the broadest possible rights, powers, privileges, and benefits under the Owner Charter Documents, including, without limitation:

(i)    The right to receive moneys or distributions with respect to the Pledged Interests whether due or to become due;

(ii)    The right to receive proceeds of any insurance, indemnity, warranty, or guaranty with respect to the Pledged Interests or other Collateral;

(iii)    The right to all claims of Pledgor for damages arising out of or for breach of or default under the Pledgor Charter Documents or the Owner Charter Documents;

(iv)    The right to: (A) perform in place and stead of Pledgor under each Owner Charter Document; (B) compel performance thereunder; and (C) exercise all rights and remedies thereunder;

(v)    The right to participate in place of Pledgor (or in its own right) in the operation or management of Owner; and

(vi)    All voting and consent rights arising under, in, or through the Pledged Interests in respect of Article 8 Matters.

(c)    <u>Obligations Unconditional</u>. Pledgor acknowledges and agrees that, to the fullest extent permitted by law, the Pledgor Obligations hereunder are absolute and unconditional, irrespective of the value, genuineness, validity, regularity, or enforceability of the Loan Agreement, or any other Loan Documents until the indefeasible payment and full performance of all of the Pledgor Obligations.

(d)    <u>Lender's Right to Protect its Security Interest</u>. Without giving rise to any obligation on the part of Lender, Pledgor authorizes Lender to the full extent permissible at law to:

(i)    Perform any and all other acts which Lender in good faith deems reasonably necessary for the protection and preservation of the Collateral or Lender's lien and security interest therein, including, without limitation, transferring, registering (or arranging for the transfer or registration) of the Collateral to or in Lender's own name and receiving the Proceeds therefrom;

(ii)    Pay any charges or expenses which Lender deems reasonably necessary for the protection of the Collateral. Any amounts paid by Lender shall be added to the indebtedness and shall constitute part of the Pledgor Obligations secured by this Pledge Agreement; and

(iii)    Store, deposit, and safeguard the Collateral in any manner Lender deems advisable. Any obligation of Lender for the reasonable care of the Collateral in Lender's possession shall be limited to the same degree of care which Lender uses for similar property pledged to Lender by other Persons.

(e)    No Duty to Prove Losses to Pursue Remedies. Pledgor hereby agrees that Lender shall have no obligation to allege, show, or prove any impairment to its security in order to pursue the legal and equitable remedies to which Lender shall be entitled at law, in equity, or pursuant to the Pledge Agreement in connection with any breach hereunder, including without limitation, any breach under Section 8(c) hereof.

(f)    Preservation of Rights. Except as required by applicable law, Lender shall not be required to take any steps or expend any amounts to preserve Pledgor's rights and interests in and to any part of the Collateral.

(g)    Revocable License. Notwithstanding the absolute nature of the pledge granted hereunder, and without limiting the generality of any other provision of this Pledge Agreement, so long as no Event of Default shall have occurred and be continuing, Pledgor shall have the right to exercise all of Pledgor's rights under the Owner Charter Documents, except to the extent limited by the terms, covenants, and conditions set forth in this Pledge Agreement, the other Loan Documents, and at law. During such time an Event of Default exists, the revocable license granted under this Section 7(g) shall automatically be revoked, and thereafter, Pledgor shall take no action nor exercise any rights under the Owner Charter Documents without the prior written consent of Lender in each instance.

(h)    Pledgor Remains Liable. Pledgor agrees it is and shall remain liable for the performance of all duties and obligations of Pledgor under the Owner Charter Documents. The Pledged Interests granted to Lender hereunder shall not impose any obligation, duty, or liability on Lender under the Owner Charter Documents. Pledgor shall indemnify Lender against all liability arising from the Lender's exercise of any rights or remedies granted to Lender under the Loan Documents. No delegation, grant of power, or exercise of power, whether to or by Lender, shall release Pledgor from any of its duties, obligations, or liabilities hereunder or under the Pledgor Charter Documents, or give rise to any liability on the part of Lender. Notwithstanding anything to the contrary herein contained, by entering into this Agreement or by taking any action pursuant hereto, Lender shall not be deemed a partner or joint venture partner with Pledgor.

(i)    Waivers. In addition to other waivers made by Pledgor hereunder, Pledgor hereby waives to the full extent permitted by law:

(i)    All rights to require Lender to proceed against any other Person, or collateral or to exercise any remedy set forth herein or in any other agreement, including without limitation, the Senior Loan Documents;

(ii)    The defense of the statute of limitations in any action to enforce the Pledgor Obligations;

(iii)    All rights of subrogation and other rights and interest in the Pledged Interests or other Collateral, and any right of subrogation or similar right in any action commenced or remedy sought in connection with any portion of the Collateral, in each case, until all Pledgor Obligations have been indefeasibly paid and performed in full; and

(iv)    Any rights to notice of any kind or nature whatsoever, unless such right is specifically required by this Pledge Agreement or the other Loan Documents, or is non-waivable under any applicable law; including, without limitation, to the extent not prohibited by the UCC Code, Pledgor's rights under Section 9-207 of the UCC Code.

8.    <u>Events of Default</u>. The occurrence of any of the following shall constitute an **"Event of Default"** hereunder:

(a)    Any provision of the Note, Loan Agreement, this Pledge Agreement, or any other Loan Document delivered in connection with the Mezzanine Loan, shall at any time and for any reason: (i) fail or cease to be valid and binding on Pledgor; (ii) fail or cease to create or to perfect a valid, perfected, first-priority security interest in the Pledged Interest; (iii) be contested or claimed invalid or unenforceable by Pledgor, anyone acting under the authority of or on behalf of Pledgor, or any Governmental Authority having jurisdiction over Pledgor;

(b)    An "Event of Default" shall occur under any of the other Loan Documents; and

(c)    An "Event of Default" shall occur under the Senior Loan Documents.

9.    <u>Remedies</u>.

(a)    <u>Rights and Remedies Generally</u>. Lender shall have all rights and remedies available to a secured party having protected purchaser status under the UCC Code (and any amendment, supplement, or substitute of the UCC Code in effect from time to time), together with all rights and remedies available to Lender under the Loan Documents, at law, or in equity.

(b)    <u>Maximum Rights and Remedies Granted</u>. From and after an Event of Default, Lender shall have the right to enforce the Pledgor Obligations to the maximum extent permitted by applicable law. Lender may enforce the Pledgor Obligations in any jurisdiction governing the Loan Documents or the Collateral. Unless required by the Loan Documents or applicable law, Lender shall have the right to exercise all remedies without notice to Pledgor. Without limiting the generality of the foregoing, Pledgor grants Lender the following:

(i)    All voting rights, consent rights, and other powers of ownership pertaining to the Pledged Interests and other Collateral as if Lender were the sole and absolute owner thereof;

(ii)    The right to foreclose the Pledged Interests and other Collateral in accordance with the UCC Code and the laws of the governing jurisdiction;

(iii)    The right to sell, transfer, and assign all or any part of the Pledged Interests or other Collateral to itself, to its successors and assigns, or to any other Person;

(iv)    The right to register the Pledged Interests in its own name, or the name of its nominee;

(v)    The right to demand, sue for, collect direct payment of, or receive any money or property in its own name, or in the name of Pledgor, which is at any time payable or receivable on account of, or in exchange for, any of the Collateral; and

(vi)    Apply all or any part of the Collateral and the Proceeds thereof, in full or partial repayment of the Mezzanine Loan.

(c)    Sale of the Collateral. Lender may, without demand for performance, upon not less than 10 days' prior written notice to Pledgor of the time and place of sale, sell, assign, or otherwise dispose of all or any part of such Collateral, at such place or places as Lender shall select, whether for cash or otherwise at either a public or private sale. Such sale may be made to Lender or to any other Persons entitled to be a purchaser, assignee, or transferee of all or any portion of the Collateral disposed at any public or private sale. The purchaser, assignee, or transferee thereof may thereafter hold the Collateral absolutely, free from any claim or right of Pledgor of any kind or nature whatsoever.

(d)    Adjournment of the Sale. Unless prohibited by applicable law, Lender may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place originally fixed for the sale, and such sale may then be made at the time or place to which the same has been adjourned by notice sent in accordance with Section 9(c) above.

(e)    Admission of New Member. Lender may, in connection with a public or private sale of the Pledged Interests, install any purchaser, assignee, or transferee to be registered as the new owner and admitted as a new member of Owner to the extent of such Pledged Interests sold. Pledgor shall withdraw and agrees to its withdrawal as member and owner of Owner if the Pledged Interests are sold. Pledgor authorizes Lender to indorse the Certificate of LLC Interest to the purchaser, assignee, or transferee of the Pledged Interests, and to take all other actions as may be necessary or advisable to affect the sale of the Pledged Interests.

(f)    No Lender Liability for Private Sale; Standards for Complying with Article 9. Pledgor recognizes, acknowledges, and agrees that by reason of certain prohibitions contained in the Securities Act of 1933, as amended ("**Securities Act**"), and certain applicable state securities laws, Lender may be compelled, with respect to the sale of all or any part of the Pledged Interests, to limit the sale of the Pledged Interests to those who agree, *inter alia*, to acquire the Pledged Interests for their own account, and not with the intent of distribution or resale. Pledgor further acknowledges that some or all of the Collateral, including, without limitation, the Pledged Interests, is or may be of a type that

is susceptible to a rapid decline in value, difficult to appraise, or not customarily sold in a public sale. In consideration of the risk and expense to Lender in effectuating a sale of the Collateral, Pledgor hereby acknowledges and agrees that:

> (i)      The UCC Code permits Pledgor to agree on the standards for determining whether Lender has complied with its obligations under Article 9 of the UCC Code.

> (ii)      Lender shall be expressly permitted to conduct a private sale on such terms and according to the standards set forth in this Pledge Agreement.

> (iii)      Pledgor shall not raise any objection to Lender's purchase of the Pledged Interests (through bidding or otherwise) at a private sale.

> (iv)      A foreclosure sale conducted in conformity with this Pledge Agreement, or in conformity with any guidance promulgated by the Securities Exchange Commission ("**SEC**") shall be considered to be a "public" sale within the meaning ascribed to such term under the UCC Code even if such sale would not be public for purposes of Section 4(a)(2) of the Securities Act.

> (v)      Lender shall have no obligation to conduct a public sale or delay a private sale to give Pledgor or Owner time to register the Collateral for public sale.

> (vi)      A private sale of the Pledged Interests shall be considered commercially reasonable notwithstanding that Lender: (A) purchases the Pledged Interests at such private sale; and (B) elects not to register or seek to register the Pledged Interests under the Securities Laws notwithstanding that Pledgor or Owner may have agreed to pay the costs of registration.

> (vii)      It waives any and all claims against Lender in the event: (A) the sale price at a private sale is less than the price which might have been obtained at a public sale; (B) the sale price is less than the outstanding balance of the Pledgor Obligations under the Mezzanine Loan; or (C) Lender sells the Collateral in whole to a single purchaser rather than in multiple parts, even if the aggregate sale price to multiple purchasers exceeds or might exceed the sale price to the single purchaser.

(g)      <u>Application of Proceeds</u>. Except as otherwise prohibited under the UCC Code, the proceeds of any collection, sale, or other realization of all or any part of the Collateral pursuant hereto, shall be applied by Lender:

> (i)      First, to the payment of all out-of-pocket costs and expenses of such collection, sale, or other realization, including reasonable attorneys' fees, other third-party costs and expenses, and all other payments made or incurred by Lender in connection therewith;

> (ii)      Next, to the payment in full of the Pledgor Obligations; and

(iii)     Last, to Pledgor, or its successors or assigns, (or such other Person as a court of competent jurisdiction may direct), any surplus then remaining.

(h)      Attorney-in-Fact. Without limiting any rights or powers granted by this Pledge Agreement to Lender, Lender is hereby appointed the attorney-in-fact of Pledgor for the purpose of, upon the occurrence and during the continuance of an Event of Default, carrying out the provisions of this Section 9 and taking any action and executing any instruments which Lender may deem necessary or advisable to accomplish the purposes hereof, which appointment as attorney-in-fact is irrevocable and coupled with an interest.

(i)      Confirmation Statement. To better assure the perfection of the security interest of Lender in the Pledged Interests, concurrently with the execution and delivery of this Pledge Agreement, Pledgor shall deliver to Lender the Confirmation Statement executed by Owner.

10.      Termination. Upon the indefeasible payment and performance in full of all Pledgor Obligations (other than those Pledgor Obligations that survive the payment in full of the Mezzanine Loan), this Pledge Agreement shall terminate and Lender shall promptly cause the Pledged Interests (and any other Collateral in the possession of Lender) to be assigned, transferred, and delivered, against receipt, but without recourse, warranty or representation whatsoever, to or on the order of Pledgor.

11.      Reinstatement. The Pledgor Obligations shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of Pledgor in respect of the Pledgor Obligations is rescinded or must be otherwise restored by any holder of any of the Pledgor Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise. Pledgor agrees that it shall indemnify Lender on demand for all losses incurred by Lender on account of any rescission and any and all costs and expenses (including, without limitation, reasonable fees of counsel) incurred by Lender in connection with any such reinstatement.

12.      Miscellaneous.

(a)      Amendments, Extensions, and Modifications. This Pledge Agreement may not be amended, supplemented, or otherwise modified except in accordance with the Loan Agreement. No amendment, supplement, or other modification of this Pledge Agreement shall be effective unless it is in writing and executed by Pledgor and Lender.

(b)      Counterparts; Entire Agreement. This Pledge Agreement and any amendments or modifications hereto may be executed in counterparts, each of which shall constitute an original, but all taken together shall constitute a single agreement. This Pledge Agreement supersedes all previous agreements and understandings, oral or written, between the parties with respect thereto. Delivery of an executed counterpart of a signature page to this Pledge Agreement or any amendment or modification thereto by facsimile or in electronic (that is, "pdf" or "tif") format shall be effective as delivery of this Pledge Agreement on the Effective Date. Notwithstanding the foregoing, Pledgor agrees to deliver within 3 Business Days of the Effective Date, one or more original executed signature pages for all documents and instruments delivered by facsimile or electronically as permitted hereunder.

(c)      <u>Successors and Assigns</u>. This Pledge Agreement may be assigned or transferred, in whole or in part, by Lender to any Person at any time without notice to or the consent of Pledgor. Pledgor may not assign or transfer this Pledge Agreement or any of its rights hereunder except as expressly permitted under the Loan Documents. This Pledge Agreement shall inure to the benefit of Lender and its successors and assigns and be binding upon Pledgor and its permitted assigns.

(d)      <u>Defined Terms; Rules of Construction</u>. The rules of construction set forth in <u>Section 11.14</u> of the Loan Agreement apply to this Pledge Agreement and are incorporated herein, by specific reference as if such rules were fully set forth herein.

(e)      <u>Headings</u>. The headings of the various articles, sections, and subsections in this Pledge Agreement are for reference only and shall not define, expand, or limit any of the terms or provision hereof.

(f)      <u>Severability</u>. If any term or provision of this Pledge Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Note or invalidate or render unenforceable such term or provision in any other jurisdiction.

(g)      <u>Governing Law</u>. This Pledge Agreement and any claim, controversy, dispute, or cause of action (whether in contract, equity, tort, or otherwise) based upon, arising out of, or relating to this Pledge Agreement and the transactions contemplated hereby shall be governed by and construed in accordance with the laws of the State of Texas without regard to principles of conflicts of law.

(h)      <u>Submission to Jurisdiction</u>. Pledgor hereby irrevocably and unconditionally agrees that:

(i)      Any legal action, suit, or proceeding arising out of or relating to this Pledge may be brought in the courts of the State of Texas, or the courts of the United States of America in said States.

(ii)      Pledgor shall submit to the jurisdiction of any such court in any such action, suit, or proceeding.

(iii)      Nothing shall affect the right of Lender to: (A) commence legal proceedings or otherwise sue Pledgor in any other court having jurisdiction over Pledgor; or the Pledged Interests; or (B) serve process upon Pledgor in any manner authorized by the laws of any applicable jurisdiction.

(iv)      Final judgment against Pledgor in any action, suit, or proceeding shall be conclusive and binding upon Pledgor and may be enforced in any permissible jurisdiction by suit on the judgment.

(i)      <u>Waiver of Jury Trial</u>. PLEDGOR AND LENDER EACH HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY

PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS PLEDGE AGREEMENT, THE OTHER LOAN DOCUMENTS, THE SENIOR LOAN DOCUMENTS, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY WHETHER BASED ON CONTRACT, EQUITY, TORT, OR ANY OTHER THEORY.

(j)      No Waiver; No Course of Dealing; No Invalidity. No failure to exercise and no delay in exercising on the part of Lender of any right, remedy, or power hereunder or rights, remedies, and powers otherwise provided by law or available in equity shall operate as a waiver thereof or preclude the exercise thereof during the continuance of any Event of Default or if any subsequent Event of Default occurs, nor shall any single or partial exercise of any right, remedy, or power hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, or power. No act or inaction of Lender under this Pledge Agreement shall be deemed to constitute or establish a "course of performance or dealing" that would require Lender to so act or refrain from acting in any particular manner at a later time under similar or dissimilar circumstances. Wherever possible, each provision of this Pledge Agreement shall be interpreted in such manner as to be effective and valid to the maximum extent allowed under applicable law.

(k)      Notices. All notices, consents, approvals, and requests required or permitted hereunder shall be given in the manner and to the addresses set forth in the Loan Agreement.

(l)      Further Assurances. Pledgor agrees that, from time to time upon the written request of Lender, Pledgor will execute and deliver such further documents and do such other acts and things as Lender may reasonably request in order fully to effect the purposes of this Pledge Agreement.

(m)      Opinion of Counsel. Pledgor shall cause to be delivered to Lender concurrently herewith, an opinion of counsel to Pledgor, acceptable to Lender in its reasonable discretion, with respect to the authority of, and due execution and delivery by, Pledgor, and the enforceability of the Pledge Agreement.

*[Signature pages follow]*

IN WITNESS WHEREOF, Pledgor and Lender have executed this Pledge Agreement as of the Effective Date.

**PLEDGOR:**

**ACRON 2 PORSCHE DRIVE MEZZCO LLC,**
a Delaware limited liability company

By:     ACRON (USA) L.P.,
        a Texas limited partnership,
        its Manager

        By:    ACRON U.S. Management, Inc.,
             a Nevada corporation
             its sole General Partner

        By: _____
        Name: Greg Wilson
        Title:  President

**LENDER**:

**CAI OVERLAND LENDER, LLC,**
a Delaware limited liability company

By: _____

Name: Austin Khan

Title:  Authorized Signatory

**EXHIBIT A**

**PLEDGOR CHARTER DOCUMENTS**

Pledgor certifies that the following collectively, shall constitute the Pledgor Charter Documents as defined hereunder:

1. Limited Liability Company Certificate of Formation of Pledgor filed with the Secretary of State of Delaware on August 7, 2023.

2. Certificate of Correction of Pledgor filed with the Secretary of State of Delaware on September 15, 2023.

3. Limited Liability Company Agreement of Pledgor, dated as of the Effective Date.

4. Certificate of Good Standing of Pledgor issued by the Secretary of State of Delaware on December 6, 2023.

**EXHIBIT B**

**OWNER CHARTER DOCUMENTS**

Pledgor certifies that collectively, the following shall constitute the Owner Charter Documents as defined hereunder:

1. Certificate of Formation of Owner filed with the Secretary of State of Delaware on July 2, 2015.

2. Second Amended and Restated Limited Liability Company Agreement of Owner, dated as of the Effective Date.

3. Certificate of Good Standing of Owner issued by the Secretary of State of Delaware on December 6, 2023.

4. Certificate of Existence of Owner, as certified by the Secretary of State of Georgia on December 7, 2023.

**EXHIBIT C**

**SENIOR LOAN DOCUMENTS**

Pledgor certifies that collectively, the following shall constitute the Senior Loan Documents as defined hereunder:

1. Senior Loan Agreement

2. Note (as defined in the Senior Loan Agreement)

3. Deed of Trust (as defined in <u>Section 1</u> above)

4. Environmental Indemnity (as defined in the Senior Loan Agreement)

5. Guaranty  (as defined in the Senior Loan Agreement)

6. Assignment of Leases (as defined in the Senior Loan Agreement)

7. Assignment of Agreements, Licenses, Permits and Contracts (as defined in the Senior Loan Agreement)

8. Prepaid Interest Agreement (as defined in the Senior Loan Agreement)

9. Certificate Concerning Governing Documents

10. Original Pledge (as defined in <u>Section 1</u> above)

11. UCC-1 Financing Statements relating to Original Pledge

12. Liquor License Agreement (as defined in the Senior Loan Agreement)

13. Bond Option Agreement (as defined in the Senior Loan Agreement)

14. Bond Pledge Agreement (as defined in the Senior Loan Agreement)

15. Hotel Operator SNDA (as defined in the Senior Loan Agreement)

16. IHG Consent (as defined in <u>Section 1</u> above)

17. Post-Closing Agreement (as defined in the Senior Loan Agreement)

C-1

# EXHIBIT D

CERTIFICATE OF LLC INTEREST

[Attached.]

CERTIFICATE for LIMITED LIABILITY COMPANY INTERESTS IN
ACRON 2 PORSCHE DRIVE, ATLANTA LLC

THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY STATE.  THE HOLDER OF THIS CERTIFICATE, BY ITS ACCEPTANCE HEREOF, REPRESENTS THAT IT IS ACQUIRING THIS SECURITY FOR INVESTMENT AND NOT WITH A VIEW TO ANY SALE OR DISTRIBUTION HEREOF.  ANY TRANSFER OF THIS CERTIFICATE OR ANY LIMITED LIABILITY COMPANY INTEREST REPRESENTED HEREBY IS SUBJECT TO THE TERMS AND CONDITIONS OF THE LIMITED LIABILITY COMPANY AGREEMENT (AS DEFINED BELOW).

Certificate Number 001                                                      100% Percentage Interest

ACRON 2 Porsche Drive, Atlanta LLC, a Delaware limited liability company (the "**Company**"), hereby certifies that ACRON 2 Porsche Drive Mezzco LLC,  a Delaware limited liability company (together with any assignee of this Certificate, the "**Holder**") is the registered owner of 100 percent of the limited liability company interests in the Company.  The rights, powers, preferences, restrictions and limitations of the limited liability company interests in the Company are set forth in, and this Certificate and the limited liability company interests in the Company represented hereby are issued and shall in all respects be subject to the terms and provisions of, the Second Amended and Restated Limited Liability Company Agreement of the Company dated as of _____ ___, 2024, as the same may be amended or restated from time to time (the "**Limited Liability Company Agreement**").  By acceptance of this Certificate, and as a condition to being entitled to any rights and/or benefits with respect to the limited liability company interests evidenced hereby, the Holder is deemed to have agreed to comply with and be bound by all the terms and conditions of the Limited Liability Company Agreement.  The Company will furnish a copy of the Limited Liability Company Agreement to the Holder without charge upon written request to the Company at its principal place of business.  Transfer of any or all of the limited liability company interests in the Company evidenced by this Certificate is subject to certain restrictions in the Limited Liability Company Agreement and can be effected only after compliance with all of those restrictions and the presentation to the Company of the Certificate, accompanied by an assignment in the form appearing on the reverse side of this Certificate, duly completed and executed by and on behalf of the transferor in such Transfer, and an application for transfer in the form appearing on the reverse side of this Certificate, duly completed and executed by and on behalf of the transferee in such Transfer.

Each limited liability company interest in the Company shall constitute a "security" within the meaning of Section 8-102(a)(15) of the Uniform Commercial Code as in effect from time to time in the State of Delaware.

This Certificate and the limited liability company interests evidenced hereby shall be governed by and construed in accordance with the laws of the State of Delaware without regard to principles of conflicts of laws.

IN WITNESS WHEREOF, the Company has caused this Certificate to be executed as of _____ ___, 2024.

**ACRON 2 PORSCHE DRIVE, ATLANTA LLC,**
a Delaware limited liability company

By:    ACRON 2 PORSCHE DRIVE MEZZCO LLC,
       a Delaware limited liability company

       By:    ACRON (USA) L.P.,
              a Texas limited partnership,
              its Manager

              By:    ACRON U.S. Management, Inc.,
                     a Nevada corporation
                     its sole General Partner

                     By: _____
                     Name: Greg Wilson
                     Title:   President

**(REVERSE SIDE OF CERTIFICATE)**

**ASSIGNMENT OF INTEREST**

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto _____ (print or typewrite name of transferee), _____ (insert Social Security or other taxpayer identification number of transferee), the following specified percentage of limited liability company interests in the Company: _____ (identify the percentage interest being transferred) effective as of the date specified in the Application for Transfer of Interests below, and irrevocably constitutes and appoints ACRON (USA) L.P., or the successor manager of the Company and each of their authorized officers, as attorney-in-fact, to transfer the same on the books and records of the Company, with full power of substitution in the premises.

Dated: _____    Signature:    ACRON 2 PORSCHE DRIVE MEZZCO LLC, a Delaware limited liability company

By:    ACRON (USA) L.P.,
a Texas limited partnership,
its Manager

By:    ACRON U.S. Management, Inc.,
a Nevada corporation
its sole General Partner

By: _____
Name: Greg Wilson
Title:  President

Address:    2424 East 21st Street, Suite 150
Tulsa, Oklahoma 74114

**APPLICATION FOR TRANSFER OF INTERESTS**

The undersigned applicant (the "**Applicant**") hereby (a) applies for a transfer of the percentage of limited liability company interests in the Company described above (the "**Transfer**") and applies to be admitted to the Company as a substitute member of the Company, (b) agrees to comply with and be bound by all of the terms and provisions of the Limited Liability Company Agreement, (c) represents that the Transfer complies with the terms and conditions of the Limited Liability Company Agreement, (d) represents that the Transfer does not violate any applicable laws and regulations, and (e) agrees to execute and acknowledge such instruments (including, without limitation, a counterpart of the Limited Liability Company Agreement), in form and substance satisfactory to the Company, as the Company reasonably deems necessary or desirable to effect the Applicant's admission to the Company as a substitute member of the Company and to confirm the agreement of the Applicant to be bound by all the terms and provisions of the Limited Liability Company Agreement with respect to the limited liability company interests in the Company described above.  Initially capitalized terms used herein and not otherwise defined herein are used as defined in the Limited Liability Company Agreement.

The Applicant directs that the foregoing Transfer and the Applicant's admission to the Company as a Substitute Member shall be effective as of _____.

Name of Transferee (Print)
_____

Dated: _____    Signature: _____
(Transferee)

Address: _____

The Company has determined (a) that the Transfer described above is permitted by the Limited Liability Company Agreement, (b) hereby agrees to effect such Transfer and the admission of the Applicant as a substitute member of

5182706.2

the Company effective as of the date and time directed above, and (c) agrees to record, as promptly as possible, in the books and records of the Company the admission of the Applicant as a substitute member.

**ACRON 2 PORSCHE DRIVE, ATLANTA LLC**,
a Delaware limited liability company

By:    ACRON 2 PORSCHE DRIVE MEZZCO LLC,
       a Delaware limited liability company

    By:    ACRON (USA) L.P.,
        a Texas limited partnership,
        its Manager

        By:    ACRON U.S. Management, Inc.,
            a Nevada corporation
            its sole General Partner

        By: _____
        Name: Greg Wilson
        Title:  President

**EXHIBIT E**

FORM OF CONFIRMATION STATEMENT AND INSTRUCTION AGREEMENT

_____ ___, 2024

To:    CAI Overland Lender, LLC
c/o Civitas Capital Group
1722 Routh Street, Suite 800
Dallas, Texas 75201
Attention: Austin Khan

       Pursuant to the requirements of that certain Pledge and Security Agreement, dated as of the date hereof (as amended, supplemented or otherwise modified from time to time, the "**Pledge Agreement**"), by and between ACRON 2 Porsche Drive Mezzco, a Delaware limited liability company ("**Pledgor**") and CAI Overland Lender, LLC, a Delaware limited liability company ("**Lender**") (capitalized but undefined terms used herein have the meaning such terms are given therein), this Confirmation Statement and Instruction Agreement relates to those limited liability company interests (the "**Pledged Interests**") as further described in the Pledge Agreement, issued by ACRON 2 Porsche Drive, Atlanta LLC, a Delaware limited liability company ("**Owner**").

       Owner agrees as follows:

       The Pledged Interests are certificated securities within the meaning of Section 8-103 of the Delaware Uniform Commercial Code and are governed by Article 8 of the UCC Code.

       The registered pledgee of the Pledged Interests is:

CAI Overland Lender, LLC

_[Remainder of page intentionally left blank;_
_signature page follows on following page]_

E-1

**OWNER:**

**ACRON 2 PORSCHE DRIVE, ATLANTA LLC**,
a Delaware limited liability company

By:   ACRON 2 PORSCHE DRIVE MEZZCO LLC,
        a Delaware limited liability company,
        its sole member and manager

        By:    ACRON (USA) L.P.,
                a Texas limited partnership,
                its Manager

                By:    ACRON U.S. Management, Inc.,
                        a Nevada corporation
                        its sole General Partner

                        By: _____
                        Name: Greg Wilson
                        Title:   President

E-2

# **EXHIBIT D**

(Guaranty Agreements)

# GUARANTY AGREEMENT
(ACRON (USA)/ACRON AG)

This **GUARANTY AGREEMENT** (this "**Guaranty**") is made as of January 18, 2024 (the "**Effective Date**"), by **ACRON (USA), L.P.**, a Texas limited partnership ("**Partnership Guarantor**") and **ACRON AG**, a Swiss stock corporation ("**ACRON Guarantor**", and together with Partnership Guarantor, jointly and severally and individually and collectively, as the context may require, "**Guarantor**"), in favor of **CAI OVERLAND LENDER, LLC**, a Delaware limited liability company ("**Lender**"). All capitalized terms not defined herein shall have the meanings ascribed to such terms in the Loan Agreement.

## RECITALS

A.       Lender has agreed to make a loan to **ACRON 2 PORSCHE DRIVE MEZZCO LLC**, a Delaware limited liability company ("**Borrower**"), in the original aggregate principal amount of $11,600,000 (the "**Mezzanine Loan**") pursuant to that certain Loan Agreement, dated as of the Effective Date, by and between Lender and Borrower (as the same may be amended, restated and/or supplemented from time to time, the "**Loan Agreement**").

B.       The Mezzanine Loan is evidenced by the Note and secured by, among other things, that certain Pledge and Security Agreement, dated as of the Effective Date, by Borrower in favor of Lender (as the same may be amended, restated and/or supplemented from time to time, the "**Security Instrument**"). The Mezzanine Loan is guaranteed in part by that certain Guaranty Agreement (TH Investment Guarantor), dated as of the Effective Date, by TH INVESTMENT HOLDINGS II, LLC, a Delaware limited liability company ("**TH Investment Guarantor**"), in favor of Lender (the "**TH Investment Guaranty**"). The Note, the Security Instrument, the TH Investment Guaranty, this Guaranty and all other documents now or hereafter executed or delivered in connection with the Mezzanine Loan, as the same may be amended, substituted for, or replaced from time to time, are referred to collectively as the "**Loan Documents**."

C.       Partnership Guarantor owns a direct or indirect interest in Borrower, and will directly benefit from Lender making the Mezzanine Loan to Borrower. Partnership Guarantor is one of the guarantors under the Guaranty of Recourse Obligations, dated as of December 31, 2021 ("**Senior Guaranty**"), by Partnership Guarantor, ACRON Guarantor and TH Investment Guarantor in favor of Senior Lender with respect to the Senior Loan and Senior Loan Documents. Partnership Guarantor is also one of the indemnitors under the Environmental Indemnity Agreement, dated as of December 31, 2021 ("**Senior Indemnity**"), by Owner (defined in the Loan Agreement as ACRON 2 Porsche Drive, Atlanta LLC, a Delaware limited liability company, which is the "Borrower" under the Senior Loan Agreement and owner of a leasehold interest in the Property pursuant to the Borrower Rental Agreement), Partnership Guarantor, ACRON Guarantor and TH Investment Guarantor in favor of Senior Lender with respect to the Senior Loan and Senior Loan Documents. Partnership Guarantor is an indemnitor under the Environmental Indemnity Agreement (as defined in the Loan Agreement) in connection with the Mezzanine Loan.

D.    ACRON Guarantor owns a direct or indirect interest in Borrower, and will directly benefit from Lender making the Mezzanine Loan to Borrower.  ACRON Guarantor is a guarantor under the Senior Guaranty and also an indemnitor under the Senior Indemnity.  ACRON Guarantor is an indemnitor under the Environmental Indemnity Agreement in connection with the Mezzanine Loan.

E.    The execution and delivery of this Guaranty by Guarantor is (i) a condition to Lender's willingness to make the Mezzanine Loan to Borrower, (ii) made in order to induce Lender to make the Mezzanine Loan and (iii) made in recognition that Lender will be relying upon this Guaranty in making the Mezzanine Loan and performing any other obligations Lender may have under the Loan Documents.

## GUARANTY

NOW, THEREFORE, to induce Lender to make the Mezzanine Loan to Borrower, and for other good and valuable consideration, the mutual receipt and legal sufficiency of which are hereby acknowledged, Guarantor hereby covenants, agrees, represents and warrants as follows:

1.    <u>Loss Recourse Events.</u>  Guarantor hereby irrevocably, unconditionally, absolutely, jointly and severally with Borrower, agrees to indemnify and hold harmless Lender, and notwithstanding anything to the contrary contained in this Guaranty or any other Loan Document, nothing shall be deemed in any way to impair, limit or prejudice the rights of Lender to collect or recover from Borrower and/or from Guarantor under this Guaranty each of the following amounts (collectively, the "**Loss Recourse Obligations**"):

(a)    any Losses incurred or sustained by Lender as a result of intentional physical waste by Borrower or Owner;

(b)    any Capital Proceeds neither turned over to Senior Lender or Lender nor applied or used in accordance with the terms of the Loan Agreement or the other Loan Documents;

(c)    any Gross Revenue generated by the Property collected by or for Owner that is (a) not properly applied to the Operating Expenses of the Property substantially in accordance with an Approved Budget or otherwise in accordance with the Loan Agreement (including payments due under the Senior Loan Documents) following an Event of Default or during any Distributable Cash Flow Sweep Period, (b) not deposited into the Operating Account, (c) not deposited otherwise with Lender- or Senior Lender-controlled reserves as and when required pursuant to any of the Loan Documents or Senior Loan Documents, respectively, (d) disbursed to Owner from the Operating Account or any such reserves and not thereafter applied for the purposes for which such funds were disbursed in accordance with the Loan Agreement or any of the other Loan Documents, or (e) otherwise misappropriated by Borrower or Owner in violation of the provisions of the Loan Documents or Senior Loan Documents;

(d)    after an Event of Default or during any Distributable Cash Flow Sweep Period, any (a) Gross Revenue or other amounts paid under Leases that are prepaid more than one month in advance, and (b) security deposits collected by or for Borrower and that are not applied in accordance with the applicable Leases and are not returned to Tenants in accordance with such applicable Leases, in both cases, to the extent not turned over to (i) Senior Lender upon foreclosure

(whether judicial, non-judicial, or by power of sale) or a receivership sale, or conveyance in lieu of foreclosure, or (ii) a receiver or trustee for the Property after the appointment of such receiver or trustee;

(e)  Intentionally omitted;

(f)  any Losses incurred or sustained by Lender in fulfilling the obligations of Owner under the Borrower Rental Agreement;

(g)  any Losses incurred or sustained by Lender (that would otherwise be covered by insurance) as a result of Borrower's failure to maintain, or cause to be maintained, any insurance required under the terms of any Loan Document and/or pay any deductible under any such insurance; provided that Guarantor shall not be liable under this clause (g) to the extent (a) Lender holds funds in escrow for such purpose pursuant to the Loan Documents and Lender failed to release such funds to Borrower or Owner for the timely payment of the same in violation of the Loan Documents or (b) the Property failed to generate sufficient Gross Revenue during the prior 12 month period to pay the premiums for such insurance or to pay the deductible;

(h)  any Losses incurred or sustained by Lender as a result of any fraud, material misrepresentation or willful misconduct by Borrower, Owner, Guarantor or any of their respective Affiliates or any representative, officer, director, partner, manager, member, shareholder, or trustee of Borrower, Owner, Guarantor or any of their respective Affiliates in connection with the Property, the Loan Agreement or the other Loan Documents (including any ongoing financial or other reporting required pursuant to Section 7.1.6 of the Loan Agreement or any request for action, approval or consent by Lender); provided, that if such misrepresentation is unintentional, susceptible of cure by Borrower or Guarantor, and does not otherwise result in an Event of Default, then Borrower shall have 10 Business Days after the earlier to occur of (1) notice from Lender and (2) Borrower obtaining knowledge of such misrepresentation, to cure such misrepresentation prior to Borrower or Guarantor incurring personal liability for the Losses arising under this clause (h);

(i)  any Losses incurred or sustained by Lender as a result of any Mechanic's Lien against or encumbering the Property; provided that Guarantor shall not be liable under this clause (i) to the extent Lender holds funds in escrow for such purpose pursuant to the Loan Documents and Lender failed to release such funds to Borrower or Owner for the timely payment of the same in violation of the Loan Documents;

(j)  Intentionally omitted;

(k)  any Losses incurred or sustained by Lender as a result of Borrower's failure to, at all times, be a Single Purpose Entity.  For the avoidance of doubt, the recourse described in this clause (k) shall not preclude recourse for substantive consolidation, as set forth in Section 2(f) of this Guaranty; and

(l)  any transfer taxes or other fees, charges or amounts in the nature of transfer taxes imposed upon Lender in connection with a foreclosure or other exercise of remedies upon or against the Property or the recording of a deed in lieu of foreclosure or other similar instrument in lieu of a foreclosure upon or against the Property, provided that Lender exercises any of the

foregoing remedies as a result of any matter set forth in <u>Section 12.2</u> and <u>Section 12.3</u> of the Loan Agreement, as applicable to this Guaranty;

(m)    any Losses incurred or sustained by Lender as a result of a cancellation or termination, not approved by Lender, of any hotel management agreement (including, without limitation, the Property Management Agreement) or similar material Property Management Agreement with or without cause;

(n)    the amount of any payments made to the Senior Lender, to the extent such payments were made in violation of the Loan Documents;

(o)    any sums expended by Lender in fulfilling the obligations of Owner under any permits, licenses (including the Liquor License (as defined in the Senior Loan Agreement), management agreement (including, without limitation, the Property Management Agreement), IHG License, branding or license agreement or any other agreements affecting or relating to the Property or the operation of the Property as a full-service hotel;

(p)    any Losses incurred or sustained by Lender in fulfilling the obligations of Owner, as borrower, under the Senior Loan Documents;

(q)    any Losses incurred or sustained by Lender as a result of Lender making any Protective Advances in accordance with the Loan Agreement and the other Loan Documents;

(r)    100% of any termination fees, liquidated damages or the Repayment Amount (as defined in Attachment B., Item 16D (Financial Enhancement) of the IHG License) that is due by Owner (as Licensee under the IHG License) upon (i) foreclosure, assignment-in-lieu of foreclosure or otherwise of the Mezzanine Loan or (ii) early termination of the IHG License regardless of the reason;

(s)    any Losses incurred or sustained by Lender as a result of Borrower's failure to replenish the Debt Service Reserve Account with $450,000 in immediately available funds if at any time Lender determines in accordance with <u>Section 4.5.1</u> of the Loan Agreement that the outstanding Debt Service Funds in the Debt Service Reserve Account are, or will be, insufficient to pay at least two months of Loan Debt Service Payments and there are at least three months of term remaining before the Maturity Date; and

(t)    any Losses incurred or sustained by Lender, directly or indirectly, arising out of or related to the three previously issued and lost copies of a Certificate for Limited Liability Company Interests in Owner (collectively, the "**Certificates**"), including (i) Lender defending itself against any claims or proceedings by, or threatened by, a third party in connection with ownership of the Collateral with respect to the lost Certificates, and (ii) Lender or Owner fulfilling any obligations of Owner under that certain Personal Undertaking signed on or about the Effective Date (a/k/a the UCCPlus Indemnity) by Owner and ACRON Guarantor in favor of the Title Company at any point after Lender (or its nominee or assignee), in accordance with the Intercreditor Agreement, commences an enforcement action to acquire the membership interests in Owner, whether via a UCC foreclosure, acceptance of an assignment-in-lieu of foreclosure (or similar instrument) or other similar enforcement action of the Mezzanine Loan.

2.    <u>Springing Recourse Events</u>. Guarantor hereby irrevocably, unconditionally, absolutely, jointly and severally with Borrower, agrees to assume and be responsible for the prompt and complete observance, fulfillment and performance of all of the Secured Obligations of Borrower under the Loan Documents, including the making of all payments of all Loan Debt Service Payments and other sums evidenced by the Note (collectively, the "**Springing Recourse Obligations**", and together with the Loss Recourse Obligations, the "**Obligations**"), upon the occurrence of any event listed below in this <u>Section 2</u> (each, a "**Springing Recourse Event**"). Such assumption and responsibility shall occur automatically upon the occurrence of any Springing Recourse Event without further action on the part of any Person.

(a)    any breach or violation of <u>Section 7.2.3(a)</u>, <u>Section 7.2.14</u>, or <u>Article 8</u> of the Loan Agreement; provided, that such breach or violation shall not be a Springing Recourse Event with respect to Guarantor until such breach or violation remains uncured for ten (10) days;

(b)    Borrower forfeits all or any portion of the Collateral, or Owner forfeits all or any portion of the Property or the Senior Collateral, due to criminal activity pursuant to the operation or enforcement of any Legal Requirement or the decision of any Governmental Authority;

(c)    any attempt (other than a good faith assertion, as an affirmative defense to foreclosure, that Borrower has paid any and all amounts then due under the Loan Documents, in each case, made on a sound legal and factual basis, based upon detailed third-party documented evidence demonstrating that Borrower has actually paid all such amounts) by Borrower, Guarantor or any other Borrower Owner Person to materially delay any foreclosure against the Collateral, or any other exercise by Lender of Lender's remedies under the Loan Documents, including any claim that any Loan Document is invalid or unenforceable to an extent that would preclude any such foreclosure or other exercise of remedies;

(d)    (a) Borrower or Owner files a voluntary petition under the Bankruptcy Code or any other Bankruptcy Law, (b) the Collateral or Property or any part thereof shall become an asset in (1) a voluntary bankruptcy or insolvency proceeding or (2) an involuntary bankruptcy or insolvency proceeding that is not dismissed within 90 days of filing (other than an involuntary bankruptcy or insolvency petition filed by or at the direction of Lender or, with respect to the Property, Senior Lender), or (c) Borrower, Guarantor or any other Borrower Control Person (x) consents to or otherwise acquiesces in or joins in or fails to oppose any involuntary bankruptcy or insolvency petition filed against Borrower or Owner (other than an involuntary bankruptcy or insolvency petition filed by or at the direction of Lender or, with respect to Owner, Senior Lender), or (y) solicits (or causes to be solicited) or colludes in the filing of any involuntary bankruptcy or insolvency petition against Borrower or Owner (other than an involuntary bankruptcy or insolvency petition filed by Lender or at the request or direction of Lender or, with respect to Owner, Senior Lender);

(e)    the appointment (a) other than by or at the direction of Senior Lender, of a receiver, trustee, or liquidator with respect to Owner or the Property or any part thereof, or (b) other than by or at the direction of Lender, of a receiver, trustee, or liquidator with respect to Borrower or the Collateral or any part thereof (provided, however, liability shall not accrue under this clause (e), if such receivership appointment was initiated by a third-party creditor independent

of any collusive action, consent or participation by Borrower, Owner, or Guarantor, any person directly or indirectly liable for the obligations of Borrower under the Mezzanine Loan or Owner under the Senior Loan, or any person directly or indirectly responsible for the management of Borrower, Owner, or Guarantor, so long as Borrower or Owner opposed the same in good faith);

(f)      Borrower is substantively consolidated with any Affiliate of Borrower in a bankruptcy or similar proceeding as a result of Borrower's material failure to, at all times, be a Single Purpose Entity and such failure is cited by the court as a material factor resulting in such substantive consolidation; or

(g)      the Loan Agreement, the Security Instrument or any of the other Loan Documents is deemed a fraudulent conveyance or preference or is otherwise deemed void pursuant to any principles limiting the rights of creditors, whether such claims, demands or assertions are made under any Bankruptcy Law, including under Sections 544, 547 or 548 of the Bankruptcy Code or under any applicable state fraudulent conveyance statutes or similar laws;

(h)      any amendment or modification of the Senior Loan or the Senior Loan Documents without Lender's prior written consent, or any voluntary prepayment or refinancing of the Senior Loan that is unaccompanied by a prepayment of this Mezzanine Loan without Lender's prior written consent; or

(i)      any execution, amendment, modification, assignment, cancellation or termination of any franchise, license or branding agreement (including, without limitation, the IHG License) affecting or relating to the Property or the operation of the Property as a full-service hotel, due to any act or omission of Borrower, Owner, or any Affiliate, without the prior written consent of Senior Lender and Lender.

3.      <u>Guaranty is Independent and Absolute</u>.  The obligations of Guarantor hereunder are independent of the obligations of Borrower and of any other Person that may become liable with respect to the Obligations.  Partnership Guarantor and ACRON Guarantor is each jointly and severally liable with Borrower and with each other for the full and timely payment of all of the Obligations.  Guarantor expressly agrees that a separate action or actions may be brought and prosecuted against Guarantor (or any other guarantor), whether or not any action is brought against Borrower, any other guarantor or any other Person for any of the Obligations and whether or not Borrower, any other guarantor or any other Persons are joined in any action against Guarantor. Guarantor further agrees that Lender shall have no obligation to proceed against any security for the Obligations prior to enforcing this Guaranty against Guarantor, and that Lender may pursue or omit to pursue any and all rights and remedies Lender has against any Person or with respect to any security in any order or simultaneously or in any other manner.  All rights of Lender and all obligations of Guarantor hereunder shall be primary, direct, immediate, absolute and unconditional irrespective of (a) any lack of validity or enforceability of the Note, the Loan Agreement, the Security Instrument or any other Loan Document and (b) any other circumstances that might otherwise constitute a defense available to, or a discharge of, Borrower in respect of the Obligations.  Guarantor acknowledges that this Guaranty is a guaranty of payment and not just of collection in respect of the Obligations that may accrue to Lender from Guarantor.  The liability of Guarantor under this Guaranty shall continue after any assignment or transfer of the interests of Lender under this Guaranty made in conjunction with an assignment of the Mezzanine Loan.

Notwithstanding the foregoing, Guarantor shall not have any liability hereunder with respect to any acts, events or circumstances that (i) are due solely and directly to the gross negligence or willful misconduct of Lender as determined by a final decision of a court of competent jurisdiction, and (ii) were not the result of any act or negligence of Borrower, Guarantor or any Affiliate Controlled by or under common Control with Borrower or Guarantor.

4.    _Authorizations to Lender_.  Guarantor authorizes Lender, without notice or demand and without affecting Guarantor's liability hereunder, from time to time, (a) to renew, extend, accelerate or otherwise change the time for payment of, change, amend, alter, cancel, compromise or otherwise modify the terms of the Note, including increasing the rate or rates of interest thereunder agreed to by Borrower, and to grant any indulgences, forbearances, or extensions of time, (b) to renew, extend, change, amend, alter, cancel, compromise or otherwise modify any of the terms, covenants, conditions or provisions of any of the other Loan Documents or any of the obligations thereunder (as permitted under the Loan Documents), (c) to apply any security and direct the order or manner of sale thereof as Lender, in Lender's sole discretion, may determine, (d) to proceed against (x) Borrower with respect to any or all of the obligations under the Loan Documents or (y) Guarantor or any other guarantor with respect to any or all of the Obligations, in each case, without first foreclosing against any security therefor, (e) to exchange, release, surrender, impair or otherwise deal in any manner with, or waive, release or subordinate any security interest in, any security for the obligations under the Loan Documents, (f) to release or substitute Borrower, any other guarantors, endorsers, or other parties that may be or become liable with respect to the Obligations or any other obligations under the Loan Documents, without any release being deemed made of Guarantor or any other such Person and (g) to accept a conveyance or transfer to Lender of all or any part of any security in partial satisfaction of the obligations under the Loan Documents, or any of them, without releasing Borrower, Guarantor, or any other guarantor, endorser or other party that may be or become liable with respect to the Obligations, from any liability for the balance of the obligations under the Loan Documents.

5.    _Application of Payments Received by Lender_.  Lender shall apply all payments made to Lender from Guarantor under this Guaranty in accordance with _Section 2.6_ (Application of Payments) of the Loan Agreement.

6.    _Waivers by Guarantor_.  In addition to all waivers expressed in any of the other Loan Documents, all of which are incorporated herein by Guarantor, Guarantor hereby waives: (a) presentment, demand, protest and notice of protest, notice of dishonor and of non-payment, notice of acceptance of this Guaranty, and diligence in collection; (b) notice of the existence, creation or incurring of any new or additional obligations under or pursuant to any of the Loan Documents; (c) any right to require Lender to proceed against, give notice to or make demand upon Borrower; (d) any right to require Lender to proceed against or exhaust any security, or to proceed against or exhaust any security in any particular order; (e) any right to require Lender to pursue any remedy of Lender; (f) any right to direct the application of any security held by Lender; (g) any right of subrogation, any right to enforce any remedy, which Lender may have against Borrower, any right to participate in any security now or hereafter held by Lender and any right to reimbursement from Borrower for amounts paid to Lender by Guarantor, until all of the Secured Obligations have been satisfied; (h) benefits, if any, of Guarantor under any anti-deficiency statutes or single-action legislation; (i) any defense arising out of any disability or other defense of Borrower, including bankruptcy, dissolution, liquidation, cessation, impairment, modification, or limitation, from any

cause, of any liability of Borrower, or of any remedy for the enforcement of such liability; (j) any statute of limitations affecting the liability of Guarantor hereunder; (k) any right to plead or assert any election of remedies by Lender; (l) any rights, benefits and defenses which might otherwise be available to Guarantor pursuant to Section 34.01 et seq. of the Texas Business and Commerce Code, Section 17.001 of the Texas Civil Practice and Remedies Code, Rule 31 of the Texas Rules of Civil Procedure, Chapter 43 of the Texas Civil Practice and Remedies Code, and Sections 51.003, 51.004 and 51.005 of the Texas Property Code (and any and all amendments, recodifications and supplements to any of the foregoing) or any other applicable law that might operate to limit (i) Guarantor's or any other Person's liability under, or the enforcement of, this Guaranty and the other Loan Documents; or (ii) the right of Lender to recover a deficiency judgment, or to otherwise proceed, against Guarantor or any other Person obligated for the payment of the Obligations, after any foreclosure, trustee's sale, or UCC sale, of any Collateral securing payment of the Obligations; and (m) any other defenses available to a surety under applicable law; provided, that nothing herein constitutes a waiver by Guarantor of any defense raised in good faith based on actual payment by Borrower or Guarantor of any of the Obligations.

7. <u>Subordination by Guarantor</u>. Guarantor hereby agrees that any indebtedness of Borrower to Guarantor, whether now existing or hereafter created, shall be, and is hereby, subordinated to the outstanding indebtedness of Borrower to Lender under the Loan Documents. At any time during which a Default or an Event of Default shall exist and is continuing, Guarantor shall not accept or seek to receive any amounts from Borrower on account of any indebtedness of Borrower to Guarantor.

8. <u>Bankruptcy Reimbursements</u>. Guarantor hereby agrees that if all or any part of the Obligations paid to Lender by Borrower, Guarantor or any other party liable for payment and satisfaction of the Obligations are recovered from Lender for any reason whatsoever (including, but not limited to, the insolvency, bankruptcy or reorganization of Guarantor or Borrower), Guarantor shall reimburse Lender immediately on demand for all amounts of such Obligations so recovered from Lender, together with interest thereon at the Default Rate (as such term is defined in the Loan Agreement) from the date such amounts are so recovered until repaid in full to Lender, and such payments shall be made into a Texas bank account of Lender's to be specified by Lender at such time. For purposes of the reimbursement of Lender by Guarantor under this <u>Section 8</u>, the provisions of this Guaranty shall survive repayment of the Secured Obligations until all amounts recovered from Lender, and any other amounts due thereon under this Guaranty, shall have been reimbursed in full.

9. <u>Governing Law; Jurisdiction and Venue</u>. Each Guarantor acknowledges that this Guaranty will be performed in the State of Texas, including satisfaction of all of its Obligations and participation in annual (or quarterly) meetings to discuss ongoing matters relating to the Mezzanine Loan and Property. The substantive laws of the State of Texas shall govern the validity, construction, enforcement and interpretation of this Guaranty and the other Loan Documents, without reference to conflicts of law principles. Any legal suit, action or proceeding against Lender or Guarantor arising out of or relating to this Guaranty or the other Loan Documents shall be instituted in any federal or state court located in or serving the County of Dallas, in the State of Texas, and Guarantor waives any objections that Guarantor may now or hereafter have based on venue and/or forum non conveniens of any such suit, action or proceeding, and Guarantor hereby irrevocably submits to the jurisdiction of any such court in any suit, action or proceeding.

8

Guarantor agrees that service of process upon Guarantor shall be complete upon delivery thereof in any manner permitted by law to Guarantor's agent for service of process as designated in <u>Section 10</u> below.

10.    <u>Service of Process</u>.

(a)    Guarantor hereby appoints Registered Agent Solutions, Inc. as its lawfully designated agent for service of process and hereby consents to such service for purposes of submitting to the jurisdiction and venue of any federal or state court located in or serving the County of Dallas, in the State of Texas, as provided in <u>Section 9</u> hereof.  Guarantor hereby agrees that Guarantor shall not change Guarantor's designated agent without giving prior written notice thereof to Lender and without having received Lender's prior express written consent to such redesignation.  In the event that service of process in accordance with the foregoing (but only to the extent that either (x) Registered Agent Solutions, Inc. is no longer serving as agent for service of process hereunder or (y) Lender is unable to effect proper service of process through Registered Agent Solutions, Inc. as the agent for service of process) is not possible after 2 weeks' reasonable effort by Lender, Guarantor hereby consents to service by publication in a newspaper of general circulation in or serving the County of Dallas, in the State of Texas.

(b)    Guarantor hereby further acknowledges and agrees that delivery to Guarantor, at the address, and in any manner provided for, in <u>Section 15</u> hereof, of any summons and complaint or any other documents in any action, as evidenced by regular or customary receipt or statement of a nationally recognized overnight delivery firm or United States Post Office, as may be applicable, shall constitute, for all purposes in any such action, service of process for purposes of submitting to the jurisdiction and venue of any federal or state court located in or serving the County of Dallas, in the State of Texas, as provided in <u>Section 9</u> above, and Guarantor hereby consents to any such service.  Guarantor hereby agrees that Guarantor shall not change any such address without giving prior written notice thereof to Lender and having received confirmation of Lender's written receipt of such change of address notice.

11.    <u>Minimum Net Worth</u>.    At all times until repayment in full of the Secured Obligations, Guarantor shall satisfy the Minimum Guarantor Financial Requirement (as defined in the Loan Agreement).

12.    <u>Other Covenants</u>.

(a)    Guarantor shall furnish to Lender the financial statements and other materials required to be delivered by or on behalf of Guarantor pursuant to <u>Section 7.1.6</u> (Financial Reporting) of the Loan Agreement.

(b)    Guarantor will participate in annual (or quarterly) meetings held in the State of Texas to discuss ongoing matters relating to performance of the Property, the Mezzanine Loan and the Loan Documents.

(c)    This Guaranty will be performed in the State of Texas, including satisfaction of all of Guarantor's Obligations hereunder, and all Guarantor payments shall be made into Lender's Texas bank account.

13.    <u>Successors and Assigns.</u>  This Guaranty and all provisions hereof shall be binding upon Guarantor and each applicable Guarantor's estate, representatives, successors and assigns, and all other Persons claiming under or through Guarantor, and the word "**Guarantor**," when used herein, shall include all such Persons, whether or not they have executed this Guaranty.  The word "**Lender**," when used herein shall include Lender's successors and assigns, including all other holders, from time to time, of the Note.

14.    <u>Payment of Costs of Enforcement</u>.  In the event any action or proceeding is brought to enforce this Guaranty, Guarantor shall, within 10 Business Days following demand by Lender, pay all out-of-pocket costs and expenses of Lender in connection with such action or proceeding, including, without limitation, all actual out-of-pocket attorneys' fees incurred by Lender.

15.    <u>Notices</u>.  Any notice, consent or approval required or permitted to be given by Guarantor or Lender under this Guaranty shall be given in the manner set forth in <u>Section 11.10</u> (Notices) of the Loan Agreement (i) to Lender, at the addresses set forth in the Loan Agreement, and/or (ii) to each Guarantor at each Guarantor's address set forth below:

If to Partnership Guarantor:

c/o ACRON (USA) L.P.
2424 E. 21st Street, Suite 150
Tulsa, OK 74114
Attention:  Greg Wilson
Email: gw@acronusa.com

with a copy to:

Baker & Hostetler LLP
200 South Orange Avenue, Suite 2300
Orlando, Florida 32801
Attention: Jessica Malchow, Esq. & Jason Brady, Esq.
Emails: nbhjmalchow@bakerlaw.com
           jbrady@bakerlaw.com

If to ACRON Guarantor:

c/o ACRON AG
2424 E. 21st Street, Suite 150
Tulsa, OK 74114
Attention:  Greg Wilson
Email: gw@acronusa.com

with a copy to:

Baker & Hostetler LLP
200 South Orange Avenue, Suite 2300
Orlando, Florida 32801

Attention: Jessica Malchow, Esq. & Jason Brady, Esq.
Emails: nbhjmalchow@bakerlaw.com
jbrady@bakerlaw.com

Any party may change such party's address for notices or copies of notices by giving notice to the other party in accordance with this <u>Section 15</u>.

16.    <u>Interpretation</u>. If any provision of this Guaranty or any paragraph, sentence, clause, phrase or word, or the application thereof, is held invalid in any circumstance, the validity of the remainder of this Guaranty shall be construed as if such invalid part were never included herein. In the event of any conflict between the terms hereof and the terms of the Loan Agreement, the terms of the Loan Agreement shall control and be binding.  The recitals set forth above in this Guaranty, together with the terms defined therein, are incorporated herein and made a part hereof by reference as if the same were fully set forth herein.

17.    <u>Joint and Several Obligation</u>. If Guarantor is more than one Person, then: (a) all Persons comprising Guarantor are jointly and severally liable for all of the Obligations; (b) all representations, warranties, and covenants made by Guarantor shall be deemed representations, warranties, and covenants of each of the Persons comprising Guarantor; (c) any breach, Default or Event of Default by any of the Persons comprising Guarantor hereunder shall be deemed to be a breach, Default, or Event of Default of Guarantor; and (d) any reference herein contained to the knowledge or awareness of Guarantor shall mean the knowledge or awareness, of any Person comprising Guarantor.

18.    <u>Rights and Remedies Cumulative</u>. All rights and remedies set forth in this Guaranty and in the other Loan Documents are cumulative, and the holder of the Note and of every other obligation secured hereby may recover judgment thereon, issue execution therefor and resort to every other right or remedy available at law or in equity without first exhausting, and without affecting or impairing the security of, any right or remedy afforded hereby.  Unless expressly provided in this Guaranty to the contrary, no consent or waiver, whether express or implied, by any interested party referred to herein regarding any breach or default by any other interested party referred to herein, in the performance by such other party of any obligations contained herein shall be deemed a consent to, or waiver by the party of, the performance by such other party of any other obligations hereunder or the performance by any other interested party referred to herein of the same, or of any other obligations hereunder.

19.    <u>WAIVER OF TRIAL BY JURY</u>.  GUARANTOR, BY EXECUTING THIS GUARANTY, AND LENDER, BY ACCEPTING THIS GUARANTY, KNOWINGLY, IRREVOCABLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT EITHER MAY HAVE TO, AND AGREE NOT TO SEEK, A TRIAL BY JURY IN RESPECT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM BASED ON THIS GUARANTY, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS GUARANTY OR ANY OTHER LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY HERETO OR TO ANY OTHER LOAN DOCUMENT. GUARANTOR, BY EXECUTING THIS GUARANTY, AND LENDER, BY ACCEPTING THIS GUARANTY, FURTHER AGREE THAT NO SUCH ACTION WITH RESPECT TO WHICH A JURY TRIAL HAS BEEN

WAIVED SHALL BE SOUGHT TO BE CONSOLIDATED WITH ANY OTHER ACTION WITH RESPECT TO WHICH A JURY TRIAL CANNOT OR HAS NOT BEEN WAIVED. THIS SECTION HAS BEEN FULLY DISCUSSED BY GUARANTOR AND LENDER, EACH OF WHOM HAS BEEN REPRESENTED BY COUNSEL, AND THIS SECTION SHALL NOT BE SUBJECT TO ANY EXCEPTIONS.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR LENDER AND GUARANTOR TO ENTER INTO THE TRANSACTIONS.

     20.   <u>Representations and Warranties</u>.  Guarantor represents and warrants as of the date hereof to Lender as follows:

     (a)   Guarantor is a direct and/or indirect owner of ownership interests in Borrower, as set forth in the Organizational Certificate.

     (b)   The execution, delivery and performance by each Guarantor of the Loan Documents to which such Guarantor is a party, as applicable, are within the power and authority of such Guarantor and have been duly authorized by all necessary action and will not violate any provision of the organizational documents of such Guarantor.

     (c)   This Guaranty and the other Loan Documents to which Guarantor is a party will, when delivered hereunder, be valid and binding obligations of Guarantor, enforceable against Guarantor in accordance with their respective terms, except as limited by equitable principles and bankruptcy, insolvency and similar laws affecting creditors' rights. This Guaranty, the Note, the Security Instrument, the Loan Agreement and the other Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense (except as expressly set forth herein) by Guarantor (including the defense of usury), and Guarantor has not asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

     (d)   The execution, delivery and performance by Guarantor of the Loan Documents to which Guarantor is a party will not contravene any applicable law or regulation or any contractual or other restriction binding on or affecting Guarantor, and will not result in or require the creation of any lien, security interest, other charge or encumbrance (other than pursuant hereto) upon or with respect to any of Guarantor's respective properties.

     (e)   No authorization, approval, consent or other action by, and no notice to or filing with, any court, governmental authority or regulatory body is required for the due execution, delivery and performance by Guarantor of any of the Loan Documents to which Guarantor is a party or the effectiveness of any assignment of any of Guarantor's rights and interests of any kind to Lender.

     (f)   Guarantor has not made any assignment for the benefit of creditors, nor has Guarantor filed, or had filed against Guarantor, any petition in bankruptcy.  Guarantor is not contemplating either the filing of a petition by Guarantor under any state or federal bankruptcy or insolvency laws or the liquidation of all or a major portion of its assets or property.  To Guarantor's knowledge, no Person is contemplating the filing of any such petition against Guarantor.

     (g)   There is no, to Guarantor's knowledge, pending or threatened litigation, action, proceeding or investigation, including, without limitation, any condemnation proceeding,

against Guarantor before any court, governmental or quasi-governmental, arbitrator or other authority.

(h)    Other than ACRON Guarantor, Guarantor is a "non-foreign person" within the meaning of Sections 1445 and 7701 of the United States Internal Revenue Code of 1986, as amended, and the regulations issued thereunder.

(i)    Guarantor has filed or has obtained extensions to file all tax returns which are required to be filed by Guarantor and has paid all taxes shown thereon to be due and payable, together with applicable interest and penalties.

(j)    Guarantor has independently and without reliance upon Lender and based on such documents and information as Guarantor has deemed appropriate, made Guarantor's own credit analysis and decision to enter into this Guaranty and each of the other Loan Documents to which Guarantor is a party.

(k)    No statement of fact made by or on behalf of Guarantor in this Guaranty or in any of the other Loan Documents to which Guarantor is a party contains any untrue statement of material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading.

(l)    Guarantor is not (i) a Prohibited Person, or (ii) subject to any other Legal Requirement that purports to restrict or regulate Guarantor's ability to comply with this Guaranty. No Person that directly or indirectly controls Partnership Guarantor or ACRON Guarantor, or that owns, directly or indirectly, any of the legal or beneficial interests in Partnership Guarantor or ACRON Guarantor, respectively, is a Prohibited Person.

(m)    Guarantor does not receive any of Guarantor's revenue from business conducted in or with countries sanctioned by the U.S. Treasury Department of Foreign Assets Control, except in connection with "Country Sanction Programs" promulgated thereby.

(n)    There exists no material adverse change in the financial condition of Partnership Guarantor from that set forth in the financial statements or statements of net worth for Partnership Guarantor dated as of December 31, 2022, true, correct and complete copies of which have been previously delivered to Lender.

(o)    There exists no material adverse change in the financial condition of ACRON Guarantor from that set forth in the financial statements or statements of net worth for ACRON Guarantor dated as of December 31, 2022, true, correct and complete copies of which have been previously delivered to Lender.

(p)    Partnership Guarantor and any Person that owns, directly or indirectly, through one or more intermediaries, any interest in Partnership Guarantor, and any such Person's direct or indirect managers, members, partners, shareholders, affiliates or controlling persons that are entities and are considered "Reporting Companies" as such term is defined in the Corporate Transparency Act (each, a "**Guarantor Reporting Company**") is in compliance in all material respects with the terms, conditions, regulations and reporting and disclosure requirements of the Corporate Transparency Act.

(q)    ACRON Guarantor and any Person that owns, directly or indirectly, through one or more intermediaries, any interest in ACRON Guarantor, and any such Guarantor Reporting Company (as defined above) is in compliance in all material respects with the terms, conditions, regulations and reporting and disclosure requirements of the Corporate Transparency Act.

21.    Corporate Transparency Act.

(a)    At all times until the full satisfaction of the Secured Obligations, each applicable Guarantor shall cooperate with Borrower in connection with the compliance by Borrower and each Guarantor of the obligations set forth in Section 7.1.14 (Prohibited Persons; Economic Sanctions; Anti-Money Laundering; Corporate Transparency Act) of the Loan Agreement.

(b)    Each applicable Guarantor hereby covenants and agrees with Lender that, from and after the Closing Date, each applicable Guarantor shall cause each Guarantor Reporting Company to (i) at all times comply with the terms, conditions, regulations and reporting and disclosure requirements of the Corporate Transparency Act and (ii) provide to the Lender upon reasonable request by Lender any information necessary (x) for Lender to confirm that any such Guarantor Reporting Company has complied with all reporting and disclosure requirements under the Corporate Transparency Act and (y) to permit Lender to comply with the terms, conditions, regulations and reporting and disclosure requirements of the Corporate Transparency Act applicable to Lender in respect of the Mezzanine Loan and the transactions contemplated by this Guaranty and the other Loan Documents. Each applicable Guarantor shall promptly deliver to Lender any certification and other evidence reasonably requested from time to time by Lender confirming compliance by Guarantor and each other Guarantor Reporting Company with this Section 21(b).

(c)    Each applicable Guarantor hereby consents on behalf of each applicable Guarantor and each Guarantor Reporting Company to permit FinCEN (as defined in the Loan Agreement) to disclose the beneficial ownership information of each Guarantor Reporting Company and any other information disclosed to FinCEN pursuant to the Corporate Transparency Act to Lender in accordance with the terms of the Corporate Transparency Act. Each applicable Guarantor hereby (i) represents and warrants that each Guarantor Reporting Company has, on behalf of such Guarantor Reporting Company, provided such a consent in writing, and (ii) covenants and agrees that each applicable Guarantor shall obtain and deliver to Lender any additional consents and/or documentation from any such Guarantor Reporting Company necessary to effectuate such a consent from any such Guarantor Reporting Company as may be required by FinCEN, from time to time, for FinCEN to release to Lender all such beneficial ownership information and other information disclosed to FinCEN pursuant to the Corporate Transparency Act.

22.    Counterparts. This Guaranty may be executed in any number of counterparts, all of which shall together constitute one and the same instrument. This Guaranty, to the extent signed and delivered by means of electronic transmission in portable document format (pdf), shall be treated in all manner and respects (and shall have the same binding legal effect) as a fully executed original Guaranty.

23.    <u>Acceptance of Cures for Event of Default</u>.  Notwithstanding anything to the contrary contained in this Guaranty or the other Loan Documents (including any reference to the "continuance" of an Event of Default or that an Event of Default is "continuing"), Lender shall in no event or under any circumstance be obligated or required to accept a cure by Borrower, Guarantor or any other Person of an Event of Default unless Lender agrees to do so in the exercise of Lender's sole and absolute discretion, it being agreed that once an Event of Default has occurred and so long as Lender has not determined to accept a cure of such Event of Default in writing, Lender shall be absolutely and unconditionally entitled to pursue all rights and remedies available to Lender under the Loan Documents, at law or in equity or otherwise.

24.    <u>Limited Accrual of Guaranty</u>. The obligations of Guarantor under this Guaranty shall accrue (exclusive of any other obligations of Guarantor under any other guaranty agreement relating to the Mezzanine Loan) until the date on which any of the following events should occur (such date, the "**Accrual End Date**"): (a) the Mezzanine Loan is paid in full and the Secured Obligations are fully satisfied and all applicable preference periods under the United States Bankruptcy Code, 11 U.S.C. §101, et seq., as amended, have expired; or (b) Lender (or its nominee or assignee), in accordance with the Intercreditor Agreement, acquires the membership interests in Owner via completion of a UCC foreclosure, acceptance of an assignment in-lieu of foreclosure (or similar instrument) or other similar enforcement action under the Loan Documents. Notwithstanding the foregoing:  (i) Guarantor shall be and remain liable for any Obligations which result from the acts or omissions of any Borrower Owner Person whether such acts occurred prior to or after the Accrual End Date (provided that, for the avoidance of doubt, "Borrower Owner Person" shall not include Owner from and after the date that Guarantor no longer owns Owner as a result of the event specified in item (b) above); and (ii) Guarantor's liability under this Guaranty shall be reinstated if the event causing the Accrual End Date to occur is ever subsequently set aside, rescinded or invalidated as a result of any bankruptcy, insolvency or similar state or federal court proceeding (which has not been initiated in writing by Lender).  In any action in connection with the enforcement of liability under this Guaranty, Guarantor shall, at its sole cost and expense, bear the burden of proof to establish that the Obligations accrued following the Accrual End Date.

[Remainder of the Page Intentionally Left Blank]

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the Effective Date.

**GUARANTOR**:

**ACRON (USA) L.P.**,
a Texas limited partnership

By:    ACRON U.S. Management, Inc.,
      a Nevada corporation
      its sole General Partner

By: _____
Name: Greg Wilson
Title:  President

**ACRON AG,**
a Swiss stock corporation

By: _____
Name: Greg Wilson
Title: Authorized Signatory

## GUARANTY AGREEMENT
### (TH Investment Guarantor)

This **GUARANTY AGREEMENT** (this "**Guaranty**") is made as of January 18, 2024 (the "**Effective Date**"), by **TH INVESTMENT HOLDINGS II, LLC**, a Delaware limited liability company ("**TH Investment Guarantor**" or "**Guarantor**"), in favor of **CAI OVERLAND LENDER, LLC**, a Delaware limited liability company ("**Lender**"). All capitalized terms not defined herein shall have the meanings ascribed to such terms in the Loan Agreement.

### RECITALS

A.     Lender has agreed to make a loan to **ACRON 2 PORSCHE DRIVE MEZZCO LLC**, a Delaware limited liability company ("**Borrower**"), in the original aggregate principal amount of $11,600,000 (the "**Mezzanine Loan**") pursuant to that certain Loan Agreement, dated as of the Effective Date, by and between Lender and Borrower (as the same may be amended, restated and/or supplemented from time to time, the "**Loan Agreement**").

B.     The Mezzanine Loan is evidenced by the Note and secured by, among other things, that certain Pledge and Security Agreement, dated as of the Effective Date, by Borrower in favor of Lender (as the same may be amended, restated and/or supplemented from time to time, the "**Security Instrument**"). The Mezzanine Loan is guaranteed in part by that certain Guaranty Agreement (ACRON), dated as of the Effective Date, by ACRON (USA), L.P., a Texas limited partnership ("**Partnership Guarantor**") and ACRON AG, a Swiss stock corporation ("**ACRON Guarantor**") in favor of Lender (the "**ACRON Guaranty**"). The Note, the Security Instrument, the ACRON Guaranty, this Guaranty and all other documents now or hereafter executed or delivered in connection with the Mezzanine Loan, as the same may be amended, substituted for, or replaced from time to time, are referred to collectively as the "**Loan Documents**."

C.     The Property is managed by TPG Manager as Property Manager. TH Investment Guarantor is the owner of a direct or indirect interest in TPG Manager, and will directly benefit from Lender making the Mezzanine Loan to Borrower. TH Investment Guarantor is one of the guarantors under the Guaranty of Recourse Obligations, dated as of December 31, 2021, by Partnership Guarantor, ACRON Guarantor and TH Investment Guarantor in favor of Senior Lender with respect to the Senior Loan and Senior Loan Documents. TH Investment Guarantor is also one of the indemnitors under the Environmental Indemnity Agreement, dated as of December 31, 2021, by Owner (defined in the Loan Agreement as ACRON 2 Porsche Drive, Atlanta LLC, a Delaware limited liability company, which is the "Borrower" under the Senior Loan Agreement and owner of a leasehold interest in the Property pursuant to the Borrower Rental Agreement), Partnership Guarantor, ACRON Guarantor and TH Investment Guarantor in favor of Senior Lender with respect to the Senior Loan and Senior Loan Documents. TH Investment Guarantor is an indemnitor under the Environmental Indemnity Agreement in connection with the Mezzanine Loan.

D.     The execution and delivery of this Guaranty by Guarantor is (i) a condition to Lender's willingness to make the Mezzanine Loan to Borrower, (ii) made in order to induce Lender

to make the Mezzanine Loan and (iii) made in recognition that Lender will be relying upon this Guaranty in making the Mezzanine Loan and performing any other obligations Lender may have under the Loan Documents.

**GUARANTY**

NOW, THEREFORE, to induce Lender to make the Mezzanine Loan to Borrower, and for other good and valuable consideration, the mutual receipt and legal sufficiency of which are hereby acknowledged, Guarantor hereby covenants, agrees, represents and warrants as follows:

1.    <u>Loss Recourse Events.</u>  Guarantor hereby irrevocably, unconditionally, absolutely, jointly and severally with Borrower, agrees to indemnify and hold harmless Lender, and notwithstanding anything to the contrary contained in this Guaranty or any other Loan Document, nothing shall be deemed in any way to impair, limit or prejudice the rights of Lender to collect or recover from Borrower and/or from Guarantor under this Guaranty each of the following amounts (collectively, the "**Loss Recourse Obligations**"):

(a)    any Losses incurred or sustained by Lender as a result of material physical waste by Borrower or Owner; provided, however, Guarantor's liability under the foregoing clause (a) shall be limited if such results from an act of omission by Borrower or Owner (e.g, failure to maintain) as opposed to an affirmative act of Borrower or Owner (e.g. affirmative destructive behavior towards the Property) to net cash flow actually available during Owner's ownership of the Property;

(b)    any Capital Proceeds neither turned over to Senior Lender or Lender nor applied or used in accordance with the terms of the Loan Agreement or the other Loan Documents;

(c)    any Gross Revenue generated by the Property collected by or for Owner that is (a) not properly applied to the Operating Expenses of the Property substantially in accordance with an Approved Budget or otherwise in accordance with the Loan Agreement (including payments due under the Senior Loan Documents) following an Event of Default or during any Distributable Cash Flow Sweep Period, (b) not deposited into the Operating Account, (c) not deposited otherwise with Lender- or Senior Lender-controlled reserves as and when required pursuant to any of the Loan Documents or Senior Loan Documents, respectively, (d) disbursed to Owner from the Operating Account or any such reserves and not thereafter applied for the purposes for which such funds were disbursed in accordance with the Loan Agreement or any of the other Loan Documents, or (e) otherwise misappropriated by Borrower or Owner in violation of the provisions of the Loan Documents or Senior Loan Documents;

(d)    after an Event of Default or during any Distributable Cash Flow Sweep Period, any (a) Gross Revenue or other amounts paid under Leases that are prepaid more than one month in advance, and (b) security deposits collected by or for Borrower and that are not applied in accordance with the applicable Leases and are not returned to Tenants in accordance with such applicable Leases, in both cases, to the extent not turned over to (i) Senior Lender upon foreclosure (whether judicial, non-judicial, or by power of sale) or a receivership sale, or conveyance in lieu of foreclosure, or (ii) a receiver or trustee for the Property after the appointment of such receiver or trustee;

5241352.6

(e)    any accrued and due Property Impositions and/or utility charges affecting the Property (whether or not the same have been billed to Borrower) that are either unpaid by Owner or Borrower; provided that (1) this clause (e) shall not apply if and to the extent Senior Lender or Lender holds funds in escrow for such purpose pursuant to the Senior Loan Documents or the Loan Documents and Senior Lender or Lender, as the case may be, failed to release such funds to Borrower or Owner for the timely payment of the same in violation of the Senior Loan Documents or the Loan Documents, and (2) Guarantor shall not be liable under this subsection (e) if the net cash flow actually available to Borrower or Owner during Owner's period of ownership of the Property is insufficient to pay the same;

(f)    any Losses incurred or sustained by Lender (that would otherwise be covered by insurance) as a result of Borrower's failure to maintain, or cause to be maintained, any insurance required under the terms of any Loan Document and/or pay any deductible under any such insurance; provided that, (1) this clause (f) shall not apply if and to the extent Senior Lender or Lender holds funds in escrow for such purpose pursuant to the Senior Loan Documents or the Loan Documents and Senior Lender or Lender, as the case may be, failed to release such funds to Borrower for the timely payment of such premiums in violation of the Senior Loan Documents or the Loan Documents, and (2) Guarantor shall not be liable under this subsection (f) if the net cash flow actually available to Borrower or Owner during Owner's period of ownership of the Property is insufficient to pay the premiums for the required insurance coverage;

(g)    any Losses incurred or sustained by Lender as a result of any fraud, material misrepresentation or willful misconduct by Borrower, Owner, Guarantor or any of their respective Affiliates or any representative, officer, director, partner, manager, member, shareholder, or trustee of Borrower, Owner, Guarantor or any their respective Affiliates in connection with the Property, the Loan Agreement or the other Loan Documents (including any ongoing financial or other reporting required pursuant to Section 7.1.6 of the Loan Agreement or any request for action, approval or consent by Lender); provided, that if such misrepresentation is unintentional, susceptible of cure by Borrower or Guarantor, and does not otherwise result in an Event of Default, then Borrower shall have ten (10) Business Days after the earlier to occur of (1) notice from Lender and (2) Borrower obtaining knowledge of such misrepresentation, to cure such misrepresentation prior to Borrower or Guarantor incurring personal liability for the Losses arising under this clause (g);

(h)    any Losses incurred or sustained by Lender as a result of any Mechanic's Lien against or encumbering the Property; provided that (1) this clause (h) shall not apply if and to the extent Senior Lender or Lender holds funds in escrow for such purpose pursuant to the Senior Loan Documents or the Loan Documents and Senior Lender or Lender, as the case may be, failed to release such funds to Borrower or Owner for the timely payment of the same in violation of the Senior Loan Documents or the Loan Documents, and (2) Guarantor shall not be liable under this subsection (h) if the net cash flow actually available to Borrower or Owner during Owner's period of ownership of the Property is insufficient to pay the same;

(i)    any Losses incurred or sustained by Lender as a result of Borrower's material failure to, at all times, be a Single Purpose Entity, unless the same is cured within five (5) Business Days of the earlier to occur of (1) notice from Lender and (2) Borrower obtaining

3

knowledge of such violation.  For the avoidance of doubt, the recourse described in this clause (i) shall not preclude recourse for substantive consolidation, as set forth in <u>Section 2(f)</u> below; and

(j)    the amount of any payments made to the Senior Lender, to the extent such payments were made in violation of the Loan Documents.

2.    <u>Springing Recourse Events</u>.  Guarantor hereby irrevocably, unconditionally, absolutely, jointly and severally with Borrower, agrees to assume and be responsible for the prompt and complete observance, fulfillment and performance of all of the Secured Obligations of Borrower under the Loan Documents, including the making of all payments of all Loan Debt Service Payments and other sums evidenced by the Note (collectively, the "**Springing Recourse Obligations**", and together with the Loss Recourse Obligations, the "**Obligations**"), upon the occurrence of any event listed below in this <u>Section 2</u> (each, a "**Springing Recourse Event**"). Such assumption and responsibility shall occur automatically upon the occurrence of any Springing Recourse Event without further action on the part of any Person.

(a)    any material breach or violation of <u>Section 7.2.3(a)</u> or <u>Article 8</u> of the Loan Agreement, provided, that such breach or violation shall not be a Springing Recourse Event with respect to Guarantor unless Guarantor shall have been given written notice of such breach or violation and failed to cure such breach or violation within thirty (30) days;

(b)    Borrower forfeits all or any portion of the Collateral, or Owner forfeits all or any portion of the Property or the Senior Collateral, due to criminal activity pursuant to the operation or enforcement of any Legal Requirement or the decision of any Governmental Authority;

(c)    any attempt by Borrower, Guarantor or any other Borrower Owner Person to materially delay any foreclosure against the Collateral, or any other exercise by Lender of Lender's remedies under the Loan Documents, including any claim that any Loan Document is invalid or unenforceable to an extent that would preclude any such foreclosure or other exercise of remedies; in each case which is adjudicated to have been frivolous, brought in bad faith, without merit (in the case of the defense) to unwarranted (in the case of the request of judicial intervention or injunctive or other equitable relief), provided, however, in the event that Guarantor does not join in or consent to the actions described in this subsection (c), such action shall not constitute a Springing Recourse Event with respect to Guarantor;

(d)    (a) Borrower or Owner files a voluntary petition under the Bankruptcy Code or any other Bankruptcy Law, (b) the Collateral or Property or any part thereof shall become an asset in a voluntary bankruptcy or insolvency proceeding, or (c) Borrower, Guarantor or any other Borrower Control Person (x) consents to or otherwise acquiesces in or joins in or fails to oppose any involuntary bankruptcy or insolvency petition filed against Borrower or Owner (other than an involuntary bankruptcy or insolvency petition filed by or at the direction of Lender or, with respect to Owner, Senior Lender), or (y) solicits (or causes to be solicited) or colludes in the filing of any involuntary bankruptcy or insolvency petition against Borrower or Owner (other than an involuntary bankruptcy or insolvency petition filed by Lender or at the request or direction of Lender or, with respect to Owner, Senior Lender), provided, however, in the event that Guarantor

4

does not join in or consent to the actions described in this subsection (d), such action shall not constitute a Springing Recourse Event with respect to Guarantor;

(e)    the appointment (a) other than by or at the direction of Senior Lender, of a receiver, trustee, or liquidator with respect to Owner or the Property or any part thereof, or (b) other than by or at the direction of Lender, of a receiver, trustee, or liquidator with respect to Borrower or the Collateral or any part thereof (provided, however, liability shall not accrue under this clause (e), if such receivership appointment was initiated by a third-party creditor independent of any collusive action, consent or participation by Borrower, Owner, or Guarantor, any person directly or indirectly liable for the obligations of Borrower under the Mezzanine Loan or Owner under the Senior Loan, or any person directly or indirectly responsible for the management of Borrower, Owner, or Guarantor, so long as Borrower or Owner opposed the same in good faith), provided, however, in the event that Guarantor does not join in or consent to the actions described in this subsection (e), such action shall not constitute a Springing Recourse Event with respect to Guarantor;

(f)    that Borrower is substantively consolidated with any Affiliate of Borrower in a bankruptcy or similar proceeding as a result of Borrower's material failure to, at all times, be a Single Purpose Entity and such failure is cited by the court as a material factor resulting in such substantive consolidation; or

(g)    any amendment or modification of the Senior Loan or the Senior Loan Documents without Lender's prior written consent, or any voluntary prepayment or refinancing of the Senior Loan that is unaccompanied by a prepayment of this Mezzanine Loan without Lender's prior written consent, provided, however, in the event that Guarantor does not join in or consent to the actions described in this subsection (g), such action shall not constitute a Springing Recourse Event with respect to Guarantor.

3.    <u>Guaranty is Independent and Absolute</u>.  The obligations of Guarantor hereunder are independent of the obligations of Borrower and of any other Person that may become liable with respect to the Obligations.  Guarantor is only jointly and severally liable with Borrower for the full and timely payment of all of the Obligations.  Guarantor expressly agrees that a separate action or actions may be brought and prosecuted against Guarantor (or any other guarantor), whether or not any action is brought against Borrower, any other guarantor or any other Person for any of the Obligations and whether or not Borrower, any other guarantor or any other Persons are joined in any action against Guarantor.  Guarantor further agrees that Lender shall have no obligation to proceed against any security for the Obligations prior to enforcing this Guaranty against Guarantor, and that Lender may pursue or omit to pursue any and all rights and remedies Lender has against any Person or with respect to any security in any order or simultaneously or in any other manner.  All rights of Lender and all obligations of Guarantor hereunder shall be primary, direct, immediate, absolute and unconditional irrespective of (a) any lack of validity or enforceability of the Note, the Loan Agreement, the Security Instrument or any other Loan Document and (b) any other circumstances that might otherwise constitute a defense available to, or a discharge of, Borrower in respect of the Obligations.  Guarantor acknowledges that this Guaranty is a guaranty of payment and not just of collection in respect of the Obligations that may accrue to Lender from Guarantor.  The liability of Guarantor under this Guaranty shall continue after any assignment or transfer of the interests of Lender under this Guaranty made in conjunction with an assignment of the

Mezzanine Loan. Notwithstanding the foregoing, Guarantor shall not have any liability hereunder with respect to any acts, events or circumstances that (i) are due solely and directly to the gross negligence or willful misconduct of Lender as determined by a final decision of a court of competent jurisdiction, and (ii) were not the result of any act or negligence of Borrower, Guarantor or any Affiliate Controlled by or under common Control with Borrower or Guarantor.

4.      Authorizations to Lender.  Guarantor authorizes Lender, without notice or demand and without affecting Guarantor's liability hereunder, from time to time, (a) to renew, extend, accelerate or otherwise change the time for payment of, change, amend, alter, cancel, compromise or otherwise modify the terms of the Note, including increasing the rate or rates of interest thereunder agreed to by Borrower, and to grant any indulgences, forbearances, or extensions of time, (b) to renew, extend, change, amend, alter, cancel, compromise or otherwise modify any of the terms, covenants, conditions or provisions of any of the other Loan Documents or any of the obligations thereunder (as permitted under the Loan Documents), (c) to apply any security and direct the order or manner of sale thereof as Lender, in Lender's sole discretion, may determine, (d) to proceed against (x) Borrower with respect to any or all of the obligations under the Loan Documents or (y) Guarantor or any other guarantor with respect to any or all of the Obligations, in each case, without first foreclosing against any security therefor, (e) to exchange, release, surrender, impair or otherwise deal in any manner with, or waive, release or subordinate any security interest in, any security for the obligations under the Loan Documents, (f) to release or substitute Borrower, any other guarantors, endorsers, or other parties that may be or become liable with respect to the Obligations or any other obligations under the Loan Documents, without any release being deemed made of Guarantor or any other such Person and (g) to accept a conveyance or transfer to Lender of all or any part of any security in partial satisfaction of the obligations under the Loan Documents, or any of them, without releasing Borrower, Guarantor, or any other guarantor, endorser or other party that may be or become liable with respect to the Obligations, from any liability for the balance of the obligations under the Loan Documents.

5.      Application of Payments Received by Lender.  Lender shall apply all payments made to Lender from Guarantor under this Guaranty in accordance with Section 2.6 (Application of Payments) of the Loan Agreement.

6.      Waivers by Guarantor.  In addition to all waivers expressed in any of the other Loan Documents, all of which are incorporated herein by Guarantor, Guarantor hereby waives: (a) presentment, demand, protest and notice of protest, notice of dishonor and of non-payment, notice of acceptance of this Guaranty, and diligence in collection; (b) notice of the existence, creation or incurring of any new or additional obligations under or pursuant to any of the Loan Documents; (c) any right to require Lender to proceed against, give notice to or make demand upon Borrower; (d) any right to require Lender to proceed against or exhaust any security, or to proceed against or exhaust any security in any particular order; (e) any right to require Lender to pursue any remedy of Lender; (f) any right to direct the application of any security held by Lender; (g) any right of subrogation, any right to enforce any remedy, which Lender may have against Borrower, any right to participate in any security now or hereafter held by Lender and any right to reimbursement from Borrower for amounts paid to Lender by Guarantor, until all of the Secured Obligations have been satisfied; (h) benefits, if any, of Guarantor under any anti-deficiency statutes or single-action legislation; (i) any defense arising out of any disability or other defense of Borrower, including bankruptcy, dissolution, liquidation, cessation, impairment, modification, or limitation, from any

cause, of any liability of Borrower, or of any remedy for the enforcement of such liability; (j) any statute of limitations affecting the liability of Guarantor hereunder; (k) any right to plead or assert any election of remedies by Lender; (l) any rights, benefits and defenses which might otherwise be available to Guarantor pursuant to Section 34.01 et seq. of the Texas Business and Commerce Code, Section 17.001 of the Texas Civil Practice and Remedies Code, Rule 31 of the Texas Rules of Civil Procedure, Chapter 43 of the Texas Civil Practice and Remedies Code, and Sections 51.003, 51.004 and 51.005 of the Texas Property Code (and any and all amendments, recodifications and supplements to any of the foregoing) or any other applicable law that might operate to limit (i) Guarantor's or any other Person's liability under, or the enforcement of, this Guaranty and the other Loan Documents; or (ii) the right of Lender to recover a deficiency judgment, or to otherwise proceed, against Guarantor or any other Person obligated for the payment of the Obligations, after any foreclosure, trustee's sale, or UCC sale, of any Collateral securing payment of the Obligations; and (m) any other defenses available to a surety under applicable law; provided, that nothing herein constitutes a waiver by Guarantor of any defense raised in good faith based on actual payment by Borrower or Guarantor of any of the Obligations.

7.     <u>Subordination by Guarantor</u>.  Guarantor hereby agrees that any indebtedness of Borrower to Guarantor, whether now existing or hereafter created, shall be, and is hereby, subordinated to the outstanding indebtedness of Borrower to Lender under the Loan Documents. At any time during which a Default or an Event of Default shall exist and is continuing, Guarantor shall not accept or seek to receive any amounts from Borrower on account of any indebtedness of Borrower to Guarantor.

8.     <u>Bankruptcy Reimbursements</u>.  Guarantor hereby agrees that if all or any part of the Obligations paid to Lender by Borrower, Guarantor or any other party liable for payment and satisfaction of the Obligations are recovered from Lender for any reason whatsoever (including, but not limited to, the insolvency, bankruptcy or reorganization of Guarantor or Borrower), Guarantor shall reimburse Lender immediately on demand for all amounts of such Obligations so recovered from Lender, together with interest thereon at the Default Rate (as such term is defined in the Loan Agreement) from the date such amounts are so recovered until repaid in full to Lender. For purposes of the reimbursement of Lender by Guarantor under this <u>Section 8</u>, the provisions of this Guaranty shall survive repayment of the Secured Obligations until all amounts recovered from Lender, and any other amounts due thereon under this Guaranty, shall have been reimbursed in full.

9.     <u>Governing Law; Jurisdiction and Venue</u>. The substantive laws of the State of Texas shall govern the validity, construction, enforcement and interpretation of this Guaranty and the other Loan Documents, without reference to conflicts of law principles.  Any legal suit, action or proceeding against Lender or Guarantor arising out of or relating to this Guaranty or the other Loan Documents shall be instituted in any federal or state court located in or serving the County of Dallas, in the State of Texas, and Guarantor waives any objections that Guarantor may now or hereafter have based on venue and/or forum non conveniens of any such suit, action or proceeding, and Guarantor hereby irrevocably submits to the jurisdiction of any such court in any suit, action or proceeding.  Guarantor agrees that service of process upon Guarantor shall be complete upon delivery thereof in any manner permitted by law to Guarantor's agent for service of process as designated in <u>Section 10</u> below.

10.    <u>Service of Process</u>.

(a)    Guarantor hereby appoints CT Corporation as its lawfully designated agent for service of process and hereby consents to such service for purposes of submitting to the jurisdiction and venue of any federal or state court located in or serving the County of Dallas, in the State of Texas, as provided in <u>Section 9</u> hereof.  Guarantor hereby agrees that Guarantor shall not change Guarantor's designated agent without giving prior written notice thereof to Lender and without having received Lender's prior express written consent to such redesignation.  In the event that service of process in accordance with the foregoing (but only to the extent that either (x) CT Corporation is no longer serving as agent for service of process hereunder or (y) Lender is unable to effect proper service of process through CT Corporation as the agent for service of process) is not possible after 2 weeks' reasonable effort by Lender, Guarantor hereby consents to service by publication in a newspaper of general circulation in or serving the County of Dallas, in the State of Texas.

(b)    Guarantor hereby further acknowledges and agrees that delivery to Guarantor, at the address, and in any manner provided for, in <u>Section 15</u> hereof, of any summons and complaint or any other documents in any action, as evidenced by regular or customary receipt or statement of a nationally recognized overnight delivery firm or United States Post Office, as may be applicable, shall constitute, for all purposes in any such action, service of process for purposes of submitting to the jurisdiction and venue of any federal or state court located in or serving the County of Dallas, in the State of Texas, as provided in <u>Section 9</u> above, and Guarantor hereby consents to any such service.  Guarantor hereby agrees that Guarantor shall not change any such address without giving prior written notice thereof to Lender and having received confirmation of Lender's written receipt of such change of address notice.

11.    <u>Minimum Net Worth</u>.    At all times until repayment in full of the Secured Obligations, Guarantor shall satisfy the Minimum Guarantor Financial Requirement (as defined in the Loan Agreement).

12.    <u>Financial Statements</u>.  Guarantor shall furnish to Lender the financial statements and other materials required to be delivered by or on behalf of Guarantor pursuant to <u>Section 7.1.6</u> (Financial Reporting) of the Loan Agreement.

13.    <u>Successors and Assigns.</u>  This Guaranty and all provisions hereof shall be binding upon Guarantor and Guarantor's estate, representatives, successors and assigns, and all other Persons claiming under or through Guarantor, and the word "**Guarantor**," when used herein, shall include all such Persons, whether or not they have executed this Guaranty.  The word "**Lender**," when used herein shall include Lender's successors and assigns, including all other holders, from time to time, of the Note.

14.    <u>Payment of Costs of Enforcement</u>.  In the event any action or proceeding is brought to enforce this Guaranty, Guarantor shall, within 10 Business Days following demand by Lender, pay all out-of-pocket costs and expenses of Lender in connection with such action or proceeding, including, without limitation, all actual out-of-pocket attorneys' fees incurred by Lender.

15.     <u>Notices</u>.  Any notice, consent or approval required or permitted to be given by Guarantor or Lender under this Guaranty shall be given in the manner set forth in <u>Section 11.10</u> (Notices) of the Loan Agreement (i) to Lender, at the addresses set forth in the Loan Agreement, and/or (ii) to Guarantor at its address set forth below:

<blockquote>
If to TH Investment Guarantor:

TH Investment Holdings II, LLC
c/o Procaccianti Companies, Inc.
1140 Reservoir Avenue
Cranston, RI 02920
Attention: Gregory D. Vickowski

with a copy to:

Procaccianti Companies, Inc.
Attn: General Counsel
1140 Reservoir Avenue
Cranston, RI 02920
</blockquote>

Any party may change such party's address for notices or copies of notices by giving notice to the other party in accordance with this <u>Section 15</u>.

16.     <u>Interpretation</u>.  If any provision of this Guaranty or any paragraph, sentence, clause, phrase or word, or the application thereof, is held invalid in any circumstance, the validity of the remainder of this Guaranty shall be construed as if such invalid part were never included herein. In the event of any conflict between the terms hereof and the terms of the Loan Agreement, the terms of the Loan Agreement shall control and be binding.  The recitals set forth above in this Guaranty, together with the terms defined therein, are incorporated herein and made a part hereof by reference as if the same were fully set forth herein.

17.     <u>Rights and Remedies Cumulative</u>.  All rights and remedies set forth in this Guaranty and in the other Loan Documents are cumulative, and the holder of the Note and of every other obligation secured hereby may recover judgment thereon, issue execution therefor and resort to every other right or remedy available at law or in equity without first exhausting, and without affecting or impairing the security of, any right or remedy afforded hereby.  Unless expressly provided in this Guaranty to the contrary, no consent or waiver, whether express or implied, by any interested party referred to herein regarding any breach or default by any other interested party referred to herein, in the performance by such other party of any obligations contained herein shall be deemed a consent to, or waiver by the party of, the performance by such other party of any other obligations hereunder or the performance by any other interested party referred to herein of the same, or of any other obligations hereunder.

18.     <u>WAIVER OF TRIAL BY JURY</u>.  GUARANTOR, BY EXECUTING THIS GUARANTY, AND LENDER, BY ACCEPTING THIS GUARANTY, KNOWINGLY, IRREVOCABLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT EITHER MAY HAVE TO, AND AGREE NOT TO SEEK, A TRIAL BY JURY IN RESPECT OF ANY

5241352.6

ACTION, PROCEEDING OR COUNTERCLAIM BASED ON THIS GUARANTY, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS GUARANTY OR ANY OTHER LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY HERETO OR TO ANY OTHER LOAN DOCUMENT.  GUARANTOR, BY EXECUTING THIS GUARANTY, AND LENDER, BY ACCEPTING THIS GUARANTY, FURTHER AGREE THAT NO SUCH ACTION WITH RESPECT TO WHICH A JURY TRIAL HAS BEEN WAIVED SHALL BE SOUGHT TO BE CONSOLIDATED WITH ANY OTHER ACTION WITH RESPECT TO WHICH A JURY TRIAL CANNOT OR HAS NOT BEEN WAIVED. THIS SECTION HAS BEEN FULLY DISCUSSED BY GUARANTOR AND LENDER, EACH OF WHOM HAS BEEN REPRESENTED BY COUNSEL, AND THIS SECTION SHALL NOT BE SUBJECT TO ANY EXCEPTIONS.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR LENDER AND GUARANTOR TO ENTER INTO THE TRANSACTIONS.

19.    <u>Representations and Warranties</u>.  Guarantor represents and warrants as of the date hereof to Lender as follows:

(a)    The Property is managed by TPG Manager as Property Manager.  TH Investment Guarantor is the owner of a direct or indirect interest in TPG Manager, as set forth in the Organizational Certificate.

(b)    The execution, delivery and performance by Guarantor of the Loan Documents to which Guarantor is a party are within the power and authority of Guarantor and have been duly authorized by all necessary action and will not violate any provision of the organizational documents of such Guarantor.

(c)    This Guaranty and the other Loan Documents to which Guarantor is a party will, when delivered hereunder, be valid and binding obligations of Guarantor, enforceable against Guarantor in accordance with their respective terms, except as limited by equitable principles and bankruptcy, insolvency and similar laws affecting creditors' rights.  This Guaranty, the Note, the Security Instrument, the Loan Agreement and the other Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense (except as expressly set forth herein) by Guarantor (including the defense of usury), and Guarantor has not asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

(d)    The execution, delivery and performance by Guarantor of the Loan Documents to which Guarantor is a party will not contravene any applicable law or regulation or any contractual or other restriction binding on or affecting Guarantor, and will not result in or require the creation of any lien, security interest, other charge or encumbrance (other than pursuant hereto) upon or with respect to any of Guarantor's respective properties.

(e)    No authorization, approval, consent or other action by, and no notice to or filing with, any court, governmental authority or regulatory body is required for the due execution, delivery and performance by Guarantor of any of the Loan Documents to which Guarantor is a party or the effectiveness of any assignment of any of Guarantor's rights and interests of any kind to Lender.

(f)     Guarantor has not made any assignment for the benefit of creditors, nor has Guarantor filed, or had filed against Guarantor, any petition in bankruptcy.  Guarantor is not contemplating either the filing of a petition by Guarantor under any state or federal bankruptcy or insolvency laws or the liquidation of all or a major portion of its assets or property.  To Guarantor's knowledge, no Person is contemplating the filing of any such petition against Guarantor.

(g)     There is no, to Guarantor's knowledge, pending or threatened litigation, action, proceeding or investigation, including, without limitation, any condemnation proceeding, against Guarantor before any court, governmental or quasi-governmental, arbitrator or other authority.

(h)     Guarantor is a "non-foreign person" within the meaning of Sections 1445 and 7701 of the United States Internal Revenue Code of 1986, as amended, and the regulations issued thereunder.

(i)     Guarantor has filed or has obtained extensions to file all tax returns which are required to be filed by Guarantor and has paid all taxes shown thereon to be due and payable, together with applicable interest and penalties.

(j)     Guarantor has independently and without reliance upon Lender and based on such documents and information as Guarantor has deemed appropriate, made Guarantor's own credit analysis and decision to enter into this Guaranty and each of the other Loan Documents to which Guarantor is a party.

(k)     No statement of fact made by or on behalf of Guarantor in this Guaranty or in any of the other Loan Documents to which Guarantor is a party contains any untrue statement of material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading.

(l)     Guarantor is not (i) a Prohibited Person, or (ii) subject to any other Legal Requirement that purports to restrict or regulate Guarantor's ability to comply with this Guaranty. No Person that directly or indirectly controls Guarantor, or that owns, directly or indirectly, any of the legal or beneficial interests in Guarantor, respectively, is a Prohibited Person.

(m)     Guarantor does not receive any of Guarantor's revenue from business conducted in or with countries sanctioned by the U.S. Treasury Department of Foreign Assets Control, except in connection with "Country Sanction Programs" promulgated thereby.

(n)     There exists no material adverse change in the financial condition of Guarantor from that set forth in the reviewed financial statements or statements of net worth for Guarantor dated as of December 31, 2022, as updated by the unaudited Q3 2023 financial statements of Guarantor dated as of September 30, 2023,  true, correct and complete copies of which have been previously delivered to Lender.

(o)      Guarantor and any Person that owns, directly or indirectly, through one or more intermediaries, any interest in Guarantor, and any such Person's direct or indirect managers, members, partners, shareholders, affiliates or controlling persons that are entities and are considered "Reporting Companies" as such term is defined in the Corporate Transparency Act

(each, a "**Guarantor Reporting Company**") is in compliance in all material respects with the terms, conditions, regulations and reporting and disclosure requirements of the Corporate Transparency Act.

20.    <u>Corporate Transparency Act</u>.

(a)    At all times until the full satisfaction of the Secured Obligations, Guarantor shall cooperate with Borrower in connection with the compliance by Borrower and Guarantor of the obligations set forth in <u>Section 7.1.14</u> (Prohibited Persons; Economic Sanctions; Anti-Money Laundering; Corporate Transparency Act) of the Loan Agreement.

(b)    Guarantor hereby covenants and agrees with Lender that, from and after the Closing Date, Guarantor shall cause each Guarantor Reporting Company to (i) at all times comply with the terms, conditions, regulations and reporting and disclosure requirements of the Corporate Transparency Act and (ii) provide to the Lender upon reasonable request by Lender any information necessary (x) for Lender to confirm that any such Guarantor Reporting Company has complied with all reporting and disclosure requirements under the Corporate Transparency Act and (y) to permit Lender to comply with the terms, conditions, regulations and reporting and disclosure requirements of the Corporate Transparency Act applicable to Lender in respect of the Mezzanine Loan and the transactions contemplated by this Guaranty and the other Loan Documents.  Guarantor shall promptly deliver to Lender any certification and other evidence reasonably requested from time to time by Lender confirming compliance by Guarantor and each other Guarantor Reporting Company with this <u>Section 20(b)</u>.

(c)    Guarantor hereby consents on behalf of itself and each Guarantor Reporting Company to permit FinCEN (as defined in the Loan Agreement) to disclose the beneficial ownership information of each Guarantor Reporting Company and any other information disclosed to FinCEN pursuant to the Corporate Transparency Act to Lender in accordance with the terms of the Corporate Transparency Act.  Guarantor hereby (i) represents and warrants that each Guarantor Reporting Company has, on behalf of such Guarantor Reporting Company, provided such a consent in writing, and (ii) covenants and agrees that Guarantor shall obtain and deliver to Lender any additional consents and/or documentation from any such Guarantor Reporting Company necessary to effectuate such a consent from any such Guarantor Reporting Company as may be required by FinCEN, from time to time, for FinCEN to release to Lender all such beneficial ownership information and other information disclosed to FinCEN pursuant to the Corporate Transparency Act.

21.    <u>Counterparts</u>.  This Guaranty may be executed in any number of counterparts, all of which shall together constitute one and the same instrument.  This Guaranty, to the extent signed and delivered by means of electronic transmission in portable document format (pdf), shall be treated in all manner and respects (and shall have the same binding legal effect) as a fully executed original Guaranty.

22.    <u>Acceptance of Cures for Event of Default</u>.  Notwithstanding anything to the contrary contained in this Guaranty or the other Loan Documents (including any reference to the "continuance" of an Event of Default or that an Event of Default is "continuing"), Lender shall in no event or under any circumstance be obligated or required to accept a cure by Borrower,

Guarantor or any other Person of an Event of Default unless Lender agrees to do so in the exercise of Lender's sole and absolute discretion, it being agreed that once an Event of Default has occurred and so long as Lender has not determined to accept a cure of such Event of Default in writing, Lender shall be absolutely and unconditionally entitled to pursue all rights and remedies available to Lender under the Loan Documents, at law or in equity or otherwise.

23.    <u>Limited Accrual of Guaranty</u>. The obligations of Guarantor under this Guaranty shall accrue (exclusive of any other obligations of Guarantor under any other guaranty agreement relating to the Mezzanine Loan) until the date on which any of the following events should occur (such date, the "**Accrual End Date**"): (a) the Mezzanine Loan is paid in full and the Secured Obligations are fully satisfied and all applicable preference periods under the United States Bankruptcy Code, 11 U.S.C. §101, et seq., as amended, have expired; or (b) Lender (or its nominee or assignee), in accordance with the Intercreditor Agreement, acquires the membership interests in Owner via completion of a UCC foreclosure, acceptance of an assignment in-lieu of foreclosure (or similar instrument) or other similar enforcement action under the Loan Documents. Notwithstanding the foregoing:  (i) Guarantor shall be and remain liable for any Obligations which result from the acts or omissions of any Borrower Owner Person whether such acts occurred prior to or after the Accrual End Date (provided that, for the avoidance of doubt, "Borrower Owner Person" shall not include Owner from and after the date that Guarantor no longer owns Owner as a result of the event specified in item (b) above); and (ii) Guarantor's liability under this Guaranty shall be reinstated if the event causing the Accrual End Date to occur is ever subsequently set aside, rescinded or invalidated as a result of any bankruptcy, insolvency or similar state or federal court proceeding (which has not been initiated in writing by Lender).  In any action in connection with the enforcement of liability under this Guaranty, Guarantor shall, at its sole cost and expense, bear the burden of proof to establish that the Obligations accrued following the Accrual End Date.

[Remainder of the Page Intentionally Left Blank]

**TH INVESTMENT HOLDINGS II, LLC,**
a Delaware limited liability company

By: _____
Name: James A. Procaccianti
Title: Manager

# **EXHIBIT E**

(UCC Statements)

107074163.3

**CSC**

www.cscglobal.com

CSC- Wilmington

251 Little Falls Drive
Wilmington, DE 19808
800-927-9800
302-636-5454 (Fax)

| | | | |
|---|---|---|---|
| **Matter#** | NOT PROVIDED | **Order#** | 1390544-1 |
| **Project Id :** | UCC 01182024 | **Order Date** | 01/18/2024 |

| | |
|---|---|
| **Entity Name:** | **ACRON 2 PORSCHE DRIVE MEZZCO LLC (Debtor) / CAI OVERLAND LENDER, LLC (Secured Party)** |
| **Jurisdiction:** | **DE - Secretary Of State** |
| **Request for:** | **UCC Filing** |
| **File Type:** | ORIGINAL UCC FILING |
| **Result:** | **Filed** |
| **File Number:** | 20240422525 |
| **Filing Date:** | 01/18/2024 |

Ordered by ANDREW LUNDBERG at FIDELITY NATIONAL TITLE GROUP - UCCPLUS DIVISION

Thank you for using CSC. For real-time 24 hour access to the status of any order placed with CSC, access our website at www.cscglobal.com.

If you have any questions concerning this order or CSCGlobal, please feel free to contact us.

Jasmine Gomes
Jasmine.Gomes@cscglobal.com

The responsibility for verification of the files and determination of the information therein lies with the filing officer; we accept no liability for errors or omissions.

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT SUBMITTER (optional)**
Shai Halbe, Esq.

**B. E-MAIL CONTACT AT SUBMITTER (optional)**
shalbe@elkinskalt.com

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)

Elkins Kalt Weintraub Reuben Gartside LLP
10345 W. Olympic Blvd.
Los Angeles, CA 90064

SEE BELOW FOR SECURED PARTY CONTACT INFORMATION

Delaware Department of State
U.C.C. Filing Section
Filed: 09:10 PM 01/18/2024
U.C.C. Initial Filing No: 2024 0422525

Service Request No: 20240169771

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| ACRON 2 PORSCHE DRIVE MEZZCO LLC | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| c/o Acron (USA), LP, 2424 E. 21st St, #150 | Tulsa | OK  74114 | USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| CAI OVERLAND LENDER, LLC | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| c/o Civitas, 1722 Routh Street, Suite 800 | Dallas | TX  75201 | USA |

**4. COLLATERAL:** This financing statement covers the following collateral:

All assets of Debtor, whether now owned or hereafter acquired and whether now existing or hereafter coming into existence, including, without limitation, the collateral more particularly described on the attached Exhibit A incorporated herein by reference.

**5.** Check only if applicable and check only one box:    Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

**6a.** Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility
**6b.** Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

**7. ALTERNATIVE DESIGNATION (if applicable):** ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:**
File with Delaware Secretary of State (Kimpton Overland Hotel Atlanta Airport)

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 07/01/23)

**CSC**

www.cscglobal.com

CSC- Springfield

801 Adlai Stevenson Drive
Springfield, IL 62703
217-544-5900
217-492-2727 (Fax)

| | | | |
|---|---|---|---|
| **Matter#** | 9481 - KIMPTON OVERLAND | **Order#** | 310317-1 |
| **Project Id :** | | **Order Date** | 02/07/2024 |

| | |
|---|---|
| **Entity Name:** | **Acron 2 Porsche Drive, Atlanta LLC (Debtor) / CAI Overland Lender, LLC (Secured Party)** |
| **Jurisdiction:** | **DE - Secretary Of State** |
| **Request for:** | **UCC Filing** |
| **File Type:** | UCC AMENDMENT FILING |
| **Original File Number:** | 20240422525 |
| **Original File date:** | 18-JAN-24 |
| **Result:** | **Filed** |
| **File Number:** | 20240422525 |
| **Filing Date:** | 02/07/2024 |

Ordered by ANDREW LUNDBERG at FIDELITY NATIONAL TITLE GROUP - UCCPLUS DIVISION

Thank you for using CSC. For real-time 24 hour access to the status of any order placed with CSC, access our website at www.cscglobal.com.

If you have any questions concerning this order or CSCGlobal, please feel free to contact us.

JOANN EDWARDS
Joann.Edwards@cscglobal.com

The responsibility for verification of the files and determination of the information therein lies with the filing officer; we accept no liability for errors or omissions.

## UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT SUBMITTER (optional)

B. E-MAIL CONTACT AT SUBMITTER (optional)

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

Corporation Service Company
P.O. Box 2969
Springfield, IL  62703

SEE BELOW FOR SECURED PARTY CONTACT INFORMATION

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 11:18 AM 02/07/2024**
**U.C.C. Initial Filing No: 2024 0422525**
**Amendment No: 2024 0824324**
**Service Request No:   20240396014**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
20240422525 filed 1-18-2024

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13.

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Part(y)(ies) authorizing this Termination Statement

3. ☐ ASSIGNMENT: Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9; check ASSIGN Collateral box in Item 8 and describe the affected collateral in item 8

4. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. PARTY INFORMATION CHANGE:

Check one of these two boxes:                                    AND  Check one of these three boxes to:
This Change affects ☐ Debtor or ☐ Secured Party of record    ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c   ☐ ADD name: Complete item 7a or 7b, and item 7c   ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION:  Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| ACRON 2 PORSCHE DRIVE MEZZCO LLC | | | |
| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |
| 7b. INDIVIDUAL'S SURNAME | | | |
| | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

8. COLLATERAL CHANGE:  Check only one box:   ☐ ADD collateral   ☐ DELETE collateral   ☑ RESTATE covered collateral   ☐ ASSIGN* collateral

Indicate collateral:                          *Check ASSIGN COLLATERAL only if the assignee's power to amend the record is limited to certain collateral and describe the collateral in Section 8

All assets of Debtor, whether now owned or hereafter acquired and whether now existing or hereafter coming into existence, including, without limitation, the collateral more particularly described on the attached Exhibit A incorporated herein by reference.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:  Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| CAI Overland Lender, LLC | | | |
| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:
File with Delaware Secretary of State (Kimpton Overland Hotel Atlanta Airport)

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 07/01/23)

UCC Financing Statement Continuation Sheet
Debtor:  ACRON 2 Porsche Drive Mezzco LLC
Secured Party:  CAI Overland Lender, LLC

## EXHIBIT A to UCC Financing Statement

| | |
|---|---|
| **DEBTOR:** | ACRON 2 PORSCHE DRIVE MEZZCO LLC, a Delaware limited liability company |
| **DEBTOR'S ADDRESS:** | c/o Acron (USA), L.P. 2424 East 21st Street, Suite 150 Tulsa, Oklahoma 74114 Attention: Greg Wilson |
| **SECURED PARTY:** | CAI Overland Lender, LLC, a Delaware limited liability company |
| **SECURED PARTY'S ADDRESS:** | c/o Civitas Capital Group 1722 Routh Street, Suite 800 Dallas, Texas 75201 Attention: Austin Khan |

## Description of Collateral

Reference is hereby made to (a) that certain Pledge and Security Agreement, dated as of January 18, 2024, made by Debtor (also known as "**Pledgor**" herein) for the benefit of Secured Party, as Lender (as the same may be amended, restated, modified and/or supplemented from time to time, the "**Security Instrument**"); and (b) that certain Loan Agreement, dated as of January 18, 2024, between Debtor, as borrower, and Lender, as lender (as the same may be amended, restated, modified and/or supplemented from time to time, the "**Loan Agreement**"). All capitalized terms set forth herein and not otherwise defined shall have the meanings set forth in the Security Instrument.

All of Debtor's right, title, interest and estate in and to the Collateral (as defined below).

(i)      100% of the limited liability company interests in ACRON 2 Porsche Drive, Atlanta LLC, a Delaware limited liability company ("**Mortgage Borrower**"), together with (a) all rights, powers, privileges, benefits, options, claims, title, and remedies of any kind or nature in connection therewith, whether now existing or hereafter created; (b) all tangible and intangible property, products, or instruments of any description issued or issuable in connection therewith, including, without limitation, the Certificate of LLC Interest; and (c) all Proceeds (as hereinafter defined) derived from any of the foregoing (all of the foregoing, collectively, the "**Pledged Interests**");

(ii)     All certificates, instruments, or other writings representing or evidencing the Pledged Interests, including, without limitation, the Certificate of LLC Interest;

UCC Financing Statement Continuation Sheet
Debtor:  ACRON 2 Porsche Drive Mezzco LLC
Secured Party:  CAI Overland Lender, LLC

(iii)    All income, dividends, distributions, including, without limitation, any return of capital, whether paid or payable in cash or in kind, now or hereafter earned, paid, or allocated to the Pledged Interests;

(iv)    All "accounts" as that term is defined in Section 9-102(a)(2) of the Delaware Uniform Commercial Code (the "**UCC Code**");

(v)    All "general intangibles" as that term is defined in Section 9-102(a)(42) of the UCC Code;

(vi)    All "investment property" as that term is defined in Section 9-102(a)(49) of the UCC Code arising out of, or in connection with, the Pledged Interests;

(vii)    To the extent not otherwise included in clauses (i) through (vi) above, all Proceeds of and to any of the foregoing;

(viii)    All books, correspondence, files, records, invoices, and other papers relating to any of the foregoing; and

(ix)    All of Pledgor's "letter of credit rights" (as that term is defined in Section 9-102(a)(51) of the UCC Code).

"**Certificate of LLC Interest**" shall mean the certificate representing the Pledged Interests in the Mortgage Borrower in suitable form for transfer, together with: (i) an undated stock power conveying ownership thereof, duly executed by Pledgor and indorsed in blank; and (ii) all replacements, substitutions, or additions thereto.

"**Proceeds**" shall have the meaning ascribed to such term in Section 9-102(a)(64) of the UCC Code and, to the extent not included in that definition shall include Cash Proceeds, as that term is defined in Section 9-102(a)(9) of the UCC Code, and to the extent not already included in either definition, all interest and profits derived from any collateral.

# **EXHIBIT F**

(DACA)

<u>DEPOSIT ACCOUNT CONTROL AGREEMENT</u>

THIS DEPOSIT ACCOUNT CONTROL AGREEMENT ("**Agreement**") is made and entered into as of January 18, 2024 (the "**Execution Date**"), by and among TEXAS CAPITAL BANK, a Texas state bank ("**Bank**"), ACRON 2 PORSCHE DRIVE MEZZCO LLC, a Delaware limited liability company ("**Company**"), and CAI OVERLAND LENDER, LLC, a Delaware limited liability company ("**Secured Party**").

A.    Pursuant to that certain Loan Agreement, dated as of the Execution Date, between Company and Secured Party (as amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), Secured Party has agreed to make a mezzanine loan and extend other financial accommodations to Company.

B.    Company has established **Account No. 2400012364** with Bank (the "**Account**").

C.    The parties hereto desire to enter into this Agreement in order to set forth their relative rights and duties with respect to the Account and all funds on deposit therein from time to time.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter set forth, the parties hereto agree as follows:

1.    <u>Effectiveness</u>.  This Agreement shall take effect immediately upon its execution as of the Execution Date by all parties hereto and shall supersede any similar agreement in effect with respect to the Account.

2.    <u>Security Interest</u>.  As collateral security for Company's obligations to Secured Party under the Credit Agreement and the other loan documents described therein, Company hereby grants to Secured Party a present and continuing security interest in (a) the Account, (b) all contract rights, claims and privileges in respect of the Account, and (c) all cash, checks, money orders and other items of value of Company now or hereafter paid, deposited, credited, held (whether for collection, provisionally or otherwise) or otherwise in the possession or under the control of, or in transit to, Bank or any Secured Party, bailee or custodian thereof (collectively, "**Receipts**"), and all proceeds of the foregoing, and Bank acknowledges that this Agreement constitutes notice of Secured Party's security interest in such collateral and does hereby consent thereto.  Subject to <u>Section 3</u> below, the parties hereto agree that Bank shall comply with instructions originated by Secured Party directing disposition of the Receipts in the Account without further consent of Company.

3.    <u>Control of Account</u>.  The Account shall be maintained by Bank in the name of "ACRON 2 PORSCHE DRIVE MEZZCO LLC, a Delaware limited liability company" and, on and after the Effective Date (defined below), the Account and all funds in the Account shall be under the sole dominion and control of Secured Party. Notwithstanding anything set forth herein to the contrary, on and after the Effective Date, neither Company nor any other person or entity, through or under Company, shall have any control over the use of, or any right to withdraw any amount from, the Account. Prior to the Effective Date, Bank may permit Company to operate

and transact business through the Account in its normal fashion, including making withdrawals from the Account.

For the purposes hereof, the "**Effective Date**" shall be the opening of business on the business day immediately following the business day on which a notice (sent in accordance with the notice instructions in <u>Section 11</u>) purporting to be signed by Secured Party, with a copy of this Agreement attached thereto (a "**<u>Shifting Control Notice</u>**"), is received by Bank, provided, however, that if the Shifting Control Notice is so received after 12:00 noon, Dallas time, on any business day, the "Effective Date" shall be the opening of business on the second business day immediately following the business day on which such receipt occurs; and, provided further, that a "**business day**" is any day other than a Saturday, Sunday or other day on which Bank is or is authorized or required by law to be closed in the state of Texas. Bank and Company acknowledge that by Secured Party's execution of this Agreement, Secured Party shall be deemed to have given the Shifting Control Notice and Bank shall follow the procedures set forth in <u>Section 4(b)</u>.

Notwithstanding the foregoing: (i) all transactions involving or resulting in a transaction involving the Account duly commenced by Bank or any affiliate prior to the Effective Date and so consummated or processed thereafter shall be deemed not to constitute a violation of this Agreement; and (ii) Bank and/or any affiliate may (at its discretion and without any obligation to do so) commence honoring solely Secured Party's instructions concerning the Account at any time or from time to time after it becomes aware that Secured Party has sent to Bank a Shifting Control Notice but prior to the Effective Date therefor (including without limitation halting, reversing or redirecting any transaction referred to in clause (i) above) with no liability whatsoever to Company or any other party for doing so.

4.    <u>Procedures for Account</u>.  Bank shall follow the following procedures with respect to the Account:

(a)    Apply and credit for deposit to the Account all Receipts from time to time tendered by or on behalf of Company for deposit therein, including without limitation all wire transfers and other payments directed to the Account.

(b)    At all times after the Effective Date (defined above in <u>Section 3</u>), Bank shall determine, on each business day, the balance of all available funds on deposit in the Account and, unless otherwise instructed by Secured Party, automatically initiate a federal funds wire transfer of all such funds not later than 2:00 p.m. (Dallas Time) on such business day to the account designated below, or to such other account as may be designated in writing from time to time by Secured Party (the "**<u>Concentration Account</u>**"):

| | |
|---|---|
| Name: | CAI OVERLAND LENDER, LLC |
| Bank: | Texas Capital Bank, NA |
| ABA #: | 111017979 |
| Account #: | 2400004392 |
| Account Name: | CAI OVERLAND LENDER, LLC |

Bank shall never be required hereunder to pay Company or Secured Party from uncollected funds (i.e., funds that are not available for withdrawal in accordance with the funds availability policy as set forth in the Deposit Account Agreements) in the Account.

5.      Statements and Other Information.  Bank shall send to Secured Party copies of all returned and dishonored Receipts promptly upon Bank's receipt thereof, and upon Secured Party's request Bank shall provide Secured Party with copies of the regular monthly bank statements provided to Company and such other information relating to the Account as shall reasonably be requested by Secured Party.  Bank shall also deliver a copy of all notices and statements required to be sent to Company pursuant to any agreement governing or related to the Account to Secured Party at such times as provided therein.

6.      Fees, Charges, and Returned Items. Company agrees to pay on demand all (a) returned or charged-back items, (b) reversals or cancellations of payment orders and other electronic fund transfers, (c) overdrafts resulting from adjustments or corrections of previous credits or other postings (together with clauses (a) and (b), collectively, "**Returned Items**") and (d) Bank's charges, fees and expenses with respect to the Account or the services provided in connection therewith or hereunder (collectively, "**Charges**").  Bank may exercise its right of set-off against the Account or any other account of Company for such amounts.  Bank agrees not to exercise or claim any right of offset, right of recoupment, security interest, banker's lien or other like right against the Account for so long as this Agreement is in effect except as provided herein with respect to Returned Items or Charges.

If any Returned Items are not paid by Company within ten (10) days after written notice by Bank to Company, Secured Party shall pay to Bank within thirty (30) days after receipt of written demand therefor from Bank the amount of such Returned Items; provided that Shifting Control Notice shall have been given prior to such item having been returned to Bank and Secured Party shall have received such demand within sixty (60) days after the effective date of any termination of this Agreement.  If any Charges are not paid by Company within ten (10) days after written notice by Bank to Company, Secured Party shall pay to Bank within thirty (30) days after receipt of written demand therefor from Bank the amount of such Charges; provided that (x) Shifting Control Notice shall have been given prior to such charge having been billed, and (y) Secured Party has received such demand within thirty days (30) after the effective date of any termination of this Agreement.  Secured Party shall not be required to reimburse Bank for any Charges or Returned Items that would cause the amount of Charges, together with Returned Items, reimbursed by Secured Party to Bank to exceed the amount of funds disbursed subsequent to Shifting Control Notice being given.

Any liability of Secured Party to Bank resulting from Charges or Returned Items shall in no way release Company under the Credit Agreement from liability to Secured Party and shall not impair Secured Party's rights and remedies against Company, by way of subrogation or otherwise, to collect all such Charges or Returned Items, which Company hereby agrees to pay to Secured Party upon demand.

7.      <u>Exculpation of Bank</u>.  Company and Secured Party agree that Bank shall have no liability to either of them for any loss or damage that either or both may claim to have suffered or incurred, either directly or indirectly, by reason of this Agreement or any transaction or service contemplated by the provisions hereof, unless directly caused by the gross negligence or willful misconduct of Bank (but in no event will Bank be liable for any indirect damages, lost profits, special, punitive, or consequential damages which arise out of or in connection with the services contemplated by this Agreement).  In no event shall Bank be liable for losses or delays resulting from computer malfunction, interruption of communication facilities, labor difficulties or other causes beyond Bank's reasonable control or for indirect, special or consequential damages. Furthermore, (i) Bank shall have only the duties and responsibilities with respect to the matters set forth herein as is expressly set forth in writing herein and shall not be deemed to be a lender, bailee, or fiduciary for any party hereto;  and (ii) Bank shall be fully protected in acting or refraining from acting in good faith without investigation on any notice, instruction or request purportedly furnished to it by Company or Secured Party in accordance with the terms hereof, in which case the parties hereto agree that Bank has no duty to make any further inquiry whatsoever.

8.      <u>Indemnity</u>.  Company hereby agrees to indemnify, defend and save harmless Bank, and its directors, officers, employees, attorneys, successors, and assigns, against any loss, liability or expense (including reasonable fees and disbursements of counsel of Bank) incurred in connection with this Agreement or the Account or incurred at Company's or Secured Party's direction or instruction, including without limitation any Returned Items or Charges, and or arising out of any interpleader proceeding related to the account or this agreement.

9.      <u>Termination</u>.  This Agreement may be terminated by Secured Party at any time, with or without cause following its delivery of written notice thereof to each of Company and Bank.  This Agreement may be terminated by Bank at any time on not less than thirty (30) days prior written notice delivered to each of Company and Secured Party.  Upon delivery or receipt of such notice of termination to or by Bank, if a Shifting Control Notice has been delivered, Bank will transmit to the Concentration Account (i) all available funds, if any, then on deposit in, or otherwise to the credit of, the Account, and (ii) as available, all funds received after such notice for deposit in, or otherwise to the credit of, the Account.  If a Shifting Control Notice has not been delivered, the amounts described in the preceding sentence shall be disbursed in accordance with Company's instructions.  The provisions of <u>Sections 2</u> and <u>3</u> shall survive termination of this Agreement unless and until specifically released by Secured Party in writing. All rights of Bank under <u>Sections 6</u>, <u>7</u> and <u>8</u> shall survive any termination of this Agreement.

10.      <u>Irrevocable Agreements</u>.  Company acknowledges that the agreements made by it and the authorizations granted by it in <u>Sections 2</u>, <u>3</u>, and <u>4</u> hereof are irrevocable and that the authorizations granted in <u>Sections 2</u>, <u>3</u> and <u>4</u> hereof are powers coupled with an interest.

11.      <u>Notices</u>. All notices, requests or other communications given to Company, Secured Party or Bank shall be given in writing (including by email) at the applicable address specified below:

Secured Party: CAI Overland Lender, LLC
c/o Civitas Capital Group
1722 Routh Street, Suite 800
Dallas, Texas 75201
Attn:  Austin Khan, Marisa Lizak
Emails: austin.khan@civitascapital.com
          marisa.lizak@civitascapital.com

Bank:        Texas Capital Bank
2350 Lakeside Blvd, Ste 800
Richardson, TX 75082
Attn:  Ken Self
Email: ken.self@texascapitalbank.com

Company:    ACRON 2 Porsche Drive Mezzco LLC
c/o ACRON U.S. Management
2424 E. 21st Street, Suite 150
Tulsa, OK 74114
Attn:  Greg Wilson
Email:gw@acronusa.com

Any party may change its address for notices hereunder by notice to each other party hereto given in accordance with this Section 11.  Each notice, request or other communication shall be effective (a) if given by email, when transmitted to the party's email address specified in this Section 11 and confirmation of complete delivery is received by the transmitting party during normal business hours or on the next business day if not confirmed during normal business hours, and an identical notice is also sent simultaneously by overnight courier, (b) if given by overnight courier, 24 hours after such communication is deposited with the overnight courier for delivery, addressed as aforesaid, or (c) if given by any other means, when delivered at the address specified in this Section 11.

12.    Bank Provisions.  Bank is entitled to rely conclusively upon Secured Party's representations made in any notice or instruction and shall have no obligation to verify the existence of any event of default under the Credit Agreement.  Bank will be fully protected in acting on any instructions given by Secured Party regarding the Account and any account documentation without making any inquiry as to Secured Party's right or authority to give the instructions or as to the application of any payment made pursuant thereto, and any payment of all or part of the funds in the Account made to Secured Party or pursuant to Secured Party's instructions will satisfy any liability Bank has to Secured Party and relieve Bank of all liability to Company for such amounts. Bank may rely on the instructions of any person providing instructions on Secured Party's letterhead, without further inquiry into the authority of that person to act on behalf of Secured Party.  Nothing contained herein will require Bank to take any action in contravention of applicable laws, any court order, or the instructions of any bankruptcy trustee.  If at any time Bank is uncertain as to its right or duties under this Agreement, Bank may consult an attorney or may interplead any funds in the Account into a court of competent jurisdiction, and Company agrees to reimburse Bank for any costs incurred.

13.   <u>Miscellaneous.</u>

(a)     This Agreement may be amended only by a written instrument executed by Secured Party, Bank, and Company acting by their respective duly authorized representatives.

(b)     This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns, but neither Company nor Bank shall be entitled to assign or delegate any of its rights or duties hereunder without first obtaining the express prior written consent of Secured Party, provided that Secured Party or Bank may assign its rights or obligations pursuant to a merger or acquisition of Secured Party or Bank, as applicable.

(c)     This Agreement may be executed in any number of several counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

(d)     Notwithstanding any of the other provisions in this Agreement, in the event of the commencement of a case pursuant to Title 11, United States Code, filed by or against Company, or in the event of the commencement of any similar case under then applicable federal or state law providing for the relief of debtors or the protection of creditors by or against Company,  Bank may act as Bank deems necessary in good faith to comply with all applicable provisions of governing statutes and neither Company nor Secured Party shall assert any claim against Bank for so doing.

(e)     **THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF TEXAS (WITHOUT GIVING EFFECT TO ITS CONFLICTS OF LAW RULES).**

(f)     **EACH PARTY HERETO HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY EACH PARTY HERETO, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. ANY PARTY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY ANY OTHER PARTY.**

*[The Remainder of this Page Intentionally Left Blank]*

IN WITNESS WHEREOF, each of the parties has executed and delivered this Deposit Account Control Agreement as of the day and year first above set forth.

**BANK:**

TEXAS CAPITAL BANK,
a Texas state bank

By: _____

Name: Robert Pitcock
Title: Authorized Signatory

**COMPANY:**

ACRON 2 PORSCHE DRIVE MEZZCO LLC,
a Delaware limited liability company

By:    ACRON (USA) L.P.,
       a Texas limited partnership,
       its Manager

       By:    ACRON U.S. Management, Inc.,
              a Nevada corporation
              its sole General Partner

       By: _____
       Name: Greg Wilson
       Title:  President

**SECURED PARTY:**

CAI OVERLAND LENDER, LLC,
a Delaware limited liability company

By: _____

Name: Austin Khan
Title:  Authorized Signatory

DACA [Civitas/Kimpton Overland Hotel Atlanta Airport]

IN WITNESS WHEREOF, each of the parties has executed and delivered this Deposit Account Control Agreement as of the day and year first above set forth.

**BANK:**

TEXAS CAPITAL BANK,
a Texas state bank

By: _____
Name: _____
Title: _____

**COMPANY:**

ACRON 2 PORSCHE DRIVE MEZZCO LLC,
a Delaware limited liability company

By:    ACRON (USA) L.P.,
      a Texas limited partnership,
      its Manager

      By:    ACRON U.S. Management, Inc.,
          a Nevada corporation
          its sole General Partner

      By: _____
      Name: Greg Wilson
      Title:  President

**SECURED PARTY:**

CAI OVERLAND LENDER, LLC,
a Delaware limited liability company

By: _____
Name: Austin Khan
Title:  Authorized Signatory

DACA [Civitas/Kimpton Overland Hotel Atlanta Airport]

IN WITNESS WHEREOF, each of the parties has executed and delivered this Deposit Account Control Agreement as of the day and year first above set forth.

**BANK:**

TEXAS CAPITAL BANK,
a Texas state bank

By: _____
Name: _____
Title: _____

**COMPANY:**

ACRON 2 PORSCHE DRIVE MEZZCO LLC,
a Delaware limited liability company

By:    ACRON (USA) L.P.,
      a Texas limited partnership,
      its Manager

        By:    ACRON U.S. Management, Inc.,
             a Nevada corporation
             its sole General Partner

        By: _____
        Name: Greg Wilson
        Title:  President

**SECURED PARTY:**

CAI OVERLAND LENDER, LLC,
a Delaware limited liability company

By: _____
Name: Austin Khan
Title:  Authorized Signatory

DACA [Civitas/Kimpton Overland Hotel Atlanta Airport]

# **<u>EXHIBIT G</u>**

(Intercreditor Agreement)

# INTERCREDITOR AGREEMENT

by and between

**KHRE SMA FUNDING, LLC**,
as Senior Lender

and

**CAI OVERLAND LENDER, LLC**,
as Mezzanine Lender

_____

Dated as of January 18, 2024

Premises:          2 Porsche Drive
                           Hapeville, Georgia 30354

_____

# INTERCREDITOR AGREEMENT

**THIS INTERCREDITOR AGREEMENT** (this "**Agreement**"), dated as of January 18, 2024, is made by and between **KHRE SMA FUNDING, LLC**, a Delaware limited liability company, having an office at c/o Knighthead Funding, LLC, 777 West Putnam Avenue, 3rd Floor, Suite B-2, Greenwich, CT 06830 (together with its successors and assigns, "**Senior Lender**"), and **CAI OVERLAND LENDER, LLC,** a Delaware limited liability company, having an office at c/o Civitas Capital Group, 1722 Routh Street, Suite 800, Dallas, TX 75201 (together with its successors and permitted assigns, "**Mezzanine Lender**").

## RECITALS

A.     Pursuant to that certain Loan Agreement dated December 21, 2018 between Senior Lender and **ACRON 2 PORSCHE DRIVE ATLANTA LLC**, a Delaware limited liability company ("**Borrower**") (as amended pursuant to that certain (i) First Amendment to Loan Agreement and Other Loan Documents and Reaffirmation of Loan Documents dated as of December 31, 2021 (the "**First Amendment to Loan Agreement**"), (ii) Second Amendment to Loan Agreement and Other Loan Documents and Reaffirmation of Loan Documents dated as of January 2, 2023, (iii) extension letter dated May 5, 2023, (iv) extension letter dated August 31, 2023, and (v) Third Amendment to Loan Agreement and Other Loan Documents and Reaffirmation of Loan Documents dated as of December 29, 2023, and as the same may be further amended, restated, consolidated, replaced, supplemented or otherwise modified from time to time, the "**Senior Loan Agreement**"), Senior Lender has made a loan to Borrower in the original principal amount of THIRTY-SIX MILLION AND 00/100 DOLLARS ($36,000,000.00) (the "**Senior Loan**"), which Senior Loan is evidenced by that certain Amended and Restated Promissory Note, dated December 21, 2018, made by Borrower for the benefit of Senior Lender in the original principal amount of the Senior Loan (collectively, as the same may be amended, restated, extended, renewed, supplemented or otherwise modified from time to time in accordance with the terms hereof, the "**Senior Note**"), and secured by, among other things, that certain Amended and Restated Deed to Secure Debt, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of December 21, 2018 and recorded in Deed Book 59576 on Page 220 by the Clerk of Superior Court of Fulton County, Georgia, made by Borrower to Senior Lender (as amended by that certain (i) First Amendment to Amended and Restated Deed to Secure Debt, Assignment of Leases and Rents, Security Agreement, and Fixture Filing, dated as of December 31, 2021 and recorded in Deed Book 65100 on Page 148 by the Clerk of Superior Court of Fulton County, Georgia, (ii) Second Amendment to Amended and Restated Deed to Secure Debt, Assignment of Leases and Rents, Security Agreement, and Fixture Filing, dated as of January 2, 2023 and recorded in Deed Book 66495 on Page 686 by the Clerk of Superior Court of Fulton County, Georgia, and (iii) Third Amendment to Amended and Restated Deed to Secure Debt, Assignment of Leases and Rents, Security Agreement, and Fixture Filing, dated as of January 18, 2024 and to be recorded with the Clerk of Superior Court of Fulton County, Georgia, and as the same may be further amended, restated, consolidated, replaced, supplemented or otherwise modified from time to time, the "**Senior Mortgage**"), which Senior Mortgage encumbers the real property described on Exhibit A attached hereto and made a part hereof, and all improvements thereon and appurtenances thereto (the "**Premises**").

B.      Pursuant to that certain Loan Agreement dated as of  January 18, 2024, between **ACRON 2 PORSCHE DRIVE MEZZCO LLC**, a Delaware limited liability company ("**Mezzanine Borrower**"), and Mezzanine Lender (as the same may be amended, restated, extended, renewed, supplemented or otherwise modified from time to time in accordance with the terms hereof, the "**Mezzanine Loan Agreement**"), Mezzanine Lender has made a loan to Mezzanine Borrower in the [maximum] principal amount of [ELEVEN MILLION ONE HUNDRED THOUSAND AND 00/100 DOLLARS ($11,100,000.00)] (the "**Mezzanine Loan**"), which Mezzanine Loan is evidenced by that certain Promissory Note dated as of January 18, 2024, made by Mezzanine Borrower to Mezzanine Lender in the amount of the Mezzanine Loan (as the same may be amended, restated, extended, renewed, supplemented or otherwise modified from time to time in accordance with the terms hereof, the "**Mezzanine Note**"), and secured by, among other things, that certain Pledge and Security Agreement dated as of January 18, 2024, made by Mezzanine Borrower to Mezzanine Lender pursuant to which Mezzanine Borrower granted to Mezzanine Lender a first priority security interest in one hundred percent (100%) of the limited liability company interests in Borrower (as the same may be amended, restated, extended, renewed, supplemented or otherwise modified from time to time in accordance with the terms hereof, the "**Pledge Agreement**").

C.      Senior Lender and Mezzanine Lender desire to enter into this Agreement to set forth, among other things, (i) the relative priority of the Senior Loan Documents (as hereinafter defined) and the Mezzanine Loan Documents (as hereinafter defined), (ii) the respective rights of Senior Lender and Mezzanine Lender with respect to the servicing and administration of the Senior Loan and the Mezzanine Loan, and (iii) the relationship between the Mezzanine Loan and the Mezzanine Loan Documents, on the one hand, and the Senior Loan and the Senior Loan Documents, on the other hand.

**NOW, THEREFORE**, in consideration of the foregoing recitals and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Senior Lender and Mezzanine Lender hereby agree as follows:

1.      **Certain Definitions; Rules of Construction.**

(a)      As used in this Agreement, the following capitalized terms shall have the following meanings:

"**Affiliate**" shall mean, when used with respect to any Person, any other Person which (a) Controls, is Controlled by or is under common Control of such Person, (b) is the spouse, sibling (whether by whole or half-blood), ancestor or lineal descendant of such Person, or is a trust or estate the beneficial owner(s) of which is the spouse, sibling (whether by whole or half-blood), ancestor or lineal descendant of such Person, or (c) is a general partner, managing member or controlling shareholder of such Person.

"**Agreement**" means this Intercreditor Agreement, as the same may be amended, restated, or otherwise modified from time to time, pursuant to the terms hereof.

"**Anti-Corruption Laws**" shall mean any and all present and future laws, statutes, regulations, orders, decrees, ordinances or rules of any jurisdiction concerning or relating to

INTERCREDITOR AGREEMENT – Page 2

bribery or corruption, including, without limitation, (i) the U.S. Foreign Corrupt Practices Act of 1977 and (ii) the U.K. Bribery Act 2010.

"**Anti-Terrorism and Anti-Money Laundering Laws**" shall mean any and all present and future laws, statutes, regulations, orders, decrees, ordinances or rules related to engaging in, financing, or facilitating terrorism or money laundering, including, without limitation, (i) The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act", 31 U.S.C. §§5311-5330 and 12 U.S.C. §§1818(s), 1820(b) and 1951-1959), as amended, (ii) the Money Laundering Control Act of 1986, as amended, (iii) the USA PATRIOT Act, (iv) the Trading with the Enemy Act (50 U.S.C.A. App. 1 et seq.), as amended, (v) the International Emergency Economic Powers Act (50 U.S.C.A. § 1701-06), and (vi) Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, relating to "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism", as amended.

"**Award**" has the meaning provided in Section 8(f) hereof.

"**Bankruptcy Code**" has the meaning provided in the definition of "Insolvency Law".

"**Borrower**" has the meaning provided in the Recitals hereto.

"**Borrower Group**" has the meaning provided in Section 9(c) hereof.

"**Collateral Proceeds**" has the meaning provided in Section 8(c) hereof.

"**Common Guarantor**" means the Senior Guarantor to the extent it is also a guarantor, indemnitor, pledgor or other obligor pursuant to the Mezzanine Loan Documents.

"**Continuing Senior Loan Event of Default**" means an Event of Default under the Senior Loan for which (i) Senior Lender has provided notice of such Event of Default to Mezzanine Lender in accordance with Section 10(a) of this Agreement and (ii) the cure period provided to Mezzanine Lender in Section 10(b) or (c) of this Agreement, as applicable, has expired without a cure having occurred or without such Event of Default having been waived in writing by Senior Lender.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or activities of a Person, whether through the ownership of voting securities or other beneficial interests, by contract or otherwise.  The terms "**Controlled by**", "**Controlling**" and "**under common Control with**" shall have correlative meanings.

"**Control Affiliate**" means, with respect to any Person, any other Person who directly or indirectly through one or more intermediary entities Controls, is Controlled by, or is under common Control with, such Person.  The terms "**Controlled Affiliate**" and "**Controlling Affiliate**" shall have correlative meanings.

"**Directing Mezzanine Lender**" has the meaning provided in Section 4(c) hereof.

"**Directing Senior Lender**" has the meaning provided in Section 4(e) hereof.

"**Enforcement Action**" means any (i) judicial or non-judicial foreclosure proceeding, the exercise of any power of sale, the acceptance of a deed or assignment-in-lieu of foreclosure, the appointment of a receiver, or otherwise taking possession or control of the Premises, (ii) acceleration of, or demand or action taken in order to collect, all or any portion of the indebtedness secured by the Premises or (iii) exercise of any right or remedy available to Senior Lender under the Senior Loan Documents, at law, in equity or otherwise, with respect to Borrower and/or the Premises; provided, however, "Enforcement Action" shall specifically exclude, without limitation, (A) requests and demands made by Senior Lender by delivery of notices to Borrower to require compliance with the Senior Loan Documents, including, without limitation, giving notices of Default or of an Event of Default and notices as to unpaid amounts under the Senior Loan, (B) accrual and imposition of default interest and late charges, (C) the filing of claims in any Insolvency Proceeding concerning Borrower, (D) the making of Protective Advances by Senior Lender or the exercise by Senior Lender of any rights of offset or the like, (E) imposing cash traps pursuant to the terms and conditions of the Senior Loan Documents, (F) to the extent Senior Lender received cash collateral or a letter of credit in connection with the satisfaction of any extension condition for the Senior Loan, applying such cash collateral, or drawing on such letter of credit, and applying such amounts to repay the Senior Loan, (G) exercising any power of attorney granted to Senior Lender pursuant to the Senior Loan Documents to mitigate any Event of Default under the Senior Loan Documents, and (H) the existence or exercise by Senior Lender of rights under the Senior Loan Documents to approve or disapprove certain actions by Borrower which specifically require the approval of Senior Lender pursuant to the Senior Loan Documents.

"**Equity Collateral**" means the equity interests of Mezzanine Borrower in Borrower pledged pursuant to the Pledge Agreement.

"**Equity Collateral Enforcement Action**" means any action or proceeding or other exercise of Mezzanine Lender's rights and remedies commenced by Mezzanine Lender, at law, in equity, or otherwise, in order to realize upon the Equity Collateral, including, without limitation, an assignment-in-lieu of foreclosure or other negotiated settlement in lieu of any such enforcement action; provided, however, "Equity Collateral Enforcement Action" shall specifically exclude, without limitation, (a) requests and demands made by Mezzanine Lender by delivery of notices to Mezzanine Borrower to require compliance with the Mezzanine Loan Documents, including, without limitation, giving notices of Default or of an Event of Default (each as defined in the Mezzanine Loan Agreement) and notices as to unpaid Mezzanine Loan amounts, (b) accrual and imposition of default interest and late charges, (c) the filing of claims in any Insolvency Proceeding concerning Mezzanine Borrower, (d) the making of Protective Advances by Mezzanine Lender or the exercise by Mezzanine Lender of any rights of offset or the like, (e) imposing cash traps pursuant to the terms and conditions of the Mezzanine Loan Documents, (f) applying amounts on reserve in any matter permitted after the occurrence of an Event of Default (as defined in the Mezzanine Loan Agreement) in accordance with the Mezzanine Loan Documents, (g) exercising any power of attorney granted to Mezzanine Lender pursuant to the Mezzanine Loan Documents to prevent, cure or mitigate any Default or Event of Default (each as defined in the Mezzanine Loan Agreement) under the Mezzanine Loan Documents, and (h) the existence or exercise by Mezzanine Lender of rights under the Mezzanine Loan Documents to approve or disapprove certain actions by Mezzanine Borrower which specifically require the approval of Mezzanine Lender pursuant to the Mezzanine Loan Documents.

"**Equity Collateral Transferee**" has the meaning provided in <u>Section 5(a)(i)</u> hereof.

"**Event of Default**" as used herein means (i) with respect to the Senior Loan and the Senior Loan Documents, any Event of Default thereunder which has occurred and is continuing (i.e., has not been cured by Borrower or by Mezzanine Lender in accordance with the terms of this Agreement or waived by Senior Lender) and (ii) with respect to the Mezzanine Loan and the Mezzanine Loan Documents, any Event of Default (as defined in the Mezzanine Loan Agreement) thereunder which has occurred and is continuing (i.e., has not been cured by Mezzanine Borrower or waived by Mezzanine Lender).

"**Excluded Party**" means a Person who, in the last seven (7) years, (i) has filed, instituted or joined in lender liability or similar litigation against banks or other institutional lenders as a debtor, obligor or guarantor relative to real estate financing, (ii) has been the subject of an Insolvency Proceeding, (iii) is an existing or was a prior borrower of Senior Lender which is or was in material default on its loan obligations to Senior Lender which led Senior Lender to exercise rights and remedies, (iv) has ownership being such that it would cause a regulatory violation by Senior Lender (e.g., loan-to-one borrower requirements), or (v) is a Prohibited Person.

"**Funding Amount**" has the meaning provided in <u>Section 35</u> hereof.

"**Hotel Operator**" means any hotel operator that is properly engaged with respect to the Premises in accordance with the provisions of the Senior Loan Documents and the Mezzanine Loan Documents.

"**Insolvency Law**" shall mean Title 11 of the United States Code entitled "Bankruptcy", as the same has been or may be amended or superseded from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder (the "**Bankruptcy Code**"), or any other applicable domestic or foreign laws relating to liquidation, conservatorship, bankruptcy, receivership, insolvency, reorganization or any similar debtor relief rights affecting the rights, remedies, powers, privileges and benefits of creditors generally.

"**Insolvency Proceeding**" shall mean any case, proceeding or other action against any Person, whether voluntary or involuntary, under any Insolvency Law.

"**Loan Pledgee**" has the meaning provided in <u>Section 14</u> hereof.

"**Loan Purchase Price**" has the meaning provided in <u>Section 12(a)</u> hereof.

"**Mezzanine Borrower**" has the meaning provided in the <u>Recitals</u> hereto.

"**Mezzanine Guaranty**" means any guaranty, pledge or indemnity executed in connection with the Mezzanine Loan and which may constitute a Mezzanine Loan Document.

"**Mezzanine Lender**" has the meaning provided in the first paragraph of this Agreement.

"**Mezzanine Loan**" has the meaning provided in the <u>Recitals</u> hereto.

"**Mezzanine Loan Agreement**" has the meaning provided in the <u>Recitals</u> hereto.

"**Mezzanine Loan Documents**" means the Mezzanine Loan Agreement, the Mezzanine Note and the Pledge Agreement, together with the other documents and instruments set forth on Exhibit C hereto, as any of the foregoing may be modified, amended, extended, supplemented, restated or replaced from time to time, subject to the limitations and agreements contained in this Agreement.

"**Mezzanine Loan Modification**" has the meaning provided in Section 6(b) hereof.

"**Mezzanine Loan Realization Event**" means (i) the conveyance by foreclosure or assignment-in-lieu thereof of all of the direct limited liability company interests in Borrower pledged to Mezzanine Lender pursuant to the Mezzanine Loan Documents, (ii) the exercise by Mezzanine Lender of any voting rights or powers with respect to Borrower so as to direct or cause the direction of the management or policies of Borrower, or (iii) any sale or transfer of the Equity Collateral by reason of the exercise of remedies by Mezzanine Lender pursuant to the Mezzanine Loan Documents.

"**Mezzanine Note**" has the meaning provided in the Recitals hereto.

"**Monetary Cure Period**" has the meaning provided in Section 10(b) hereof.

"**Permitted Exceptions**" means (i) the encumbrances, charges, liens, easements, restrictions, security interests and other matters (if any) expressly listed as exceptions (i.e., not pre-printed or standard exceptions) to coverage in the Title Insurance Policy, (ii) the liens and security interests created by the Loan Documents, and (iii) liens, if any, for taxes not yet delinquent.

"**Person**" means any individual, sole proprietorship, corporation, general partnership, limited partnership, limited liability company or partnership, joint venture, association, joint stock company, bank, trust, estate unincorporated organization, any federal, state, county or municipal government (or any agency or political subdivision thereof) endowment fund or any other form of entity.

"**Pledge**" has the meaning provided in Section 14 hereof

"**Pledge Agreement**" has the meaning provided in the Recitals hereto.

"**Policies**" has the meaning provided in Section 8(g) hereof.

"**Premises**" has the meaning provided in the Recitals hereto.

"**Prescribed Laws**" shall mean, individually or collectively, as the context may require, Anti-Corruption Laws, Anti-Terrorism and Anti-Money Laundering Laws and/or Sanctions.

"**Prohibited Person**" means any Person:

(i)    listed in the annex to, or who is otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (the "**Executive Order**");

(ii)     that is owned or controlled by, or acting for or on behalf of, any person or entity that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii)     with whom a Person is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including the Executive Order;

(iv)     who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(v)     that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website or at any replacement website or other replacement official publication of such list; or

(vi)     who is an Affiliate of a Person listed in clauses (i) through (v) above.

"**Protective Advances**" means all funds paid or advanced to pay (i) real estate taxes (including special payments in lieu of real estate taxes), (ii) insurance premiums, (iii) capital expenditures, maintenance costs, operating expenses, ground rents or other carry costs (including, but not limited to, amounts payable under or in respect of any easement, restrictive covenant or other similar agreement), (iv) for the removal of any encumbrance, charge, lien, easement, restriction, security interest or other matter affecting the Premises (or any portion thereof) or the Separate Collateral (or any portion thereof) which is not a Permitted Exception (including, but not limited to, the payment, purchase, contest or compromise of any such encumbrance, charge, lien, easement, restriction, security interest or other matter) or (v) reasonable attorneys' fees and expenses incurred in connection with any of the foregoing, in each case, incurred in the ordinary course and reasonably necessary to preserve, protect, maintain or defend the Premises (or any portion thereof) or the Separate Collateral (or any portion thereof), respectively, or the lien (or priority of the lien) of the Senior Loan Documents or the Mezzanine Loan Documents, respectively, from any intervening lien, forfeiture, casualty, loss, waste, diminution or reduction in value.  For the avoidance of ambiguity, amounts expended by Mezzanine Lender pursuant to Section 10 hereof in connection with Mezzanine Lender's right to cure certain matters under the Senior Loan shall constitute a Protective Advance.

"**Purchase Option Election Notice**" has the meaning provided in Section 12(a) hereof.

"**Purchase Option Event**" has the meaning provided in Section 12(a) hereof.

"**Purchase Option Expiration Date**" has the meaning provided in Section 12(c) hereof.

"**Purchase Option Notice**" has the meaning provided in Section 12(a) hereof.

"**Qualified Operator**" means a reputable national or regional hotel operator that (i) operates, together with its affiliates, properties across the country which are similar in size, character, use, class, scope and value to the Premises (10 hotels and 1,500 keys being sufficient, but not a minimum requirement), (ii) has then current management capabilities, reputation and financial resources to operate the Premises, (iii) is not the Borrower or an Affiliate of the Borrower

or an Excluded Party or an Affiliate of an Excluded Party, and (iv) has been approved by the licensor or franchisor, to the extent required, under any hotel licensing or franchise agreement.

"**Qualified Transferee**" means (i) Mezzanine Lender, (ii) any Control Affiliate of Mezzanine Lender, (iii) Senior Lender, (iv) any Control Affiliate of Senior Lender, or (v) any Person approved by Senior Lender in writing, in Senior Lender's reasonable discretion; provided, however, under no circumstances shall an Excluded Party or an Affiliate of an Excluded Party be a Qualified Transferee.

"**Sanctions**" shall mean economic or financial sanctions or trade embargoes enacted, imposed, administered or enforced from time to time by (i) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, (ii) the United Nations Security Council, the European Union or any of its member states or His Majesty's Treasury of the United Kingdom, or (iii) any other relevant sanctions authority.

"**Senior Carveout Guaranty**" means that certain Guaranty of Recourse Obligations executed by Senior Guarantor in favor of Senior Lender as part of the Senior Loan Documents.

"**Senior Environmental Indemnity Agreement**" means that certain Environmental Indemnity Agreement executed by Borrower and Senior Guarantor in favor of Senior Lender as part of the Senior Loan Documents.

"**Senior Guarantor**" means any guarantor, indemnitor, pledgor or other obligor pursuant to any of the Senior Loan Documents.

"**Senior Guaranty**" means any guaranty, pledge or indemnity executed by a Senior Guarantor in connection with the Senior Loan and which may constitute a Senior Loan Document, including, without limitation, the Senior Carveout Guaranty and the Senior Environmental Indemnity Agreement.

"**Senior Lender**" has the meaning provided in the first paragraph of this Agreement.

"**Senior Loan**" has the meaning provided in the Recitals hereto.

"**Senior Loan Agreement**" has the meaning provided in the Recitals hereto.

"**Senior Loan Default Notice**" has the meaning provided in Section 10(a) hereof.

"**Senior Loan Documents**" means the Senior Loan Agreement, the Senior Note and the Senior Mortgage, together with the instruments and documents set forth on Exhibit B hereto, as any of the foregoing may be modified, amended, extended, supplemented, restated or replaced from time to time, subject to the limitations and agreements contained in this Agreement.

"**Senior Loan Liabilities**" means, collectively, all of the indebtedness, liabilities and obligations of Borrower evidenced by the Senior Loan Documents, including without limitation (i) the principal amount of, and accrued interest on (including, without limitation, any interest which accrues after the commencement of any Insolvency Proceeding of Borrower, whether or not

such interest would be allowed in such Insolvency Proceeding), the Senior Loan, (ii) all other indebtedness, obligations and liabilities of Borrower to Senior Lender now existing or hereafter incurred or created under the Senior Loan Documents and (iii) all amounts due or to become due pursuant to the Senior Loan Documents, including interest thereon and any other amounts payable in respect thereof or in connection therewith, including, without limitation, any late charges, default interest, "make-whole" or prepayment fees or premiums, exit fees, yield maintenance charges, advances, post-petition interest, and attorneys' fees and expenses.

"**Senior Loan Modification**" has the meaning provided in Section 6(a) hereof

"**Senior Mortgage**" has the meaning provided in the Recitals hereto.

"**Senior Note**" has the meaning provided in the Recitals hereto.

"**Separate Collateral**" means (i) the Equity Collateral, (ii) the accounts (and monies therein from time to time) established pursuant to the Mezzanine Loan Documents, (iii) the UCC lender's insurance policy and the mezzanine endorsement to the owner's policy of title insurance issued in connection with the Mezzanine Loan, and (iv) any other collateral given as security for the Mezzanine Loan pursuant to the Mezzanine Loan Documents that does not directly constitute security for the Senior Loan.

"**Supplemental Guarantor**" means (1) Civitas Capital Management, LLC; provided, that, Civitas Capital Management, LLC satisfies Senior Lender's then applicable KYC requirements at the time of becoming a Supplemental Guarantor hereunder, or (2) a Person that (i) has Control over Borrower (as constituted after giving effect to the Mezzanine Loan Realization Event), (ii) owns a direct or indirect interest in Borrower (as constituted after giving effect to the Mezzanine Loan Realization Event), (iii) satisfies Senior Lender's then applicable KYC requirements, (iv) has a net worth equal to no less than the then outstanding principal balance of the Senior Loan and liquidity equal to no less than ten percent (10%) of the then outstanding principal balance of the Senior Loan, (v) is not an Excluded Party or an Affiliate of an Excluded Party and (vi) if such Person is an investment fund, such investment fund has a remaining term, including any as-of-right extensions, that extends at least twelve (12) months beyond the fully extended maturity date of the Senior Loan.

"**Supplemental Guaranty**" means any guaranty, pledge or indemnity executed as a supplement to any Senior Guaranty in accordance with Section 5(a).

"**Transfer**" means any assignment, pledge, conveyance, sale, transfer, mortgage, encumbrance, grant of a security interest, issuance of a participation interest, or other disposition, either directly or indirectly, by contract, operation of law or otherwise.

"**USA PATRIOT Act**" shall mean The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001 (107 Public Law 56 (October 26, 2001)), as the same was restored and amended by Uniting and Strengthening America by Fulfilling Rights and Ensuring Effective Discipline Over Monitoring Act of 2015 (USA FREEDOM Act, 114 Public Law 23 (June 2, 2015)), as amended.

(b)     For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(i)     all capitalized terms defined in the Recitals to this Agreement shall have the meanings ascribed thereto whenever used in this Agreement and the terms defined in this Agreement have the meanings assigned to them in this Agreement, and the use of any gender herein shall be deemed to include the other gender;

(ii)     all capitalized terms not otherwise defined herein shall have the meaning assigned to them in the Senior Loan Agreement;

(iii)     all references in this Agreement to designated sections, subsections, paragraphs, articles, exhibits, schedules and other subdivisions or addenda without reference to a document are to the designated sections, subsections, paragraphs, articles, exhibits, schedules and other subdivisions and addenda to this Agreement, unless otherwise specified;

(iv)     a reference to a subsection without further reference to a section is a reference to such subsection as contained in the same section in which the reference appears, and this rule shall apply to paragraphs and other subdivisions;

(v)     the terms "includes" or "including" shall mean without limitation by reason of enumeration;

(vi)     the words "herein", "hereof", "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision;

(vii)     the words "to Mezzanine Lender's knowledge" or "to the knowledge of Mezzanine Lender" (or words of similar meaning) shall mean to the actual knowledge of officers of Mezzanine Lender with direct oversight responsibility for the Mezzanine Loan without independent investigation or inquiry and without any imputation whatsoever; and

(viii)     the words "to Senior Lender's knowledge" or "to the knowledge of Senior Lender" (or words of similar meaning) shall mean to the actual knowledge of officers of Senior Lender with direct oversight responsibility for the Senior Loan without independent investigation or inquiry and without any imputation whatsoever.

2.     **Approval of Loans and Loan Documents**.

(a)     Mezzanine Lender hereby acknowledges that (i) it has received and reviewed the Senior Loan Documents and, subject to the terms and conditions of this Agreement, hereby consents to and approves all of the terms and provisions of the Senior Loan Documents and the making of the Senior Loan, (ii) the execution, delivery and performance of the Senior Loan Documents will not constitute a default or an event which, with the giving of notice or the lapse of time, or both, would constitute a default under the Mezzanine Loan Documents, (iii) Senior Lender is under no obligation or duty to, nor has Senior Lender represented that it will, see to the application of the proceeds of the Senior Loan by Borrower or any other Person to whom Senior

Lender disburses such proceeds, and (iv) any application or use of the proceeds of the Senior Loan for purposes other than those provided in the Senior Loan Documents shall not affect, impair or defeat the terms and provisions of this Agreement or the Senior Loan Documents.

(b)    Senior Lender hereby acknowledges that (i) it has received and reviewed the Mezzanine Loan Documents and, subject to the terms and conditions of this Agreement, hereby consents to and approves all of the terms and provisions of the Mezzanine Loan Documents and the making of the Mezzanine Loan, (ii) the execution, delivery and performance of the Mezzanine Loan Documents will not constitute a default or an event which, with the giving of notice or the lapse of time, or both, would constitute a default under the Senior Loan Documents, (iii) Mezzanine Lender is under no obligation or duty to, nor has Mezzanine Lender represented that it will, see to the application of the proceeds of the Mezzanine Loan by Mezzanine Borrower or any other Person to whom Mezzanine Lender disburses such proceeds, and (iv) any application or use of the proceeds of the Mezzanine Loan for purposes other than those provided in the Mezzanine Loan Documents shall not affect, impair or defeat the terms and provisions of this Agreement or the Mezzanine Loan Documents. Senior Lender hereby further acknowledges and agrees that any conditions precedent to Senior Lender's consent to mezzanine financing as set forth in the Senior Loan Documents or any other agreements with Borrower, as they apply to the Mezzanine Loan Documents or the making of the Mezzanine Loan, have been either satisfied or waived.

(c)    Senior Lender hereby acknowledges that (i) Mezzanine Borrower does not and will not have any direct liability or obligation whatsoever in connection with the payment of the Senior Loan, (ii) the Senior Loan does not constitute or impose, and shall not be deemed or construed as constituting or imposing now or hereafter, a lien or encumbrance upon, or security interest in, any portion of the Separate Collateral, (iii) Senior Lender shall not assert, claim or raise as a defense in any action or proceeding, including any insolvency or bankruptcy proceeding commenced by or against Mezzanine Borrower, a lien, encumbrance or security interest in the Separate Collateral, (iv) Senior Lender shall not assert, pursue, confirm or acquiesce in any way to any recharacterization of the Senior Loan as having conferred upon Senior Lender any lien or encumbrance upon, or security interest in, the Separate Collateral or any portion thereof, and (v) on account of the Senior Loan, Senior Lender is not a creditor of Mezzanine Borrower and Senior Lender will not assert or claim at any time that Senior Lender is a creditor of Mezzanine Borrower.

3.    **Representations and Warranties**.

(a)    Mezzanine Lender hereby represents and warrants as follows:

(i)    Exhibit C attached hereto and made a part hereof is a true, correct and complete listing of all of the Mezzanine Loan Documents as of the date hereof. To Mezzanine Lender's knowledge, there currently exists no default or event which, with the giving of notice or the lapse of time, or both, would constitute a default under any of the Mezzanine Loan Documents.

(ii)    Mezzanine Lender is the legal and beneficial owner of the entire Mezzanine Loan free and clear of any lien, security interest, option or other charge or

encumbrance, other than any lien or security interest granted to any Loan Pledgee as contemplated by the provisions of <u>Section 14</u> hereof.

(iii)    There are no conditions precedent to the effectiveness of this Agreement that have not been satisfied or waived.

(iv)    Mezzanine Lender has, independently and without reliance upon Senior Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.

(v)    Mezzanine Lender is duly organized and is validly existing under the laws of the jurisdiction under which it was organized with full power to execute, deliver, and perform this Agreement and consummate the transactions contemplated hereby.

(vi)    All actions necessary to authorize the execution, delivery, and performance of this Agreement on behalf of Mezzanine Lender have been duly taken, and all such actions continue in full force and effect as of the date hereof.

(vii)    Mezzanine Lender has duly executed and delivered this Agreement and this Agreement constitutes the legal, valid, and binding agreement of Mezzanine Lender enforceable against Mezzanine Lender in accordance with its terms subject to (x) applicable bankruptcy, reorganization, insolvency and moratorium laws, and (y) general principles of equity which may apply regardless of whether a proceeding is brought at law or in equity.

(viii)    To Mezzanine Lender's knowledge, no consent of any other Person and no consent, license, approval, or authorization of, or exemption by, or registration or declaration or filing with, any governmental authority, bureau or agency is required in connection with the execution, delivery or performance by Mezzanine Lender of this Agreement or consummation by Mezzanine Lender of the transactions contemplated by this Agreement.

(ix)    None of the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated by this Agreement will (v) violate or conflict with any provision of the organizational or governing documents of Mezzanine Lender, (w) to Mezzanine Lender's knowledge, violate, conflict with, or result in the breach or termination of, or otherwise give any other Person the right to terminate, or constitute (or with the giving of notice or lapse of time, or both, would constitute) a default under the terms of any contract, mortgage, lease, bond, indenture, agreement, or other instrument to which Mezzanine Lender is a party or to which any of its properties are subject, (x) to Mezzanine Lender's knowledge, result in the creation of any lien, charge, encumbrance, mortgage, lease, claim, security interest, or other right or interest upon the properties or assets of Mezzanine Lender pursuant to the terms of any such contract, mortgage, lease, bond, indenture, agreement, franchise, or other instrument (<u>provided</u>, <u>however</u>, that Mezzanine Lender shall have the right to grant a lien, charge, encumbrance, claim or security interest in the Mezzanine Loan or any portion thereof to a Loan Pledgee as

INTERCREDITOR AGREEMENT – Page 12

contemplated by the provisions of <u>Section 14</u> hereof), (y) violate any judgment, order, injunction, decree, or award of any court, arbitrator, administrative agency or governmental or regulatory body of which Mezzanine Lender has knowledge against, or binding upon, Mezzanine Lender or upon any of the securities, properties, assets, or businesses of Mezzanine Lender or (z) to Mezzanine Lender's knowledge, constitute a violation by Mezzanine Lender of any statute, law or regulation that is applicable to Mezzanine Lender.

(x)     The Mezzanine Loan is not cross-defaulted with any loan other than the Senior Loan.  The Premises do not secure any loan from Mezzanine Lender to Mezzanine Borrower or any other Affiliate of Borrower.

(xi)     Mezzanine Lender and its Control Affiliates are currently in compliance with, and shall at all times during the term of this Agreement remain in compliance with, Prescribed Laws.

(xii)     The organizational chart attached hereto as <u>Exhibit D</u> and made a part hereof is a true and correct depiction of the ownership and organizational structure of Mezzanine Lender.

(b)     Senior Lender hereby represents and warrants as follows:

(i)     <u>Exhibit B</u> attached hereto and made a part hereof is a true, correct and complete listing of the Senior Loan Documents as of the date hereof.  To Senior Lender's knowledge, there currently exists no default or event which, with the giving of notice or the lapse of time, or both, would constitute a default under any of the Senior Loan Documents.

(ii)     Senior Lender is the legal and beneficial owner of the Senior Loan free and clear of any lien, security interest, option or other charge or encumbrance, subject to such participations with respect to the Senior Loan as Senior Lender may have undertaken (or hereafter undertake).

(iii)     There are no conditions precedent to the effectiveness of this Agreement that have not been satisfied or waived.

(iv)     Senior Lender has, independently and without reliance upon Mezzanine Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.

(v)     Senior Lender is duly organized and is validly existing under the laws of the jurisdiction under which it was organized with full power to execute, deliver, and perform this Agreement and consummate the transactions contemplated hereby.

(vi)     All actions necessary to authorize the execution, delivery, and performance of this Agreement on behalf of Senior Lender have been duly taken, and all such actions continue in full force and effect as of the date hereof.

(vii)     Senior Lender has duly executed and delivered this Agreement and this Agreement constitutes the legal, valid, and binding agreement of Senior Lender enforceable against Senior Lender in accordance with its terms subject to (x) applicable bankruptcy, reorganization, insolvency and moratorium laws and (y) general principles of equity which may apply regardless of whether a proceeding is brought at law or in equity.

(viii)     To Senior Lender's knowledge, no consent of any other Person and no consent, license, approval, or authorization of, or exemption by, or registration or declaration or filing with, any governmental authority, bureau or agency is required in connection with the execution, delivery or performance by Senior Lender of this Agreement or consummation by Senior Lender of the transactions contemplated by this Agreement.

(ix)     None of the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated by this Agreement will (v) violate or conflict with any provision of the organizational or governing documents of Senior Lender, (w) to Senior Lender's knowledge, violate, conflict with, or result in the breach or termination of, or otherwise give any other Person the right to terminate, or constitute (or with the giving of notice or lapse of time, or both, would constitute) a default under the terms of any contract, mortgage, lease, bond, indenture, agreement, or other instrument to which Senior Lender is a party or to which any of its properties are subject, (x) to Senior Lender's knowledge, result in the creation of any lien, charge, encumbrance, mortgage, lease, claim, security interest, or other right or interest upon the properties or assets of Senior Lender pursuant to the terms of any such contract, mortgage, lease, bond, indenture, agreement, franchise or other instrument, (y) violate any judgment, order, injunction, decree or award of any court, arbitrator, administrative agency or governmental or regulatory body of which Senior Lender has knowledge against, or binding upon, Senior Lender or upon any of the securities, properties, assets, or businesses of Senior Lender or (z) to Senior Lender's knowledge, constitute a violation by Senior Lender of any statute, law or regulation that is applicable to Senior Lender.

(x)     The Senior Loan is not cross-defaulted with any other loan. The Premises do not secure any other loan from Senior Lender to Borrower, Mezzanine Borrower or any other Affiliate of Borrower.

(xi)     Senior Lender is currently in compliance with and shall at all times during the term of this Agreement remain in compliance with Prescribed Laws.

**4.     Transfer of Mezzanine Loan or Senior Loan.**

(a)     Mezzanine Lender shall have the right to Transfer its legal or beneficial interest in the Mezzanine Loan to any Person; provided, that, (i) a controlling interest in the Mezzanine Loan (as determined when aggregated with all prior Transfers) is not so transferred, and (ii) such Person is not an Excluded Party.  In all cases, Mezzanine Lender and the applicable transferee must comply with the terms and conditions set forth below in this Section 4 and the applicable transferee must satisfy Senior Lender's then applicable KYC requirements at the time of such Transfer.  Any such transferee (other than a participant or Loan Pledgee (prior to its

realization on the pledged Mezzanine Loan), both of which shall take subject to this Agreement) must assume in writing the obligations of Mezzanine Lender hereunder and agree to be bound by the terms and provisions hereof.  Any such transferee (other than a participant or Loan Pledgee (prior to its realization on the pledged Mezzanine Loan), both of which shall take subject to this Agreement) shall also remake each of the representations and warranties contained herein made by Mezzanine Lender for the benefit of Senior Lender; provided, that, such transferee shall describe any changes therein.  Notwithstanding anything contained herein to the contrary, neither Mezzanine Lender nor any Loan Pledgee may Transfer all or any portion of its legal or beneficial interest in the Mezzanine Loan to Borrower, Mezzanine Borrower or any Affiliate of Borrower or Mezzanine Borrower and any Transfer of any interest in the Mezzanine Loan to Borrower, Mezzanine Borrower or an Affiliate of Borrower or Mezzanine Borrower shall be void ab initio unless such transfer results in the substantially contemporaneous extinguishment of such Mezzanine Loan.

(b)      At least five (5) Business Days prior to a Transfer, Mezzanine Lender shall provide to Senior Lender a notice which includes the name and contact information of the transferee, organizational information sufficient for Senior Lender to verify that such transferee is not an Excluded Party and to complete Senior Lender's then applicable KYC requirements with respect to such transferee.

(c)      If more than one Person shall hold a direct interest in the Mezzanine Loan, the holder(s) of more than fifty percent (50%) of the principal amount of the Mezzanine Loan (unless the applicable participation agreement or co-lender agreement among the holders of the Mezzanine Loan provide a different designation mechanism, which different mechanism shall be specified in such notice and upon which Senior Lender shall be entitled to rely upon without independent investigation) shall designate by written notice to Senior Lender one of such Persons (or a servicer on their behalf) (the "**Directing Mezzanine Lender**") to act on behalf of all such Persons holding an interest in the Mezzanine Loan.  The Directing Mezzanine Lender shall have the sole right to receive any notices which are required to be given or which may be given to Mezzanine Lender pursuant to this Agreement and to exercise the rights and power given to Mezzanine Lender hereunder, including any approval rights of Mezzanine Lender; provided, that, until the Directing Mezzanine Lender has been so designated, the last Person known to Senior Lender to hold more than a fifty percent (50%) direct interest in the Mezzanine Loan shall be deemed to be the Directing Mezzanine Lender.  Once the Directing Mezzanine Lender has been designated hereunder, Senior Lender shall be entitled to rely on such designation until it has received written notice from the holder(s) of more than fifty percent (50%) of the principal amount of the Mezzanine Loan (unless the applicable participation or co-lender agreement among the holders of the Mezzanine Loan provide a different designation mechanism, which different mechanism shall be specified in such notice and upon which Senior Lender shall be entitled to rely upon without independent investigation) of the designation of a different Person to act as the Directing Mezzanine Lender.  Notwithstanding any provision of this Section 4(c) to the contrary, each Person holding an interest in a Mezzanine Loan shall be deemed to be a Mezzanine Lender with respect to the Mezzanine Loan for purposes of the rights and restrictions contained in Sections 4(a) and (b), and shall be subject to the rights and restrictions thereof with respect to such Person's interest in the Mezzanine Loan.

(d)      Senior Lender may, from time to time, in its sole discretion, Transfer all or any of the Senior Loan or any interest therein to any Person other than a Prohibited Person, and notwithstanding any such Transfer or subsequent Transfer, the Senior Loan and the Senior Loan Documents shall be and remain a senior obligation in the respects set forth in this Agreement to the Mezzanine Loan and the Mezzanine Loan Documents in accordance with the terms and provisions of this Agreement.  Senior Lender shall give Mezzanine Lender prompt written notice of any Transfer of the Senior Loan (including, without limitation, the name and address of any such transferee) after the date hereof.

(e)      If more than one Person shall hold a direct interest in the Senior Loan, the holder(s) of more than fifty percent (50%) of the principal amount of the Senior Loan (unless the applicable participation agreement or co-lender agreement among the holders of the Senior Loan provide a different designation mechanism, which different mechanism shall be specified in such notice and upon which Mezzanine Lender shall be entitled to rely upon without independent investigation) shall designate by written notice to Mezzanine Lender one of such Persons (or a servicer on their behalf) (a "**Directing Senior Lender**") to act on behalf of all such Persons holding an interest in the Senior Loan.  **KHRE SMA FUNDING, LLC**, a Delaware limited liability company, shall be the initial Directing Senior Lender hereunder.  The Directing Senior Lender shall have the sole right to receive any notices which are required to be given or which may be given to Senior Lender pursuant to this Agreement and to exercise the rights and power given to Senior Lender hereunder, including any approval rights of Senior Lender; provided, that, until a Directing Senior Lender has been so designated, the last Person known to Mezzanine Lender to hold more than a fifty percent (50%) direct interest in the Senior Loan shall be deemed to be the Directing Senior Lender.  Once a Directing Senior Lender has been designated hereunder with respect to the Senior Loan, Mezzanine Lender shall be entitled to rely on such designation until it has received written notice from the holder(s) of more than fifty percent (50%) of the principal amount of the Senior Loan (unless the applicable participation or co-lender agreement among the holders of the Senior Loan provide a different designation mechanism, which different mechanism shall be specified in such notice and upon which Mezzanine Lender shall be entitled to rely upon without independent investigation) of the designation of a different Person to act as the Directing Senior Lender for the Senior Loan.  Notwithstanding any provision of this Section 4(e) to the contrary, each Person holding an interest in the Senior Loan shall be deemed to be a Senior Lender for purposes of the rights and restrictions contained in Section 4(d), and shall be subject to the rights and restrictions thereof with respect to such Person's interest in the Senior Loan.

5.      **Foreclosure of Separate Collateral.**

(a)      Mezzanine Lender (or its designee or nominee) shall not consummate a Mezzanine Loan Realization Event, unless all of the following conditions have been satisfied, as reasonably determined by Senior Lender:

(i)      the transferee of title to the Equity Collateral is a Qualified Transferee ("**Equity Collateral Transferee**"); provided, that, the requirement under this clause (i) shall be deemed satisfied if the direct or indirect owner of the transferee is a Qualified Transferee in accordance with the definition thereof;

(ii)    a Qualified Operator shall have been engaged (or will be engaged within fifteen (15) Business Days, provided there is no interruption in the management of the Premises by a hotel operator or receiver, as applicable) pursuant to a hotel operating agreement, which agreement shall be subject to a subordination in favor of Senior Lender (which hotel operating management agreement and subordination thereof shall be in form and substance reasonably acceptable to Senior Lender);

(iii)    unless already expressly provided pursuant to a comfort letter issued to Mezzanine Lender by the applicable hotel licensor or franchisor, Mezzanine Lender shall have received all necessary approvals of any applicable hotel licensor or franchisor as may be required pursuant to any applicable hotel licensing or franchising agreement;

(iv)    if already in place prior to the occurrence of a Mezzanine Loan Realization Event, a cash management system and maintenance of adequate reserves for taxes, insurance, debt service, ground rents, capital expenditures, tenant improvement expenses, leasing commissions and operating expenses will continue under the Senior Loan after the consummation of such Mezzanine Loan Realization Event;

(v)    all monetary defaults under the Senior Loan Documents shall have been cured, except for the monetary default by reason of acceleration of the Senior Loan following the occurrence of an Event of Default under the Senior Loan;

(vi)    all non-monetary defaults under the Senior Loan Documents shall have been cured, except those non-monetary defaults which (A) are not susceptible of being cured by Equity Collateral Transferee, or (B) are susceptible of being cured by Equity Collateral Transferee, but only after Equity Collateral Transferee has consummated a Mezzanine Loan Realization Event and has a reasonable period of time thereafter to effectuate such cure;

(vii)    Equity Collateral Transferee shall have complied with Senior Lender's then-current KYC requirements;

(viii)    Equity Collateral Transferee shall have caused Borrower to execute and deliver to Senior Lender a reaffirmation agreement in form and substance reasonably acceptable to Senior Lender, which agreement shall reaffirm all of the terms, conditions and provisions of the Senior Loan Documents and all of Borrower's obligations thereunder;

(ix)    regardless of whether or not the occurrence of a Mezzanine Loan Realization Event results in the release of liability of any Senior Guarantor for any acts, events or circumstances first occurring or arising after such Transfer, Supplemental Guarantor shall (A) have executed and delivered to Senior Lender a Supplemental Guaranty with respect to each Senior Guaranty executed and delivered by Senior Guarantor and in a form substantially similar to such Senior Guaranty (with modifications reasonably requested by Senior Lender to account for practice and legal developments occurring subsequent to the date thereof), which Supplemental Guaranty shall automatically become effective simultaneously with the consummation of the Mezzanine Loan Realization Event, and (B) delivered or caused to be delivered to Senior Lender an opinion of counsel in form

reasonably satisfactory to Senior Lender regarding the due organization and authorization of such Supplemental Guarantor and the enforceability of each Supplemental Guaranty, together with organizational documents, certificates and other documents with respect to such Supplemental Guarantor as reasonably requested by Senior Lender; and

(x)    an authorized person of Equity Collateral Transferee shall have executed and delivered an officer's certificate certifying to Senior Lender that all of the foregoing conditions set forth in this Section 5(a) have been satisfied, which certification shall (A) attach a true, correct and complete organizational chart depicting the ownership and Control of the Equity Collateral Transferee and any Supplemental Guarantor, and (B) attach such organizational documents as required by Senior Lender.

Upon the consummation of a Mezzanine Loan Realization Event in accordance with this Section 5(a), the Senior Loan and the Senior Loan Documents shall remain in full force and effect.  The consummation of a Mezzanine Loan Realization Event that does not comply with all requirements of this Section 5(a) shall be void *ab initio*.

(b)    Mezzanine Lender shall (i) prior to commencing any Equity Collateral Enforcement Action, give Senior Lender written notice of the default which would permit Mezzanine Lender to commence such Equity Collateral Enforcement Action and (ii) provide Senior Lender with copies of any and all material notices, pleadings, agreements, motions and briefs served upon, delivered to or with any party to any Equity Collateral Enforcement Action and otherwise keep Senior Lender reasonably apprised as to the status of any Equity Collateral Enforcement Action.  Except as provided in Section 8, nothing contained herein shall limit or restrict the right of Mezzanine Lender to exercise its rights and remedies, at law, in equity, or otherwise, in order to realize on any Separate Collateral.

(c)    Following the consummation of a Mezzanine Loan Realization Event, the Equity Collateral Transferee shall cause Borrower to cure all non-monetary defaults under the Senior Loan which remain uncured as of the date of the Mezzanine Loan Realization Event and which are susceptible of being cured but were not susceptible of being cured without first obtaining title to the Equity Collateral; provided, that, Equity Collateral Transferee shall only have such right to cure such non-monetary defaults if (A) Equity Collateral Transferee promptly proceeds to commence to cure and thereafter continuously and diligently pursues the cure of such non-monetary defaults, and (B) Borrower is not a debtor in an Insolvency Proceeding.  Notwithstanding the foregoing, Equity Collateral Transferee shall have no obligation to cure any non-monetary default under the Senior Loan which remains uncured as of the date of the consummation of the Mezzanine Loan Realization Event which is not susceptible of being cured by Equity Collateral Transferee due to the fact that such non-monetary default is personal in nature to Borrower or its Affiliates (e.g., failure to provide timely financial statements).

(d)    In the event that a Mezzanine Loan Realization Event occurs in accordance with the provisions and conditions of this Agreement, Senior Lender hereby acknowledges and agrees that (i) such Mezzanine Loan Realization Event shall not constitute a breach or default under the Senior Loan Documents, (ii) Equity Collateral Transferee shall be admitted as a new member of each entity whose limited liability company interests constitute a part of such Equity Collateral, and (iii) any transfer, acquisition, assumption or similar fee in the Senior Loan

Agreement shall be waived with respect to such Mezzanine Loan Realization Event; provided, however, that all out-of-pocket fees, costs and expenses incurred by Senior Lender in connection with any such Mezzanine Loan Realization Event and the documentation and deliveries relating thereto shall be paid by Mezzanine Lender or Equity Collateral Transferee (including, without limitation, Senior Lender's costs and expenses as described in Section 30(a)).

(e)      Notwithstanding anything to the contrary in this Section 5, in the event Borrower fails to repay the Senior Loan in full on the maturity date thereof (including a maturity by reason of acceleration due to a bankruptcy of Borrower), Mezzanine Lender shall not have the right to complete any Equity Collateral Enforcement Action; provided, however, Mezzanine Lender shall have the right to purchase the Senior Loan pursuant to the terms, and subject to the conditions, provided in Section 12.

**6.      Modifications, Amendments, Etc.**

(a)      Senior Lender shall have the right without the consent of Mezzanine Lender in each instance to enter into any amendment, deferral, extension, modification, increase, renewal, replacement, consolidation, supplement or waiver of the Senior Loan or the Senior Loan Documents (individually and collectively, a "**Senior Loan Modification**"); provided, that, no such Senior Loan Modification shall (i) increase the interest rate of the Senior Loan (except to the extent such increase in the interest rate is contemplated under the Senior Loan Documents (including default interest)), (ii) increase the maximum principal amount of the Senior Loan (other than increases to the maximum principal amount of the Senior Loan due to Protective Advances or interest accruals or accretions and any compounding thereof (including default interest) under the Senior Loan), (iii) increase in any other material respect any monetary obligations of Borrower under the Senior Loan Documents (other than increases to the maximum principal amount of the Senior Loan due to Protective Advances or interest accruals or accretions and any compounding thereof (including default interest) under the Senior Loan), (iv) extend or shorten the scheduled maturity date of the Senior Loan (except that Senior Lender may permit Borrower to exercise any extension options in accordance with the terms and provisions of the Senior Loan Documents), (v) convert or exchange the Senior Loan into or for any other indebtedness or subordinate any of the Senior Loan to any indebtedness of Borrower, (vi) amend or modify or waive the provisions limiting transfers or encumbrances of direct and indirect interests in Borrower or the Premises, (vii) modify or amend the terms and provisions of the Senior Loan Documents with respect to the manner, timing and method of the application of payments under the Senior Loan Documents, (viii) cross default the Senior Loan with any other indebtedness or otherwise modify the definition of "Event of Default" in the Senior Loan Agreement, (ix) obtain any contingent interest, additional interest or so-called "kicker" measured on the basis of the cash flow or appreciation of the Premises, (or other similar equity participation), (x) extend the period during which voluntary prepayments are prohibited or during which prepayments require the payment of a "make-whole" or prepayment fee or premium or yield maintenance charge or increase the amount of any such "make-whole" or prepayment fee, premium or yield maintenance charge, (xi) impose any more onerous financial covenants on Borrower or any Guarantor under the Senior Loan Guaranties, (xii) impose any new or additional fees that would be required to be paid on a regular or periodic basis not provided for in the Senior Loan Documents as of the date hereof, (xiii) amend, waive or modify the terms and provisions of any of the Senior Loan Documents relating to any cash management provisions or any reserve funds or impose any new reserve requirements, or

(xiv) modify, amend or waive any obligation or liability of any guarantor under the Senior Loan with respect to the Senior Loan debt being recourse to such guarantor pursuant to and in accordance with the related Senior Loan Guaranty (other than following the replacement of any Guarantor pursuant to the Senior Loan Agreement); provided, however, in no event shall Senior Lender be obligated to obtain Mezzanine Lender's consent to a Senior Loan Modification during the existence of a Continuing Senior Loan Event of Default, except that under no circumstance shall a Senior Loan Modification be made as described in clauses (i), (ii), (iii), (ix) or (x) without the written consent of Mezzanine Lender.   Notwithstanding the foregoing, Senior Lender shall not be obligated to obtain Mezzanine Lender's consent to a Senior Loan Modification set forth in any proposed plan of reorganization including Borrower in connection with an Insolvency Proceeding, including, without limitation, in respect of any such plan proposed or voted for by Senior Lender or in respect of any agreements or documents contemplated by any such plan.   Notwithstanding any provision of the Mezzanine Loan Documents to the contrary, Mezzanine Lender agrees (A) that no Senior Loan Modification permitted hereunder shall give rise to a default (or otherwise cause liability to arise) under the Mezzanine Loan Documents, and Mezzanine Lender shall not notice or otherwise declare a default under the Mezzanine Loan Documents (or exercise or attempt to exercise any rights or remedies against Mezzanine Borrower or Guarantor) on the basis of any such permitted Senior Loan Modification and (B) to provide Mezzanine Borrower with all consents required pursuant to the Mezzanine Loan Agreement to the extent such consents are necessary to effectuate a Senior Loan Modification which is permitted pursuant to this Section 6(a).

(b)     Mezzanine Lender shall have the right without the consent of Senior Lender in each instance to enter into any amendment, deferral, extension, modification, increase, renewal, replacement, consolidation, supplement or waiver of the Mezzanine Loan or the Mezzanine Loan Documents (individually and collectively, a "**Mezzanine Loan Modification**"); provided, that, no such Mezzanine Loan Modification shall (i) increase the interest rate of the Mezzanine Loan (except to the extent such increase in the interest rate is expressly contemplated under the Mezzanine Loan Documents), (ii) increase the maximum principal amount of the Mezzanine Loan (other than increases to the maximum principal amount of the Mezzanine Loan due to Protective Advances or interest accruals or accretions and any compounding thereof (including default interest) under the Mezzanine Loan), (iii) increase in any other material respect any monetary obligations of Mezzanine Borrower under the Mezzanine Loan Documents, (iv) extend or shorten the scheduled maturity date of the Mezzanine Loan (except that Mezzanine Lender may permit Mezzanine Borrower to exercise any extension options in accordance with the terms and provisions of the Mezzanine Loan Documents), (v) convert or exchange the Mezzanine Loan into or for any other indebtedness or subordinate any of the Mezzanine Loan to any indebtedness of Mezzanine Borrower, (vi) modify or amend the terms and provisions of the Mezzanine Loan Documents with respect to the manner, timing and method of the application of payments under the Mezzanine Loan Documents, (vii) provide for any additional contingent interest, additional interest or so-called "kicker" measured on the basis of the cash flow or appreciation of the Premises, (viii) cross default the Mezzanine Loan with any other indebtedness, or (ix) consent to a higher strike price with respect to any new or extended interest rate cap agreement entered into in connection with any extended term of the Mezzanine Loan; provided, however, Mezzanine Lender shall not be obligated to obtain the consent of Senior Lender to a Mezzanine Loan Modification during the existence of an Event of Default under the Mezzanine Loan Documents, except that under no circumstance shall a Mezzanine Loan Modification be made as described in

clause (i) (with respect to increases in principal amount only), clause (iii), clause (iv) (with respect to shortening the maturity only), clause (v) or clause (vii) without the written consent of Senior Lender.  Notwithstanding any provision of the Senior Loan Documents to the contrary, Senior Lender agrees (A) that no Mezzanine Loan Modification permitted hereunder shall give rise to a default (or otherwise cause liability to arise) under the Senior Loan Documents, and Senior Lender shall not notice or otherwise declare a default under the Senior Loan Documents (or exercise or attempt to exercise any rights or remedies against Borrower or any Senior Guarantor) on the basis of any such permitted Mezzanine Loan Modification, and (B) to provide Borrower with all consents required pursuant to the Senior Loan Agreement to the extent such consents are necessary to effectuate a Mezzanine Loan Modification which is permitted pursuant to this Section 6(b).

(c)     Senior Lender shall deliver to Mezzanine Lender copies of any and all modifications, amendments, extensions, consolidations, spreaders, restatements, alterations, changes or revisions to any one or more of the Senior Loan Documents (including, without limitation, any side letters, waivers or consents entered into, executed or delivered by Senior Lender) within a reasonable time after any of such applicable instruments have been executed by Senior Lender.

(d)     Mezzanine Lender shall deliver to Senior Lender copies of any and all modifications, amendments, extensions, consolidations, spreaders, restatements, alterations, changes or revisions to any one or more of the Mezzanine Loan Documents (including, without limitation, any side letters, waivers or consents entered into, executed or delivered by Mezzanine Lender) within a reasonable time after any of such applicable instruments have been executed by Mezzanine Lender.

7.     **Subordination of Mezzanine Loan and Mezzanine Loan Documents**.

(a)     Mezzanine Lender hereby subordinates and makes junior the Mezzanine Loan, the Mezzanine Loan Documents and the liens and security interests created thereby, and all rights, remedies, terms and covenants contained therein to (i) the Senior Loan, (ii) the liens and security interests created by the Senior Loan Documents and (iii) all of the terms, covenants, conditions, rights and remedies contained in the Senior Loan Documents.   No extensions, modifications, consolidations, supplements, amendments, replacements or restatements of and/or to the Senior Loan Documents or waivers of any provisions thereof shall affect the subordination of the Mezzanine Loan and the Mezzanine Loan Documents as set forth in this Section 7(a).  Mezzanine Lender hereby acknowledges and agrees that the Mezzanine Loan is not secured by a lien on the Premises or any of the other collateral securing the Senior Loan or any other assets of Borrower.

(b)     This Agreement shall not be construed as subordinating and shall not subordinate or impair Mezzanine Lender's first lien priority right, estate and interest in and to the Separate Collateral (except as provided in Section 8(d)) and Senior Lender hereby acknowledges and agrees that Senior Lender does not have and shall not hereafter acquire, any lien on, or any other interest whatsoever in, the Separate Collateral, or any part thereof (except as provided in Section 8(d)), and that the exercise of remedies and realization upon the Separate Collateral by Mezzanine Lender or a Loan Pledgee in accordance with the terms and provisions of this

Agreement shall not in and of itself constitute a default or an Event of Default under the Senior Loan Documents.

## 8.    **Payment Subordination.**

(a)    Except (i) as otherwise expressly provided in this Agreement or (ii) in connection with the exercise by Mezzanine Lender of its rights and remedies with respect to the Separate Collateral in accordance with the terms of this Agreement (except as provided in Section 8(d)), all of Mezzanine Lender's rights to payment of the Mezzanine Loan and the obligations evidenced by the Mezzanine Loan Documents are hereby subordinated to all of Senior Lender's rights to payment by Borrower of the Senior Loan and the obligations secured by the Senior Loan Documents, and Mezzanine Lender shall not accept or receive payments (including, without limitation, whether in cash or other property and whether received directly, indirectly or by set-off, counterclaim or otherwise) from Borrower, the Premises and/or other collateral securing the Senior Loan prior to the date that all Senior Loan Liabilities are fully, finally and indefeasibly paid. Nothing contained herein shall prohibit Mezzanine Lender from making Protective Advances (and adding the amount thereof to the principal balance of the Mezzanine Loan) notwithstanding the existence of a default under the Senior Loan at such time.

(b)    If an Insolvency Proceeding shall have occurred and not been dismissed or a Continuing Senior Loan Event of Default shall have occurred and be continuing, Senior Lender shall be entitled to receive payment and performance in full of all amounts due or to become due to Senior Lender under the Senior Loan Documents before Mezzanine Lender is entitled to receive any further payment on account of the Mezzanine Loan (other than (i) proceeds of a Mezzanine Loan Realization Event completed in accordance with this Agreement, and (ii) amounts recovered under the Mezzanine Guaranty subject to Section 8(d)). Provided that no Insolvency Proceeding shall have occurred and not been dismissed and no Continuing Senior Loan Event of Default shall have occurred and be continuing, Mezzanine Lender may accept payments of any amounts due and payable from time to time which Mezzanine Borrower is obligated to pay Mezzanine Lender in accordance with the terms and conditions of the Mezzanine Loan Documents and Mezzanine Lender shall have no obligation to pay over to Senior Lender any such amounts.

(c)    Notwithstanding anything to the contrary contained in this Agreement, including, without limitation, Sections 8(a) and (b), any Person (other than Borrower) may make payments from its own funds (and not revenue derived from the Premises, insurance, condemnation proceeds, reserve/escrow amounts or the other collateral for the Senior Loan (collectively, "**Collateral Proceeds**")) to cure a default or otherwise make any payments (including, without limitation, prepayments) under or in respect of the Mezzanine Loan and Mezzanine Lender may receive and retain any such payments notwithstanding the existence of any Default or Event of Default under the Senior Loan; provided, that, for purposes of clarification, such Person's own funds may include, and Collateral Proceeds shall not include, property-related revenue distributed or dividended by Borrower to its equity owners (including Mezzanine Borrower) from excess cash flow permitted under the terms of the Senior Loan Documents to be so distributed or dividended by Borrower to its equity owners, if such distribution or dividend is or was made when no Default or Event of Default under the Senior Loan Documents exists or

existed and is or was not made in violation of the applicable terms and conditions of the Senior Loan Documents. Any Collateral Proceeds which Mezzanine Lender knows were distributed in violation of the terms of the Senior Loan Documents and received by Mezzanine Lender shall be held in trust for the benefit of Senior Lender and shall be promptly paid over to Senior Lender in the same form as so received (with any necessary endorsement) to be applied (in the case of cash) to, or held as collateral (in the case of non-cash property or securities) for, the payment or performance of the Senior Loan in accordance with the terms of the Senior Loan Documents and this Agreement.

(d)    Senior Lender acknowledges and agrees that the Senior Guaranty and Mezzanine Guaranty are not the same as each other, and that the Mezzanine Guaranty includes recourse events which are not recourse events under the Senior Guaranty.  Senior Lender and Mezzanine Lender hereby acknowledge and agree that any right of payment or other claim of Mezzanine Lender against any Common Guarantor shall be subordinate in all respects to any right of payment or claim of Senior Lender against such Common Guarantor, but only insofar as the right of payment or other claim of Mezzanine Lender against the Common Guarantor and the right of payment or claim of Senior Lender against the Common Guarantor relate to (i) the same Common Guarantor, (ii) the same (or substantially similar) recourse event in the Mezzanine Loan Documents and the Senior Loan Documents, and (iii) the same conduct, action or omission (the "**Overlapping Claim Conditions**").    Notwithstanding the foregoing limited subordination, Mezzanine Lender may pursue a claim or commence an action or proceeding against a Common Guarantor pursuant to the Mezzanine Loan Documents or otherwise seek to collect any amounts or otherwise assert or enforce any rights or remedies against such Common Guarantor in connection with the Mezzanine Loan; provided, that, (i) during any period when an outstanding claim has been made by Senior Lender against Senior Guarantor in connection with the Senior Loan which claim has not been fully satisfied, or if Senior Lender asserts a claim against a Senior Guarantor in connection with the Senior Loan following the commencement by Mezzanine Lender of any such action or proceeding, then Senior Lender may at any time notify Mezzanine Lender in writing that Senior Lender has asserted a claim meeting the Overlapping Claim Conditions, and if requested by Senior Lender in such notice, Mezzanine Lender shall immediately cease and desist its action or proceeding (to the extent such action or proceeding meets the Overlapping Claim Conditions) against the same Common Guarantor until such time as the claim by Senior Lender meeting the Overlapping Claim Conditions has been fully satisfied, (ii) Mezzanine Lender shall provide Senior Lender with copies of all court filings (including, without limitation, pleadings, motions, briefs and judgments) and notices with respect to any such pending claims, and (iii) Mezzanine Lender shall immediately pay over to Senior Lender all amounts recovered by Mezzanine Lender with respect to any claim meeting the Overlapping Claim Conditions for application by Senior Lender to either the Senior Loan Liabilities in such order and priority as Senior Lender may elect or to be held by Senior Lender as additional collateral for the Senior Loan; provided, that, at such time as the Senior Loan Liabilities have been indefeasibly repaid in full, all amounts held by Senior Lender as additional collateral for the Senior Loan shall be promptly delivered by Senior Lender to Mezzanine Lender.  Notwithstanding anything to the contrary set forth in this Section 8(d), at such time as the Senior Loan Liabilities have been indefeasibly repaid in full, all amounts recovered by Mezzanine Lender and held by Senior Lender as additional collateral for the Senior Loan shall be promptly delivered by Senior Lender to Mezzanine Lender.  Any determination hereunder as to whether the Overlapping Claim Conditions have been satisfied shall be made by Senior Lender in its commercially reasonable discretion.

(e)    All payments or distributions upon or with respect to the Mezzanine Loan which are received by Mezzanine Lender contrary to the provisions of this Agreement shall be received and held in trust by Mezzanine Lender for the benefit of Senior Lender and shall be paid over to Senior Lender in the same form as so received (with any necessary endorsement) to be applied (in the case of cash) to, or held as collateral (in the case of non-cash property or securities) for, the payment or performance of the Senior Loan in accordance with the terms of the Senior Loan Documents and this Agreement.

(f)    In the event of a casualty to the buildings or improvements constructed on any portion of the Premises or a condemnation or taking under a power of eminent domain of all or any portion of the Premises, Senior Lender shall have a first and prior interest in and to any payments, awards, proceeds, distributions, or consideration arising from any such event (individually and collectively, the "**Award**").  If the amount of the Award is in excess of all amounts owed to Senior Lender under the Senior Loan Documents, however, and either the Senior Loan has been fully, finally and indefeasibly paid or Borrower is entitled to a remittance or retention of same under the Senior Loan Documents other than to restore the Premises, such excess Award or portion to be so remitted to or retained by Borrower shall, to the extent permitted in the Senior Loan Documents and required by the Mezzanine Loan Documents, be paid to or at the direction of Mezzanine Lender, unless other Persons have claimed the right to such Awards, in which case Senior Lender shall only be required to provide notice to Mezzanine Lender of such excess Award and of any other claims thereto.  In the event of any competing claims for all or any portion of such excess Award, Senior Lender shall continue to hold such excess Award (or such portion thereof) until Senior Lender receives an agreement signed by all Persons making a claim to the excess Award (or such portion thereof) or a final, non-appealable order of a court of competent jurisdiction directing Senior Lender as to how such excess Award (or such portion thereof) is to be distributed. Notwithstanding the foregoing, in the event of a casualty or condemnation, Senior Lender shall release the Award from any such event to Borrower if and to the extent required by the terms and conditions of the Senior Loan Documents in order to repair and restore the Premises or any portion thereof in accordance with the terms and provisions of the Senior Loan Documents.  Any portion of the Award made available to Borrower for the repair or restoration of the Premises or any portion thereof shall not be subject to attachment by Mezzanine Lender.

(g)    With respect to any insurance policies (collectively, the "**Policies**") for the Premises for which either Mezzanine Lender and/or its Affiliate are identified as "certificate holders," until such time as the Senior Loan has been paid in full, Mezzanine Lender acknowledges and agrees that neither Mezzanine Lender nor any such Affiliate shall have any right whatsoever to (i) participate in any negotiations or discussions concerning the settlement or adjustment of any claims under the Policies, or to otherwise contest or challenge (in their capacity as named insureds) any such settlement or adjustment, (ii) consent to, or disapprove, any settlement or adjustment of any claim or any distribution of proceeds under the Policies or (iii) be issued checks, drafts or wires (jointly or otherwise) representing proceeds of the Policies.  If Mezzanine Lender and/or its Affiliate are issued checks, drafts or wires (jointly or otherwise) representing proceeds of the Policies, Mezzanine Lender and/or its Affiliate shall sign over all right to such proceeds to Senior Lender.  Subject to the foregoing, however, after the occurrence of a casualty event, Senior Lender shall, from time to time, at Mezzanine Lender's request advise Mezzanine Lender of the status of Senior Lender's negotiations with the issuers of the applicable policies relating to the settlement

and adjustment of claims; provided, that, under no circumstances shall Mezzanine Lender have any right to challenge Senior Lender's settlement, adjustment or other resolution of such claims. Nothing contained in this Section 8(g) is meant to limit any rights that Mezzanine Lender has under any Mezzanine Loan Documents to approve of or participate in any action taken by Mezzanine Borrower.

9.    **Rights of Subrogation; Bankruptcy.**

(a)    Each of Mezzanine Lender and Senior Lender hereby waives any requirement for marshaling of assets in connection with any foreclosure of any security interest or any other realization upon collateral in respect of the Senior Loan Documents or the Mezzanine Loan Documents, as applicable, or any exercise of any rights of set-off or otherwise. Each of Mezzanine Lender and Senior Lender assumes all responsibility for keeping itself informed as to the condition (financial or otherwise), business, assets and operations of Borrower and Mezzanine Borrower, the condition of the Premises and all other collateral and other circumstances and, except for notices expressly required by this Agreement, neither Senior Lender nor Mezzanine Lender shall have any duty whatsoever to obtain, advise or deliver information or documents to the other relative to such condition, business, assets and/or operations. Mezzanine Lender agrees that Senior Lender owes no fiduciary duty to Mezzanine Lender in connection with the administration of the Senior Loan and the Senior Loan Documents and Mezzanine Lender agrees not to assert any such claim. Senior Lender agrees that Mezzanine Lender owes no fiduciary duty to Senior Lender in connection with the administration of the Mezzanine Loan and the Mezzanine Loan Documents and Senior Lender agrees not to assert any such claim.

(b)    No payment or distribution to Senior Lender pursuant to the provisions of this Agreement (including without limitation under Section 8(d) hereof) and no Protective Advance by Mezzanine Lender shall entitle Mezzanine Lender to exercise any right of subrogation in respect thereof prior to the full, final and indefeasible payment of the Senior Loan Liabilities, and Mezzanine Lender agrees that, except with respect to the enforcement of its remedies under the Mezzanine Loan Documents permitted hereunder, prior to the full, final and indefeasible payment of the Senior Loan Liabilities it shall not acquire, by subrogation or otherwise, any lien, estate, right or other interest in any portion of the Premises or any other collateral now securing the Senior Loan or the proceeds therefrom that is or may be prior to, or of equal priority to, any of the Senior Loan Documents or the liens, rights, estates and interests created thereby.

(c)    Subject to Section 28 of this Agreement, the provisions of this Agreement shall be applicable both before and after the commencement, whether voluntary or involuntary, of any Insolvency Proceeding. Until such time as the Senior Loan has been indefeasibly repaid in full, Mezzanine Lender shall not, and shall not solicit any Person to, and shall not direct or cause Mezzanine Borrower to direct or cause either Borrower or any Person which Controls (directly or indirectly) Borrower (collectively, the "**Borrower Group**") to: (i) commence any Insolvency Proceeding; (ii) institute an Insolvency Proceeding to have Borrower or Mezzanine Borrower adjudicated bankrupt or insolvent; (iii) consent to, or acquiesce in, the institution of an Insolvency Proceeding against Borrower or Mezzanine Borrower; (iv) file a petition or consent to the filing of a petition seeking reorganization, arrangement, adjustment, winding-up, dissolution, composition, liquidation or other relief by or on behalf of Borrower or Mezzanine Borrower; (v) seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator,

custodian or any similar official for Borrower or Mezzanine Borrower, the Premises (or any portion thereof) or any other collateral securing the Senior Loan (or any portion thereof); (vi) make an assignment for the benefit of any creditor of Borrower or Mezzanine Borrower; (vii) seek to consolidate the Premises or any other assets of Borrower with the assets of Mezzanine Borrower or any member of Borrower Group in any Insolvency Proceeding; or (viii) take any action in furtherance of any of the foregoing.  The terms and provisions of this Section 9(c) apply to Mezzanine Lender solely in its capacity as a "mezzanine lender".  If Mezzanine Lender commences an Equity Collateral Enforcement Action, and pursuant to such Equity Collateral Enforcement Action, Mezzanine Lender takes title to the Equity Collateral, from and after the date title to such Equity Collateral is vested in Mezzanine Lender, Mezzanine Lender shall be bound by the terms and provisions of the respective organizational documents of Borrower regarding bankruptcy and all matters requiring the vote of the independent directors/managers/members of Borrower and not by the terms of this Section.

(d)     If Mezzanine Lender is deemed to be a creditor of Borrower or to hold a claim against Borrower in any Insolvency Proceeding (i) Mezzanine Lender hereby agrees that it shall not make any election, give any consent, commence any action or file any motion, claim, obligation, notice or application or take any other action in any Insolvency Proceeding by or against Borrower without the prior written consent of Senior Lender, except to the extent necessary to preserve or realize upon Mezzanine Lender's interest in any Separate Collateral; provided, however, that any such filing shall not be as a creditor of Borrower unless (and, if applicable, to the extent) necessary to permit such action or filing, (ii) Senior Lender may vote in any such Insolvency Proceeding any and all claims of Mezzanine Lender against Borrower, and Mezzanine Lender hereby appoints Senior Lender as its agent and attorney-in-fact, and grants to Senior Lender an irrevocable power of attorney coupled with an interest, and its proxy, for the purpose of exercising any and all rights and taking any and all actions available to Mezzanine Lender in connection with any claim by or against Borrower in any Insolvency Proceeding, including without limitation, the right to file and/or prosecute any claims, to vote to accept or reject a plan, to make any election under Section 1111(b) of the Bankruptcy Code; provided, however, that with respect to any proposed plan of reorganization including Borrower (including any consolidated entity that includes Borrower) in respect of which creditors are voting, Senior Lender may vote on behalf of Mezzanine Lender only if the proposed plan would result in Senior Lender's claims or interests being "impaired" (as such term is defined in the Bankruptcy Code) and (iii) Mezzanine Lender shall not challenge the validity or amount of any claim or the extent or priority of any lien(s) related thereto submitted in such Insolvency Proceeding by Senior Lender in good faith or any valuations of the Premises or other Senior Loan collateral submitted by Senior Lender in good faith, in such Insolvency Proceeding or take any other action in such Insolvency Proceeding, which is adverse to Senior Lender's enforcement of its claim or receipt of "adequate protection" (as that term is defined in the Bankruptcy Code).  The terms and provisions of this Section 9(d) apply to Mezzanine Lender solely in its capacity as a "mezzanine lender".

10.     **Rights of Cure.**

(a)     Prior to Senior Lender commencing any Enforcement Action under the Senior Loan Documents (other than pursuant to any automatic acceleration provided for in the Senior Loan Documents), Senior Lender shall provide written notice of the default which would permit Senior Lender to commence such Enforcement Action to Mezzanine Lender and any Loan

Pledgee entitled to notice thereof pursuant to Section 14, whether or not Senior Lender is obligated to give notice thereof to Borrower (each, a "**Senior Loan Default Notice**").  Except in connection with Borrower's failure to repay the Senior Loan in full on the maturity date thereof, including a maturity by reason of automatic acceleration provided for in the Senior Loan Documents (and for which no Senior Loan Default Notice shall be required), Senior Lender shall permit Mezzanine Lender an opportunity to cure such default in accordance with the provisions of this Section 10 and shall not commence an Enforcement Action (other than pursuant to any automatic acceleration provided for in the Senior Loan Documents) on account of such default unless such cure is not effectuated within the applicable cure periods provided for in this Section 10.  In the event Borrower fails to repay the Senior Loan in full on the maturity date thereof (including a maturity by reason of automatic acceleration provided for in the Senior Loan Documents), Mezzanine Lender shall have the right to purchase the Senior Loan pursuant to the terms, and subject to the conditions, provided in Section 12.  Prior to or concurrently with undertaking any curative action with respect to the Senior Loan, Mezzanine Lender shall provide Senior Lender with written notice thereof.1

        (b)     If the default is a monetary default relating to a liquidated sum of money (except a maturity default as set forth in clause (a) above), Mezzanine Lender shall have until twelve (12) Business Days after the later of (i) the giving by Senior Lender of the Senior Loan Default Notice and (ii) the expiration of the period of time under the Senior Loan Documents, if any, for Borrower to cure such monetary default (a "**Monetary Cure Period**") to cure such monetary default; provided, however, in the event it elects to cure any such monetary default, Mezzanine Lender shall reimburse Senior Lender for any interest charged by Senior Lender on any required advances for monthly payments of principal and/or interest on the Senior Loan and/or on any Protective Advances.  Mezzanine Lender shall not have the right to cure as hereinabove set forth with respect to monthly scheduled debt service payments on the Senior Loan for a period of more than twelve (12) months in the aggregate unless Mezzanine Lender has commenced and is continuing to diligently pursue its rights against the Equity Collateral.  Notwithstanding the foregoing, any Monetary Cure Period (and any additional cure period granted to Mezzanine Lender hereunder) shall automatically expire and terminate upon the initiation of any Proceeding.

        (c)     If the default is of a non-monetary nature, Mezzanine Lender shall have until the later of (i) fifteen (15) Business Days following the giving by Senior Lender of the Senior Loan Default Notice and (ii) thirty (30) days following the expiration of Borrower's cure period, if any, for such non-monetary default provided in the Senior Loan Documents, to cure such non-monetary default (the "**Non-Monetary Cure Period**"); provided, however, if such non-monetary default is susceptible of being cured but cannot reasonably be cured within such Non-Monetary Cure Period and if curative action was promptly commenced and is being continuously and diligently pursued by Mezzanine Lender (or with respect to a non-monetary default that is not susceptible of being cured without the foreclosure of the Equity Collateral or not susceptible of being cured at all, if Mezzanine Lender shall be diligently pursuing the foreclosure of the Equity Collateral), Mezzanine Lender shall be given an additional period of time as is reasonably

---

1 The exception for automatic acceleration swallows the rule since the Senior Loan Documents allow for automatic acceleration after an EOD.  IF there are situations where the Senior Lender doesn't want to give Mezzanine Lender the chance to cure, let's discuss and specifically list those situations. Acceleration is only automatic in a couple of instances (essentially bankruptcy/assignment for the benefit of creditors). The point is that it is automatic, so Senior Lender can't possibly give prior notice.

necessary for Mezzanine Lender in the exercise of due diligence to cure such non-monetary default (or to foreclose on the Equity Collateral, if the non-monetary default is not susceptible of being cured without the foreclosure of the Equity Collateral or not susceptible of being cured at all) for so long as (i) Mezzanine Lender makes or causes to be made timely payment of Borrower's regularly scheduled monthly principal and/or interest payments under the Senior Loan and any other amounts due under the Senior Loan Documents, (ii) such additional period of time does not exceed sixty (60) days, unless such non-monetary default is of a nature that cannot be cured within such sixty (60) days, in which case, provided Mezzanine Lender shall be diligently pursuing such cure and the foreclosure of the Equity Collateral, Mezzanine Lender shall have such additional time as is reasonably necessary for Mezzanine Lender in the exercise of due diligence to cure such non-monetary default, and (iii) such default is not caused by a bankruptcy, insolvency or assignment for the benefit of creditors of Borrower.  Notwithstanding the foregoing, any non-monetary cure period (and any additional cure period granted to Mezzanine Lender hereunder) shall automatically expire and terminate upon the initiation of any Insolvency Proceeding.

(d)     So long as no Event of Default shall have occurred and be continuing under the Senior Loan Documents, all funds held and applied pursuant to the Senior Loan Documents, shall continue to be applied pursuant thereto and shall not be applied by Senior Lender to prepay outstanding principal balance of the Senior Loan other than the application of such funds to the amortization of the Senior Loan as contemplated by the terms and provisions of the Senior Loan Documents.

**11.     Termination and Replacement of Hotel Operator.**  Senior Lender consents to Mezzanine Lender's right, pursuant to the Mezzanine Loan Documents, and Mezzanine Lender consents to Senior Lender's right pursuant to the Senior Loan Documents, under certain circumstances, to cause the termination of the Hotel Operator.  In the event both Mezzanine Lender and Senior Lender shall have such rights at any time, and Senior Lender shall fail to exercise such rights, Mezzanine Lender may exercise such rights, provided such exercise may be superseded by any subsequent exercise of such rights by Senior Lender pursuant to the Senior Loan Documents. Upon the occurrence of any event which would entitle Mezzanine Lender to cause the termination of the Hotel Operator pursuant to the Mezzanine Loan Documents, Mezzanine Lender shall have the right to select, or cause the selection of, a replacement hotel operator for the Premises, which replacement hotel operator shall either be (a) subject to Senior Lender's reasonable approval or (b) a Qualified Operator.  Notwithstanding anything in this Section 11 to the contrary, if an Event of Default under the Senior Loan then exists or any other event shall have occurred pursuant to which Senior Lender has the right to select any replacement hotel operator pursuant to the Senior Loan Documents, Senior Lender shall have the sole right to select any replacement hotel operator, whether or not any such new hotel operator was retained by Mezzanine Lender.

**12.     Right to Purchase Senior Loan.**

(a)     If (i) any Enforcement Action has been commenced and is continuing under the Senior Loan Documents, (ii) Borrower has become a debtor in any Insolvency Proceeding, (iii) the Senior Loan has been accelerated or the Senior Loan becomes specially serviced (or its equivalent), or (iv) a deed-in-lieu of foreclosure of the Premises has been tendered to Senior Lender (each of the foregoing, a "**Purchase Option Event**"), then Senior Lender shall provide prompt written notice of the same to Mezzanine Lender (the "**Purchase Option Notice**"); provided, that,

in no case shall Senior Lender be obligated to send more than one (1) Purchase Option Notice in respect of any single event or occurrence as to which such Purchase Option Event relates except in the event a Purchase Option Expiration Date occurs solely pursuant to <u>Section 12(c)(ii)</u> below and another Purchase Option Event thereafter occurs.  Following the delivery of the Purchase Option Notice and until the Purchase Option Expiration Date (as hereinafter defined), upon not less than ten (10) Business Days prior written notice to Senior Lender (the "**Purchase Option Election Notice**"), Mezzanine Lender shall have the right to purchase for cash, in whole but not in part, the Senior Loan for a price equal to the sum of (without duplication) the outstanding principal balance thereof, together with all accrued interest and other amounts due thereon, including, without limitation, (A) any late charges or default interest; <u>provided</u>, <u>however</u>, such late charges and interest in excess of interest at the non-default rate shall be excluded from this calculation if the Senior Loan is purchased by Mezzanine Lender within sixty (60) days of the date on which the Purchase Option Notice was given to Mezzanine Lender, (B) any "make-whole" or prepayment fee or premium, exit fee, yield maintenance charge or liquidated damage amount, as applicable, calculated as if the Senior Loan were being repaid in full on the date of the purchase; <u>provided</u>, <u>however</u>, such "make-whole" or prepayment fee or premium, exit fee, yield maintenance charge or liquidated damage amount, as applicable, shall be excluded from this calculation if the Senior Loan is purchased by Mezzanine Lender within sixty (60) days of the date on which the Purchase Option Notice was given to Mezzanine Lender, (C) the amount of any Protective Advances, (D) post-petition interest, (E) any interest charged by Senior Lender on any advances for monthly payments of principal and/or interest on the Senior Loan (including any interest on account of Protective Advances), and (F) all costs and expenses (including, without limitation, attorneys' fees and expenses) actually incurred by Senior Lender in enforcing the terms of the Senior Loan Documents (collectively, the "**Loan Purchase Price**"); <u>provided</u>, <u>however</u>, Mezzanine Lender's right to purchase the Senior Loan is expressly subject to the satisfaction of the other conditions in this <u>Section 12</u> including, without limitation, those specified in <u>Section 12(b)</u>.  Concurrently with payment to Senior Lender of the Loan Purchase Price, Senior Lender shall deliver or cause to be delivered Mezzanine Lender all Senior Loan Documents held by or on behalf of Senior Lender and will execute in favor of Mezzanine Lender or its designee assignment documentation, in form and substance reasonably acceptable to Mezzanine Lender and Senior Lender, at the sole cost and expense of Mezzanine Lender, to assign the Senior Loan and its rights under the Senior Loan Documents (without recourse, representations or warranties, except for representations as to the outstanding balance of the Senior Loan, the power and authority of Senior Lender to enter into the applicable assignment documentation, and as to Senior Lender's ownership and not having previously assigned, transferred (but not including any participations) or encumbered its rights in the Senior Loan).

(b)     In order to preserve Mezzanine Lender's right to purchase the Senior Loan pursuant to <u>Section 12(a)</u>, Mezzanine Lender must pay all delinquent monthly payments and deposits into any reserves required pursuant to the Senior Loan Documents on or before the expiration of thirty (30) days after receipt of a Purchase Option Notice and thereafter pay all monthly payment obligations under the Senior Loan Documents as and when required pursuant to the terms of the Senior Loan Documents; <u>provided</u>, <u>however</u>, to the extent the Senior Loan has matured (whether at the stated maturity date or via acceleration), the monthly payments required (solely for purposes of this sentence) shall be calculated as if such acceleration had not taken place.

(c)    The right of Mezzanine Lender to purchase the Senior Loan shall automatically terminate (i) upon a transfer of the Premises by foreclosure sale, sale by power of sale or consummation of a deed-in-lieu of foreclosure (which Senior Lender may accept in its sole and absolute discretion); provided, however, in no event shall Senior Lender consummate a deed-in-lieu of foreclosure of the Premises on or before the date that is sixty (60) days after delivery of the Purchase Option Notice or, to the extent the Purchase Option Event described in the Purchase Option Notice was not a deed-in-lieu of foreclosure and Mezzanine Lender's right to purchase the Senior Loan pursuant to this Section 12 has not otherwise expired, delivery of a second Purchase Option Notice stating that a Purchase Option Event has occurred as a result of a tender of a deed-in-lieu of foreclosure, (ii) to the extent such right arose with respect to a specific Purchase Option Event, if such Purchase Option Event ceases to exist (and no other Purchase Option Event exists), (iii) if Mezzanine Lender provides a Purchase Option Election Notice but thereafter fails to tender the Loan Purchase Price to Senior Lender and complete such purchase within sixty (60) days (other than as a result of a default or breach by Senior Lender of its obligations hereunder with respect to a sale of the Senior Loan), (iv) if Mezzanine Lender fails to timely tender the monthly payments required pursuant to the provisions of Section 12(b), or (v) if Mezzanine Lender fails, in any circumstance, to tender the Loan Purchase Price to Senior Lender and complete such purchase within sixty (60) days after delivery of the Purchase Option Notice (other than as a result of a default or breach by Senior Lender of its obligations hereunder with respect to a sale of the Senior Loan).  To the extent Mezzanine Lender's purchase option should terminate pursuant to the provisions of this Section 12(c), the date of such termination shall be deemed the "**Purchase Option Expiration Date**" for purposes of this Agreement.

(d)    Senior Lender acknowledges and agrees that, without limiting the other rights provided hereunder, Mezzanine Lender shall be entitled to bid at a foreclosure of the Premises as permitted by applicable law.

(e)    Mezzanine Lender covenants not to enter into any agreement with Borrower or any Affiliate thereof to purchase the Senior Loan pursuant to this Section or in connection with any refinancing of the Senior Loan in any manner designed to avoid or circumvent the provisions of the Senior Loan Documents which require the payment of a "make-whole" or prepayment fee or premium, yield maintenance charge, exit fee, late fee or default interest in connection with a prepayment of the Senior Loan by Borrower.

**13.**    **Additional Understandings**.    For as long as the Mezzanine Loan remains outstanding:

(a)    Notices of Transfer; Consent.    Senior Lender shall promptly notify Mezzanine Lender if Borrower seeks or requests a release of the lien of the Senior Loan or seeks or requests Senior Lender's consent to, or takes any action in connection with or in furtherance of, a sale or transfer of all or any material portion of the Premises, the granting of a further mortgage, deed of trust or similar encumbrance against the Premises or a prepayment or refinancing of the Senior Loan. In the event of a request by Borrower for Senior Lender's consent to either (i) the sale or transfer of all or any material portion of the Premises or (ii) the granting of a further mortgage, deed of trust or similar encumbrance against the Premises, Senior Lender shall, if Senior Lender has the right to consent, obtain the prior written consent of Mezzanine Lender prior to Senior Lender's granting of its consent or agreement thereto.

(b)      Consent Rights of Mezzanine Lender.  Except as specifically provided elsewhere in this Agreement, wherever under any document or instrument held by Mezzanine Lender, Mezzanine Lender is granted the right or option of consent, approval or authorization with respect to any matter therein addressed including, without limitation, all approvals, consents and authorizations relating to construction matters under the Mezzanine Loan Agreement, Mezzanine Lender shall be deemed to have given such consent, approval or authorization if Senior Lender shall have given its consent, approval or authorization with respect to such matter under or pursuant to the Senior Loan Documents, and Mezzanine Lender's consent, approval or authorization of any such matter shall have no force or effect if Senior Lender shall have not granted a similar consent, approval or authorization with respect to such matter under or pursuant to the Senior Loan Documents.  Senior Lender will give Mezzanine Lender prompt written notice of the granting of any such consent, approval or authorization.

(c)      Advances under Senior Loan.

(i)      In making disbursements under any of the Senior Loan Documents, Senior Lender has no duty to, nor has Senior Lender represented that it will, see to the application of any proceeds by the Person or Persons to whom Senior Lender disburses such proceeds.  Any application or use of such proceeds for purposes other than those provided for in the Senior Loan Documents does not and shall not defeat the subordination herein made, in whole or in part.

(ii)      In making disbursements under any of the Senior Loan Documents, Senior Lender may waive any and all conditions to a disbursement contained in the Senior Loan Documents.  No such waiver shall defeat the subordination herein made, in whole or in part.

(iii)      The rights granted to Senior Lender hereunder are solely for its protection and nothing herein contained shall impose on Senior Lender any duties with respect to Borrower or Mezzanine Lender.

**14.      Financing of Mezzanine Loan.**

Notwithstanding any other provision hereof, upon notice to Senior Lender, Mezzanine Lender may pledge (a "**Pledge**") the Mezzanine Loan and the Separate Collateral to a Loan Pledgee (as defined below), which has extended a credit facility (including, without limitation, credit in the form of a repurchase agreement facility) to Mezzanine Lender, on the terms and conditions set forth in this Section 14.  It is also agreed that the sale by Mezzanine Lender of the Mezzanine Loan to a Person, which is not Borrower, Mezzanine Borrower or an Affiliate of Borrower or Mezzanine Borrower and satisfies Senior Lender's then applicable KYC requirements and is not an Excluded Party (a "**Loan Pledgee**"), and the simultaneous agreement by Mezzanine Lender to repurchase the Mezzanine Loan under an arrangement documented as a repurchase agreement shall qualify as a Pledge; provided, that, all applicable terms and conditions of this Section 14 are complied with.  A Loan Pledgee shall be permitted to fully exercise its rights and remedies against Mezzanine Lender and to realize on any and all collateral granted by Mezzanine Lender to Loan Pledgee (and accept an assignment-in-lieu of foreclosure as to such collateral), in accordance with applicable law.  In such event, Senior Lender shall recognize Loan Pledgee (and

any transferee which is also a Loan Pledgee at any foreclosure or similar sale held by Loan Pledgee or any transfer in lieu of such foreclosure), and its successors and assigns, as the successor to Mezzanine Lender's rights, remedies and obligations under this Agreement and the Mezzanine Loan Documents and any such Loan Pledgee shall assume in writing (for the benefit of Senior Lender and its successor and assigns) the obligations of Mezzanine Lender hereunder accruing from and after such Transfer and agrees to be bound by the terms and provisions hereof (it being agreed that, notwithstanding anything to the contrary contained herein, such Loan Pledgee shall not be required to so assume Mezzanine Lender's obligations hereunder prior to such realization on such collateral).  The rights of a Loan Pledgee under this <u>Section 14</u> shall remain effective unless and until such Loan Pledgee shall have notified Senior Lender in writing that its interest in the Mezzanine Loan has terminated.

      **15.**    <u>**Obligations Hereunder Not Affected**</u>.

      (a)    All rights, interests, agreements and obligations of Senior Lender and Mezzanine Lender under this Agreement shall remain in full force and effect irrespective of:

      (i)    any lack of validity or enforceability of the Senior Loan Documents or the Mezzanine Loan Documents or any other agreement or instrument relating thereto;

      (ii)    any taking, exchange, release or non-perfection of any other collateral, or any taking, release or amendment or waiver of or consent to or departure from any guaranty, for all or any portion of the Senior Loan or the Mezzanine Loan;

      (iii)    any manner of application of collateral, or proceeds thereof, to all or any portion of the Senior Loan or the Mezzanine Loan, or any manner of sale or other disposition of any collateral for all or any portion of the Senior Loan or the Mezzanine Loan or any other assets of Borrower, Mezzanine Borrower or any other Affiliates of Borrower or Mezzanine Borrower;

      (iv)    any change, restructuring or termination of the corporate structure or existence of Borrower, Mezzanine Borrower or any other Affiliates of Borrower or Mezzanine Borrower; or

      (v)    any other circumstance which might otherwise constitute a defense available to, or a discharge of, Borrower, Mezzanine Borrower, a subordinated creditor or a senior lender subject to the terms hereof.

      (b)    This Agreement shall continue to be effective or be reinstated, as the case may be, if at any time any payment of all or any portion of the Senior Loan or Mezzanine Loan is rescinded or must otherwise be returned by Senior Lender or Mezzanine Lender upon the insolvency, bankruptcy or reorganization of Borrower or Mezzanine Borrower or otherwise, all as though such payment had not been made.

      **16.**    <u>**Notices.**</u>  All notices or other communications required or permitted to be given pursuant hereto shall be in writing and shall be considered as properly given (i) if mailed by first class United States mail, postage prepaid, registered or certified with return receipt requested; (ii) by delivering same in person to the intended addressee; (iii) by delivery to a reputable

independent third party commercial delivery service for same day or next day delivery and providing for evidence of receipt at the office of the intended addressee; or (iv) e-mail (provided that any notice, approval, consent or other communication sent by e-mail is also delivered by one of the other means set forth in this Section 16).  Notice so mailed shall be effective upon two (2) Business Days' following its deposit (properly addressed) with the United States Postal Service or any successor thereto; notice given by personal delivery shall be effective only if and when received by the addressee; notice sent by a reputable commercial delivery service shall be effective upon the transmitting parties' receipt of written verification of delivery from such reputable commercial delivery service at the proper address indicated hereinbelow; notice by email shall be effective in accordance with the other method of delivery chosen in accordance herewith; and notice given by other means shall be effective only if and when received at the designated address of the intended addressee.  For purposes of notice, the addresses of the parties shall be as set forth below:

If to Mezzanine Lender:

CAI OVERLAND LENDER, LLC
c/o Civitas Capital Group
1722 Routh Street, Suite 800
Dallas, TX 75201
Attn:  Austin Khan and Marisa Lizak
Email: austin.khan@civitascapital.com and
marisa.lizak@civitascapital.com

With a copy to:

Elkins Kalt Weintraub Reuben Gartside LLP
10345 West Olympic Boulevard
Los Angeles, CA 90064
Attn:  Shai Halbe, Esq.
Email: shalbe@elkinskalt.com

If to Senior Lender:

KHRE SMA FUNDING, LLC
c/o Knighthead Funding, LLC
777 West Putnam Avenue, 3rd Floor, Suite B-2
Greenwich, CT 06830
Attn:  Jonathan J. Daniel
Email: LoanServicing@knightheadfunding.com

With a copy to:

King & Spalding LLP
300 S. Tryon St., Suite 1700
Charlotte, NC 28202
Attention:  Roland Macher, Esq.
Email: rmacher@kslaw.com

Any of the foregoing parties shall have the right to change its address for notice hereunder to any other location within the continental United States by the giving of thirty (30) days' notice to the other party in the manner set forth herein.

17.  **Estoppel.**

(a)  Mezzanine Lender shall, within ten (10) days following a request from Senior Lender, provide Senior Lender with a written statement setting forth the then current outstanding principal balance of the Mezzanine Loan, the aggregate accrued and unpaid interest under the Mezzanine Loan, and stating whether to Mezzanine Lender's knowledge any default or Event of Default exists under the Mezzanine Loan.

(b)  Senior Lender shall, within ten (10) days following a request from Mezzanine Lender, provide Mezzanine Lender with a written statement setting forth the then current outstanding principal balance of the Senior Loan, the aggregate accrued and unpaid interest under the Senior Loan, and stating whether to Senior Lender's knowledge any default or Event of Default exists under the Senior Loan.

18.  **Further Assurances.**  So long as all or any portion of the Senior Loan and the Mezzanine Loan remains unpaid and the Senior Mortgage encumbers the Premises, Mezzanine Lender and Senior Lender will each execute, acknowledge and deliver in recordable form and upon demand of the other, any other instruments or agreements reasonably required in order to carry out the provisions of this Agreement or to effectuate the intent and purposes hereof.

19.  **No Third Party Beneficiaries; No Modification.**  The parties hereto do not intend the benefits of this Agreement to inure to Borrower, Mezzanine Borrower or any other Person (other than the successors and permitted assigns of the parties hereto and any Loan Pledgees pursuant to Section 14).  This Agreement may not be changed or terminated orally, but only by an agreement in writing signed by the party against whom enforcement of any change is sought.

20.  **Successors and Assigns.**  This Agreement shall bind the respective successors and permitted assigns of Senior Lender and Mezzanine Lender and shall inure to the benefit of the respective successors and permitted assigns of Senior Lender and Mezzanine Lender.

21.  **Counterparts; Facsimile and Electronic Transmission.**  To facilitate execution, this Agreement may be executed in as many counterparts as may be convenient or required.  It shall not be necessary that the signature and acknowledgment of, or on behalf of, each party, or that the signature and acknowledgment of all Persons required to bind any party, appear on each counterpart.  All counterparts shall collectively constitute a single instrument.  It shall not be necessary in making proof of this Agreement to produce or account for more than a single counterpart containing the respective signatures and acknowledgment of, or on behalf of, each of

INTERCREDITOR AGREEMENT – Page 34

the parties hereto. Any signature and acknowledgment page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures and acknowledgments thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature and acknowledgment pages. This Agreement may be transmitted and/or signed by facsimile or e-mail transmission (e.g., "pdf" or "tif"). The effectiveness of any such documents and signatures shall, subject to applicable law, have the same force and effect as manually-signed originals and shall be binding on all parties to this Agreement. Lender may also require that any such documents and signatures be confirmed by a manually-signed original thereof; provided, however, that the failure to request or deliver the same shall not limit the effectiveness of any facsimile or e-mail document or signature.

22. **Legal Construction.** In all respects, including, without limitation, matters of construction and performance of this Agreement and the obligations arising hereunder, this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York applicable to agreements intended to be wholly performed within the State of New York.

23. **No Waiver, Remedies.** No failure on the part of Senior Lender to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

24. **No Joint Venture.** Nothing provided herein is intended to create a joint venture, partnership, tenancy-in-common or joint tenancy relationship between or among any of the parties hereto.

25. **Captions.** The captions in this Agreement are inserted only as a matter of convenience and for reference, and are not and shall not be deemed to be a part hereof.

26. **Conflicts.** In the event of any conflict, ambiguity or inconsistency between the terms and conditions of this Agreement and the terms and conditions of any of the Senior Loan Documents or the Mezzanine Loan Documents as to the respective rights of Senior Lender and Mezzanine Lender, as between themselves, the terms and conditions of this Agreement shall control. This Section 26 is for the sole benefit of Senior Lender and Mezzanine Lender and creates no rights or responsibilities to any third party whatsoever.

27. **No Release.** Nothing herein contained shall operate (a) to release Borrower from (i) its obligation to keep and perform all of the terms, conditions, obligations, covenants and agreements contained in the Senior Loan Documents or (ii) any liability of Borrower under the Senior Loan Documents or (b) to release Mezzanine Borrower from (i) its obligation to keep and perform all of the terms, conditions, obligations, covenants and agreements contained in the Mezzanine Loan Documents or (ii) any liability of Mezzanine Borrower under the Mezzanine Loan Documents.

28. **Continuing Agreement.** This Agreement is a continuing agreement and shall remain in full force and effect until the earliest of (a) payment in full of the Senior Loan, (b) subject

INTERCREDITOR AGREEMENT – Page 35

to the rights granted to Mezzanine Lender under <u>Section 12(d)</u>, transfer of the Premises by foreclosure of the Senior Mortgage or the exercise of the power of sale contained therein or by deed-in-lieu of foreclosure, (c) transfer of title of the Equity Collateral consistent with the requirements of <u>Section 5</u> hereof and the other provisions of this Agreement, or (d) payment in full of the Mezzanine Loan; <u>provided</u>, <u>however</u>, that (i) the terms of each of <u>Section 5(a)</u>, <u>Section 7</u>, and <u>Section 8</u> hereof shall survive such termination, (ii) any rights or remedies of either party hereto arising out of any breach of any provision hereof occurring prior to such date of termination shall survive such termination and (iii) if at any time any payment in full of the Senior Loan or Mezzanine Loan is rescinded in whole or in part or must be otherwise restored or returned in whole or in part upon the insolvency, bankruptcy or reorganization of Borrower or Mezzanine Borrower, as applicable, or otherwise then, upon the restoration or return of any portion of such payment in full, Senior Lender's or Mezzanine Lender's, as applicable, rights and obligations hereunder shall be reinstated as though such payment in full (or portion thereof so restored or returned, as the case may be) had not been made at such time.  Notwithstanding the foregoing provisions of this <u>Section 28</u>, in the event the Senior Loan or Mezzanine Loan is repaid in full or otherwise retired, cancelled or terminated (including by reason of the completion of an Equity Collateral Enforcement Action), the holder of such repaid Senior Loan or Mezzanine Loan shall have no further rights or obligations under this Agreement, except those rights and obligations that expressly survive the expiration and termination of this Agreement.  The provisions of this <u>Section 28</u> shall survive the expiration and termination of this Agreement with respect to any party hereto.

      **29.**    <u>**Severability**</u>**.**  In the event that any provision of this Agreement or the application hereof to any party hereto shall, to any extent, be invalid or unenforceable under any applicable statute, regulation, or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform to such statute, regulation or rule of law, and the remainder of this Agreement and the application of any such invalid or unenforceable provisions to parties, jurisdictions or circumstances other than to whom or to which it is held invalid or unenforceable, shall not be affected thereby nor shall same affect the validity or enforceability of any other provision of this Agreement.

      **30.**    <u>**Expenses.**</u>

      (a)    To the extent not paid by Borrower or out of or from any collateral securing the Senior Loan which is realized by Senior Lender, Mezzanine Lender agrees upon demand to pay to Senior Lender the amount of any and all reasonable expenses, including, without limitation, the reasonable fees and expenses of its counsel and of any experts or agents, which Senior Lender may incur in connection with (i) the exercise or enforcement of any of the rights of Senior Lender against Mezzanine Lender hereunder to the extent that Senior Lender is the prevailing party in any dispute with respect thereto, (ii) the failure by Mezzanine Lender to perform or observe any of the provisions hereof, (iii) any remedial measures as may be undertaken (whether or not completed) by Mezzanine Lender against Mezzanine Borrower including Senior Lender's costs and expenses incurred with respect to its determination of a Qualified Transferee and approval of any Supplemental Guarantor in accordance with the provisions of Section 5(a), or (iv) any Transfer or proposed Transfer of the Mezzanine Loan or any portion thereof or any Mezzanine Loan Modification.

(b)     To the extent not paid by Mezzanine Borrower or out of or from any collateral securing the Mezzanine Loan which is realized by Mezzanine Lender, Senior Lender agrees upon demand to pay to Mezzanine Lender the amount of any and all reasonable expenses, including, without limitation, the reasonable fees and expenses of its counsel and of any experts or agents, which Mezzanine Lender may incur in connection with the (i) exercise or enforcement of any of the rights of Mezzanine Lender against Senior Lender hereunder to the extent that Mezzanine Lender is the prevailing party in any dispute with respect thereto or (ii) the failure by Senior Lender to perform or observe any of the provisions hereof.

31.     **Injunction**.  Senior Lender and Mezzanine Lender each acknowledge (and waive any defense based on a claim) that monetary damages are not an adequate remedy to redress a breach by the other hereunder and that a breach by either Senior Lender or Mezzanine Lender hereunder would cause irreparable harm to the other.  Accordingly, Senior Lender and Mezzanine Lender agree that upon a breach of this Agreement by the other, the remedies of injunction, declaratory judgment and specific performance shall be available to such non-breaching party.

32.     **Mutual Disclaimer**.

(a)     Each of Senior Lender and Mezzanine Lender are sophisticated lenders and/or investors in real estate and their respective decision to enter into the Senior Loan and the Mezzanine Loan is based upon their own independent expert evaluation of the terms, covenants, conditions and provisions of, respectively, the Senior Loan Documents and the Mezzanine Loan Documents and such other matters, materials and market conditions and criteria which each of Senior Lender and Mezzanine Lender deem relevant.  Each of Senior Lender and Mezzanine Lender has not relied in entering into this Agreement, and respectively, the Senior Loan, the Senior Loan Documents, the Mezzanine Loan or the Mezzanine Loan Documents, upon any oral or written information, representation, warranty or covenant from the other, or any of the other's representatives, employees, Affiliates or agents other than the representations and warranties of the other contained herein.  Each of Senior Lender and Mezzanine Lender further acknowledges that no employee, agent or representative of the other has been authorized to make, and that each of Senior Lender and Mezzanine Lender have not relied upon, any statements, representations, warranties or covenants other than those specifically contained in this Agreement.  Without limiting the foregoing, each of Senior Lender and Mezzanine Lender acknowledges that the other has made no representations or warranties as to the Senior Loan or the Mezzanine Loan (other than those specifically contained in this Agreement) or the Premises (including, without limitation, the cash flow of the Premises, the value, marketability, condition or future performance thereof, the existence, status, adequacy or sufficiency of the leases, the tenancies or occupancies of the Premises, or the sufficiency of the cash flow of the Premises, to pay all amounts which may become due from time to time pursuant to the Senior Loan or the Mezzanine Loan).

(b)     Each of Senior Lender and Mezzanine Lender acknowledges that the Senior Loan and the Mezzanine Loan are distinct, separate transactions and loans, separate and apart from each other.  Each of Senior Lender and Mezzanine Lender acknowledges that the other is a distinct separate lender with a distinct and separate loan with various rights and remedies with respect to the Premises which are not in all respects aligned.

33.  **Consents to Jurisdiction.**  Each of the parties hereto irrevocably and unconditionally (a) submits to the jurisdiction of the state and federal courts in the State of New York, and any appellate court from any thereof, in any action, proceeding or counterclaim arising out of or relating to this Agreement or the transactions contemplated hereunder or for recognition or enforcement of any judgment, and (b) agrees that all claims in respect of any action, proceeding or counterclaim arising out of or relating to this Agreement or the transactions contemplated hereunder may be heard or determined in such State of New York court or, to the extent permitted by law, in such federal court.

34.  **Trial by Jury.**  EACH PARTY HERETO AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND EACH WAIVES ANY RESPECTIVE RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION HEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY EACH PARTY HERETO, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  EACH PARTY HERETO IS HEREBY RESPECTIVELY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY EACH PARTY HERETO.

List of Attachments:

Exhibit A – Legal Description
Exhibit B – Senior Loan Documents
Exhibit C – Mezzanine Loan Documents
Exhibit D – Mezzanine Lender Organizational Chart

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.  SIGNATURE PAGES FOLLOW.]**

**IN WITNESS WHEREOF**, Senior Lender and Mezzanine Lender have executed this Agreement as of the date and year first set forth above.

**SENIOR LENDER:**

**KHRE SMA FUNDING, LLC,**
a Delaware limited liability company

By: _____
     Name: Laura L. Torrado
     Title:  Authorized Signatory

[Signature Page to Intercreditor Agreement]

**MEZZANINE LENDER:**

**CAI OVERLAND LENDER, LLC,**
a Delaware limited liability company

By: _____

      Name: Austin Khan
      Title: Authorized Signatory

# Exhibit A

## Legal Description

PARCEL 1:

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOT 96 OF THE 14TH DISTRICT, CITY OF HAPEVILLE, FULTON COUNTY, GEORGIA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A NAIL SET ON THE SOUTHWESTERLY RIGHT-OF-WAY OF PORSCHE AVENUE (FORMERLY KNOWN AS HENRY FORD II AVENUE AND HAVING A VARIED RIGHT-OF-WAY) AT ITS INTERSECTION WITH THE WESTERLY RIGHT-OF-WAY OF PORSCHE DRIVE (HAVING A VARIED RIGHT-OF-WAY); THENCE RUNNING ALONG THE WESTERLY RIGHT-OF-WAY OF PORSCHE DRIVE SOUTH 63 DEGREES 35 MINUTES 46 SECONDS EAST A DISTANCE OF 21.49 FEET TO A NAIL SET; THENCE CONTINUING ALONG SAID RIGHT-OF-WAY SOUTH 49 DEGREES 10 MINUTES 54 SECONDS EAST A DISTANCE OF 21.67 FEET TO A NAIL SET; THENCE LEAVING SAID RIGHT-OF-WAY AND RUNNING ALONG A CURVE TO THE RIGHT AN ARC DISTANCE OF 44.79 FEET (SAID ARC HAVING A RADIUS OF 45.00 FEET AND BEING SUBTENDED BY A CHORD 42.97 FEET IN LENGTH LYING TO THE SOUTHWEST OF SAID ARC AND BEARING SOUTH 05 DEGREES 43 MINUTES 43 SECONDS EAST) TO A POINT; THENCE RUNNING SOUTH 22 DEGREES 47 MINUTES 15 SECONDS WEST A DISTANCE OF 230.40 FEET TO A POINT; THENCE RUNNING ALONG A CURVE TO THE LEFT AN ARC DISTANCE OF 126.77 FEET (SAID ARC HAVING A RADIUS OF 432.62 FEET AND BEING SUBTENDED BY A CHORD 126.32 FEET IN LENGTH LYING TO THE SOUTHEAST OF SAID ARC AND BEARING SOUTH 13 DEGREES 57 MINUTES 08 SECONDS WEST) TO A 1/2 INCH REBAR SET; THENCE RUNNING SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST A DISTANCE OF 212.04 FEET TO A NAIL SET; THENCE RUNNING NORTH 70 DEGREES 00 MINUTES 00 SECONDS WEST A DISTANCE OF 208.76 FEET TO A 1/2 INCH REBAR SET; THENCE RUNNING NORTH 00 DEGREES 00 MINUTES 00 SECONDS WEST A DISTANCE OF 181.08 FEET TO A 1/2 INCH REBAR SET; THENCE RUNNING NORTH 44 DEGREES 40 MINUTES 27 SECONDS EAST A DISTANCE OF 257.60 FEET TO A 1/2 INCH REBAR SET; THENCE RUNNING SOUTH 45 DEGREES 00 MINUTES 00 SECONDS EAST A DISTANCE OF 122.00 FEET TO A 1/2 INCH REBAR SET; THENCE RUNNING NORTH 45 DEGREES 00 MINUTES 00 SECONDS EAST A DISTANCE OF 144.04 FEET TO A NAIL SET ON THE SOUTHWESTERLY RIGHT-OF-WAY OF PORSCHE AVENUE; THENCE RUNNING ALONG SAID RIGHT-OF-WAY ALONG A CURVE TO THE LEFT AN ARC DISTANCE OF 128.77 FEET (SAID ARC HAVING A RADIUS OF 2437.76 FEET AND BEING SUBTENDED BY A CHORD 128.75 FEET IN LENGTH LYING TO THE SOUTHWEST OF SAID ARC AND BEARING SOUTH 67 DEGREES 15 MINUTES 42 SECONDS EAST) TO A NAIL SET AND THE POINT OF BEGINNING;

SAID TRACT CONTAINS 3.98 ACRES (173,460 SQUARE FEET), MORE OR LESS. BEING THE SAME PROPERTY DEPICTED AS THE "3.98 ACRE TRACT" ON THAT CERTAIN ALTA/ACSM SURVEY PREPARED BY LOWE ENGINEERS, BEARING THE SEAL AND SIGNATURE OF WILLIAM J. DANIEL III, G.R.L.S. NO. 2257, SAID PLAT DATED DECEMBER 4, 2015, BEING JOB NO. 15-0120, AS REVISED.

PARCEL 2:

EASEMENTS AND OTHER INTERESTS IN REAL PROPERTY CONTAINED IN THAT CERTAIN DECLARATION OF EASEMENT, COVENANTS, CONDITIONS AND RESTRICTIONS BETWEEN PORSCHE CARS NORTH AMERICA, INC., A DELAWARE CORPORATION AND ACRON 2 PORSCHE DRIVE, ATLANTA LLC, LLC, A DELAWARE LIMITED LIABILITY COMPANY, DATED DECEMBER 30, 2015, FILED FOR RECORD DECEMBER 31, 2015, RECORDED IN DEED BOOK 55721, PAGE 498 , RECORDS OF FULTON COUNTY, GEORGIA.

PARCEL 3:

BENEFICIAL EASEMENTS CREATED PURSUANT TO THAT CERTAIN EASEMENT AGREEMENT DATED
SEPTEMBER 30, 2011, FILED FOR RECORD OCTOBER 5, 2011, RECORDED IN DEED BOOK 50440, PAGE
499, aforesaid records; AS AMENDED BY THAT CERTAIN AMENDED AND RESTATED EASEMENT
AGREEMENT, DATED MAY 11, 2012, FILED FOR THE RECORD JUNE 25, 2012, RECORDED IN DEED
BOOK 51337, PAGE 235, aforesaid records; AS AFFECTED BY THAT CERTAIN ASSIGNMENT AND
ASSUMPTION OF AMENDED AND RESTATED EASEMENT AGREEMENT DATED FEBRUARY 27, 2017, FILED
FOR RECORD FEBRUARY 28, 2017, AND RECORDED IN DEED BOOK 57228, PAGE 93.

PARCEL 4:

BENEFICIAL EASEMENTS CREATED PURSUANT TO THAT EASEMENT AND OPERATION AGREEMENT,
DATED JUNE 21, 2012, FILED FOR RECORD JUNE 25, 2012, AND RECORDED IN DEED BOOK 51337,
PAGE 322, AFORESAID RECORDS; AND AS AFFECTED BY THAT CERTAIN ASSIGNMENT AND
ASSUMPTION OF EASEMENT AND OPERATION AGREEMENT DATED FEBRUARY 23, 2017, FILED FOR
RECORD FEBRUARY 28, 2017, AND RECORDED IN DEED BOOK 57228, PAGE 111, AFORESAID RECORDS.

Exhibit A

# **EXHIBIT B**

<u>Senior Loan Documents</u>

## THIRD AMENDMENT TO LOAN AGREEMENT AND OTHER LOAN DOCUMENTS AND REAFFIRMATION OF LOAN DOCUMENTS

This **THIRD AMENDMENT TO LOAN AGREEMENT AND OTHER LOAN DOCUMENTS AND REAFFIRMATION OF LOAN DOCUMENTS** (this "*Amendment*"), dated as of January 18, 2024 (the "*Amendment Effective Date*"), is by and between **ACRON 2 PORSCHE DRIVE, ATLANTA LLC**, a Delaware limited liability company, having its principal place of business at c/o ACRON (USA), L.P., 2424 East 21st Street, Suite 150, Tulsa, Oklahoma 74114 ("*Borrower*"), **ACRON (USA) L.P.**, a Texas limited partnership, having its principal place of business at c/o ACRON (USA), L.P., 2424 East 21st Street, Suite 150, Tulsa, Oklahoma 74114 (the "*Partnership*") and **ACRON AG**, a Swiss stock corporation, having its principal place of business at c/o ACRON (USA), L.P., 2424 East 21st Street, Suite 150, Tulsa, Oklahoma 74114 ("*ACRON*", together with Partnership, the "*ACRON Guarantors*") and **TH INVESTMENT HOLDINGS II, LLC**, a Delaware limited liability company, having a principal place of business at c/o Procaccianti Companies, Inc, 1140 Reservoir Avenue, Cranston, RI   02920 ("*TH Guarantor*"; and together with ACRON Guarantors, jointly and severally, individually and collectively as the context may require, the "*Guarantor*"), on the one hand, and **KHRE SMA FUNDING, LLC**, a Delaware limited liability company (together with its successors and/or assigns, "*Lender*"), having offices at c/o Knighthead Funding, LLC, 777 West Putnam Avenue, 3rd Floor, Suite B-2, Greenwich, CT 06830, on the other hand.

## <u>RECITALS</u>

A.      Borrower and Lender entered into that certain Loan Agreement (the "***Original Loan Agreement***") dated as of December 21, 2018 (the "***Original Closing Date***"), pursuant to which Lender made a mortgage loan to Borrower in the original principal amount of THIRTY-SIX MILLION and 00/100 DOLLARS ($36,000,000.00) (the "***Loan***"), which Loan is evidenced by that certain Amended and Restated Promissory Note dated as of the Original Closing Date (the "***Note***") made by Borrower in favor of Lender in the original principal amount of THIRTY-SIX MILLION and 00/100 DOLLARS ($36,000,000.00).

B.      As security for the Loan, Borrower, ACRON Guarantors and Bradley Guarantors (as defined in the Original Loan Agreement) executed the "Loan Documents" to which each is respectively a party (the "***Original Loan Documents***").

C.      Borrower, Lender, Bradley Guarantors and Guarantor executed that certain First Amendment to Loan Agreement and Other Loan Documents and Reaffirmation of Loan Documents (the "***First Amendment to Loan Agreement***") dated as of December 31, 2021, pursuant to which Lender amended the definition of "Maturity Date", replaced Bradley Guarantors with TH Guarantor as a guarantor under the Original Loan Documents and Lender made certain other amendments to the Original Loan Agreement, and in connection therewith Borrower made a principal paydown of the Loan to Lender in the amount of $3,000,000, such that the current outstanding principal balance of the Loan as of the date hereof is THIRTY-THREE MILLION and 00/100 DOLLARS ($33,000,000).

D.      Borrower, Lender and Guarantor entered into that certain Second Amendment to

39774531

Loan Agreement and Other Loan Documents and Reaffirmation of Loan Documents (the "***Second Amendment to Loan Agreement***") dated as of January 2, 2023, pursuant to which Lender amended the definition of "Maturity Date" and made certain other amendments to the Original Loan Agreement.

E.      Borrower, Lender and Guarantor entered into that certain Letter Agreement, dated as of May 5, 2023 (the "***First Extension Letter***") pursuant to which Lender extended the Maturity Date to August 2, 2023.

F.      Borrower, Lender and Guarantor entered into that certain Letter Agreement, dated as of August 31, 2023 (the "***Second Extension Letter***"; together with the Original Loan Agreement, the First Amendment to Loan Agreement, the Second Amendment to Loan Agreement and the First Extension Letter, and as amended by this Amendment, collectively, the "***Loan Agreement***") pursuant to which Lender extended the Maturity Date to October 2, 2023.

G.      Capitalized terms used herein without definition shall have the meanings set forth in the Loan Agreement.

H.      In connection with the First Amendment to Loan Agreement, the Second Amendment to Loan Agreement, the First Extension Letter and the Second Extension Letter, respectively, Borrower, Guarantor and Lender executed additional Loan Documents to which each is respectively a party (the "***Amendment Loan Documents***"; together with the Original Loan Documents, as amended by this Amendment and the Other Amendment Document, collectively, the "***Loan Documents***").

I.      Concurrently with the execution hereof, Borrower is executing that certain Third Amendment to Amended and Restated Deed to Secure Debt, Assignment, Security Agreement and Fixture Filing (the "***Other Amendment Document***").

J.      Concurrently with the execution hereof, Lender is executing that certain Termination of Pledge Agreement and filing three (3) UCC-3 Financing Statements with the applicable Secretary of State in connection with the termination of that certain Pledge Agreement by and among ACRON (USA) L.P., a Texas limited partnership, CASTLETON HOLDINGS LLC, a District of Columbia limited liability company and ACRON 2 PORSCHE DRIVE HOLDING LLC, a Delaware limited liability company and Lender, dated as of December 21, 2018.

K.      In connection with the foregoing, Borrower and Guarantors have requested, and Lender has agreed, to make certain modifications to the Loan and the Loan Documents as herein provided for.

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and legal sufficiency whereof are hereby acknowledged, the parties hereto agree as follows:

I.      <u>MODIFICATION OF THE LOAN DOCUMENTS</u>. As of the Amendment Effective Date, the Loan Documents are modified and amended as follows:

1.      All references in the Loan Documents to the "Loan Agreement" shall mean the Loan Agreement, as modified by this Amendment, and as the same may hereafter be further amended, modified, supplemented or restated from time to time.

2.      All references in the Loan Documents to the "Loan Documents" shall mean the Loan Documents, as modified by this Amendment and the Other Amendment Document, and as the same may hereafter be further amended, modified, supplemented or restated from time to time.

3.      All references in the Loan Documents to "Maturity Date" shall mean the Maturity Date, as defined in this Amendment and the Other Amendment Document, and as the same may hereafter be further amended, modified, supplemented or restated from time to time.

II.      <u>MODIFICATION OF THE LOAN AGREEMENT</u>. As of the Amendment Effective Date, the Loan Agreement is modified and amended as follows:

1.      Section 1.1 of the Loan Agreement is hereby modified to add the following specific definition(s) in alphabetical order:

a.   "<u>Mezzanine Borrower</u>" shall mean ACRON 2 Porsche Drive Mezzco LLC, a Delaware limited liability company.

b.   "<u>Mezzanine Lender</u>" shall mean CAI Overland Lender, LLC, a Delaware limited liability company and any subsequent holder of the Mezzanine Loan to whom the Mezzanine Loan has been assigned.

c.   "<u>Mezzanine Loan</u>" shall mean that certain mezzanine loan in the principal amount of $11,600,000.00 (the "<u>Mezzanine Loan Amount</u>") made on January 18, 2024 ("M<u>ezzanine Loan Closing Date"</u>) by Mezzanine Lender to Mezzanine Borrower, and evidenced and secured by the Mezzanine Loan Documents.

d.   "<u>Mezzanine Loan Closing Date</u>" shall have the meaning for such definition in the definition for "Mezzanine Loan".

e.   "<u>Mezzanine Loan Default</u>" shall mean an "Event of Default" under the Mezzanine Loan and as defined in the Mezzanine Loan Documents and Lender may conclusively rely on any notice from Mezzanine Lender of such Mezzanine Loan Default without any inquiry into the validity thereof.

f.   "<u>Mezzanine Loan Documents</u>" shall mean (i) that certain Loan Agreement dated as of the Mezzanine Loan Closing Date between Mezzanine Lender and Mezzanine Borrower (the "<u>Mezzanine Loan Agreement</u>"), (ii) that certain Promissory Note dated as of the Mezzanine Loan Closing Date in the original principal amount of the Mezzanine Loan made by Mezzanine Borrower and payable to Mezzanine Lender, (iii) that certain Pledge and Security Agreement

3

dated as of the Mezzanine Loan Closing Date made by Mezzanine Borrower in favor of Mezzanine Lender (the "Mezzanine Pledge Agreement"), (iv) the UCC Financing Statement filed in connection with the Mezzanine Pledge Agreement, (v) that certain Guaranty Agreement made by Guarantor to Mezzanine Lender (the "Mezzanine Guaranty") and (vi) any other "Loan Document," as defined in the Mezzanine Loan Agreement referred to in clause (i) above, as each of the foregoing may be modified, amended and restated from time to time.

g. "Mezzanine Loan Liens" shall mean the Liens in favor of Mezzanine Lender created pursuant to the Mezzanine Loan Documents.

h. "Mezzanine Pledge Agreement" shall have the meaning for such definition in the definition for "Mezzanine Loan Documents".

i. "Mezzanine Spread" shall mean ten and thirty-two hundredths percent (10.32%).

2.     Section 1.1 of the Loan Agreement is hereby modified to amend and restate the following specific definition(s):

a. "Hotel Operator" shall mean TPG HOTELS & RESORTS, INC., a Rhode Island corporation, or any other hotel manager approved by Lender in its sole and absolute discretion.

b. "Lien" shall mean, with respect to the Property, any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting Borrower, Mezzanine Borrower, the Property, any portion thereof or any interest therein, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

c. "Loan Documents" shall mean, collectively, this Agreement, the Note, the Security Instrument, the Assignment of Leases, the Prepaid Interest Agreement, the Environmental Indemnity, the Guaranty, the Assignment of Agreements, Licenses, Permits and Contracts, the Post-Closing Agreement, the Liquor License Agreement, the Bond Option Agreement and the Bond Pledge Agreement, and all other documents executed and/or delivered in connection with the Loan.

d. "Maturity Date" shall mean January 18, 2026, or such other date on which the final payment of the principal of the Note becomes due and payable as therein or herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise.

e. "Note Rate" shall mean a rate per annum equal to 5.53%.

f.  "<u>Permitted Encumbrances</u>" shall mean, collectively, (a) the Liens and security interests created by the Loan Documents, (b) all Liens, encumbrances and other matters disclosed in the Title Insurance Policy relating to the Property or any part thereof, (c) Liens, if any, for Taxes imposed by any Governmental Authority not yet delinquent, (d) Liens arising in favor of Borrower pursuant to the Bond Documents, (e) any pledge of any direct or indirect equity interest in Mezzanine Borrower provided that the exercise of remedies under any such pledge would not result in the occurrence of any Default or Event of Default hereunder, (f) the Mezzanine Loan Liens, and (g) such other title and survey exceptions as Lender has approved or may approve in writing in Lender's sole discretion.

g.  "<u>Permitted Equity Transfer</u>" shall mean, absent an existing Event of Default, transfers by holders of direct or indirect equity interests in Borrower or Mezzanine Borrower, provided that at all times during the term of the Loan, (1) (I) ACRON AG Controls Borrower or Mezzanine Borrower and (II) ACRON AG continues to own, directly or indirectly, at least fifty-one percent (51%) of the legal and beneficial membership interests in Borrower or Mezzanine Borrower, (2) with respect to transfers of direct interests in the general partner, managing member or manager of Borrower or Mezzanine Borrower, no transferee shall obtain or hold any Controlling interests other than ACRON AG and/or affiliates Controlled by, or under common Control with, ACRON AG, (3) in the event that, after giving effect to such proposed transfer, the proposed transferee, individually or in the aggregate with its affiliates and subsidiaries, would own ten percent (10%) or more of the aggregate legal and beneficial ownership interests in Borrower or Mezzanine Borrower, Borrower or Mezzanine Borrower, as applicable, shall provide Lender not less than thirty (30) days' advance notice of such proposed transfer of such interests, together with all applicable "know your customer" and "anti-money laundering" diligence (the "<u>KYC Standards</u>") relating to the proposed transferee(s) as may be reasonably requested by Lender, and such transfer will be subject to such proposed transferee's compliance with the KYC Standards, as determined by Lender in its sole discretion and (4) no transfers of direct interests in Borrower or Mezzanine Borrower shall be made in connection with any mezzanine financing transactions, except for transfers of the direct interest in Borrower as a result of (i) a pledge of such interest to Mezzanine Lender pursuant to the Mezzanine Loan Documents or (ii) the exercise of the remedies of Mezzanine Lender under the Mezzanine Loan Documents; <u>provided</u>, <u>that</u>, such exercise of remedies is permitted pursuant to (and effectuated in accordance with) the Intercreditor Agreement.

h.  "<u>Restricted Party</u>" shall mean Borrower, Mezzanine Borrower, Principal, any Guarantor, or any Affiliated Hotel Operator or any shareholder, partner, member or non-member manager, or any direct or indirect legal or beneficial owner of, Borrower, Mezzanine Borrower, Principal, any Guarantor, any Affiliated Hotel Operator or any non-member manager.

5

3.    Section 1.1 of the Loan Agreement is hereby modified to delete the following specific definition(s):

a.    "Hotel Operator SNDA" shall mean a subordination, non-disturbance and attornment agreement with respect to the Hotel Operating Agreement, by and among the Hotel Operator, the Borrower and Lender, in form and substance satisfactory to Lender.

b.    "Pledge Agreement" shall mean that certain Pledge Agreement, dated as of the Closing Date, by and among Pledgor and Lender, as the same may be amended, restated, supplemented or otherwise modified from time to time.

c.    "Pledgor" shall mean individually and collectively as the context may require, ACRON (USA) L.P., a Texas limited partnership, CASTLETON HOLDINGS LLC, a District of Columbia limited liability company and ACRON 2 PORSCHE DRIVE HOLDING LLC, a Delaware limited liability company.

4.    Section 1.2 of the Loan Agreement is hereby amended to add the below paragraph:

d.    Notwithstanding anything to the contrary contained herein, including references to the Mezzanine Loan or to capitalized terms being defined in the Mezzanine Loan Agreement, nothing herein creates any obligation of Borrower with respect to any of the Mezzanine Loan Documents and Borrower has no obligation to comply with and shall not be liable under any Mezzanine Loan Document, and nothing herein creates any obligation of Mezzanine Borrower with respect to any of the Loan Documents and Mezzanine Borrower does not have any obligation to comply with and shall not be liable under this Agreement or any Loan Document.

5.    Section 4.1.8 of the Loan Agreement is hereby amended and restated in its entirety as follows:

a.    Neither Borrower nor Mezzanine Borrower is a Plan and none of the assets of Borrower constitute or will constitute, by virtue of the application of 29 C.F.R. §2510.3-101(f) as modified by section 3(42) of ERISA, "Plan Assets" of one or more Plans.  In addition, (a) neither Borrower nor Mezzanine Borrower is a "governmental plan" within the meaning of Section 3(32) of ERISA and (b) transactions by or with Borrower and/or Mezzanine Borrower are not subject to State statutes regulating investment of, and fiduciary obligations with respect to, governmental plans similar to the provisions of Section 406 of ERISA or Section 4975 of the Code currently in effect, which prohibit or otherwise restrict the transactions contemplated by this Agreement.

6.    Section 4.1.35 of the Loan Agreement shall be amended and restated to replace the capitalized word "Principal" with "Mezzanine Borrower".

7.    Section 4.1.35(g) of the Loan Agreement shall be amended and restated in its

entirety as follows:

a. with respect to Borrower, incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than the Mezzanine Loan and the Debt (except for (1) obligations of Borrower arising under the Bond Documents and (2) trade payables in the ordinary course of its business of owning and operating the Property, provided that such debt (i) is not evidenced by a note, (ii) is paid within sixty (60) days of the date incurred, (iii) does not exceed, in the aggregate, one percent (1%) of the outstanding principal balance of the Note and (iv) is payable to trade creditors and in amounts as are normal and reasonable under the circumstances), and with respect to Principal, incur any debt secured or unsecured, direct or contingent (including guaranteeing any obligations);

8.    Section 4.1 of the Loan Agreement is hereby amended to include the following new section in numerical order:

a. 4.1.45 <u>Mezzanine Loan</u>. Borrower acknowledges that as of the Mezzanine Loan Closing Date, Mezzanine Borrower is obtaining the Mezzanine Loan from Mezzanine Lender in the amount of $11,600,00.00 with a maturity date in no event earlier than the Maturity Date of the Loan, providing for an interest rate of the greater of (i) SOFR (as defined in the Mezzanine Loan Agreement) or (ii) four and one-half percent (4.50%), plus the Mezzanine Spread. Borrower acknowledges that the Mezzanine Loan is being disbursed to Mezzanine Borrower on the Mezzanine Loan Closing Date. Borrower acknowledges that the Mezzanine Loan is being secured by, among other things, the Mezzanine Pledge Agreement. Borrower acknowledges that as a condition to the Mezzanine Loan, Mezzanine Lender and Lender are entering into an Intercreditor Agreement acceptable to Lender (as the same may be amended, restated or otherwise modified from time to time, the "<u>Intercreditor Agreement</u>"). Borrower hereby acknowledges and agrees that the Intercreditor Agreement will be solely for the benefit of Lender and Mezzanine Lender, and that Borrower and Mezzanine Borrower shall not be intended third-party beneficiaries of any of the provisions therein, shall have no rights thereunder and shall not be entitled to rely on any of the provisions contained therein. Lender and Mezzanine Lender shall have no obligation to disclose to Borrower the contents of the Intercreditor Agreement. Borrower's obligations hereunder are and will be independent of such Intercreditor Agreement and shall remain unmodified by the terms and provisions thereof.

9.    Section 5.1.1(a) and (b) of the Loan Agreement shall each be amended and restated in their entirety as follows:

a.  Borrower and Mezzanine Borrower shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, licenses, permits and franchises, and comply, in all material respects,

with all Legal Requirements applicable to it and the Property. There shall never be committed by Borrower or Mezzanine Borrower or any other Person in occupancy of or involved with the operation or use of the Property any act or omission affording the federal government or any State or local government the right of forfeiture against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents or Mezzanine Borrower's obligations under the Mezzanine Loan Documents. Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording such right of forfeiture. Borrower and/or Mezzanine Borrower, as applicable, shall at all times maintain, preserve and protect all franchises and trade names and preserve all the remainder of its property used or useful in the conduct of its business and shall keep the Property in good working order and repair, and from time to time make, or cause to be made, all reasonably necessary repairs, renewals, replacements, betterments and improvements thereto, all as more fully provided in the Security Instrument. Borrower shall keep the Property insured at all times by financially sound and reputable insurers consistent with the requirements as stated in this Agreement, to such extent and against such risks, and maintain liability and such other insurance, as is more fully provided in this Agreement.

b.  Borrower and Mezzanine Borrower agree that the Property shall at all times comply with the requirements of the Access Laws, to the extent such Access Laws are applicable to the Property. Notwithstanding any provisions set forth herein or in any other documents regarding Lender's approval or alterations of the Property, Borrower shall not alter the Property in any manner which would materially increase Borrower's responsibilities for compliance with the applicable Access Laws without the prior written approval of Lender. The foregoing shall apply to tenant improvements constructed by Borrower or any tenants. Lender may condition any such approval upon receipt of a certificate of Access Law compliance from an architect, engineer, or other person acceptable to Lender. Borrower agrees to give prompt notice to Lender of the receipt by Borrower and/or Mezzanine Borrower of any written complaints related to violations of any Access Laws and of the commencement of any proceedings or investigations which relate to compliance with applicable Access Laws.

10.  Section 5.1.3 of the Loan Agreement is hereby amended and restated in its entirety as follows:

a.  Borrower shall give prompt written notice to Lender of any litigation or governmental proceedings pending or threatened in writing against Borrower, Mezzanine Borrower, Principal or Guarantor.

11.  Section 5.1.8(b) of the Loan Agreement is hereby amended and restated in its entirety as follows:

a. execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve and/or protect the Collateral at any time securing or intended to secure the obligations of Borrower under the Loan Documents, as Lender may reasonably require including, without limitation, the authorization of Lender to execute and/or the execution by Borrower and/or Mezzanine Borrower of UCC financing statements

12.    Section 5.1 of the Loan Agreement is hereby amended to include the following new section in numerical order:

5.1.27 <u>Mezzanine Loan</u>.

a. Borrower shall promptly deliver to Lender a copy of any written notice from Mezzanine Lender to Mezzanine Borrower regarding any default by Mezzanine Borrower in the performance or observance of any of the terms, covenants or conditions of the Mezzanine Loan Documents on the part of Mezzanine Borrower to be performed or observed. Borrower will deliver (or cause Mezzanine Borrower to deliver) to Lender all of the financial statements and material reports, certificates and related items delivered or required to be delivered by Mezzanine Borrower to Mezzanine Lender under the Mezzanine Loan Documents as and when delivered under the Mezzanine Loan Documents.

b. After written request by Lender, Borrower shall (or shall cause Mezzanine Borrower to) from time to time, obtain from Mezzanine Lender such estoppel certificates with respect to the status of the Mezzanine Loan and compliance by Mezzanine Borrower with the terms of the Mezzanine Loan Documents as may reasonably be requested by Lender.

c. Borrower and Lender hereby acknowledge and agree that Lender may conclusively rely on any notice delivered by Mezzanine Lender without any inquiry into the validity thereof, including, without limitation, a notice from Mezzanine Lender that a Mezzanine Loan Default has occurred or is continuing. Prior to the indefeasible payment and performance of all of the Obligations (other than any Obligations that survive repayment of the Loan pursuant to the express terms and conditions of the Mezzanine Loan Agreement and/or Mezzanine Loan Documents), none of Borrower, Mezzanine Borrower or Guarantor shall modify, amend, waive or terminate any of the Mezzanine Loan Documents, in each case, without obtaining the prior written consent of Lender, except as expressly permitted pursuant to the terms and conditions of Section 6(b) and any other applicable section of the Intercreditor Agreement. Except as otherwise expressly permitted pursuant to the Mezzanine Loan Documents, no Restricted Party shall acquire or agree to acquire the Mezzanine Loan, or any portion thereof or any interest therein, via purchase, transfer, exchange or otherwise, and any breach or attempted breach of this provision shall constitute an Event of Default hereunder.

13.    Section 5.2.10(a) of the Loan Agreement shall be amended and restated in its entirety as follows:

     a.    Except for the Mezzanine Pledge Agreement, Borrower shall not sell, convey, mortgage, grant, bargain, encumber, pledge, assign, grant options with respect to, or otherwise transfer or dispose of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) the Property or any part thereof or any legal or beneficial interest therein or permit a Sale or Pledge of an interest in any Restricted Party (collectively, a "Transfer"), other than pursuant to Leases of space in the Improvements to tenants, without the prior written consent of Lender.

14.    Section 5.2.14(iii) in the first sentence of Section 5.2.14 of the Loan Agreement is hereby amended and restated in its entirety as follows:

     a.    "mezzanine financing, except for the Mezzanine Loan or"

15.    The first sentence of Section 10.17 of the Loan Agreement is hereby amended and restated in its entirety as follows:

     a.    All news releases, publicity or advertising by Borrower, Mezzanine Borrower or their Affiliates through any media intended to reach the general public which refers to the Loan Documents or the financing evidenced by the Loan Documents, to Lender or any of its Affiliates, shall be subject to the prior written approval of Lender.

16.    Section 5.2 of the Loan Agreement is hereby amended to include the following new section in numerical order:

5.2.18 <u>Mezzanine Loan</u>.

     a.    Borrower's constituent members shall not be permitted to pledge their respective ownership interests (direct or indirect) in Borrower as collateral for any mezzanine loans (other than the Mezzanine Loan).

     b.    Prior to the full satisfaction of the Debt, without Lender's prior written consent, which consent may be granted or withheld in Lender's sole discretion, the outstanding principal amount of the Mezzanine Loan shall not exceed Eleven Million Six Hundred Thousand and No/100 Dollars ($11,600,000.00). In the event that Lender approves, in writing in its sole and absolute discretion, further advances by the Mezzanine Lender under the Mezzanine Loan in excess of such amount, Borrower shall deliver to Lender (i) prior written notice of the date of any such advance and the uses of the funds to be advanced, together with appropriate back-up documentation as reasonably required by Lender, and (ii) any other documentation and information reasonably requested by Lender.

    c.   The Mezzanine Loan shall have a maturity date that is no earlier than the maturity of the Loan.

    d.   The Borrower shall be prohibited from placing any form of mortgage, deed of trust, deed to secure debt or any similar instrument or lien on the Property, except for the Loan.

    e.   Without Lender's prior written consent, which consent may be granted or withheld by Lender in its sole discretion, Borrower shall not amend (or permit to be amended) the terms of the Mezzanine Loan or the Mezzanine Loan Documents.

    f.   Borrower shall not guarantee repayment of the Mezzanine Loan, either explicitly or otherwise.

17.    Section 6.1(b)(viii) of the Loan Agreement is hereby amended and restated in its entirety as follows:

    a.   umbrella liability insurance in an amount not less than $25,000,000 per occurrence on terms consistent with the commercial general liability insurance policy required under Section 6.1(b)(ii) hereof, and providing for excess Automobile liability consistent with Section 6.1(b)(ix);

18.    Section 8.1(a) of the Loan Agreement is hereby amended to include the following new subsection in numerical order:

    a.   (xxviii) Borrower shall fail to comply with any of the covenants contained in Section 5.1.27.

19.    Section 6.1(b)(viii) of the Loan Agreement is hereby amended and restated in its entirety as follows:

    (b)   Notwithstanding the foregoing, the agreement of Lender not to pursue recourse liability as set forth in Subsection (a) above SHALL BECOME NULL AND VOID and shall be of no further force and effect and the Loan shall become fully recourse to Borrower and Guarantor, jointly and severally in the event there shall occur any of the following (each a "**Springing Recourse Event**"): (i) any violation of the provisions of Section 5.2.10 hereof, provided, however, that such breach or violation shall not be a Springing Recourse Event with respect to TH Investment unless TH Investment shall have been given written notice of such breach or violation and failed to cure such breach or violation within ten (10) days; (ii) any material violation of any of the covenants and representations under Section 4.1.35 hereof which results in, the substantive consolidation of (1) the Property with other property not securing the Loan or (2) the Borrower with any other person or entity, in either case, in any bankruptcy, insolvency or similar proceeding and such failure is cited by the court as a material

factor resulting in such substantive consolidation; (iii) Borrower, Guarantor or any Person acting on behalf of Borrower or Guarantor files, or joins in the filing of, an involuntary petition against Borrower or Guarantor under any Creditors Rights Laws, or solicits or causes to be solicited petitioning creditors for any involuntary petition against Borrower or Guarantor from any Person (other than any such petition solicited at the written direction of Lender) provided, however, in the event that TH Investment does not join in or consent to the actions described in this subsection (iii), such action shall not constitute a Springing Recourse Event with respect to TH Investment; (iv) Borrower, Guarantor or any Person acting on behalf of Borrower or Guarantor files an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under any Creditors Rights Laws, or solicits or causes to be solicited petitioning creditors for any involuntary petition from any Person (other than any such petition solicited at the written direction of Lender) provided, however, in the event that TH Investment does not join in or consent to the actions described in this subsection (iv), such action shall not constitute a Springing Recourse Event with respect to TH Investment; (v) Borrower, Guarantor or any Person acting on behalf of Borrower or Guarantor consents to or acquiesces in or joins in an application for the appointment of a custodian, receiver, trustee, or examiner for Borrower or Guarantor or any portion of the Property (other than any such petition solicited at the written direction of Lender) provided, however, in the event that Guarantor does not join in or consent to the actions described in this subsection (v), such action shall not constitute a Spring Recourse Event with respect to Guarantor; (vi) if Borrower, Guarantor, the Property or any part thereof shall become an asset in a voluntary bankruptcy or insolvency proceeding, (vii) fraud or an intentional material misrepresentation by Borrower, Guarantor or any other authorized person acting on behalf of Borrower or Guarantor provided, however, in the event that the fraud or intentional material misrepresentation by Borrower occurs without the consent of TH Investment shall not constitute a Springing Recourse Event with respect to TH Investment; or (viii) Borrower, Guarantor or any Related Party, in connection with any enforcement action or exercise or assertion of any right or remedy by or on behalf of Lender or in connection with the Loan Documents, (A) seeks a defense, judicial intervention or injunctive or other equitable relief of any kind, (B) asserts in a pleading filed in connection with the judicial proceeding any defense against Lender or any right in connection with any security for the Loan, or (C) delays, opposes, impedes, obstructs, hinders, enjoins or otherwise interferes with or frustrates the due exercise by Lender of any such enforcement action, right or remedy; in each case which is adjudicated to have been frivolous, brought in bad faith, without merit (in the case of the defense) or unwarranted (in the case of the request of judicial intervention or injunctive or other equitable relief).

12

20.     Section 10 of the Loan Agreement is hereby amended to include the following new sections in numerical order:

    a.  Section 10.27. <u>Certain Payments from Mezzanine Lender</u>. Lender has advised Borrower that, pursuant to an intercreditor agreement to be entered into between Lender and Mezzanine Lender, Mezzanine Lender may be required in certain circumstances to turn over to Lender certain payments received by Mezzanine Lender from Mezzanine Borrower or a Guarantor.  If Mezzanine Lender turns over any such payments (or any portion thereof) to Lender, then Lender shall have the option to apply such amounts received from Mezzanine Lender to any amounts then due and payable to Lender pursuant to the Guaranty, this Agreement or the other Loan Documents, and any balance shall, at Lender's election, continue to be held by Lender and thereafter applied to amounts that may thereafter become due and payable to Lender pursuant to any of the foregoing and/or thereafter returned by Lender to Mezzanine Lender.

    b.  Section 10.28. <u>Consent of Mezzanine Lender</u>. With respect to any matter for which Borrower is required to obtain the consent and/or approval of Lender hereunder or under any of the other Loan Documents, any such request by Borrower shall be in writing, the sending of which by Borrower shall be deemed to be a representation to Lender that, to the extent the Mezzanine Lender has a correlative consent or approval right under the Mezzanine Loan Documents, the Mezzanine Lender has been requested to approve or consent to any such matter.

III.     <u>AMENDMENTS TO GUARANTY.</u>

1.     New Section 7.16 is hereby added to the Guaranty to provide as follows:

Section 7.16  Survival.  The obligations of Guarantor under this Guaranty shall survive (exclusive of any other obligations of Guarantor under any other guaranty agreement relating to the Loan) until the earliest to occur of the date (the "**Termination Date**") on which any of the following events should occur (any such event, a "**Guaranty Termination Event**"): (X) the Debt is paid in full and the Guaranteed Obligations to the extent then due are fully satisfied and all applicable preference periods under the United States Bankruptcy Code, 11 U.S.C. §101, et seq., as amended, have expired; (Y) Lender (or its nominee or assignee) acquires possession, control or title to the Property via appointment of a receiver, the completion of a foreclosure of the Mortgages or deed in lieu of foreclosure with respect to the Property; and (Z) Mezzanine Lender (or its nominee or assignee), in accordance with the Intercreditor Agreement, acquires the membership interests in Borrower via completion of a UCC foreclosure, acceptance of an assignment in-lieu of foreclosure (or similar instrument) or other similar enforcement action under the Mezzanine Loan Documents. Notwithstanding the foregoing, (i) any obligations of Guarantor which are expressly stated herein to survive termination shall survive such termination of

this Guaranty; (ii) all Guaranteed Obligations hereunder accruing prior to the Termination Date shall survive such termination of this Guaranty; (iii) Guarantor shall be and remain liable for any Guaranteed Obligations which result from the acts or omissions of any Related Party whether such acts occurred prior to or after the Termination Date (provided that, for the avoidance of doubt, "Related Party" shall not include Borrower from and after the date that Guarantor no longer controls Borrower as a result of a Guaranty Termination Event set forth in clause (Z) above); and (iv) Guarantor's liability under this Guaranty shall be reinstated if the applicable Guaranty Termination Event is ever subsequently set aside, rescinded or invalidated as a result of any bankruptcy, insolvency or similar state or federal court proceeding (which has not been initiated in writing by Lender). In any action in connection with the enforcement of liability under this Guaranty, Guarantor shall, at its sole cost and expense, bear the burden of proof to establish that the Guaranteed Obligations hereunder accrued following the Termination Date.

IV.    RATIFICATION AND REAFFIRMATION.  Borrower and Guarantor hereby:

1.    Ratify, confirm, and reaffirm each of the terms and conditions of the Loan Documents to which each is a party and that the same shall remain in full force and effect, as amended hereby and by the Other Amendment Document.

2.    Ratify, confirm, and reaffirm, and hereby covenant and agree that the security interests and liens granted pursuant to the Loan Documents and otherwise, each, to the extent and subject to the terms thereof, secure and shall continue to secure the payment and performance of all of the Debt.

3.    Borrower hereby ratifies, confirms, and reaffirms the effectiveness of any previously filed financing statements, and authorizes Lender (and any agent or representative of Lender) to prepare and file such financing statements (and, if appropriate, amendments to existing financing statements) as Lender may deem necessary or appropriate to perfect or protect its interests in the collateral granted under the terms of the Loan Documents, or termination of same, including, without limitation, financing statements which describe the collateral with generic terms such as "all assets" and/or "all personal property" (or words of similar import).

4.    Agree to cooperate with Lender and execute and deliver to Lender such further instruments and documents as Lender shall request to carry out to its satisfaction the transactions contemplated by this Amendment and the Other Amendment Document.

V.    REMAKING OF LOAN DOCUMENT REPRESENTATIONS.    Except as otherwise expressly modified by this Amendment, each of Borrower and Guarantor hereby remakes as of the date hereof all of the representations and warranties of Borrower and Guarantor, respectively, set forth in such of the Loan Documents to which it is a respective party, which representations and warranties shall be given as of the date hereof (except in each case for representations and warranties which by their terms are expressly applicable to an earlier date) and shall survive the execution and delivery of this Amendment and the Other Amendment

Document.

    VI.   <u>REPRESENTATIONS</u>.  Each of Borrower, ACRON Guarantors and TH Guarantor hereby represents and warrants to Lender as of the date hereof as follows solely and respectively as to itself only:

    1.   Each of Borrower, ACRON Guarantors and TH Guarantor has taken all necessary action to authorize the execution, delivery and performance of this Amendment and the Other Amendment Document to which it is a party, and each has the power and requisite authority to execute, deliver and perform its respective obligations under this Amendment and the Other Amendment Document to which it is a party and all the transactions contemplated hereby and thereby.

    2.   This Amendment and the Other Amendment Document to which it is a party have been duly authorized, executed and delivered by Borrower, ACRON Guarantors and TH Guarantor, respectively, and constitutes the legal, valid and binding obligations of Borrower, ACRON Guarantors and TH Guarantor, enforceable against Borrower, ACRON Guarantors and TH Guarantor, as applicable, in accordance with its and their respective terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally, and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

    3.   This Amendment and the Other Amendment Document are not subject to any right of rescission, set-off, counterclaim or defense by Borrower or Guarantor including the defense of usury, nor would the operation of any of the terms of this Amendment and/or the Other Amendment Document, or the exercise of any right hereunder and/or thereunder, render this Amendment and/or the Other Amendment Document unenforceable, and none of Borrower, ACRON Guarantors or TH Guarantor have asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

    4.   No consent, approval, authorization or order of any court or Governmental Authority or any third party is required in connection with the execution and delivery by Borrower, ACRON Guarantors or TH Guarantor of this Amendment or the Other Amendment Document to which it is a party or to consummate the transactions contemplated hereby or thereby, which consent has not been obtained.

    5.   The execution, delivery and performance of this Amendment and the Other Amendment Document by Borrower, ACRON Guarantors and TH Guarantor and the transactions contemplated hereby and thereby will not conflict with any provision of any law or regulation to which Borrower, ACRON Guarantors and/or TH Guarantor is subject, or conflict with, or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any Lien (other than pursuant to the Loan Documents) upon any of the property of Borrower, ACRON Guarantors or TH Guarantor pursuant to the terms of, any agreement or instrument to which Borrower, ACRON Guarantors and/or TH Guarantor are a party or by which its property is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any Governmental Authority having jurisdiction over

Borrower, ACRON Guarantors and/or TH Guarantor or any of their properties.

6.     To Borrower, ACRON Guarantors and TH Guarantor's knowledge, no Default or Event of Default has occurred and is continuing under any of the Loan Documents after giving effect to this Amendment.

7.     To Borrower, ACRON Guarantors and TH Guarantor's knowledge, no statement of fact made by Borrower, ACRON Guarantors or TH Guarantor in any documents delivered to Lender in connection with this Amendment or the Other Amendment Document, and Lender's due diligence with respect thereto, contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained therein not misleading.

8.     Borrower, ACRON Guarantors and TH Guarantor have read and understand each of the terms and conditions of this Amendment and the Other Amendment Document and are entering into this Amendment and the Other Amendment Document freely and voluntarily, without duress, after having had an opportunity for consultation with independent counsel of its own respective selection, and not in reliance upon any representations, warranties, or agreements made by Lender and not set forth in this Amendment and the Other Amendment Document.

VII.   <u>WAIVERS</u>.

1.     Borrower and Guarantor (each a "***Borrower Party***" and collectively, the "***Borrower Parties***") hereby acknowledge and agree that they do not have any offsets, defenses, claims, or counterclaims against Lender or any of its affiliates, or their respective officers, directors, employees, servicers, asset managers, attorneys, representatives, predecessors, successors or assigns (all of the foregoing, the "***Released Parties***") with respect to the Loan Documents, the Debt, or otherwise, and that if any Borrower Party now has, or ever did have, any such offsets, defenses, claims, or counterclaims against any Released Parties, whether known or unknown, at law or in equity, from the beginning of the world through this date and through the time of execution of this Amendment and the Other Amendment Document, all of them are hereby expressly **WAIVED**, and Borrower Parties hereby **RELEASE** all of the Released Parties from any liability therefor.

2.     Each Borrower Party hereby makes the following waiver knowingly, voluntarily, and intentionally, and understands that Lender, in entering into this Amendment and the Other Amendment Document, is expressly relying on such waiver:  **THE BORROWER PARTIES AND LENDER HEREBY IRREVOCABLY WAIVE ANY PRESENT OR FUTURE RIGHT TO A JURY IN ANY TRIAL OF ANY CASE OR CONTROVERSY IN WHICH BORROWER, GUARANTOR OR LENDER IS OR BECOMES A PARTY (WHETHER SUCH CASE OR CONTROVERSY IS INITIATED BY OR AGAINST LENDER OR IN WHICH LENDER IS JOINED AS A PARTY LITIGANT), WHICH CASE OR CONTROVERSY ARISES OUT OF, OR IS IN RESPECT OF, ANY RELATIONSHIP AMONG BORROWER AND/OR GUARANTOR AND LENDER.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR LENDER AND BORROWER PARTIES TO ENTER INTO THIS AMENDMENT AND THE OTHER AMENDMENT DOCUMENT**.

VIII.   <u>SUCCESSORS AND ASSIGNS</u>.  This Amendment shall be binding upon and shall inure to the benefit (i) of Lender and its successors and assigns and (ii) of Borrower and Guarantor and their respective permitted successors and assigns.

IX.   <u>CONDITIONS TO CLOSING</u>.

1.   Borrower and Guarantor agree to reimburse Lender for all costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender in connection with the preparation, negotiation, execution and delivery of this Amendment, the Other Amendment Document and any other document or instrument executed in connection herewith.

2.   Borrower agrees, concurrently with the execution hereof, to make a payment to Lender in the amount of $8,000,000.00 as a principal paydown, which paydown shall be funded by proceeds from the Mezzanine Loan. For the avoidance of doubt, no Make Whole Fee shall be due to Lender in connection with this Amendment and the obligations therein.

3.   Lender shall have received and approved fully executed copies of all Mezzanine Loan Documents, in form and substance reasonably acceptable to Lender, and such other matters reasonably requested by Lender.

4.   Lender shall have received and approved fully executed copies of the Intercreditor Agreement, in form and substance reasonably acceptable to Lender, and such other matters reasonably requested by Lender.

5.   After giving effect to the terms and conditions hereof, there shall be no Default or Event of Default as of the Amendment Effective Date.

6.   Borrower shall have taken all necessary action to authorize the execution, delivery and performance of this Amendment and the other Loan Documents contemplated hereby.

X.   <u>GOVERNING LAW</u>.  This Amendment shall be deemed to be a contract entered into pursuant to the laws of the State of New York and shall in all respects be governed, construed, applied and enforced in accordance with the laws of the State of New York without reference to conflicts of law provisions which, but for this provision, could require the application of the law of another jurisdiction.

XI.   <u>MERGER CLAUSE</u>.  This Amendment and the Other Amendment Document incorporate all discussions and negotiations among the Borrower Parties and Lender, either express or implied, concerning the matters included herein and in such other instruments, any custom, usage, or course of dealings to the contrary notwithstanding.  No such discussions, negotiations, custom, usage, or course of dealings shall limit, modify, or otherwise affect the provisions hereof.

XII.   <u>COURSE OF DEALING</u>.  The agreement by Lender to enter into this Amendment and the Other Amendment Document is a one-time agreement only and will not constitute or be

17

deemed to constitute an agreement by Lender to any additional requests of Borrower or Guarantor to modify or waive any terms of the Loan Documents. Additionally, neither this Amendment nor the Other Amendment Document shall be deemed to constitute a course of conduct or dealing whatsoever or a waiver of any rights of Lender under the Loan Documents.

XIII.   NO FURTHER MODIFICATION AND CONTINUING OBLIGATIONS. Except as modified, amended or otherwise provided by this Amendment and the Other Amendment Document, the Loan Documents and the respective obligations of Lender, Borrower, and Guarantor thereunder and in respect of the Loan shall remain unmodified and in full force and effect. Each of Borrower and Guarantor shall continue to comply with all of the other terms and conditions of the Loan Documents to which each is respectively a party, as modified hereby and by the Other Amendment Document to which each is respectively a party.

XIV.   EXTENSION OPTIONS. Borrower and Lender agree that in no event shall the Loan be further extended beyond the Maturity Date, as such term is amended by this Amendment.

XV.   VALIDITY. Any determination that any provision of this Amendment or the Other Amendment Document or any application thereof is invalid, illegal, or unenforceable in any respect in any instance shall not affect the validity, legality, or enforceability of such provision in any other instance, or the validity, legality, or enforceability of any other provision of this Amendment or the Other Amendment Document.

XVI.   CAPTIONS. The captions of this Amendment are for convenience purposes only and shall not be used in construing the intent of the parties to this Amendment.

XVII. COUNTERPARTS.   This Amendment may be executed in one or more counterparts, each of which shall constitute an original and all of which taken together shall constitute one agreement, binding for all purposes. Each party executing this Amendment represents that such party has the full authority and legal power to do so. An electronic image (including a facsimile, "pdf", photograph or other electronic image) of an executed counterpart of this Amendment shall be deemed to be an original for all purposes. Execution of this Amendment by a party by e-signature shall fully bind such party to this Amendment.

[Remainder of page intentionally left blank]

18

**IN WITNESS WHEREOF**, the parties hereto have caused this Amendment to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**LENDER:**

**KHRE SMA FUNDING, LLC,**
a Delaware limited liability company

By: _____

Name: Laura L. Torrado
Title:   Authorized Signatory

[Signatures continue on following page]

[Signature Page to Third Amendment to Loan Agreement and Other Loan Documents
and Reaffirmation of Loan Documents (Kimpton)]

**BORROWER:**

**ACRON 2 PORSCHE DRIVE, ATLANTA LLC,**
a Delaware limited liability company

By:     ACRON (USA) L.P., its Manager

       By:     ACRON U.S. MANAGEMENT,
       INC., its sole General Partner

By: _____
    Name:  Greg Wilson
    Title:  President

[Signatures continue on following page]

[Signature Page to Third Amendment to Loan Agreement and Other Loan Documents
and Reaffirmation of Loan Documents (Kimpton)]

**GUARANTOR:**

**ACRON (USA), L.P.**, a Texas limited partnership

By:     ACRON U.S. MANAGEMENT, INC., a
Nevada corporation, its sole General Partner

By:_____
     Name: Greg Wilson
     Title: President

**ACRON AG**, a Swiss stock corporation

By:_____
Name: Peer Bender
Title:   Chief Executive Officer

**TH INVESTMENT HOLDINGS II, LLC** a Delaware
limited liability company

By:_____
Name:
Title:

**GUARANTOR:**

**ACRON (USA), L.P.**, a Texas limited partnership

By:    ACRON U.S. MANAGEMENT, INC., a
Nevada corporation, its sole General Partner

By:_____
      Name: Greg Wilson
      Title: President

**ACRON AG**, a Swiss stock corporation

By:_____
Name: Peer Bender
Title:   Chief Executive Officer

**TH INVESTMENT HOLDINGS II, LLC** a Delaware
limited liability company

By:_____
Name:
Title:

[Signature Page to Third Amendment to Loan Agreement and Other Loan Documents
and Reaffirmation of Loan Documents (Kimpton)]

**GUARANTOR:**

**ACRON (USA), L.P.,** a Texas limited partnership

By:     ACRON U.S. MANAGEMENT, INC., a
Nevada corporation, its sole General Partner

By: _____
        Name:  Greg Wilson
        Title:  President

**ACRON AG,** a Swiss stock corporation

By: _____
Name: Peer Bender
Title:   Chief Executive Officer

**TH INVESTMENT HOLDINGS II, LLC** a Delaware
limited liability company

By: _____
Name: James A. Procaccianti
Title:

[Signature Page to Third Amendment to Loan Agreement and Other Loan Documents
and Reaffirmation of Loan Documents (Kimpton)]

THIS INSTRUMENT PREPARED BY
AND AFTER RECORDING RETURN TO:
King & Spalding LLP

300 S. Tryon Street, Suite 1700
Charlotte, North Carolina 28202
Attention:  Roland C. Macher, Esq.

Cross Reference:
Deed Book 59576, Page 220
Deed Book 59788, Page 14
Deed Book 65100, Page 148
Deed Book 66495, Page 686

---

### THIRD AMENDMENT TO AMENDED AND RESTATED DEED TO SECURE DEBT, ASSIGNMENT, SECURITY AGREEMENT, AND FIXTURE FILING

GRANTOR**:**          **ACRON 2 PORSCHE DRIVE, ATLANTA LLC**, a Delaware limited
                                 liability company

GRANTEE:              **KHRE SMA FUNDING, LLC**, a Delaware limited liability company

DATE:                    January          18,          2024

Street Address:      2 Porsche Drive, Atlanta, Georgia

County:                  Fulton

Parcel ID:             14-0096-LL-062-7

Intangible Tax Due:   $0.00

Intangible Recording Tax Exemption Authority:  Intangible tax previously paid in the amount of
$25,000.00 upon recording of the Amended and Restated Deed to Secure Debt, Assignment,
Security Agreement and Fixture Filing, recorded at Deede Book 59576, Page 220, Records of
Fulton County, Georgia.  No tax due per GA DOR Rule 560-11-8-.03(4).

**THIRD AMENDMENT TO AMENDED AND RESTATED DEED TO SECURE DEBT, ASSIGNMENT, SECURITY AGREEMENT AND FIXTURE FILING**

THIS THIRD AMENDMENT TO AMENDED AND RESTATED DEED TO SECURE DEBT, ASSIGNMENT, SECURITY AGREEMENT AND FIXTURE FILING (this "**Amendment**") is made as of this 24th day of January, 2024, by **ACRON 2 PORSCHE DRIVE, ATLANTA LLC**, a Delaware limited liability company, having its principal place of business at c/o ACRON (USA), L.P., 2424 East 21st Street, Suite 150, Tulsa, Oklahoma 74114, as grantor ("**Grantor**") to **KHRE SMA FUNDING, LLC**, a Delaware limited liability company, as grantee (together with its successors and/or assigns, "**Grantee**"), having offices at c/o Knighthead Funding, LLC, 777 West Putnam Avenue, 3rd Floor, Suite B-2, Greenwich, CT  06830.

<u>W I T N E S S E T H</u>:

WHEREAS, a certain AMENDED AND RESTATED DEED TO SECURE DEBT, ASSIGNMENT, SECURITY AGREEMENT AND FIXTURE FILING dated as of December 21, 2018, was given by Grantor to Grantee, recorded in Deed Book 59576 on Page 220 by the Clerk of Superior Court of Fulton County, Georgia, re-recorded on March 12, 2019 in Deed Book 59788, Page 14, in aforesaid records, as amended by that First Amendment to Amended and Restated Deed to Secure Debt, Assignment of Leases and Rents, Security Agreement, and Fixture Filing, dated as of December 31, 2021, recorded in Deed Book 65100 on Page 148 by the Clerk of Superior Court of Fulton County, Georgia, and as further amended by that Second Amendment to Amended and Restated Deed to Secure Debt, Assignment of Leases and Rents, Security Agreement, and Fixture Filing, dated as of January 2, 2023, recorded in Deed Book 66495 on Page 686 by the Clerk of Superior Court of Fulton County, Georgia (collectively, the "**Existing Security Instrument**"),  and encumbering the property more particularly described in <u>Exhibit A</u> attached hereto; and given to secure a loan in the original principal amount of THIRTY-SIX MILLION and 00/100 DOLLARS ($36,000,000.00) (the "**Loan**") or so much thereof as was advanced pursuant to that certain Loan Agreement, dated as of December 21, 2018, among Grantor and Grantee (as amended by that First Amendment to Loan Agreement and Other Loan Documents and Reaffirmation of Loan Documents, dated as of December 31, 2021, that certain Second Amendment to Loan Agreement and Other Loan Documents and Reaffirmation of Loan Documents, dated as of January 2, 2023, and that certain Third Amendment to Loan Agreement and Other Loan Documents and Reaffirmation of Loan Documents, dated as of the date hereof, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, collectively, the "**Loan Agreement**") and evidenced by that certain Amended and Restated Promissory Note, dated as of December 21, 2018, in the original principal amount of THIRTY-SIX MILLION and 00/100 DOLLARS ($36,000,000.00) (the "**Note**").  Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Loan Agreement;

WHEREAS, Grantee has agreed to extend the Maturity Date of the Loan; and

NOW, THEREFORE, for and in consideration of the premises, TEN DOLLARS ($10.00) in hand paid and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      <u>Amendments to Existing Security Instrument</u>.  Effective as of this date, the Existing Security Instrument has been and is hereby amended as follows:

1.1      All references to "October 2, 2023" shall be changed to "January 18, 2026";

2.      <u>No Other Change</u>.  Except as herein expressly amended, each and every term, condition, warranty and provision of the Existing Security Instrument shall remain in full force and effect, and such are hereby ratified, confirmed and approved by the parties hereto.  Nothing herein shall be construed to alter or affect the priority of the lien or title created by the Existing Security Instrument, it being the expressly declared intention of the parties hereto that no novation of the Loan Documents be created hereby.

3.      <u>Entire Agreement</u>.  This Amendment and the Existing Security Instrument, as the same has been amended by this Amendment, set forth the entire understanding of the parties with respect to the matters set forth herein, and shall supersede any prior negotiations, commitment letters, or agreements, whether written or oral, with respect to such matters.

4.      <u>Binding Effect</u>.  This Amendment shall be binding upon and shall inure to the benefit of the parties hereto, their respective successors, legal representatives and assigns.

5.      <u>Counterparts</u>.  This Amendment may be executed in any number of counterparts and by different parties hereto in separate counterparts, all of which taken together shall constitute but one and the same instrument.

6.      <u>Governing Law</u>.  This Amendment shall be governed by and shall be construed and enforced in accordance with the internal laws of the State of New York, without regard to conflicts of law principles, except to the extent the law of the state where the Property is located necessarily applies because the property encumbered by the Existing Security Instrument, as amended by this Amendment, is located in such state.

[NO FURTHER TEXT ON THIS PAGE]

IN WITNESS WHEREOF, THIS AMENDMENT has been executed by Grantor as of the day and year first above written.

Signed, sealed and delivered
in the presence of:

_____
Unofficial Witness

**GRANTOR:**

**ACRON 2 PORSCHE DRIVE, ATLANTA LLC,**
a Delaware limited liability company

By:     ACRON (USA) L.P., its Manager

     By:     ACRON U.S. MANAGEMENT,
     INC., its sole General Partner

_____

By: _____ (SEAL)
Name:  Greg Wilson
Title: President

Notary Public
My Commission Expires: March 24, 2026

    [Affix Notarial Seal]

```
SUSAN LOWE
Notary Public - State of Oklahoma
Commission Number 14002837
My Commission Expires Mar 24, 2026
```

[Signature Page to Third Amendment to Deed to Secure Debt]

**GRANTEE:**

**KHRE SMA FUNDING, LLC**,
a Delaware limited liability company

By: _____
      Name: Laura L. Torrado
      Title:   Authorized Signatory

Signed, sealed and delivered in the
presence of:

_____
Unofficial Witness
Printed Name: _Megan Wojnar_

_____
Notary Public
My Commission Expires: June 14, 2025

[NOTARY SEAL]

Nikki Neciforo
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01NO6418572
Qualified in New York County
Commission Expires     June 14, 2025

[Signature Page to Third Amendment to Deed to Secure Debt]

# Exhibit "A"

## Legal Description

PARCEL 1:

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOT 96 OF THE 14TH DISTRICT, CITY OF HAPEVILLE, FULTON COUNTY, GEORGIA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A NAIL SET ON THE SOUTHWESTERLY RIGHT-OF-WAY OF PORSCHE AVENUE (FORMERLY KNOWN AS HENRY FORD II AVENUE AND HAVING A VARIED RIGHT-OF-WAY) AT ITS INTERSECTION WITH THE WESTERLY RIGHT-OF-WAY OF PORSCHE DRIVE (HAVING A VARIED RIGHT-OF-WAY); THENCE RUNNING ALONG THE WESTERLY RIGHT-OF-WAY OF PORSCHE DRIVE SOUTH 63 DEGREES 35 MINUTES 46 SECONDS EAST A DISTANCE OF 21.49 FEET TO A NAIL SET; THENCE CONTINUING ALONG SAID RIGHT-OF-WAY SOUTH 49 DEGREES 10 MINUTES 54 SECONDS EAST A DISTANCE OF 21.67 FEET TO A NAIL SET; THENCE LEAVING SAID RIGHT-OF-WAY AND RUNNING ALONG A CURVE TO THE RIGHT AN ARC DISTANCE OF 44.79 FEET (SAID ARC HAVING A RADIUS OF 45.00 FEET AND BEING SUBTENDED BY A CHORD 42.97 FEET IN LENGTH LYING TO THE SOUTHWEST OF SAID ARC AND BEARING SOUTH 05 DEGREES 43 MINUTES 43 SECONDS EAST) TO A POINT; THENCE RUNNING SOUTH 22 DEGREES 47 MINUTES 15 SECONDS WEST A DISTANCE OF 230.40 FEET TO A POINT; THENCE RUNNING ALONG A CURVE TO THE LEFT AN ARC DISTANCE OF 126.77 FEET (SAID ARC HAVING A RADIUS OF 432.62 FEET AND BEING SUBTENDED BY A CHORD 126.32 FEET IN LENGTH LYING TO THE SOUTHEAST OF SAID ARC AND BEARING SOUTH 13 DEGREES 57 MINUTES 08 SECONDS WEST) TO A 1/2 INCH REBAR SET; THENCE RUNNING SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST A DISTANCE OF 212.04 FEET TO A NAIL SET; THENCE RUNNING NORTH 70 DEGREES 00 MINUTES 00 SECONDS WEST A DISTANCE OF 208.76 FEET TO A 1/2 INCH REBAR SET; THENCE RUNNING NORTH 00 DEGREES 00 MINUTES 00 SECONDS WEST A DISTANCE OF 181.08 FEET TO A 1/2 INCH REBAR SET; THENCE RUNNING NORTH 44 DEGREES 40 MINUTES 27 SECONDS EAST A DISTANCE OF 257.60 FEET TO A 1/2 INCH REBAR SET; THENCE RUNNING SOUTH 45 DEGREES 00 MINUTES 00 SECONDS EAST A DISTANCE OF 122.00 FEET TO A 1/2 INCH REBAR SET; THENCE RUNNING NORTH 45 DEGREES 00 MINUTES 00 SECONDS EAST A DISTANCE OF 144.04 FEET TO A NAIL SET ON THE SOUTHWESTERLY RIGHT-OF-WAY OF PORSCHE AVENUE; THENCE RUNNING ALONG SAID RIGHT-OF-WAY ALONG A CURVE TO THE LEFT AN ARC DISTANCE OF 128.77 FEET (SAID ARC HAVING A RADIUS OF 2437.76 FEET AND BEING SUBTENDED BY A CHORD 128.75 FEET IN LENGTH LYING TO THE SOUTHWEST OF SAID ARC AND BEARING SOUTH 67 DEGREES 15 MINUTES 42 SECONDS EAST) TO A NAIL SET AND THE POINT OF BEGINNING;

SAID TRACT CONTAINS 3.98 ACRES (173,460 SQUARE FEET), MORE OR LESS. BEING THE SAME PROPERTY DEPICTED AS THE "3.98 ACRE TRACT" ON THAT CERTAIN ALTA/ACSM SURVEY PREPARED BY LOWE ENGINEERS, BEARING THE SEAL AND SIGNATURE OF WILLIAM J. DANIEL III, G.R.L.S. NO. 2257, SAID PLAT DATED DECEMBER 4, 2015, BEING JOB NO. 15-0120, AS REVISED.

PARCEL 2:

EASEMENTS AND OTHER INTERESTS IN REAL PROPERTY CONTAINED IN THAT CERTAIN DECLARATION OF EASEMENT, COVENANTS, CONDITIONS AND RESTRICTIONS BETWEEN PORSCHE CARS NORTH AMERICA, INC., A DELAWARE CORPORATION AND ACRON 2 PORSCHE DRIVE, ATLANTA LLC, LLC, A DELAWARE LIMITED LIABILITY COMPANY, DATED DECEMBER 30, 2015, FILED FOR RECORD DECEMBER 31, 2015, RECORDED IN DEED BOOK 55721, PAGE 498 , RECORDS OF FULTON COUNTY, GEORGIA.

PARCEL 3:

BENEFICIAL EASEMENTS CREATED PURSUANT TO THAT CERTAIN EASEMENT AGREEMENT DATED SEPTEMBER 30, 2011, FILED FOR RECORD OCTOBER 5, 2011, RECORDED IN DEED BOOK 50440, PAGE 499, aforesaid records; AS AMENDED BY THAT CERTAIN AMENDED AND RESTATED EASEMENT AGREEMENT, DATED MAY 11, 2012, FILED FOR THE RECORD JUNE 25, 2012, RECORDED IN DEED BOOK 51337, PAGE 235, aforesaid records; AS AFFECTED BY THAT CERTAIN ASSIGNMENT AND ASSUMPTION OF AMENDED AND RESTATED EASEMENT AGREEMENT DATED FEBRUARY 27, 2017, FILED FOR RECORD FEBRUARY 28, 2017, AND RECORDED IN DEED BOOK 57228, PAGE 93.

PARCEL 4:

BENEFICIAL EASEMENTS CREATED PURSUANT TO THAT EASEMENT AND OPERATION AGREEMENT, DATED JUNE 21, 2012, FILED FOR RECORD JUNE 25, 2012, AND RECORDED IN DEED BOOK 51337, PAGE 322, AFORESAID RECORDS; AND AS AFFECTED BY THAT CERTAIN ASSIGNMENT AND ASSUMPTION OF EASEMENT AND OPERATION AGREEMENT DATED FEBRUARY 23, 2017, FILED FOR RECORD FEBRUARY 28, 2017, AND RECORDED IN DEED BOOK 57228, PAGE 111, AFORESAID RECORDS.

Exhibit A

## <u>TERMINATION OF PLEDGE AGREEMENT</u>

THIS TERMINATION OF PLEDGE AGREEMENT (this "**Termination Agreement**") is executed as of January 18, 2024 (the "**Effective Date**") by and between KHRE SMA FUNDING, LLC, a Delaware limited liability company ("**Secured Party**"), on the one hand, and ACRON (USA) L.P., a Texas limited partnership ("**ACRON USA**"), CASTLETON HOLDINGS LLC, a District of Columbia limited liability company ("**Castleton**"), and ACRON 2 PORSCHE DRIVE HOLDING LLC, a Delaware limited liability company ("**ACRON Holding**", together with ACRON USA and Castleton, jointly and severally, individually and collectively as the context may require, "**Pledgor**"), on the other hand.

WHEREAS, Pledgor had previously executed that certain Pledge Agreement, dated as of December 21, 2018, in favor of Secured Party (as previously amended, supplemented or otherwise modified from time to time the "**Original Pledge**"; all capitalized terms not otherwise defined herein shall have the meanings set forth in the Original Pledge), pursuant to which Pledgor had granted a security interest in the Pledged Collateral (as defined in Section 1 of the Original Pledge) to secure certain obligations to the Secured Party as set forth therein;

WHEREAS, Secured Party and Pledgor have mutually agreed upon a termination of the Original Pledge, subject to the terms and conditions set forth herein.

NOW, THEREFORE, for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Secured Party and Pledgor hereby agree as follows:

1.      <u>Termination of Original Pledge.</u>  Upon the satisfaction of the conditions set forth in <u>Section 2</u> of this Termination Agreement, and notwithstanding anything to the contrary in the Original Pledge, the Original Pledge shall automatically terminate and be of no further force or effect, as of the Effective Date, without any further action by any party thereto.  Secured Party acknowledges and agrees that any Pledgor shall be entitled to file any financing statement terminations necessary to reflect termination of the Original Pledge on or after the Effective Date.

2.      <u>Miscellaneous</u>.

(a)      Except as otherwise provided in the Original Pledge, the substantive laws of the State of Texas shall govern the validity, construction, enforcement and interpretation of this Termination Agreement without reference to conflicts of law principles.  Except as otherwise provided in the Original Pledge, any legal suit, action or proceeding against Secured Party or Pledgor arising out of or relating to this Termination Agreement shall be instituted in any federal or state court located in the County of Dallas, State of Texas, and each party waives any objections that it may now or hereafter have based on venue and/or forum non conveniens of any such suit, action or proceeding, and each party hereby irrevocably submits to the jurisdiction of any such court in any suit, action or proceeding.

(b)      This Termination Agreement and each of the terms and provisions hereof may only be amended, modified, waived, or supplemented by an agreement in writing signed by each party hereto.

(c)      Wherever possible, each provision of this Termination Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Termination Agreement is held to be illegal, invalid or unenforceable under applicable law, then the legality, validity, and enforceability of the remaining provisions of this Termination Agreement shall not be affected thereby, and in lieu of each such illegal, invalid or unenforceable provision there shall be added automatically as a part of this Termination Agreement a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible to be legal, valid, and enforceable.

(d)      This Termination Agreement constitutes the sole and entire agreement between the parties hereto with respect to the subject matter contained herein and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

(e)      This Termination Agreement may be executed in counterparts, each of which is deemed an original, but all of which constitutes one and the same agreement. This Termination Agreement, to the extent signed and delivered by means of electronic transmission in portable document format (pdf), shall be treated in all manner and respects (and shall have the same binding legal effect) as a fully executed original Termination Agreement.

(Signatures on following page)

IN WITNESS WHEREOF, the parties hereto have caused this Termination Agreement to be duly executed, by their duly authorized representatives, as of the Effective Date.

**SECURED PARTY:**

**KHRE SMA FUNDING, LLC,**
a Delaware limited liability company

By: _____
Name: Laura L. Torrado
Title:   Authorized Signatory

(Signatures on following page)

**PLEDGOR:**

**ACRON (USA) L.P.**,
a Texas limited partnership

By:     ACRON U.S. Management, Inc.,

       a Nevada corporation
       its sole General Partner

       By: _____
       Name: Greg Wilson
       Title:  President

**CASTLETON HOLDINGS LLC**,
a District of Columbia limited liability company

By: _____
Name: Bruce F. Bradley
Title:  Managing Member

**ACRON 2 PORSCHE DRIVE HOLDING LLC**,
a Delaware limited liability company

By:     ACRON (USA) LP, a Texas LP, as its
       managing member

By:     ACRON U.S. Management, Inc., a Nevada
       corporation, its sole General Partner

       By: _____
       Name: Greg Wilson
       Title:  President

[Signature Page to Termination of Pledge and Security Agreement]

**PLEDGOR:**


**ACRON (USA) L.P.,**
a Texas limited partnership

By:    ACRON U.S. Management, Inc.,
        a Nevada corporation
        its sole General Partner

        By: _____
        Name: Greg Wilson
        Title:  President


**CASTLETON HOLDINGS LLC,**
a District of Columbia limited liability company

By:    _____
Name: Bruce F. Bradley
Title:  Managing Member


**ACRON 2 PORSCHE DRIVE HOLDING LLC,**
a Delaware limited liability company

By:    ACRON (USA) LP, a Texas LP, as its
        managing member

By:    ACRON U.S. Management, Inc., a Nevada
        corporation, its sole General Partner

        By: _____
        Name: Greg Wilson
        Title:  President

# **EXHIBIT C**

<u>Mezzanine Loan Documents</u>

# **<u>EXHIBIT D</u>**

<u>Mezzanine Lender Organizational Chart</u>



# **EXHIBIT H**

(Valuation Analysis)



KIMPTON OVERLAND HOTEL ATLANTA AIRPORT
VALUATION ANALYSIS

HWE
HODGES WARD ELLIOTT

# TABLE OF CONTENTS

| | |
|---|---|
| Executive Summary | 4 |
| Financial Analysis | 6 |
| Market Overview | 11 |
| Team Qualifications | 16 |

## PRESENTED BY:

**Clint Hodges**
Managing Director

**Jeff Berkman**
Director

**Chase Wood**
Associate


HWE



*HWE appreciates the opportunity to present
our qualifications and experience*

# HWE Advantage

Real Time Marketing of
Comparable Properties

Unmatched Experience
Selling Metro Atlanta

Highly Synergistic,
Vertically Integrated
Platform

Global
Connectivity

Renowned for Data-
Driven Arguments that
Maximize Value

HWE



HWE

# EXECUTIVE SUMMARY

# EXECUTIVE SUMMARY
## *Valuation Summary - Tribute Portfolio Brand Conversion*

HWE is pleased to provide the following Valuation Analysis of the **Kimpton Overland Hotel Atlanta Airport.** Our objective is to provide you with a baseline valuation that can be supported by disciplined underwriting. In a marketing effort, HWE's underwriting would reflect more aggressive assumptions and target pricing at the upper end of the valuation range.



*HWE valuation metrics are calculated against the high end of the value range.

$24,000,000
$112,150 PER KEY

$26,000,000
$121,495 PER KEY

$28,000,000
$130,841 PER KEY

TRADE
RANGE

BASELINE PRICING

TARGET PRICING





HWE

FINANCIAL ANALYSIS

# FINANCIAL ANALYSIS
## *Valuation Summary - Tribute Portfolio Brand Conversion*

## VALUATION METRICS

**Kimpton Overland Hotel Atlanta Airport • Atlanta, GA**

| | |
|---|---|
| Value: | $28,000,000 |
| Value Per Room: | $130,841 |
| Estimated Capital & Closing Costs: | $6,980,000 |
| Debt Reserve: | $300,000 |
| All-In Acquisition Cost: | $35,280,000 |
| All-In Price Per Room: | $164,860 |
| All-In Cap Rate on YE 2023 NOI: | 4.4% |
| All-In Cap Rate on YE 2024 NOI: | 2.9% |
| All-In Cap Rate on 2025 Budget NOI: | 7.8% |
| All-In Cap Rate on HWE Year One (2025) NOI: | 4.4% |
| 5-Year Leveraged IRR: | 19.7% |
| 10-Year Unleveraged IRR: | 13.0% |

*\* Metrics recorded at highpoint of value range presented.*

| Purchase Price | Per Key | All-In Cap Rate on Year End 2024 | All-In Cap Rate on 2025 Budget | All-In Cap Rate on HWE Proforma Year One |
|---|---|---|---|---|
| $24,000,000 | $112,150 | 3.3% | 8.8% | 5.0% |
| $25,000,000 | $116,822 | 3.2% | 8.6% | 4.8% |
| $26,000,000 | $121,495 | 3.1% | 8.3% | 4.7% |
| $27,000,000 | $126,168 | 3.0% | 8.1% | 4.5% |
| $28,000,000 | $130,841 | 2.9% | 7.8% | 4.4% |

*Note: All-In Metrics Include Estimated Closing Costs & CapEx.*

### KEY ASSUMPTIONS

- Unencumbered of Management and Management Fee equaling 3.0% of Total Revenue.

- FF&E Reserve equaling 4.0% of Total Revenue.

- ~$6.4M ($30,000/key) allowed for Tribute Portfolio brand conversion. Incremental capital expenditures will impact pricing.

- HWE assumes $300,000 of Debt Reserve in Year One.

- Acquisition financing at 65% LTC, I/O, SOFR+400.

- Closing costs equal to 2.0% of purchase price.

- Terminal capitalization rate of 9.0%.



# FINANCIAL ANALYSIS
## *Historical & Projected Cash Flow - Tribute Portfolio Brand Conversion*

| | Year Ended December 31, 2023 Amount | Ratio | Year Ended December 31, 2024 Amount | Ratio | Budget Year Ended December 31, 2025 Amount | Ratio | 2025 Year One Amount | Ratio | 2026 Year Two Amount | Ratio | 2027 Year Three Amount | Ratio | 2028 Year Four Amount | Ratio | 2029 Year Five Amount | Ratio |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | | | | | |
| Rooms | $8,699,999 | 66.9% | $8,195,015 | 66.2% | $9,226,187 | 60.7% | $8,604,598 | 65.6% | $10,001,579 | 65.7% | $9,884,456 | 65.2% | $10,586,592 | 65.4% | $10,874,397 | 65.3% |
| Food & Beverage | 3,765,606 | 28.9% | 3,666,143 | 29.6% | 5,443,357 | 35.8% | 3,983,610 | 30.4% | 4,674,884 | 30.7% | 4,711,175 | 31.1% | 5,021,572 | 31.0% | 5,183,127 | 31.1% |
| Parking | 413,549 | 3.2% | 402,875 | 3.3% | 436,154 | 2.9% | 436,154 | 3.3% | 456,000 | 3.0% | 471,960 | 3.1% | 488,479 | 3.0% | 505,575 | 3.0% |
| Other | 130,373 | 1.0% | 109,242 | 0.9% | 87,282 | 0.6% | 87,282 | 0.7% | 90,600 | 0.6% | 93,771 | 0.6% | 97,053 | 0.6% | 100,450 | 0.6% |
| **Total Revenue** | 13,009,527 | 100.0% | 12,373,275 | 100.0% | 15,192,980 | 100.0% | 13,111,644 | 100.0% | 15,223,063 | 100.0% | 15,161,362 | 100.0% | 16,193,696 | 100.0% | 16,663,549 | 100.0% |
| | | | | | | | | | | | | | | | | |
| **Departmental Expenses** | | | | | | | | | | | | | | | | |
| Rooms | 2,826,352 | 32.5% | 2,481,553 | 30.3% | 2,568,570 | 27.8% | 2,496,396 | 29.0% | 2,671,362 | 26.7% | 2,679,095 | 27.1% | 2,841,812 | 26.8% | 2,919,069 | 26.8% |
| Food & Beverage | 2,517,970 | 66.9% | 2,628,589 | 71.7% | 2,705,893 | 49.7% | 2,788,527 | 70.0% | 3,272,418 | 70.0% | 3,281,891 | 69.3% | 3,481,220 | 69.3% | 3,575,860 | 69.0% |
| Parking | 84,325 | 20.4% | 131,868 | 32.7% | 79,067 | 18.1% | 79,067 | 18.1% | 82,080 | 18.0% | 84,542 | 17.9% | 87,079 | 17.8% | 89,691 | 17.7% |
| Other | 3,742 | 2.9% | 4,064 | 3.7% | - | 0.0% | - | 0.0% | - | 0.0% | - | 0.0% | - | 0.0% | - | 0.0% |
| **Total Departmental Expenses** | 5,432,389 | 41.8% | 5,246,074 | 42.4% | 5,353,530 | 35.2% | 5,363,990 | 40.9% | 6,025,860 | 39.6% | 6,045,529 | 39.9% | 6,410,111 | 39.6% | 6,584,620 | 39.5% |
| | | | | | | | | | | | | | | | | |
| **Total Departmental Profit** | 7,577,138 | 58.2% | 7,127,201 | 57.6% | 9,839,450 | 64.8% | 7,747,654 | 59.1% | 9,197,202 | 60.4% | 9,115,833 | 60.1% | 9,783,585 | 60.4% | 10,078,929 | 60.5% |
| | | | | | | | | | | | | | | | | |
| **Undistributed Oper. Expenses** | | | | | | | | | | | | | | | | |
| Admin. & Gen. | 1,204,747 | 9.3% | 1,287,981 | 10.4% | 1,437,256 | 9.5% | 1,200,000 | 9.2% | 1,236,000 | 8.1% | 1,273,080 | 8.4% | 1,311,272 | 8.1% | 1,350,611 | 8.1% |
| Info. & Telecomm. Systems | 263,901 | 2.0% | 288,638 | 2.3% | 316,014 | 2.1% | 272,722 | 2.1% | 304,461 | 2.0% | 313,595 | 2.1% | 323,003 | 2.0% | 332,693 | 2.0% |
| Franchise Fees | 909,602 | 7.0% | 928,492 | 7.5% | 1,040,719 | 6.9% | 970,604 | 7.4% | - | 0.0% | - | 0.0% | - | 0.0% | - | 0.0% |
| Marketing | 817,381 | 6.3% | 752,127 | 6.1% | 938,926 | 6.2% | 810,300 | 6.2% | 913,384 | 6.0% | 940,785 | 6.2% | 969,009 | 6.0% | 998,079 | 6.0% |
| Utility Costs | 445,309 | 3.4% | 483,848 | 3.9% | 536,312 | 3.5% | 517,869 | 3.9% | 596,159 | 3.9% | 597,885 | 3.9% | 634,198 | 3.9% | 651,439 | 3.9% |
| Property Oper. & Maint. | 595,956 | 4.6% | 569,304 | 4.6% | 650,260 | 4.3% | 561,178 | 4.3% | 646,980 | 4.3% | 666,390 | 4.4% | 686,381 | 4.2% | 706,973 | 4.2% |
| **Total Undistributed Oper. Expenses** | 4,236,896 | 32.6% | 4,310,390 | 34.8% | 4,919,487 | 32.4% | 4,332,673 | 33.0% | 3,696,984 | 24.3% | 3,791,735 | 25.0% | 3,923,863 | 24.2% | 4,039,794 | 24.2% |
| | | | | | | | | | | | | | | | | |
| **Gross Operating Profit** | 3,340,242 | 25.7% | 2,816,811 | 22.8% | 4,919,963 | 32.4% | 3,414,981 | 26.0% | 5,500,218 | 36.1% | 5,324,099 | 35.1% | 5,859,721 | 36.2% | 6,039,134 | 36.2% |
| | | | | | | | | | | | | | | | | |
| Management Fees | 390,286 | 3.0% | 371,198 | 3.0% | 455,789 | 3.0% | 393,349 | 3.0% | 456,692 | 3.0% | 454,841 | 3.0% | 485,811 | 3.0% | 499,906 | 3.0% |
| **Income Before Fixed Charges** | 2,949,956 | 22.7% | 2,445,613 | 19.8% | 4,464,173 | 29.4% | 3,021,632 | 23.0% | 5,043,526 | 33.1% | 4,869,258 | 32.1% | 5,373,911 | 33.2% | 5,539,228 | 33.2% |
| | | | | | | | | | | | | | | | | |
| **Fixed Charges** | | | | | | | | | | | | | | | | |
| Insurance | 300,860 | 2.3% | 411,496 | 3.3% | 563,628 | 3.7% | 420,000 | 3.2% | 432,600 | 2.8% | 445,578 | 2.9% | 458,945 | 2.8% | 472,714 | 2.8% |
| Property Taxes | 455,644 | 3.5% | 460,201 | 3.7% | 464,803 | 3.1% | 464,803 | 3.5% | 469,451 | 3.1% | 474,145 | 3.1% | 478,887 | 3.0% | 483,675 | 2.9% |
| Other Taxes | 115,050 | 0.9% | 1,154 | 0.0% | 1,175 | 0.0% | 1,175 | 0.0% | 1,176 | 0.0% | 1,211 | 0.0% | 1,248 | 0.0% | 1,285 | 0.0% |
| Equipment Leases | - | 0.0% | 60,334 | 0.5% | 60,422 | 0.4% | 60,422 | 0.5% | 62,235 | 0.4% | 64,102 | 0.4% | 66,025 | 0.4% | 68,005 | 0.4% |
| **Total Fixed Charges** | 871,554 | 6.7% | 933,185 | 7.5% | 1,090,028 | 7.2% | 946,400 | 7.2% | 965,461 | 6.3% | 985,036 | 6.5% | 1,005,104 | 6.2% | 1,025,680 | 6.2% |
| | | | | | | | | | | | | | | | | |
| **EBITDA** | 2,078,402 | 16.0% | 1,512,428 | 12.2% | 3,374,145 | 22.2% | 2,075,232 | 15.8% | 4,078,065 | 26.8% | 3,884,222 | 25.6% | 4,368,806 | 27.0% | 4,513,548 | 27.1% |
| | | | | | | | | | | | | | | | | |
| Reserve for Replacement | 520,381 | 4.0% | 494,931 | 4.0% | 607,719 | 4.0% | 524,466 | 4.0% | 608,923 | 4.0% | 606,454 | 4.0% | 647,748 | 4.0% | 666,542 | 4.0% |
| | | | | | | | | | | | | | | | | |
| **Net Operating Income** | $1,558,021 | 12.0% | $1,017,497 | 8.2% | $2,766,426 | 18.2% | $1,550,766 | 11.8% | $3,469,142 | 22.8% | $3,277,767 | 21.6% | $3,721,058 | 23.0% | $3,847,006 | 23.1% |
| *NOI/ Key* | *$7,280* | | *$4,755* | | *$12,927* | | *$7,247* | | *$16,211* | | *$15,317* | | *$17,388* | | *$17,977* | |
| | | | | | | | | | | | | | | | | |
| **Operating Statistics** | | | | | | | | | | | | | | | | |
| Occupancy | 76.6% | | 66.9% | | 66.9% | | 68.0% | | 76.0% | | 74.0% | | 76.0% | | 76.0% | |
| Average Daily Rate | $145.49 | | $156.31 | | $176.62 | | $162.00 | | $168.48 | | $171.01 | | $177.85 | | $183.18 | |
| RevPAR | $111.38 | | $104.63 | | $118.12 | | $110.16 | | $128.04 | | $126.55 | | $135.16 | | $139.22 | |



# FINANCIAL ANALYSIS
## *Historical & Projected Penetration Analysis - Tribute Portfolio Brand Conversion*

| Subject Property | Year End Dec. 31, 2019 | Year End Dec. 31, 2020 | Year End Dec. 31, 2021 | Year End Dec. 31, 2022 | Year End Dec. 31, 2023 | Year End Dec. 31, 2024 | Compded. % Change 2019-2024 | HWE Proj 2025 Year 1 * | World Cup 2026 Year 2 | 2027 Year 3 | Super Bowl 2028 Year 4 | 2029 Year 5 | Compded. % Change YR1 - YR5 | Compded. % Change YR2 – YR5 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Occupancy | 56.7% | 41.1% | 50.8% | 64.4% | 76.6% | 66.9% | | 68.0% | 76.0% | 74.0% | 76.0% | 76.0% | | |
| % Change | ●●● | -27.5% | 23.6% | 26.9% | 18.9% | -12.6% | 3.4% | 1.6% | 11.8% | -2.6% | 2.7% | 0.0% | 2.8% | 0.0% |
| Occupancy Penetration | 67.6% | 92.7% | 78.2% | 78.3% | 92.8% | 84.8% | | 84.4% | 91.6% | 93.9% | 96.4% | 96.4% | | |
| Rank | | 4 of 5 | 4 of 5 | 4 of 5 | 4 of 5 | 4 of 5 | | | | | | | | |
| | | | | | | | | | | | | | | |
| Average Daily Rate | $152.51 | $122.23 | $134.38 | $150.28 | $145.46 | $156.31 | | $162.00 | $168.48 | $171.01 | $177.85 | $183.18 | | |
| % Change | ●●● | -19.9% | 9.9% | 11.8% | -3.2% | 7.5% | 0.5% | 3.6% | 4.0% | 1.5% | 4.0% | 3.0% | 3.1% | 2.8% |
| ADR Penetration | 105.9% | 107.0% | 116.9% | 109.4% | 93.0% | 96.5% | | 97.1% | 97.1% | 97.5% | 99.5% | 100.4% | | |
| Rank | | 3 of 5 | 1 of 5 | 3 of 5 | 3 of 5 | 3 of 5 | | | | | | | | |
| | | | | | | | | | | | | | | |
| RevPAR | $86.45 | $50.21 | $68.20 | $96.79 | $111.39 | $104.63 | | $110.16 | $128.04 | $126.55 | $135.16 | $139.22 | | |
| % Change | ●●● | -41.9% | 35.8% | 41.9% | 15.1% | -6.1% | 3.9% | 5.3% | 16.2% | -1.2% | 6.8% | 3.0% | 6.0% | 2.8% |
| RevPAR Penetration | 71.6% | 99.1% | 91.4% | 85.7% | 86.3% | 81.8% | | 81.9% | 88.9% | 91.6% | 95.9% | 96.8% | | |
| Rank | | 3 of 5 | 4 of 5 | 4 of 5 | 4 of 5 | 4 of 5 | | | | | | | | |

| Competitive Set (1) | Year End Dec. 31, 2019 | Year End Dec. 31, 2020 | Year End Dec. 31, 2021 | Year End Dec. 31, 2022 | Year End Dec. 31, 2023 | Year End Dec. 31, 2024 | Compded. % Change 2019-2024 | Year 1 * | Year 2 | Year 3 | Year 4 | Year 5 | Compded. % Change YR1 - YR5 | Compded. % Change YR2 – YR5 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Occupancy | 83.9% | 44.3% | 64.9% | 82.2% | 82.5% | 79.0% | | 80.6% | 83.0% | 78.8% | 78.8% | 78.8% | | |
| % Change | ●●● | -47.2% | 46.4% | 26.6% | 0.4% | -4.3% | -1.2% | 2.0% | 3.0% | -5.0% | 0.0% | 0.0% | -0.5% | -1.7% |
| | | | | | | | | | | | | | | |
| Average Daily Rate | $143.99 | $114.24 | $114.95 | $137.33 | $156.34 | $162.04 | | $166.90 | $173.58 | $175.32 | $178.82 | $182.40 | | |
| % Change | ●●● | -20.7% | 0.6% | 19.5% | 13.8% | 3.6% | 2.4% | 3.0% | 4.0% | 1.0% | 2.0% | 2.0% | 2.2% | 1.7% |
| | | | | | | | | | | | | | | |
| RevPAR | $120.79 | $50.64 | $74.62 | $112.90 | $129.04 | $127.97 | | $134.45 | $144.02 | $138.19 | $140.95 | $143.77 | | |
| % Change | ●●● | -58.1% | 47.4% | 51.3% | 14.3% | -0.8% | 1.2% | 5.1% | 7.1% | -4.1% | 2.0% | 2.0% | 1.7% | -0.1% |
| | | | | | | | | | | | | | | |
| Room Supply | 1,495 | 1,495 | 1,495 | 1,495 | 1,495 | 1,495 | | 1,495 | 1,495 | 1,495 | 1,495 | 1,495 | | |
| % Change | ●●● | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| | | | | | | | | | | | | | | |
| Accommodated Demand | 457,763 | 241,889 | 354,237 | 448,589 | 450,399 | 430,942 | | 439,561 | 452,748 | 430,111 | 430,111 | 430,111 | | |
| % Change | ●●● | -47.2% | 46.4% | 26.6% | 0.4% | -4.3% | -1.2% | 2.0% | 3.0% | -5.0% | 0.0% | 0.0% | -0.5% | -1.7% |

*(1) Historical results for the Competitive Set are derived from STR data.  Projections for Years One through
Five for the Hotel and the Competitive Set are based on our study of the current market conditions. HWE neither warrants nor
guarantees the results of these projections and analyses since unanticipated events and circumstances may occur.
\* Budget 2025 percentage change is calculated from Year End 2024.
\* Proforma Year 1 percentage change is calculated from Budget 2025.*

| | Key Count: | Open Date: |
|---|---|---|
| ● Subject Property *NOT included* | 214 | Nov-17 |
| Competitive Set includes: | | |
| ● Sonesta Atlanta Airport North | 378 | Aug-73 |
| ● Hilton Atlanta Airport | 510 | Jan-89 |
| ● Atlanta Airport Marriott Gateway | 403 | Aug-10 |
| ● Renaissance Atlanta Airport Gateway Hotel | 204 | May-17 |
| | 1,495 | |



# FINANCIAL ANALYSIS
## *Projected Leveraged Return Analysis - Tribute Portfolio Conversion*

### Source and Use of Funds

| | | Per Key | | | |
|---|---|---|---|---|---|
| Property Acquisition | $28,000,000 | $130,841 | First Mortgage | $22,932,000 | 65% |
| Renovation | 6,420,000 | 30,000 | Equity | 12,348,000 | 35% |
| Debt Reserve | $300,000 | 1,402 | | | |
| Closing Costs | 2.0% | 560,000 | 2,617 | | |
| Total Use of Funds | $35,280,000 | $164,860 | Total Source of Funds | $35,280,000 | 100% |

| Number of Rooms | 214 |
|---|---|

| | |
|---|---|
| YE 2024 Debt Yield | 4.4% |
| YR1 Debt Yield | 6.8% |

| | |
|---|---|
| YE 2023, All-In Cap Rate | 4.4% |
| YE 2023, Acquisition Cap Rate | 5.6% |
| YE 2024, All-In Cap Rate | 2.9% |
| YE 2024, Acquisition Cap Rate | 3.6% |
| BUD 2025, All-In Cap Rate | 7.8% |
| BUD 2025, Acquisition Cap Rate | 9.9% |
| BUD 2025, EBITDA Multiple | 8.30 x |

| | |
|---|---|
| Year One, All-In Cap Rate | 4.4% |
| Year One, Acquisition Cap Rate | 5.5% |
| Year One, EBITDA Multiple | 13.49 x |
| Year Two, All-In Cap Rate | 9.8% |
| Year Two, Acquisition Cap Rate | 12.4% |
| Year Two, EBITDA Multiple | 6.87 x |

### Capital Gain Calculation

| | |
|---|---|
| Sixth Year Net Operating Income | $4,049,575 |
| Terminal Cap Rate | 9.0% |
| Gross Sales Price | $44,995,283 |
| | |
| Selling Costs | 2.0% |
| Net Sales Price | $44,095,377 |
| Remaining Mortgage Balance | $22,932,000 |
| Return of Equity | 12,348,000 |
| Return of Remaining Reserve | - |
| Capital Gain | $8,815,377 |
| Sales Price per Room | $210,258 |

### First Mortgage

| | |
|---|---|
| Mortgage Amount | $22,932,000 |
| Interest Rate | Variable |
| Amortization Period | Interest Only |

| | SOFR Base: | 4.09% | 3.89% | 3.93% | 3.96% | 3.99% |
|---|---|---|---|---|---|---|
| | Spread: | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% |
| | Annual Interest Rate: | 8.09% | 7.89% | 7.93% | 7.96% | 7.99% |
| | | Year One | Year Two | Year Three | Year Four | Year Five |
| Beginning Balance | | $22,932,000 | $22,932,000 | $22,932,000 | $22,932,000 | $22,932,000 |
| Annual Payment | | 1,855,874 | 1,809,311 | 1,817,840 | 1,825,554 | 1,831,591 |
| Portion to Interest | | 1,855,874 | 1,809,311 | 1,817,840 | 1,825,554 | 1,831,591 |
| Portion to Principal | | - | - | - | - | - |
| Ending Balance | | $22,932,000 | $22,932,000 | $22,932,000 | $22,932,000 | $22,932,000 |

### Yearly Cash Flow Summary

| | Year One | Year Two | Year Three | Year Four | Year Five | Year Six |
|---|---|---|---|---|---|---|
| Net Operating Income | $1,550,766 | $3,469,142 | $3,277,767 | $3,721,058 | $3,847,006 | $4,049,575 |
| First Mortgage Annual Payment | 1,855,874 | 1,809,311 | 1,817,840 | 1,825,554 | 1,831,591 | |
| Cash Flow after Debt Service | ($305,108) | $1,659,832 | $1,459,927 | $1,895,504 | $2,015,415 | |
| Cash Flow Funded by Reserve | 300,000 | | | | | |
| Cash Flow after Debt Service | ($5,108) | $1,659,832 | $1,459,927 | $1,895,504 | $2,015,415 | |
| NOI/Key | $7,247 | $16,211 | $15,317 | $17,388 | $17,977 | |
| Debt Yield | 6.8% | 15.1% | 14.3% | 16.2% | 16.8% | |
| Debt Service Coverage Ratio | 0.84 | 1.92 | 1.80 | 2.04 | 2.10 | |

### Leveraged IRR Analysis

| | Year Zero | Year One | Year Two | Year Three | Year Four | Year Five |
|---|---|---|---|---|---|---|
| Equity | (12,348,000) | | | | | |
| Cash Flow after Debt Service | | (5,108) | 1,659,832 | 1,459,927 | 1,895,504 | 2,015,415 |
| Net Refinance Proceeds | | - | - | - | - | - |
| Net Sales Price | | | | | | 44,095,377 |
| Remaining Mortgage Balance | | | | | | (22,932,000) |
| Net Cash Flow | ($12,348,000) | ($5,108) | $1,659,832 | $1,459,927 | $1,895,504 | $23,178,792 |
| Cash-on-Cash Return | | 0.0% | 13.4% | 11.8% | 15.4% | |

| | |
|---|---|
| Five-Year Leveraged IRR | 19.7% |
| Equity Multiple | 2.28 x |





HWE

MARKET OVERVIEW

# MARKET OVERVIEW
## *Market Sales Comps*

| Date | Property Name | City | Keys | Year Built | Purchase Price | Price per Key | Buyer | Seller |
|------|---------------|------|------|-----------|----------------|---------------|-------|--------|
| Dec-24 | Hotel Indigo Atlanta Airport College Park | College Park | 142 | 2010 | $10,500,000 | $73,944 | Apsilon Hotels | Blackstone |
| Feb-24 | DoubleTree Atlanta Airport | East Point | 220 | 1985 | $16,778,599 | $76,266 | CrossHarbor Capital | HHM |
| Jan-24 | Residence Inn Atlanta Airport | Hapeville | 126 | 1990 | $21,050,000 | $167,063 | Anthony M Re; Fairbanks Capital Management Inc | Amin Alibhai |
| Jan-24 | Courtyard Atlanta Airport West | East Point | 128 | 2008 | $16,500,000 | $128,906 | Munira Kapadia; Faysal Kapadia | HTH Corporation |
| Sep-23 | Hampton Inn & Suites Atlanta | East Point | 119 | 2008 | $14,750,000 | $123,950 | Munira Kapadia | BPR Properties |
| Apr-22 | Holiday Inn Express Atlanta Airport | College Park | 160 | 1983 | $13,500,000 | $84,375 | TAJ Heritage LLC | Kelco Hotels |
| Feb-22 | Hilton Garden Inn Atlanta Airport North | East Point | 174 | 2009 | $26,200,000 | $150,575 | Alpental Capital | Paragon Hotel Company |
| Mar-20 | Fairfield Inn & Suites Atlanta Airport | East Point | 85 | 2001 | $10,300,000 | $121,176 | Heri Aum LLC | Universal Lodging 1 LLC |
| Jan-20 | Radisson Hotel Atlanta Airport | College Park | 143 | 2008 | $20,925,000 | $146,329 | Jamal Tajuddin | Enterprise America |
| Aug-19 | Residence Inn Atlanta Airport | Hapeville | 126 | 1990 | $13,500,000 | $107,143 | Diamond Holdings & Hospitality LLC | Blackstone |
| Jun-19 | Hilton Atlanta Airport | Hapeville | 504 | 1989 | $101,000,000 | $200,397 | Wheelock Street Capital | Park Hotels & Resorts |



# MARKET OVERVIEW
## *New & Future Supply*

| | Property Name | Address | Distance From Subject | Key Count | Status | Opened / Opening Date |
|---|---|---|---|---|---|---|
| 1 | Residence Inn Atlanta Airport International Terminal | 3609 Porsche Avenue | 0.4 Miles | 135 | Final Planning | Q4 2026 |
| 2 | Residence Inn Atlanta Airport West | NEQ Gateway Boulevard and Roosevelt Hwy | 4.6. Miles | 149 | Final Planning | Q1 2027 |
| 3 | Courtyard Atlanta Airport North | 940 Virginia Ave | 1.5 Miles | 157 | Final Planning | Q2 2027 |
| 4 | Sheraton Atlanta Airport Gateway | SWQ I-85 and Camp Creek Parkway | 4.7 Miles | 300 | Final Planning | Q2 2027 |
| 5 | Sleep Inn & Suites Atlanta | 5168 Clark Howell Hwy | 3.9 Miles | 87 | Final Planning | Q4 2027 |
| 6 | Tru / Home2 Suites Atlanta Airport College Park | 2101 Convention Center Concourse A | 4.7 Miles | 243 | Open | Q3 2023 |
| 7 | Embassy Suites Atlanta Airport | 3450 International Blvd | 1.7 Miles | 178 | Open | Q2 2022 |
| 8 | TownePlace Suites Atlanta Airport North | 3424 Norman Berry Dr | 2.2 Miles | 100 | Open | Q2 2022 |

*Source: CoStar*

| Total: | 1,349 |
|---|---|





# MARKET OVERVIEW
## *Long Term Trends – Atlanta Airport Submarket*

| Year | Occ | % Δ | ADR | % Δ | RevPAR | % Δ | Supply | % Δ | Demand | % Δ |
|------|-----|-----|-----|-----|--------|-----|--------|-----|--------|-----|
| 2024 | 67.4% | -4.3% | $115.06 | -1.2% | $77.50 | -5.5% | 4,779,088 | 1.0% | 3,219,129 | -3.4% |
| 2023 | 70.4% | 1.0% | $116.45 | 6.9% | $81.96 | 8.0% | 4,732,549 | 2.4% | 3,331,087 | 3.4% |
| 2022 | 69.7% | 12.9% | $108.90 | 18.7% | $75.88 | 33.9% | 4,622,616 | 1.5% | 3,220,655 | 14.6% |
| 2021 | 61.7% | 29.7% | $91.78 | 10.9% | $56.66 | 43.9% | 4,552,533 | 1.1% | 2,810,758 | 31.1% |
| 2020 | 47.6% | -35.7% | $82.74 | -20.9% | $39.39 | -49.1% | 4,504,600 | 3.1% | 2,144,497 | -33.7% |
| 2019 | 74.0% | 0.3% | $104.62 | 2.3% | $77.45 | 2.6% | 4,369,415 | 2.5% | 3,234,356 | 2.8% |
| 2018 | 73.8% | -1.3% | $102.24 | 3.7% | $75.45 | 2.3% | 4,261,373 | 0.1% | 3,144,886 | -1.2% |
| 2017 | 74.8% | 2.9% | $98.62 | 4.8% | $73.76 | 7.9% | 4,255,372 | 0.4% | 3,182,768 | 3.3% |
| 2016 | 72.7% | -1.0% | $94.10 | 7.5% | $68.37 | 6.4% | 4,240,445 | 0.5% | 3,081,180 | -0.5% |
| 2015 | 73.4% | 4.1% | $87.52 | 7.4% | $64.24 | 11.8% | 4,218,951 | 0.6% | 3,096,380 | 4.7% |
| 2014 | 70.5% | 8.6% | $81.51 | 6.1% | $57.46 | 15.2% | 4,194,369 | 0.2% | 2,957,079 | 8.9% |
| 2013 | 64.9% | 3.2% | $76.82 | 1.0% | $49.86 | 4.2% | 4,184,789 | 0.5% | 2,716,208 | 3.7% |
| 2012 | 62.9% | -0.9% | $76.07 | 0.3% | $47.85 | -0.6% | 4,164,047 | 1.3% | 2,619,303 | 0.4% |
| 2011 | 63.5% | 3.4% | $75.85 | 2.2% | $48.13 | 5.7% | 4,112,752 | -2.3% | 2,610,023 | 1.0% |
| 2010 | 61.4% | ●●● | $74.19 | ●●● | $45.55 | ●●● | 4,208,087 | ●●● | 2,583,749 | ●●● |

|  | Avg. Occ | | CAGR | ADR | | RevPAR | | Supply | | Demand |
|--|----------|--|------|-----|--|--------|--|--------|--|--------|
| 2010-2024 | 67.7% | | | 3.2% | | 3.9% | | 0.9% | | 1.6% |
| 2010-2019 | 69.2% | | | 3.9% | | 6.1% | | 0.4% | | 2.5% |

*Source: CoStar*



# MARKET OVERVIEW
## *Long Term Trends – Atlanta Airport Submarket*



Atlanta Airport Submarket Hotel Performance

*Source: CoStar*





HWE

TEAM QUALIFICATIONS

# TEAM QUALIFICATIONS
*Current HWE Airport Listings*



**Atlanta Airport Marriott**
*641 Keys | Marketing | Atlanta, GA*



**Courtyard Minneapolis St. Paul Airport**
*146 Keys | Executed Term Sheet | Mendota Heights, MN*



**DoubleTree San Antonio Airport**
*384 Keys | Offers Received | San Antonio, TX*



**Four Points Tampa Airport Westshore**
*261 Keys | Offers Received | Tampa, FL*



**Hampton Inn Philadelphia International Airport**
*151 Keys | Marketing | Philadelphia, PA*



**Courtyard Dulles Airport Herndon**
*187 Keys | Pre-Marketing | Herndon, VA*



KIMPTON OVERLAND HOTEL ATLANTA AIRPORT | MARCH 2025        17

# TEAM QUALIFICATIONS
## *Representative HWE Airport Transactions*



**Hotel Indigo Atlanta Airport College Park**
*142 Keys | Asset Sale | College Park, GA*



**The Westin Atlanta Airport**
*500 Keys | Asset Sale | Atlanta, GA*



**Hilton Garden Inn Salt Lake City Airport**
*500 Keys | Asset Sale | Salt Lake City, UT172*



**Hyatt Regency DFW International Airport**
*811 Keys | Asset Sale | Dallas, TX*



**Embassy Suites Nashville Airport**
*296 Keys | Asset Sale | Nashville, TN*



**Seattle Airport Marriott**
*459 Keys | Asset Sale | Seattle, WA*



KIMPTON OVERLAND HOTEL ATLANTA AIRPORT | MARCH 2025     18

# TEAM QUALIFICATIONS
## *Representative HWE Lifestyle & Soft Branded Transactions*



**AC Sunnyvale Cupertino**
*182 Keys | Asset Sale | Sunnyvale, CA*



**Kimpton Brice**
*145 Keys | Asset Sale | Savannah, GA*



**AC Austin Hill Country**
*134 Keys | Asset Sale | Austin, TX*



**Placemakr Wedgewood-Houston**
*89 Keys | Asset Sale | Nashville, TN*



**AC San Jose Santa Clara**
*188 Keys | Asset Sale | Santa Clara, CA*



**Tribute Portfolio The Alida Savannah**
*173 Keys | Asset Sale | Savannah, GA*



KIMPTON OVERLAND HOTEL ATLANTA AIRPORT | MARCH 2025

19

# TEAM QUALIFICATIONS
## *Representative HWE Lifestyle & Soft Branded Transactions*



**Luxury Collection Perry Lane Hotel**
*167 Keys | Asset Sale | Savannah, GA*



**Hotel Bella Grace**
*50 Keys | Asset Sale (2x) | Charleston, SC*



**The Georgian Santa Monica**
*84 Keys | Asset Sale | Santa Monica, CA*



**Tapatio Springs Hill Country**
*111 Keys | Asset Sale | Boerne, TX*



**Bellmoor Inn & Spa**
*78 Keys | Asset Sale | Rehoboth Beach, DE*



**AC New Orleans French Quarter**
*220 Keys | Asset Sale | New Orleans, LA*



# TEAM QUALIFICATIONS
## *Post-COVID HWE Full-Service Transactions*

| Date | Property / Deal Name | Keys |
|------|----------------------|------|
| Dec-24 | Poco Diablo Resort | 137 |
| Dec-24 | Marriott Tysons Corner | 400 |
| Oct-24 | The Beeman Hotel | 296 |
| Sep-24 | Ray Hotel Delray Beach | 282 |
| Aug-24 | Dillard House | 95 |
| Jul-24 | Lorien Hotel & Spa | 107 |
| Jun-24 | Hawaii Airport Hotels | 581 |
| May-24 | Cambria Hotel Washington D.C. Convention Center | 182 |
| May-24 | Blue Moon Hotel Miami Beach | 75 |
| May-24 | Marriott Austin North | 295 |
| May-24 | The Raphael Hotel | 126 |
| Apr-24 | Nashville 1 Hotel/Embassy Suites | 721 |
| Mar-24 | Haggai International Mid-Pacific Center | 250 |
| Mar-24 | The Aviator Hotel | 149 |
| Jan-24 | Yachtsman Resort | 159 |
| Nov-23 | Hilton Brooklyn New York | 392 |
| Sep-23 | Marriott Albuquerque Pyramid North | 310 |
| Aug-23 | Proposed Embassy Suites Gulf Shores | 275 |
| Aug-23 | Saint Julian Hotel | 92 |
| Jul-23 | Marriott Cedar Rapids | 220 |
| Mar-23 | Bento Nashville WeHo | 89 |
| Mar-23 | Marriott Saddle Brook | 241 |
| Dec-22 | Sheraton Denver Tech Center | 263 |
| Dec-22 | Sirata Beach Resort | 382 |
| Nov-22 | Hilton College Station & Conference Center | 303 |

| Date | Property / Deal Name | Keys |
|------|----------------------|------|
| Oct-22 | Bohemian Celebration | 115 |
| Oct-22 | Watermark Portfolio | 7,440 |
| Oct-22 | Embassy Suites El Paso | 187 |
| Oct-22 | Hyatt Regency Greenwich | 373 |
| Sep-22 | DoubleTree Resort Myrtle Beach Oceanfront | 453 |
| Aug-22 | Casa De Palmas | 165 |
| Aug-22 | Source Hotel Denver | 100 |
| Aug-22 | Artmore Hotel | 103 |
| Jun-22 | Wyoming Inn Of Jackson Hole | 69 |
| Jun-22 | DoubleTree Biloxi | 195 |
| Jun-22 | Mansion On Forsyth Park | 126 |
| Jun-22 | The Godfrey Hotel Hollywood | 220 |
| Jun-22 | The Westin Stonebriar Hotel & Golf Club | 470 |
| Jun-22 | Tapatio Springs Hill Country Resort | 111 |
| Apr-22 | DoubleTree Austin | 350 |
| Mar-22 | Wyndham Houston West Energy Corridor | 344 |
| Mar-22 | Amangani | 40 |
| Mar-22 | Sheraton Augusta Hotel | 152 |
| Mar-22 | Grand Orlando Resort | 718 |
| Mar-22 | Georgian Santa Monica | 84 |
| Feb-22 | Faro Blanco Resort | 376 |
| Jan-22 | Hutton Hotel Nashville | 250 |
| Jan-22 | Ryder Hotel Charleston | 91 |
| Jan-22 | Newcrest Dallas Frisco 3-Pack | 450 |
| Jan-22 | Tranquility Bay Beachfront Hotel & Spa | 103 |



# TEAM QUALIFICATIONS
## *Post-COVID HWE Full-Service Transactions*

| Date | Property / Deal Name | Keys |
|------|----------------------|------|
| Dec-21 | Hotel Van Zandt | 319 |
| Dec-21 | Tribute Portfolio The Alida, Savannah | 173 |
| Dec-21 | Surfrider Hotel Malibu | 20 |
| Nov-21 | Westin Atlanta Perimeter North | 372 |
| Nov-21 | DoubleTree Minneapolis | 229 |
| Nov-21 | Hyatt Regency DFW International Airport | 811 |
| Nov-21 | Hotel Bella Grace Charleston | 50 |
| Oct-21 | Host Hotels Portfolio | 2,323 |
| Oct-21 | Hyatt Regency Frisco | 303 |
| Oct-21 | The Wylie Hotel Atlanta | 111 |
| Sep-21 | South Seas Island Resort | 107 |
| Sep-21 | Margaritaville Hollywood Beach Resort | 349 |
| Sep-21 | Alila Ventana Big Sur | 59 |
| Sep-21 | Hilton Phoenix Chandler | 197 |
| Sep-21 | DoubleTree Salt Lake City Downtown | 241 |
| Aug-21 | DoubleTree Roswell | 174 |
| Aug-21 | Thompson Chicago | 247 |
| Jul-21 | Hotel Adagio | 171 |
| Jun-21 | Islamorada Hotel Portfolio | 379 |
| Jun-21 | Marriott Village Orlando LBV 3-Hotel Portfolio | 1,100 |
| Jun-21 | Crescent Dallas Portfolio | 444 |
| May-21 | Marriott Hutchinson Island | 274 |
| May-21 | Perry Lane Hotel | 167 |
| May-21 | Four Seasons Resort Orlando at Walt Disney World | 444 |
| Mar-21 | Capitol Hill Hotel | 153 |

| Date | Property / Deal Name | Keys |
|------|----------------------|------|
| Mar-21 | Magnolia Dallas Downtown | 325 |
| Mar-21 | Omni Hotel Portfolio | 1,729 |
| Feb-21 | Sheraton Lake Buena Vista Resort | 486 |
| Jan-21 | Le Meridien Chambers Minneapolis | 60 |
| Dec-20 | Planters Inn | 64 |
| Dec-20 | Pelham Hotel | 65 |
| Nov-20 | Hotel Contessa San Antonio | 265 |
| Nov-20 | Waldorf Astoria Chicago | 215 |
| Sep-20 | The Hotel at Avalon | 330 |
| Sep-20 | Holiday Inn Memphis Airport & Conference Center | 256 |
| Aug-20 | Georgian Hotel | 84 |
| Jul-20 | Watermark Portfolio Recapitalization | 9,048 |
| Jul-20 | Renaissance Baltimore Harborplace Hotel | 622 |
| Jun-20 | Hutton Hotel Nashville | 250 |
| Mar-20 | Crowne Plaza Annapolis | 392 |
| Mar-20 | Sofitel Washington DC Lafayette Square | 237 |
| Mar-20 | InterContinental Buckhead Atlanta | 422 |

| | |
|---|---|
| **Total Keys** | **43,574** |

| | |
|---|---|
| **Total Volume** | **$12,167,351,450** |



# TEAM QUALIFICATIONS
*Extensive Transactional Experience Across All Geographies*

**HWE has executed transactions in all 50 states and all 50 of the most populous U.S. metro areas.**





# TEAM QUALIFICATIONS
## *HWE History*

Our track record encompasses **approximately $100 billion of closed transactions, including more than $50 billion over the past 5 years.**



# TEAM QUALIFICATIONS
## *HWE Firm Coverage*



**William M. Hodges,** *CEO*

**Hotels**
**Capital Markets**



**ATLANTA**
Pete Dannemiller, *Managing Director*
Todd Ratliff, *Managing Director*
Clint Hodges, *Managing Director*
Jeff Berkman, *Director*
Scott Harrell, *Director*
Nate Ries, *Senior Vice President*
Chase Wood, *Associate*

**DALLAS**
Austin Brooks, *Managing Director*
Michael Brandes, *Vice President*

**DENVER**
Michael Tormey, *Senior Vice President*
Zak Brodstein, *Vice President*

**LOS ANGELES**
Tom McHugh, *Senior Vice President*

**NASHVILLE**
Zach Moore, *Senior Vice President*

**NEW YORK**
Michael Britvan, *Managing Director*
Coby Campbell, *Senior Vice President*

**MIAMI**
Alexandra Lalos Church, *Managing Director*
Lauren Habig, *Analyst*

**ORLANDO**
Rudy Reudelhuber, *Managing Director*

**TAMPA**
Preston Reid, *Managing Director*
Wyatt Krapf, *Managing Director*

**LONDON**
Charles Human, *Managing Director*
Chris Martin, *Senior Director*



# TEAM QUALIFICATIONS
## *HWE Advantage*



**GLOBALLY CONNECTED**
HWE maintains senior level relationships with key investment decision makers around the world.

**TEAM APPROACH**
We approach every engagement as a team, with client success as our singular focus.

**THOUGHTFUL**
HWE prides itself on a unique ability to unlock hidden value and maximize returns for our clients.

**CLIENT-ORIENTED**
Our goal is simple – deliver results in line with the goals of our clients; their interests always come first.

**TRUSTED**
When faced with challenging situations, our clients seek our counsel time and again for over 45 years.

**EXPERIENCED**
Nothing beats the power of experience, and no one is more experienced than our team.





Atlanta • Dallas • Denver • Los Angeles • Nashville • New York • Miami • Orlando • Tampa • London

## **EXHIBIT I**

(Notice of Disposition of Collateral)



May 16, 2025

***VIA EMAIL & FEDEX OVERNIGHT DELIVERY***

ACRON 2 Porsche Drive Mezzco LLC
c/o ACRON U.S. Management
2424 E. 21st Street, Suite 150
Tulsa, OK 74114
Attention: Greg Wilson
Email: gw@acronusa.com

Seyfarth Shaw LLP
233 S. Wacker Drive, Suite 8000
Chicago, Illinois 60606-6448
Attention: Jason J. DeJonker
Email: JDeJonker@seyfarth.com

ACRON (USA) L.P.
2424 E. 21st Street, Suite 150
Tulsa, OK 74114
Attention:  Greg Wilson
Email:    gw@acronusa.com

ACRON AG
2424 E. 21st Street, Suite 150
Tulsa, OK 74114
Attention:  Greg Wilson
Email:    gw@acronusa.com

TH Investment Holdings II, LLC
c/o Procaccianti Companies, Inc.
1140 Reservoir Avenue
Cranston, RI 02920
Attention: Gregory D. Vickowski
Email:    gvick@procaccianti.com
        gvickowski@procgroup.com

Procaccianti Companies, Inc.
Attn: Ron Hadar, Esq., General Counsel
1140 Reservoir Avenue
Cranston, RI 02920
Email:    rhadar@procaccianti.com

KHRE SMA Funding, LLC
c/o Knighthead Funding, LLC
777 West Putnam Avenue, 3rd Fl, Suite B-2
Greenwich, CT 06830
Attention: Jonathan J. Daniel
Email:
LoanServicing@knightheadfunding.com

King & Spalding LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036
Attention: David Hart
Email: dhart@kslaw.com

RE:    **Kimpton Overland Hotel Atlanta Airport – Mezzanine Loan – Default Notices; Continuing Events of Default; Notice of Disposition of Collateral; Notice of Public Sale of Collateral; Terms of Sale**

All:

Reference is made to (a) that certain Loan Agreement, dated as of January 18, 2024 (the "**Loan Agreement**"), by and between CAI OVERLAND LENDER, LLC ("**Lender**") and ACRON 2

Civitas Capital Group
1722 Routh Street | Suite 800
Dallas, Texas 75201 USA
5628385.8

civitascapital.com
+1 214.572.2300
info@civitascapital.com

ACRON 2 Porsche Drive Mezzco LLC
Page 2 of 5

PORSCHE DRIVE MEZZCO LLC ("**Borrower**"), (b) the January 13, 2025 default notice letter (to Borrower and its counsel) regarding Borrower's failures to pay scheduled amounts due under the Loan Agreement (the "**January 2025 Default Notice**"), (c) the February 6, 2025 default notice letter (to Borrower and its counsel) including Lender's demand that Borrower replenish the Debt Service Reserve Account (the "**February 2025 Default Notice**"), (d) the April 2, 2025 default notice letter (to Borrower and its newly designated counsel) including Lender's notice of commencement of foreclosure proceedings regarding the Collateral (the "**April 2025 Default Notice**"), and (e) the May 12, 2025 default notice letter (to Borrower and Guarantors and their counsel) including Lender's update on the UCC foreclosure process (the "**May 2025 Default Notice**", and together with the January 2025 Default Notice, February 2025 Default Notice and April 2025 Default Notice, the "**Default Notices**"). Capitalized terms not defined herein shall have the meanings ascribed to such terms in the Loan Agreement.

Pursuant to the Default Notices, Lender (through its counsel) previously gave written notice to Borrower and Guarantors (and their counsel) that Borrower had defaulted in the performance of certain obligations under the Loan Documents. Borrower failed to timely cure various defaults within the time periods prescribed under the Loan Agreement and, as such, multiple Events of Default exist and are continuing as of the date hereof.

Attached hereto as **Exhibit A** is the Notice of Disposition of Collateral (the "**Disposition Notice**"), which is being delivered pursuant to Section 9-611, Section 9-613 and other applicable sections of the Uniform Commercial Code as adopted in the State of Texas.  Lender requests from the addressees of this letter the names and contact information of any parties who may be interested in purchasing the Collateral at the sale described in the Disposition Notice.

Attached hereto as **Exhibit B** is a copy of the Notice of Public Sale of Collateral, which Lender plans to utilize in public advertisements.

The Terms of Sale is forthcoming and will be provided to Borrower and its counsel at the time that CBRE's secure online data room is officially opened up to prospective bidders that execute a Confidentiality and Non-Disclosure Agreement and otherwise comply with the applicable conditions set forth in the Disposition Notice (as defined above).

Docusign Envelope ID: F7EA3358-BAFA-40F4-B075-528504D3F0D0

ACRON 2 Porsche Drive Mezzco LLC
Page 3 of 6

Nothing contained herein shall be deemed a waiver, election or limitation of the rights or remedies of Lender, whether arising under the Loan Documents, at law, or in equity, all of which Lender hereby expressly reserves. Should you have any questions, please contact us as soon as possible.

Sincerely,

*Austin Khan*

Austin Khan, Authorized Signatory
CAI Overland Lender, LLC
austin.khan@civitascapital.com

cc:    Nicholas R. Marcus, Esq. (via email: nmarcus@seyfarth.com)
Rebecca Brown (via email: rbrown@knightheadfunding.com)
James P. Redding, Esq. (via email: reddingj@gtlaw.com)
Marisa Lizak (via email: marisa.lizak@civitascapital.com)
Melanie Pugmire (via email: melanie.pugmire@civitascapital.com)
Shai Halbe, Esq. (via email: shalbe@elkinskalt.com)
Daniel Abram, Esq. (via email: dabram@elkinskalt.com)
Karen Gutierrez (via email: kgutierrez@elkinskalt.com)

ACRON 2 Porsche Drive Mezzco LLC
Page 4 of 5

## **EXHIBIT A**

NOTICE OF DISPOSITION OF COLLATERAL

(Attached)

## <u>NOTICE OF DISPOSITION OF COLLATERAL</u>

TO DEBTOR:                ACRON 2 Porsche Drive Mezzco LLC,
a Delaware limited liability company ("<u>Debtor</u>")

c/o ACRON U.S. Management
2424 E. 21st Street, Suite 150
Tulsa, OK 74114
Attention: Greg Wilson

FROM SECURED PARTY: CAI Overland Lender, LLC,
a Delaware limited liability company ("<u>Secured Party</u>")

c/o Civitas Capital Group
1722 Routh Street, Suite 800
Dallas, Texas 75201
Attention: Austin Khan, Marisa Lizak
Telephone number: (214) 572-2300

**UCC Foreclosure**

**PLEASE TAKE NOTICE** that subject to the terms herein and the Terms of Sale (defined herein),
Secured Party will offer for sale at a public auction (the "<u>Public Sale</u>") the Collateral (defined
herein) at the following date, time, and place (the "<u>Disposition</u>"):

Day and Date: Wednesday, July 30, 2025
Time:            10:00 A.M. prevailing Central Time
Place:           Online via the designated Zoom credentials set forth below:

Zoom Meeting URL: https://bit.ly/AcronUCC

Zoom Meeting ID: 861 4554 5997

Zoom Meeting Password: 085908

Zoom Meeting Dial-in Number: +1-646-931-3860 (US)

(International participants only, follow the below URL to find your local dial-in number) -
https://us06web.zoom.us/u/kncNax0Nv

The term "<u>Collateral</u>" refers to 100% of the limited liability company interests in ACRON 2
Porsche Drive, Atlanta LLC, a Delaware limited liability company (the "<u>Pledged Entity</u>"), together
with all other "Collateral" as such term is defined in that certain Pledge and Security Agreement,

dated as of January 18, 2024, made by Debtor for the benefit of Secured Party (the "Pledge Agreement").

The Disposition is made pursuant to Section 9-610 and other applicable sections of the Uniform Commercial Code ("UCC") as adopted in the State of Texas, as well as other applicable law, and the provisions of the Loan Documents (as defined in the Pledge Agreement). The Collateral secures Debtor's indebtedness to Secured Party in the original principal amount of $11,600,000 plus, without limitation, any and all unpaid interest (base and default interest), protective advances, prepayment premium, servicing fees, late charges, attorneys' fees and other costs, fees and charges including the costs to sell the Collateral (collectively, the "Debt").

The Public Sale will be held by Matthew D. Mannion, principal auctioneer for Mannion Auctions, LLC, in conjunction with Eric Rubin, principal auctioneer for Moecker Auctions, Inc., online via the aforementioned Zoom meeting access details that will be made available to "qualified bidders" (as described more particularly in the Terms of Sale) who, among other requirements, execute the NDA (as defined herein and in the Terms of Sale).

The Secured Party reserves the right to determine which bidders qualify for participation in the Public Sale, to reject any bid or all bids at the Public Sale, to announce such other terms at the Public Sale as may be commercially reasonable in the Secured Party's sole discretion or to accept non-conforming bids. Further, the Secured Party reserves the right to cancel, postpone or adjourn the Public Sale by announcement made at the Public Sale, either before or after the commencement of bidding, and without written notice or further publication. The Secured Party reserves the right to credit bid any portion of its Debt then outstanding at the Public Sale. The Secured Party reserves the right to implement such other terms or conditions at the Public Sale or regarding the Public Sale procedures as the Secured Party, in its sole discretion, determines to be commercially reasonable under the circumstances.

The Secured Party's understanding, without making any representation or warranty as to accuracy or completeness, is that (a) the principal asset of the Pledged Entity is a leased fee interest in the real property located at 2 Porsche Drive, Hapeville, Georgia, commonly known as the Kimpton Overland Hotel – Atlanta Airport, and (b) such real property secures the obligations of the Pledged Entity with respect to a senior mortgage loan made by a certain lender to the Pledged Entity in the currently outstanding principal amount of $25,000,000.

The sale of the Collateral will be subject to all applicable third-party consents and regulatory approvals, if any, as well as the terms of sale prepared by the Secured Party (the "Terms of Sale"). The Terms of Sale will provide additional information about the bidding process, including bidder qualifications, deposit information, Public Sale participation and determination of any winning bid. Without limitation to the foregoing, please take notice that there are specific requirements for any potential successful bidder in connection with obtaining information and bidding on the Collateral, including, but not limited to, execution of the NDA.

Prospective bidders will be required to represent in writing to the Secured Party that they are purchasing the Collateral for their own account and not acquiring the Collateral with a view toward the sale or distribution thereof and will not resell the Collateral unless pursuant to a valid

registration under applicable federal and/or state securities laws, or a valid exemption from the registration thereunder. The Collateral has not been registered under such securities laws and cannot be sold by the winning bidder(s) without registration or application of a valid exemption. The Collateral will be offered for sale at the Public Sale "**AS-IS, WHERE-IS**", and there are no express or implied warranties or representations of any kind or nature whatsoever, including without limitation, relating to title, possession, quiet enjoyment, merchantability, fitness, or the like as to the Collateral. The sale of the Collateral is specifically subject to all taxes, liens (other than those of Secured Party), claims, assessments, liabilities and encumbrances, if any, that may exist against the Collateral under the UCC or other applicable law. The winning bidder(s) will be responsible for the payment of all transfer taxes, stamp duties and similar taxes incurred in connection with the purchase of the Collateral.

All inquiries concerning this Notice of Disposition of Collateral and the Terms of Sale (including requirements to be a "qualified bidder") shall be made to: Joanne Au of CBRE Capital Markets at CBREuccsales@cbre.com.  Any person making any inquiry or request must: (i) disclose the person or entity on whose behalf such information is being sought, (ii) execute the Confidentiality and Non-Disclosure Agreement (the "NDA"), which can be accessed via the website https://tinyurl.com/UCCSaleKimptonATL (case sensitive), and (iii) maintain the confidentiality of the information provided. Interested parties who do not contact CBRE and register before the Public Sale will not be permitted to participate in bidding at the Public Sale.

Debtor is entitled to an accounting of the unpaid Debt (as defined above) secured by the Collateral which Secured Party intends to sell. Secured Party's charge for an accounting shall be in an amount equal to its costs and expenses (including attorney fees) incurred as a result of providing such accounting. Debtor may request an accounting by emailing Marisa Lizak at marisa.lizak@civitascapital.com and/or calling her at (214) 572-2300.

ACRON 2 Porsche Drive Mezzco LLC
Page 5 of 5

## **EXHIBIT B**

NOTICE OF PUBLIC SALE OF COLLATERAL

(Attached)

## NOTICE OF PUBLIC SALE OF COLLATERAL

PLEASE TAKE NOTICE that 100% of the limited liability company interests in ACRON 2 PORSCHE DRIVE, ATLANTA LLC, a Delaware limited liability company (the "**Company**"), and together with all economic, management and other rights, property and status relating thereto (collectively, the "**Collateral**"), will be offered for sale at a public auction and sold to the highest "qualified bidder" on July 30, 2025 at 10 a.m. prevailing Central Time. The sale will be conducted online in a Zoom meeting. The Zoom meeting credentials will be shared in the Terms of Sale, which will be made available to qualified bidders who, among other requirements, execute a Confidentiality and Non-Disclosure Agreement (the "**NDA**").

The principal asset of the Company is the leased fee interest in that certain real property and the improvements thereon commonly known as the Kimpton Overland Hotel – Atlanta Airport located at 2 Porsche Drive, Hapeville, Georgia 30354 (the "**Property**").

This sale is held to enforce the rights of CAI OVERLAND LENDER, LLC, a Delaware limited liability company, as secured party ("**Secured Party**") under (A) that certain Loan Agreement, dated as of January 18, 2024, by and between Secured Party and ACRON 2 PORSCHE DRIVE MEZZCO LLC, a Delaware limited liability company ("**Borrower**") (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**") and (B) that certain Pledge and Security Agreement, dated as of January 18, 2024 (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Pledge Agreement**" and together with the Loan Agreement and all other agreements entered into by the parties pursuant to the Loan Agreement or the Pledge Agreement, the "**Loan Documents**"), executed by Borrower in favor of Secured Party.

The Collateral is offered "**AS IS, WHERE IS**", with all faults, and Secured Party makes no guarantee, representation, or warranty, including without limitation any representation or warranty of merchantability or fitness for use (express or implied), of any kind or nature whatsoever.

Secured Party will be permitted to bid at the sale, and notwithstanding any requirement herein that the sale of the Collateral be for cash, Secured Party may credit bid all or any portion of the outstanding balance of the amounts due under the Loan Documents. Secured Party reserves the right, in its sole and absolute discretion (for any reason or no reason), to (a) reject all bids and terminate, or adjourn to another date and time, the sale as the Secured Party may deem proper, by announcement at the place and on the date of such sale, and any subsequent adjournment thereof, without further publication, and (b) impose any other commercially reasonable conditions upon the sale of

the Collateral as Secured Party may deem proper in its sole and absolute discretion.

Interested parties who desire additional information regarding the Company, the Collateral, the Property or the terms of the public sale (including the requirements to be a "qualified bidder") shall execute the NDA (as defined above), which can be accessed via the website https://tinyurl.com/UCCSaleKimptonATL (case sensitive). For questions and inquiries, please contact Joanne Au of CBRE Capital Markets at CBREuccsales@cbre.com.

# **EXHIBIT J**

(Terms of Sale Notice)

107074163.3

**ELKINS KALT**

**Daniel B. Abram**
DAbram@elkinskalt.com

May 28, 2025

***VIA EMAIL & FEDEX OVERNIGHT DELIVERY***

ACRON 2 Porsche Drive Mezzco LLC
c/o ACRON U.S. Management
2424 E. 21st Street, Suite 150
Tulsa, OK 74114
Attention:  Greg Wilson
Email:    gw@acronusa.com

Seyfarth Shaw LLP
233 S. Wacker Drive, Suite 8000
Chicago, Illinois 60606-6448
Attention: Jason J DeJonker
Email:    JDeJonker@seyfarth.com

        Re:    **Kimpton Overland Hotel – Atlanta Airport; Terms of Sale**

All:

        Reference is made to (a) that certain Loan Agreement, dated as of January 18, 2024 (the "**Mezz Loan Agreement**"), by and between CAI OVERLAND LENDER, LLC, a Delaware limited liability company ("**Lender**"), and ACRON 2 PORSCHE DRIVE MEZZCO LLC, a Delaware limited liability company ("**Borrower**"), and (b) the most recent May 16, 2025 letter from Lender to Borrower, ACRON Guarantors, Borrower's counsel and ACRON Guarantors' counsel (Jason J. DeJonker of Seyfarth Shaw LLP), TH Investment Guarantor, TH Investment Guarantor's in-house counsel Ron Hadar, Senior Lender and Senior Lender's counsel (David Hart of King & Spalding LLP) (the "**5/16/25 Lender Notice**"). Capitalized terms used but not defined in this letter shall have the meanings ascribed to such terms in the Mezz Loan Agreement.

        As you know, we represent Lender and are writing to you regarding the Terms of Sale in connection with Lender's UCC foreclosure proceeding of the Collateral. In the 5/16/25 Lender Notice, Lender previously delivered the Notice of Disposition of Collateral ("**Disposition Notice**"), as well as a copy of the Notice of Public Sale of Collateral. In such letter, Lender explained that the Terms of Sale was forthcoming and would be provided to Borrower and its counsel at the time that CBRE's secure online data room is officially opened up to prospective bidders that execute

Elkins Kalt Weintraub Reuben Gartside LLP

5653026.1

ACRON 2 PORSCHE DRIVE MEZZCO LLC
May 28, 2025
Page 2

a Confidentiality and Non-Disclosure Agreement and otherwise comply with the applicable conditions set forth in the Disposition Notice (as defined above).

As of the date of this letter, CBRE's secure online data room is officially opening today to prospective bidders that executed a Confidentiality and Non-Disclosure Agreement. Therefore, a copy of the Terms of Sale that has been incorporated in the Offering Memorandum (included in the data room) is attached hereto as **Exhibit A**.

Lender continues to reserve all rights and remedies under the Loan Documents.

Very truly yours,

DANIEL B. ABRAM
Elkins Kalt Weintraub Reuben Gartside LLP

cc:  Carole Hoffman (via email: cjh@acronusa.com)
Nicholas R. Marcus, Esq. (via email: nmarcus@seyfarth.com)
Gregory D. Vickowski (via email: gvick@procaccianti.com)
Ron Hadar (via email: rhadar@procaccianti.com)
James P. Redding, Esq. (via email: reddingj@gtlaw.com)
Jonathan J. Daniel (via email: LoanServicing@knightheadfunding.com)
Rebecca Brown (via email: rbrown@knightheadfunding.com)
David Hart (via email: dhart@kslaw.com)
Austin Khan (via email: austin.khan@civitascapital.com)
Marisa Lizak (via email: marisa.lizak@civitascapital.com)
Melanie Pugmire (via email: melanie.pugmire@civitascapital.com)
Shai Halbe, Esq. (via email: shalbe@elkinskalt.com)
Karen Gutierrez (via email: kgutierrez@elkinskalt.com)

5653026.1

ACRON 2 PORSCHE DRIVE MEZZCO LLC
May 28, 2025
Page 3

<u>Exhibit A</u>

**Terms of Sale**

(Attached)

5653026.1

**TERMS OF SALE**

On **July 30, 2025 at 10:00 A.M.** prevailing Central Time (the "**Public Auction Date**"), on behalf of CAI Overland Lender, LLC, a Delaware limited liability company (the "**Secured Party**" and/or "**Lender**"), Mannion Auctions, LLC in conjunction with Moecker Auctions, Inc. (collectively, "**Auctioneer**"), will offer for sale the following interests, as permitted pursuant to the terms of that certain Pledge and Security Agreement, dated as of January 18, 2024 (the "**Mezz Pledge Agreement**"), between ACRON 2 Porsche Drive Mezzco LLC, a Delaware limited liability company ("**Mezzanine Borrower**") and the Secured Party and Article 8 & 9 of the Uniform Commercial Code of the State of Texas.

1. Secured Party is offering for sale all limited liability company interests (the "**Interests**") in ACRON 2 Porsche Drive, Atlanta LLC, a Delaware limited liability company (the "**Pledged Entity**" and/or "**Borrower**") owned by the Mezzanine Borrower, which Pledged Entity has a leased fee interest in the real property located at 2 Porsche Drive, Hapeville, Georgia, commonly known as the Kimpton Overland Hotel – Atlanta Airport (the "**Real Property**"). The sale is being made in connection with the foreclosure on a pledge of the Interests to Secured Party by Mezzanine Borrower under the Mezz Pledge Agreement, pursuant to which Mezzanine Borrower has granted to Secured Party a first priority lien on the Interests as collateral for the mezzanine loan (the "**Mezz Loan**") from Lender to Mezzanine Borrower. The Mezz Loan was made pursuant to that certain mezzanine Loan Agreement, dated as of January 18, 2024, by and between Mezzanine Borrower and Lender (the "**Mezz Loan Agreement**") and certain other related loan documents (collectively, with the Mezz Loan Agreement and Mezz Pledge Agreement, the "**Mezz Loan Documents**").

2. The Real Property secures the obligations of the Pledged Entity with respect to a mortgage loan in the currently outstanding principal amount of $25,000,000 (the "**Senior Loan**") made by KHRE SMA Funding, LLC, a Delaware limited liability company ("**Senior Lender**") to the Pledged Entity pursuant to that certain Loan Agreement, dated as of December 21, 2018 (as amended, the "**Senior Loan Agreement**"), by and between the Pledged Entity and Senior Lender and certain other related loan documents (collectively, with the Senior Loan Agreement, the "**Senior Loan Documents**").

3. Mezzanine Borrower failed to timely perform certain obligations, including payment obligations, under the Mezz Loan Documents. Mezzanine Borrower received notices of such defaults from Lender and failed to cure such defaults within the cure period (if any) afforded Mezzanine Borrower under the Mezz Loan Documents. As a result, Events of Default (as defined in the Mezz Loan Agreement) have occurred and are continuing.

4. All inquiries concerning these Terms of Sale (including requirements to be a Qualified Bidder (as defined in Section 13) shall be made to: Joanne Au of CBRE Capital Markets at CBREuccsales@cbre.com. Any person making any inquiry or request must: (i) disclose the person or entity on whose behalf such information is being sought, (ii) execute the Confidentiality and Non-Disclosure Agreement (the "**NDA**"), which can be accessed via the website https://tinyurl.com/UCCSaleKimptonATL (case sensitive),

and (iii) maintain the confidentiality of the information provided. Interested parties who do not contact CBRE and register before the public sale will not be permitted to participate in bidding at the public sale.

5.  Secured Party will provide to prospective bidders that execute the NDA (as defined above) access to an online data site that contains certain relevant information that Secured Party possesses concerning the Mezzanine Borrower, the Interests, the Pledged Entity, the Real Property and copies of the Mezz Loan Documents and Senior Loan Documents (collectively, the "**Transaction Documents**").    Certain additional documentation may be made available to prospective bidders from time to time. Prospective bidders are encouraged to review all Transaction Documents and perform such due diligence as they deem necessary in advance of the date of the foreclosure sale.

6.  The Interests will be offered in a single lot.  The Interests are being sold strictly on an "**AS IS AND WHERE IS**" BASIS, AND (i) WITHOUT ANY REPRESENTATIONS OR WARRANTIES (WHETHER EXPRESSED OR IMPLIED) OF ANY KIND MADE BY SECURED PARTY (OR ANY OTHER PERSON ACTING FOR OR ON BEHALF OF SECURED PARTY), INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO THE EXISTENCE OR NONEXISTENCE OF OTHER LIENS, THE QUANTITY, QUALITY, CONDITION OR DESCRIPTION OF THE INTERESTS, THE REAL PROPERTY, AND/OR THE VALUE OF ANY OF THE FOREGOING, AND (ii) WITHOUT ANY RECOURSE WHATSOEVER AGAINST SECURED PARTY (OR ANY OTHER PERSON ACTING FOR OR ON BEHALF OF SECURED PARTY). No information provided to any prospective bidder in response to any request for information to Secured Party or any attorney or broker it may retain or otherwise shall constitute a representation or warranty of any kind with respect to such information, the Interests, the Mezz Loan, the Real Property, the sale of the Interests or any other matter.

7.  Without limiting the foregoing, any purchaser must purchase the Interests subject, in all respects, to (a) the terms of the governing documents of the Pledged Entity (including its operating agreement), (b) the terms of the Rental Agreement, dated May 5, 2017, between Pledged Entity (as Tenant) and the Development Authority of the City of Hapeville, a public body corporate and politic created and existing under the laws of the State of Georgia (as Landlord), and (c) the terms of the Senior Loan Documents, the obligations of the Pledged Entity thereunder, and the lien on the Real Property serving as security therefor.

8.  Secured Party reserves the right to require a showing of financial ability from prospective bidders prior to the date of the sale.  If a prospective bidder is a special purpose entity or an entity with creditworthiness that is, in Secured Party's reasonable judgment, insufficient to support the requirements herein, Secured Party reserves the right to require additional credit support in the form of a guaranty by a creditworthy affiliate of such prospective bidder or other appropriate credit support.

9.  Secured Party reserves the right to credit bid, set a minimum reserve price, reject any or all bids (including, without limitation, any bid that it deems has been made by a bidder that is unable to satisfy the requirements imposed by Secured Party upon

prospective bidders in connection with the sale or to whom in Secured Party's sole judgment a sale may not lawfully be made), terminate or adjourn to another time the sale, without further notice, and to sell the Interests at a subsequent public or private sale, and to amend, from time to time, but prior to the start of bidding, these Terms of Sale to revise or add any other commercially reasonable conditions as the Secured Party may deem necessary or appropriate to facilitate a commercially reasonable sale of the Interests.  Secured Party further reserves the right to determine  the qualifications of any bidder, including a prospective bidder's ability to close the transaction on the terms and conditions referenced herein.

10. The Interests have not been and will not be registered under the Securities Act of 1933, as amended (the "**Securities Act**"), or any applicable state securities laws, and may not be sold or transferred without registration under the Securities Act and applicable state securities law or the availability of valid exemptions from such registration requirements. Secured Party reserves the right to verify that each certificate for the Interests to be sold bears a legend substantially to the effect that such Interests have not been registered under the Securities Act and to impose such other limitations or conditions in connection with the sale of the Interests as Secured Party deems necessary or advisable in order to comply with the Securities Act or any other applicable law.

11. Secured Party will only consider bids from persons/bidders whom, in Secured Party's sole judgment, may lawfully execute and close such sale.  Bidders are hereby notified that (i) the Interests are required to be acquired for the account of the bidder and not with a view to resale or distribution, and (ii) that the bidder may not resell the Interests without compliance with the registration requirements of the Securities Act, and the regulations  of the Securities and Exchange Commission (the "**SEC**") thereunder and applicable state securities laws or pursuant to valid exemptions therefrom.

12. A bid by any person will be deemed to be a representation that such bidder has sufficient knowledge and experience in business and financial matters to evaluate properly the merits and risks of investment in the Interests, that such bidder has had such access to information concerning the Interests as such bidder deems necessary to make an informed investment decision and that such bidder is qualified to become a transferee under all transfer restrictions applicable to the Interests.  Further, such bidder may be required to establish that such bidder is able to bear the economic risks involved in investment in the Interests.

13. In order for a prospective bidder (other than Secured Party) to be a "**Qualified Bidder**" and eligible to bid at the public auction, each such prospective bidder must satisfy the following conditions precedent to participation:

(a) Complete and execute the written certification in the form of **Exhibit A** attached hereto (the "**Certification**") and email a copy of the signed and completed Certification to Joanne Au, CBRE Capital Markets, Inc., at CBREUCCSales@cbre.com no later than **5:00 P.M.** prevailing Central Time on **July 23, 2025** (the "**Qualified Bidder Deadline**"), TIME BEING OF THE ESSENCE WITH RESPECT TO SUCH DELIVERY;

(b) Post a deposit, by wire transfer to an escrow account to be designated by Secured

Party, in an amount not less than FIVE HUNDRED THOUSAND DOLLARS ($500,000) (the "**Deposit**") by the Qualified Bidder Deadline (as defined above) and email the Federal Reference Number (assigned to such wire transfer) to Joanne Au, CBRE Capital Markets, Inc., at CBREUCCSales@cbre.com by the Qualified Bidder Deadline. The Deposit shall be refunded to such prospective bidder within two (2) business days following the sale unless such prospective bidder is chosen as the successful bidder, in which event such Deposit shall, simultaneously with such selection, be deemed non-refundable to such bidder and applied as a credit against the purchase price;

(c) Depending on the answers provided in the Certification, the prospective bidder may be required to confirm to Secured Party (and its counsel) that (i) its purchase of the Interests is in compliance with all applicable federal and state laws, and (ii) it can comply with the certifications set forth in the Certification relating to such bidder's ability to qualify as a "Qualified Transferee" and to meet the eligibility requirements set forth in the Intercreditor Agreement, dated as of January 18, 2024, by and between Secured Party and Senior Lender (the "**Intercreditor Agreement**") and such confirmation (if required) is both provided to Secured Party and approved by Secured Party no less than two (2) business days prior to the Public Auction Date (as defined above);

(d) Each prospective bidder must demonstrate, to Secured Party's satisfaction, its financial ability to tender the balance of the purchase price for the Interests, by submitting to Joanne Au, CBRE Capital Markets, Inc., at CBREUCCSales@cbre.com, by the Qualified Bidder Deadline (as defined above), (i) a certified balance sheet or other certified financial information (including publicly available reports posted on EDGAR) evidencing the prospective bidder's total assets under management, capital/statutory surplus or partners' equity and market capitalization, and/or (ii) specific identification of the source of equity capital or loan commitments necessary to be utilized by the prospective bidder for the closing of the potential acquisition, which, in the case of (i) and (ii), Secured Party and CBRE shall hold as confidential;

(e) As set forth in Section 8 above, if a prospective bidder is a special purpose entity or an entity with creditworthiness that is, in Secured Party's reasonable judgment, insufficient to support the requirements herein, such prospective bidder has promptly provided, at Secured Party's request, additional credit support in the form of a guaranty by a creditworthy affiliate of such prospective bidder or other appropriate credit support, in each case via email to Joanne Au, CBRE Capital Markets, Inc., at CBREUCCSales@cbre.com, which additional credit support shall be approved by Secured Party in Secured Party's sole discretion, no less than two (2) business days prior to the Public Auction Date; and

(f) Each prospective bidder promptly provides all additional information that Secured Party and/or its agents (i.e., its counsel or CBRE) may request to confirm certain information set forth in a prospective bidder's Certificate (as defined above) or to otherwise confirm financial ability, to Secured Party's satisfaction, at least two (2) business days prior to the Public Auction Date.

As set forth above, Secured Party shall be entitled to seek additional information from any prospective bidder to confirm the information set forth in its Certification or other information provided (e.g., with respect to financial information and additional credit support), and the failure to provide such confirmatory information shall constitute permissible grounds for Secured Party to disqualify such prospective bidder. Prospective bidders are also advised to promptly submit any confirmatory information requested by Secured Party and/or its agents (i.e., its counsel or CBRE) in order to give Secured Party (and its agents) adequate time to review and approve such confirmatory information to Secured Party's satisfaction prior to the deadlines set forth above in Section 13(c), (e) and (f).

Meeting each of the foregoing requirements (including any requirements of the Intercreditor Agreement) shall be at the sole responsibility, risk, cost, and expense of a prospective bidder and prospective bidders are advised that the failure to meet such requirements may result in a default under the Intercreditor Agreement and/or the inability of a successful bidder to purchase the Interests. Without limitation to the foregoing, the foregoing requirements shall not apply to Secured Party or any Control Affiliate of Secured Party (as defined in the Intercreditor Agreement), each of which is stipulated to be a Qualified Bidder.

14. Prospective bidders are hereby advised that (a) although Secured Party has provided access to certain information regarding the Mezzanine Borrower, Pledged Entity and/or the Interests on an online data site, there is no assurance that Secured Party does not have information that it is contractually or legally prohibited from providing to potential bidders due to restrictions in confidentiality agreements or otherwise, or that it has disclosed all information in its possession relating to the Mezzanine Borrower, the Pledged Entity, the Real Property or the Interests and (b) Secured Party may be in possession of information which prospective bidders may not have.

15. The sale shall be a public auction to the highest Qualified Bidder. All bids (other than bids submitted by Secured Party) must be submitted in writing and must be for cash. The minimum bidding increments will be at least $100,000.00 or such other amount as Auctioneer may announce and modify at the auction in Auctioneer's sole discretion. Higher bids will continue to be entertained until Auctioneer has determined that it has received the highest bid from those bidders determined by Secured Party to be Qualified Bidders. No offers may be withdrawn once made during the auction, but no sale shall be final until accepted in writing by Secured Party. The entire amount of the successful bid (less the applicable Deposit) shall be paid by the successful bidder to Secured Party in immediately available good funds (wire transferred from, or certified check drawn on and certified by, a U.S. commercial bank that is a member of the Federal Reserve system) within fifteen (15) business days after the conclusion of the auction (the "**Funding Deadline**"), TIME BEING OF THE ESSENCE, and the scheduled closing of the sale shall take place on such date, subject in all respects to the winning bidder's satisfaction of all of the terms and conditions of these bidding procedures and Section 5 (Foreclosure of Separate Collateral) of the Intercreditor Agreement (as defined above), including, receipt of Senior Lender's approval as set forth in item (g) of **Exhibit A** (the Certification) attached hereto. If Secured Party bids

at the sale, part or all of its bid(s) and payment may be in the form of some or all of the debt it holds under the Mezz Loan on the same basis as if the amount of the indebtedness outstanding under the Mezz Loan which Secured Party bids at the sale were cash and immediately available good, collected funds.

16. If Secured Party is not the highest Qualified Bidder for the Interests, Secured Party reserves the right to designate a back-up bidder. If the highest Qualified Bidder fails to timely fund the entire balance of the purchase price as set forth in the above paragraph by the Funding Deadline (as defined above), such bidder's Deposit shall be immediately released to Secured Party as liquidated damages for such failure, and the back-up bidder shall be notified within two (2) business days after the Funding Deadline (the "**Back-Up Bidder Notice**"), and shall be obligated, within one (1) business day of receiving the Back-Up Bidder Notice from Secured Party, to (i) complete and execute a confirmation of sale in a form to be provided by Secured Party and (ii) post the Deposit by wire transfer to such third-party escrow account (to be designated by Secured Party). If a back-up bidder (other than Secured Party) is ultimately selected as the winning bidder for the Interests, the back-up bidder will be required to pay the balance of the purchase price for the Interests to be purchased by the back-up bidder by certified or bank check, or wire transfer of immediately available funds, no later than five (5) business days after delivery of the Back-Up Bidder Notice from Secured Party to the back-up bidder, TIME BEING OF THE ESSENCE. The sale of the Interests to a back-up bidder will otherwise be consummated on the same terms as applicable to the successful bidder at the public auction. If the back-up bidder for the Interests is Secured Party, then the foregoing requirements will not apply to the Interests and payment for the Interests may be made by applying the amounts due under the Mezz Loan against the winning bid amount.

17. If the back-up bidder fails to timely pay the balance of the successful bid, the back-up bidder's Deposit will be immediately released to Secured Party as its liquidated damages, and the Interests may, at Secured Party's option, be sold to the next highest bidder. If Secured Party is unable for any reason (other than as set forth in the immediately preceding sentence or in Section 16 with respect to a bidder's failure to timely pay the balance of the successful bid) to consummate the sale of the Interests to a successful bidder at the public sale, Secured Party shall have no liability or obligation whatsoever to the successful bidder except only to return any balance of the bidder's purchase price paid (i.e., the entire amount of the successful bid less the applicable Deposit) and Secured Party shall retain the Deposit under such circumstances. By bidding at the sale, each bidder acknowledges that it would be impractical and extremely difficult to ascertain Secured Party's actual damages in the event a successful bidder fails to consummate the purchase of the Interests as set forth herein and, as such, each bidder acknowledges and agrees that the Deposit represents a fair and reasonable estimate of the net present detriment Secured Party would suffer in such event. Each prospective bidder acknowledges and agrees that the release to Secured Party of the Deposit under the circumstances described in Section 16 and this Section 17, with respect to the initial winning bidder and back-up bidder, respectively, is not intended as a forfeiture or penalty but is intended to constitute liquidated damages to Secured Party in each case under such circumstances. A successful bidder or back up bidder shall have no right to postpone or nullify a sale of the Interests if it is unable to meet

any of the requirements under any of the documents relating to the Interests.

18. The winning bidder shall be solely responsible for the payment of all transfer taxes, stamp duties and similar taxes incurred in connection with the purchase of the Interests.

19. The bidding shall take place under the direction of Matthew D. Mannion, principal auctioneer for Mannion Auctions, LLC, in conjunction with Eric Rubin, principal auctioneer for Moecker Auctions, Inc., at the following date, time, and place:

Day and Date:     Wednesday, July 30, 2025
Time:             10:00 A.M. prevailing Central Time
Place:            Online via the designated Zoom credentials set forth below:

Zoom Meeting URL: https://bit.ly/AcronUCC

Zoom Meeting ID: 861 4554 5997

Zoom Meeting Password: 085908

Zoom Meeting Dial-in Number: +1-646-931-3860 (US)

(International participants only, follow the below URL to find your local dial-in number) - https://us06web.zoom.us/u/kncNax0Nv

## EXHIBIT A

CERTIFICATION

Re:    ACRON 2 Porsche Drive Mezzco LLC's right, title and interest in the limited liability company interests in ACRON 2 Porsche Drive, Atlanta LLC (together with certain related rights and property relating thereto, the "**Interests**")

Name of Prospective Bidder:    _____

Contact Information:    _____
                        _____
                        _____
                        Tel: _____
                        Email: _____

Ladies and Gentlemen:

The undersigned prospective bidder (the "**Bidder**") has indicated that it is interested in bidding on the Interests, which will be auctioned in accordance with the Terms of Sale issued by Secured Party with respect to the Interests (the "**Terms of Sale**"). Capitalized terms not otherwise defined herein shall have the meaning ascribed thereto in the Terms of Sale. This letter constitutes the Certification referenced in the Terms of Sale.

With the understanding that Secured Party will rely upon the representations and warranties made by Bidder in this Certification in connection with the sale of the Interests, the undersigned hereby certifies to Secured Party as follows:

(a) Bidder is acquiring the Interests for investment purposes, solely for the Bidder's own account and not with a view to distribution or resale of the Interests;

(b) Bidder has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of investment and has sufficient financial means to afford the risk of investment in the Interests;

(c) Bidder will not resell or otherwise hypothecate the Interests without a valid registration under applicable federal or state laws, including, without limitation, the Securities Act of 1933, as amended, or an available exemption therefrom;

(d) Bidder's purchase of the Interests will be in compliance with all applicable federal and state laws;

(e) Bidder will be present at the public auction through the virtual Zoom meeting;

(f) Bidder acknowledges that the following individuals are entitled to participate in the public sale on

behalf of Bidder, and none other:

Name: _____     Email: _____

Company: _____     Tel: _____

Name: _____     Email: _____

Company: _____     Tel: _____

*[attach a schedule if more individuals need to be identified]*

(g) Bidder:

i.  represents and warrants that (i) it is a Qualified Bidder (as defined in the Terms of Sale), and (ii) it will promptly provide all additional confirmatory information, requested by Secured Party (or its agents), in order to fully satisfy the conditions precedent required to be a Qualified Bidder pursuant to and in accordance with the terms and conditions of Section 13 of the Terms of Sale.

ii.  acknowledges that in order for a prospective bidder to be a "Qualified Transferee" under the Intercreditor Agreement, such Person must be "approved by Senior Lender in writing, in Senior Lender's reasonable discretion" and "under no circumstances shall an Excluded Party or an Affiliate of an Excluded Party be a Qualified Transferee" pursuant to Section 5(a)(i) of the Intercreditor Agreement and the Intercreditor Agreement's definition of the term "Qualified Transferee".

iii.  represents and warrants that to the best of Bidder's knowledge, Bidder is not an "Excluded Party" nor an "Affiliate" of an Excluded Party (as such preceding terms are defined in the Intercreditor Agreement and excerpted in the Definitions section below).

iv.  represents and warrants that if it is the winning bidder at the auction sale of the Interests, it will be able to satisfy and will satisfy the various requirements of Section 5 (Foreclosure of Separate Collateral) of the Intercreditor Agreement regarding the obligations, consents and acknowledgements of any "Qualified Transferee" which takes title to the pledged Interests, by working directly with Senior Lender and its counsel (or other agents) and subject in all respects to the receipt of Senior Lender's approval (as set forth above). Please describe below how the Bidder meets or intends to meet the requirements to be a "Qualified Transferee" in accordance with the Intercreditor Agreement:

_____

_____

_____

_____

_____

Certification (Terms of Sale - ACRON 2 Porsche Drive Mezzco LLC)

_____

v.    has or will have on the closing of the sale a "**Supplemental Guarantor**" (as defined below). Please describe below how the Bidder meets or intends to meet the requirement to have a Supplemental Guarantor.

_____

_____

_____

_____

_____

(h) Bidder acknowledges that it has received the Terms of Sale and has received, or has had the opportunity to receive, legal advice from independent, competent counsel of its own choosing regarding the meaning and legal significance of the Terms of Sale (including, without limitation, with respect to the Deposit requirements and Secured Party's remedy to retain the Deposit under certain circumstances as liquidated damages). The Bidder further acknowledges that it is satisfied with any legal counsel and advice received from it and fully understands and accepts the terms and conditions set forth therein.

Bidder acknowledges and agrees that the certifications contained in this Certification may be, and are being, relied upon by Secured Party and its successors and assigns, and that said certifications shall be binding upon Bidder and its successors and assigns.

Bidder hereby agrees to indemnify, defend and hold harmless Secured Party and its affiliates, directors, officers, members, agents, employees and consultants from and against any claim and/or out-of-pocket loss, liability or expense (including, without limitation, attorneys fees) resulting from or based on any misrepresentation or inaccuracy in the information contained in this Certification that is provided by Bidder or its agents (including any attachments or supplements to this Certification provided by the Bidder or its agents).

Excerpted Definitions from Intercreditor Agreement:

"**Affiliate**" shall mean, when used with respect to any Person, any other Person which (a) Controls, is Controlled by or is under common Control of such Person, (b) is the spouse, sibling (whether by whole or half-blood), ancestor or lineal descendant of such Person, or is a trust or estate the beneficial owner(s) of which is the spouse, sibling (whether by whole or half-blood), ancestor or lineal descendant of such Person, or (c) is a general partner, managing member or controlling shareholder of such Person.

"**Borrower**" has the meaning provided in the Recitals hereto.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or activities of a Person, whether through the ownership of voting securities or other beneficial interests, by contract or otherwise. The terms "Controlled by", "Controlling" and "under common Control with" shall have correlative meanings.

"**Control Affiliate**" means, with respect to any Person, any other Person who directly or indirectly through one or more intermediary entities Controls, is Controlled by, or is under common Control with, such Person. The terms "Controlled Affiliate" and "Controlling Affiliate" shall have correlative meanings.

"**Equity Collateral**" means the equity interests of Mezzanine Borrower in Borrower pledged pursuant to the Pledge Agreement.

"**Excluded Party**" means a Person who, in the last seven (7) years, (i) has filed, instituted or joined in lender liability or similar litigation against banks or other institutional lenders as a debtor, obligor or guarantor relative to real estate financing, (ii) has been the subject of an Insolvency Proceeding, (iii) is an existing or was a prior borrower of Senior Lender which is or was in material default on its loan obligations to Senior Lender which led Senior Lender to exercise rights and remedies, (iv) has ownership being such that it would cause a regulatory violation by Senior Lender (e.g., loan-to-one borrower requirements), or (v) is a Prohibited Person.

"**Insolvency Law**" shall mean Title 11 of the United States Code entitled "Bankruptcy", as the same has been or may be amended or superseded from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder (the "Bankruptcy Code"), or any other applicable domestic or foreign laws relating to liquidation, conservatorship, bankruptcy, receivership, insolvency, reorganization or any similar debtor relief rights affecting the rights, remedies, powers, privileges and benefits of creditors generally.

"**Insolvency Proceeding**" shall mean any case, proceeding or other action against any Person, whether voluntary or involuntary, under any Insolvency Law.

"**Mezzanine Borrower**" has the meaning provided in the Recitals hereto.

"**Mezzanine Lender**" has the meaning provided in the first paragraph of this Agreement.

"**Mezzanine Loan**" has the meaning provided in the Recitals hereto.

"**Mezzanine Loan Agreement**" has the meaning provided in the Recitals hereto.

"**Mezzanine Loan Documents**" means the Mezzanine Loan Agreement, the Mezzanine Note and the Pledge Agreement, together with the other documents and instruments set forth on Exhibit C hereto, as any of the foregoing may be modified, amended, extended, supplemented, restated or replaced from time to time, subject to the limitations and agreements contained in this Agreement.

"**Mezzanine Loan Realization Event**" means (i) the conveyance by foreclosure or assignment-in-lieu thereof of all of the direct limited liability company interests in Borrower pledged to Mezzanine Lender pursuant to the Mezzanine Loan Documents, (ii) the exercise by Mezzanine Lender of any voting rights

or powers with respect to Borrower so as to direct or cause the direction of the management or policies of Borrower, or (iii) any sale or transfer of the Equity Collateral by reason of the exercise of remedies by Mezzanine Lender pursuant to the Mezzanine Loan Documents.

"**Mezzanine Note**" has the meaning provided in the Recitals hereto.

"**Person**" means any individual, sole proprietorship, corporation, general partnership, limited partnership, limited liability company or partnership, joint venture, association, joint stock company, bank, trust, estate unincorporated organization, any federal, state, county or municipal government (or any agency or political subdivision thereof) endowment fund or any other form of entity.

"**Pledge Agreement**" has the meaning provided in the Recitals hereto.

"**Prohibited Person**" means any Person:

(i) listed in the annex to, or who is otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (the "Executive Order");

(ii) that is owned or controlled by, or acting for or on behalf of, any person or entity that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii) with whom a Person is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including the Executive Order;

(iv) who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(v) that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website or at any replacement website or other replacement official publication of such list; or

(vi) who is an Affiliate of a Person listed in clauses (i) through (v) above.

"**Qualified Transferee**" means (i) Mezzanine Lender, (ii) any Control Affiliate of Mezzanine Lender, (iii) Senior Lender, (iv) any Control Affiliate of Senior Lender, or (v) any Person approved by Senior Lender in writing, in Senior Lender's reasonable discretion; provided, however, under no circumstances shall an Excluded Party or an Affiliate of an Excluded Party be a Qualified Transferee.

"**Senior Lender**" has the meaning provided in the first paragraph of this Agreement.

"**Senior Loan**" has the meaning provided in the Recitals hereto.

"**Supplemental Guarantor**" means (1) Civitas Capital Management, LLC; provided, that, Civitas Capital Management, LLC satisfies Senior Lender's then applicable KYC requirements at the time of

becoming a Supplemental Guarantor hereunder, or (2) a Person that (i) has Control over Borrower (as constituted after giving effect to the Mezzanine Loan Realization Event), (ii) owns a direct or indirect interest in Borrower (as constituted after giving effect to the Mezzanine Loan Realization Event), (iii) satisfies Senior Lender's then applicable KYC requirements, (iv) has a net worth equal to no less than the then outstanding principal balance of the Senior Loan and liquidity equal to no less than ten percent (10%) of the then outstanding principal balance of the Senior Loan, (v) is not an Excluded Party or an Affiliate of an Excluded Party and (vi) if such Person is an investment fund, such investment fund has a remaining term, including any as-of-right extensions, that extends at least twelve (12) months beyond the fully extended maturity date of the Senior Loan.

[Remainder of page intentionally left blank; signature page follows]

IN WITNESS WHEREOF, the Bidder has caused this Certification to be duly executed and delivered.

Date: _____, 2025

_____

By: _____

Name: _____

Title: _____

## **<u>EXHIBIT K</u>**

(First Adjournment Notice)



**Daniel B. Abram**
DAbram@elkinskalt.com

Elkins Kalt Weintraub Reuben Gartside LLP

July 22, 2025

*VIA EMAIL & FEDEX OVERNIGHT DELIVERY*

ACRON 2 Porsche Drive Mezzco LLC
c/o ACRON U.S. Management
2424 E. 21st Street, Suite 150
Tulsa, OK 74114
Attention:  Greg Wilson
Email:       gw@acronusa.com

ACRON (USA) L.P.
2424 E. 21st Street, Suite 150
Tulsa, OK 74114
Attention:  Greg Wilson
Email:       gw@acronusa.com

ACRON AG
2424 E. 21st Street, Suite 150
Tulsa, OK 74114
Attention: Greg Wilson
Email:       gw@acronusa.com

Seyfarth Shaw LLP
233 S. Wacker Drive, Suite 8000
Chicago, Illinois 60606-6448
Attention: Jason J. DeJonker
Email:       JDeJonker@seyfarth.com

TH Investment Holdings II, LLC
c/o Procaccianti Companies, Inc.
1140 Reservoir Avenue
Cranston, RI 02920
Attention: Gregory D. Vickowski
Email:       gvick@procaccianti.com
                  gvickowski@procgroup.com

Procaccianti Companies, Inc.
Attn: Ron Hadar, Esq., General Counsel
1140 Reservoir Avenue
Cranston, RI 02920
Email:       rhadar@procaccianti.com

Greenberg Traurig, LLP
One International Place, Suite 2000
Boston, MA 02110
Attention: James P. Redding, Esq.
Email:       reddingj@gtlaw.com

Re:      **Kimpton Overland Hotel Atlanta Airport – Adjournment of UCC Public
Auction; Updated UCC Foreclosure Documents**

All:

Reference is made to that certain Loan Agreement, dated as of January 18, 2024 (the "**Loan
Agreement**"), by and between CAI OVERLAND LENDER, LLC, a Delaware limited liability
company ("**Lender**"), and ACRON 2 PORSCHE DRIVE MEZZCO LLC, a Delaware limited liability

5683989.1

ACRON 2 PORSCHE DRIVE MEZZCO LLC
July 22, 2025
Page 2

company ("**Borrower**").   Capitalized terms used but not defined in this letter shall have the meanings ascribed to such terms in the Loan Agreement.

As you know, we represent Lender and are writing to you regarding the UCC foreclosure sale. Lender is adjourning the UCC public auction from the previously scheduled July 30, 2025 public auction date to **August 19, 2025 at 9:00 A.M. prevailing Central Time**. Lender is also adjourning the Qualified Bidder Deadline (as defined in the Terms of Sale) to **August 12, 2025 at 5:00 P.M. prevailing Central Time**.

These updates are reflected in the following updated UCC foreclosure materials: (i) the Amended and Restated Notice of Disposition of Collateral (attached as **Exhibit A** hereto), (ii) the Amended and Restated Terms of Sale (attached as **Exhibit B** hereto), and (iii) the updated Notice of Public Sale of Collateral (attached as **Exhibit C** hereto). No other revisions have been made to the bidding requirements in these materials and the Zoom meeting credentials remain the same.

Nothing contained herein shall be deemed a waiver, election or limitation of the rights or remedies of Lender, whether arising under the Loan Documents, at law, or in equity, all of which Lender hereby expressly reserves.

Very truly yours,

DANIEL B. ABRAM
Elkins Kalt Weintraub Reuben Gartside LLP

cc:   Nicholas R. Marcus (via email: nmarcus@seyfarth.com)
      Carole Hoffman (via email: cjh@acronusa.com)
      Jonathan J. Daniel (via email: LoanServicing@knightheadfunding.com)
      Rebecca Brown (via email: rbrown@knightheadfunding.com)
      David Hart, Esq. (via email: dhart@kslaw.com)
      Austin Khan (via email: austin.khan@civitascapital.com)
      Marisa Lizak (via email: marisa.lizak@civitascapital.com)
      Melanie Pugmire (via email: melanie.pugmire@civitascapital.com)
      Shai Halbe, Esq. (via email: shalbe@elkinskalt.com)

5683989.1

**EXHIBIT A**

**Amended and Restated Notice of Disposition of Collateral**

(See Attached)

5683989.1

<u>**AMENDED AND RESTATED**</u>
<u>**NOTICE OF DISPOSITION OF COLLATERAL**</u>

TO DEBTOR:           ACRON 2 Porsche Drive Mezzco LLC,
a Delaware limited liability company ("<u>Debtor</u>")

c/o ACRON U.S. Management
2424 E. 21st Street, Suite 150
Tulsa, OK 74114
Attention: Greg Wilson

FROM SECURED PARTY:  CAI Overland Lender, LLC,
a Delaware limited liability company ("<u>Secured Party</u>")

c/o Civitas Capital Group
1722 Routh Street, Suite 800
Dallas, Texas 75201
Attention: Austin Khan, Marisa Lizak
Telephone number: (214) 572-2300

**UCC Foreclosure**

This AMENDED AND RESTATED NOTICE OF DISPOSITION OF COLLATERAL, effective as of July 22, 2025, restates and supersedes the prior Notice of Disposition of Collateral previously delivered to Debtor, its designated counsel, and other transaction parties on May 16, 2025, with respect to the UCC foreclosure in order to update the day and date, and time of the Public Sale, as set forth below.

**PLEASE TAKE NOTICE** that subject to the terms herein and the Terms of Sale (defined herein), Secured Party will offer for sale at a public auction (the "<u>Public Sale</u>") the Collateral (defined herein) at the following date, time, and place (the "<u>Disposition</u>"):

Day and Date: ***<u>Tuesday, August 19, 2025</u>***
Time:           ***<u>9:00 A.M. prevailing Central Time</u>***
Place:          Online via the designated Zoom credentials set forth below:

Zoom Meeting URL: https://bit.ly/AcronUCC

Zoom Meeting ID: 861 4554 5997

Zoom Meeting Password: 085908

Zoom Meeting Dial-in Number: +1-646-931-3860 (US)

(International participants only, follow the below URL to find your local dial-in number) -
https://us06web.zoom.us/u/kncNax0Nv

The term "Collateral" refers to 100% of the limited liability company interests in ACRON 2 Porsche Drive, Atlanta LLC, a Delaware limited liability company (the "Pledged Entity"), together with all other "Collateral" as such term is defined in that certain Pledge and Security Agreement, dated as of January 18, 2024, made by Debtor for the benefit of Secured Party (the "Pledge Agreement").

The Disposition is made pursuant to Section 9-610 and other applicable sections of the Uniform Commercial Code ("UCC") as adopted in the State of Texas, as well as other applicable law, and the provisions of the Loan Documents (as defined in the Pledge Agreement). The Collateral secures Debtor's indebtedness to Secured Party in the original principal amount of $11,600,000 plus, without limitation, any and all unpaid interest (base and default interest), protective advances, prepayment premium, servicing fees, late charges, attorneys' fees and other costs, fees and charges including the costs to sell the Collateral (collectively, the "Debt").

The Public Sale will be held by Matthew D. Mannion, principal auctioneer for Mannion Auctions, LLC, in conjunction with Eric Rubin, principal auctioneer for Moecker Auctions, Inc., online via the aforementioned Zoom meeting access details that will be made available to "qualified bidders" (as described more particularly in the Terms of Sale) who, among other requirements, execute the NDA (as defined herein and in the Terms of Sale).

The Secured Party reserves the right to determine which bidders qualify for participation in the Public Sale, to reject any bid or all bids at the Public Sale, to announce such other terms at the Public Sale as may be commercially reasonable in the Secured Party's sole discretion or to accept non-conforming bids.  Further, the Secured Party reserves the right to cancel, postpone or adjourn the Public Sale by announcement made at the Public Sale, either before or after the commencement of bidding, and without written notice or further publication.  The Secured Party reserves the right to credit bid any portion of its Debt then outstanding at the Public Sale.  The Secured Party reserves the right to implement such other terms or conditions at the Public Sale or regarding the Public Sale procedures as the Secured Party, in its sole discretion, determines to be commercially reasonable under the circumstances.

The Secured Party's understanding, without making any representation or warranty as to accuracy or completeness, is that (a) the principal asset of the Pledged Entity is a leased fee interest in the real property located at 2 Porsche Drive, Hapeville, Georgia, commonly known as the Kimpton Overland Hotel – Atlanta Airport, and (b) such real property secures the obligations of the Pledged Entity with respect to a senior mortgage loan made by a certain lender to the Pledged Entity in the currently outstanding principal amount of $25,000,000.

The sale of the Collateral will be subject to all applicable third-party consents and regulatory approvals, if any, as well as the terms of sale prepared by the Secured Party (the "Terms of Sale"). The Terms of Sale will provide additional information about the bidding process, including bidder qualifications, deposit information, Public Sale participation and determination of any winning

bid. Without limitation to the foregoing, please take notice that there are specific requirements for any potential successful bidder in connection with obtaining information and bidding on the Collateral, including, but not limited to, execution of the NDA.

Prospective bidders will be required to represent in writing to the Secured Party that they are purchasing the Collateral for their own account and not acquiring the Collateral with a view toward the sale or distribution thereof and will not resell the Collateral unless pursuant to a valid registration under applicable federal and/or state securities laws, or a valid exemption from the registration thereunder. The Collateral has not been registered under such securities laws and cannot be sold by the winning bidder(s) without registration or application of a valid exemption. The Collateral will be offered for sale at the Public Sale "**AS-IS, WHERE-IS**", and there are no express or implied warranties or representations of any kind or nature whatsoever, including without limitation, relating to title, possession, quiet enjoyment, merchantability, fitness, or the like as to the Collateral. The sale of the Collateral is specifically subject to all taxes, liens (other than those of Secured Party), claims, assessments, liabilities and encumbrances, if any, that may exist against the Collateral under the UCC or other applicable law. The winning bidder(s) will be responsible for the payment of all transfer taxes, stamp duties and similar taxes incurred in connection with the purchase of the Collateral.

All inquiries concerning this Notice of Disposition of Collateral and the Terms of Sale (including requirements to be a "qualified bidder") shall be made to: Joanne Au of CBRE Capital Markets at CBREuccsales@cbre.com.  Any person making any inquiry or request must: (i) disclose the person or entity on whose behalf such information is being sought, (ii) execute the Confidentiality and Non-Disclosure Agreement (the "NDA"), which can be accessed via the website https://tinyurl.com/UCCSaleKimptonATL (case sensitive), and (iii) maintain the confidentiality of the information provided. Interested parties who do not contact CBRE and register before the Public Sale will not be permitted to participate in bidding at the Public Sale.

Debtor is entitled to an accounting of the unpaid Debt (as defined above) secured by the Collateral which Secured Party intends to sell. Secured Party's charge for an accounting shall be in an amount equal to its costs and expenses (including attorney fees) incurred as a result of providing such accounting. Debtor may request an accounting by emailing Marisa Lizak at marisa.lizak@civitascapital.com and/or calling her at (214) 572-2300.

**EXHIBIT B**

**Amended and Restated Terms of Sale**

(See Attached)

5683989.1

## <u>AMENDED AND RESTATED TERMS OF SALE</u>

These AMENDED AND RESTATED TERMS OF SALE, effective as of July 22, 2025, restate and supersede the prior Terms of Sale previously delivered to Borrower (as defined below) and its designated counsel on May 28, 2025, with respect to the UCC foreclosure set forth below, in order to extend both the Qualified Bidder Deadline (as defined below) and Public Auction Date (as defined below), as set forth below.

On ***August 19, 2025 at 9:00 A.M.*** prevailing Central Time (the "**Public Auction Date**"), on behalf of CAI Overland Lender, LLC, a Delaware limited liability company (the "**Secured Party**" and/or "**Lender**"), Mannion Auctions, LLC in conjunction with Moecker Auctions, Inc. (collectively, "**Auctioneer**"), will offer for sale the following interests, as permitted pursuant to the terms of that certain Pledge and Security Agreement, dated as of January 18, 2024 (the "**Mezz Pledge Agreement**"), between ACRON 2 Porsche Drive Mezzco LLC, a Delaware limited liability company ("**Mezzanine Borrower**") and the Secured Party and Article 8 & 9 of the Uniform Commercial Code of the State of Texas.

1. Secured Party is offering for sale all limited liability company interests (the "**Interests**") in ACRON 2 Porsche Drive, Atlanta LLC, a Delaware limited liability company (the "**Pledged Entity**" and/or "**Borrower**") owned by the Mezzanine Borrower, which Pledged Entity has a leased fee interest in the real property located at 2 Porsche Drive, Hapeville, Georgia, commonly known as the Kimpton Overland Hotel – Atlanta Airport (the "**Real Property**"). The sale is being made in connection with the foreclosure on a pledge of the Interests to Secured Party by Mezzanine Borrower under the Mezz Pledge Agreement, pursuant to which Mezzanine Borrower has granted to Secured Party a first priority lien on the Interests as collateral for the mezzanine loan (the "**Mezz Loan**") from Lender to Mezzanine Borrower.  The Mezz Loan was made pursuant to that certain mezzanine Loan Agreement, dated as of January 18, 2024, by and between Mezzanine Borrower and Lender (the "**Mezz Loan Agreement**") and certain other related loan documents (collectively, with the Mezz Loan Agreement and Mezz Pledge Agreement, the "**Mezz Loan Documents**").

2. The Real Property secures the obligations of the Pledged Entity with respect to a mortgage loan in the currently outstanding principal amount of $25,000,000 (the "**Senior Loan**") made by KHRE SMA Funding, LLC, a Delaware limited liability company ("**Senior Lender**") to the Pledged Entity pursuant to that certain Loan Agreement, dated as of December 21, 2018 (as amended, the "**Senior Loan Agreement**"), by and between the Pledged Entity and Senior Lender and certain other related loan documents (collectively, with the Senior Loan Agreement, the "**Senior Loan Documents**").

3. Mezzanine Borrower failed to timely perform certain obligations, including payment obligations, under the Mezz Loan Documents. Mezzanine Borrower received notices of such defaults from Lender and failed to cure such defaults within the cure period (if any) afforded Mezzanine Borrower under the Mezz Loan Documents. As a result, Events of Default (as defined in the Mezz Loan Agreement) have occurred and are continuing.

4. All inquiries concerning these Terms of Sale (including requirements to be a Qualified Bidder (as defined in Section 13) shall be made to: Joanne Au of CBRE Capital Markets at CBREuccsales@cbre.com. Any person making any inquiry or request must: (i) disclose the person or entity on whose behalf such information is being sought, (ii) execute the Confidentiality and Non-Disclosure Agreement (the "**NDA**"), which can be accessed via the website https://tinyurl.com/UCCSaleKimptonATL (case sensitive), and (iii) maintain the confidentiality of the information provided. Interested parties who do not contact CBRE and register before the public sale will not be permitted to participate in bidding at the public sale.

5. Secured Party will provide to prospective bidders that execute the NDA (as defined above) access to an online data site that contains certain relevant information that Secured Party possesses concerning the Mezzanine Borrower, the Interests, the Pledged Entity, the Real Property and copies of the Mezz Loan Documents and Senior Loan Documents (collectively, the "**Transaction Documents**"). Certain additional documentation may be made available to prospective bidders from time to time. Prospective bidders are encouraged to review all Transaction Documents and perform such due diligence as they deem necessary in advance of the date of the foreclosure sale.

6. The Interests will be offered in a single lot. The Interests are being sold strictly on an "**AS IS AND WHERE IS**" BASIS, AND (i) WITHOUT ANY REPRESENTATIONS OR WARRANTIES (WHETHER EXPRESSED OR IMPLIED) OF ANY KIND MADE BY SECURED PARTY (OR ANY OTHER PERSON ACTING FOR OR ON BEHALF OF SECURED PARTY), INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO THE EXISTENCE OR NONEXISTENCE OF OTHER LIENS, THE QUANTITY, QUALITY, CONDITION OR DESCRIPTION OF THE INTERESTS, THE REAL PROPERTY, AND/OR THE VALUE OF ANY OF THE FOREGOING, AND (ii) WITHOUT ANY RECOURSE WHATSOEVER AGAINST SECURED PARTY (OR ANY OTHER PERSON ACTING FOR OR ON BEHALF OF SECURED PARTY). No information provided to any prospective bidder in response to any request for information to Secured Party or any attorney or broker it may retain or otherwise shall constitute a representation or warranty of any kind with respect to such information, the Interests, the Mezz Loan, the Real Property, the sale of the Interests or any other matter.

7. Without limiting the foregoing, any purchaser must purchase the Interests subject, in all respects, to (a) the terms of the governing documents of the Pledged Entity (including its operating agreement), (b) the terms of the Rental Agreement, dated May 5, 2017, between Pledged Entity (as Tenant) and the Development Authority of the City of Hapeville, a public body corporate and politic created and existing under the laws of the State of Georgia (as Landlord), and (c) the terms of the Senior Loan Documents, the obligations of the Pledged Entity thereunder, and the lien on the Real Property serving as security therefor.

8. Secured Party reserves the right to require a showing of financial ability from prospective bidders prior to the date of the sale. If a prospective bidder is a special purpose entity or an entity with creditworthiness that is, in Secured Party's reasonable judgment, insufficient to support the requirements herein, Secured Party reserves the

right to require additional credit support in the form of a guaranty by a creditworthy affiliate of such prospective bidder or other appropriate credit support.

9.   Secured Party reserves the right to credit bid, set a minimum reserve price, reject any or all bids (including, without limitation, any bid that it deems has been made by a bidder that is unable to satisfy the requirements imposed by Secured Party upon prospective bidders in connection with the sale or to whom in Secured Party's sole judgment a sale may not lawfully be made), terminate or adjourn to another time the sale, without further notice, and to sell the Interests at a subsequent public or private sale, and to amend, from time to time, <u>but prior to the start of bidding</u>, these Terms of Sale to revise or add any other commercially reasonable conditions as the Secured Party may deem necessary or appropriate to facilitate a commercially reasonable sale of the Interests.  Secured Party further reserves the right to determine  the qualifications of any bidder, including a prospective bidder's ability to close the transaction on the terms and conditions referenced herein.

10.  The Interests have not been and will not be registered under the Securities Act of 1933, as amended (the "**Securities Act**"), or any applicable state securities laws, and may not be sold or transferred without registration under the Securities Act and applicable state securities law or the availability of valid exemptions from such registration requirements. Secured Party reserves the right to verify that each certificate for the Interests to be sold bears a legend substantially to the effect that such Interests have not been registered under the Securities Act and to impose such other limitations or conditions in connection with the sale of the Interests as Secured Party deems necessary or advisable in order to comply with the Securities Act or any other applicable law.

11.  Secured Party will only consider bids from persons/bidders whom, in Secured Party's sole judgment, may lawfully execute and close such sale.  Bidders are hereby notified that (i) the Interests are required to be acquired for the account of the bidder and not with a view to resale or distribution, and (ii) that the bidder may not resell the Interests without compliance with the registration requirements of the Securities Act, and the regulations  of the Securities and Exchange Commission (the "**SEC**") thereunder and applicable state securities laws or pursuant to valid exemptions therefrom.

12.  A bid by any person will be deemed to be a representation that such bidder has sufficient knowledge and experience in business and financial matters to evaluate properly the merits and risks of investment in the Interests, that such bidder has had such access to information concerning the Interests as such bidder deems necessary to make an informed investment decision and that such bidder is qualified to become a transferee under all transfer restrictions applicable to the Interests.  Further, such bidder may be required to establish that such bidder is able to bear the economic risks  involved  in investment in the Interests.

13.  In order for a prospective bidder (other than Secured Party) to be a "**Qualified Bidder**" and eligible to bid at the public auction, each such prospective bidder must satisfy the following conditions precedent to participation:

        (a) Complete and execute the written certification in the form of **Exhibit A** attached hereto (the "**Certification**") and email a copy of the signed and completed

Certification to Joanne Au, CBRE Capital Markets, Inc., at CBREUCCSales@cbre.com no later than **5:00 P.M.** prevailing Central Time on *August 12, 2025* (the "**Qualified Bidder Deadline**"), TIME BEING OF THE ESSENCE WITH RESPECT TO SUCH DELIVERY;

(b) Post a deposit, by wire transfer to an escrow account to be designated by Secured Party, in an amount not less than FIVE HUNDRED THOUSAND DOLLARS ($500,000) (the "**Deposit**") by the Qualified Bidder Deadline (as defined above) and email the Federal Reference Number (assigned to such wire transfer) to Joanne Au, CBRE Capital Markets, Inc., at CBREUCCSales@cbre.com by the Qualified Bidder Deadline. The Deposit shall be refunded to such prospective bidder within two (2) business days following the sale unless such prospective bidder is chosen as the successful bidder, in which event such Deposit shall, simultaneously with such selection, be deemed non-refundable to such bidder and applied as a credit against the purchase price;

(c) Depending on the answers provided in the Certification, the prospective bidder may be required to confirm to Secured Party (and its counsel) that (i) its purchase of the Interests is in compliance with all applicable federal and state laws, and (ii) it can comply with the certifications set forth in the Certification relating to such bidder's ability to qualify as a "Qualified Transferee" and to meet the eligibility requirements set forth in the Intercreditor Agreement, dated as of January 18, 2024, by and between Secured Party and Senior Lender (the "**Intercreditor Agreement**") and such confirmation (if required) is both provided to Secured Party and approved by Secured Party no less than two (2) business days prior to the Public Auction Date (as defined above);

(d) Each prospective bidder must demonstrate, to Secured Party's satisfaction, its financial ability to tender the balance of the purchase price for the Interests, by submitting to Joanne Au, CBRE Capital Markets, Inc., at CBREUCCSales@cbre.com, by the Qualified Bidder Deadline (as defined above), (i) a certified balance sheet or other certified financial information (including publicly available reports posted on EDGAR) evidencing the prospective bidder's total assets under management, capital/statutory surplus or partners' equity and market capitalization, and/or (ii) specific identification of the source of equity capital or loan commitments necessary to be utilized by the prospective bidder for the closing of the potential acquisition, which, in the case of (i) and (ii), Secured Party and CBRE shall hold as confidential;

(e) As set forth in Section 8 above, if a prospective bidder is a special purpose entity or an entity with creditworthiness that is, in Secured Party's reasonable judgment, insufficient to support the requirements herein, such prospective bidder has promptly provided, at Secured Party's request, additional credit support in the form of a guaranty by a creditworthy affiliate of such prospective bidder or other appropriate credit support, in each case via email to Joanne Au, CBRE Capital Markets, Inc., at CBREUCCSales@cbre.com, which additional credit support shall be approved by Secured Party in Secured Party's sole discretion, no less than two (2) business days prior to the Public Auction Date; and

(f) Each prospective bidder promptly provides all additional information that Secured Party and/or its agents (i.e., its counsel or CBRE) may request to confirm certain information set forth in a prospective bidder's Certificate (as defined above) or to otherwise confirm financial ability, to Secured Party's satisfaction, at least two (2) business days prior to the Public Auction Date.

As set forth above, Secured Party shall be entitled to seek additional information from any prospective bidder to confirm the information set forth in its Certification or other information provided (e.g., with respect to financial information and additional credit support), and the failure to provide such confirmatory information shall constitute permissible grounds for Secured Party to disqualify such prospective bidder. Prospective bidders are also advised to promptly submit any confirmatory information requested by Secured Party and/or its agents (i.e., its counsel or CBRE) in order to give Secured Party (and its agents) adequate time to review and approve such confirmatory information to Secured Party's satisfaction prior to the deadlines set forth above in Section 13(c), (e) and (f).

Meeting each of the foregoing requirements (including any requirements of the Intercreditor Agreement) shall be at the sole responsibility, risk, cost, and expense of a prospective bidder and prospective bidders are advised that the failure to meet such requirements may result in a default under the Intercreditor Agreement and/or the inability of a successful bidder to purchase the Interests. Without limitation to the foregoing, the foregoing requirements shall not apply to Secured Party or any Control Affiliate of Secured Party (as defined in the Intercreditor Agreement), each of which is stipulated to be a Qualified Bidder.

14. Prospective bidders are hereby advised that (a) although Secured Party has provided access to certain information regarding the Mezzanine Borrower, Pledged Entity and/or the Interests on an online data site, there is no assurance that Secured Party does not have information that it is contractually or legally prohibited from providing to potential bidders due to restrictions in confidentiality agreements or otherwise, or that it has disclosed all information in its possession relating to the Mezzanine Borrower, the Pledged Entity, the Real Property or the Interests and (b) Secured Party may be in possession of information which prospective bidders may not have.

15. The sale shall be a public auction to the highest Qualified Bidder.  All bids (other than bids submitted by Secured Party) must be submitted in writing and must be for cash. The minimum bidding increments will be at least $100,000.00 or such other amount as Auctioneer may announce and modify at the auction in Auctioneer's sole discretion. Higher bids will continue to be entertained until Auctioneer has determined that it has received the highest bid from those bidders determined by Secured Party to be Qualified Bidders.  No offers may be withdrawn once made during the auction, but no sale shall be final until accepted in writing by Secured Party.  The entire amount of the successful bid (less the applicable Deposit) shall be paid by the successful bidder to Secured Party in immediately available good funds (wire transferred from, or certified check drawn on and certified by, a U.S. commercial bank that is a member of the Federal Reserve system) within fifteen (15) business days after the conclusion of the

auction (the "**Funding Deadline**"), TIME BEING OF THE ESSENCE, and the scheduled closing of the sale shall take place on such date, subject in all respects to the winning bidder's satisfaction of all of the terms and conditions of these bidding procedures and Section 5 (Foreclosure of Separate Collateral) of the Intercreditor Agreement (as defined above), including, receipt of Senior Lender's approval as set forth in item (g) of **Exhibit A** (the Certification) attached hereto. If Secured Party bids at the sale, part or all of its bid(s) and payment may be in the form of some or all of the debt it holds under the Mezz Loan on the same basis as if the amount of the indebtedness outstanding under the Mezz Loan which Secured Party bids at the sale were cash and immediately available good, collected funds.

16. If Secured Party is not the highest Qualified Bidder for the Interests, Secured Party reserves the right to designate a back-up bidder.  If the highest Qualified Bidder fails to timely fund the entire balance of the purchase price as set forth in the above paragraph by the Funding Deadline (as defined above), such bidder's Deposit shall be immediately released to Secured Party as liquidated damages for such failure, and the back-up bidder shall be notified within two (2) business days after the Funding Deadline (the "**Back-Up Bidder Notice**"), and shall be obligated, within one (1) business day of receiving the Back-Up Bidder Notice from Secured Party, to (i) complete and execute a confirmation of sale in a form to be provided by Secured Party and (ii) post the Deposit by wire transfer to such third-party escrow account (to be designated by Secured Party).  If a back-up bidder (other than Secured Party) is ultimately selected as the winning bidder for the Interests, the back-up bidder will be required to pay the balance of the purchase price for the Interests to be purchased by the back-up bidder by certified or bank check, or wire transfer of immediately available funds, no later than five (5) business days after delivery of the Back-Up Bidder Notice from Secured Party to the back-up bidder, TIME BEING OF THE ESSENCE. The sale of the Interests to a back-up bidder will otherwise be consummated on the same terms as applicable to the successful bidder at the public auction. If the back-up bidder for the Interests is Secured Party, then the foregoing requirements will not apply to the Interests and payment for the Interests may be made by applying the amounts due under the Mezz Loan against the winning bid amount.

17. If the back-up bidder fails to timely pay the balance of the successful bid, the back-up bidder's Deposit will be immediately released to Secured Party as its liquidated damages, and the Interests may, at Secured Party's option, be sold to the next highest bidder.  If Secured Party is unable for any reason (other than as set forth in the immediately preceding sentence or in Section 16 with respect to a bidder's failure to timely pay the balance of the successful bid) to consummate the sale of the Interests to a successful bidder at the public sale, Secured Party shall have no liability or obligation whatsoever to the successful bidder except only to return any balance of the bidder's purchase price paid (i.e., the entire amount of the successful bid less the applicable Deposit) and Secured Party shall retain the Deposit under such circumstances.  By bidding at the sale, each bidder acknowledges that it would be impractical and extremely difficult to ascertain Secured Party's actual damages in the event a successful bidder fails to consummate the purchase of the Interests as set forth herein and, as such, each bidder acknowledges and agrees that the Deposit represents a fair and reasonable estimate of the net present detriment Secured Party would suffer in such event.  Each

prospective bidder acknowledges and agrees that the release to Secured Party of the Deposit under the circumstances described in Section 16 and this Section 17, with respect to the initial winning bidder and back-up bidder, respectively, is not intended as a forfeiture or penalty but is intended to constitute liquidated damages to Secured Party in each case under such circumstances. A successful bidder or back up bidder shall have no right to postpone or nullify a sale of the Interests if it is unable to meet any of the requirements under any of the documents relating to the Interests.

18. The winning bidder shall be solely responsible for the payment of all transfer taxes, stamp duties and similar taxes incurred in connection with the purchase of the Interests.

19. The bidding shall take place under the direction of Matthew D. Mannion, principal auctioneer for Mannion Auctions, LLC, in conjunction with Eric Rubin, principal auctioneer for Moecker Auctions, Inc., at the following date, time, and place:

Day and Date:      ***Tuesday, August 19, 2025***
Time:              ***9:00 A.M. prevailing Central Time***
Place:             Online via the designated Zoom credentials set forth below:

Zoom Meeting URL: https://bit.ly/AcronUCC

Zoom Meeting ID: 861 4554 5997

Zoom Meeting Password: 085908

Zoom Meeting Dial-in Number: +1-646-931-3860 (US)

(International participants only, follow the below URL to find your local dial-in number) - https://us06web.zoom.us/u/kncNax0Nv

## <u>EXHIBIT A</u>

CERTIFICATION

Re:     ACRON 2 Porsche Drive Mezzco LLC's right, title and interest in the limited liability company interests in ACRON 2 Porsche Drive, Atlanta LLC (together with certain related rights and property relating thereto, the "**<u>Interests</u>**")

Name of Prospective Bidder: _____

Contact Information:        _____
                           _____
                           _____
                    Tel: _____
                    Email: _____

Ladies and Gentlemen:

The undersigned prospective bidder (the "**<u>Bidder</u>**") has indicated that it is interested in bidding on the Interests, which will be auctioned in accordance with the Terms of Sale issued by Secured Party with respect to the Interests (the "**<u>Terms of Sale</u>**"). Capitalized terms not otherwise defined herein shall have the meaning ascribed thereto in the Terms of Sale. This letter constitutes the Certification referenced in the Terms of Sale.

With the understanding that Secured Party will rely upon the representations and warranties made by Bidder in this Certification in connection with the sale of the Interests, the undersigned hereby certifies to Secured Party as follows:

(a)  Bidder is acquiring the Interests for investment purposes, solely for the Bidder's own account and not with a view to distribution or resale of the Interests;

(b)  Bidder has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of investment and has sufficient financial means to afford the risk of investment in the Interests;

(c)  Bidder will not resell or otherwise hypothecate the Interests without a valid registration under applicable federal or state laws, including, without limitation, the Securities Act of 1933, as amended, or an available exemption therefrom;

(d)  Bidder's purchase of the Interests will be in compliance with all applicable federal and state laws;

(e)  Bidder will be present at the public auction through the virtual Zoom meeting;

(f)  Bidder acknowledges that the following individuals are entitled to participate in the public sale on

behalf of Bidder, and none other:

| | | | |
|---|---|---|---|
| Name: _____ | | Email: _____ | |
| Company: _____ | | Tel: _____ | |
| Name: _____ | | Email: _____ | |
| Company: _____ | | Tel: _____ | |

*[attach a schedule if more individuals need to be identified]*

(g) Bidder:

i.   represents and warrants that (i) it is a Qualified Bidder (as defined in the Terms of Sale), and (ii) it will promptly provide all additional confirmatory information, requested by Secured Party (or its agents), in order to fully satisfy the conditions precedent required to be a Qualified Bidder pursuant to and in accordance with the terms and conditions of Section 13 of the Terms of Sale.

ii.   acknowledges that in order for a prospective bidder to be a "Qualified Transferee" under the Intercreditor Agreement, such Person must be "approved by Senior Lender in writing, in Senior Lender's reasonable discretion" and "under no circumstances shall an Excluded Party or an Affiliate of an Excluded Party be a Qualified Transferee" pursuant to Section 5(a)(i) of the Intercreditor Agreement and the Intercreditor Agreement's definition of the term "Qualified Transferee".

iii.   represents and warrants that to the best of Bidder's knowledge, Bidder is not an "Excluded Party" nor an "Affiliate" of an Excluded Party (as such preceding terms are defined in the Intercreditor Agreement and excerpted in the Definitions section below).

iv.   represents and warrants that if it is the winning bidder at the auction sale of the Interests, it will be able to satisfy and will satisfy the various requirements of Section 5 (Foreclosure of Separate Collateral) of the Intercreditor Agreement regarding the obligations, consents and acknowledgements of any "Qualified Transferee" which takes title to the pledged Interests, by working directly with Senior Lender and its counsel (or other agents) and subject in all respects to the receipt of Senior Lender's approval (as set forth above). Please describe below how the Bidder meets or intends to meet the requirements to be a "Qualified Transferee" in accordance with the Intercreditor Agreement:

_____

_____

_____

_____

_____

Certification (Terms of Sale - ACRON 2 Porsche Drive Mezzco LLC)

v.     has or will have on the closing of the sale a "**Supplemental Guarantor**" (as defined below). Please describe below how the Bidder meets or intends to meet the requirement to have a Supplemental Guarantor.

_____

_____

_____

_____

_____

(h) Bidder acknowledges that it has received the Terms of Sale and has received, or has had the opportunity to receive, legal advice from independent, competent counsel of its own choosing regarding the meaning and legal significance of the Terms of Sale (including, without limitation, with respect to the Deposit requirements and Secured Party's remedy to retain the Deposit under certain circumstances as liquidated damages). The Bidder further acknowledges that it is satisfied with any legal counsel and advice received from it and fully understands and accepts the terms and conditions set forth therein.

Bidder acknowledges and agrees that the certifications contained in this Certification may be, and are being, relied upon by Secured Party and its successors and assigns, and that said certifications shall be binding upon Bidder and its successors and assigns.

Bidder hereby agrees to indemnify, defend and hold harmless Secured Party and its affiliates, directors, officers, members, agents, employees and consultants from and against any claim and/or out-of-pocket loss, liability or expense (including, without limitation, attorneys fees) resulting from or based on any misrepresentation or inaccuracy in the information contained in this Certification that is provided by Bidder or its agents (including any attachments or supplements to this Certification provided by the Bidder or its agents).

<u>Excerpted Definitions from Intercreditor Agreement</u>:

"**Affiliate**" shall mean, when used with respect to any Person, any other Person which (a) Controls, is Controlled by or is under common Control of such Person, (b) is the spouse, sibling (whether by whole or half-blood), ancestor or lineal descendant of such Person, or is a trust or estate the beneficial owner(s) of which is the spouse, sibling (whether by whole or half-blood), ancestor or lineal descendant of such Person, or (c) is a general partner, managing member or controlling shareholder of such Person.

"**Borrower**" has the meaning provided in the Recitals hereto.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or activities of a Person, whether through the ownership of voting securities or other beneficial interests, by contract or otherwise. The terms "Controlled by", "Controlling" and "under common Control with" shall have correlative meanings.

"**Control Affiliate**" means, with respect to any Person, any other Person who directly or indirectly through one or more intermediary entities Controls, is Controlled by, or is under common Control with, such Person. The terms "Controlled Affiliate" and "Controlling Affiliate" shall have correlative meanings.

"**Equity Collateral**" means the equity interests of Mezzanine Borrower in Borrower pledged pursuant to the Pledge Agreement.

"**Excluded Party**" means a Person who, in the last seven (7) years, (i) has filed, instituted or joined in lender liability or similar litigation against banks or other institutional lenders as a debtor, obligor or guarantor relative to real estate financing, (ii) has been the subject of an Insolvency Proceeding, (iii) is an existing or was a prior borrower of Senior Lender which is or was in material default on its loan obligations to Senior Lender which led Senior Lender to exercise rights and remedies, (iv) has ownership being such that it would cause a regulatory violation by Senior Lender (e.g., loan-to-one borrower requirements), or (v) is a Prohibited Person.

"**Insolvency Law**" shall mean Title 11 of the United States Code entitled "Bankruptcy", as the same has been or may be amended or superseded from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder (the "Bankruptcy Code"), or any other applicable domestic or foreign laws relating to liquidation, conservatorship, bankruptcy, receivership, insolvency, reorganization or any similar debtor relief rights affecting the rights, remedies, powers, privileges and benefits of creditors generally.

"**Insolvency Proceeding**" shall mean any case, proceeding or other action against any Person, whether voluntary or involuntary, under any Insolvency Law.

"**Mezzanine Borrower**" has the meaning provided in the Recitals hereto.

"**Mezzanine Lender**" has the meaning provided in the first paragraph of this Agreement.

"**Mezzanine Loan**" has the meaning provided in the Recitals hereto.

"**Mezzanine Loan Agreement**" has the meaning provided in the Recitals hereto.

"**Mezzanine Loan Documents**" means the Mezzanine Loan Agreement, the Mezzanine Note and the Pledge Agreement, together with the other documents and instruments set forth on Exhibit C hereto, as any of the foregoing may be modified, amended, extended, supplemented, restated or replaced from time to time, subject to the limitations and agreements contained in this Agreement.

"**Mezzanine Loan Realization Event**" means (i) the conveyance by foreclosure or assignment-in-lieu thereof of all of the direct limited liability company interests in Borrower pledged to Mezzanine Lender pursuant to the Mezzanine Loan Documents, (ii) the exercise by Mezzanine Lender of any voting rights

or powers with respect to Borrower so as to direct or cause the direction of the management or policies of Borrower, or (iii) any sale or transfer of the Equity Collateral by reason of the exercise of remedies by Mezzanine Lender pursuant to the Mezzanine Loan Documents.

"**<u>Mezzanine Note</u>**" has the meaning provided in the Recitals hereto.

"**<u>Person</u>**" means any individual, sole proprietorship, corporation, general partnership, limited partnership, limited liability company or partnership, joint venture, association, joint stock company, bank, trust, estate unincorporated organization, any federal, state, county or municipal government (or any agency or political subdivision thereof) endowment fund or any other form of entity.

"**<u>Pledge Agreement</u>**" has the meaning provided in the Recitals hereto.

"**<u>Prohibited Person</u>**" means any Person:

(i) listed in the annex to, or who is otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (the "<u>Executive Order</u>");

(ii) that is owned or controlled by, or acting for or on behalf of, any person or entity that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii) with whom a Person is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including the Executive Order;

(iv) who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(v) that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website or at any replacement website or other replacement official publication of such list; or

(vi) who is an Affiliate of a Person listed in clauses (i) through (v) above.

"**<u>Qualified Transferee</u>**" means (i) Mezzanine Lender, (ii) any Control Affiliate of Mezzanine Lender, (iii) Senior Lender, (iv) any Control Affiliate of Senior Lender, or (v) any Person approved by Senior Lender in writing, in Senior Lender's reasonable discretion; provided, however, under no circumstances shall an Excluded Party or an Affiliate of an Excluded Party be a Qualified Transferee.

"**<u>Senior Lender</u>**" has the meaning provided in the first paragraph of this Agreement.

"**<u>Senior Loan</u>**" has the meaning provided in the Recitals hereto.

"**<u>Supplemental Guarantor</u>**" means (1) Civitas Capital Management, LLC; provided, that, Civitas Capital Management, LLC satisfies Senior Lender's then applicable KYC requirements at the time of

Certification (Terms of Sale - ACRON 2 Porsche Drive Mezzco LLC)

becoming a Supplemental Guarantor hereunder, or (2) a Person that (i) has Control over Borrower (as constituted after giving effect to the Mezzanine Loan Realization Event), (ii) owns a direct or indirect interest in Borrower (as constituted after giving effect to the Mezzanine Loan Realization Event), (iii) satisfies Senior Lender's then applicable KYC requirements, (iv) has a net worth equal to no less than the then outstanding principal balance of the Senior Loan and liquidity equal to no less than ten percent (10%) of the then outstanding principal balance of the Senior Loan, (v) is not an Excluded Party or an Affiliate of an Excluded Party and (vi) if such Person is an investment fund, such investment fund has a remaining term, including any as-of-right extensions, that extends at least twelve (12) months beyond the fully extended maturity date of the Senior Loan.

[Remainder of page intentionally left blank; signature page follows]

Certification (Terms of Sale - ACRON 2 Porsche Drive Mezzco LLC)

IN WITNESS WHEREOF, the Bidder has caused this Certification to be duly executed and delivered.

Date: _____, 2025


_____

By: _____
Name: _____
Title: _____

**EXHIBIT C**

**Updated Notice of Public Sale of Collateral**

(See Attached)

5683989.1

### NOTICE OF PUBLIC SALE OF COLLATERAL

PLEASE TAKE NOTICE that 100% of the limited liability company interests in ACRON 2 PORSCHE DRIVE, ATLANTA LLC, a Delaware limited liability company (the "**Company**"), and together with all economic, management and other rights, property and status relating thereto (collectively, the "**Collateral**"), will be offered for sale at a public auction and sold to the highest "qualified bidder" on *August 19, 2025 at 9 a.m. prevailing Central Time*. The sale will be conducted online in a Zoom meeting. The Zoom meeting credentials will be shared in the Terms of Sale, which will be made available to qualified bidders who, among other requirements, execute a Confidentiality and Non-Disclosure Agreement (the "**NDA**").

The principal asset of the Company is the leased fee interest in that certain real property and the improvements thereon commonly known as the Kimpton Overland Hotel – Atlanta Airport located at 2 Porsche Drive, Hapeville, Georgia 30354 (the "**Property**").

This sale is held to enforce the rights of CAI OVERLAND LENDER, LLC, a Delaware limited liability company, as secured party ("**Secured Party**") under (A) that certain Loan Agreement, dated as of January 18, 2024, by and between Secured Party and ACRON 2 PORSCHE DRIVE MEZZCO LLC, a Delaware limited liability company ("**Borrower**") (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**") and (B) that certain Pledge and Security Agreement, dated as of January 18, 2024 (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Pledge Agreement**" and together with the Loan Agreement and all other agreements entered into by the parties pursuant to the Loan Agreement or the Pledge Agreement, the "**Loan Documents**"), executed by Borrower in favor of Secured Party.

The Collateral is offered "**AS IS, WHERE IS**", with all faults, and Secured Party makes no guarantee, representation, or warranty, including without limitation any representation or warranty of merchantability or fitness for use (express or implied), of any kind or nature whatsoever.

Secured Party will be permitted to bid at the sale, and notwithstanding any requirement herein that the sale of the Collateral be for cash, Secured Party may credit bid all or any portion of the outstanding balance of the amounts due under the Loan Documents. Secured Party reserves the right, in its sole and absolute discretion (for any reason or no reason), to (a) reject all bids and terminate, or adjourn to another date and time, the sale as the Secured Party may deem proper, by announcement at the place and on the date of such sale, and any subsequent adjournment thereof, without further publication, and (b) impose any other commercially reasonable conditions upon the sale of

the Collateral as Secured Party may deem proper in its sole and absolute discretion.

Interested parties who desire additional information regarding the Company, the Collateral, the Property or the terms of the public sale (including the requirements to be a "qualified bidder") shall execute the NDA (as defined above), which can be accessed via the website https://tinyurl.com/UCCSaleKimptonATL (case sensitive). For questions and inquiries, please contact Joanne Au of CBRE Capital Markets at CBREuccsales@cbre.com.

**<u>EXHIBIT L</u>**

(Second Adjournment Notice)

**EK** ELKINS KALT

Daniel B. Abram
DAbram@elkinskalt.com

Elkins Kalt Weintraub Reuben Gartside LLP

July 24, 2025

***VIA EMAIL & FEDEX OVERNIGHT DELIVERY***

ACRON 2 Porsche Drive Mezzco LLC
c/o ACRON U.S. Management
2424 E. 21st Street, Suite 150
Tulsa, OK 74114
Attention:  Greg Wilson
Email:      gw@acronusa.com

ACRON (USA) L.P.
2424 E. 21st Street, Suite 150
Tulsa, OK 74114
Attention:  Greg Wilson
Email:      gw@acronusa.com

ACRON AG
2424 E. 21st Street, Suite 150
Tulsa, OK 74114
Attention:  Greg Wilson
Email:      gw@acronusa.com

Seyfarth Shaw LLP
233 S. Wacker Drive, Suite 8000
Chicago, Illinois 60606-6448
Attention: Jason J. DeJonker
Email:      JDeJonker@seyfarth.com

TH Investment Holdings II, LLC
c/o Procaccianti Companies, Inc.
1140 Reservoir Avenue
Cranston, RI 02920
Attention: Gregory D. Vickowski
Email:      gvick@procaccianti.com
            gvickowski@procgroup.com

Procaccianti Companies, Inc.
Attn: Ron Hadar, Esq., General Counsel
1140 Reservoir Avenue
Cranston, RI 02920
Email:      rhadar@procaccianti.com

Greenberg Traurig, LLP
One International Place, Suite 2000
Boston, MA 02110
Attention: James P. Redding, Esq.
Email:      reddingj@gtlaw.com

Re:    **Kimpton Overland Hotel Atlanta Airport – Adjournment of UCC Public
       Auction; Updated UCC Foreclosure Documents**

All:

Reference is made to that certain Loan Agreement, dated as of January 18, 2024 (the "**Loan
Agreement**"), by and between CAI OVERLAND LENDER, LLC, a Delaware limited liability
company ("**Lender**"), and ACRON 2 PORSCHE DRIVE MEZZCO LLC, a Delaware limited liability

5684971.2

ACRON 2 PORSCHE DRIVE MEZZCO LLC
July 24, 2025
Page 2

company ("**Borrower**"). Capitalized terms used but not defined in this letter shall have the meanings ascribed to such terms in the Loan Agreement.

As you know, we represent Lender and are writing to you regarding the UCC foreclosure sale. On behalf of Lender, our law firm previously sent that certain letter, dated July 22, 2025 (the "**EK 7/22/25 Letter**"), to Borrower and the other addressee and cc:d parties thereon. In the EK 7/22/25 Letter, we previously notified Borrower and the other parties that Lender was adjourning (i) the UCC public auction from the previously scheduled July 30, 2025 public auction date to **August 19, 2025 at 9:00 A.M. prevailing Central Time**, and (ii) the Qualified Bidder Deadline (as defined in the Terms of Sale) to **August 12, 2025 at 5:00 P.M. prevailing Central Time**. In accordance therewith, the EK 7/22/25 Letter had included the updated UCC foreclosure documents in three exhibits as follows: (i) Exhibit A (Amended and Restated Notice of Disposition of Collateral), (ii) Exhibit B (Amended and Restated Terms of Sale), and (iii) Exhibit C (Updated Notice of Public Sale of Collateral).

Due to an unforeseen scheduling conflict, Lender has rescheduled the UCC public auction to **August 27, 2025 at 12:30 P.M. prevailing Central Time**. Lender has also adjourned the Qualified Bidder Deadline (as defined in the Terms of Sale) to **August 20, 2025 at 5:00 P.M. prevailing Central Time**.

These updates are reflected in the following further updated UCC foreclosure materials: (i) the Second Amended and Restated Notice of Disposition of Collateral (attached as **Exhibit A** hereto), (ii) the Second Amended and Restated Terms of Sale (attached as **Exhibit B** hereto), and (iii) the further updated Notice of Public Sale of Collateral (attached as **Exhibit C** hereto). No other revisions have been made to the bidding requirements in these materials and the Zoom meeting credentials remain the same.

[Remainder of page intentionally left blank.]

5684971.2

ACRON 2 PORSCHE DRIVE MEZZCO LLC
July 24, 2025
Page 3

Nothing contained herein shall be deemed a waiver, election or limitation of the rights or remedies of Lender, whether arising under the Loan Documents, at law, or in equity, all of which Lender hereby expressly reserves.

Very truly yours,

DANIEL B. ABRAM
Elkins Kalt Weintraub Reuben Gartside LLP

cc:   Nicholas R. Marcus (via email: nmarcus@seyfarth.com)
Carole Hoffman (via email: cjh@acronusa.com)
Jonathan J. Daniel (via email: LoanServicing@knightheadfunding.com)
Rebecca Brown (via email: rbrown@knightheadfunding.com)
David Hart, Esq. (via email: dhart@kslaw.com)
Austin Khan (via email: austin.khan@civitascapital.com)
Marisa Lizak (via email: marisa.lizak@civitascapital.com)
Melanie Pugmire (via email: melanie.pugmire@civitascapital.com)
Shai Halbe, Esq. (via email: shalbe@elkinskalt.com)

5684971.2

**EXHIBIT A**

**Second Amended and Restated Notice of Disposition of Collateral**

(See Attached)

<u>**SECOND AMENDED AND RESTATED**</u>
<u>**NOTICE OF DISPOSITION OF COLLATERAL**</u>


TO DEBTOR:               ACRON 2 Porsche Drive Mezzco LLC,
a Delaware limited liability company ("<u>Debtor</u>")

c/o ACRON U.S. Management
2424 E. 21st Street, Suite 150
Tulsa, OK 74114
Attention: Greg Wilson

FROM SECURED PARTY:  CAI Overland Lender, LLC,
a Delaware limited liability company ("<u>Secured Party</u>")

c/o Civitas Capital Group
1722 Routh Street, Suite 800
Dallas, Texas 75201
Attention: Austin Khan, Marisa Lizak
Telephone number: (214) 572-2300


**UCC Foreclosure**

This SECOND AMENDED AND RESTATED NOTICE OF DISPOSITION OF COLLATERAL, effective as of July 24, 2025, restates and supersedes the prior Amended and Restated Notice of Disposition of Collateral (the "<u>First A&R Notice of Disposition</u>") previously delivered to Debtor, its designated counsel, and other transaction parties on July 22, 2025, with respect to the UCC foreclosure in order to update the day and date, and time of the Public Sale, as set forth below. The First A&R Notice of Disposition had previously restated and superseded the original Notice of Disposition of Collateral previously delivered to Debtor, its designated counsel, and other transaction parties on May 16, 2025, with respect to the UCC foreclosure in order to modify the day and date, and time of the Public Sale.


**PLEASE TAKE NOTICE** that subject to the terms herein and the Terms of Sale (defined herein), Secured Party will offer for sale at a public auction (the "<u>Public Sale</u>") the Collateral (defined herein) at the following date, time, and place (the "<u>Disposition</u>"):

Day and Date: <u>***Wednesday, August 27, 2025***</u>
Time:         <u>***12:30 P.M. prevailing Central Time***</u>
Place:        Online via the designated Zoom credentials set forth below:

Zoom Meeting URL: https://bit.ly/AcronUCC

Zoom Meeting ID: 861 4554 5997

Zoom Meeting Password: 085908

Zoom Meeting Dial-in Number: +1-646-931-3860 (US)

(International participants only, follow the below URL to find your local dial-in number) - https://us06web.zoom.us/u/kncNax0Nv

The term "Collateral" refers to 100% of the limited liability company interests in ACRON 2 Porsche Drive, Atlanta LLC, a Delaware limited liability company (the "Pledged Entity"), together with all other "Collateral" as such term is defined in that certain Pledge and Security Agreement, dated as of January 18, 2024, made by Debtor for the benefit of Secured Party (the "Pledge Agreement").

The Disposition is made pursuant to Section 9-610 and other applicable sections of the Uniform Commercial Code ("UCC") as adopted in the State of Texas, as well as other applicable law, and the provisions of the Loan Documents (as defined in the Pledge Agreement). The Collateral secures Debtor's indebtedness to Secured Party in the original principal amount of $11,600,000 plus, without limitation, any and all unpaid interest (base and default interest), protective advances, prepayment premium, servicing fees, late charges, attorneys' fees and other costs, fees and charges including the costs to sell the Collateral (collectively, the "Debt").

The Public Sale will be held by Matthew D. Mannion, principal auctioneer for Mannion Auctions, LLC, in conjunction with Eric Rubin, principal auctioneer for Moecker Auctions, Inc., online via the aforementioned Zoom meeting access details that will be made available to "qualified bidders" (as described more particularly in the Terms of Sale) who, among other requirements, execute the NDA (as defined herein and in the Terms of Sale).

The Secured Party reserves the right to determine which bidders qualify for participation in the Public Sale, to reject any bid or all bids at the Public Sale, to announce such other terms at the Public Sale as may be commercially reasonable in the Secured Party's sole discretion or to accept non-conforming bids. Further, the Secured Party reserves the right to cancel, postpone or adjourn the Public Sale by announcement made at the Public Sale, either before or after the commencement of bidding, and without written notice or further publication. The Secured Party reserves the right to credit bid any portion of its Debt then outstanding at the Public Sale. The Secured Party reserves the right to implement such other terms or conditions at the Public Sale or regarding the Public Sale procedures as the Secured Party, in its sole discretion, determines to be commercially reasonable under the circumstances.

The Secured Party's understanding, without making any representation or warranty as to accuracy or completeness, is that (a) the principal asset of the Pledged Entity is a leased fee interest in the real property located at 2 Porsche Drive, Hapeville, Georgia, commonly known as the Kimpton Overland Hotel – Atlanta Airport, and (b) such real property secures the obligations of the Pledged Entity with respect to a senior mortgage loan made by a certain lender to the Pledged Entity in the currently outstanding principal amount of $25,000,000.

The sale of the Collateral will be subject to all applicable third-party consents and regulatory approvals, if any, as well as the terms of sale prepared by the Secured Party (the "Terms of Sale"). The Terms of Sale will provide additional information about the bidding process, including bidder qualifications, deposit information, Public Sale participation and determination of any winning bid. Without limitation to the foregoing, please take notice that there are specific requirements for any potential successful bidder in connection with obtaining information and bidding on the Collateral, including, but not limited to, execution of the NDA.

Prospective bidders will be required to represent in writing to the Secured Party that they are purchasing the Collateral for their own account and not acquiring the Collateral with a view toward the sale or distribution thereof and will not resell the Collateral unless pursuant to a valid registration under applicable federal and/or state securities laws, or a valid exemption from the registration thereunder. The Collateral has not been registered under such securities laws and cannot be sold by the winning bidder(s) without registration or application of a valid exemption. The Collateral will be offered for sale at the Public Sale "**AS-IS, WHERE-IS**", and there are no express or implied warranties or representations of any kind or nature whatsoever, including without limitation, relating to title, possession, quiet enjoyment, merchantability, fitness, or the like as to the Collateral. The sale of the Collateral is specifically subject to all taxes, liens (other than those of Secured Party), claims, assessments, liabilities and encumbrances, if any, that may exist against the Collateral under the UCC or other applicable law. The winning bidder(s) will be responsible for the payment of all transfer taxes, stamp duties and similar taxes incurred in connection with the purchase of the Collateral.

All inquiries concerning this Notice of Disposition of Collateral and the Terms of Sale (including requirements to be a "qualified bidder") shall be made to: Joanne Au of CBRE Capital Markets at CBREuccsales@cbre.com. Any person making any inquiry or request must: (i) disclose the person or entity on whose behalf such information is being sought, (ii) execute the Confidentiality and Non-Disclosure Agreement (the "NDA"), which can be accessed via the website https://tinyurl.com/UCCSaleKimptonATL (case sensitive), and (iii) maintain the confidentiality of the information provided. Interested parties who do not contact CBRE and register before the Public Sale will not be permitted to participate in bidding at the Public Sale.

Debtor is entitled to an accounting of the unpaid Debt (as defined above) secured by the Collateral which Secured Party intends to sell. Secured Party's charge for an accounting shall be in an amount equal to its costs and expenses (including attorney fees) incurred as a result of providing such accounting. Debtor may request an accounting by emailing Marisa Lizak at marisa.lizak@civitascapital.com and/or calling her at (214) 572-2300.

**EXHIBIT B**

**Second Amended and Restated Terms of Sale**

(See Attached)

### SECOND AMENDED AND RESTATED TERMS OF SALE

These SECOND AMENDED AND RESTATED TERMS OF SALE, effective as of July 24, 2025, restate and supersede the prior Amended and Restated Terms of Sale previously delivered to Borrower (as defined below), its designated counsel and other parties on July 22, 2025 (the "**First A&R Terms**"), with respect to the UCC foreclosure set forth below in order to extend both the Qualified Bidder Deadline (as defined in Section 13(a) below) and Public Auction Date (as defined in the next paragraph below), as set forth below. The First A&R Terms had previously restated and superseded the original Terms of Sale delivered to Borrower and its designated counsel on May 28, 2025, with respect to the UCC foreclosure, in order to modify the Qualified Bidder Deadline and Public Auction Date.

On **_August 27, 2025 at 12:30 P.M_** prevailing Central Time (the "**Public Auction Date**"), on behalf of CAI Overland Lender, LLC, a Delaware limited liability company (the "**Secured Party**" and/or "**Lender**"), Mannion Auctions, LLC in conjunction with Moecker Auctions, Inc. (collectively, "**Auctioneer**"), will offer for sale the following interests, as permitted pursuant to the terms of that certain Pledge and Security Agreement, dated as of January 18, 2024 (the "**Mezz Pledge Agreement**"), between ACRON 2 Porsche Drive Mezzco LLC, a Delaware limited liability company ("**Mezzanine Borrower**") and the Secured Party and Article 8 & 9 of the Uniform Commercial Code of the State of Texas.

1. Secured Party is offering for sale all limited liability company interests (the "**Interests**") in ACRON 2 Porsche Drive, Atlanta LLC, a Delaware limited liability company (the "**Pledged Entity**" and/or "**Borrower**") owned by the Mezzanine Borrower, which Pledged Entity has a leased fee interest in the real property located at 2 Porsche Drive, Hapeville, Georgia, commonly known as the Kimpton Overland Hotel – Atlanta Airport (the "**Real Property**"). The sale is being made in connection with the foreclosure on a pledge of the Interests to Secured Party by Mezzanine Borrower under the Mezz Pledge Agreement, pursuant to which Mezzanine Borrower has granted to Secured Party a first priority lien on the Interests as collateral for the mezzanine loan (the "**Mezz Loan**") from Lender to Mezzanine Borrower. The Mezz Loan was made pursuant to that certain mezzanine Loan Agreement, dated as of January 18, 2024, by and between Mezzanine Borrower and Lender (the "**Mezz Loan Agreement**") and certain other related loan documents (collectively, with the Mezz Loan Agreement and Mezz Pledge Agreement, the "**Mezz Loan Documents**").

2. The Real Property secures the obligations of the Pledged Entity with respect to a mortgage loan in the currently outstanding principal amount of $25,000,000 (the "**Senior Loan**") made by KHRE SMA Funding, LLC, a Delaware limited liability company ("**Senior Lender**") to the Pledged Entity pursuant to that certain Loan Agreement, dated as of December 21, 2018 (as amended, the "**Senior Loan Agreement**"), by and between the Pledged Entity and Senior Lender and certain other related loan documents (collectively, with the Senior Loan Agreement, the "**Senior Loan Documents**").

3. Mezzanine Borrower failed to timely perform certain obligations, including payment obligations, under the Mezz Loan Documents. Mezzanine Borrower received notices of such defaults from Lender and failed to cure such defaults within the cure period (if

any) afforded Mezzanine Borrower under the Mezz Loan Documents. As a result, Events of Default (as defined in the Mezz Loan Agreement) have occurred and are continuing.

4. All inquiries concerning these Terms of Sale (including requirements to be a Qualified Bidder (as defined in Section 13) shall be made to: Joanne Au of CBRE Capital Markets at CBREuccsales@cbre.com. Any person making any inquiry or request must: (i) disclose the person or entity on whose behalf such information is being sought, (ii) execute the Confidentiality and Non-Disclosure Agreement (the "**NDA**"), which can be accessed via the website https://tinyurl.com/UCCSaleKimptonATL (case sensitive), and (iii) maintain the confidentiality of the information provided. Interested parties who do not contact CBRE and register before the public sale will not be permitted to participate in bidding at the public sale.

5. Secured Party will provide to prospective bidders that execute the NDA (as defined above) access to an online data site that contains certain relevant information that Secured Party possesses concerning the Mezzanine Borrower, the Interests, the Pledged Entity, the Real Property and copies of the Mezz Loan Documents and Senior Loan Documents (collectively, the "**Transaction Documents**"). Certain additional documentation may be made available to prospective bidders from time to time. Prospective bidders are encouraged to review all Transaction Documents and perform such due diligence as they deem necessary in advance of the date of the foreclosure sale.

6. The Interests will be offered in a single lot. The Interests are being sold strictly on an "**AS IS AND WHERE IS**" BASIS, AND (i) WITHOUT ANY REPRESENTATIONS OR WARRANTIES (WHETHER EXPRESSED OR IMPLIED) OF ANY KIND MADE BY SECURED PARTY (OR ANY OTHER PERSON ACTING FOR OR ON BEHALF OF SECURED PARTY), INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO THE EXISTENCE OR NONEXISTENCE OF OTHER LIENS, THE QUANTITY, QUALITY, CONDITION OR DESCRIPTION OF THE INTERESTS, THE REAL PROPERTY, AND/OR THE VALUE OF ANY OF THE FOREGOING, AND (ii) WITHOUT ANY RECOURSE WHATSOEVER AGAINST SECURED PARTY (OR ANY OTHER PERSON ACTING FOR OR ON BEHALF OF SECURED PARTY). No information provided to any prospective bidder in response to any request for information to Secured Party or any attorney or broker it may retain or otherwise shall constitute a representation or warranty of any kind with respect to such information, the Interests, the Mezz Loan, the Real Property, the sale of the Interests or any other matter.

7. Without limiting the foregoing, any purchaser must purchase the Interests subject, in all respects, to (a) the terms of the governing documents of the Pledged Entity (including its operating agreement), (b) the terms of the Rental Agreement, dated May 5, 2017, between Pledged Entity (as Tenant) and the Development Authority of the City of Hapeville, a public body corporate and politic created and existing under the laws of the State of Georgia (as Landlord), and (c) the terms of the Senior Loan Documents, the obligations of the Pledged Entity thereunder, and the lien on the Real

Property serving as security therefor.

8. Secured Party reserves the right to require a showing of financial ability from prospective bidders prior to the date of the sale. If a prospective bidder is a special purpose entity or an entity with creditworthiness that is, in Secured Party's reasonable judgment, insufficient to support the requirements herein, Secured Party reserves the right to require additional credit support in the form of a guaranty by a creditworthy affiliate of such prospective bidder or other appropriate credit support.

9. Secured Party reserves the right to credit bid, set a minimum reserve price, reject any or all bids (including, without limitation, any bid that it deems has been made by a bidder that is unable to satisfy the requirements imposed by Secured Party upon prospective bidders in connection with the sale or to whom in Secured Party's sole judgment a sale may not lawfully be made), terminate or adjourn to another time the sale, without further notice, and to sell the Interests at a subsequent public or private sale, and to amend, from time to time, but prior to the start of bidding, these Terms of Sale to revise or add any other commercially reasonable conditions as the Secured Party may deem necessary or appropriate to facilitate a commercially reasonable sale of the Interests. Secured Party further reserves the right to determine the qualifications of any bidder, including a prospective bidder's ability to close the transaction on the terms and conditions referenced herein.

10. The Interests have not been and will not be registered under the Securities Act of 1933, as amended (the "**Securities Act**"), or any applicable state securities laws, and may not be sold or transferred without registration under the Securities Act and applicable state securities law or the availability of valid exemptions from such registration requirements. Secured Party reserves the right to verify that each certificate for the Interests to be sold bears a legend substantially to the effect that such Interests have not been registered under the Securities Act and to impose such other limitations or conditions in connection with the sale of the Interests as Secured Party deems necessary or advisable in order to comply with the Securities Act or any other applicable law.

11. Secured Party will only consider bids from persons/bidders whom, in Secured Party's sole judgment, may lawfully execute and close such sale. Bidders are hereby notified that (i) the Interests are required to be acquired for the account of the bidder and not with a view to resale or distribution, and (ii) that the bidder may not resell the Interests without compliance with the registration requirements of the Securities Act, and the regulations of the Securities and Exchange Commission (the "**SEC**") thereunder and applicable state securities laws or pursuant to valid exemptions therefrom.

12. A bid by any person will be deemed to be a representation that such bidder has sufficient knowledge and experience in business and financial matters to evaluate properly the merits and risks of investment in the Interests, that such bidder has had such access to information concerning the Interests as such bidder deems necessary to make an informed investment decision and that such bidder is qualified to become a transferee under all transfer restrictions applicable to the Interests. Further, such bidder may be required to establish that such bidder is able to bear the economic risks involved in investment in the Interests.

13. In order for a prospective bidder (other than Secured Party) to be a "**Qualified Bidder**" and eligible to bid at the public auction, each such prospective bidder must satisfy the following conditions precedent to participation:

(a) Complete and execute the written certification in the form of **Exhibit A** attached hereto (the "**Certification**") and email a copy of the signed and completed Certification to Joanne Au, CBRE Capital Markets, Inc., at CBREUCCSales@cbre.com no later than **5:00 P.M.** prevailing Central Time on _**August 20, 2025**_ (the "**Qualified Bidder Deadline**"), TIME BEING OF THE ESSENCE WITH RESPECT TO SUCH DELIVERY;

(b) Post a deposit, by wire transfer to an escrow account to be designated by Secured Party, in an amount not less than FIVE HUNDRED THOUSAND DOLLARS ($500,000) (the "**Deposit**") by the Qualified Bidder Deadline (as defined above) and email the Federal Reference Number (assigned to such wire transfer) to Joanne Au, CBRE Capital Markets, Inc., at CBREUCCSales@cbre.com by the Qualified Bidder Deadline. The Deposit shall be refunded to such prospective bidder within two (2) business days following the sale unless such prospective bidder is chosen as the successful bidder, in which event such Deposit shall, simultaneously with such selection, be deemed non-refundable to such bidder and applied as a credit against the purchase price;

(c) Depending on the answers provided in the Certification, the prospective bidder may be required to confirm to Secured Party (and its counsel) that (i) its purchase of the Interests is in compliance with all applicable federal and state laws, and (ii) it can comply with the certifications set forth in the Certification relating to such bidder's ability to qualify as a "Qualified Transferee" and to meet the eligibility requirements set forth in the Intercreditor Agreement, dated as of January 18, 2024, by and between Secured Party and Senior Lender (the "**Intercreditor Agreement**") and such confirmation (if required) is both provided to Secured Party and approved by Secured Party no less than two (2) business days prior to the Public Auction Date (as defined above);

(d) Each prospective bidder must demonstrate, to Secured Party's satisfaction, its financial ability to tender the balance of the purchase price for the Interests, by submitting to Joanne Au, CBRE Capital Markets, Inc., at CBREUCCSales@cbre.com, by the Qualified Bidder Deadline (as defined above), (i) a certified balance sheet or other certified financial information (including publicly available reports posted on EDGAR) evidencing the prospective bidder's total assets under management, capital/statutory surplus or partners' equity and market capitalization, and/or (ii) specific identification of the source of equity capital or loan commitments necessary to be utilized by the prospective bidder for the closing of the potential acquisition, which, in the case of (i) and (ii), Secured Party and CBRE shall hold as confidential;

(e) As set forth in Section 8 above, if a prospective bidder is a special purpose entity or an entity with creditworthiness that is, in Secured Party's reasonable judgment, insufficient to support the requirements herein, such prospective bidder has promptly

provided, at Secured Party's request, additional credit support in the form of a guaranty by a creditworthy affiliate of such prospective bidder or other appropriate credit support, in each case via email to Joanne Au, CBRE Capital Markets, Inc., at CBREUCCSales@cbre.com, which additional credit support shall be approved by Secured Party in Secured Party's sole discretion, no less than two (2) business days prior to the Public Auction Date; and

(f) Each prospective bidder promptly provides all additional information that Secured Party and/or its agents (i.e., its counsel or CBRE) may request to confirm certain information set forth in a prospective bidder's Certificate (as defined above) or to otherwise confirm financial ability, to Secured Party's satisfaction, at least two (2) business days prior to the Public Auction Date.

As set forth above, Secured Party shall be entitled to seek additional information from any prospective bidder to confirm the information set forth in its Certification or other information provided (e.g., with respect to financial information and additional credit support), and the failure to provide such confirmatory information shall constitute permissible grounds for Secured Party to disqualify such prospective bidder. Prospective bidders are also advised to promptly submit any confirmatory information requested by Secured Party and/or its agents (i.e., its counsel or CBRE) in order to give Secured Party (and its agents) adequate time to review and approve such confirmatory information to Secured Party's satisfaction prior to the deadlines set forth above in Section 13(c), (e) and (f).

Meeting each of the foregoing requirements (including any requirements of the Intercreditor Agreement) shall be at the sole responsibility, risk, cost, and expense of a prospective bidder and prospective bidders are advised that the failure to meet such requirements may result in a default under the Intercreditor Agreement and/or the inability of a successful bidder to purchase the Interests. Without limitation to the foregoing, the foregoing requirements shall not apply to Secured Party or any Control Affiliate of Secured Party (as defined in the Intercreditor Agreement), each of which is stipulated to be a Qualified Bidder.

14. Prospective bidders are hereby advised that (a) although Secured Party has provided access to certain information regarding the Mezzanine Borrower, Pledged Entity and/or the Interests on an online data site, there is no assurance that Secured Party does not have information that it is contractually or legally prohibited from providing to potential bidders due to restrictions in confidentiality agreements or otherwise, or that it has disclosed all information in its possession relating to the Mezzanine Borrower, the Pledged Entity, the Real Property or the Interests and (b) Secured Party may be in possession of information which prospective bidders may not have.

15. The sale shall be a public auction to the highest Qualified Bidder. All bids (other than bids submitted by Secured Party) must be submitted in writing and must be for cash. The minimum bidding increments will be at least $100,000.00 or such other amount as Auctioneer may announce and modify at the auction in Auctioneer's sole discretion. Higher bids will continue to be entertained until Auctioneer has determined that it has received the highest bid from those bidders determined by Secured Party to be

Qualified Bidders.  No offers may be withdrawn once made during the auction, but no sale shall be final until accepted in writing by Secured Party.  The entire amount of the successful bid (less the applicable Deposit) shall be paid by the successful bidder to Secured Party in immediately available good funds (wire transferred from, or certified check drawn on and certified by, a U.S. commercial bank that is a member of the Federal Reserve system) within fifteen (15) business days after the conclusion of the auction (the "**Funding Deadline**"), TIME BEING OF THE ESSENCE, and the scheduled closing of the sale shall take place on such date, subject in all respects to the winning bidder's satisfaction of all of the terms and conditions of these bidding procedures and Section 5 (Foreclosure of Separate Collateral) of the Intercreditor Agreement (as defined above), including, receipt of Senior Lender's approval as set forth in item (g) of **Exhibit A** (the Certification) attached hereto. If Secured Party bids at the sale, part or all of its bid(s) and payment may be in the form of some or all of the debt it holds under the Mezz Loan on the same basis as if the amount of the indebtedness outstanding under the Mezz Loan which Secured Party bids at the sale were cash and immediately available good, collected funds.

16. If Secured Party is not the highest Qualified Bidder for the Interests, Secured Party reserves the right to designate a back-up bidder.  If the highest Qualified Bidder fails to timely fund the entire balance of the purchase price as set forth in the above paragraph by the Funding Deadline (as defined above), such bidder's Deposit shall be immediately released to Secured Party as liquidated damages for such failure, and the back-up bidder shall be notified within two (2) business days after the Funding Deadline (the "**Back-Up Bidder Notice**"), and shall be obligated, within one (1) business day of receiving the Back-Up Bidder Notice from Secured Party, to (i) complete and execute a confirmation of sale in a form to be provided by Secured Party and (ii) post the Deposit by wire transfer to such third-party escrow account (to be designated by Secured Party).  If a back-up bidder (other than Secured Party) is ultimately selected as the winning bidder for the Interests, the back-up bidder will be required to pay the balance of the purchase price for the Interests to be purchased by the back-up bidder by certified or bank check, or wire transfer of immediately available funds, no later than five (5) business days after delivery of the Back-Up Bidder Notice from Secured Party to the back-up bidder, TIME BEING OF THE ESSENCE. The sale of the Interests to a back-up bidder will otherwise be consummated on the same terms as applicable to the successful bidder at the public auction. If the back-up bidder for the Interests is Secured Party, then the foregoing requirements will not apply to the Interests and payment for the Interests may be made by applying the amounts due under the Mezz Loan against the winning bid amount.

17. If the back-up bidder fails to timely pay the balance of the successful bid, the back-up bidder's Deposit will be immediately released to Secured Party as its liquidated damages, and the Interests may, at Secured Party's option, be sold to the next highest bidder.  If Secured Party is unable for any reason (other than as set forth in the immediately preceding sentence or in Section 16 with respect to a bidder's failure to timely pay the balance of the successful bid) to consummate the sale of the Interests to a successful bidder at the public sale, Secured Party shall have no liability or obligation whatsoever to the successful bidder except only to return any balance of the bidder's purchase price paid (i.e., the entire amount of the successful bid less the applicable

Deposit) and Secured Party shall retain the Deposit under such circumstances. By bidding at the sale, each bidder acknowledges that it would be impractical and extremely difficult to ascertain Secured Party's actual damages in the event a successful bidder fails to consummate the purchase of the Interests as set forth herein and, as such, each bidder acknowledges and agrees that the Deposit represents a fair and reasonable estimate of the net present detriment Secured Party would suffer in such event. Each prospective bidder acknowledges and agrees that the release to Secured Party of the Deposit under the circumstances described in Section 16 and this Section 17, with respect to the initial winning bidder and back-up bidder, respectively, is not intended as a forfeiture or penalty but is intended to constitute liquidated damages to Secured Party in each case under such circumstances. A successful bidder or back up bidder shall have no right to postpone or nullify a sale of the Interests if it is unable to meet any of the requirements under any of the documents relating to the Interests.

18. The winning bidder shall be solely responsible for the payment of all transfer taxes, stamp duties and similar taxes incurred in connection with the purchase of the Interests.

19. The bidding shall take place under the direction of Matthew D. Mannion, principal auctioneer for Mannion Auctions, LLC, in conjunction with Eric Rubin, principal auctioneer for Moecker Auctions, Inc., at the following date, time, and place:

Day and Date:    ***Wednesday, August 27, 2025***
Time:            ***12:30 P.M. prevailing Central Time***
Place:           Online via the designated Zoom credentials set forth below:

Zoom Meeting URL: https://bit.ly/AcronUCC

Zoom Meeting ID: 861 4554 5997

Zoom Meeting Password: 085908

Zoom Meeting Dial-in Number: +1-646-931-3860 (US)

(International participants only, follow the below URL to find your local dial-in number) - https://us06web.zoom.us/u/kncNax0Nv

**EXHIBIT A**

CERTIFICATION

Re:    ACRON 2 Porsche Drive Mezzco LLC's right, title and interest in the limited liability company interests in ACRON 2 Porsche Drive, Atlanta LLC (together with certain related rights and property relating thereto, the "**Interests**")

Name of Prospective Bidder:    _____

Contact Information:    _____

_____

_____

Tel: _____

Email: _____

Ladies and Gentlemen:

The undersigned prospective bidder (the "**Bidder**") has indicated that it is interested in bidding on the Interests, which will be auctioned in accordance with the Terms of Sale issued by Secured Party with respect to the Interests (the "**Terms of Sale**"). Capitalized terms not otherwise defined herein shall have the meaning ascribed thereto in the Terms of Sale. This letter constitutes the Certification referenced in the Terms of Sale.

With the understanding that Secured Party will rely upon the representations and warranties made by Bidder in this Certification in connection with the sale of the Interests, the undersigned hereby certifies to Secured Party as follows:

(a) Bidder is acquiring the Interests for investment purposes, solely for the Bidder's own account and not with a view to distribution or resale of the Interests;

(b) Bidder has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of investment and has sufficient financial means to afford the risk of investment in the Interests;

(c) Bidder will not resell or otherwise hypothecate the Interests without a valid registration under applicable federal or state laws, including, without limitation, the Securities Act of 1933, as amended, or an available exemption therefrom;

(d) Bidder's purchase of the Interests will be in compliance with all applicable federal and state laws;

(e) Bidder will be present at the public auction through the virtual Zoom meeting;

(f) Bidder acknowledges that the following individuals are entitled to participate in the public sale on

behalf of Bidder, and none other:

| | |
|---|---|
| Name: _____ | Email: _____ |
| Company: _____ | Tel: _____ |
| Name: _____ | Email: _____ |
| Company: _____ | Tel: _____ |

*[attach a schedule if more individuals need to be identified]*

(g) Bidder:

i.　represents and warrants that (i) it is a Qualified Bidder (as defined in the Terms of Sale), and (ii) it will promptly provide all additional confirmatory information, requested by Secured Party (or its agents), in order to fully satisfy the conditions precedent required to be a Qualified Bidder pursuant to and in accordance with the terms and conditions of Section 13 of the Terms of Sale.

ii.　acknowledges that in order for a prospective bidder to be a "Qualified Transferee" under the Intercreditor Agreement, such Person must be "approved by Senior Lender in writing, in Senior Lender's reasonable discretion" and "under no circumstances shall an Excluded Party or an Affiliate of an Excluded Party be a Qualified Transferee" pursuant to Section 5(a)(i) of the Intercreditor Agreement and the Intercreditor Agreement's definition of the term "Qualified Transferee".

iii.　represents and warrants that to the best of Bidder's knowledge, Bidder is not an "Excluded Party" nor an "Affiliate" of an Excluded Party (as such preceding terms are defined in the Intercreditor Agreement and excerpted in the Definitions section below).

iv.　represents and warrants that if it is the winning bidder at the auction sale of the Interests, it will be able to satisfy and will satisfy the various requirements of Section 5 (Foreclosure of Separate Collateral) of the Intercreditor Agreement regarding the obligations, consents and acknowledgements of any "Qualified Transferee" which takes title to the pledged Interests, by working directly with Senior Lender and its counsel (or other agents) and subject in all respects to the receipt of Senior Lender's approval (as set forth above). Please describe below how the Bidder meets or intends to meet the requirements to be a "Qualified Transferee" in accordance with the Intercreditor Agreement:

_____

_____

_____

_____

_____

Certification (Terms of Sale - ACRON 2 Porsche Drive Mezzco LLC)

_____

v.   has or will have on the closing of the sale a "**Supplemental Guarantor**" (as defined below). Please describe below how the Bidder meets or intends to meet the requirement to have a Supplemental Guarantor.

_____

_____

_____

_____

_____

(h) Bidder acknowledges that it has received the Terms of Sale and has received, or has had the opportunity to receive, legal advice from independent, competent counsel of its own choosing regarding the meaning and legal significance of the Terms of Sale (including, without limitation, with respect to the Deposit requirements and Secured Party's remedy to retain the Deposit under certain circumstances as liquidated damages). The Bidder further acknowledges that it is satisfied with any legal counsel and advice received from it and fully understands and accepts the terms and conditions set forth therein.

Bidder acknowledges and agrees that the certifications contained in this Certification may be, and are being, relied upon by Secured Party and its successors and assigns, and that said certifications shall be binding upon Bidder and its successors and assigns.

Bidder hereby agrees to indemnify, defend and hold harmless Secured Party and its affiliates, directors, officers, members, agents, employees and consultants from and against any claim and/or out-of-pocket loss, liability or expense (including, without limitation, attorneys fees) resulting from or based on any misrepresentation or inaccuracy in the information contained in this Certification that is provided by Bidder or its agents (including any attachments or supplements to this Certification provided by the Bidder or its agents).

Excerpted Definitions from Intercreditor Agreement:

"**Affiliate**" shall mean, when used with respect to any Person, any other Person which (a) Controls, is Controlled by or is under common Control of such Person, (b) is the spouse, sibling (whether by whole or half-blood), ancestor or lineal descendant of such Person, or is a trust or estate the beneficial owner(s) of which is the spouse, sibling (whether by whole or half-blood), ancestor or lineal descendant of such Person, or (c) is a general partner, managing member or controlling shareholder of such Person.

"**Borrower**" has the meaning provided in the Recitals hereto.

Certification (Terms of Sale - ACRON 2 Porsche Drive Mezzco LLC)

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or activities of a Person, whether through the ownership of voting securities or other beneficial interests, by contract or otherwise. The terms "Controlled by", "Controlling" and "under common Control with" shall have correlative meanings.

"**Control Affiliate**" means, with respect to any Person, any other Person who directly or indirectly through one or more intermediary entities Controls, is Controlled by, or is under common Control with, such Person. The terms "Controlled Affiliate" and "Controlling Affiliate" shall have correlative meanings.

"**Equity Collateral**" means the equity interests of Mezzanine Borrower in Borrower pledged pursuant to the Pledge Agreement.

"**Excluded Party**" means a Person who, in the last seven (7) years, (i) has filed, instituted or joined in lender liability or similar litigation against banks or other institutional lenders as a debtor, obligor or guarantor relative to real estate financing, (ii) has been the subject of an Insolvency Proceeding, (iii) is an existing or was a prior borrower of Senior Lender which is or was in material default on its loan obligations to Senior Lender which led Senior Lender to exercise rights and remedies, (iv) has ownership being such that it would cause a regulatory violation by Senior Lender (e.g., loan-to-one borrower requirements), or (v) is a Prohibited Person.

"**Insolvency Law**" shall mean Title 11 of the United States Code entitled "Bankruptcy", as the same has been or may be amended or superseded from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder (the "Bankruptcy Code"), or any other applicable domestic or foreign laws relating to liquidation, conservatorship, bankruptcy, receivership, insolvency, reorganization or any similar debtor relief rights affecting the rights, remedies, powers, privileges and benefits of creditors generally.

"**Insolvency Proceeding**" shall mean any case, proceeding or other action against any Person, whether voluntary or involuntary, under any Insolvency Law.

"**Mezzanine Borrower**" has the meaning provided in the Recitals hereto.

"**Mezzanine Lender**" has the meaning provided in the first paragraph of this Agreement.

"**Mezzanine Loan**" has the meaning provided in the Recitals hereto.

"**Mezzanine Loan Agreement**" has the meaning provided in the Recitals hereto.

"**Mezzanine Loan Documents**" means the Mezzanine Loan Agreement, the Mezzanine Note and the Pledge Agreement, together with the other documents and instruments set forth on Exhibit C hereto, as any of the foregoing may be modified, amended, extended, supplemented, restated or replaced from time to time, subject to the limitations and agreements contained in this Agreement.

"**Mezzanine Loan Realization Event**" means (i) the conveyance by foreclosure or assignment-in-lieu thereof of all of the direct limited liability company interests in Borrower pledged to Mezzanine Lender pursuant to the Mezzanine Loan Documents, (ii) the exercise by Mezzanine Lender of any voting rights

or powers with respect to Borrower so as to direct or cause the direction of the management or policies of Borrower, or (iii) any sale or transfer of the Equity Collateral by reason of the exercise of remedies by Mezzanine Lender pursuant to the Mezzanine Loan Documents.

"**Mezzanine Note**" has the meaning provided in the Recitals hereto.

"**Person**" means any individual, sole proprietorship, corporation, general partnership, limited partnership, limited liability company or partnership, joint venture, association, joint stock company, bank, trust, estate unincorporated organization, any federal, state, county or municipal government (or any agency or political subdivision thereof) endowment fund or any other form of entity.

"**Pledge Agreement**" has the meaning provided in the Recitals hereto.

"**Prohibited Person**" means any Person:

(i) listed in the annex to, or who is otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (the "Executive Order");

(ii) that is owned or controlled by, or acting for or on behalf of, any person or entity that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii) with whom a Person is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including the Executive Order;

(iv) who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(v) that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website or at any replacement website or other replacement official publication of such list; or

(vi) who is an Affiliate of a Person listed in clauses (i) through (v) above.

"**Qualified Transferee**" means (i) Mezzanine Lender, (ii) any Control Affiliate of Mezzanine Lender, (iii) Senior Lender, (iv) any Control Affiliate of Senior Lender, or (v) any Person approved by Senior Lender in writing, in Senior Lender's reasonable discretion; provided, however, under no circumstances shall an Excluded Party or an Affiliate of an Excluded Party be a Qualified Transferee.

"**Senior Lender**" has the meaning provided in the first paragraph of this Agreement.

"**Senior Loan**" has the meaning provided in the Recitals hereto.

"**Supplemental Guarantor**" means (1) Civitas Capital Management, LLC; provided, that, Civitas Capital Management, LLC satisfies Senior Lender's then applicable KYC requirements at the time of

becoming a Supplemental Guarantor hereunder, or (2) a Person that (i) has Control over Borrower (as constituted after giving effect to the Mezzanine Loan Realization Event), (ii) owns a direct or indirect interest in Borrower (as constituted after giving effect to the Mezzanine Loan Realization Event), (iii) satisfies Senior Lender's then applicable KYC requirements, (iv) has a net worth equal to no less than the then outstanding principal balance of the Senior Loan and liquidity equal to no less than ten percent (10%) of the then outstanding principal balance of the Senior Loan, (v) is not an Excluded Party or an Affiliate of an Excluded Party and (vi) if such Person is an investment fund, such investment fund has a remaining term, including any as-of-right extensions, that extends at least twelve (12) months beyond the fully extended maturity date of the Senior Loan.

[Remainder of page intentionally left blank; signature page follows]

IN WITNESS WHEREOF, the Bidder has caused this Certification to be duly executed and delivered.

Date: _____, 2025


_____

By: _____
Name: _____
Title: _____

**EXHIBIT C**

**Updated Notice of Public Sale of Collateral**

(See Attached)

5684971.2

### NOTICE OF PUBLIC SALE OF COLLATERAL

PLEASE TAKE NOTICE that 100% of the limited liability company interests in ACRON 2 PORSCHE DRIVE, ATLANTA LLC, a Delaware limited liability company (the "**Company**"), and together with all economic, management and other rights, property and status relating thereto (collectively, the "**Collateral**"), will be offered for sale at a public auction and sold to the highest "qualified bidder" on ***August 27, 2025 at 12:30 p.m. prevailing Central Time***. The sale will be conducted online in a Zoom meeting. The Zoom meeting credentials will be shared in the Terms of Sale, which will be made available to qualified bidders who, among other requirements, execute a Confidentiality and Non-Disclosure Agreement (the "**NDA**").

The principal asset of the Company is the leased fee interest in that certain real property and the improvements thereon commonly known as the Kimpton Overland Hotel – Atlanta Airport located at 2 Porsche Drive, Hapeville, Georgia 30354 (the "**Property**").

This sale is held to enforce the rights of CAI OVERLAND LENDER, LLC, a Delaware limited liability company, as secured party ("**Secured Party**") under (A) that certain Loan Agreement, dated as of January 18, 2024, by and between Secured Party and ACRON 2 PORSCHE DRIVE MEZZCO LLC, a Delaware limited liability company ("**Borrower**") (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**") and (B) that certain Pledge and Security Agreement, dated as of January 18, 2024 (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Pledge Agreement**" and together with the Loan Agreement and all other agreements entered into by the parties pursuant to the Loan Agreement or the Pledge Agreement, the "**Loan Documents**"), executed by Borrower in favor of Secured Party.

The Collateral is offered "**AS IS, WHERE IS**", with all faults, and Secured Party makes no guarantee, representation, or warranty, including without limitation any representation or warranty of merchantability or fitness for use (express or implied), of any kind or nature whatsoever.

Secured Party will be permitted to bid at the sale, and notwithstanding any requirement herein that the sale of the Collateral be for cash, Secured Party may credit bid all or any portion of the outstanding balance of the amounts due under the Loan Documents. Secured Party reserves the right, in its sole and absolute discretion (for any reason or no reason), to (a) reject all bids and terminate, or adjourn to another date and time, the sale as the Secured Party may deem proper, by announcement at the place and on the date of such sale, and any subsequent adjournment thereof, without further publication, and (b) impose any other commercially reasonable conditions upon the sale of

the Collateral as Secured Party may deem proper in its sole and absolute discretion.

Interested parties who desire additional information regarding the Company, the Collateral, the Property or the terms of the public sale (including the requirements to be a "qualified bidder") shall execute the NDA (as defined above), which can be accessed via the website https://tinyurl.com/UCCSaleKimptonATL (case sensitive). For questions and inquiries, please contact Joanne Au of CBRE Capital Markets at CBREuccsales@cbre.com.

# **EXHIBIT M**

(Texas Court Order)

107074163.3

**CAUSE NO. DC-25-14180**

| | | |
|---|---|---|
| ACRON 2 PORSCHE DRIVE MEZZCO, LLC, | § | IN THE DISTRICT COURT |
| and ACRON 2 PORSCHE DRIVE, | § | |
| ATLANTA, LLC, | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | 160th DISTRICT COURT |
| | § | |
| CAI OVERLAND LENDER, LLC, | § | |
| *Defendant.* | § | DALLAS COUNTY, TEXAS |

<u>**ORDER DENYING PLAINTIFFS'**</u>
<u>**MOTION FOR TEMPORARY INJUNCTION**</u>

On this date, the Court considered Plaintiffs' Motion for Temporary Injunction (the "Motion"). The parties appeared before the Court for the hearing on the Motion. After considering the live pleadings, the Motion, the responses, the evidence, and the arguments of counsel, the Court finds that Plaintiffs are not entitled to the injunctive relief requested within the Motion.

It is therefore ORDERED, ADJUDGED AND DECREED that the Motion is DENIED in its entirety.

SIGNED, this the           9/10/2025

_____
Judge Presiding

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Judy Burgess on behalf of E. Jason Billick
Bar No. 24078230
jburgess@abdmlaw.com
Envelope ID: 105349641
Filing Code Description: Proposed Order/Judgment
Filing Description: ENVELOPE #105349641 DOC001
Status as of 9/8/2025 8:47 PM CST

Associated Case Party: CAI OVERLAND LENDER LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jason Billick | | jbillick@abdmlaw.com | 9/8/2025 4:38:10 PM | SENT |
| Katherine Turner | | kturner@abdmlaw.com | 9/8/2025 4:38:10 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Emma C.Mata | | Emata@Seyfarth.com | 9/8/2025 4:38:10 PM | SENT |
| Edward Billick | 24078230 | jbillick@abdmlaw.com | 9/8/2025 4:38:10 PM | SENT |
| Roger Donnellan | | rdonnellan@seyfarth.com | 9/8/2025 4:38:10 PM | SENT |
| Houston  Docketing | | HouDocket@seyfarth.com | 9/8/2025 4:38:10 PM | SENT |
| Giovanni Perez | | gperez@seyfarth.com | 9/8/2025 4:38:10 PM | SENT |
| Judy Burgess | | jburgess@abdmlaw.com | 9/8/2025 4:38:10 PM | SENT |

## **EXHIBIT N**

(September Notice)



**Daniel B. Abram**
DAbram@elkinskalt.com

Elkins Kalt Weintraub Reuben Gartside LLP

September 15, 2025

***VIA EMAIL & FEDEX OVERNIGHT DELIVERY***

ACRON 2 Porsche Drive Mezzco LLC
c/o ACRON U.S. Management
2424 E. 21st Street, Suite 150
Tulsa, OK 74114
Attention:  Greg Wilson
Email:      gw@acronusa.com

ACRON (USA) L.P.
2424 E. 21st Street, Suite 150
Tulsa, OK 74114
Attention:  Greg Wilson
Email:      gw@acronusa.com

ACRON AG
2424 E. 21st Street, Suite 150
Tulsa, OK 74114
Attention:  Greg Wilson
Email:      gw@acronusa.com

Seyfarth Shaw LLP
233 S. Wacker Drive, Suite 8000
Chicago, Illinois 60606-6448
Attention: Jason J. DeJonker
Email:      JDeJonker@seyfarth.com

TH Investment Holdings II, LLC
c/o Procaccianti Companies, Inc.
1140 Reservoir Avenue
Cranston, RI 02920
Attention: Gregory D. Vickowski
Email:      gvick@procaccianti.com
            gvickowski@procgroup.com

Procaccianti Companies, Inc.
Attn: Ron Hadar, Esq., General Counsel
1140 Reservoir Avenue
Cranston, RI 02920
Email:      rhadar@procaccianti.com

Greenberg Traurig, LLP
One International Place, Suite 2000
Boston, MA 02110
Attention: James P. Redding, Esq.
Email:      reddingj@gtlaw.com

Re:    **Kimpton Overland Hotel Atlanta Airport – Notice of Borrower's Continuing
       Defaults and Events of Default under Loan Documents; Temporary
       Restraining Order, Injunction Hearing, and Judge's Subsequent Order
       Denying Plaintiffs' Motion for Temporary Injunction; New Dates for UCC
       Public Auction and Qualified Bidder Deadline; Updated UCC Foreclosure
       Documents**

ACRON 2 PORSCHE DRIVE MEZZCO LLC
September 15, 2025
Page 2

All:

Reference is made to that certain Loan Agreement, dated as of January 18, 2024 (the "**Loan Agreement**"), by and between CAI OVERLAND LENDER, LLC, a Delaware limited liability company ("**Lender**"), and ACRON 2 PORSCHE DRIVE MEZZCO LLC, a Delaware limited liability company ("**Borrower**").  Capitalized terms used but not defined in this letter shall have the meanings ascribed to such terms in the Loan Agreement.

As you know, we represent Lender and are writing to you regarding the UCC foreclosure sale.

**A.      Prior Recent Correspondence from Lender's Counsel**

On behalf of Lender, our law firm previously sent that certain letter, dated July 24, 2025, to Borrower, ACRON Guarantor, Partnership Guarantor, and their counsel Seyfarth; and to TH Guarantor, its in-house counsel Ron Hadar, Esq., and its outside counsel Greenberg Traurig, LLP), regarding further adjournment of the Qualified Bidder Deadline (as set forth in the Terms of Sale) and UCC public auction date, including transmittal of the further updated UCC foreclosure materials at such time via exhibits to such letter: (i) the Second Amended and Restated Notice of Disposition of Collateral, (ii) the Second Amended and Restated Terms of Sale, and (iii) the further updated Notice of Public Sale of Collateral (the "**July 24, 2025 Notice**").

Subsequent to the July 24, 2025 Notice, on behalf of Lender, our law firm previously sent that certain letter, dated August 1, 2025, to Borrower, ACRON Guarantor, Partnership Guarantor, and their counsel Seyfarth; and to TH Guarantor, its in-house counsel Ron Hadar, Esq., and its outside counsel Greenberg Traurig, LLP) (the "**August 1, 2025 Notice**").  In such letter, our law firm provided notice of the following matters:

- Borrower's continuing Defaults and Events of Default under the Loan Documents;

- Borrower's failure to cause Owner to timely pay and perform each of its obligations under or in connection with the IHG License, which immediately became an Event of Default which is continuing (with respect to the Hotel's 6-month rolling Guest Love Score being below the reputable threshold for the brand in breach of the IHG License);

- Further notice of Borrower's continued violation of Section 7.1.10 of the Loan Agreement, regarding the entering into a Listing Agreement with Berkadia without Lender's prior written consent, and its ripening into an Event of Default, which is continuing;

- Further notice that Owner and Borrower are prohibited from selling the Property without prior approval from Lender and Senior Lender; Springing Recourse Event implications under ACRON Guaranty and TH Investment Guaranty;

5709811.3

ACRON 2 PORSCHE DRIVE MEZZCO LLC
September 15, 2025
Page 3

- Additional notice regarding Springing Recourse Event implications under both the ACRON Guaranty and TH Investment Guaranty for certain interference with the UCC foreclosure process;

- Lender's written notice to Borrower that (i) Borrower has violated Section 7.1.6(a) of the Loan Agreement by failing to deliver Owner's Financial Statements for June 2025 to Lender, and (ii) if such failure continues for a period of 10 Business Days following the date of such letter (which deadline was on Friday, August 15, 2025), then Borrower will have triggered at least the Event of Default set forth in Section 10.1.21 of the Loan Agreement;

- That because Borrower had committed multiple Defaults and Events of Defaults, which are continuing as set forth in such letter and prior Notices of Default, such letter also served as Lender's demand that pursuant to and in accordance with Section 7.1.6(a) of the Loan Agreement, "*Borrower shall deliver to Lender the items required in this Section 7.1.6(a) not later than the 20th Day of each calendar month.*" "Therefore, in addition to Borrower's outstanding obligation to deliver to Lender Owner's Financial Statements for the Property for June 2025, in forthcoming months (unless Lender waives the Defaults and Events of Default) Borrower shall deliver to Lender the required items in Section 7.1.6(a) of the Loan Agreement not later than the 20th day of each calendar month. For example, this means that Owner's Financial Statements for July 2025 will need to be delivered by Borrower to Lender not later than Wednesday, August 20, 2025.";

- Borrower's failure to timely provide (within 10 Business Days following Lender's request) the loss run reports for insurance purposes, a detailed guestroom matrix, pace reports (transient, group, B&C, etc.), the 2025 Budget in detailed format, cash flow details, and certain asset management reports, which failure violated Section 7.1.6 (Financial Reporting), subsection (f) of the Loan Agreement, and thereby triggered the Event of Default per Section 10.1.21 (Financial Statements) of the Loan Agreement; and

- Information on the previously scheduled UCC public auction (for August 27, 2025 at 12:30 P.M. prevailing Central Time) and (ii) the Qualified Bidder Deadline (as defined in the Terms of Sale, for August 20, 2025 at 5:00 P.M. prevailing Central Time).

**B.    Borrower's Continuing Defaults and Events of Default under Loan Documents**

All of the Defaults and Events of Default identified in the August 1, 2025 Notice (as defined above) exist and are continuing, provided that, with respect to Section A of the August 1, 2025 Notice, while Lender understands that Owner has since paid its past due balance of $170,795.26 on its account with respect to the IHG License, the Hotel's 6-month rolling Guest Love score being below the acceptable threshold for the brand, in breach of the IHG License, has not been cured.

ACRON 2 PORSCHE DRIVE MEZZCO LLC
September 15, 2025
Page 4

1. **Borrower's Failure to Deliver Owner's Financial Statements for June 2025 to Lender**

In particular, as set forth in the August 1, 2025 Notice, Lender notified Borrower that (i) Borrower has violated Section 7.1.6(a) of the Loan Agreement by failing to deliver Owner's Financial Statements for June 2025 to Lender, and (ii) if such failure continues for a period of 10 Business Days following the date of such letter (which deadline was on August 15, 2025), then Borrower will have triggered at least the Event of Default set forth in Section 10.1.21 of the Loan Agreement. Borrower failed to deliver Owner's Financial Statements for June 2025 to Lender by said August 15th deadline, and Borrower has also failed to deliver such financial statements since such deadline. This failure by Borrower triggered at least the Event of Default set forth in Section 10.1.21 of the Loan Agreement.

2. **Borrower's Failure to Deliver Owner's Financial Statements for July 2025 to Lender**

As set forth in the August 1, 2025 Notice, such letter served, in part, as Lender's demand that pursuant to and in accordance with Section 7.1.6(a) of the Loan Agreement, "Borrower shall deliver to Lender the items required in this Section 7.1.6(a) not later than the 20th Day of each calendar month." Such letter noted that "in addition to Borrower's outstanding obligation to deliver to Lender Owner's Financial Statements for the Property for June 2025, in forthcoming months (unless Lender waives the Defaults and Events of Default) Borrower shall deliver to Lender the required items in Section 7.1.6(a) of the Loan Agreement not later than the 20th day of each calendar month. For example, this means that Owner's Financial Statements for July 2025 will need to be delivered by Borrower to Lender not later than Wednesday, August 20, 2025."

Borrower failed to deliver Owner's Financial Statements for July 2025 to Lender by said August 20th deadline or at any time since then. This failure by Borrower triggered at least the Event of Default set forth in Section 10.1.21 of the Loan Agreement.

3. **Borrower's Obligation to Deliver Owner's Financial Statements for August 2025 to Lender**

As set forth in the August 1, 2025 Notice, Borrower is obligated to deliver to Lender Owner's Financial Statements for the Property for August 2025 not later than Saturday, September 20, 2025 (which next business day deadline is Monday, September 22nd).

5709811.3

ACRON 2 PORSCHE DRIVE MEZZCO LLC
September 15, 2025
Page 5

    **4.**        **Borrower's Continuing Failure to Provide Various Documents in Violation of Section 7.1.6 of the Loan Agreement**

        As set forth in the August 1, 2025 Notice, Borrower's failure to timely provide (within 10 Business Days following Lender's prior request) the loss run reports for insurance purposes, a detailed guestroom matrix, pace reports (transient, group, B&C, etc.), the 2025 Budget in detailed format, cash flow details, and certain asset management reports, had violated Section 7.1.6 (Financial Reporting), subsection (f) of the Loan Agreement, and thereby triggered the Event of Default per Section 10.1.21 (Financial Statements) of the Loan Agreement. Borrower has continued to fail to provide said documents and this Event of Default is continuing.

**C.**      **ACRON's Motion for TRO & Initial TRO Hearing**

Two days before Lender's previously scheduled UCC public auction date of August 27th, on August 25, 2025, Emma Mata of Seyfarth Shaw LLP ("**Borrower's counsel**") notified Lender's Texas counsel (Jason Billick of the law firm Almanza, Blackburn, Dickie & Mitchell LLP) that Borrower had filed suit in Texas to stop the pending UCC foreclosure and that a hearing on ACRON's Motion for Temporary Restraining Order (**"TRO"**) had been set for the same day, August 25th, in the 160th Judicial District Court, Dallas County. In such email, Borrower's counsel circulated (i) Plaintiff's Original Verified Petition (filed August 22nd), (ii) Plaintiff's Amended Motion for Temporary Restraining Order and Temporary-Injunction Hearing, and (iii) Proposed TRO.

The TRO hearing took place on August 26th, at which time the judge issued the TRO (allowing for the temporary postponement of the UCC foreclosure sale), which TRO was set to expire on September 9, 2025 at 12:30 p.m. Central Time before the District Court of Dallas County, Texas, 160th Judicial District.

**D.**      **Injunction Hearing before Judge Rachel Craig & Order Denying Plaintiffs' Motion for Temporary Injunction**

Upon expiration of the TRO, the injunction hearing took place via Zoom before Associate Judge Rachel Craig on September 9 and 10, 2025. On September 10, the Presiding Judge Craig signed a document entitled "Order Denying Plaintiffs' Motion for Temporary Injunction". In this Order, the Judge wrote, in part, that "After considering the live pleadings, the Motion, the responses, the evidence, and the arguments of counsel, the Court finds that Plaintiffs are not entitled to the injunctive relief requested within the Motion" and "It is therefore ORDERED, ADJUDGED AND DECREED that the Motion is DENIED in its entirety".

**E.**      **Updated UCC Foreclosure Dates**

As a result of the judge denying Plaintiffs' Motion for Temporary Injunction and effectively permitting Lender's UCC foreclosure process to continue, Lender has rescheduled:

5709811.3

ACRON 2 PORSCHE DRIVE MEZZCO LLC
September 15, 2025
Page 6

- the UCC public auction from the previously scheduled date of August 27, 2025 to **October 6, 2025** at **2:30 P.M. prevailing Central Time**; and

- the Qualified Bidder Deadline (as defined in the Terms of Sale) from the previously scheduled date of August 20, 2025 to **September 29, 2025** at **5:00 P.M. prevailing Central Time**, which is one (1) week prior to the new UCC public auction date.

**F.    Updated UCC Foreclosure Documents**

The rescheduled UCC foreclosure dates are reflected in the following further updated UCC foreclosure materials: (i) the Third Amended and Restated Notice of Disposition of Collateral (attached as **Exhibit A** hereto), (ii) the Third Amended and Restated Terms of Sale (attached as **Exhibit B** hereto), and (iii) the further updated Notice of Public Sale of Collateral (attached as **Exhibit C** hereto). No other revisions have been made to the bidding requirements in these materials and the Zoom meeting credentials remain the same.

**G.    Loan Documents in Full Force and Effect; Lender's Remedies**

The Loan Agreement and other Loan Documents are in full force and effect, Borrower and Guarantors remain bound by them, and Lender expects such parties to perform all of their contractual obligations, despite the fact that the UCC foreclosure process is underway.

Lender and its team of attorneys and other advisors are continuing to closely monitor all aspects of Borrower's, and all three Guarantors', performance and breaches of their various obligations under the Loan Documents, including the actions of any third parties who are involved with these Loan Document violations.

[Remainder of page intentionally left blank.]

5709811.3

ACRON 2 PORSCHE DRIVE MEZZCO LLC
September 15, 2025
Page 7


Nothing contained herein shall be deemed a waiver, election or limitation of the rights or remedies of Lender, whether arising under the Loan Documents, at law, or in equity, all of which Lender hereby expressly reserves.

Very truly yours,

DANIEL B. ABRAM
Elkins Kalt Weintraub Reuben Gartside LLP


cc:    Nicholas R. Marcus, Esq. (via email: nmarcus@seyfarth.com)
       Emma C. Mata, Esq. (via email: emata@seyfarth.com)
       Giovanni Perez, Esq. (via email: gperez@seyfarth.com)
       Carole Hoffman (via email: cjh@acronusa.com)
       Jonathan J. Daniel (via email: LoanServicing@knightheadfunding.com)
       Rebecca Brown (via email: rbrown@knightheadfunding.com)
       David Hart, Esq. (via email: dhart@kslaw.com)
       Jason Billick, Esq. (via email: jbillick@abdmlaw.com)
       Austin Khan (via email: austin.khan@civitascapital.com)
       Marisa Lizak (via email: marisa.lizak@civitascapital.com)
       Melanie Pugmire (via email: melanie.pugmire@civitascapital.com)
       Shai Halbe, Esq. (via email: shalbe@elkinskalt.com)

5709811.3

**EXHIBIT A**

**Third Amended and Restated Notice of Disposition of Collateral**

(See Attached)

**THIRD AMENDED AND RESTATED**

**NOTICE OF DISPOSITION OF COLLATERAL**

TO DEBTOR:                    ACRON 2 Porsche Drive Mezzco LLC,
                              a Delaware limited liability company ("Debtor")

                              c/o ACRON U.S. Management
                              2424 E. 21st Street, Suite 150
                              Tulsa, OK 74114
                              Attention: Greg Wilson

FROM SECURED PARTY:  CAI Overland Lender, LLC,
                              a Delaware limited liability company ("Secured Party")

                              c/o Civitas Capital Group
                              1722 Routh Street, Suite 800
                              Dallas, Texas 75201
                              Attention: Austin Khan, Marisa Lizak
                              Telephone number: (214) 572-2300

**UCC Foreclosure**

This THIRD AMENDED AND RESTATED NOTICE OF DISPOSITION OF COLLATERAL, effective as of September 15, 2025, restates and supersedes the prior Second Amended and Restated Notice of Disposition of Collateral (the "Second A&R Notice of Disposition") previously delivered to Debtor, its designated counsel, and other transaction parties on July 24, 2025, with respect to the UCC foreclosure in order to update the day and date, and time of the Public Sale, as set forth below. The Second A&R Notice of Disposition had previously restated and superseded the Amended and Restated Notice of Disposition of Collateral (the "First A&R Notice of Disposition"), previously delivered to Debtor, its designated counsel, and other transaction parties on July 22, 2025, with respect to the UCC foreclosure in order to update the day and date, and time of the Public Sale.  The First A&R Notice of Disposition had previously restated and superseded the original Notice of Disposition of Collateral, previously delivered to Debtor, its designated counsel, and other transaction parties on May 16, 2025, with respect to the UCC foreclosure in order to modify the day and date, and time of the Public Sale.

**PLEASE TAKE NOTICE** that subject to the terms herein and the Terms of Sale (defined herein), Secured Party will offer for sale at a public auction (the "Public Sale") the Collateral (defined herein) at the following date, time, and place (the "Disposition"):

Day and Date: ***Monday, October 6, 2025***
Time:                ***2:30 P.M. prevailing Central Time***
Place:              Online via the designated Zoom credentials set forth below:

Zoom Meeting URL: https://bit.ly/AcronUCC

Zoom Meeting ID: 861 4554 5997

Zoom Meeting Password: 085908

Zoom Meeting Dial-in Number: +1-646-931-3860 (US)

(International participants only, follow the below URL to find your local dial-in number) - https://us06web.zoom.us/u/kncNax0Nv

The term "Collateral" refers to 100% of the limited liability company interests in ACRON 2 Porsche Drive, Atlanta LLC, a Delaware limited liability company (the "Pledged Entity"), together with all other "Collateral" as such term is defined in that certain Pledge and Security Agreement, dated as of January 18, 2024, made by Debtor for the benefit of Secured Party (the "Pledge Agreement").

The Disposition is made pursuant to Section 9-610 and other applicable sections of the Uniform Commercial Code ("UCC") as adopted in the State of Texas, as well as other applicable law, and the provisions of the Loan Documents (as defined in the Pledge Agreement). The Collateral secures Debtor's indebtedness to Secured Party in the original principal amount of $11,600,000 plus, without limitation, any and all unpaid interest (base and default interest), protective advances, prepayment premium, servicing fees, late charges, attorneys' fees and other costs, fees and charges including the costs to sell the Collateral (collectively, the "Debt").

The Public Sale will be held by Matthew D. Mannion, principal auctioneer for Mannion Auctions, LLC, in conjunction with Lance Swigert, Texas Licensed Auctioneer from Moecker Auctions, Inc., Texas State Auctioneer License Number 15939, online via the aforementioned Zoom meeting access details that will be made available to "qualified bidders" (as described more particularly in the Terms of Sale) who, among other requirements, execute the NDA (as defined herein and in the Terms of Sale).

The Secured Party reserves the right to determine which bidders qualify for participation in the Public Sale, to reject any bid or all bids at the Public Sale, to announce such other terms at the Public Sale as may be commercially reasonable in the Secured Party's sole discretion or to accept non-conforming bids.  Further, the Secured Party reserves the right to cancel, postpone or adjourn the Public Sale by announcement made at the Public Sale, either before or after the commencement of bidding, and without written notice or further publication.  The Secured Party reserves the right to credit bid any portion of its Debt then outstanding at the Public Sale.  The Secured Party reserves the right to implement such other terms or conditions at the Public Sale or regarding the Public Sale procedures as the Secured Party, in its sole discretion, determines to be commercially reasonable under the circumstances.

The Secured Party's understanding, without making any representation or warranty as to accuracy or completeness, is that (a) the principal asset of the Pledged Entity is a leased fee interest in the

real property located at 2 Porsche Drive, Hapeville, Georgia, commonly known as the Kimpton Overland Hotel – Atlanta Airport, and (b) such real property secures the obligations of the Pledged Entity with respect to a senior mortgage loan made by a certain lender to the Pledged Entity in the currently outstanding principal amount of $25,000,000.

The sale of the Collateral will be subject to all applicable third-party consents and regulatory approvals, if any, as well as the terms of sale prepared by the Secured Party (the "Terms of Sale"). The Terms of Sale will provide additional information about the bidding process, including bidder qualifications, deposit information, Public Sale participation and determination of any winning bid. Without limitation to the foregoing, please take notice that there are specific requirements for any potential successful bidder in connection with obtaining information and bidding on the Collateral, including, but not limited to, execution of the NDA.

Prospective bidders will be required to represent in writing to the Secured Party that they are purchasing the Collateral for their own account and not acquiring the Collateral with a view toward the sale or distribution thereof and will not resell the Collateral unless pursuant to a valid registration under applicable federal and/or state securities laws, or a valid exemption from the registration thereunder. The Collateral has not been registered under such securities laws and cannot be sold by the winning bidder(s) without registration or application of a valid exemption. The Collateral will be offered for sale at the Public Sale "**AS-IS, WHERE-IS**", and there are no express or implied warranties or representations of any kind or nature whatsoever, including without limitation, relating to title, possession, quiet enjoyment, merchantability, fitness, or the like as to the Collateral. The sale of the Collateral is specifically subject to all taxes, liens (other than those of Secured Party), claims, assessments, liabilities and encumbrances, if any, that may exist against the Collateral under the UCC or other applicable law. The winning bidder(s) will be responsible for the payment of all transfer taxes, stamp duties and similar taxes incurred in connection with the purchase of the Collateral.

All inquiries concerning this Notice of Disposition of Collateral and the Terms of Sale (including requirements to be a "qualified bidder") shall be made to: Joanne Au of CBRE Capital Markets at CBREuccsales@cbre.com.  Any person making any inquiry or request must: (i) disclose the person or entity on whose behalf such information is being sought, (ii) execute the Confidentiality and Non-Disclosure Agreement (the "NDA"), which can be accessed via the website https://tinyurl.com/UCCSaleKimptonATL (case sensitive), and (iii) maintain the confidentiality of the information provided. Interested parties who do not contact CBRE and register before the Public Sale will not be permitted to participate in bidding at the Public Sale.

Debtor is entitled to an accounting of the unpaid Debt (as defined above) secured by the Collateral which Secured Party intends to sell. Secured Party's charge for an accounting shall be in an amount equal to its costs and expenses (including attorney fees) incurred as a result of providing such accounting. Debtor may request an accounting by emailing Marisa Lizak at marisa.lizak@civitascapital.com and/or calling her at (214) 572-2300.

**EXHIBIT B**

**Third Amended and Restated Terms of Sale**

(See Attached)

5709811.3

## <u>THIRD AMENDED AND RESTATED TERMS OF SALE</u>

These THIRD AMENDED AND RESTATED TERMS OF SALE, effective as of September 15, 2025, restate and supersede the prior Second Amended and Restated Terms of Sale previously delivered to Borrower (as defined below), its designated counsel and other parties on July 24, 2025 (the "**Second A&R Terms**"), with respect to the UCC foreclosure set forth below in order to extend both the Qualified Bidder Deadline (as defined in Section 13(a) below) and Public Auction Date (as defined in the next paragraph below), as set forth below. The Second A&R Terms had previously restated and superseded the Amended and Restated Terms of Sale (the "**First A&R Terms**") previously delivered to Borrower and its designated counsel on July 22, 2025, with respect to the UCC foreclosure, in order to modify the Qualified Bidder Deadline and Public Auction Date. The First A&R Terms had previously restated and superseded the original Terms of Sale previously delivered to Borrower and its designated counsel on May 28, 2025, with respect to the UCC foreclosure, in order to modify the Qualified Bidder Deadline and Public Auction Date.

On *<u>October 6, 2025 at 2:30 P.M</u>*. prevailing Central Time (the "**Public Auction Date**"), on behalf of CAI Overland Lender, LLC, a Delaware limited liability company (the "**Secured Party**" and/or "**Lender**"), Mannion Auctions, LLC in conjunction with Moecker Auctions, Inc. (collectively, "**Auctioneer**"), will offer for sale the following interests, as permitted pursuant to the terms of that certain Pledge and Security Agreement, dated as of January 18, 2024 (the "**Mezz Pledge Agreement**"), between ACRON 2 Porsche Drive Mezzco LLC, a Delaware limited liability company ("**Mezzanine Borrower**") and the Secured Party and Article 8 & 9 of the Uniform Commercial Code of the State of Texas.

1.  Secured Party is offering for sale all limited liability company interests (the "**Interests**") in ACRON 2 Porsche Drive, Atlanta LLC, a Delaware limited liability company (the "**Pledged Entity**" and/or "**Borrower**") owned by the Mezzanine Borrower, which Pledged Entity has a leased fee interest in the real property located at 2 Porsche Drive, Hapeville, Georgia, commonly known as the Kimpton Overland Hotel – Atlanta Airport (the "**Real Property**"). The sale is being made in connection with the foreclosure on a pledge of the Interests to Secured Party by Mezzanine Borrower under the Mezz Pledge Agreement, pursuant to which Mezzanine Borrower has granted to Secured Party a first priority lien on the Interests as collateral for the mezzanine loan (the "**Mezz Loan**") from Lender to Mezzanine Borrower.  The Mezz Loan was made pursuant to that certain mezzanine Loan Agreement, dated as of January 18, 2024, by and between Mezzanine Borrower and Lender (the "**Mezz Loan Agreement**") and certain other related loan documents (collectively, with the Mezz Loan Agreement and Mezz Pledge Agreement, the "**Mezz Loan Documents**").

2.  The Real Property secures the obligations of the Pledged Entity with respect to a mortgage loan in the currently outstanding principal amount of $25,000,000 (the "**Senior Loan**") made by KHRE SMA Funding, LLC, a Delaware limited liability company ("**Senior Lender**") to the Pledged Entity pursuant to that certain Loan Agreement, dated as of December 21, 2018 (as amended, the "**Senior Loan Agreement**"), by and between the Pledged Entity and Senior Lender and certain other related loan documents (collectively, with the Senior Loan Agreement, the "**Senior Loan Documents**").

3. Mezzanine Borrower failed to timely perform certain obligations, including payment obligations, under the Mezz Loan Documents. Mezzanine Borrower received notices of such defaults from Lender and failed to cure such defaults within the cure period (if any) afforded Mezzanine Borrower under the Mezz Loan Documents. As a result, Events of Default (as defined in the Mezz Loan Agreement) have occurred and are continuing.

4. All inquiries concerning these Terms of Sale (including requirements to be a Qualified Bidder (as defined in Section 13) shall be made to: Joanne Au of CBRE Capital Markets at CBREuccsales@cbre.com. Any person making any inquiry or request must: (i) disclose the person or entity on whose behalf such information is being sought, (ii) execute the Confidentiality and Non-Disclosure Agreement (the "**NDA**"), which can be accessed via the website https://tinyurl.com/UCCSaleKimptonATL (case sensitive), and (iii) maintain the confidentiality of the information provided. Interested parties who do not contact CBRE and register before the public sale will not be permitted to participate in bidding at the public sale.

5. Secured Party will provide to prospective bidders that execute the NDA (as defined above) access to an online data site that contains certain relevant information that Secured Party possesses concerning the Mezzanine Borrower, the Interests, the Pledged Entity, the Real Property and copies of the Mezz Loan Documents and Senior Loan Documents (collectively, the "**Transaction Documents**").   Certain additional documentation may be made available to prospective bidders from time to time. Prospective bidders are encouraged to review all Transaction Documents and perform such due diligence as they deem necessary in advance of the  date of the foreclosure sale.

6. The Interests will be offered in a single lot.  The Interests are being sold strictly on an "**AS IS AND WHERE IS**" BASIS, AND (i) WITHOUT ANY REPRESENTATIONS OR WARRANTIES (WHETHER EXPRESSED OR IMPLIED) OF ANY KIND MADE BY SECURED PARTY (OR ANY OTHER PERSON ACTING FOR OR ON BEHALF OF SECURED PARTY), INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO THE EXISTENCE OR NONEXISTENCE OF OTHER LIENS, THE QUANTITY, QUALITY, CONDITION OR DESCRIPTION OF THE INTERESTS, THE REAL PROPERTY, AND/OR THE VALUE OF ANY OF THE FOREGOING, AND (ii) WITHOUT ANY RECOURSE WHATSOEVER AGAINST SECURED PARTY (OR ANY OTHER PERSON ACTING FOR OR ON BEHALF OF SECURED PARTY).  No information provided to any prospective bidder in response to any request for information to Secured Party or any attorney or broker it may retain or otherwise shall constitute a representation or warranty of any kind with respect to such information, the Interests, the Mezz Loan, the Real Property, the sale of the Interests or any other matter.

7. Without limiting the foregoing, any purchaser must purchase the Interests subject, in all respects, to (a) the terms of the governing documents of the Pledged Entity (including its operating agreement), (b) the terms of the Rental Agreement, dated May 5, 2017, between Pledged Entity (as Tenant) and the Development Authority of the

City of Hapeville, a public body corporate and politic created and existing under the laws of the State of Georgia (as Landlord), and (c) the terms of the Senior Loan Documents, the obligations of the Pledged Entity thereunder, and the lien on the Real Property serving as security therefor.

8. Secured Party reserves the right to require a showing of financial ability from prospective bidders prior to the date of the sale. If a prospective bidder is a special purpose entity or an entity with creditworthiness that is, in Secured Party's reasonable judgment, insufficient to support the requirements herein, Secured Party reserves the right to require additional credit support in the form of a guaranty by a creditworthy affiliate of such prospective bidder or other appropriate credit support.

9. Secured Party reserves the right to credit bid, set a minimum reserve price, reject any or all bids (including, without limitation, any bid that it deems has been made by a bidder that is unable to satisfy the requirements imposed by Secured Party upon prospective bidders in connection with the sale or to whom in Secured Party's sole judgment a sale may not lawfully be made), terminate or adjourn to another time the sale, without further notice, and to sell the Interests at a subsequent public or private sale, and to amend, from time to time, but prior to the start of bidding, these Terms of Sale to revise or add any other commercially reasonable conditions as the Secured Party may deem necessary or appropriate to facilitate a commercially reasonable sale of the Interests. Secured Party further reserves the right to determine the qualifications of any bidder, including a prospective bidder's ability to close the transaction on the terms and conditions referenced herein.

10. The Interests have not been and will not be registered under the Securities Act of 1933, as amended (the "**Securities Act**"), or any applicable state securities laws, and may not be sold or transferred without registration under the Securities Act and applicable state securities law or the availability of valid exemptions from such registration requirements. Secured Party reserves the right to verify that each certificate for the Interests to be sold bears a legend substantially to the effect that such Interests have not been registered under the Securities Act and to impose such other limitations or conditions in connection with the sale of the Interests as Secured Party deems necessary or advisable in order to comply with the Securities Act or any other applicable law.

11. Secured Party will only consider bids from persons/bidders whom, in Secured Party's sole judgment, may lawfully execute and close such sale. Bidders are hereby notified that (i) the Interests are required to be acquired for the account of the bidder and not with a view to resale or distribution, and (ii) that the bidder may not resell the Interests without compliance with the registration requirements of the Securities Act, and the regulations of the Securities and Exchange Commission (the "**SEC**") thereunder and applicable state securities laws or pursuant to valid exemptions therefrom.

12. A bid by any person will be deemed to be a representation that such bidder has sufficient knowledge and experience in business and financial matters to evaluate properly the merits and risks of investment in the Interests, that such bidder has had such access to information concerning the Interests as such bidder deems necessary to make an informed investment decision and that such bidder is qualified to become a transferee under all transfer restrictions applicable to the Interests. Further, such

bidder may be required to establish that such bidder is able to bear the economic risks involved in investment in the Interests.

13. In order for a prospective bidder (other than Secured Party) to be a "**Qualified Bidder**" and eligible to bid at the public auction, each such prospective bidder must satisfy the following conditions precedent to participation:

(a) Complete and execute the written certification in the form of **Exhibit A** attached hereto (the "**Certification**") and email a copy of the signed and completed Certification to Joanne Au, CBRE Capital Markets, Inc., at CBREUCCSales@cbre.com no later than **5:00 P.M.** prevailing Central Time on ***September 29, 2025*** (the "**Qualified Bidder Deadline**"), TIME BEING OF THE ESSENCE WITH RESPECT TO SUCH DELIVERY;

(b) Post a deposit, by wire transfer to an escrow account to be designated by Secured Party, in an amount not less than FIVE HUNDRED THOUSAND DOLLARS ($500,000) (the "**Deposit**") by the Qualified Bidder Deadline (as defined above) and email the Federal Reference Number (assigned to such wire transfer) to Joanne Au, CBRE Capital Markets, Inc., at CBREUCCSales@cbre.com by the Qualified Bidder Deadline. The Deposit shall be refunded to such prospective bidder within two (2) business days following the sale unless such prospective bidder is chosen as the successful bidder, in which event such Deposit shall, simultaneously with such selection, be deemed non-refundable to such bidder and applied as a credit against the purchase price;

(c) Depending on the answers provided in the Certification, the prospective bidder may be required to confirm to Secured Party (and its counsel) that (i) its purchase of the Interests is in compliance with all applicable federal and state laws, and (ii) it can comply with the certifications set forth in the Certification relating to such bidder's ability to qualify as a "Qualified Transferee" and to meet the eligibility requirements set forth in the Intercreditor Agreement, dated as of January 18, 2024, by and between Secured Party and Senior Lender (the "**Intercreditor Agreement**") and such confirmation (if required) is both provided to Secured Party and approved by Secured Party no less than two (2) business days prior to the Public Auction Date (as defined above);

(d) Each prospective bidder must demonstrate, to Secured Party's satisfaction, its financial ability to tender the balance of the purchase price for the Interests, by submitting to Joanne Au, CBRE Capital Markets, Inc., at CBREUCCSales@cbre.com, by the Qualified Bidder Deadline (as defined above), (i) a certified balance sheet or other certified financial information (including publicly available reports posted on EDGAR) evidencing the prospective bidder's total assets under management, capital/statutory surplus or partners' equity and market capitalization, and/or (ii) specific identification of the source of equity capital or loan commitments necessary to be utilized by the prospective bidder for the closing of the potential acquisition, which, in the case of (i) and (ii), Secured Party and CBRE shall hold as confidential;

(e) As set forth in Section 8 above, if a prospective bidder is a special purpose entity or an entity with creditworthiness that is, in Secured Party's reasonable judgment, insufficient to support the requirements herein, such prospective bidder has promptly provided, at Secured Party's request, additional credit support in the form of a guaranty by a creditworthy affiliate of such prospective bidder or other appropriate credit support, in each case via email to Joanne Au, CBRE Capital Markets, Inc., at CBREUCCSales@cbre.com, which additional credit support shall be approved by Secured Party in Secured Party's sole discretion, no less than two (2) business days prior to the Public Auction Date; and

(f) Each prospective bidder promptly provides all additional information that Secured Party and/or its agents (i.e., its counsel or CBRE) may request to confirm certain information set forth in a prospective bidder's Certificate (as defined above) or to otherwise confirm financial ability, to Secured Party's satisfaction, at least two (2) business days prior to the Public Auction Date.

As set forth above, Secured Party shall be entitled to seek additional information from any prospective bidder to confirm the information set forth in its Certification or other information provided (e.g., with respect to financial information and additional credit support), and the failure to provide such confirmatory information shall constitute permissible grounds for Secured Party to disqualify such prospective bidder. Prospective bidders are also advised to promptly submit any confirmatory information requested by Secured Party and/or its agents (i.e., its counsel or CBRE) in order to give Secured Party (and its agents) adequate time to review and approve such confirmatory information to Secured Party's satisfaction prior to the deadlines set forth above in Section 13(c), (e) and (f).

Meeting each of the foregoing requirements (including any requirements of the Intercreditor Agreement) shall be at the sole responsibility, risk, cost, and expense of a prospective bidder and prospective bidders are advised that the failure to meet such requirements may result in a default under the Intercreditor Agreement and/or the inability of a successful bidder to purchase the Interests. Without limitation to the foregoing, the foregoing requirements shall not apply to Secured Party or any Control Affiliate of Secured Party (as defined in the Intercreditor Agreement), each of which is stipulated to be a Qualified Bidder.

14. Prospective bidders are hereby advised that (a) although Secured Party has provided access to certain information regarding the Mezzanine Borrower, Pledged Entity and/or the Interests on an online data site, there is no assurance that Secured Party does not have information that it is contractually or legally prohibited from providing to potential bidders due to restrictions in confidentiality agreements or otherwise, or that it has disclosed all information in its possession relating to the Mezzanine Borrower, the Pledged Entity, the Real Property or the Interests and (b) Secured Party may be in possession of information which prospective bidders may not have.

15. The sale shall be a public auction to the highest Qualified Bidder. All bids (other than bids submitted by Secured Party) must be submitted in writing and must be for cash. The minimum bidding increments will be at least $100,000.00 or such other amount as

Auctioneer may announce and modify at the auction in Auctioneer's sole discretion. Higher bids will continue to be entertained until Auctioneer has determined that it has received the highest bid from those bidders determined by Secured Party to be Qualified Bidders. No offers may be withdrawn once made during the auction, but no sale shall be final until accepted in writing by Secured Party. The entire amount of the successful bid (less the applicable Deposit) shall be paid by the successful bidder to Secured Party in immediately available good funds (wire transferred from, or certified check drawn on and certified by, a U.S. commercial bank that is a member of the Federal Reserve system) within fifteen (15) business days after the conclusion of the auction (the "**Funding Deadline**"), TIME BEING OF THE ESSENCE, and the scheduled closing of the sale shall take place on such date, subject in all respects to the winning bidder's satisfaction of all of the terms and conditions of these bidding procedures and Section 5 (Foreclosure of Separate Collateral) of the Intercreditor Agreement (as defined above), including, receipt of Senior Lender's approval as set forth in item (g) of **Exhibit A** (the Certification) attached hereto. If Secured Party bids at the sale, part or all of its bid(s) and payment may be in the form of some or all of the debt it holds under the Mezz Loan on the same basis as if the amount of the indebtedness outstanding under the Mezz Loan which Secured Party bids at the sale were cash and immediately available good, collected funds.

16. If Secured Party is not the highest Qualified Bidder for the Interests, Secured Party reserves the right to designate a back-up bidder. If the highest Qualified Bidder fails to timely fund the entire balance of the purchase price as set forth in the above paragraph by the Funding Deadline (as defined above), such bidder's Deposit shall be immediately released to Secured Party as liquidated damages for such failure, and the back-up bidder shall be notified within two (2) business days after the Funding Deadline (the "**Back-Up Bidder Notice**"), and shall be obligated, within one (1) business day of receiving the Back-Up Bidder Notice from Secured Party, to (i) complete and execute a confirmation of sale in a form to be provided by Secured Party and (ii) post the Deposit by wire transfer to such third-party escrow account (to be designated by Secured Party). If a back-up bidder (other than Secured Party) is ultimately selected as the winning bidder for the Interests, the back-up bidder will be required to pay the balance of the purchase price for the Interests to be purchased by the back-up bidder by certified or bank check, or wire transfer of immediately available funds, no later than five (5) business days after delivery of the Back-Up Bidder Notice from Secured Party to the back-up bidder, TIME BEING OF THE ESSENCE. The sale of the Interests to a back-up bidder will otherwise be consummated on the same terms as applicable to the successful bidder at the public auction. If the back-up bidder for the Interests is Secured Party, then the foregoing requirements will not apply to the Interests and payment for the Interests may be made by applying the amounts due under the Mezz Loan against the winning bid amount.

17. If the back-up bidder fails to timely pay the balance of the successful bid, the back-up bidder's Deposit will be immediately released to Secured Party as its liquidated damages, and the Interests may, at Secured Party's option, be sold to the next highest bidder. If Secured Party is unable for any reason (other than as set forth in the immediately preceding sentence or in Section 16 with respect to a bidder's failure to timely pay the balance of the successful bid) to consummate the sale of the Interests to

a successful bidder at the public sale, Secured Party shall have no liability or obligation whatsoever to the successful bidder except only to return any balance of the bidder's purchase price paid (i.e., the entire amount of the successful bid less the applicable Deposit) and Secured Party shall retain the Deposit under such circumstances. By bidding at the sale, each bidder acknowledges that it would be impractical and extremely difficult to ascertain Secured Party's actual damages in the event a successful bidder fails to consummate the purchase of the Interests as set forth herein and, as such, each bidder acknowledges and agrees that the Deposit represents a fair and reasonable estimate of the net present detriment Secured Party would suffer in such event. Each prospective bidder acknowledges and agrees that the release to Secured Party of the Deposit under the circumstances described in Section 16 and this Section 17, with respect to the initial winning bidder and back-up bidder, respectively, is not intended as a forfeiture or penalty but is intended to constitute liquidated damages to Secured Party in each case under such circumstances. A successful bidder or back up bidder shall have no right to postpone or nullify a sale of the Interests if it is unable to meet any of the requirements under any of the documents relating to the Interests.

18. The winning bidder shall be solely responsible for the payment of all transfer taxes, stamp duties and similar taxes incurred in connection with the purchase of the Interests.

19. The bidding shall take place under the direction of Matthew D. Mannion, principal auctioneer for Mannion Auctions, LLC, in conjunction with Lance Swigert, Texas Licensed Auctioneer from Moecker Auctions, Inc., Texas State Auctioneer License Number 15939, at the following date, time, and place:

Day and Date:    ***Monday, October 6, 2025***
Time:            ***2:30 P.M. prevailing Central Time***
Place:           Online via the designated Zoom credentials set forth below:


Zoom Meeting URL: https://bit.ly/AcronUCC

Zoom Meeting ID: 861 4554 5997

Zoom Meeting Password: 085908

Zoom Meeting Dial-in Number: +1-646-931-3860 (US)

(International participants only, follow the below URL to find your local dial-in number) - https://us06web.zoom.us/u/kncNax0Nv

## <u>EXHIBIT A</u>

### CERTIFICATION

Re:    ACRON 2 Porsche Drive Mezzco LLC's right, title and interest in the limited liability company interests in ACRON 2 Porsche Drive, Atlanta LLC (together with certain related rights and property relating thereto, the "**<u>Interests</u>**")

Name of Prospective Bidder: _____

Contact Information:        _____

                              _____

                              _____

                              Tel: _____

                              Email: _____

Ladies and Gentlemen:

The undersigned prospective bidder (the "**<u>Bidder</u>**") has indicated that it is interested in bidding on the Interests, which will be auctioned in accordance with the Terms of Sale issued by Secured Party with respect to the Interests (the "**<u>Terms of Sale</u>**"). Capitalized terms not otherwise defined herein shall have the meaning ascribed thereto in the Terms of Sale. This letter constitutes the Certification referenced in the Terms of Sale.

With the understanding that Secured Party will rely upon the representations and warranties made by Bidder in this Certification in connection with the sale of the Interests, the undersigned hereby certifies to Secured Party as follows:

(a) Bidder is acquiring the Interests for investment purposes, solely for the Bidder's own account and not with a view to distribution or resale of the Interests;

(b) Bidder has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of investment and has sufficient financial means to afford the risk of investment in the Interests;

(c) Bidder will not resell or otherwise hypothecate the Interests without a valid registration under applicable federal or state laws, including, without limitation, the Securities Act of 1933, as amended, or an available exemption therefrom;

(d) Bidder's purchase of the Interests will be in compliance with all applicable federal and state laws;

(e) Bidder will be present at the public auction through the virtual Zoom meeting;

(f) Bidder acknowledges that the following individuals are entitled to participate in the public sale on

Certification (Terms of Sale - ACRON 2 Porsche Drive Mezzco LLC)

behalf of Bidder, and none other:

Name: _____    Email: _____
Company: _____    Tel: _____

Name: _____    Email: _____
Company: _____    Tel: _____

*[attach a schedule if more individuals need to be identified]*

(g) Bidder:

i.  represents and warrants that (i) it is a Qualified Bidder (as defined in the Terms of Sale), and (ii) it will promptly provide all additional confirmatory information, requested by Secured Party (or its agents), in order to fully satisfy the conditions precedent required to be a Qualified Bidder pursuant to and in accordance with the terms and conditions of Section 13 of the Terms of Sale.

ii. acknowledges that in order for a prospective bidder to be a "Qualified Transferee" under the Intercreditor Agreement, such Person must be "approved by Senior Lender in writing, in Senior Lender's reasonable discretion" and "under no circumstances shall an Excluded Party or an Affiliate of an Excluded Party be a Qualified Transferee" pursuant to Section 5(a)(i) of the Intercreditor Agreement and the Intercreditor Agreement's definition of the term "Qualified Transferee".

iii. represents and warrants that to the best of Bidder's knowledge, Bidder is not an "Excluded Party" nor an "Affiliate" of an Excluded Party (as such preceding terms are defined in the Intercreditor Agreement and excerpted in the Definitions section below).

iv. represents and warrants that if it is the winning bidder at the auction sale of the Interests, it will be able to satisfy and will satisfy the various requirements of Section 5 (Foreclosure of Separate Collateral) of the Intercreditor Agreement regarding the obligations, consents and acknowledgements of any "Qualified Transferee" which takes title to the pledged Interests, by working directly with Senior Lender and its counsel (or other agents) and subject in all respects to the receipt of Senior Lender's approval (as set forth above). Please describe below how the Bidder meets or intends to meet the requirements to be a "Qualified Transferee" in accordance with the Intercreditor Agreement:

_____

_____

_____

_____

_____

5709760.4

Certification (Terms of Sale - ACRON 2 Porsche Drive Mezzco LLC)

_____

v.  has or will have on the closing of the sale a "**Supplemental Guarantor**" (as defined below). Please describe below how the Bidder meets or intends to meet the requirement to have a Supplemental Guarantor.

_____

_____

_____

_____

_____

(h) Bidder acknowledges that it has received the Terms of Sale and has received, or has had the opportunity to receive, legal advice from independent, competent counsel of its own choosing regarding the meaning and legal significance of the Terms of Sale (including, without limitation, with respect to the Deposit requirements and Secured Party's remedy to retain the Deposit under certain circumstances as liquidated damages). The Bidder further acknowledges that it is satisfied with any legal counsel and advice received from it and fully understands and accepts the terms and conditions set forth therein.

Bidder acknowledges and agrees that the certifications contained in this Certification may be, and are being, relied upon by Secured Party and its successors and assigns, and that said certifications shall be binding upon Bidder and its successors and assigns.

Bidder hereby agrees to indemnify, defend and hold harmless Secured Party and its affiliates, directors, officers, members, agents, employees and consultants from and against any claim and/or out-of-pocket loss, liability or expense (including, without limitation, attorneys fees) resulting from or based on any misrepresentation or inaccuracy in the information contained in this Certification that is provided by Bidder or its agents (including any attachments or supplements to this Certification provided by the Bidder or its agents).

Excerpted Definitions from Intercreditor Agreement:

"**Affiliate**" shall mean, when used with respect to any Person, any other Person which (a) Controls, is Controlled by or is under common Control of such Person, (b) is the spouse, sibling (whether by whole or half-blood), ancestor or lineal descendant of such Person, or is a trust or estate the beneficial owner(s) of which is the spouse, sibling (whether by whole or half-blood), ancestor or lineal descendant of such Person, or (c) is a general partner, managing member or controlling shareholder of such Person.

"**Borrower**" has the meaning provided in the Recitals hereto.

Certification (Terms of Sale - ACRON 2 Porsche Drive Mezzco LLC)

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or activities of a Person, whether through the ownership of voting securities or other beneficial interests, by contract or otherwise. The terms "Controlled by", "Controlling" and "under common Control with" shall have correlative meanings.

"**Control Affiliate**" means, with respect to any Person, any other Person who directly or indirectly through one or more intermediary entities Controls, is Controlled by, or is under common Control with, such Person. The terms "Controlled Affiliate" and "Controlling Affiliate" shall have correlative meanings.

"**Equity Collateral**" means the equity interests of Mezzanine Borrower in Borrower pledged pursuant to the Pledge Agreement.

"**Excluded Party**" means a Person who, in the last seven (7) years, (i) has filed, instituted or joined in lender liability or similar litigation against banks or other institutional lenders as a debtor, obligor or guarantor relative to real estate financing, (ii) has been the subject of an Insolvency Proceeding, (iii) is an existing or was a prior borrower of Senior Lender which is or was in material default on its loan obligations to Senior Lender which led Senior Lender to exercise rights and remedies, (iv) has ownership being such that it would cause a regulatory violation by Senior Lender (e.g., loan-to-one borrower requirements), or (v) is a Prohibited Person.

"**Insolvency Law**" shall mean Title 11 of the United States Code entitled "Bankruptcy", as the same has been or may be amended or superseded from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder (the "Bankruptcy Code"), or any other applicable domestic or foreign laws relating to liquidation, conservatorship, bankruptcy, receivership, insolvency, reorganization or any similar debtor relief rights affecting the rights, remedies, powers, privileges and benefits of creditors generally.

"**Insolvency Proceeding**" shall mean any case, proceeding or other action against any Person, whether voluntary or involuntary, under any Insolvency Law.

"**Mezzanine Borrower**" has the meaning provided in the Recitals hereto.

"**Mezzanine Lender**" has the meaning provided in the first paragraph of this Agreement.

"**Mezzanine Loan**" has the meaning provided in the Recitals hereto.

"**Mezzanine Loan Agreement**" has the meaning provided in the Recitals hereto.

"**Mezzanine Loan Documents**" means the Mezzanine Loan Agreement, the Mezzanine Note and the Pledge Agreement, together with the other documents and instruments set forth on Exhibit C hereto, as any of the foregoing may be modified, amended, extended, supplemented, restated or replaced from time to time, subject to the limitations and agreements contained in this Agreement.

"**Mezzanine Loan Realization Event**" means (i) the conveyance by foreclosure or assignment-in-lieu thereof of all of the direct limited liability company interests in Borrower pledged to Mezzanine Lender pursuant to the Mezzanine Loan Documents, (ii) the exercise by Mezzanine Lender of any voting rights

or powers with respect to Borrower so as to direct or cause the direction of the management or policies of Borrower, or (iii) any sale or transfer of the Equity Collateral by reason of the exercise of remedies by Mezzanine Lender pursuant to the Mezzanine Loan Documents.

"**Mezzanine Note**" has the meaning provided in the Recitals hereto.

"**Person**" means any individual, sole proprietorship, corporation, general partnership, limited partnership, limited liability company or partnership, joint venture, association, joint stock company, bank, trust, estate unincorporated organization, any federal, state, county or municipal government (or any agency or political subdivision thereof) endowment fund or any other form of entity.

"**Pledge Agreement**" has the meaning provided in the Recitals hereto.

"**Prohibited Person**" means any Person:

(i) listed in the annex to, or who is otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (the "Executive Order");

(ii) that is owned or controlled by, or acting for or on behalf of, any person or entity that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii) with whom a Person is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including the Executive Order;

(iv) who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(v) that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website or at any replacement website or other replacement official publication of such list; or

(vi) who is an Affiliate of a Person listed in clauses (i) through (v) above.

"**Qualified Transferee**" means (i) Mezzanine Lender, (ii) any Control Affiliate of Mezzanine Lender, (iii) Senior Lender, (iv) any Control Affiliate of Senior Lender, or (v) any Person approved by Senior Lender in writing, in Senior Lender's reasonable discretion; provided, however, under no circumstances shall an Excluded Party or an Affiliate of an Excluded Party be a Qualified Transferee.

"**Senior Lender**" has the meaning provided in the first paragraph of this Agreement.

"**Senior Loan**" has the meaning provided in the Recitals hereto.

"**Supplemental Guarantor**" means (1) Civitas Capital Management, LLC; provided, that, Civitas Capital Management, LLC satisfies Senior Lender's then applicable KYC requirements at the time of

Certification (Terms of Sale - ACRON 2 Porsche Drive Mezzco LLC)

becoming a Supplemental Guarantor hereunder, or (2) a Person that (i) has Control over Borrower (as constituted after giving effect to the Mezzanine Loan Realization Event), (ii) owns a direct or indirect interest in Borrower (as constituted after giving effect to the Mezzanine Loan Realization Event), (iii) satisfies Senior Lender's then applicable KYC requirements, (iv) has a net worth equal to no less than the then outstanding principal balance of the Senior Loan and liquidity equal to no less than ten percent (10%) of the then outstanding principal balance of the Senior Loan, (v) is not an Excluded Party or an Affiliate of an Excluded Party and (vi) if such Person is an investment fund, such investment fund has a remaining term, including any as-of-right extensions, that extends at least twelve (12) months beyond the fully extended maturity date of the Senior Loan.

[Remainder of page intentionally left blank; signature page follows]

Certification (Terms of Sale - ACRON 2 Porsche Drive Mezzco LLC)

IN WITNESS WHEREOF, the Bidder has caused this Certification to be duly executed and delivered.

Date: _____, 2025

_____

By: _____

Name: _____

Title: _____

**EXHIBIT C**

**Updated Notice of Public Sale of Collateral**

(See Attached)

5709811.3

## NOTICE OF PUBLIC SALE OF COLLATERAL

PLEASE TAKE NOTICE that 100% of the limited liability company interests in ACRON 2 PORSCHE DRIVE, ATLANTA LLC, a Delaware limited liability company (the "**Company**"), and together with all economic, management and other rights, property and status relating thereto (collectively, the "**Collateral**"), will be offered for sale at a public auction and sold to the highest "qualified bidder" on *October 6, 2025 at 2:30 p.m. prevailing Central Time*. The sale will be conducted online in a Zoom meeting. The Zoom meeting credentials will be shared in the Terms of Sale, which will be made available to qualified bidders who, among other requirements, execute a Confidentiality and Non-Disclosure Agreement (the "**NDA**").

The principal asset of the Company is the leased fee interest in that certain real property and the improvements thereon commonly known as the Kimpton Overland Hotel – Atlanta Airport located at 2 Porsche Drive, Hapeville, Georgia 30354 (the "**Property**").

This sale is held to enforce the rights of CAI OVERLAND LENDER, LLC, a Delaware limited liability company, as secured party ("**Secured Party**") under (A) that certain Loan Agreement, dated as of January 18, 2024, by and between Secured Party and ACRON 2 PORSCHE DRIVE MEZZCO LLC, a Delaware limited liability company ("**Borrower**") (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**") and (B) that certain Pledge and Security Agreement, dated as of January 18, 2024 (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Pledge Agreement**" and together with the Loan Agreement and all other agreements entered into by the parties pursuant to the Loan Agreement or the Pledge Agreement, the "**Loan Documents**"), executed by Borrower in favor of Secured Party.

The Collateral is offered "**AS IS, WHERE IS**", with all faults, and Secured Party makes no guarantee, representation, or warranty, including without limitation any representation or warranty of merchantability or fitness for use (express or implied), of any kind or nature whatsoever.

Secured Party will be permitted to bid at the sale, and notwithstanding any requirement herein that the sale of the Collateral be for cash, Secured Party may credit bid all or any portion of the outstanding balance of the amounts due under the Loan Documents. Secured Party reserves the right, in its sole and absolute discretion (for any reason or no reason), to (a) reject all bids and terminate, or adjourn to another date and time, the sale as the Secured Party may deem proper, by announcement at the place and on the date of such sale, and any subsequent adjournment thereof, without further publication, and (b) impose any other commercially reasonable conditions upon the sale of

5709774.2

the Collateral as Secured Party may deem proper in its sole and absolute discretion.

Interested parties who desire additional information regarding the Company, the Collateral, the Property or the terms of the public sale (including the requirements to be a "qualified bidder") shall execute the NDA (as defined above), which can be accessed via the website https://tinyurl.com/UCCSaleKimptonATL (case sensitive). For questions and inquiries, please contact Joanne Au of CBRE Capital Markets at CBREuccsales@cbre.com.