**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| IN RE:<br><br>**ACRON 2 PORSCHE DRIVE MEZZCO LLC,**<br><br>          **Debtor.** | Case No:<br><br>**25-61529-LRC**<br><br>**Chapter 7** |
| **CAI OVERLAND LENDER, LLC,**<br><br>          **Movant,**<br><br>v.<br><br>**ACRON 2 PORSCHE DRIVE MEZZCO LLC and S. GREGORY HAYS as Chapter 7 Trustee,**<br><br>          **Respondents**. | **CONTESTED MATTER** |

**DECLARATION OF MICHAEL I. GOTTFRIED**
**IN SUPPORT OF MOTION FOR RELIEF FROM STAY**

I, Michael I. Gottfried, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am a partner at the law firm of Elkins Kalt Weintraub Reuben Gartside LLP, located in Losa Angeles, California ("**Elkins Kalt**").

2.      Elkins Kalt has and continues to represent Lender in connection with the Mezzanine Loan,[1] Debtor's defaults thereunder, and the related foreclosure proceedings related thereto.

3.      Except as otherwise indicated herein, I have personal knowledge of the matters set forth herein and, if called as a witness, would testify competently thereto.

---

[1] Capitalized terms not otherwise defined herein shall have the definitions assigned to them in the Motion.

107055844.2

4.      I submit this declaration in support of the *Motion for Relief from Stay* (the "**Motion**") filed contemporaneously herewith by CAI Overland Lender, LLC ("**Lender**").

5.      On October 8, 2025, I sent an email to Greg Hays, the chapter 7 trustee appointed in this case (the "**Trustee**"), in which I provided him with information regarding Lender's security interest and the history of the pending foreclosure proceeding that was scheduled to occur on October 6, 2025 (the "**October 8 Email**"). In accordance with the October 8 Email, I provided the Trustee with the HWE Valuation Analysis as well as with a description of the marketing process undertaken by CBRE in accordance with the foreclosure proceeding.  I informed the Trustee that the Lender did not believe that there was any equity in the property based on CBRE's extensive 100-day marketing process and the HWE Valuation Analysis, and that it is Lender's position that the bankruptcy case was filed in bad faith. As such, I requested that the Trustee stipulate to relief from the automatic stay. A copy of the October 8 Email is attached hereto as Exhibit A.

6.      The Trustee informed me that he was out of town and that he would need to review Lender's issues as well as the bankruptcy petition. On October 21, 2025, I engaged in an initial telephone conversation with the Trustee who informed me that he had engaged counsel and that he would get back to me after discussing Lender's request with his counsel.

7.      On October 30, 2025, I spoke with the Trustee and his counsel at which time they told me that they were considering engaging in a sale process to sell the Property. The Trustee and his counsel also asked me if the Lender would consider providing the Trustee and his professionals with a carve-out to proceed with a sale process. While I expressed skepticism regarding the Lender's willingness to provide such carve-out, I told the Trustee that I would make the request of my client.

8.      Following the call, I followed up with the Trustee and his counsel via email and

2

107055844.2

asked how the Trustee intended to sell the Property, which is not property of the Debtor's estate. In an email from Trustee's counsel dated October 31, 2025 (the "**October 31 Email**"), counsel indicated that the Trustee is considering voting Debtor's membership interest in ACRON Atlanta in order sell the Property. A true and correct copy of the October 31 Email is attached hereto as Exhibit B.

9.      In email correspondence to the Trustee and his counsel dated November 5, 2025 (the "**November 5 Email**"), I responded to the October 31 Email and explained that the restrictions contained in the Loan Agreement and Pledge Agreement, copies of which I attached to the November 5 Email, precluded the sale of the Property by Debtor or even the exercise of the voting interests of the Debtor in ACRON Atlanta absent the consent of the Lender, which it was unwilling to give. I also explained that the client would not agree to a carve-out to move forward with a sale process and requested that the Trustee reconsider his position with respect to stay relief. A true and correct copy of the November 5 Email is attached hereto as Exhibit C.

10.      To date, I have not received a response to the November 5 email.

I declare under penalty of perjury that the foregoing in true and correct.

Executed this 12th day of November, 2025.

_____

Michael I. Gottfried

## EXHIBIT A

(October 8 Email)

107055844.2

**Ashley Champion**

---

**Subject:**          FW: Acron 2 Porsche Drive Mezzco, LLC
**Attachments:**   2025-09-04 Motion for Temporary Injunction(5710391.1).pdf; 2025-09-10 Order
Denying Injunction(5713038.1).pdf; Kimpton Overland ATL Hotel UCC Sale - Status
Report_09.30.2025.pdf; HWE - Kimpton Overland Hotel Atlanta Airport BOV - March
2025[95].pdf; Plaintiffs' Ex. 26.pdf

---

**From:** Michael I. Gottfried
**Sent:** Wednesday, October 8, 2025 1:17 PM
**To:** 'ghays@haysconsulting.net' <ghays@haysconsulting.net>
**Cc:** Shai N. Halbe <SHalbe@elkinskalt.com>; Daniel B. Abram <DAbram@elkinskalt.com>
**Subject:** Acron 2 Porsche Drive Mezzco, LLC

Hi Greg,

My firm represents CAI Overland Lender, LLC (the "Secured Lender") in connection with the Chapter 7 bankruptcy case of Acron 2 Porsche Drive Mezzco, LLC (the "Debtor"). I am writing to request that you, in your capacity as Chapter 7 Trustee, enter into a stipulation with the Secured Lender for relief from the automatic stay to foreclose on the secured collateral based on the following.

As provided by the Debtor's Schedules of Assets and Liabilities, the Secured Lender has an undisputed claim in the amount of approximately $17 million secured by the Debtor's 100% equity interest in Acron 2 Porsche Drive Atlanta, LLC ("Acron 2 Porsche Drive Atlanta"). It is our belief that this is a "bad faith" bankruptcy filing as this is a 2-party dispute in which the Debtor filed the bankruptcy case on the eve of a foreclosure proceeding with no possibility of reorganizing (as evidenced by the fact the Debtor chose to file a Chapter 7 petition). Other than the Secured Lender, the only other creditor listed in the Debtor's Schedules of Assets and Liabilities is a related company that is owed approximately $1 million and listed as an "intercompany" debt. Moreover, we do not believe that the asset would provide any value to the bankruptcy estate based on the extensive marketing undertaken by CBRE in connection with the pending foreclosure sale, as well as a Broker Opinion of Value by Hodges Ward Elliott (the "HWE Valuation Analysis").

The Secured Lender originally scheduled a foreclosure sale on its equity collateral for August 27, 2025. On August 25, 2025 (two days prior to the scheduled foreclosure sale), the Debtor filed a Motion for Temporary Restraining Order (the "TRO Motion") in the District Court, Dallas County, Texas, a copy of which is attached. On August 26, 2025, a hearing was held with respect to the TRO Motion, and the District Court granted the TRO Motion such that the UCC foreclosure auction temporarily was postponed, subject to further hearing that was held on September 9, 2025. At the September 9th hearing, the District Court denied the Motion for Temporary Injunction in its entirety, and the foreclosure sale then was rescheduled to October 6, 2025. The Order Denying Plaintiff's Motion for Temporary

Injunction is attached. The Debtor then filed its Chapter 7 bankruptcy petition for the purpose of once again postponing the foreclosure sale.

In connection with the pending foreclosure sale, the Secured Lender worked with CBRE Capital Markets, Inc. ("CBRE") as its exclusive brokerage advisor. Over the course of an approximately 100-day marketing period, which began in mid-May 2025, the foreclosure sale was publicly noticed and advertised with 15 publications running in a myriad of periodicals including: The Wall Street Journal, The Atlanta Journal-Constitution, Commercial Mortgage Alert, Real Estate Alert, the monthly hospitality newsletter referred to as 'Hotel Business', and The New York Times. Additionally, CBRE disseminated multiple email sale announcements and reminders of this auction opportunity to its proprietary investor list that includes over 7,500 individuals or entities that operate in a space relative to the collateral being sold. According to CBRE's Marketing Status Report (Updated September 30, 2025): "No investor group has submitted eligible Bidder Qualification Materials for CBRE or Secured Party's review as of the date of this status report."  A copy of the CBRE Marketing Status Report is attached.

In addition to the fact that CBRE was unable to locate a single qualified bidder in its approximately 100 days of marketing the asset, the Secured Lender obtained the attached HWE Valuation Analysis which provides in the "Executive Summary" on page 5, a valuation of Kimpton Overland Hotel, Atlanta Airport (the "Hotel" that is the underlying asset for which the Debtor owns a 100% equity interest) providing that the Hotel has a value of between $24,000,000 and $28,000,000.  As the Hotel is secured by a first priority lien in the amount of $25,000,000, it is clear that the Secured Lender here (with a secured mezz claim of approximately $17,000,000), substantially is undersecured.

In support of the Debtor's Motion for Temporary Injunction, the Debtor attached an LOI that ironically supports the position that there is no value for the bankruptcy estate in the Debtor's equity interest In Acron 2 Porsche Drive Alanta.  First, the LOI is subject to multiple contingencies including a "Due Diligence Period", "Financing Contingency", and "Franchise Approval Contingency".  Second the $38,000,000 proposed purchase price is inclusive of a $500,000 credit to be applied at closing for capital expenditures, and "if the estimated costs exceed the $500,000 credit, the Purchaser may negotiate an adjustment to the Purchase Price or terminate in its sole discretion."  Third, even if the undisclosed Purchaser went forward with the sale for the full purchase price of $37,500,000 (which is highly suspect), the proceeds would not be sufficient to pay the senior lender on the Hotel property, and the Secured Lender here.

I would appreciate the opportunity to discuss the matter with you, and I'd be happy to provide you with any additional information that we may have.  I am also copying my partners who had involvement in the matter prior to the filing of the bankruptcy case.  If you agree to stipulate with us for relief from the automatic stay, we also would be happy to assist in drafting the stipulation.

Michael I. Gottfried
MGottfried@elkinskalt.com
Direct Dial: (310) 746-4407 | Fax: (310) 746-4499 | Download VCard

Elkins Kalt Weintraub Reuben Gartside LLP
10345 W. Olympic Boulevard, Los Angeles, CA 90064
www.elkinskalt.com



CONFIDENTIALITY NOTICE: This e-mail message and any attachments are confidential and may be attorney-client privileged. Dissemination, distribution or copying of this message or attachments without proper authorization is strictly prohibited.  If you are not the intended recipient, please notify Elkins Kalt Weintraub Reuben Gartside LLP immediately by telephone or by e-mail, and permanently delete the original, and destroy all copies, of this message and all attachments.

## **EXHIBIT B**

(October 31 Email)

**Ashley Champion**

---

**Subject:**                          FW: Acron 2 Porsche Drive Mezzco, LLC

-----Original Message-----
From: Michael Bargar <mbargar@rlkglaw.com>
Sent: Friday, October 31, 2025 11:07 AM
To: Michael I. Gottfried <MGottfried@elkinskalt.com>; Greg Hays <ghays@haysconsulting.net>
Cc: Shai N. Halbe <SHalbe@elkinskalt.com>; Daniel B. Abram <DAbram@elkinskalt.com>
Subject: RE: Acron 2 Porsche Drive Mezzco, LLC

---EXTERNAL EMAIL: Do not click links or attachments unless you recognize the sender and know the content is safe---

Hi Michael,

I hope you are doing well. There are a few ways to accomplish the sale. The one that Trustee is considering at the moment is to vote the membership interest of the subsidiary and to sell the underlying collateral. He would then wind up the business affairs of the subsidiary and upstream the net sale proceeds to the Debtor's bankruptcy estate.

Please let me know if you have any other questions.

Kind regards,

Mike

Michael J. Bargar
Partner
Rountree Leitman Klein & Geer, LLC
Century Plaza I
2987 Clairmont Road, Suite 350
Atlanta, GA 30329
mbargar@rlkglaw.com
404-410-1220

CONFIDENTIALITY NOTICE: This email and any attachments are intended solely for the recipients identified in the "To," "Cc," and "Bcc" lines of this email. Additionally, this email and any attachments are confidential and may contain privileged information. Rountree Leitman Klein & Geer, LLC reserves and asserts all rights to confidentiality and privileges that may apply to this email and any attachments. If you are not an intended recipient, then your receipt of this email and its attachments is the result of an inadvertent disclosure or unauthorized transmittal. Furthermore, no attorney-client relationship exists without a signed agreement. In accordance with those rights and privileges, you are instructed to delete and destroy immediately all copies of the email and its attachments in any form and immediately notify Rountree Leitman Klein & Geer, LLC. You are not permitted in any way to review, copy, or rely on the contents of this email and any attachments. Rountree Leitman Klein & Geer, LLC expressly reserves all

rights and remedies for violations of confidentiality and privilege. This email and any attachments are covered by the Electronic Communications Privacy Act, 18 USC § 2510 et seq.
FDCPA NOTICE: Please be advised that this Firm may be acting as a debt collector and that this communication may constitute an attempt to collect a debt, and any information obtained will be used for that purpose.  If the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is not intended as and does not constitute an attempt to collect the debt.
CFPB NOTICE: You may opt out of receiving further e-mail communications from Rountree Leitman Klein & Geer, LLC to this e-mail address by replying with an e-mail message that has the word "STOP" in the subject line.

-----Original Message-----
From: Michael I. Gottfried [mailto:MGottfried@elkinskalt.com]
Sent: Friday, October 31, 2025 1:47 PM
To: Greg Hays <ghays@haysconsulting.net>
Cc: Michael Bargar <mbargar@rlkglaw.com>; Shai N. Halbe <SHalbe@elkinskalt.com>; Daniel B. Abram <DAbram@elkinskalt.com>
Subject: RE: Acron 2 Porsche Drive Mezzco, LLC

Greg & Mike,

I had a brief conversation with the client who wants to have a better understanding from you as to how the estate would be able to sell the hotel (which is not an asset of the estate), as opposed to the equity interest. I would appreciate it if you could let me know as she does not want to consider anything else prior to having that information.

Thanks,
Michael

Michael I. Gottfried
Elkins Kalt Weintraub Reuben Gartside LLP Direct Dial: (310) 746-4407 | Main: (310) 746-4400 | Fax: (310) 746-4499 | Email: MGottfried@elkinskalt.com | Web: http://www.elkinskalt.com

# **EXHIBIT C**

(November 5 Email)

107055844.2

**Ashley Champion**

**Subject:** FW: Acron 2 Porsche Drive Mezzco, LLC
**Attachments:** 2. Loan Agreement (mezz loan) - Civitas Kimpton ATL (fully executed).pdf; 4. Pledge and Security Agreement (mezz loan) – Civitas Kimpton ATL (fully executed).pdf; May 1, 2025 Seyfarth Letter re Notice of Listing of Property for Sale(5637024.1).pdf; Kimpton Overland Hotel - May 12, 2025 Response to Borrower and NOD Letter(5636758.6).pdf; Kimpton Overland Hotel - August 1, 2025 NOD Letter to Mezz Borrower & Other Parties(5686575.5).pdf

---

**From:** Michael I. Gottfried
**Sent:** Wednesday, November 5, 2025 5:00 PM
**To:** Michael Bargar <mbargar@rlkglaw.com>
**Cc:** Greg Hays <ghays@haysconsulting.net>; Shai N. Halbe <SHalbe@elkinskalt.com>; Daniel B. Abram <DAbram@elkinskalt.com>
**Subject:** Acron 2 Porsche Drive Mezzco, LLC

Mike,

Thanks for your email of October 31ˢᵗ in which you told me that the Trustee is considering various ways in which he could sell the hotel including the possibility that he could "vote the membership interest of the subsidiary . . . to sell the underlying collateral." For the reasons provided below, we do not believe that the Trustee could sell the hotel absent my client's consent which it will not agree to provide. The need to obtain my client's consent to the sale is based on the following:

There are clear restrictions in the mezz loan documents on the ability of ACRON 2 Porsche Drive Mezzco LLC (the mezz borrower defined as "**Borrower**" in the mezz loan agreement) and ACRON 2 Porsche Drive, Atlanta LLC (the senior/mortgage borrower defined as "**Owner**" in the mezz loan agreement) to market and sell the hotel without first obtaining the prior approval of both CAI Overland Lender, LLC (the mezz lender defined as "**Lender**" in the mezz loan agreement) and KHRE SMA Funding, LLC (the senior/mortgage lender defined as "**Senior Lender**" in the mezz loan agreement), as explained in sections A. & B. below.

Moreover, after an Event of Default has occurred, the mezz lender has voting and consent rights regarding the membership interest of Owner (as the pledged entity) pursuant to and in accordance with the attached Pledge and Security Agreement, between mezz borrower (as the "Pledgor" party therein) and mezz lender (the "**Mezz Pledge Agreement**"), as explained in Section C. below.

**A.    Prohibition on Entering into Listing Agreement without Prior Approval from Mezz Lender**

Section 7.1.10 (Management and Leasing of the Property) of the Mezz Loan Agreement (a copy of which is attached), provides, in part, the following covenant made by mezz borrower and each of the Guarantors in subsection (c): "***Borrower shall not (and shall not cause Owner to) enter into***, *amend or modify **any listing agreement or brokerage agreement for the Property** (a "**Listing Agreement**") **without Lender's prior written consent**; provided, however, Lender's prior written consent shall not be required, and Borrower shall only be required to provide 10 days' prior written notice to Lender, if any Listing Agreement expressly provides that such agreement shall automatically terminate (at no cost to Owner or Borrower)*

*if the membership interests in Owner is transferred to a lender of Owner's owner or to another party acquiring the membership interests in Owner in connection with an enforcement action against Owner's owner (by foreclosure, assignment-in-lieu of foreclosure or otherwise).*" (emphasis added)

In a letter to our law firm, dated May 1, 2025, from Seyfarth Shaw LLP (outside counsel to mezz borrower and senior borrower) (the "**Seyfarth Letter**"), the Seyfarth attorney stated that "Borrower" (defined collectively in such letter as the "Mezzanine Borrower" and "Senior Borrower") "entered into that certain Exclusive Listing Agreement, dated April 23, 2025 (the "Listing Agreement") with Berkadia Real Estate Advisors LLC ("Broker")...to market and sell the Property". A copy of the fully executed Listing Agreement was attached to such letter.

The Seyfarth Letter, including the enclosed Listing Agreement, ignored the Section 7.1.10(c) covenant. Such violation of the mezz loan agreement was undertaken without mezz borrower first formally requesting mezz lender's prior written consent to same, which was required. Moreover, the Section 7.1.10(c) exception had not been satisfied as the Listing Agreement with Berkadia didn't provide for automatic termination "*(at no cost to Owner or Borrower) if the membership interests in Owner is transferred to a lender of Owner's owner or to another party acquiring the membership interests in Owner in connection with an enforcement action against Owner's owner (by foreclosure, assignment-in-lieu of foreclosure or otherwise)*". Instead, the term of the Listing Agreement provided to us runs from April 23, 2025, through midnight on November 1, 2025, and there is a "Break-up Fee" payable to Berkadia even if ACRON merely withdraws the Property from the market during either the "Term" or "Post-Term Period".

A copy of the Seyfarth Letter, as well as our law firm's two response letters (dated May 12, 2025 & August 1, 2025), on behalf of mezz lender, are attached.

In our firm's May 12th letter, please see Section C (beginning on page 4), which covers the aforementioned issues with ACRON entering into the listing agreement, and the prohibition on ACRON selling the property without the prior approval from mezz lender & senior lender (which latter point will be discussed in the next Section B. below). Also, in our August 1st letter, please see Sections B & C (from pages 6 – 8).

## B.    Prohibition on Selling the Property without Prior Approval from Senior Lender & Mezz Lender

Additionally, Pursuant to Section 8.1 (Transfer, Encumbrance and Change of Control Prohibition Regarding Owner and Property) of the mezz loan agreement, except as provided in Article 8 (with respect to certain permitted transfers which are not applicable in this case), "***without Senior Lender's and Lender's prior written consent, Borrower shall not, and shall not permit Owner to, (i) directly or indirectly sell, assign, convey, transfer or otherwise dispose of the Property or other Collateral or any portion thereof or any direct or indirect legal, beneficial or equitable interest in all or any part of the Property or Senior Collateral***..." (emphasis added)

Moreover, Section 5.2.10(a) (Transfers) of the Senior Loan Agreement (which was last amended and restated pursuant to Section 13 of the Third Amendment to Senior Loan Agreement) provides that "*Except for the Mezzanine Pledge Agreement, **Borrower shall not sell**, convey, mortgage, grant, bargain, encumber, pledge, assign, grant options with respect to, or otherwise transfer or dispose of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) **the Property** or any part thereof or any legal or beneficial interest therein or permit a Sale or Pledge of an interest in any Restricted Party (collectively, a "Transfer"), other than pursuant to Leases of space in the Improvements to tenants, **without the prior written consent of***

***Lender*.**" (emphasis added) The term "Borrower" refers to the senior loan borrower and "Lender" refers to the senior loan lender in the foregoing excerpt and otherwise in the Senior Loan Agreement. Under Section 8.1(a)(v) of the Senior Loan Agreement, it is an "Event of Default" thereunder if "*Borrower transfers or encumbers any portion of any of the Property in violation of the provisions of Section 5.2.10 hereof or Section 8 of the Security Instrument;*" In connection with the foregoing, note that it is an immediate Event of Default under Section 10.1.24 of the Mezz Loan Agreement if a "*Senior Event of Default has occurred that is not waived by Senior Lender…*"

Also note Section 6(d) (No Impairment of the Collateral) of the Mezz Pledge Agreement (as defined above) which provides that mezz borrower (as the "Pledgor" party) "*shall not assign, transfer, release, subordinate, terminate, encumber, or cancel the Pledged Interests in whole or in part, or give any consent under, any of the instruments, documents, or agreements constituting the Collateral or exercise any of the rights, options or interests of Pledgor except as permitted under the Loan Documents*." In Section 6(g) (Duty to Cause Owner Compliance), subsection (iii) of the Mezz Pledge Agreement, the Pledgor party shall "*Comply, and cause Owner to comply, with all terms, covenants, and agreements contained in the Senior Loan Documents…*" As noted above, mezz borrower's pursuit of a sale of the Property without Senior Lender's consent is a violation of such Mezz Pledge Agreement provision.

C.    **Mezz Lender's Right to Vote the Membership Interest of Owner After an Event of Default**

Section 9 (Remedies) of the Mezz Pledge Agreement sets forth the scope of the various remedies at mezz lender's disposal in respect of mezz borrower's pledge of its membership interests in Owner and mezz borrower's defaults.  Section 9(b) provides, in part, that "*From and after an Event of Default, Lender shall have the right to enforce the Pledgor Obligations to the maximum extent permitted by applicable law*." Notably, Section 9(b) also states, in part, that "*Pledgor grants Lender the following: (i) <u>All voting rights, consent rights, and other powers of ownership pertaining to the Pledged Interests and other Collateral as if Lender were the sole and absolute owner thereof</u>…*" (emphasis added)

Furthermore, Section 7(g) of the Mezz Pledge Agreement clearly states that "*During such time an Event of Default exists, the revocable license granted under this Section 7(g) shall automatically be revoked, and thereafter, Pledgor shall take no action nor exercise any rights under the Owner Charter Documents <u>without the prior written consent of Lender</u> in each instance*." (emphasis added)

The aforementioned provisions in the Mezz Pledge Agreement clearly set forth the mezz lender's voting and consent rights during an Event of Default, which is the case now considering that mezz borrower is guilty of a litany of continuing Events of Default which our firm has tracked and extensively documented in various notice of default letters previously delivered to the mezz borrower, its counsel and other parties.

Based on the above, it is our position that <u>even if the Trustee can vote the membership interest of the subsidiary</u>, he could not sell the hotel absent the consent of my client, and my client has not and will not provide such consent.

Separately, pursuant to our telephone conversation, you asked if my client would provide the Trustee with a carve-out to move forward with the sale process.  While we understand why the Trustee would request a carve-out, particularly as we believe it to be highly unlikely that administrative claims would be paid absent such carve-out, my client is unwilling to provide it.  Again, my client does not believe that there would be any benefit to the bankruptcy estate for the Trustee to move forward with a sale (of the equity or the hotel), and as mentioned, my client already has expended a great deal of time and money to move forward with a foreclosure sale which was thwarted by the Debtor's bad faith bankruptcy filing.

I would request that the Trustee reconsider his position to stipulate to relief from the automatic stay.

Thank you for your consideration of the above.

Best regards,
Michael

**Michael I. Gottfried**
MGottfried@elkinskalt.com
Direct Dial: (310) 746-4407 | Fax: (310) 746-4499

Elkins Kalt Weintraub Reuben Gartside LLP
10345 W. Olympic Boulevard, Los Angeles CA 90064
www.elkinskalt.com